UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

| | | |
|---|---|---|
| BC MEDIA FUNDING COMPANY II and MEDIA FUNDING COMPANY, | : | **ECF CASE** |
| | : | 08-CV-06228 (RPP) (RLE) |
| | : | |
| Plaintiffs, | : | **DECLARATION OF** |
| | : | **KARA L. GORYCKI** |
| -against- | : | |
| | : | |
| FRANK LAZAUSKAS, MICHAEL L. METTER, | : | |
| LEONARD F. MOSCATI and B. MICHAEL PISANI, | : | |
| Defendants. | : | |
| | : | |

-----------------------------------------------------------------------x

Kara L. Gorycki declares under penalty of perjury that the following is true and correct:

1.      I am an associate of the firm of Winston & Strawn LLP and counsel for Plaintiffs BC Media Funding Company II ("BCMF") and Media Funding Company ("MFC") (collectively, "Plaintiffs").

2.      Plaintiffs commenced this action against defendants Frank Lazauskas, Michael L. Metter, Leonard F. Moscati and B. Michael Pisani (collectively "Defendants") by serving and filing a motion for summary judgment in lieu of complaint in New York State Supreme Court, New York County, pursuant to New York's Civil Practice Law and Rules ("CPLR") § 3213. (Annexed hereto as Exhibit 1 are true and correct copies of the moving papers filed by Plaintiffs in the New York Supreme Court, New York County).

3.      Included in Plaintiffs' moving papers was the Affidavit of Timothy Olson ("Olson Affidavit"), sworn to on June 5, 2008.  The exhibits to the Olson Affidavit were not correctly presented — one document was inadvertently included as Exhibit H, and the two letters referenced in paragraph 12 were inadvertently omitted from the filing.  Accordingly, Plaintiffs have annexed hereto as Exhibit 2 a correct copy of the Olson Affidavit and exhibits.

4.      Defendants removed this action to this Court by filing and serving a

Notice of Removal on July 9, 2008.  (Annexed hereto as Exhibit 3 is a true and correct copy of

Defendants' Notice of Removal.)

Dated: July 15, 2008
        New York, New York


                                        _____
                                                    /S/
                                        KARA GORYCKI

UCS-840(REV 1/2000)

## REQUEST FOR JUDICIAL INTERVENTION

| | For Clerk Only |
|---|---|
| SUPREME COURT, NEW YORK COUNTY | |
| INDEX NO. 08-601724 DATE PURCHASED: June 9, 2008 | |
| PLAINTIFF(S): BC Media Funding Company II and Media Funding Company | IAS entry date |
| | |
| DEFENDANT(S): Frank Lazauskas, Michael L. Metter, Leonard F. Moscati and B. Michael Pisani | Judge Assigned |
| RECEIVED JUL 3 2008 | |
| | RJI Date |

Date issue joined: N/A    Has a summons been served (Y/N):    [ ]Yes    [X]No

RECEIVED
NYS SUPREME COURT - CIVIL
JUL 0 3 2008
COUNTY NEW YORK
COUNTY CLERK'S OFFICE

NATURE OF JUDICIAL INTERVENTION (Check ONE box only AND enter information)

[ ] Request for preliminary conference

[ ] Note of issue and/or certificate of
    readiness

[X] Notice of motion (return date:_____,
2008)
    Relief sought: Summary Judgment in Lieu of
Complaint

[ ] Order to show cause
    (clerk enter return Date:_____)
    Relief sought

[ ] Other ex parte application (specify:
    _____)
[ ] Notice of petition (return date:_____)
    Relief sought _____

[ ] Notice of medical or dental malpractice
action (specify:_____)

[ ] Statement of net worth

[ ] Writ of habeas corpus

[ ] Other (specify):

**NATURE OF ACTION OR PROCEEDING** (Check ONE box only)

| MATRIMONIAL | | | | |
|---|---|---|---|---|
| [ ] Contested | -CM | [ ] Dental | | -DM |
| [ ] Uncontested | -UM | [ ] *Other Professional | | -OPM |
| | | [ ] Motor Vehicle | | -MV |
| COMMERCIAL | | [ ] *Products Liability | | -PL |
| [X] Contract | -CONT | | | |
| [ ] Corporate | -CORP | [ ] Environmental | | -EN |
| [ ] Insurance (where insurer is a | | [ ] Asbestos | | -ASB |
| party, except arbitration) | -INS | [ ] Breast Implant | | -BI |
| [ ] UCC (including sales, negotiable | -UCC | [ ] *Other Negligence | | -OTN |
| instruments) | | | | |
| [ ] *Other Commercial | -OC | [ ] *Other Tort (including | | |
| | | intentional) | | -OT |

| REAL PROPERTY | | SPECIAL PROCEEDINGS | |
|---|---|---|---|
| [ ] Tax Certiorari | -TAX | [ ] Art. 75 (Arbitration) | -ART75 |
| [ ] Foreclosure | -FOR | [ ] Art. 77 (Trusts) | -ART77 |
| [ ] Condemnation | -COND | [ ] Art. 78 | -ART78 |
| [ ] Landlord/Tenant | -LT | [ ] Election Law | -ELEC |
| [ ] *Other Real Property | -ORP | [ ] Guardianship (MHL Art. 81) | -GUARD81 |
| | | [ ] *Other Mental Hygiene | -MHYG |

| OTHER MATTERS | | | |
|---|---|---|---|
| [ ] *_____ | -OTH | [ ] *Other Special Proceeding | -OSP |

* If asterisk used, please specify.

TORTS
Malpractice
[ ] Medical/Podiatric    -MM

Check "YES" or "NO" for each of the following questions:

Is this action/proceeding against a

| YES | NO | | YES | NO | |
|-----|-----|-----|-----|-----|-----|
| [ ] | [X] | Municipality: | [ ] | [X] | Public Authority: |
| | | (Specify_____) | | | (Specify_____) |

| YES | NO | |
|-----|-----|-----|
| [ ] | [X] | Does this action/proceeding seek equitable relief? |
| [ ] | [X] | Does this action/proceeding seek recovery for personal injury? |
| [ ] | [X] | Does this action/proceeding seek recovery for property damage? |

Pre-Note Time Frames:
(This applies to all cases except contested matrimonial and tax certiorari cases)

Estimated time period for case to be ready for trial (from filing of RJI to filing of Note of Issue):

    X Expedited: 0-8 months        _ Standard: 9-12 months        _ Complex: 13-15 months

Contested Matrimonial Cases Only: (Check and give date)

    Has summons been served?            _ No      _ Yes, Date_____

    Was a Notice of No Necessity filed?  _ No      _ Yes, Date_____

ATTORNEY(S) FOR PLAINTIFF(S):

| Self Rep.* | Name | Address | Phone # |
|-----|------|---------|---------|
| • | Anthony DiSarro, Kara Gorycki, Winston & Strawn LLP | 200 Park Avenue New York, NY 10166 | 212-294-6700 |

ATTORNEY(S) FOR DEFENDANT(S):

| Self Rep.* | Name | Address | Phone # |
|-----|------|---------|---------|
| • | | | |

*Self Represented: parties representing themselves, without an attorney, should check the "Self Rep." box and enter their name, address, and phone # in the space provided above for attorneys.

INSURANCE CARRIERS: _____
N/A

RELATED CASES: (IF NONE, write "NONE" below)

| Title | Index # | Court | Nature of Relationship |
|-------|---------|-------|------------------------|
| None | | | |

    I AFFIRM UNDER PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.

Dated:  June 9, 20.;                    _____
                                        (SIGNATURE)


                                        Anthony DiSarro '

                                        (PRINT OR TYPE NAME)
                                                    '
                                        ATTORNEY FOR
                                        Plaintiffs BC Media Funding Company II and Media Funding Company

        ATTACH RIDER SHEET IF NECESSARY TO PROVIDE REQUIRED INFORMATION

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------ x
BC MEDIA FUNDING COMPANY II and MEDIA      :
FUNDING COMPANY,

                  Plaintiffs,      :

            -against-      :

FRANK LAZAUSKAS, MICHAEL L. METTER,      :
LEONARD F. MOSCATI and B. MICHAEL PISANI,

                        :

            Defendants.      :

------------------------------------------------------------------ x

RECEIVED

JUL 3 2008

IAS MOTION SUPPORT OFFICE
NYS SUPREME COURT · CIVIL

Index No. 08-601 724

**STATEMENT IN SUPPORT
OF ASSIGNMENT OF CASE
TO THE COMMERCIAL
DIVISION**

ANTHONY DISARRO, Esq., counsel for BC Media Funding Company II and Media Funding Company, plaintiffs in this matter ("Plaintiffs"), submits this Statement and the accompanying copy of the pleadings, pursuant to Section 202.70(d)(2) of the Uniform Rules for the Trial Courts, in support of Plaintiffs' request for the assignment of this matter to the Commercial Division of this court.

1.     I have reviewed the standards for assignment of cases to the Commercial Division set forth in Section 202.70. This case meets those standards. I therefore request that this case be assigned to the Division.

2.     The sums at issue in this case (exclusive of punitive damages, interest, costs, disbursements, and counsel fees claimed) are in excess of the monetary threshold of the Division in this county as set out in Subdivision (a) of said Section in that Plaintiffs are seeking, at a minimum, damages of $5,418,763.15.

3.     This case falls within the standards set out in Subdivision (b) of Section 202.70 in that the principal claim is one for breach of contract arising out of a financing agreement.

4.   In view of the foregoing, Plaintiffs submit that it is proper to assign this matter to the Commercial Division of this court.

Dated: New York, New York
       June 9, 2008

                                        WINSTON & STRAWN LLP

                                        By: _____
                                            Anthony DiSarro

                                        200 Park Avenue
                                        New York, New York 10166
                                        (212) 294-6700
                                        llerner@winston.com

                                        *Attorney for Plaintiffs*
                                        *BC Media Funding Company II and*
                                        *Media Funding Company*

# R E C E I P T

## COUNTY CLERK
## NEW YORK COUNTY

009635

**NORMAN GOODMAN**
COUNTY CLERK AND CLERK OF
THE SUPREME COURT

160

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x
BC MEDIA FUNDING COMPANY II and MEDIA :
FUNDING COMPANY,                     :
                                     :      Index No. 08- 601724
               Plaintiffs,           :      Date of filing: June 9, 2008
                                     :
                                     :      **SUMMONS**
          -against-                  :
                                     :
FRANK LAZAUSKAS, MICHAEL L. METTER,  :
LEONARD F. MUSCASTI and B. MICHAEL PISANI, :
               Defendants.           :
                                     :
------------------------------------------------------------------x

**TO THE ABOVE NAMED DEFENDANTS:**

      **YOU ARE HEREBY SUMMONED** and required to submit to Plaintiffs'

attorney at the address stated below, answering papers on this motion within the time provided in

the notice of motion annexed hereto. If you fail to submit answering papers, summary judgment

will be taken against you by default for the relief demanded in the notice of motion.

      The action will be heard in the Supreme Court of the State of New York, County

of New York. This action is brought in the County of New York because it is the location of

Plaintiff BC Media Company II's principal place of business, 10 Rockefeller Plaza, New York,

New York, 10020, and because this venue was agreed to by Plaintiffs and Defendants as the

appropriate forum for litigation between them.

Dated: New York, New York
      June 9, 2008

Respectfully submitted,

WINSTON & STRAWN LLP

By: _____
    Anthony DiSarro
    Kara L. Gorycki
    200 Park Avenue
    New York, New York 10166-4193
    (212) 294-6700
    (212) 294-4700 (facsimile)
    adisarro@winston.com
    kgorycki@winston.com

*Attorneys for Plaintiffs*
*BC Media Funding Company II and*
*Media Funding Company*

TO:    Frank Lazauskas
        1490 Dayton Avenue
        Greenwich, CT 06830

        Michael L. Metter
        One Tinker Lane
        Greenwich, CT 06830

        Leonard F. Moscati
        41 Richmond Hill Road
        Greenwich, CT 06830

        B. Michael Pisani
        44 Lake Road
        Short Hills, NJ 07078

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------

RECEIVED

JUL 3  2008

IAS MOTION SUPPORT OFFICE
NYS SUPK..M...  COURT  CIVIL

BC MEDIA FUNDING COMPANY II and MEDIA
FUNDING COMPANY,

               Plaintiffs,

           -against-

FRANK LAZAUSKAS, MICHAEL L. METTER,
LEONARD F. MOSCATI and B. MICHAEL PISANI,

               Defendants.

--------------------------------------------------------------------x

Index No. 08-601734

**NOTICE OF MOTION
FOR SUMMARY
JUDGMENT IN LIEU OF
COMPLAINT**

PLEASE TAKE NOTICE that upon the summons dated June 9, 2008, the annexed Affidavit of Timothy P. Olson, sworn to on June 6, 2008, together with the exhibits annexed thereto, and for the reasons set forth in the Memorandum of Law In Support of Plaintiffs' Motion for Summary Judgment, BC Media Funding Company II ("BCMF") and Media Funding Company ("MFC") (collectively "Plaintiffs") will move this Court, at Room 130 of the Courthouse located at 60 Centre Street, New York, New York, on August 8, 2008 at 9:30 a.m., for an Order pursuant to CPLR 3213, granting Plaintiffs' motion for summary judgment in lieu of complaint and entering judgment in favor of Plaintiffs and against each of the Defendants, jointly and severally, pursuant to the terms of the personal guarantees of each Defendant, each dated November 13, 2006, for the principal sum of $5,418,763.15, with interest thereon, together with reasonable attorneys' fees and the costs and disbursements of this action, upon the ground that this action is based upon instruments for the payment of money only and that there are no defenses to the action, and granting such other and further relief as this Court may deem just and proper.

PLEASE TAKE FURTHER NOTICE that in accordance with CPLR 3213, answering papers, if any, must be served upon the undersigned no later than ten (10) days prior to the return date of this motion.

Dated: New York, New York
      June 9, 2008

Respectfully submitted,

WINSTON & STRAWN LLP

By:_____
    Anthony DiSarro
    Kara L. Gorycki
    200 Park Avenue
    New York, New York 10166-4193
    (212) 294-6700
    (212) 294-4700 (facsimile)
    adisarro@winston.com
    kgorycki@winston.com

*Attorneys for BC Media Funding
Company II and Media Funding
Company*

TO:    Frank Lazauskas
      1490 Dayton Avenue
      Greenwich, CT 06830

      Michael L. Metter
      One Tinker Lane
      Greenwich, CT 06830

      Leonard F. Moscati
      41 Richmond Hill Road
      Greenwich, CT 06830

      B. Michael Pisani
      44 Lake Road
      Short Hills, NJ 07078

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------x

BC MEDIA FUNDING COMPANY II and MEDIA
FUNDING COMPANY,

                             Plaintiffs,

                -against-

FRANK LAZAUSKAS, MICHAEL L. METTER,
LEONARD F. MOSCATI and B. MICHAEL PISANI,

                            Defendants.

-----------------------------------------------------------------------x

INDEX No.: 08-601724

**AFFIDAVIT OF**
**TIMOTHY P. OLSON**

STATE OF SOUTH DAKOTA    )
                             ) ss.:
COUNTY OF MINNEHAHA      )

         TIMOTHY P. OLSON, being duly sworn, deposes and says:

        1.    I am Managing Director and General Counsel of Barker Capital, LLC

("Barker Capital"), a New York limited liability company with its principal place of business

located at 10 Rockefeller Plaza, New York, New York.  Barker Capital and BC Media Funding

Company II ("BCMF"), a Delaware limited liability company with its principal place of business

located at 10 Rockefeller Plaza, New York, New York, are under common control.  I have been

authorized by BCMF to submit this affidavit.  I make this affidavit, which is based on personal

knowledge, in support of the motion for summary judgment by plaintiffs, BCMF and Media

Funding Company ("MFC" and, together with BCMF, "Plaintiffs").

        2.    BCMF is the agent for MFC with respect to a Financing Agreement, dated

as of November 13, 2006 (the "Financing Agreement"), between MFC, as lender, and

BusinessTalkradio.net, Inc. ("BTR"), as borrower. (Attached hereto as Exhibit A is a true and correct copy of the Financing Agreement).

3. MCF is a Delaware limited liability company engaged in the business of providing financing to entities engaged in the media business. BTR is a Delaware corporation engaged in the media business; specifically it owns and operates two radio networks and at least three FCC licensed AM radio stations in three major markets. Defendant Michael L. Metter is President and CEO of BTR.

4. Pursuant to the Financing Agreement, MFC agreed to extend term loans to BTR in the aggregate principal amount of $5.5 million. The term loans were secured by a lien on all of BTR's assets in favor of BCMF, as MFC's agent, which is set forth in a Security Agreement, dated November 13, 2006. (Attached hereto as Exhibit B is a true and correct copy of the Security Agreement).

5. In further protection to MFC in the event of BTR's non-payment, each of the Defendants was required to and did execute an "irrevocable, absolute and unconditional" personal guarantee of all amounts owed by BTR under the Financing Agreement. (Attached hereto as Exhibits C, D, E and F respectively, are true and correct copies of the guarantees, dated as of November 13, 2006, by Frank Lazauskas, Michael L. Metter, Leonard F. Moscati and B. Michael Pisani (together, the "Individual Guarantees")).

6. Each of the Individual Guarantees provides that the Guarantor shall pay all sums payable by BTR under the Financing Agreement "when due, no matter how the same shall become due." (Section 1(a) and (c)). The Individual Guarantees are unconditional. So long as BTR is in default under the Financing Agreement, no action or notice is required to obligate the Guarantors to pay amounts owed by BTR under the Financing Agreement. (Section 2).

2

7.    BTR borrowed significant sums under the Financing Agreement. Indeed, as of June 2, 2008, BTR owes Plaintiffs an amount that is no less than $5,418,763.15 as a result of such borrowing.

8.    As of December 28, 2007, as a result of certain events of default that occurred under the Financing Agreement, BTR, BCMF and MFC, entered into a Forbearance Agreement (Attached hereto as Exhibit G is a true and correct copy of the Forbearance Agreement). Pursuant to the Forbearance Agreement, BTR agreed and acknowledged that "Events of Default" existed under the Financing Agreement (the "Existing Events of Default") and BCMF and MFC agreed to forbear from exercising their rights under the Financing Agreement for a limited period of time as a result of those Existing Events of Default; provided that BTR complied with the terms of the Forbearance Agreement. (Forbearance Agreement, Recitals and Section 3.01). By the terms of the Forbearance Agreement, such limited forbearance period expired no later than March 31, 2008, and earlier upon occurrence of a default under the Forbearance Agreement. (Forbearance Agreement, Sections 3.01 and 1.02).

9.    . On April 24, 2008, BCMF sent the Defendants a written letter declaring that BTR repeatedly had failed to satisfy its covenants under the Financing Agreement. Specifically, BTR had breached several of its covenants set forth in the Financing Agreement by, among other failures, failing to achieve certain operating performance metrics, to meet certain financial commitments under the Financing Agreement, and to provide reports of certain events required by the Financing Agreement. Each violation of the contractual covenants constituted an independent "Event of Default" under the Financing Agreement. The letter indicated to the Defendants that, unless BTR took immediate steps to pay in full all "Obligations" outstanding under the Financing Agreement, BCMF and MCF would take such steps they deemed necessary

3

to enforce their rights under the Financing Agreement. (Attached hereto as Exhibit H is a true and correct copy of such correspondence from BCMF to BTR).

10.    On May 6, 2008, BTR provided BCMF certain officer certificates required under the Financing Agreement and executed by Defendant Michael L. Metter for the quarter ending March 31, 2008 and the month ending March 31, 2008 (together, the "March Officer Certificates"). (Attached hereto as Exhibit I is a true and correct copy of the March Officer Certificates). Thereafter, on May 14, 2008, BTR provided BCMF a certain officer certificate required under the Financing Agreement and executed by Defendant Michael L. Metter for the month ending April 30, 2008 (the "April Officer Certificate"). (Attached hereto as Exhibit J is a true and correct copy of the April Officer Certificate). As certified as correct by Defendant Michael L. Metter, the March Officer Certificates and the April Officer Certificate explicitly detail various Events of Defaults that exist under the Financing Agreement as a result of BTR's action or inaction. (See, e.g., Exhibit J (indicating that the "Fixed Charge Coverage Ratio for the twelve-month period ending April 30, 2008 did not meet the minimum required under the Financing Agreement)).

11.    Despite BTR's prior agreement and acknowledgement in the Forbearance Agreement that Events of Default existed under the Financing Agreement and Defendant Michael L. Metter's certification as to the existence of various Events of Defaults under the Financing Agreement, BTR has refused to pay interest with respect to its obligations under the Financing Agreement at the Default Rate as it is required to do under the Financing Agreement, which resulted in an independent and separate Event of Default under the Financing Agreement.

12.    In addition, in a May 16, 2008, written letter from BTR's attorneys, just two days following the certification from BTR's President and CEO detailing the events of

4

default and after BTR had agreed and acknowledged in the Forbearance Agreement that Events of Default existed under the Financing Agreement, BTR denied the existence of any events of default under the Financing Agreement. (Attached hereto as Exhibit K is a true and correct copy of such correspondence from BTR's attorney). On May 20, 2008, BCMF responded to the May 16, 2008, letter to point out that by BTR's own admissions in the March Officer Certificates and the April Officer Certificate, events of default plainly existed under the Financing Agreement and to reserve expressly BCMF's and MFC's rights under the Financing Agreement. (Attached hereto as Exhibit L is a true and correct copy of such correspondence to BTR's attorney). BTR's attorneys never responded to BCMF's letter of May 20, 2008.

13.     In light of BTR's numerous events of default and failure to pay, among other things, the default interest required under the Financing Agreement, BCMF commenced efforts to exercise Plaintiffs' rights to foreclose upon collateral under the Security Agreement and to enforce the Individual Guarantees.

14.     To date, Defendants have failed to make payment in accordance with their obligations under the Individual Guarantees.

15.     There is no defense to liability of the Defendants under the Individual Guarantees. The Individual Guarantees are "irrevocable, absolute and unconditional." BTR has defaulted under the Financing Agreement, and thus each Defendant is obligated to pay the total amount due from BTR under the Financing Agreement.

16.    Plaintiffs are entitled to the entry of summary judgment against each Defendant, jointly and severally, in the amount of no less than $5,418,763.15, which amount continues to accrue interest and other expenses, such as attorneys' fees, under the terms of the Financing Agreement.

TIMOTHY P. OLSON

Sworn to before me this 5th
day of June, 2008

Notary Public

# Exhibit A

FINANCING AGREEMENT

Dated as of November ___, 2006

by and among

BUSINESSTALKRADIO.NET, INC.
as Borrower,


MEDIA FUNDING COMPANY, LLC,
as Lender,
and

BC MEDIA FUNDING COMPANY II, LLC,
as Agent

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS; CERTAIN TERMS ........................................................ 1
    Section 1.01  Definitions.......................................................................................... 1
    Section 1.02  Terms Generally............................................................................... 22
    Section 1.03  Accounting and Other Terms........................................................... 22
    Section 1.04  Time References............................................................................... 22

ARTICLE II THE TERM LOAN ........................................................................... 23
    Section 2.01  Commitment. .................................................................................... 23
    Section 2.02  Making the Term Loan. .................................................................... 23
    Section 2.03  Repayment of Term Loan; Evidence of Debt. ................................. 24
    Section 2.04  Interest.............................................................................................. 25
    Section 2.05  Reduction of Commitment; Prepayment of Term Loan. .................. 25
    Section 2.06  Fees. ................................................................................................. 27
    Section 2.07  [Intentionally Omitted] ...............................**Error! Bookmark not defined.**
    Section 2.08  Taxes................................................................................................ 27

ARTICLE III FEES, PAYMENTS AND OTHER COMPENSATION ................... 28
    Section 3.01  Audit and Collateral Monitoring Fees ............................................ 28
    Section 3.02  Payments; Computations and Statements. ...................................... 29
    Section 3.03  Apportionment of Payments ............................................................ 29
    Section 3.04  Increased Costs and Reduced Return............................................... 30
    Section 3.05  Joint and Several Liability of the Credit Parties. ............................ 31

ARTICLE IV CONDITIONS TO TERM LOAN .................................................... 32
    Section 4.01  Conditions Precedent ....................................................................... 32
    Section 4.02  Conditions to Each Extension of Credit........................................... 33

ARTICLE V REPRESENTATIONS AND WARRANTIES .................................... 33
    Section 5.01  Representations and Warranties....................................................... 33

ARTICLE VI COVENANTS OF THE CREDIT PARTIES ................................... 33
    Section 6.01  Affirmative Covenants..................................................................... 33
    Section 6.02  Negative Covenants ......................................................................... 33
    Section 6.03  Financial Covenants......................................................................... 33
    Section 6.04  Individual Financial Covenants ....................................................... 33

ARTICLE VII MANAGEMENT, COLLECTION AND STATUS OF ACCOUNTS
RECEIVABLE AND OTHER COLLATERAL ....................................................... 33
    Section 7.01  Management of Collateral................................................................ 33
    Section 7.02  Working Capital Control Account .................................................... 33

Section 7.03    Collateral Custodian......................................................................33
Section 7.04    Deposit Accounts............................................................................33

ARTICLE VIII EVENTS OF DEFAULT                                           33
Section 8.01    Events of Default ...........................................................................33
Section 8.02    FCC Matters...................................................................................33

ARTICLE IX AGENT                                                        33
Section 9.01    Appointment ..................................................................................33
Section 9.02    Nature of Duties ............................................................................33
Section 9.03    Rights, Exculpation, Etc ...............................................................33
Section 9.04    Reliance..........................................................................................33
Section 9.05    Indemnification..............................................................................33
Section 9.06    Agent Individually ........................................................................33
Section 9.07    Successor Agent.............................................................................33
Section 9.08    Collateral Matters..........................................................................33
Section 9.09    Agency for Perfection ...................................................................33

ARTICLE X MISCELLANEOUS                                                 33
Section 10.01    Notices, Etc..................................................................................33
Section 10.02    Amendments, Etc.........................................................................33
Section 10.03    No Waiver; Remedies, Etc...........................................................33
Section 10.04    Expenses; Taxes; Attorneys' Fees ..............................................33
Section 10.05    Right of Set-off ............................................................................33
Section 10.06    Severability ..................................................................................33
Section 10.07    Assignments and Participations ..................................................33
Section 10.08    Counterparts.................................................................................33
Section 10.09    GOVERNING LAW .....................................................................33
Section 10.10    CONSENT TO JURISDICTION; SERVICE OF PROCESS AND
                 VENUE .......................................................................................33
Section 10.11    WAIVER OF JURY TRIAL, ETC ................................................33
Section 10.12    Consent by the Agent and Lender................................................33
Section 10.13    No Party Deemed Drafter ............................................................33
Section 10.14    Reinstatement; Certain Payments ...............................................33
Section 10.15    Indemnification.............................................................................33
Section 10.16    Records .........................................................................................33
Section 10.17    Binding Effect...............................................................................33
Section 10.18    Interest...........................................................................................33
Section 10.19    Confession of Judgment...............................................................33
Section 10.20    Confidentiality ..............................................................................33
Section 10.21    Integration .....................................................................................33

Schedules

| 2.05(a) | Payment Schedule |
| 5.01(c) | Governmental Approvals |
| 5.01(e) | Capitalization |
| 5.01(f) | Litigation |
| 5.01(n) | Broadcast Licenses |
| 5.01(n)(iv) | Actions, Proceedings or Investigation |
| 5.01(o) | Real Property |
| 5.01(r) | Environmental Matters |
| 5.01(s) | Insurance |
| 5.01(t) | Use of Proceeds |
| 5.01(v) | Bank Accounts |
| 5.01(w) | Intellectual Property |
| 5.01(x) | Material Contracts |
| 5.01(cc) | Company Information |
| 5.01(ee) | Change in Collateral; Collateral Records |

Exhibits

| A-2 | Cooperation Guaranty |
| A-3 | Individual Guaranty |
| A-4 | Subsidiary Guaranty |
| B | Security Agreement |
| C | Pledge Agreement |
| D | Intercompany Subordination Agreement |
| E | Control Agreement |
| F | Affiliate Subordination Agreement |
| G | Post-Closing Agreement |

**Schedule 1.01(A)**

**Schedule 2.5(a)**

**Payment Schedule**

**(Attached)**

## FINANCING AGREEMENT

THIS FINANCING AGREEMENT, dated as of November 13, 2006, by and among BusinessTalkradio.net, Inc., a Delaware corporation, (the "*Borrower*") and The Greenwich Broadcasting Corporation, a Connecticut corporation ("*Greenwich*"), The Lifestyle TalkRadio Network, Inc., a Delaware corporation ("*Lifestyle*"), BTR West, Inc., a Nevada corporation ("*BTR West*"), BTR Communications Boston, Inc., a Massachusetts corporation ("*BTR Boston*"), BTR Greenwich, Inc., a Connecticut corporation ("*BTR Connecticut*"), BTR West II, Inc., a Nevada corporation ("*Nevada II*"), BTR Communications Boston II, Inc., a Massachusetts corporation ("*Boston II*", together with Greenwich, Lifestyle, BTR West, BTR Boston, BTR Connecticut and Nevada II, the "*Subsidiary Guarantors*"), Media Funding Company, LLC, a Delaware limited liability company (the "*Lender*"), and BC Media Funding Company II, LLC, a Delaware limited liability company, as agent for the Lender (in such capacity, the "*Agent*").

## RECITALS

**WHEREAS**, the Borrower has requested that the Lender extend credit to the Borrower consisting of term loans in an aggregate amount of $5,500,000. The proceeds of the term loans shall be used to refinance existing indebtedness of the Borrower, for the Acquisitions (as defined below), for general working capital purposes of the Borrower and to pay fees and expenses related to this Agreement. The Lender is willing to extend such credit to the Borrower subject to the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS; CERTAIN TERMS

Section 1.01    <u>Definitions</u>. As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"*Account Debtor*" means each debtor, customer or obligor in any way obligated on or in connection with any Account Receivable.

"*Account Receivable*" means, with respect to any Person, any and all rights of such Person to payment for goods sold and/or services rendered, including accounts, general intangibles and any and all such rights evidenced by chattel paper, instruments or documents, whether due or to become due and whether or not earned by performance, and whether now or hereafter acquired or arising in the future, and any proceeds arising therefrom or relating thereto.

"*Acquisitions*" shall have the meaning specified therefor in <u>Section 2.01(c)</u> [Commitments].

"*Action*" has the meaning specified therefor in Section 10.12 [Consent by the Agent and Lender].

"*Affiliate*" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (i) vote 1% or more of the Capital Stock having ordinary voting power for the election of directors of such Person or (ii) direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Notwithstanding anything herein to the contrary, all Individual Guarantors shall be considered an "*Affiliate*" of the Loan Parties and in no event shall the Agent or Lender be considered an "*Affiliate*" of any Loan Party.

"*Affiliate Subordination Agreement*" means a subordination agreement executed and delivered by Credit Parties and each Guarantor in favor of Agent for the benefit of the Lender, substantially in the form of Exhibit F, as the same may be amended, modified and supplemented from time to time.

"*After Acquired Property*" has the meaning specified therefor in Section 6.01(o) [After Acquired Real Property].

"*Agent*" has the meaning specified therefor in the preamble hereto.

"*Agent Advances*" has the meaning specified therefor in Section 9.08(a) [Collateral Matters].

"*Agent's Account*" means an account at a bank designated by the Agent from time to time as the account into which the Loan Parties shall make all payments to the Agent for the benefit of the Agent and the Lender under this Agreement and the other Loan Documents.

"*Agreement*" means this Financing Agreement, as amended, supplemented or otherwise modified from time to time, including any exhibits and schedules hereto.

"*Applicable Rate*" means, at any time, the lesser of (a) the sum of the Current Rate plus the Payment-in-kind Interest Rate and (b) the Highest Lawful Rate.

"*Authorized Officer*" means, with respect to any Person, the chief executive officer, chief financial officer, president or executive vice president of such Person.

"*Bankruptcy Code*" means the United States Bankruptcy Code (11 U.S.C. § 101, et seq.), as amended, and any successor statute.

"*Becker Loan*" shall mean that certain Promissory Note, dated June 18, 2003, by and between the Borrower and John Becker in the principal amount of $500,000.

"*Board*" means the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" means, with respect to any Person, the board of directors (or comparable managers) of such Person or any committee thereof duly authorized to act on behalf of the board (or such managers).

"**Borrower**" has the meaning specified in the preamble hereto.

"**Broadcast License Subsidiary**" shall mean BTR Connecticut, BTR West, BTR Boston and any other Subsidiary of Borrower that holds a Broadcast License other than Lifestyle.

"**Broadcast Licenses**" means, with respect to any radio station, all licenses, authorizations, permits and approvals issued by the FCC necessary for the lawful operation of such radio station, including any amendments, modifications, consents or additional authorizations issued from time to time.

"**BTR West**" has the meaning specified in the preamble hereto.

"**BTR Boston**" has the meaning specified in the preamble hereto.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required to close.

"**Capital Expenditures**" means for any period, with respect to any Person, the aggregate of all expenditures by such Person and its Subsidiaries for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a consolidated balance sheet of such Person and its Subsidiaries provided that, for purposes of calculating compliance with Section 6.02(g) [Capital Expenditures], provided that the following expenditures shall be excluded, without duplication: (i) expenditures made to restore or replace Property to the condition of such Property immediately prior to any damage, loss, or destruction or condemnation of such Property, to the extent such expenditure is made with, or subsequently reimbursed out of the proceeds received from any Recovery Event, (ii) expenditures made by the Borrower or any of its Subsidiaries constituting an Investment permitted by Section 6.02(e)(ii) [Loans, Advances, Investments, Etc.], (iii) expenditures made by the Borrower of any of its Subsidiaries as a tenant in leasehold improvements, to the extent reimbursed by the landlord and (iv) expenditures made with the proceeds of any Dispositions permitted by clauses (ii)(A) and (ii)(B) of Section 6.02(c) [Fundamental Changes; Dispositions].

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"**Capitalized Lease**" means, with respect to any Person, any lease of real or personal property by such Person as lessee which is (i) required under GAAP to be capitalized on the balance sheet of such Person or (ii) a transaction of a type commonly known as a "*synthetic lease*" (i.e. a lease transaction that is treated as an operating lease for accounting purposes but

with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for Federal income tax purposes).

"*Capitalized Lease Obligations*" means, with respect to any Person, obligations of such Person under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"*Cash Equivalents*" means: (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of one year or less from the date of acquisition issued by any commercial bank organized under the laws of the United States of America or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-1 by Standard and Poor's or P-1 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within nine months from the date of acquisition; and (d) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by Standard and Poor's or A by Moody's.

"*Change of Control*" means each occurrence of any of the following:

(a)    the Individual Guarantors shall cease to beneficially own and of record own and control, directly or indirectly, free and clear of all Liens (other than Liens in favor of Agent), at least fifty percent (50%) of the issued and outstanding Capital Stock of the Borrower;

(b)    Borrower shall cease to directly beneficially and of record own and control, free and clear of all Liens (other than Liens in favor of Agent), one hundred percent (100%) of the issued and outstanding Capital Stock of the Subsidiary Guarantors;

(c)    (i) the Borrower or any of its Subsidiaries consolidates with or merges into another entity or conveys, transfers or leases all or substantially all of its property and assets to another Person, or (ii) any entity consolidates with or merges into the Borrower or any Subsidiary in a transaction pursuant to which the outstanding voting Capital Stock of the Borrower or such Subsidiary is reclassified or changed into or exchanged for cash, securities or other property; or

(d)    at any time, Michael Metter (or a comparable replacement satisfactory to the Agent) shall cease to be involved in the day to day operations and management of the business of the Credit Parties.

"*Closing Fee*" has the meaning specified therefor in Section 2.06(a) [Closing Fees].

"*Collateral*" means all of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by any Person upon which a Lien is granted or purported to be granted by such Person as security for all or any part of the Obligations.

"*Collateral Lease Assignment*" means an agreement made by a Credit Party in favor of the Agent for the benefit of the Lender, collaterally assigning to Agent one or more Leases, securing the Obligations and delivered to the Agent, in form and substance reasonably satisfactory to the Agent, as amended, supplemented or otherwise modified from time to time, including any exhibits and schedules thereto.

"*Communications Act*" means the Communications Act of 1934, as amended.

"*Communications Laws*" means all applicable provisions of (a) the Communications Act, and (b) the rules, regulations, published policies and published decisions promulgated and in effect from time to time (i) under the Communications Act, and (ii) by the FCC.

"*Consolidated EBITDA*" means with respect to any period, the Consolidated Net Income of the Borrower and its Subsidiaries on a consolidated basis (other than Lifestyle) for such period plus, to the extent deducted in determining such Consolidated Net Income for such period, without duplication, Consolidated Net Interest Expense, income tax expense, and depreciation and amortization, in each case determined on a basis consistent with (and accordance with the procedures set forth in) the Independent Accountant Report, and otherwise in accordance with GAAP.

"*Consolidated Net Income*" means, with respect to any Person for any period, the consolidated net income (loss) of such Person and its Subsidiaries for such period, determined on a consolidated basis, but excluding from the determination of Consolidated Net Income (without duplication) (a) any extraordinary or non recurring gains or losses or gains or losses from Dispositions, (b) interest income, (c) income not directly derived from the operation of the Stations or the ownership and leasing of broadcast towers and (d) non-cash income, including, without limitation, from trade or barter, determined on a basis consistent with (and accordance with the procedures set forth in) the Independent Accountant Report, and otherwise in accordance with GAAP.

"*Consolidated Net Interest Expense*" means, with respect to any Person for any period, consolidated gross interest expense of such Person and its Subsidiaries for such period determined on a consolidated basis and in accordance with GAAP (including, without limitation, interest expense paid to Affiliates of such Person), less consolidated interest income for such period determined on a consolidated basis and in accordance with GAAP and including non-cash expenses.

"*Consolidated Rental Expense*" means, for any period, the aggregate amount of all rents paid or payable in cash during such period under all real property leases to which Borrower or any of its Subsidiaries is a party as lessor as determined without duplication on a consolidated basis for Borrower and its Subsidiaries in conformity with GAAP.

"*Consolidated Total Debt*" means, at of any date of determination, the aggregate stated balance sheet amount of all Indebtedness of Borrower and its Subsidiaries, determined on a consolidated basis in accordance with GAAP.

"*Contingent Obligation*" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "*Contingent Obligation*" shall not include any product warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"*Control Agreement*" means a control agreement, in the form of Exhibit E attached hereto, executed and delivered by the Borrower, the Agent, and the applicable securities intermediary with respect to a securities account or a bank with respect to a deposit account, as amended, supplemented or otherwise modified from time to time, including any exhibits and schedules thereto.

"*Cooperation Guaranty*" means the cooperation guaranty made by the Credit Parties and their Affiliates in favor of the Agent for the benefit of the Lender, substantially in the form of Exhibit A-2, as amended, supplemented or otherwise modified from time to time, including any exhibits and schedules thereto.

"*Credit Parties*" means the Borrower and all of its Subsidiaries.

"*Current Interest*" means all interest that has accrued at the Current Rate.

"*Current Interest Amount*" means, as at any date of determination, the aggregate amount of accrued but unpaid interest that has accrued at the Current Rate.

"***Current Rate***" means, at any day, a rate per annum equal to the lesser of (a) the greater of (i) the sum of the Prime Rate in effect on such day plus 5.1% and (ii) seven (7.0%) percent, and (b) the Highest Lawful Rate.

"***Current Value***" shall have the meaning assigned to it in Section 6.01(o) [After Acquired Real Property]

"***Default***" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"***Default Rate***" means the lesser of (a) the sum of the Applicable Rate plus four (4.0%) percent per annum and (b) the Highest Lawful Rate.

"***Disposition***" means any transaction, or series of related transactions, pursuant to which any Person sells, assigns, transfers or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person.

"***Dollar***," "***Dollars***" and the symbol "***$***" each means lawful money of the United States of America.

"***Effective Date***" means the date of this Agreement.

"***Employee Plan***" means an employee benefit plan (other than a Multiemployer Plan) covered by Title IV of ERISA and maintained (or that was maintained at any time during the six (6) calendar years preceding the date of any borrowing hereunder) for employees of any Credit Party or any of its ERISA Affiliates.

"***Environmental Actions***" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter or other communication from any Person or Governmental Authority involving violations of Environmental Laws or Releases of Hazardous Materials (a) from any assets, properties or businesses owned or operated by any Credit Party or any predecessor in interest; (b) from adjoining properties or businesses; or (c) onto any facilities which received Hazardous Materials generated by any Credit Party or any predecessor in interest.

"***Environmental Laws***" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), as such laws may be amended or otherwise modified from time to time, and any other present or future federal, state, local or foreign statute, ordinance, rule, regulation, order, judgment, decree, permit, license or other binding determination of any Governmental Authority imposing liability or establishing standards of conduct for protection of the environment or other government restrictions relating to the protection of the environment or the Release, deposit or migration of any Hazardous Materials into the environment.

"*Environmental Liabilities and Costs*" means all liabilities, monetary obligations, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any Governmental Authority or any third party, and which relate to any environmental condition or a Release of Hazardous Materials from or onto (i) any property presently or formerly owned by any Credit Party or (ii) any facility which received Hazardous Materials generated by any Credit Party.

"*Environmental Lien*" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time. References to sections of ERISA shall be construed also to refer to any successor sections.

"*ERISA Affiliate*" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "*controlled group*" within the meaning of Sections 414(b), (c), (m) and (o) of the Internal Revenue Code.

"*Event of Default*" means any of the events set forth in Section 8.01 [Events of Default] (after the giving of any notice or the passage of any applicable grace period, if any, expressly specified in Section 8.01 [Events of Default]).

"*Excess Cash Flow*" means, with respect to any Person for any period, (a) Consolidated Net Income of such Person for such period, plus (b) all non-cash items of such Person deducted in determining Consolidated Net Income for such period, less (c) the sum of (i) all non-cash items of such Person added to the calculation of Consolidated Net Income for such period, (ii) all scheduled and mandatory cash principal payments on the Term Loan made during such period, and all scheduled cash principal payments on other Indebtedness of such Person during such period to the extent such other Indebtedness is permitted to be incurred, and such payments are permitted to be made, under this Agreement, (iii) the cash portion of Capital Expenditures made by such Person during such period to the extent permitted to be made under this Agreement, and (iv) the excess, if any, of the 30-day moving average of Working Investment at the end of such period (such moving average to be calculated for the 30 days prior to the last day of such period) over the 30-day moving average of Working Investment at the beginning of such period (such moving average to be calculated for the 30 days prior to the last day of such period) (or minus the excess, if any, of 30-day moving average of Working Investment at the beginning of such period over such 30-day moving average of Working Investment at the end of such period).

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Extraordinary Receipts*" means any cash received by any Credit Party not in the ordinary course of business (and not consisting of proceeds described in Sections 2.05(c)(ii) or

2.05(c)(iii) [Mandatory Pre-payments] hereof), including, without limitation, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance (except to the extent applied to repair or replace property as reasonably required by Section 6.01(g) [Maintenance of Properties, Etc.]), (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (e) condemnation awards (and payments in lieu thereof) (except to the extent applied to repair or replace property as reasonably required by Section 6.01(g) [Maintenance of Properties, Etc.]), (f) indemnity payments and (g) any purchase price adjustment received in connection with any purchase agreement other than a refund of a portion of the purchase price actually paid in cash in connection with the New York Acquisitions or the Greenwich Acquisition by Borrower to the sellers thereof.

"*FAA*" means the Federal Aviation Administration or any successor to the functions and powers thereof.

"*FCC*" means the Federal Communications Commission or any successor to the functions and powers thereof.

"*FCC License*" has the meaning set forth in Section 8.01 [Events of Default].

"*Final Maturity Date*" means the date at the end of the applicable month, three (3) years after the Effective Date or such earlier date on which the Term Loan shall become due and payable in accordance with the terms of this Agreement or any of the other Loan Documents.

"*Financial Statements*" means (a) the combined and consolidated balance sheet of the Credit Parties for the Fiscal Year ended December 31, 2005, and the related consolidated statement of operations, shareholders' equity and cash flows for the Fiscal Year then ended, (b) the combined and consolidated balance sheet of the Credit Parties for the Fiscal Quarter ended [June 30, 2006], and the related consolidated statement of operations, shareholders' equity and cash flows for the Fiscal Quarter then ended and (c) the combined and consolidated balance sheet of the Credit Parties for each month since the last Fiscal Quarter, and the related consolidated statement of operations, shareholder's equity and cash flows for such months then ended.

"*Fiscal Quarters*" means the three-month periods ending each March 31, June 30, September 30 and December 31.

"*Fiscal Year*" means the fiscal year of the Credit Parties ending on December 31 of each year.

"*Fixed Charge Coverage Ratio*" shall mean, for any period, the ratio of (x) Consolidated EBITDA for such period to (y) Fixed Charges, for such period, calculated on a rolling 12-month basis beginning as of October 31, 2006 and each month thereafter.

"*Fixed Charges*" shall mean for any period of determination the sum (without duplication) of (i) Consolidated Net Interest Expense, (ii) scheduled principal payments in respect to Consolidated Total Debt, and (iii) Consolidated Rental Expense, all of the following as

determined on a consolidated basis for the Borrower and its Subsidiaries in conformity with GAAP.

"*GAAP*" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis, provided that for the purpose of Section 6.03 [Financial Covenants] hereof and the definitions used therein, "*GAAP*" shall mean generally accepted accounting principles in effect on the date hereof and consistent with those used in the preparation of the Financial Statements, provided, further, that if there occurs after the date of this Agreement any change in GAAP that affects in any respect the calculation of any covenant contained in Section 6.03 [Financial Covenants] hereof, the Agent and the Borrower shall negotiate in good faith amendments to the provisions of this Agreement that relate to the calculation of such covenant with the intent of having the respective positions of the Lender and the Borrower after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the covenants in Section 6.03 [Financial Covenants] hereof shall be calculated as if no such change in GAAP has occurred.

"*Governing Documents*" means, with respect to any Person, the certificate of incorporation and by-laws, the certificate of formation and partnership (or other formation document) and the bylaws, limited liability company agreement, operating agreement, partnership agreement (or other operating agreements) or other organizational documents of such Person.

"*Governmental Authority*" means any nation or government, any Federal, state, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Greenwich*" has the meaning assigned thereto in the preamble hereto.

"*Greenwich Acquisition*" means the acquisition of WGCH (AM) station and its related assets.

"*Ground Lease*" means a Lease of real property on which a tower owned by the Credit Parties sits that is used or held for use in the operation of the Stations.

"*Guarantor*" means the Individual Guarantors, the Subsidiary Guarantors, the Guarantors under the Cooperation Guaranty and each other Person that guarantees, pursuant to Section 6.01(b) [Additional Guarantees and Collateral Security] or otherwise, all or any part of the Obligations.

"*Guaranty*" means (a) the Cooperation Guaranty, (b) the Subsidiary Guarantees and (c) the Individual Guarantees.

"*Hazardous Material*" means (a) any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special

waste, or solid waste under Environmental Laws or that is likely to cause immediately, or at some future time, harm to or have an adverse effect on, the environment or risk to human health or safety, including, without limitation, any pollutant, contaminant, waste, hazardous waste, toxic substance or dangerous good which is defined or identified in any Environmental Law and which is present in the environment in such quantity or state that it contravenes any Environmental Law; (b) petroleum and its refined products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous waste characteristic, including, without limitation, corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials; and (e) any raw materials, building components (including, without limitation, asbestos-containing materials) and manufactured products containing hazardous substances listed or classified as such under Environmental Laws.

"*Highest Lawful Rate*" means, with respect to the Agent or the Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to the Agent or the Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"*Indebtedness*" means, with respect to any Person, all liabilities and obligations, contingent or otherwise, that in accordance with GAAP are required to be classified as liabilities upon the balance sheet of such Person (except items of capital stock, capital or paid-in surplus or of retained earnings), and in any event including, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than sixty (60) days after the date such payable was created); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) all Contingent Obligations; (h) liabilities incurred under Title IV of ERISA with respect to any plan (other than a Multiemployer Plan) covered by Title IV of ERISA and maintained for employees of such Person or any of its ERISA Affiliates; (i) withdrawal liability incurred under ERISA by such Person or any of its ERISA Affiliates with respect to any Multiemployer Plan; and (j) all obligations referred to in clauses (a) through (i) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer unless the Agent determines that such Person does not have any liability or obligation, contingent or otherwise, in respect of such Indebtedness.

"***Indemnified Matters***" has the meaning specified therefor in <u>Section 10.15(a)</u> [General Indemnity].

"***Indemnitees***" has the meaning specified therefor in <u>Section 10.15(a)</u> [General Indemnity].

"***Independent Accountant***" means the independent accountant retained to audit the Credit Parties' Financial Statements in connection with and prior to the Term Loan. Such independent accountant must have professional liability coverage of no less than $14 million dollars and otherwise be satisfactory to Lender. If the Agent requests the Independent Accountant to review any calculation by the Credit Parties of Consolidated Net Income or Consolidated EBIDTA at any time, then any adjustments made by the Independent Accountant shall be binding upon the Credit Parties.

"***Independent Accountant Report***" means the final report of the Independent Accountant, which adjusts 2005 Consolidated Net Income of the Credit Parties, a copy of which has been delivered to the Credit Parties prior to the Term Loan.

"***Individual Guarantee***" means each guaranty, made by each of the Individual Guarantors in favor of the Agent for the benefit of the Lender, substantially in the form of Exhibit A-3, as each may be amended, supplemented or otherwise modified from time to time, including any exhibits and schedules thereto.

"***Individual Guarantors***" means, collectively, (a) B. Michael Pisani, a resident of the State of New Jersey; (b) Michael L. Metter, a resident of the State of Connecticut; (c) Frank Lazauskas, a resident of the State of New Jersey; and (d) Leonard F. Moscati, a resident of the State of Connecticut.

"***Insolvency Proceeding***" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"***Intercompany Subordination Agreement***" means a subordination agreement executed and delivered by Credit Parties and each Guarantor in favor of Agent for the benefit of the Lender, substantially in the form of <u>Exhibit G;</u> as the same may be amended, supplemented or modified from time to time.

"***Internal Revenue Code***" means the Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the regulations thereunder.

"***Inventory***" means, with respect to any Person, all goods and merchandise of such Person, including, without limitation, all raw materials, work-in-process, packaging, supplies, materials and finished goods of every nature used or usable in connection with the shipping, storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired, and all such other property the sale or other disposition of which would give rise to an Account Receivable or cash.

- 12 -

"*Investment*" means any advance, loan, extension of credit or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets substantially constituting an ongoing business from, or make any other investment in, any other Person.

"*Lease*" means any lease of real property to which any Loan Party or any of their Subsidiaries is a party as lessor or lessee.

"*Leased Real Property*" means all real property leased by the Credit Parties and used or held for use in the operation of the Stations, including without limitation land leased by the Credit Parties on which the Stations' studio, towers and transmitters are located, all buildings and other improvements owned by the Credit Parties thereon, all fixtures owned by the Credit Parties located at or used in connection with such facilities, all whether now or hereafter existing.

"*Lender*" has the meaning specified therefor in the preamble hereto.

"*Licenses*" means all of the Broadcast Licenses and all other permits, authorizations and licenses of any Governmental Authority granted or assigned, or to be granted or assigned, to any Credit Party in connection with the ownership or operation of the Stations.

"*Lien*" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any Capitalized Lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"*Lifestyle*" has the meaning assigned to it in the preamble hereto.

"*Liquid Assets*" means cash and Cash Equivalents.

"*LMA*" means a local marketing agreement, time brokerage agreement or any similar agreement between a broadcaster and a radio station licensee pursuant to which the broadcaster provides programming to, and/or retains the advertising revenues of, a substantial portion of the airtime of such station in exchange for fees paid to the licensee.

"*Loan Account*" means an account maintained hereunder by the Agent on its books of account at the Payment Office and, with respect to the Borrower, in which the Borrower will be charged with the Term Loan made to, and all other Obligations incurred by, the Borrower.

"*Loan Document*" means this Agreement, any Guaranty, any Security Agreement, any Pledge Agreement, any Mortgage, any Collateral Lease Assignment, the Affiliate Subordination Agreements, the Control Agreements and any other agreement, instrument, and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing the Term Loan or any other Obligation.

"*Loan Party*" means any Credit Party and any Guarantor.

"*Loan Servicing Fee*" has the meaning specified therefor in Section 2.06(b) [Loan Servicing Fee].

"*Marketable Security*" means (i) securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's or BBB (or equivalent) by Standard & Poor's, or an equivalent rating by a nationally recognized statistical rating organization, but excluding any debt securities or loans or advances between and among the Company and its Subsidiaries (ii) any stock or bonds regularly traded on the New York Stock Exchange, the American Stock Exchange or the NASDAQ Stock Market but specifically excludes (x) any security traded on the over-the-counter markets, and (y) any derivative securities and (iii) investment funds investing at least 95% of their assets in securities of the types described in clauses (i)-(ii) above.

"*Material Adverse Effect*" means a material adverse effect on any of (a) the operations, business, assets, properties, prospects or condition (financial or otherwise) of any Credit Party or the Credit Parties taken as a whole, (b) the ability of any Loan Party to perform any of its obligations under any Loan Document to which it is a party, (c) the legality, validity or enforceability of this Agreement or any other Loan Document, (d) the rights and remedies of the Agent or the Lender under any Loan Document, or (e) the validity, perfection or priority of a Lien in favor of the Agent for the benefit of the Lender on any of the Collateral.

"*Material Contract*" means, with respect to any Person, (a) each contract or agreement to which such Person is a party involving aggregate consideration payable to or by such Person of $25,000 or more (other than purchase orders in the ordinary course of the business of such Person and other than contracts that by their terms may be terminated by such Person in the ordinary course of its business upon less than sixty (60) days' notice without penalty or premium) and (b) all other contracts or agreements material to the business, operations, condition (financial or otherwise), performance, prospects or properties of such Person.

"*Moody's*" means Moody's Investors Service, Inc. and any successor thereto.

"*Mortgage*" means a mortgage (including, without limitation, a leasehold mortgage), deed of trust or deed to secure debt, in form and substance satisfactory to the Agent, made by a Credit Party in favor of the Agent for the benefit of the Lender, securing the Obligations and delivered to the Agent pursuant to Section 4.01(d) [Delivery of Documents], Section 6.01(b) [Additional Guarantees and Collateral Security], Section 5.01(o) [Properties] or otherwise.

"*Multiemployer Plan*" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Credit Party or any of its ERISA Affiliates has contributed to, or has been obligated to contribute, at any time during the preceding six (6) years.

"*Net Cash Proceeds*" means, (a) with respect to any Disposition by any Person, the amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Lien permitted by Section 6.02(a) [Liens, Etc.] on any asset (other

than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such Disposition (other than Indebtedness under this Agreement), (ii) reasonable expenses related thereto incurred by such Person in connection therewith, (iii) transfer taxes paid to any taxing authorities by such Person in connection therewith, and (iv) net income taxes to be paid in connection with such Disposition (after taking into account any tax credits or deductions and any tax sharing arrangements) and (b) with respect to the issuance or incurrence of any Indebtedness by any Person, or the sale or issuance by any Person of any shares of its Capital Stock, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person in connection therewith, after deducting therefrom only (i) reasonable expenses related thereto incurred by such Person in connection therewith, (ii) transfer taxes paid by such Person in connection therewith and (iii) net income taxes to be paid in connection therewith (after taking into account any tax credits or deductions and any tax sharing arrangements); in each case of clause (a) and (b) to the extent, but only to the extent, that the amounts so deducted are (x) actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person and (y) properly attributable to such transaction or to the asset that is the subject thereof.

"***Net Cash Revenue***" means, for any period, gross cash operating revenues of the Credit Parties for such period.

"***New York Acquisitions***" means the acquisitions of ____________, ____________, ________ or ________ stations and their related assets.

"***Notice of Borrowing***" has the meaning specified therefor in Section 2.02(b) [Making the Term Loan].

"***Obligations***" means all present and future indebtedness, obligations, and liabilities of each Loan Party to the Agent and/or the Lender, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 8.01 [Events of Default] including all such indebtedness, obligations and liabilities under the Loan Documents. Without limiting the generality of the foregoing, the Obligations of each Loan Party under the Loan Documents include (a) the obligation to pay principal, interest (including any interest that, but for the provisions of the Bankruptcy Code, would have accrued), charges, expenses, fees, attorneys' fees and disbursements (including any charges, expenses, fees, attorneys' fees and disbursements that, but for the provisions of the Bankruptcy Code, would have accrued), indemnities and other amounts payable by such Person under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that the Agent or the Lender (in their sole discretion) may elect to pay or advance on behalf of such Person in accordance with the terms of the Loan Documents.

"***Operating Lease Obligations***" means all obligations for the payment of rent for any real or personal property under leases or agreements to lease, other than Capitalized Lease Obligations.

"***Owned Real Property***" means all real property now or hereafter owned by the Credit Parties and used or held for use in the operation of the Stations, including without limitation land owned by the Credit Parties on which the Stations' studio, towers and transmitters are located, all buildings and other improvements thereon, all fixtures located at or used in connection with such facilities, all whether now or hereafter existing.

"***Payment-in-Kind Interest***" means, as at any date of determination, the amount of accrued but unpaid interest at the Payment-in-Kind Interest Rate as of such date.

"***Payment-in-Kind Interest Rate***" means 1.50%, per annum.

"***Payment Office***" means the Agent's office located at 10 Rockefeller Plaza, Suite 910, New York, New York 10020, or at such other office or offices of the Agent as may be designated in writing from time to time by the Agent to the Borrower.

"***PBGC***" means the Pension Benefit Guaranty Corporation or any successor thereto.

"***Permitted Indebtedness***" means:

(a)    any Indebtedness owing to the Agent and the Lender under this Agreement and the other Loan Documents;

(b)    Indebtedness evidenced by Capitalized Lease Obligations entered into in order to finance Capital Expenditures made by the Credit Parties in accordance with the provisions of Section 6.02(g) [Capital Expenditures], which Indebtedness does not exceed $75,000 at any time outstanding;

(c)    temporary loans and advances made by one Credit Party to another Credit Party other than Lifestyle, in the ordinary course of business that are subordinated to the Obligations on terms acceptable to Agent and not exceeding in the aggregate for all Credit Parties at any one time outstanding $100,000; and

(d)    trade payables incurred in the ordinary course of business of the Stations that are unsecured and properly classified as current liabilities upon the balance sheet of a Credit Party in accordance with GAAP and that are in amounts consistent with past practice and, in any event, not materially greater than the amounts set forth on the 2005 year-end balance sheet included in the Financial Statements.

(e)    guarantee obligations of Michael Metter pursuant to that Lease Agreement dated September 1, 2006 by and between Osrock Partnership and Borrower as in effect on the Effective Date; and

(f)    guarantee obligations of Michael Metter pursuant to that certain Lease Agreement, dated July 1, 2006, by and between Harrison Management Company and Greenwich Broadcasting Corporation as in effect on the Effective Date.

- 16 -

"*Permitted Investments*" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case, maturing within six months from the date of acquisition thereof; (b) commercial paper, maturing not more than 270 days after the date of issue rated P-1 by Moody's or A-1 by Standard & Poor's; (c) certificates of deposit maturing not more than 270 days after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000; (d) repurchase agreements having maturities of not more than ninety (90) days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (c) above and which are secured by readily marketable direct obligations of the United States Government or any agency thereof, (e) money market accounts maintained with mutual funds having assets in excess of $2,500,000,000; (f) the Pittsburg Acquisition; and (g) tax exempt securities rated A or better by Moody's or A+ or better by Standard & Poor's.

"*Permitted Liens*" means:

(a)     Liens securing the Obligations;

(b)     Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's and other similar Liens arising (provided they are subordinate to the Agent's Liens on Collateral, except as provided by law) in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than thirty (30) days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(c)     deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) and statutory obligations or (iii) obligations on surety or appeal bonds, but only to the extent such deposits or pledges are incurred or otherwise arise in the ordinary course of business and secure obligations not past due;

(d)     easements, zoning restrictions and similar encumbrances on real property and minor irregularities in the title thereto that do not (i) secure obligations for the payment of money or (ii) materially impair the value of such property or its use by any Credit Party in the normal conduct of such Person's business; and

(e)     Liens covering Collateral having an aggregate fair market value not to exceed $25,000 at any time.

"*Person*" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"*Pittsburgh Acquisition*" means the acquisition of WURP (AM) station and its related assets.

"*Plan*" means any Employee Plan or Multiemployer Plan.

"*Pledge Agreement*" means each pledge and security agreement made by the holders of (i) a majority of the Capital Stock of the Borrower and (ii) all of the Capital Stock of each of the Borrower's Subsidiaries, in favor of the Agent for the benefit of the Lender, substantially in the form of Exhibit C, as amended, supplemented or otherwise modified from time to time, including any exhibits and schedules thereto.

"*Post-Closing Agreement*" means the post-closing agreement made by each Credit Parties and the Borrower for the benefit of the Agent, as agent for the Lender, in form of Exhibit G, including any exhibits and schedules thereto, as the same may be amended, modified or supplemented from time to time.

"*Prime Rate*" means for any day a per annum rate of interest equal to the "prime rate," as published in the "Money Rates" column of *The Wall Street Journal*, Central Edition, from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer of the Lender.

"*Property*" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including Capital Stock.

"*Recovery Event*" means any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of the Borrower or any of its Subsidiaries.

"*Regulation T*", "*Regulation U*" and "*Regulation X*" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"*Release*" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

"*Remedial Action*" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the indoor or outdoor environment; (b) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (c) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (d) perform any other actions authorized by 42 U.S.C. § 9601.

"*Reportable Event*" means an event described in Section 4043 of ERISA (other than an event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section).

"*Requirement of Law*" means, as to any Person, the Governing Documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*SEC*" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"*Securities Act*" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"*Security Agreement*" means any Security Agreement made by a Credit Party in favor of the Agent for the benefit of the Lender, substantially in the form of Exhibit B, securing the Obligations and delivered to the Agent, as amended, supplemented or otherwise modified from time to time, including any exhibits and schedules thereto.

"*Solvent*" means with respect to any Person, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value (as such term is defined in clause (a)) of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business and (d) such Person will be able to pay its debts as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured; provided that, for purposes of this definition, in computing the amount of any contingent, unliquidated, unmatured or disputed claim at any time, it is intended that such claims will be computed at the amount which, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual, liquidated or matured claim.

"*Specified Authority*" means the FCC, the FAA and all other Governmental Authorities having jurisdiction over the Credit Parties, any Station and/or any License.

"*Standard & Poor's*" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"*Stations*" means collectively the following radio stations (and any other radio stations acquired by any Credit Party at any time):

WGCH (AM), Greenwich, Connecticut
KNUU(AM), Las Vegas, Nevada
WBET(AM), Brockton, Massachusetts

"*Subsidiary*" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of (i) the outstanding Capital Stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such Person, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such Person.

"*Subsidiary Guarantors*" shall have the meaning assigned thereto in the preamble hereto.

"*Subsidiary Guaranty*" means the unconditional guaranty, made by the Subsidiary Guarantors in favor of the Agent for the benefit of the Lender, substantially in the form of Exhibit A-4, as amended, supplemented or otherwise modified from time to time, including any exhibits and schedules thereto.

"*Tax Distributions*" means in any period, collectively, any and all payments, distributions, loans or advances made by a Credit Party to the holders of its Capital Stock, based on reasonable estimates of the amount of federal, state and local income taxes that such holders (or the owners of any Capital Stock that is a pass-through entity for tax purposes) would be required to pay with respect to the Fiscal Year in question due solely to such holder's status as a holder of Capital Stock of such Credit Party; provided, however, that (a) such Credit Party shall promptly provide to the Agent documentation supporting the determination of the amounts to be reported by such holders in respect of such taxes and any portion thereof proposed to be paid under Section 6.02(h) [Restricted Payments] to the reasonable satisfaction of the Agent, and (b) such payments shall be made only when and to the extent that any such holder is obligated to make estimated (based upon the highest combined federal, state and local income tax rates applicable to such holder) and final cash tax payments under applicable law.

"*Term*" shall mean the expiration of a period of three (3) years after the Effective Date.

"*Term Loan*" shall have the meaning specified therefore in Section 2.02(a) [Commitments].

"*Termination Event*" means (a) a Reportable Event with respect to any Employee Plan, (b) any event that causes any Loan Party or any of its ERISA Affiliates to incur liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, (b) the filing of a notice of intent to terminate an Employee Plan or the treatment of an Employee Plan amendment as a termination under Section 4041 of ERISA, (c) the institution of proceedings by the PBGC to terminate an Employee Plan, or (d) any other event or condition which would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Employee Plan.

"*Title Insurance Policy*" means a mortgagee's loan policy, in form and substance satisfactory to the Agent, together with all endorsements made from time to time thereto, issued by or on behalf of a title insurance company satisfactory to the Agent, insuring the Lien created by a Mortgage in an amount and on terms satisfactory to the Agent, delivered to the Agent.

"*Total Commitment*" means an aggregate amount of $5,500,000.

"*Tranche I*" means the portion of the Total Commitment designated as Tranche I on Schedule 1.01(A) hereto.

"*Tranche II*" means the portion of the Total Commitment designated as Tranche II on Schedule 1.01(A) hereto.

"*Tranche II Date*" means December ___, 2006 **[30 days from Effective Date]**.

"*Tower Site Lease*" means an agreement for the lease of a tower or of space on a tower or for real property where a tower is located, in any case, where such tower is for the primary radio signal of a Station (as the location of such tower is specified in the applicable Broadcast License with respect to such Station).

"*Uniform Commercial Code*" has the meaning specified therefor in Section 1.03 [Accounting and Other Terms].

"*WARN*" has the meaning specified therefor in Section 5.01(z) [Employee and Labor Matters].

"*Working Capital Account Balance*" has the meaning specified therefor in Section 7.02 [Working Capital Control Account].

"*Working Capital Bank*" has the meaning specified therefor in Section 7.02 [Working Capital Control Account].

"*Working Capital Control Account*" has the meaning specified therefor in Section 7.02 [Working Capital Control Account].

"*Working Investment*" means, at any date of determination thereof, (a) the sum, for any Person, of (i) the unpaid face amount of all Accounts Receivable of such Person as at such date of determination, plus (ii) the aggregate amount of prepaid expenses and other current

assets of such Person as at such date of determination, minus (b) the sum, for such Person, of (i) the unpaid amount of all accounts payable of such Person as at such date of determination, plus (ii) the aggregate amount of all accrued expenses of such Person as at such date of determination (but, excluding from accounts payable and accrued expenses, the current portion of long-term debt and all accrued interest and taxes).

"*Yield Maintenance Premium*" has the meaning specified therefor in Section 2.06(c) [Yield Maintenance Premium].

Section 1.02   Terms Generally.   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "*include*", "*includes*" and "*including*" shall be deemed to be followed by the phrase "*without limitation*". The word "*will*" shall be construed to have the same meaning and effect as the word "*shall*". Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "*herein*", "*hereof*" and "*hereunder*", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible. References in this Agreement to "*determination*" by the Agent include good faith estimates by the Agent (in the case of quantitative determinations) and good faith beliefs by the Agent (in the case of qualitative determinations).

Section 1.03   Accounting and Other Terms.   Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP applied on a basis consistent with those used in preparing the Financial Statements. All terms used in this Agreement which are defined in Article 8 or Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "*Uniform Commercial Code*") and which are not otherwise defined herein shall have the same meanings herein as set forth therein, provided that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Agent may otherwise determine.

Section 1.04   Time References.   Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day. For purposes of the computation of a period of time from a specified date to a later specified date, the word "*from*" means "*from and including*" and the words "*to*" and "*until*" each means "*to but excluding*"; provided, however, that with respect to a computation of fees or interest payable to the Agent or the Lender, such period shall in any event

consist of at least one full day.

## ARTICLE II

## THE TERM LOAN

Section 2.01    Commitment.

(a)    Subject to the terms and conditions herein set forth and relying upon the representations and warranties herein set forth, the Lender agrees to lend to the Borrower (i) on the Effective Date, the Tranche I portion of the Term Loan, and (ii) subject to the terms and upon satisfaction of the conditions set forth in Section 2.01(d) below, Tranche II portion of the Term Loan (together the "*Term Loan*").

(b)    The aggregate principal amount of the Term Loan shall not exceed the Total Commitment.  Any principal amount of the Term Loan which is repaid or prepaid may not be reborrowed.

(c)    The proceeds of the Term Loan may be used by the Credit Parties only (i) to refinance existing indebtedness of the Borrower, (ii) for the acquisition of KNUU-(AM) and WBET-(AM) radio stations (collectively, the "*Acquisitions*"), (iii) for general working capital purposes of the Borrower and its Subsidiaries except Lifestyle and (iv) to pay fees and expenses related to this Agreement and to the Acquisitions.

(d)    The Credit Parties may request the Tranche II portion of the Term Loan by delivery of a Notice of Borrowing no later than three (3) business days prior to the date of the proposed credit advance of the Tranche II portion of the Term Loan, which shall not be later than the Tranche II Date.  The Lender's obligation to make the Tranche II portion of the Term Loan is subject to (i) satisfaction by the Credit Parties of the conditions set forth in Section 4.01 [Conditions Precedent] as of the date of the advance of the Tranche II portion of the Term Loan (whether or not satisfied as of the date of the Tranche I portion of the Term Loan) and Section 4.02 [Conditions Precedent to Each Extension of Credit].

Section 2.02    Making the Term Loan.

(a)    Making the Tranche I Portion of the Term Loan.  Except as otherwise provided in this Section 2.02 [Making the Term Loan], on the Effective Date, the Tranche I portion of the Term Loan under this Agreement shall be made by the Lender by wire transfer in immediately available funds.  Notwithstanding any other provision of this Agreement, the Lender shall not have an obligation to make any Term Loan, if an Event of Default or Default exists.

(b)    Making the Tranche II Portion of the Term Loan.  (i) The Borrower shall give the Agent prior telephonic notice (immediately confirmed in writing, in substantially the form of Exhibit D hereto (a "*Notice of Borrowing*")), not later than 12:00 noon (New York City time) on the date which is three Business Days prior to the date of the proposed funding of the Term Loan or portion thereof (or such longer period as provided by Section 2.01(d)).  The Notice of Borrowing shall be irrevocable and shall specify and certify (1) the principal amount of the

proposed Term Loan or portion thereof, (2) the intended use of the proceeds, (3) the proposed borrowing date, which for Tranche II may not be later than the Tranche II Date, and (4) satisfaction of all conditions precedent thereto. The Agent and the Lender may act without liability upon the basis of written, telecopied or telephonic notice believed by the Agent in good faith to be from the Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Borrower to the Agent). Each Credit Party hereby waives the right to dispute the Agent's record of the terms of any such telephonic Notice of Borrowing. The Agent and the Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request the Term Loan or portion thereof on behalf of the Credit Parties until the Agent receives written notice to the contrary. The Agent and the Lender shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing.

(c)     The Notice of Borrowing pursuant to this Section 2.02 shall be irrevocable and the Credit Parties shall be bound to make the borrowing in accordance therewith.

Section 2.03   Repayment of Term Loan; Evidence of Debt.

(a)     The Credit Parties shall pay the Agent for the account of the Lender principal payments equal to the amounts listed on Schedule 2.5(a) on the corresponding dates on the Term Loan, due and payable on the last day of each calendar month, commencing on June 30, 2007, with the final installment due on the Final Maturity Date in an amount equal to the entire principal balance of the Term Loan then unpaid, together with all such other amounts as may be necessary to pay in full, in cash, all Obligations to the Lender in the manner set forth in Section 3.02(a) [Payments, Computations and Statements].

(b)     The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Credit Parties to the Lender, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

(c)     The Agent shall maintain accounts in which it shall record (i) the amount of the Term Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Credit Parties to the Lender hereunder and (iii) the amount of any sum received by the Agent hereunder for the account of the Lender.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of the Lender or the Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Credit Parties to repay the Term Loan in accordance with the terms of this Agreement.

(e)     The Lender may request that the Term Loan (or portion thereof) made by it be evidenced by a promissory note. In such event, the Credit Parties shall execute and deliver to the Lender a promissory note payable to the order of the Lender (or, if requested by the Lender, to the Agent) in a form furnished by the Agent and reasonably acceptable to the Borrower. Thereafter, the Term Loan (or portion thereof) evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 10.07 [Assignments and Participations]) be represented by one or more promissory notes in such form

payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.04   Interest.

(a)     The Term Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Term Loan until such principal amount is paid in full by Borrower to Lender, at the Applicable Rate.

(b)     Default Interest. To the extent permitted by law, upon the occurrence and during the continuance of an Event of Default, the principal of, and all accrued and unpaid interest on, the Term Loan and any other unpaid Obligations shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Default Rate.

(c)     Interest Payment. Current Interest on the Term Loan shall be payable in cash monthly, in arrears, on the last day of each month, commencing on the last day of the month in which the Term Loan is made and at maturity (whether upon demand, by acceleration or otherwise). Payment-in-Kind Interest shall accrue monthly, and shall be capitalized and added to the outstanding principal amount, in arrears, on the first day of each month, commencing on the first day of the month following the month in which the Term Loan is made until the Final Maturity Date. Interest at the Default Rate shall be payable on demand. Each Credit Party hereby authorizes the Agent to, and the Agent may, from time to time, charge the Loan Account pursuant to Section 3.02 [Payments, Computations and Statements] with the amount of any interest payment due hereunder.

(d)     General. All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed.

Section 2.05   Reduction of Commitment; Prepayment of Term Loan.

(a)     Termination of Commitments. The Tranche I portion of the Total Commitment shall terminate at 5:00 p.m. (New York city time) on the Effective Date. The Tranche II portion of the Total Commitment shall terminate at 5:00 p.m. (New York City time) on the Tranche II Date.

(b)     Optional Prepayment. The Credit Parties may, upon at least five (5) Business Days' prior written notice to the Agent, prepay, together with any applicable Yield Maintenance Premium, the principal of the Term Loan, in whole or in part. Each prepayment made pursuant to this clause (b) shall be accompanied by the payment of accrued interest in cash (including, without limitation, the Payment-in-Kind Interest Amount) to the date of such payment on the amount prepaid, together with any applicable Yield Maintenance Premium.

(c)     Mandatory Prepayment.

(i)     Within ten (10) days of delivery to the Agent and the Lender of Fiscal Quarter financial statements pursuant to Section 6.01(a)(ii) [Reporting Requirements], commencing with the delivery to the Agent and the Lender of the financial statements for the

Fiscal Quarter ended June 30, 2007 or, if such financial statements are not delivered to the Agent and the Lender on the date such statements are required to be delivered pursuant to Section 6.01(a)(ii) [Reporting Requirements], ten (10) days after the date such statements are required to be delivered to the Agent and the Lender pursuant to Section 6.01(a)(ii) [Reporting Requirements], the Credit Parties shall prepay the outstanding principal amount of the Term Loan in an amount equal to 100% of the Excess Cash Flow of the Credit Parties (other than Lifestyle) for such Fiscal Quarter; provided, that for the Fiscal Quarter in which the Pittsburgh Acquisition is permitted under Section 6.02(v) and consummated, such prepayment shall be reduced by the amount of Excess Cash Flow for such Fiscal Quarter that is used to fund the Pittsburgh Acquisition.

(ii)     Immediately upon any Disposition by any Credit Party, other than pursuant to either clause (A) or clause (B) of Section 6.02(c)(ii) [Fundamental Changes, Dispositions], the Credit Parties shall prepay the outstanding principal amount of the Term Loan in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Disposition to the extent that the aggregate amount of Net Cash Proceeds received by the Credit Parties (and not paid to Agent as a prepayment of the Term Loan) shall exceed for all such Dispositions per annum $100,000. Nothing contained in this subsection (ii) shall permit any Credit Party to make a Disposition of any property other than in accordance with Section 6.02(c)(ii) [Fundamental Changes, Dispositions].

(iii)     Upon the issuance or incurrence by any Credit Party of any Indebtedness (other than Permitted Indebtedness), or the sale or issuance by any Credit Party of any shares of its Capital Stock (except for the first $3,000,000 of Net Cash Proceeds of such sale or issuance by any Credit Party of shares of its Capital Stock), the Credit Parties shall prepay the outstanding amount of the Term Loan in an amount equal to 50% of the Net Cash Proceeds received by such Person in connection therewith. The provisions of this subsection shall not be deemed to be implied consent to any such issuance, incurrence or sale otherwise prohibited by the terms and conditions of this Agreement.

(iv)     Upon the receipt by any Credit Party of any Extraordinary Receipts, the Credit Parties shall prepay the outstanding principal of the Term Loan in an amount equal to 100% of such Extraordinary Receipts, net of any reasonable expenses incurred, directly or indirectly, in collecting such Extraordinary Receipts. In the event that the aggregate amount of the cash and Permitted Investments of the Credit Parties at the end of any calendar year exceeds $500,000 (including the Working Capital Account Balance and any other amounts in the Working Capital Control Account, if any), the Credit Parties shall immediately prepay the outstanding principal of the Term Loan in the amount equal to such excess.

(d)     Interest and Fees. Any prepayment made pursuant to this Section 2.05 [Termination of Commitment; Prepayment of Term Loan] shall be accompanied by accrued interest on the principal amount being prepaid to the date of prepayment (including, without limitation, the Payment-in-Kind Interest Amount) and the Yield Maintenance Premium.

(e)     Cumulative Prepayments. Except as otherwise expressly provided in this Section 2.05 [Termination of Commitment; Prepayment of Term Loan], payments with respect to any subsection of this Section 2.05 [Termination of Commitment; Prepayment of Term Loan]

are in addition to payments made or required to be made under any other subsection of this Section 2.05 [Termination of Commitment; Prepayment of Term Loan].

Section 2.06    Fees.

(a)    Closing Fee. On or prior to the Effective Date, the Credit Parties shall pay to the Agent for the account of the Lender, a non-refundable closing fee (the "*Closing Fee*") equal to 2.50% of the Total Commitment, which shall be deemed fully earned when paid.

(b)    Loan Servicing Fee. From and after the Effective Date and until the later of (i) the Final Maturity Date and (ii) the date on which all Obligations are paid in full, the Credit Parties shall pay to the Agent for the account of the Agent, a non-refundable loan servicing fee (the "*Loan Servicing Fee*") equal to $2,300 each month, which shall be deemed fully earned when paid and which shall be payable on the Effective Date (payable ratably based on the number of days remaining in the calendar month in which the Effective Date occurs) and monthly in advance thereafter on the first day of each calendar month.

(c)    Yield Maintenance Premium. If for any reason at any time prior to the first anniversary of the Effective Date any of the Credit Parties prepay the Term Loan in whole or from time to time any of the Credit Parties prepay the Term Loan in part other than payments made in accordance with Sections 2.05(c)(i), and 2.05(c)(iv) [Mandatory Prepayments], the Credit Parties shall pay to the Agent for the account of the Lender, an amount (the "*Yield Maintenance Premium*") equal to the aggregate amount of interest (calculated based on the Current Rate then in effect) that would have otherwise accrued on the amount of the principal prepaid, during the period from the date of prepayment until the date twelve (12) months after the Effective Date.

Section 2.07    Taxes. (a) All payments made by any Loan Party hereunder or under any other Loan Document shall be made without set-off, counterclaim, deduction or other defense. All such payments shall be made free and clear of and without deduction for any present or future income, franchise, sales, use, excise, stamp or other taxes, levies, imposts, deductions, charges, fees, withholdings, restrictions or conditions of any nature now or hereafter imposed, levied, collected, withheld or assessed by any jurisdiction (whether pursuant to Federal, state, local or foreign law) or by any political subdivision or taxing authority thereof or therein, and all interest, penalties or additional amounts, excluding taxes on the net income of the Lender or the Agent imposed by the United States or the jurisdiction in which the Lender or the Agent is organized or any political subdivision thereof or taxing authority thereof or any jurisdiction in which such Person's principal office is located or any political subdivision thereof or taxing authority thereof (such nonexcluded taxes, levies, imposts, deductions, charges, fees, withholdings, restrictions, conditions, interest, penalties and additional amounts being hereinafter collectively referred to as "Taxes"). If any Loan Party shall be required to deduct or to withhold any Taxes from or in respect of any amount payable hereunder or under any other Loan Document,

(i)    the amount so payable shall be increased so that after making all required deductions and withholdings (including Taxes on amounts payable pursuant to this

sentence) the Lender or the Agent, as the case may be, receive an amount equal to the sum they would have received had no such deduction or withholding been made,

    (ii)    such Loan Party shall make such deduction or withholding,

    (iii)    such Loan Party shall pay the full amount deducted or withheld to the relevant taxation authority in accordance with applicable law, and

    (iv)    as promptly as possible thereafter, such Loan Party shall send the Lender and the Agent an official receipt (or, if an official receipt is not available, such other documentation as shall be reasonably satisfactory to the Lender or the Agent, as the case may be) evidencing payment of the amount or amounts so deducted or withheld. In addition, each Loan Party agrees to pay any present or future taxes, charges or similar levies which arise from any payment made hereunder or from the execution, delivery, performance, recordation or filing of, or otherwise with respect to, this Agreement or any other Loan Document other than the foregoing excluded taxes (hereinafter referred to as "*Other Taxes*").

    (b)    The Loan Parties hereby jointly and severally indemnify and agree to hold the Lender and the Agent harmless from and against Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this <u>Section 2.08</u> [Taxes]) paid by the Lender or the Agent and any liability (including penalties, interest and expenses for nonpayment, late payment or otherwise) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. Such indemnification shall be paid within ten (10) days from the date on which any the Lender or the Agent makes written demand therefor, which demand shall identify in reasonable detail the nature and amount of such Taxes or Other Taxes.

    (c)    If any Loan Party fails to perform any of its obligations under this <u>Section 2.08</u> [Taxes], the Loan Parties shall indemnify the Lender and the Agent for any taxes, interest or penalties that may become payable as a result of any such failure. The obligations of the Loan Parties under this <u>Section 2.08</u> [Taxes] shall survive the termination of this Agreement and the payment of the Term Loan and all other amounts payable hereunder.

### ARTICLE III

### FEES, PAYMENTS AND OTHER COMPENSATION

    Section 3.01   <u>Audit and Collateral Monitoring Fees</u>.  The Credit Parties acknowledge that pursuant to Section 6.01(f) [Inspection Rights], representatives of the Agent may visit any or all of the Credit Parties' properties and/or conduct audits, inspections, valuations and/or field examinations of any or all of the Credit Parties at any time and from time to time (so long as no Event of Default has occurred and is continuing, upon reasonable prior notice and during normal business hours and in a manner so as to not unduly disrupt the business of the Credit Parties). The Credit Parties agree to pay (i) the examiner's out-of-pocket costs and expenses incurred in connection with all such visits, audits, inspections, valuations and field examinations and (ii) the reasonable cost of all visits, audits, inspections, valuations and field examinations conducted by a third party on behalf of the Agent.

Section 3.02    <u>Payments; Computations and Statements.</u>

(a)    The Credit Parties will make each payment under this Agreement not later than 2:00 p.m. (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Agent's Account. All payments received by the Agent after 2:00 p.m. (New York City time) on any Business Day will be credited to the Loan Account on the next succeeding Business Day. All payments shall be made by the Credit Parties without set-off, counterclaim, deduction or other defense to the Agent and the Lender. Except as provided in <u>Section 2.02</u> [Making the Term Loan], after receipt, the Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal to the Lender and like funds relating to the payment of any other amount payable to the Lender to the Lender, in each case to be applied in accordance with the terms of this Agreement, provided that the Agent will cause to be distributed all interest and fees received from or for the account of the Borrower not less than once each month and in any event promptly after receipt thereof. The Lender and the Credit Parties hereby authorize the Agent to, and the Agent may, from time to time, charge the Loan Account of the Borrower with any amount due and payable by the Credit Parties under any Loan Document. Each of the Lender and the Credit Parties agrees that the Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing. The Lender and the Credit Parties confirm that any charges which the Agent may so make to the Loan Account of the Borrower as herein provided shall constitute part of the Obligations, shall be secured by the Loan Documents and shall be made as an accommodation to the Borrower and solely at the Agent's discretion. Whenever any payment to be made under any such Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be. All computations of fees shall be made by the Agent on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such fees are payable. Each determination by the Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

(b)    The Agent may (but is not obligated to), and shall promptly upon the Borrower's request but in any event not more frequently than once monthly, provide the Borrower from time to time a summary statement (in the form from time to time used by the Agent) of the amounts and dates of all payments on account of the Term Loan, the application of such payments, the amount of interest accrued on the Term Loan, the amount and nature of any charges to the Loan Account, and the amount of all unpaid fees, expenses and other Obligations. All entries on any such statement shall be presumed to be correct and, thirty (30) days after the same is sent, shall be final and conclusive absent manifest error.

Section 3.03    <u>Apportionment of Payments.</u> Subject to Section 2.02 [Making of Term Loan] hereof:

(a)    all payments of principal and interest in respect of the outstanding Term Loan, all payments of fees (other than the fees set forth in <u>Section 2.06</u> [Fees] hereof to the extent set forth in a written agreement among the Agent and the Lender, and the audit and collateral monitoring fee provided for in <u>Section 3.01</u> [Audit and Collateral Monitoring Fee]) and all other payments in respect of any other Obligations shall be allocated by the Agent to the

Lender as is entitled thereto, or otherwise as provided herein or, in respect of payments not made on account of the Term Loan, as designated by the Person making payment when the payment is made.

(b)     After the occurrence and during the continuance of an Event of Default, the Agent may, and upon the direction of the Lender shall, apply all payments in respect of any Obligations and all proceeds of the Collateral, subject to the provisions of this Agreement, (i) first, to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due to the Agent until paid in full, (ii) second, to pay the Obligations in respect of any fees and indemnities then due to the Lender until paid in full, (iii) third, to pay the Payment-in-Kind Interest Amount due in respect of the Term Loan until paid in full, (iv) fourth, to pay the Current Interest Amount due in respect of the Term Loan until paid in full, (v) fifth, to pay principal of the Term Loan until paid in full, and (vi) sixth, to the payment of all other Obligations then due and payable.

(c)     In each instance, so long as no Event of Default has occurred and is continuing, Section 3.03(b) [Apportionment of Payments] shall not be deemed to apply to any payment by the Credit Parties specified by the Borrower to the Agent to be for the payment of Obligations then due and payable under any provision of this Agreement or the prepayment of all or part of the principal of the Term Loan in accordance with the terms and conditions of Section 2.05 [Reduction of Commitment; Prepayment of Term Loan].

(d)     For purposes of Section 3.03(b) [Apportionment of Payments], *"paid in full"* with respect to interest shall include interest accrued after the commencement of any Insolvency Proceeding irrespective of whether a claim for such interest is allowable in such Insolvency Proceeding.

Section 3.04     Increased Costs and Reduced Return.

(a)     If the Lender or the Agent shall have determined that the adoption or implementation of, or any change in, in each case after the Effective Date, any law, rule, treaty or regulation, or any policy, guideline or directive of, or any change in, the interpretation or administration thereof by, any court, central bank or other administrative or Governmental Authority, or compliance by the Lender or the Agent or any Person controlling any the Lender or the Agent with any directive of, or guideline from, any Governmental Authority or the introduction of, or change in, any accounting principles applicable to the Lender or the Agent or any Person controlling any the Lender or the Agent (in each case, whether or not having the force of law), shall (i) subject the Lender or the Agent, or any Person controlling any the Lender or the Agent to any tax, duty or other charge with respect to this Agreement or the Term Loan made by the Lender or the Agent or change the basis of taxation of payments to the Lender or the Agent or any Person controlling any the Lender or the Agent of any amounts payable hereunder (except for taxes on the overall net income of the Lender or the Agent or any Person controlling any the Lender or  the Agent), or (ii) impose on the Lender or the Agent or any Person controlling any the Lender or the Agent any other condition regarding this Agreement or the Term Loan, and the result of any event referred to in clauses (i) or (ii) above shall be to increase the cost to the Lender or the Agent of making the Term Loan, or agreeing to make the Term Loan, or to reduce any amount received or receivable by the Lender or the Agent hereunder,

then, upon demand by any the Lender or the Agent, the Credit Parties shall pay to the Lender or the Agent such additional amounts as will compensate the Lender or the Agent for such increased costs or reductions in amount.

        (b)    If Lender or the Agent shall have determined that the implementation of, or any change in, any applicable accounting principles (in each case, whether or not having the force of law), has or would have the effect of reducing the rate of return on the Lender's or the Agent's or any such other controlling Person's capital to a level below that which the Lender or the Agent or such controlling Person could have achieved but for such circumstances as a consequence of the Term Loan made or maintained or any agreement to make the Term Loan or the Lender's or the Agent's or such other controlling Person's other obligations hereunder, then, upon demand by the Lender or the Agent, the Credit Parties shall pay to the Lender or the Agent from time to time such additional amounts as will compensate the Lender or the Agent for such reduction in the rate of return on the Lender's or the Agent's or such other controlling Person's capital.

        (c)    All amounts payable under this Section 3.04 [Increased Costs and Reduced Return] shall bear interest from the date that is ten (10) days after the date of demand by the Lender or the Agent until payment in full to the Lender or the Agent at the Current Rate. A certificate of the Lender or the Agent claiming compensation under this Section 3.04 [Increased Costs and Reduced Return], specifying the event herein above described and the nature of such event shall be submitted by the Lender or the Agent to the Borrower, setting forth the additional amount due and an explanation of the calculation thereof, and the Lender's or the Agent's reasons for invoking the provisions of this Section 3.04 [Increased Costs and Reduced Return], and shall be final and conclusive absent manifest error.

        Section 3.05   Joint and Several Liability of the Credit Parties.

        (a)    Notwithstanding anything in this Agreement or any other Loan Document to the contrary, each of the Credit Parties hereby accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Agent and the Lender under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each of the Credit Parties and in consideration of the undertakings of the other Credit Parties to accept joint and several liability for the Obligations.   Each of the Credit Parties, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Credit Parties, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 3.06 [Joint and Several Liability of the Credit Parties]), it being the intention of the parties hereto that all of the Obligations shall be the joint and several obligations of each of the Credit Parties without preferences or distinction among them.  If and to the extent that any of the Credit Parties shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event, the other Credit Parties will make such payment with respect to, or perform, such Obligation.  Subject to the terms and conditions hereof, the Obligations of each of the Credit Parties under the provisions of this Section 3.06 [Joint and Several Liability of the Credit Parties] constitute the absolute and unconditional, full recourse Obligations of each of the Credit Parties, enforceable

against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.

(b)    The provisions of this Section 3.06 [Joint and Several Liability of the Credit Parties] are made for the benefit of the Agent, the Lender and their successors and assigns, and may be enforced by them from time to time against any or all of the Credit Parties as often as occasion therefor may arise and without requirement on the part of the Agent, the Lender or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Credit Parties or to exhaust any remedies available to it or them against any of the other Credit Parties or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 3.06 [Joint and Several Liability of the Credit Parties] shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.

(c)    Each of the Credit Parties hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Credit Parties with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agent or the Lender with respect to any of the Obligations or any Collateral, until such time as all of the Obligations have been paid in full in cash.  Any claim which any Credit Party may have against any other Credit Party with respect to any payments to the Agent or the Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

## ARTICLE IV

## CONDITIONS TO TERM LOAN

Section 4.01    Conditions Precedent.  The initial extension of credit requested to be made by Lender hereunder is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Effective Date, of the following conditions precedent:

(a)    Payment of Fees, Etc.  The Credit Parties shall have paid on or before the date of each portion of the Term Loan all fees, costs, expenses and taxes then payable in connection with the Acquisitions pursuant to Section 2.06 [Fees], Section 10.04 [Expenses; Taxes; Attorneys' Fees], Schedule 5.10(t) and payment of certain broker fees in connection with the Acquisitions including (1) William Fleming and (2) Media Capital Solutions, LLC.

(b)    Representations and Warranties; No Event of Default.  The following statements shall be true and correct: (i) the representations and warranties contained in Article V [Representations and Warranties] and in each other Loan Document, certificate or other writing delivered to the Agent or the Lender pursuant hereto or thereto on or prior to the date of the Term Loan are true and correct on and as of such date as though made on and as of such date and (ii) no Default or Event of Default shall have occurred and be continuing on such date or would result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

(c)  Legality.  The making of the Term Loan shall not contravene any law, rule or regulation applicable to the Agent or the Lender.

(d)  Delivery of Documents.  The Agent shall have received on or before the date of the Term Loan the following, each duly executed by appropriate parties, dated a date, and otherwise in form and substance, satisfactory to the Agent:

(i)  if requested by Agent, one or more promissory notes duly executed by all of the Credit Parties evidencing the Term Loan (or a portion thereof);

(ii)  the Security Agreement;

(iii)  the Pledge Agreements, together with the original certificates (if any) representing (i) all of the Capital Stock owned by the Loan Parties of the Credit Parties, and (ii) all of the Capital Stock owned by the Credit Parties and all intercompany promissory notes of the Credit Parties, accompanied by undated stock powers executed in blank and other proper instruments of transfer;

(iv)  the Subsidiary Guarantees, the Cooperation Guaranty and the Individual Guarantees;

(v)  Mortgages, with respect each parcel of Owned Real Property and each Ground Lease, and Collateral Lease Assignments with respect to each Lease set forth on Schedule 5.01(o);

(vi)  evidence of the recording of the Mortgages in such office or offices as may be necessary or, in the opinion of the Agent, desirable to perfect the Lien purported to be created thereby or to otherwise protect the rights of the Agent and the Lender thereunder;

(vii)  a Title Insurance Policy with respect to each parcel of Owned Real Property and each Ground Lease;

(viii)  a survey of each parcel of Owned Real Property and each Ground Lease, certified to the Agent and to the issuer of the Title Insurance Policy;

(ix)  a copy of each environmental assessment in the possession of a Credit Party that is applicable to any Owned Real Property or any Ground Lease;

(x)  the Affiliate Subordination Agreement;

(xi)  the Intercompany Subordination Agreement;

(xii)  the Post-Closing Agreement;

(xiii)  confirmation of filing of all UCC financing statements as may be necessary or, in the opinion of the Agent, desirable to perfect the security interests purported to

- 33 -

be created by each Security Agreement, each Pledge Agreement, and each Mortgage, if applicable;

(xiv)   certified copies of request for copies of information on Form UCC-11 or lien searches, listing all effective financing statements which name as debtor any Loan Party and which are filed in the offices referred to in paragraph (xi) above, together with copies of such financing statements, none of which, except as otherwise agreed in writing by the Agent, shall cover any of the Collateral, and the results of searches for any tax Lien and judgment Lien filed against such Person or its property, which results, except as otherwise agreed to in writing by the Agent, shall not show any such Liens;

(xv)    a copy of the resolutions of each Loan Party (other than any individual that is a Loan Party), certified by an Authorized Officer thereof, authorizing (A) the borrowings hereunder and the transactions contemplated by the Loan Documents to which such Loan Party is or will be a party, and (B) the execution, delivery and performance by such Loan Party of each Loan Document to which such Loan Party is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith;

(xvi)   a certificate of an Authorized Officer of each Loan Party (other than any individual that is a Loan Party), certifying the names and true signatures of the representatives of such Loan Party authorized to sign each Loan Document to which such Loan Party is or will be a party and the other documents to be executed and delivered by such Loan Party in connection herewith and therewith, together with evidence of the incumbency of such authorized officers;

(xvii)  a certificate of the appropriate official(s) of the state of organization of each Loan Party (other than for an individual that is a Loan Party), certifying as to the subsistence in good standing of, and the payment of taxes by, such Loan Party in such states;

(xviii) a true and complete copy of the charter, certificate of formation, certificate of limited partnership or other publicly filed organizational document of each Loan Party (other than any individual that is a Loan Party), certified by an appropriate official of the state of organization of such Loan Party which shall set forth the same complete name of such Loan Party as is set forth herein and the organizational number of such Loan Party, if an organized number is issued in such jurisdiction;

(xix)   a copy of the charter and by-laws, limited liability company agreement, operating agreement, agreement of limited partnership or other organizational document of each Loan Party (other than any individual that is a Loan Party), as applicable, together with all amendments thereto, certified by an Authorized Officer of such Loan Party;

(xx)    opinions of Seiden Wayne, LLC, corporate counsel to the Parties and The Law Offices of Dan Alpert, Special FCC counsel to the Credit Parties;

(xxi)   a certificate of an Authorized Officer of the Borrower, certifying as to the matters set forth in subsection (b) of this ARTICLE IV [Conditions Precedent];

(xxii) a copy of the Financial Statements and the financial projections described in Section 5.01(g)(ii) [Financial Condition] hereof, certified as being true and correct copies thereof by an Authorized Officer of the Borrower;

(xxiii) a certificate of the financial officer of the Borrower, setting forth in reasonable detail the calculations required to establish compliance, on a pro forma basis after giving effect to the Term Loan, with each of the financial covenants for Fiscal Quarter ending September 30, 2006 contained in Section 6.03 [Financial Covenants];

(xxiv) a certificate of each Loan Party, certifying as to the solvency of such Loan Party;

(xxv) evidence of the insurance coverage required by Section 6.01 [Affirmative Covenants] and the terms of each Security Agreement and each Mortgage, if applicable, and such other insurance coverage with respect to the business and operations of the Credit Parties as the Agent may reasonably request, in each case, where requested by the Agent, with such endorsements as to the named insureds or loss payees thereunder as the Agent may request and providing that such policy may be terminated or canceled (by the insurer or the insured thereunder) only upon thirty (30) days' prior written notice to the Agent and each such named insured or loss payee, together with evidence of the payment of all premiums due in respect thereof for such period as the Agent may request;

(xxvi) a landlord estoppel, waiver and nondisturbance agreement, executed by each landlord with respect to each of the Leases set forth on Schedule 5.01(o);

(xxvii) copies of each LMA, each Tower Site Lease, each lease for a transmitter, and the other Material Contracts to which a Credit Party is a party, certified as true and correct copies thereof by an Authorized Officer of the Borrower, together with a certificate of an Authorized Officer of the Borrower stating that such agreements remain in full force and effect and that none of the Credit Parties has breached or defaulted in any of its obligations under such agreements;

(xxviii) a termination and release agreement with respect to the Becker Loan and all related documents including the note executed therewith, duly executed by such parties, as applicable, together with UCC termination statements for all UCC financing statements filed with respect to the Becker Loan and covering any portion of the Collateral;

(xxix) a statement of sources and uses prepared by the Credit Parties and satisfactory to the Agent;

(xxx) a copy of the budget with respect to the operation of the Stations and any capital improvements;

(xxxi) a copy of an engineering analysis and capital expenditure budget for all modifications or new facilities for which any Credit Party holds an FCC construction permit;

(xxxii) copies of all Licenses, consents and other authorizations, approvals or evidence of other actions (including, without limitation, any Broadcast License) required by any Governmental Authority (including, without limitation, the FCC and the FAA) in connection with the execution and delivery by any Loan Party of this Agreement or any other Loan Document or with the consummation of the transactions contemplated hereby or thereby (except such consents of the FCC as are referred to in Section 8.02 [FCC Matters]), and a status report as to all pending applications for such Licenses, consents, authorizations and other approvals;

(xxxiii)copies of all construction permits (A) issued by the FCC in connection with any Station, or (B) otherwise required to complete those modifications to facilities necessary for the commencement of the on-air operations of any Station; and

(xxxiv)such other agreements, instruments, approvals, opinions and other documents, as the Agent may reasonably request.

(e)    Material Adverse Effect.  The Agent shall have determined, in its sole judgment, that no event or development shall have occurred since the date of the most recent Financial Statements which could reasonably be expected to have a Material Adverse Effect.

(f)    Approvals.  All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of each portion of the Term Loan shall have been obtained and shall be in full force and effect.

(g)    Proceedings; Receipt of Documents.  All proceedings in connection with the making of each portion of the Term Loan and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be reasonably satisfactory to the Agent and its counsel, and the Agent and such counsel shall have received all such information and such counterpart originals or certified or other copies of such documents as the Agent or such counsel may reasonably request.

(h)    Due Diligence.  The Agent shall have completed its business, legal and collateral due diligence with respect to each Loan Party and the results thereof shall be acceptable to the Agent, in its sole and absolute discretion.

Section 4.02   Conditions to Each Extension of Credit.  Each extension of credit requested to be made by the Lender hereunder on any date (including the initial extension of credit) is subject to the satisfaction of the following conditions precedent:

(a)    Representations and Warranties.    Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date, except such representations and warranties expressly stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date.

(b)    No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Section 5.01    Representations and Warranties.    Each Credit Party hereby represents and warrants to the Agent and the Lender as follows:

(a)    Organization, Good Standing, Etc.  Each Loan Party (other than a Loan Party that is an individual) (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its organization, (ii) has all requisite power and authority to conduct its business as now conducted and as presently contemplated and, in the case of the Credit Parties, to make the borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

(b)    Authorization, Etc.  The execution, delivery and performance by each Loan Party (with respect to (i), (ii) and (iii) below, other than a Loan Party that is an individual) of each Loan Document to which it is or will be a party, (i) have been duly authorized by all necessary action, (ii) do not and will not contravene its charter or by-laws, its limited liability company or operating agreement or its certificate of partnership or partnership agreement, as applicable, or any applicable law or any contractual restriction binding on or otherwise affecting it or any of its properties, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Loan Document) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license (including, without limitation, any Broadcast License), authorization or approval applicable to its operations or any of its properties.

(c)    Governmental Approvals.  No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with the due execution, delivery and performance by any Loan Party of any Loan Document to which it is or will be a party including, without limitation, any Specified Authority or any other Person in connection with or as a condition to the execution, delivery or performance of any of the Loan Documents except (i) for the filing and/or recording of fixture filings and Mortgages, if applicable, (ii) from time to time, the Credit Parties may be required to obtain certain authorizations of or to make certain filings with the FCC and the FAA that are required in the ordinary course of business, (iii) copies of certain documents, including, without limitation, certain Loan Documents, may be required to be filed with the FCC within thirty (30) days of the closing, provided that the failure to file such copies will not affect the due execution, delivery and performance by any Loan Party of any Loan Document to which such Loan Party is a party or the legality, validity or enforceability thereof, (iv) prior approval of the FCC must be obtained for the consummation of any assignments or transfers of control of FCC authorizations and

ownership reports are required to be filed with the FCC after such consummation, and (v) prior to the exercise of certain rights or remedies under the Loan Documents by the Agent, FCC consents and notifications with respect to such exercise may be required to be timely obtained or made. All consents, approvals and authorizations described in Schedule 5.01(c) have been duly granted and are in full force and effect on the date hereof and all filings described in Schedule 5.01(c) have been properly and timely made.

(d)    Enforceability of Loan Documents.  This Agreement is, and each other Loan Document to which any Loan Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws.

(e)    Capitalization; Subsidiaries.  All of the issued and outstanding Capital Stock of each Subsidiary is owned by Borrower. All of the issued and outstanding Capital Stock of the Borrower is owned by the Persons listed on Schedule 5.01(e) attached hereto. All of the issued and outstanding shares of Capital Stock of each Subsidiary and of Borrower have been validly issued and are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights. Except as listed on Schedule 5.01(e), there are no outstanding debt or equity securities of any Borrower or any of Subsidiaries and no outstanding obligations of any Borrower or any Subsidiaries convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from such Borrower or any Subsidiary, or other obligations of such Borrower or any Subsidiary to issue, directly or indirectly, any shares of Capital Stock of such Borrower or any Subsidiary.

(f)    Litigation; Commercial Tort Claims.  Except as set forth on Schedule 5.01(f) hereto, there is no pending or, to the best knowledge of any Loan Party, threatened action, suit or proceeding affecting any Credit Party before any court or other Governmental Authority, including, without limitation, any Specified Authority, or any arbitrator that (A) if adversely determined, could reasonably be expected to have a Material Adverse Effect or (B) relates to this Agreement or any other Loan Document to which a Credit Party is a party or any transaction contemplated hereby or thereby.  As of the Effective Date, except as set forth on Schedule 5.01(f), none of the Credit Parties holds any commercial tort claims in respect of which a claim has been filed in a court of law or a written notice by an attorney has been given to a potential defendant.

(g)    Financial Condition.

(i)    The Financial Statements, copies of which have been delivered to the Agent and the Lender, fairly present the consolidated financial condition of the Credit Parties on a consolidated basis as at the respective dates thereof and the consolidated results of operations of the Credit Parties for the fiscal periods ended on such respective dates, all in accordance with GAAP (except for the absence of footnotes and normal year-end adjustments), and since the date of the most recent Financial Statements no event or development has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

(ii)    The Credit Parties have heretofore furnished to the Agent and the Lender (A) projected monthly income statements ending on December 31, 2006, and (B) projected annual income statements and statements of cash flows of the Credit Parties for the Fiscal Years ending in 2006 through 2008, which projected financial statements shall be updated from time to time pursuant to Section 6.01(a)(vii) [Reporting Requirements]. Such projections, as so updated, shall be believed by the Credit Parties at the time furnished to be reasonable, shall have been prepared on a reasonable basis and in good faith by the Credit Parties, and shall have been based on reasonable assumptions at the time made and upon the best information then available to the Credit Parties, and the Credit Parties shall not be aware of any facts or information that would lead them to believe that such projections, as so updated, are incorrect or misleading in any material respect.

(h)    Compliance with Law, Etc.    No Loan Party is in violation of its organizational documents, any law (including, without limitation, the Communications Laws), rule, regulation, judgment or order of any Governmental Authority (including, without limitation, any Specified Authority) applicable to it or any of its property or assets, or any material term of any agreement or instrument (including, without limitation, any Material Contract) binding on or otherwise affecting it or any of its properties.

(i)    ERISA.    (i) Each Employee Plan is in compliance with ERISA and the Internal Revenue Code, (ii) no Termination Event has occurred nor is reasonably expected to occur with respect to any Employee Plan, (iii) the most recent annual report (Form 5500 Series) with respect to each Employee Plan, including any required Schedule B (Actuarial Information) thereto, copies of which have been filed with the Internal Revenue Service and delivered to the Agent, is complete and correct and fairly presents the funding status of such Employee Plan, and since the date of such report there has been no material adverse change in such funding status, (iv) copies of each agreement entered into with the PBGC, the U.S. Department of Labor or the Internal Revenue Service with respect to any Employee Plan have been delivered to the Agent, (v) no Employee Plan had an accumulated or waived funding deficiency or permitted decrease which would create a deficiency in its funding standard account or has applied for an extension of any amortization period within the meaning of Section 412 of the Internal Revenue Code at any time during the previous sixty (60) months, and (vi) no Lien imposed under the Internal Revenue Code or ERISA exists or is likely to arise on account of any Employee Plan within the meaning of Section 412 of the Internal Revenue Code. No Credit Party or any of its ERISA Affiliates has incurred any withdrawal liability under ERISA with respect to any Multiemployer Plan, or is aware of any facts indicating that it or any of its ERISA Affiliates may in the future incur any such withdrawal liability. No Credit Party or any of its ERISA Affiliates nor any fiduciary of any Employee Plan has (i) engaged in a nonexempt prohibited transaction described in Sections 406 of ERISA or 4975 of the Internal Revenue Code, (ii) failed to pay any required installment or other payment required under Section 412 of the Internal Revenue Code on or before the due date for such required installment or payment, (iii) engaged in a transaction within the meaning of Section 4069 of ERISA or (iv) incurred any liability to the PBGC which remains outstanding other than the payment of premiums, and there are no premium payments which have become due which are unpaid. There are no pending or, to the best knowledge of any Credit Party, threatened claims, actions, proceedings or lawsuits (other than claims for benefits in the normal course) asserted or instituted against (i) any Employee Plan or its assets, (ii) any fiduciary with respect to any Employee Plan, or (iii) any Credit Party or any of its ERISA

Affiliates with respect to any Employee Plan. Except as required by Section 4980B of the Internal Revenue Code, no Credit Party or any of its ERISA Affiliates maintains an employee welfare benefit plan (as defined in Section 3(1) of ERISA) which provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Credit Party or any of its ERISA Affiliates or coverage after a participant's termination of employment.

      (j)    Taxes, Etc. All Federal, state and local tax returns and other reports required by applicable law to be filed by any Credit Party have been filed, or extensions have been obtained, and all taxes, assessments and other governmental charges imposed upon any Credit Party or any property of any Credit Party and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP.

      (k)    Regulations T, U and X. No Credit Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of the Term Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

      (l)    Nature of Business. Borrower, Greenwich Lifestyle, Nevada II and Boston II are not engaged in any business other than owning and operating radio broadcast properties, the Stations, radio broadcast programming services in connection therewith and any other activities directly or indirectly related thereto and no Broadcast License Subsidiary shall engage in any business other than holding its respective Broadcast License.

      (m)    Adverse Agreements, Etc. No Loan Party is a party to any agreement or instrument, or subject to any charter, limited liability company agreement, partnership agreement or other corporate, partnership or limited liability company restriction or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority, which has, or in the future could reasonably be expected to have, a Material Adverse Effect.

      (n)    Broadcast Licenses; Permits, Etc.

      (i)    Except as listed on Schedule 5.01(n), the Credit Parties, the Stations and the operations of the Credit Parties are in compliance with the Communications Laws, the applicable Broadcast Licenses (including, without limitation, payment of all annual FCC regulatory fees assessed with respect to such Broadcast Licenses), and all other Requirements of Law of the FCC and the FAA, including, without limitation, requirements for the filing of reports, except as those violations that would not in the aggregate have Material Adverse Effect other than any FCC fine over $1,000. In particular, except as set forth on Schedule 5.01(n) hereto, each Station is operating (A) from a tower structure, (B) at the center of radiation height, and (C) full-time and within at least 95% of the power, all as specified in the applicable Broadcast Licenses with respect to such Station that authorize the primary transmissions of such Station.

(ii)     All of the tower structures used or proposed to be used in the operation of the Stations (including, without limitation, tower structures used or proposed to be used in the operation of any FM booster facility) are obstruction-marked and lighted in accordance with the Communications Laws and all other Requirements of Law. Appropriate notifications to the FAA have been filed for each such tower structure, if and to the extent required by the Communications Laws or any other Requirement of Law. The FAA has granted *"No Hazard"* determinations with respect to each such tower structure, if and to the extent required by the Communications Laws or any other Requirement of Law. Appropriate Antenna Structure Registrations have been issued by the FCC with respect to each such tower structure, if and to the extent required by the Communications Laws or any other Requirement of Law. To the best knowledge of any Credit Party, neither the current nor proposed operation of any Station (including, without limitation, the operation of any FM booster facility) does or will expose workers or the general public to levels of radio frequency radiation in excess of the levels prescribed by the Communications Laws.

(iii)     Schedule 5.01(n) sets forth for each Station an accurate and complete list of all Broadcast Licenses issued by the FCC with respect to the Stations. The Broadcast Licenses listed in Schedule 5.01(n) with respect to any Station include all material authorizations, licenses, applications and permits issued by or filed with the FCC that are required or necessary for the operation of such Station, and the conduct of the business of each applicable Credit Party with respect to such Station, as now conducted and as presently proposed to be conducted. Except as listed in Schedule 5.01(n), the Broadcast Licenses with respect to each Station are issued in the name of the respective Credit Party that operates such Station (as set forth in Schedule 5.01(n)) under authority of such Broadcast Licenses and are validly issued and in full force and effect, unimpaired by any act of or omission by such Credit Party, its employees or agents, and have not been revoked, cancelled or forfeited and have not expired. The Broadcast Licenses listed on Schedule 5.01(n) are not subject to any condition not stated on the face of such Broadcast License, except such conditions as are applicable to radio stations of such type generally under the Communications Laws. Each Credit Party has fulfilled and performed in all material respects all of its obligations to date with respect to the Broadcast Licenses for the Stations. The Credit Parties have timely filed with the FCC applications for renewal of the Broadcast Licenses of all of the Stations. The renewal application is still pending for the Station in Connecticut. Such renewal applications disclose all information that may affect FCC action thereon. No Credit Party is aware of any information leading it to believe that any of the Broadcast Licenses (including without limitation those with pending renewal applications) will not be renewed in the ordinary course.

(iv)     (A) Except as set forth on Schedule 5.01(n)(iv), there is no action, proceeding, investigation, complaint, petition, objection or request for hearing reconsideration or administrative or judicial review pending or, to any Credit Party's knowledge threatened, with respect to any Station, any Broadcast License with respect to any Station or any Credit Party, which seeks or will seek to deny or adversely modify any application or rule making proposal pending before the FCC and pertaining to any Station, any Broadcast License with respect to any Station or any Credit Party, or with respect to any amendment or modification of any such Broadcast License or a Station and its operations, or the revocation of or conditional renewal or non-renewal of any such Broadcast License, and (B) there is no action, proceeding, investigation, complaint, petition, objection or request for hearing, reconsideration or administrative or judicial

review pending, or to any Credit Party's knowledge, threatened against any Person under common ownership with a Credit Party and regulated by the FCC which, in either case, if adversely determined, could reasonably be expected to have a Material Adverse Effect. Each Person who holds an "*attributable interest*" (within the meaning of the Communications Laws) with respect to any Credit Party is qualified to be an FCC licensee under the Communications Laws. To the best knowledge of the Credit Parties, none of the Stations (I) is causing or receiving objectionable interference or (II) is presently the subject of any presentation before the FCC or elsewhere that alleges that any of such stations is causing objectionable interference or that contains a proposal that could reasonably be expected to have the effect of causing objectionable interference to any of such stations or of requiring that any such Station cease operations or modify its facilities in any material respect.

(v)     No fine, forfeiture, notice of apparent liability or other penalty (A) assessed by the FCC with respect to the operations of any Station or the Broadcast Licenses of any Station, and (B) the payment or performance of which, or the compliance with which, could reasonably be expected to have a Material Adverse Effect, is payable or subject to performance or compliance with by any Credit Party; and no proceeding is pending or (to the best knowledge of any Credit Party) threatened with respect to the assessment of any such fine, forfeiture, notice of apparent liability or other penalty.

(o)     <u>Properties</u>. BTR West holds all of the Broadcast Licenses held for use in the operation of the Stations and Nevada II owns all of the other assets and properties used or held for use in the operation of the Stations located in Nevada. BTR Boston holds all of the Broadcast Licenses held for use in the operation of the Stations and BTR Boston II owns all of the other assets and properties used or held for use in the operation of the Stations in Massachusetts. BTR Connecticut holds all of the Broadcast Licenses and Greenwich owns all of the other assets and properties used or held for use in the operation of the Stations located in Connecticut. Lifestyle holds all of the Broadcast Licenses and owns all of the other assets and properties used or held for use in the operation of the Stations located in New York. Borrower owns all of the Capital Stock of the Subsidiary Guarantors and other assets used in the operation of the Stations.

(i)     Each Credit Party has good and marketable title to, valid leasehold interests in, or valid licenses to use, all property and assets material to its business, free and clear of all Liens, except Permitted Liens. All such properties and assets are in good working order and condition, ordinary wear and tear excepted.

(ii)     <u>Schedule 5.01(o)</u> sets forth a complete and accurate list, as of the Effective Date, of the location, by state and street address or coordinates, of all real property (including, without limitation, Tower Lease Sites, studio and transmitter sites) owned or leased by each Credit Party. As of the Effective Date, each Credit Party has valid leasehold interests in the Leases described on <u>Schedule 5.01(o)</u> to which it is a party. Schedule 5.01(o) sets forth with respect to each such Lease, the commencement date, termination date, renewal options (if any) and annual base rents. Each such Lease is valid and enforceable in accordance with its terms in all respects and is in full force and effect. No consent or approval of any landlord or other third party in connection with any such Lease is necessary for any Credit Party to enter into and execute the Loan Documents to which it is a party, except as set forth on <u>Schedule 5.01(o)</u>. To

the best knowledge of any Credit Party, (A) no other party to any such Lease is in default of its obligations thereunder, and (B) no Credit Party (or, to the knowledge of any Credit party, any other party to any such Lease) has at any time delivered or received any notice of default which remains uncured under any such Lease and, as of the Effective Date, no event has occurred which, with the giving of notice or the passage of time or both, would constitute a material default under any such Lease.

(p)    Full Disclosure.    Each Credit Party has disclosed to the Agent all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the other reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Agent in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which it was made, not misleading; provided that, with respect to projected financial information, each Credit Party represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time. There is no contingent liability or fact that may have a Material Adverse Effect which has not been set forth in a footnote included in the Financial Statements or a Schedule hereto.

(q)    Operating Lease Obligations.    On the Effective Date, none of the Credit Parties has any Operating Lease Obligations other than the real property Leases set forth on Schedule 5.01(o).

(r)    Environmental Matters.    (i) Except as set forth on Schedule 5.01(r), the operations of each Credit Party are in compliance with all Environmental Laws; (ii) there has been no Release at any of the properties owned or operated by any Credit Party or a predecessor in interest, or at any disposal or treatment facility which received Hazardous Materials generated by any Credit Party or any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (iii) no Environmental Action has been asserted against any Credit Party or any predecessor in interest nor does any Credit Party have knowledge or notice of any threatened or pending Environmental Action against any Credit Party or any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (iv) no Environmental Actions have been asserted against any facilities that may have received Hazardous Materials generated by any Credit Party or, any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (v) no property now or formerly owned or operated by a Credit Party has been used as a treatment or disposal site for any Hazardous Material; (vi) no Credit Party has failed to report to the proper Governmental Authority any Release which is required to be so reported by any Environmental Laws which could reasonably be expected to have a Material Adverse Effect; (vii) each Credit Party holds all licenses, permits and approvals required under any Environmental Laws in connection with the operation of the business carried on by it, except for such licenses, permits and approvals as to which a Credit Party's failure to maintain or comply with could not reasonably be expected to have a Material Adverse Effect; and (viii) no Credit Party has received any notification pursuant to any Environmental Laws that (A) any work, repairs, construction or Capital Expenditures are required to be made in respect as a condition of continued compliance with any Environmental

Laws, or any license, permit or approval issued pursuant thereto or (B) any license, permit or approval referred to above is about to be reviewed, made, subject to limitations or conditions, revoked, withdrawn or terminated, in each case, except as could not reasonably be expected to have a Material Adverse Effect.

(s)     Insurance.  Each Credit Party keeps its property adequately insured and maintains (i) insurance to such extent and against such risks, including fire, as is customary with companies in the same or similar businesses, (ii) workmen's compensation insurance in the amount required by applicable law, (iii) public liability insurance, which shall include product liability insurance, in the amount customary with companies in the same or similar business against claims for personal injury or death on properties owned, occupied or controlled by it, and (iv) such other insurance as may be required by law or as may be reasonably required by the Agent (including, without limitation, against broadcasters' liability, insurance against claims of libel, slander, disparagement, defamation, interference with rights of privacy, and copyright and other proprietary right infringement, larceny, embezzlement or other criminal misappropriation). Schedule 5.01(s) sets forth a list of all insurance maintained by each Credit Party on the Effective Date.

(t)     Use of Proceeds.  The proceeds of the Term Loan will be used only as set forth in Section 2.01 [Commitments].  Except as set forth on Schedule 5.10(t), there is no broker fee due as a result of any action by any Loan Party in connection with the transactions contemplated by this Agreement and the other Loan Documents.

(u)     Solvency.  After giving effect to the transactions contemplated by this Agreement and before and after giving effect to the Term Loan, each of the Loan Parties is, and the Credit Parties are, individually and on a consolidated basis, Solvent.

(v)     Location of Bank Accounts.  Schedule 5.01(v) sets forth a complete and accurate list as of the Effective Date of all deposit, checking and other bank accounts, all securities and other accounts maintained with any broker dealer and all other similar accounts maintained by each Credit Party, together with a description thereof (i.e., the bank or broker dealer at which such deposit or other account is maintained and the account number and the purpose thereof).

(w)     Intellectual Property.  Each Credit Party owns or licenses or otherwise has the right to use all material licenses, permits, patents, patent applications, trademarks, trademark applications, service marks, tradenames, copyrights, copyright applications, franchises, authorizations, non-governmental licenses and permits and other intellectual property rights that are necessary for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Set forth on Schedule 5.01(w) is a complete and accurate list as of the Effective Date of all such material licenses, permits, patents, patent applications, trademarks, trademark applications, service marks, tradenames, copyrights, copyright applications, franchises, authorizations, non-governmental licenses and permits and other intellectual property rights of each Credit Party.  No slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Credit Party

infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Credit Party, threatened, except for such infringements and conflicts which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. To the best knowledge of each Credit Party, no patent, invention, device, application, principle or any statute, law, rule, regulations, standard or code is pending, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(x)    Material Contracts. Set forth on Schedule 5.01(x) is a complete and accurate list as of the Effective Date of all Material Contracts of each Credit Party, showing the parties and subject matter thereof and amendments and modifications thereto. Each such Material Contract (i) is in full force and effect and is binding upon and enforceable against each Credit Party that is a party thereto and, to the best knowledge of such Credit Party, all other parties thereto in accordance with its terms and (ii) has not been otherwise amended or modified and (iii) is not in default due to the action of any Credit Party or, to the best knowledge of any Credit Party, any other party thereto.

(y)    Investment Company Acts. None of the Credit Parties is an "*investment company*" or an "*affiliated person*" or "*promoter*" of, or "*principal underwriter*" of or for, an "*investment company*", as such terms are defined in the Investment Company Act of 1940, as amended.

(z)    Employee and Labor Matters. There is (i) no unfair labor practice complaint pending or, to the best knowledge of any Credit Party, threatened against any Credit Party before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Credit Party which arises out of or under any collective bargaining agreement, (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened against any Credit Party or (iii) to the best knowledge of any Credit Party, no union representation question existing with respect to the employees of any Credit Party and no union organizing activity taking place with respect to any of the employees of any Credit Party. No Credit Party or any of its ERISA Affiliates has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("*WARN*") or similar state law, which remains unpaid or unsatisfied. The hours worked and payments made to employees of any Credit Party have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements. All material payments due from any Credit Party on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Credit Party.

(aa)    Customers and Suppliers. There exists no actual or threatened termination, cancellation or limitation of, or modification to or material change in, the business relationship between (i) any Credit Party, on the one hand, and any customer or any group thereof, on the other hand, whose agreements with any Credit Party are individually or in the aggregate material to the business or operations of such Credit Party, or (ii) any Credit Party, on the one hand, and any material supplier thereof, on the other hand; and there exists no present state of facts or circumstances that could reasonably be expected to give rise to or result in any such termination, cancellation, limitation, modification or material change.

(bb)    No Bankruptcy Filing.    No Credit Party is contemplating either an Insolvency Proceeding or the liquidation of all or a major portion of such Credit Party's assets or property, and no Credit Party has any knowledge of any Person contemplating an Insolvency Proceeding against it.

(cc)    Company Information.    Schedule 5.01(cc) sets forth a complete and accurate list as of the date hereof of (i) each place of business of each Credit Party, (ii) each location at which any Collateral is located, (iii) the chief executive office of each Credit Party, (iv) the federal employer identification number of each Credit Party, (v) each previous name used by a Credit Party within the last five years and (vi) each tradename used by each Credit Party, if any.

(dd)    Locations of Collateral.    There is no location at which any Credit Party has any Collateral (except for Inventory in transit) other than (i) those locations listed on Schedule 5.01(cc) and (ii) any other locations within the United States, so long as any Credit Party notifies Agent and Lender in writing ten (10) days prior to the movement of any collateral to said location except for those certain locations of radio station towers.

(ee)    Security Interests.    Each Security Agreement creates in favor of the Agent, for the benefit of the Lender, a legal, valid and enforceable security interest in the Collateral secured thereby.    Upon the filing of the UCC financing statements described in Section 4.01(d)(xi) [Delivery of Documents], such security interests in and Liens on the Collateral granted thereby shall be perfected, first priority security interests, and no further recordings or filings are or will be required in connection with the creation, perfection or enforcement of such security interests and Liens, other than (i) the filing of continuation statements in accordance with applicable law, (ii) the recording of the Collateral Assignments for Security pursuant to each Security Agreement in the United States Patent and Trademark Office and the United States Copyright Office, as applicable, with respect to after-acquired U.S. patent and trademark applications and registrations and U.S. copyrights and (iii) the recordation of appropriate evidence of the security interest in the appropriate foreign registry with respect to all foreign intellectual property.

(ff)    Schedules.    All of the information which is required to be scheduled to this Agreement is set forth on the Schedules attached hereto, is correct and accurate in all material respects as of the date hereof and does not omit to state any information material thereto.

(gg)    Representations and Warranties in Documents; No Default.    All representations and warranties set forth in this Agreement and the other Loan Documents are true and correct in all material respects at the time as of which such representations were made and on the Effective Date.    No Event of Default has occurred and is continuing and no condition exists which constitutes a Default or an Event of Default.

## ARTICLE VI

## COVENANTS OF THE CREDIT PARTIES

Section 6.01  <u>Affirmative Covenants</u>.  So long as any principal of or interest on the Term Loan or any other Obligation (whether or not due) shall remain unpaid or the Lender shall have any Commitment hereunder, each Credit Party will, and each Individual Guarantor will, pursuant to Sections 6.01(a)(xiii), 6.01(a)(xiv), 6.01(a)(xviii), 6.01(c) and 6.01(k), unless the Lender shall otherwise consent in writing:

(a)    <u>Reporting Requirements</u>.  Furnish to the Agent and the Lender:

(i)    as soon as available and in any event within forty-five (45) days after the end of each fiscal quarter of the Credit Parties commencing with the first fiscal quarter of each Credit Party ending after the Effective Date, consolidated balance sheets, consolidated statements of operations and retained earnings and consolidated statements of cash flows of the Credit Parties as at the end of such quarter, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the figures for the corresponding date or period of the immediately preceding Fiscal Year, all in reasonable detail and certified by an Authorized Officer of the Borrower as fairly presenting, in all respects, the financial position of the Credit Parties as of the end of such quarter and the results of operations and cash flows of the Credit Parties for such quarter, in accordance with GAAP applied in a manner consistent with that of the most recent financial statements of the Credit Parties furnished to the Agent and the Lender, subject to normal year-end adjustments;

(ii)    as soon as available and in any event within ninety (90) days after the end of each Fiscal Year of the Credit Parties and in the case of Fiscal Year 2005, on or before forty-five (45) days after the Effective Date, audited consolidated balance sheets, audited consolidated statements of operations and retained earnings and audited consolidated statements of cash flows of the Credit Parties as at the end of such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the immediately preceding Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, and accompanied by a report and an opinion, prepared in accordance with generally accepted auditing standards, of independent certified public accountants of recognized standing selected by the Borrower and reasonably satisfactory to the Agent (which opinion shall be without (A) a "going concern" or like qualification or exception, (B) any qualification or exception as to the scope of such audit, or (C) any qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item, the effect of which would be to cause any noncompliance with the provisions of <u>Section 6.03</u> [Financial Covenants]), together with a written statement of such accountants (1) to the effect that, in making the examination necessary for their certification of such financial statements, they have not obtained any knowledge of the existence of an Event of Default or a Default and (2) if such accountants shall have obtained any knowledge of the existence of an Event of Default or such Default, describing the nature thereof;

(iii)     as soon as available and in any event within fifteen (15) days after the end of each fiscal month of the Credit Parties commencing with the first fiscal month of the Credit Parties ending after the Effective Date, internally prepared consolidated balance sheets, consolidated statements of operations and retained earnings and consolidated statements of cash flows as at the end of such fiscal month, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such fiscal month, all in reasonable detail and certified by an Authorized Officer of the Borrower as fairly presenting, in all material respects, the financial position of the Credit Parties as at the end of such fiscal month and the results of operations, retained earnings and cash flows of the Credit Parties for such fiscal month, in accordance with GAAP applied in a manner consistent with that of the most recent financial statements furnished to the Agent and the Lender, subject to normal year-end adjustments;

(iv)     simultaneously with the delivery of the financial statements of the Credit Parties required by clauses (i), (ii) and (iii) of this Section 6.01(a) [Reporting Requirements], a certificate of an Authorized Officer of the Borrower (A) stating that such Authorized Officer has reviewed the provisions of this Agreement and the other Loan Documents and has made or caused to be made under his or her supervision a review of the condition and operations of the Credit Parties during the period covered by such financial statements with a view to determining whether the Credit Parties were in material compliance with all of the provisions of this Agreement and such Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and such Authorized Officer has no knowledge of, the existence of an Event of Default or Default or, if an Event of Default or Default exists, describing the nature and period of existence thereof and the action which the Credit Parties propose to take or have taken with respect thereto; (B) stating specifically whether the Credit Parties have complied with the provisions of Section 6.02(u) during such period; (C) attaching a schedule showing the calculations specified in Section 6.03 [Financial Covenants]; and (D) certifying that during such period that no proceeds of the Term Loan have been used by or for the benefit of Lifestyle.

(v)     simultaneously with the delivery of the financial statements of the Credit Parties required by clauses (i) and (ii) of this Section 6.01(a) [Reporting Requirements] and after the occurrence of any Default or Event of Default, simultaneously with the delivery of the financial statements of the Credit Parties required by clause (iii) of this Section 6.01(a) [Reporting Requirements], a certificate of an Mr. B. Michael Pisani stating that he has reviewed the provisions of this Agreement and the other Loan Documents and has made a review of the financial conditions of the Individual Guarantors during the relevant period with a view to determining whether the Individual Guarantors were in compliance with all of the provisions of this Agreement and such Loan Documents including but not limited to Section 6.04 [Individual Financial Covenants] hereof, and that such review (i) has not disclosed, and he has no knowledge of, the existence of an Event of Default or Default and (ii) has disclosed that the Individual Guarantors have maintained collectively during such period at least $6,000,000 in Liquid Assets and Marketable Securities;

(vi)     promptly upon the Agent's request, reports in form and detail satisfactory to the Agent and certified by an Authorized Officer of the Borrower as being accurate and complete (A) listing all Accounts Receivable of the Credit Parties as of such day,

which shall include the amount and age of each such Account Receivable, showing separately those which are more than 30, 60, 90 and 120 days old and a description of all Liens, set-offs, defenses and counterclaims with respect thereto, together with a reconciliation of such schedule with the schedule delivered to the Agent pursuant to this clause (v)(A) for the immediately preceding fiscal month, the name and mailing address of each Account Debtor with respect to each such Account Receivable and such other information as the Agent may reasonably request, and (B) listing all accounts payable of the Credit Parties as of each such day which shall include the amount and age of each such account payable, the name and mailing address of each account creditor and such other information as the Agent may reasonably request, all in detail and in form satisfactory to the Agent;

(vii)    as soon as available and in any event not later than thirty (30) days prior to the end of each Fiscal Year, financial projections, supplementing and superseding the financial projections referred to in Section 5.01(g)(ii)(A) [Financial Condition], prepared on a monthly basis and the consolidated final annual budget and any other forecasts or projections of the Credit Parties, in form and substance reasonably satisfactory to the Agent, for the immediately succeeding Fiscal Year for the Credit Parties;

(viii)    (A) promptly after submission to any Governmental Authority, (I) all documents and information furnished to such Governmental Authority in connection with any investigation of any Credit Party other than routine inquiries by such Governmental Authority, and (II) copies of any periodic or special reports filed by any Credit Party with any Specified Authority, other than routine reports filed in the ordinary course of business, and (B) as soon as available and in any event within five (5) days of the execution, receipt or delivery thereof, copies of material notices and other material communications received from or sent to any Specified Authority which specifically relate to a Credit Party, any Station or any License;

(ix)    as soon as possible and in any event within three (3) Business Days after the occurrence of an Event of Default or Default or in any event within five (5) Business Days of the occurrence of any event or development that could reasonably be expected to have a Material Adverse Effect, the written statement of an Authorized Officer of the Borrower setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Credit Party proposes to take with respect thereto;

(x)    (A) as soon as possible and in any event within ten (10) days after any Credit Party or any ERISA Affiliate thereof knows or has reason to know that (1) any Reportable Event with respect to any Employee Plan has occurred, (2) any other Termination Event with respect to any Employee Plan has occurred, or (3) an accumulated funding deficiency has been incurred or an application has been made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including installment payments) or an extension of any amortization period under Section 412 of the Internal Revenue Code with respect to an Employee Plan, a statement of an Authorized Officer of the Borrower setting forth the details of such occurrence and the action, if any, which such Credit Party or such ERISA Affiliate proposes to take with respect thereto, (B) promptly and in any event within three (3) days after receipt thereof by any Credit Party or any ERISA Affiliate thereof from the PBGC, copies of each notice received by any Credit Party or any ERISA Affiliate thereof of the PBGC's

intention to terminate any Plan or to have a trustee appointed to administer any Plan, (C) promptly and in any event within 10 (ten) days after the filing thereof with the Internal Revenue Service if requested by the Agent, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Employee Plan and Multiemployer Plan, (D) promptly and in any event within 10 (ten) days after any Credit Party or any ERISA Affiliate thereof knows or has reason to know that a required installment within the meaning of Section 412 of the Internal Revenue Code has not been made when due with respect to an Employee Plan, (E) promptly and in any event within three (3) Business Days after receipt thereof by any Credit Party or any ERISA Affiliate thereof from a sponsor of a Multiemployer Plan or from the PBGC, a copy of each notice received by any Credit Party or any ERISA Affiliate thereof concerning the imposition or amount of withdrawal liability under Section 4202 of ERISA or indicating that such Multiemployer Plan may enter reorganization status under Section 4241 of ERISA, and (F) promptly and in any event within ten (10) days after any Credit Party or any ERISA Affiliate thereof sends notice of a plant closing or mass layoff (as defined in WARN) to employees, copies of each such notice sent by such Credit Party or such ERISA Affiliate thereof;

(xi)    promptly upon their becoming available, and in any event within ten (10) days following the publication thereof, all Arbitron and other ratings reports applicable to any Credit Party with respect to the radio broadcast markets in which any Station is located;

(xii)    promptly after the commencement thereof but in any event not later than ten (10) days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Credit Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(xiii)    as soon as possible and in any event within ten (10) days after execution, receipt or delivery thereof, copies of any material notices that any Credit Party executes or receives in connection with any Material Contract;

(xiv)    as soon as possible and in any event within ten (10) days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with the sale or other Disposition of the Capital Stock of, or all or substantially all of the assets of, any Credit Party;

(xv)    promptly after the sending or filing thereof, copies of all statements, reports and other information any Loan Party sends to any holders of, or files with any Governmental Authority in respect of, any Indebtedness or Capital Stock of any Credit Party;

(xvi)    promptly upon receipt thereof, copies of all financial reports (including, without limitation, management letters), if any, and submitted to any Credit Party by its auditors in connection with any annual or interim audit of the books thereof, and copies of all correspondence between its auditors and any Credit Party;

(xvii)    promptly, and in any event within five (5) days after the end of each month, an update of any reports delivered pursuant to Section 4.01(d) [Delivery of

Documents], including reports as to the status of any FCC construction permits and applications and any related work, in form and substance reasonably satisfactory to the Agent;

(xviii) promptly, and in any event within five (5) days after the internal distribution thereof, copies of all internal financial and other reports prepared by or delivered to any Credit Party or any executive officer of a Credit Party;

(xix) promptly at the end of the Fiscal Quarter ending on April 30, 2007 and at the end of Fiscal Year 2007 and each Fiscal Year thereafter during the term hereof each Individual Guarantor shall provide quarterly financial statements or annual financial statements, as applicable, in form and substance acceptable to Lender, including but not limited to, (a) total net worth of each Individual Guarantor, and (b) total amount of Liquid Assets and Marketable Securities held by such Individual Guarantor, but at least delivered within forty-five (45) days of the end of each Fiscal Quarter listed above and at the end of each Fiscal Year during the term hereof, and at the end of each Fiscal Year, copies of federal income tax returns within forty-five (45) days of their having been filed during the term hereof of each Individual Guarantor;

(xx) promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Credit Party as the Agent may from time to time may reasonably request; and

(xxi) on the closing date of each Acquisition, a certificate of the financial officer of the Borrower, setting forth in reasonable detail the calculations required to establish compliance, both (A) immediately prior to giving effect to such the Acquisition and (B) on a pro forma basis immediately after giving effect to such Acquisition, with each of the financial covenants contained in Section 6.03 [Financial Covenants];.

(b)    Additional Guarantees and Collateral Security. Cause:

(i)    each Subsidiary of any Credit Party not in existence on the Effective Date to execute and deliver to the Agent promptly and in any event within three (3) Business Days after the formation, acquisition by any Credit Party or change in status thereof (A) a Subsidiary Guaranty guaranteeing the Obligations, (B) a Security Agreement, (C) if such Subsidiary has any Subsidiaries, a Pledge Agreement together with (x) certificates evidencing all of the Capital Stock of any Person owned by such Subsidiary, (y) undated stock powers executed in blank with signature guaranteed, and (z) such opinion of counsel and such approving certificate of such Subsidiary as the Agent may request in respect of complying with any legend on any such certificate or any other matter relating to such shares, (D) one or more Mortgages creating on the real property of such Subsidiary a perfected, first priority Lien on such real property, a Title Insurance Policy covering such real property, a current ALTA survey thereof and a surveyor's certificate, each in form and substance satisfactory to the Agent, together with such other agreements, instruments and documents as the Agent may require whether comparable to the documents required under Section 6.01(o) [After Acquired Real Property] or otherwise, and (E) such other agreements, instruments, approvals, legal opinions or other documents reasonably requested by the Agent in order to create, perfect, establish the first priority of or otherwise protect any Lien purported to be covered by any such Security Agreement, Pledge Agreement[, Mortgage] or otherwise to effect the intent that such Subsidiary shall become bound by all of the

terms, covenants and agreements contained in the Loan Documents and that all property and assets of such Subsidiary shall (to the maximum extent permitted by applicable law) become Collateral for the Obligations; and

              (ii)     each owner of the Capital Stock of any such Subsidiary to execute and deliver promptly and in any event within three (3) days after the formation or acquisition by any Credit Party of such Subsidiary a Pledge Agreement, together with (A) certificates evidencing all of the Capital Stock of such Subsidiary, (B) undated stock powers or other appropriate instruments of assignment executed in blank with signature guaranteed, (C) such opinion of counsel and such approving certificate of such Subsidiary as the Agent may reasonably request in respect of complying with any legend on any such certificate or any other matter relating to such shares and (D) such other agreements, instruments, approvals, legal opinions or other documents reasonably requested by the Agent.]

              (c)    <u>Compliance with Laws, Etc.</u>  Each Credit Party and each Individual Guarantor will comply in all material respects with all applicable laws, rules, regulations and orders (including, without limitation, all Communications Laws and Environmental Laws), such compliance to include, without limitation, (i) paying before the same become delinquent all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any of its properties, and (ii) paying all lawful claims which if unpaid might become a Lien or charge upon any of its properties, except, in any case, to the extent of an extension of payment date or to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP.

              (d)    <u>Preservation of Existence, Etc.</u>  Maintain and preserve its existence, rights and privileges, and become or remain duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

              (e)    <u>Keeping of Records and Books of Account.</u>  Keep reasonably adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP.

              (f)    <u>Inspection Rights.</u>  Permit the agents and representatives of the Agent at any time and from time to time (so long as no Event of Default has occurred and is continuing, during normal business hours and in a manner so as not to unduly disrupt the business of the Credit Parties), at the expense of the Borrower, to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other assets, to conduct audits, physical counts, valuations, appraisals, Phase I Environmental Site Assessments (and, if requested by the Agent based upon the results of any such Phase I Environmental Site Assessment, a Phase II Environmental Site Assessment) or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives. In furtherance of the foregoing, each Credit Party hereby authorizes its independent accountants to discuss the affairs, finances and

accounts of such Person (independently or together with representatives of such Person) with the agents and representatives of the Agent in accordance with this <u>Section 6.01(f)</u> [Inspection Rights].

(g)     <u>Maintenance of Properties, Etc.</u>  Maintain and preserve all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, if such loss or forfeiture could reasonably be expected to result in a Material Adverse Effect.

(h)     <u>Maintenance of Insurance.</u>  Maintain insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance, broadcasters' liability, insurance against claims of libel, slander, disparagement, defamation, interference with rights of privacy, and copyright and other proprietary right infringement, larceny, embezzlement or other criminal misappropriation) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and in any event in amount, adequacy and scope reasonably satisfactory to the Agent.  All policies covering the Collateral are to be made payable to the Agent for the benefit of the Lender, as its interests may appear, in case of loss, under a standard non contributory "lender" or "secured party" clause and are to contain such other provisions as the Agent may require to fully protect the Lender's interest in the Collateral and to any payments to be made under such policies.  All certificates of insurance are to be delivered to the Agent and the policies are to be premium prepaid, with the loss payable and additional insured endorsement in favor of the Agent and such other Persons as the Agent may designate from time to time, and shall provide for not less than thirty (30) days' prior written notice to the Agent of the exercise of any right of cancellation.  If any Credit Party fails to maintain such insurance, the Agent may arrange for such insurance, but at the Borrowers' expense and without any responsibility on the Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  Upon the occurrence and during the continuance of an Event of Default, the Agent shall have the sole right, in the name of the Lender, any Credit Party, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(i)     <u>Obtaining of Permits, Etc.</u>  Obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses (including, without limitation, all Broadcast Licenses), authorizations, approvals, entitlements and accreditations which are necessary or useful in the proper conduct of its business as presently conducted or as proposed to be conducted (including, without limitation, maintaining each outstanding FCC construction permit in connection with any Station in full force and effect and not permitting any such permit to lapse, expire, or be cancelled or forfeited).

(j)     Environmental. (i) Keep any property either owned or operated by it free of any Environmental Liens; (ii) comply in all material respects with applicable Environmental Laws and provide to the Agent any documentation of such compliance which the Agent may reasonably request; (iii) provide the Agent written notice within five (5) days of any Release of a Hazardous Material in excess of any reportable quantity from or onto property at any time owned or operated by it and take any Remedial Actions required to abate said Release; and (iv) provide the Agent with written notice within ten (10) days of the receipt of any of the following: (A) notice that an Environmental Lien has been filed against any property of any Credit Party; (B) commencement of any Environmental Action or unequivocal notice that an Environmental Action will be filed against any Credit Party; and (C) notice of a violation, citation or other administrative order which could reasonably be expected to have a Material Adverse Effect.

(k)     Further Assurances. Each Credit Party and each Individual Guarantor will take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as the Agent may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents to which any Loan Party is a party, (ii) to subject to valid and perfected first priority Liens any of the Collateral or any other property of any Credit Party, (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents to which any Loan Party is a party and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto the Agent and, the Lender the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document to which any Loan Party is a party. In furtherance of the foregoing, to the maximum extent permitted by applicable law, each Credit Party (i) authorizes the Agent to execute any such agreements, instruments or other documents in such Credit Party's name and to file such agreements, instruments or other documents in any appropriate filing office (to the extent not executed or filed by a Credit Party), (ii) authorizes the Agent to file any financing statement required hereunder or under any other Loan Document, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of such Credit Party, and (iii) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of such Credit Party prior to the date hereof.

(l)     Change in Collateral; Collateral Records. (i) Give the Agent not less than thirty (30) days' prior written notice of any change in the location of any Collateral, other than to locations set forth on Schedule 5.01(ee) and with respect to which the Agent has filed financing statements and otherwise perfect its Liens thereon, (ii) advise the Agent promptly, in sufficient detail, of any material adverse change relating to the type, quantity or quality of the Collateral or the Lien granted thereon and (iii) execute and deliver to the Agent for the benefit of the Lender from time to time, solely for the Agent's convenience in maintaining a record of Collateral, such written statements and schedules as the Agent may reasonably require, designating, identifying or describing the Collateral.

(m)     Landlord Waivers; Collateral Access Agreements.

(i)     At any time any Collateral with a book value in excess of $10,000 (when aggregated with all other Collateral at the same location) is located on any real property of

a Credit Party (whether such real property is now existing or acquired after the Effective Date) which is not owned by a Credit Party, use reasonable best efforts to obtain written subordinations or waivers, in form and substance reasonably satisfactory to the Agent, of all present and future Liens to which the owner or lessor of such premises may be entitled to assert against the Collateral; and

      (ii)     Use reasonable best efforts to obtain written access agreements, in form and substance reasonably satisfactory to the Agent, providing access to Collateral located on any premises not owned by a Credit Party in order to remove such Collateral from such premises during an Event of Default.

      (n)     <u>Subordination</u>. Cause all Indebtedness and other obligations now or hereafter owed by it to any of its Affiliates, to be subordinated in right of payment and security to the Indebtedness and other Obligations owing to the Agent and the Lender in accordance with a subordination agreement in form and substance reasonably satisfactory to the Agent.

      (o)     <u>After Acquired Real Property</u>. Upon the acquisition by it after the date hereof of any interest (whether fee or leasehold) in any real property (wherever located) (each such interest being an "***After Acquired Property***") (x) with a Current Value (as defined below) in excess of $50,000 in the case of a fee interest, or (y) requiring the payment of annual rent exceeding in the aggregate $18,000 in the case of leasehold interest, immediately so notify the Agent, setting forth with specificity a description of the interest acquired, the location of the real property, any structures or improvements thereon and either an appraisal or such Credit Party's good-faith estimate of the current value of such real property (for purposes of this Section, the "***Current Value***"). The Agent shall notify such Credit Party whether it intends to require a Mortgage and the other documents referred to below or in the case of leasehold, a leasehold Mortgage or landlord's waiver (pursuant to <u>Section 6.02(m)</u>) [Landlord Waivers; Collateral Access Agreements] hereof). Upon receipt of such notice requesting a Mortgage, the Person which has acquired such After Acquired Property shall promptly, and in any event not more than fourteen (14) days after the acquisition of such property, furnish to the Agent the following, each in form and substance satisfactory to the Agent: (i) a Mortgage and (if required by the Agent) an Environmental Indemnity Agreement with respect to such real property and related assets located at the After Acquired Property, each duly executed by such Person and in recordable form; (ii) evidence of the recording of the Mortgage referred to in clause (i) above in such office or offices as may be necessary or, in the opinion of the Agent, desirable to create and perfect a valid and enforceable first priority lien on the property purported to be covered thereby or to otherwise protect the rights of the Agent and the Lender thereunder; (iii) a Title Insurance Policy, (iv) a survey of such real property, certified to the Agent and to the issuer of the Title Insurance Policy by a licensed professional surveyor reasonably satisfactory to the Agent; (v) Phase I Environmental Site Assessments with respect to such real property, certified to the Agent by a company reasonably satisfactory to the Agent; (vi) in the case of a leasehold interest, a certified copy of the lease between the landlord and such Person with respect to such real property in which such Person has a leasehold interest, and the certificate of occupancy with respect thereto; (vii) in the case of a leasehold interest, an attornment and nondisturbance agreement between the landlord (and any fee mortgagee) with respect to such real property and the Agent; and (viii) such other documents or instruments (including guaranties and opinions of counsel) as the Agent may reasonably require. The Borrower shall pay all fees and expenses, including reasonable

attorneys' fees and expenses, and all title insurance charges and premiums, in connection with each Credit Party's obligations under this Section 6.01(m) [After Acquired Real Property].

(p)    Fiscal Year.    Cause the Fiscal Year of the Credit Parties to end on December 31 of each calendar year unless the Agent consents to a change in such Fiscal Year (and appropriate related changes to this Agreement).

(q)    Renewal of Licenses.    Diligently prosecute the Credit Parties' pending applications for renewal of Broadcast Licenses, and renew the Licenses in a timely manner and in accordance with all applicable provisions thereof.

Section 6.02    Negative Covenants.    So long as any principal of or interest on the Term Loan or any other Obligation (whether or not due) shall remain unpaid or the Lender shall have any Commitment hereunder, each Credit Party shall not and, each Individual Guarantor shall not, pursuant to Sections 6.02(w) and (x), unless the Lender shall otherwise consent in writing:

(a)    Liens, Etc.    Create, incur, assume or suffer to exist any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired; file or suffer to exist under the Uniform Commercial Code or any similar law or statute of any jurisdiction, a financing statement (or the equivalent thereof) that names it as debtor; sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement (or the equivalent thereof); sell any of its property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets; or assign or otherwise transfer any account or other right to receive income; other than, as to all of the above in the case of a Credit Party other than a Broadcast License Subsidiary, Permitted Liens.

(b)    Indebtedness.    Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to any Indebtedness, other than, in case of a Credit Party other than a Broadcast License Subsidiary, Permitted Indebtedness.

(c)    Fundamental Changes; Dispositions.    Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with, any Person, or convey, sell, lease or sublease, transfer or otherwise dispose of, whether in one transaction or a series of related transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing), or purchase or otherwise acquire, whether in one transaction or a series of related transactions, all or substantially all of the assets of any Person (or any division thereof) (or agree to do any of the foregoing); provided, however, that

(i)    any wholly-owned Subsidiary of any Borrower may be merged into Borrower or another wholly-owned Subsidiary of such Borrower (except for Lifestyle), so long as (A) no other provision of this Agreement would be violated thereby, (B) such Credit Party gives the Agent at least thirty (30) days' prior written notice of such merger or consolidation, (C) no Default or Event of Default shall have occurred and be continuing either before or after giving effect to such transaction, (D) the Lender's rights in any Collateral, including, without limitation, the existence, perfection and priority of any Lien thereon, are not adversely affected by such merger or consolidation and (E) the surviving Subsidiary, if any, is

joined as a Loan Party hereunder and is a party to a Subsidiary Guaranty and a Security Agreement and the Capital Stock of which Subsidiary is the subject of a Pledge Agreement, in each case, which is in full force and effect on the date of and immediately after giving effect to such merger or consolidation; and

(ii)     any Credit Party may, for cash proceeds only, (A) sell Inventory in the ordinary course of business, (B) dispose of obsolete or worn-out equipment in the ordinary course of business (so long as such equipment is replaced with equivalent equipment), and (C) sell or otherwise dispose of other property or assets (other than a Broadcast License) for cash in an aggregate amount not less than the fair market value of such property or assets, provided that, in the case of (ii)(B) and (ii)(C), the Net Cash Proceeds of such Dispositions do not exceed $100,000 in the aggregate in any twelve-month period and are paid to the Agent for the benefit of the Lender to the extent required pursuant to the terms of Section 2.05(c) [Mandatory Payments].

(d)     Change in Nature of Business.  Make any material change in the nature of its business as described in Section 5.01(l) [Nature of Business].

(e)     Loans, Advances, Investments, Etc.  Make or commit or agree to make any loan, advance guarantee of obligations, other extension of credit or capital contributions to, or hold or invest in or commit or agree to hold or invest in, or purchase or otherwise acquire or commit or agree to purchase or otherwise acquire any shares of the Capital Stock, bonds, notes, debentures or other securities of, or make or commit or agree to make any other Investment in, any other Person, or purchase or own any futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, except for:  (i) temporary loans and advances made by one Credit Party to another Credit Party other than Lifestyle in the ordinary course of business and not exceeding in the aggregate for all Credit Parties at any one time outstanding $100,000, provided that no Credit Party at any time may (1) claim any impairment of said loans, (2) write-off any amount thereunder or (3) charge off any amount thereunder; (ii) Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers; and (iii) Permitted Investments.   Notwithstanding the previous sentence, at no time may any Credit Party make any loans or advances to or for the benefit of Lifestyle.

(f)     Lease Obligations.  Create, incur or suffer to exist any obligations as lessee (i) for the payment of rent for any real or personal property in connection with any sale and leaseback transaction or (ii) for the payment of rent for any real or personal property under leases or agreements to lease other than (A) Capitalized Lease Obligations which would not cause the aggregate amount of all obligations under Capitalized Leases entered into after the Effective Date owing by all Credit Parties in any Fiscal Year to exceed the amounts set forth in subsection (g) of this Section 6.02 [Negative Covenants], and (B) Operating Lease Obligations which would not cause the aggregate amount of all Operating Lease Obligations owing by all Credit Parties in any Fiscal Year to exceed $125,000.

(g)     Capital Expenditures.  Make or commit or agree to make any Capital Expenditure (by purchase or Capitalized Lease) that would cause the aggregate amount of all

Capital Expenditures made by the Credit Parties to exceed $200,000 per calendar year (on a cumulative, aggregate basis) other than the Acquisitions and the Pittsburgh Acquisition.

(h)    Restricted Payments. (i) Declare or pay any dividend or other distribution, direct or indirect, on account of any Capital Stock of any Credit Party, now or hereafter outstanding, (ii) make any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Capital Stock or Indebtedness (other than the payment of Permitted Indebtedness in the ordinary course of business and otherwise in compliance with this Agreement), now or hereafter outstanding, (iii) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Capital Stock of Borrower, now or hereafter outstanding, (iv) return any Capital Stock to any shareholders or other equity holders of any Credit Party, or make any other distribution of property, assets, shares of Capital Stock, warrants, rights, options, obligations or securities thereto as such, or (v) pay any management fees or any other fees or expenses (including the reimbursement thereof by any Credit Party) pursuant to any management, consulting or other services agreement to any of the shareholders or other equityholders of any Credit Party or other Affiliates, or to any other Subsidiaries or Affiliates of Borrower; provided, however, that (A) Borrower may make Tax Distributions to the holders of its Capital Stock, in each case if, and only if, on and as of the date of such making of any Tax Distribution and after giving effect thereto, no Default or Event of Default has occurred and is continuing or will result therefrom, and the Borrower making such Tax Distribution is Solvent (and the Borrower agrees not to make any such Tax Distribution if the Agent has not given written notice to the Borrower that any such condition has not been satisfied), (B) a Credit Party may make distributions to the Borrower or another Credit Party (other than Lifestyle) and (C) Lifestyle may make distributions to any Credit Party.

(i)    Federal Reserve Regulations. Permit the Term Loan or the proceeds of the Term Loan under this Agreement to be used for any purpose that would cause the Term Loan to be a margin loan under the provisions of Regulation T, U or X of the Board.

(j)    Transactions with Affiliates. Enter into, renew, extend or be a party to any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except (i) in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof, (ii) transactions with another Credit Party other than Lifestyle, and (iii) transactions permitted by Section 6.02(e) [Loans, Advances, Investments, Etc.].

(k)    Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries. Create or otherwise cause, incur, assume, suffer or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of any Credit Party (i) to pay dividends or to make any other distribution on any shares of Capital Stock of such Subsidiary owned by any Loan Party or any of its Subsidiaries, (ii) to pay or prepay or to subordinate any Indebtedness owed to any Loan Party or any of its Subsidiaries, (iii) to make loans or advances to any Loan Party or any of its Subsidiaries or (iv) to transfer any

of its property or assets to any Loan Party or any of its Subsidiaries, or permit any of its Subsidiaries to do any of the foregoing; provided, however, that nothing in any of clauses (i) through (iv) of this Section 6.02(k) [Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries] shall prohibit or restrict compliance with:

        (A)    this Agreement and the other Loan Documents;

        (B)    any applicable law, rule or regulation (including, without limitation, applicable currency control laws and applicable state corporate statutes restricting the payment of dividends in certain circumstances);

        (C)    in the case of clause (iv) any agreement setting forth customary restrictions on the subletting, assignment or transfer of any property or asset that is a lease, license, conveyance or contract of similar property or assets; or

        (D)    in the case of clause (iv) any agreement, instrument or other document evidencing a Permitted Lien from restricting on customary terms the transfer of any property or assets subject thereto.

        (l)    Limitation on Issuance of Capital Stock.  Issue or sell or enter into any agreement or arrangement for the issuance and sale of any shares of its Capital Stock, any securities convertible into or exchangeable for its Capital Stock or any warrants except pursuant to the Borrower's equity incentive plan.

        (m)    Modifications of Indebtedness, Organizational Documents and Certain Other Agreements; Etc.  (i) Amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of its Indebtedness or of any instrument or agreement (including, without limitation, any LMA, purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness if such amendment, modification or change would shorten the final maturity or average life to maturity of, or require any payment to be made earlier than the date originally scheduled on, such Indebtedness, would increase the interest rate applicable to such Indebtedness, would change the subordination provision, if any, of such Indebtedness, or would otherwise be adverse to the Lender or the issuer of such Indebtedness in any respect, (ii) except as permitted by Section 6.02(c) [Fundamental Changes, Dispositions], amend, modify or otherwise change its name, jurisdiction of organization, organizational identification number or FEIN, (iii) amend, modify or otherwise change its certificate of incorporation or bylaws (or other similar organizational documents), including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it, with respect to any of its Capital Stock (including any shareholders' agreement), or enter into any new agreement with respect to any of its Capital Stock, except any such amendments, modifications or changes or any such new agreements or arrangements pursuant to this clause (iii) that either individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect or (iv) amend, modify or otherwise change any License except for any amendments or modifications (A) required by applicable law, (B) required in connection with the renewal of any License or (C) which would not materially change the rights, duties and obligations of any Credit Party under such License.

(n)     Investment Company Act of 1940.  Engage in any business, enter into any transaction, use any securities or take any other action that would cause it to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" or a company "controlled" by an "investment company" not entitled to an exemption within the meaning of such Act.

(o)     Compromise of Accounts Receivable.  Compromise or adjust any Account Receivable (or extend the time of payment thereof) or grant any discounts, allowances or credits other than, provided no Default or Event of Default has occurred and is continuing, in the ordinary course of its business; provided, however, in no event shall any such discount, allowance or credit exceed $100,000 in any Fiscal Year and no such extension of the time for payment extend beyond 180 days from the original due date thereof.

(p)     Properties.  Permit any property to become a fixture with respect to real property or to become an accession with respect to other personal property with respect to which real or personal property the Agent does not have a valid and perfected first priority Lien.

(q)     ERISA.  (i) Engage, or permit any ERISA Affiliate to engage, in any transaction described in Section 4069 of ERISA; (ii) engage, or permit any ERISA Affiliate to engage, in any prohibited transaction described in Section 406 of ERISA or 4975 of the Internal Revenue Code for which a statutory or class exemption is not available or a private exemption has not previously been obtained from the U.S. Department of Labor; (iii) adopt or permit any ERISA Affiliate to adopt any employee welfare benefit plan within the meaning of Section 3(1) of ERISA which provides benefits to employees after termination of employment other than as required by Section 601 of ERISA or applicable law; (iv) fail to make any contribution or payment to any Multiemployer Plan which it or any ERISA Affiliate may be required to make under any agreement relating to such Multiemployer Plan, or any law pertaining thereto; or (v) fail, or permit any ERISA Affiliate to fail, to pay any required installment or any other payment required under Section 412 of the Internal Revenue Code on or before the due date for such installment or other payment.

(r)     Environmental.  Permit the use, handling, generation, storage, treatment, Release or disposal of Hazardous Materials at any property owned or leased by it, except in compliance with Environmental Laws and so long as such use, handling, generation, storage, treatment, Release or disposal of Hazardous Materials does not result in a Material Adverse Effect.

(s)     Certain Agreements.  Agree to any material amendment or other material change to or material waiver of any of its rights under any Material Contract.

(t)     LMA's, Etc.  Enter into any LMA or other similar arrangement, other than the LMAs set forth on Schedule 5.01(n) and in effect on the date hereof.

(u)     Lifestyle.  Advance or transfer any funds to Lifestyle or to any Person for the benefit of Lifestyle.

(v)     Purchase of Assets.  Purchase or otherwise acquire assets other than, if no Default or Event of Default exists, (i) assets purchased in the ordinary course of business, (ii) the Acquisitions, (iii) Capital Expenditures permitted under Section 6.02(g) [Capital Expenditures],

and (iv) if the Borrower delivers an officer's certificate to Lender certifying that (A) no Default or Event of Default exists, (B) calculations demonstrating sufficient Excess Cash Flow for the relevant Fiscal Quarter to pay for all costs and related expenses of the Pittsburgh Acquisition, including the entire purchase price thereof, and (C) that all such costs and expenses will be funded out of the Excess Cash Flow for such Fiscal Quarter, of any applicable Pittsburgh Acquisition.

(w)     Asset Transfer.  In regards to any Individual Guarantor transfer any assets to any other Person if the result is to render such Individual Guarantor not Solvent after giving effect to the transfer and such Individual Guarantor's full, actual and contingent liability under his Guaranty.

(x)     Majority Control by Individual Guarantors.  In regards to any Individual Guarantor, allow the aggregate amount of the Equity Interest (both voting and economic) owned and pledged under the Loan Documents by the Individual Guarantors at any time be less than 51% of the issued and outstanding Equity Interests (both voting and economic) of the Borrower.

(y)     No Impairment and Charge-Offs.  No Credit Party may write-off, charge-off, discount, or impair in any other way any Indebtedness owed to such Credit Party by any other Loan Party without the Agent's prior written consent.

Section 6.03     Financial Covenants.  So long as any principal of or interest on the Term Loan or any other Obligation (whether or not due) shall remain unpaid or the Lender shall have any Commitment hereunder, the Credit Parties shall not, and unless the Lender shall otherwise consent in writing:

(a)     Cash on Hand.  Permit the aggregate amount of Liquid Assets held by the Credit Parties free and clear of any Liens (other than any Lien in favor of the Agent) to be less than $200,000 at any time.  Without limiting the generality of the foregoing and without limiting any other restriction in this Agreement, the Credit Parties shall not make any payment of corporate overhead expense if, upon such payment, they are not in compliance with the foregoing covenant.

(b)     Minimum Fixed Charge Coverage Ratio.  Permit the Fixed Charge Coverage Ratio, calculated for any twelve-month period ending during any period to be less than 1.0 to 1.0.

(c)     Consolidated EBITDA.  Permit Consolidated EBITDA at the end of each Fiscal Quarter set forth below of the Credit Parties to be less than the applicable amount set forth below for all Stations for such Fiscal Quarter:

| Fiscal Quarter Ending | Amount |
|---|---|
| September 30, 2006 | $157,000 |
| December 31, 2006 | $142,375 |
| March 31, 2007 | $109,394 |
| June 30, 2007 | $300,030 |
| September 30, 2007 | $323,775 |
| December 31, 2007 | $540,592 |
| March 31, 2008 | $132,639 |

| | |
|---|---|
| June 30, 2008 | $330,147 |
| September 30, 2008 | $355,592 |
| December 31, 200 | $581,082 |
| March 31, 2009 | $156,994 |
| June 30, 2009 | $311,543 |
| September 30, 2009 | $388,869 |
| October 31, 2009 | $188,686 |

(d)    Net Revenue.  Permit Net Cash Revenue of the Credit Parties at the end of each Fiscal Quarter set forth below of the Credit Parties to be less than the applicable amount set forth below for all Stations for such Fiscal Quarter:

| Fiscal Quarter Ending | Amount |
|---|---|
| September 30, 2006 | $1,108,000 |
| December 31, 2006 | $657,000 |
| March 31, 2007 | $919,588 |
| June 30, 2007 | $1,157,057 |
| September 30, 2007 | $1,186,637 |
| December 31, 2007 | $1,456,720 |
| March 31, 2008 | $956,373 |
| June 30, 2008 | $1,202,406 |
| September 30, 2008 | $1,234,102 |
| December 31, 2008 | $1,514,990 |
| March 31, 2009 | $994,628 |
| June 30, 2009 | $1,187,142 |
| September 30, 2009 | $1,283,467 |
| October 31, 2009 | $501,395 |

Section 6.04   Individual Financial Covenants.  So long as any principal of or interest on the Term Loan or any other Obligation (whether or not due) shall remain unpaid or the Lender shall have any Commitment hereunder, the Individual Guarantors shall, unless the Lender shall otherwise consents in writing, maintain at all times aggregate Liquid Assets and Marketable Securities of $6,000,000 collectively, to be tested and certified to at the end of each Fiscal Quarter during the term hereof and, after the occurrence of any Default or Event of Default, to be tested and certified to at the end of each month during the term hereof.

## ARTICLE VII
## MANAGEMENT, COLLECTION AND STATUS OF
## ACCOUNTS RECEIVABLE AND OTHER COLLATERAL

Section 7.01   Management of Collateral.

(a)    Immediately upon the request of the Agent, after a Default has occurred, the Credit Parties shall (i) establish, and, during the term of this Agreement, maintain one or more lockboxes in the name of the Agent (collectively, the "*Lockboxes*") with the financial

institutions selected by the Agent in its sole discretion (each being referred to as a "*Lockbox Bank*"), and (ii) establish, and during the term of this Agreement, maintain an account (a "*Collection Account*" and, collectively, the "*Collection Accounts*") with each Lockbox Bank. All such Lockboxes and Collection Accounts shall be under the control of the Agent pursuant to a Control Agreement. Upon such request by the Agent, the Credit Parties shall irrevocably instruct their Account Debtors, with respect to Accounts Receivable of the Credit Parties, to remit all payments to be made by checks or other drafts to the Lockboxes and to remit all payments to be made by wire transfer or by Automated Clearing House, Inc. payment as directed by the Agent and shall instruct each Lockbox Bank to deposit all amounts received in its Lockbox to the Collection Account at such Lockbox Bank on the day received or, if such day is not a Business Day, on the next succeeding Business Day.  After such request by the Agent and until the Agent has advised the Credit Parties to the contrary after the occurrence and during the continuance of an Event of Default, the Credit Parties may and will enforce, collect and receive all amounts owing on the Accounts Receivable of the Credit Parties for the Agent's benefit and on the Agent's behalf, but at the Credit Parties' expense; such privilege shall terminate, at the election of the Agent, upon the occurrence and during the continuance of an Event of Default. All checks, drafts, notes, money orders, acceptances, cash and other evidences of Indebtedness received directly by the Credit Parties from any of their Account Debtors, as proceeds from Accounts Receivable of the Credit Parties, or as proceeds of any other Collateral, shall be held by the Credit Parties in trust for the Agents and the Lender and upon receipt be deposited by the Credit Parties in original form and no later than the next Business Day after receipt thereof into a Collection Account.  The Credit Parties shall not commingle such collections with the Credit Parties' own funds or the funds of any of their Affiliates or with the proceeds of any assets not included in the Collateral.  If any Event of Default shall occur and be continuing, upon notice from the Agent all funds received in the Collection Account shall be sent by wire transfer or Automated Clearing House, Inc. payment to the Agent's Account for application at the end of each Business Day to reduce the then principal balance of the Term Loan, conditional upon final payment to the Agent.  No checks, drafts or other instruments received by the Agent shall constitute final payment to the Agent unless and until such checks, drafts or instruments have actually been collected.

(b)     After the occurrence and during the continuance of an Event of Default, the Agent may send a notice of assignment and/or notice of the Lender's security interest to any and all Account Debtors or third parties holding or otherwise concerned with any of the Collateral, and thereafter the Agent shall have the sole right to collect the Accounts Receivable and/or take possession of the Collateral and the books and records relating thereto.  The Credit Parties shall not, without prior written consent of the Agent, grant any extension of time of payment of any Account Receivable, compromise or settle any Account Receivable for less than the full amount thereof, release, in whole or in part, any Person or property liable for the payment thereof, or allow any credit or discount whatsoever thereon, except, in the absence of a continuing Event of Default, as permitted by <u>Section 6.02(o)</u> [Compromise of Accounts Receivable].

(c)     Each Credit Party hereby appoints the Agent or its designee on behalf of the Agent as the Credit Parties' attorney-in-fact with power exercisable during the continuance of an Event of Default to endorse any Credit Party's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Accounts Receivable, to sign

- 63 -

any Credit Party's name on any invoice or bill of lading relating to any of the Accounts Receivable, drafts against Account Debtors with respect to Accounts Receivable, assignments and verifications of Accounts Receivable and notices to Account Debtors with respect to Accounts Receivable, to send verification of Accounts Receivable, and to notify the Postal Service authorities to change the address for delivery of mail addressed to any Credit Party to such address as the Agent may designate and to do all other acts and things necessary to carry out this Agreement. All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission (other than acts of omission or commission constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction), or for any error of judgment or mistake of fact or law; this power being coupled with an interest is irrevocable until the Term Loan and other Obligations under the Loan Documents are paid in full and all of the Loan Documents are terminated. It is understood and agreed that any such attorney or designee shall not exercise control over the programming or operations of any of the Stations to the extent such control would violate the Communications Laws.

(d)    Nothing herein contained shall be construed to constitute the Agent as agent of any Credit Party for any purpose whatsoever, and the Agent shall not be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof (other than from acts of omission or commission constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction). The Agent shall not, under any circumstance or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Accounts Receivable or any instrument received in payment thereof or for any damage resulting therefrom (other than acts of omission or commission constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction). The Agent, by anything herein or in any assignment or otherwise, does not assume any of the obligations under any contract or agreement assigned to the Agent and shall not be responsible in any way for the performance by any Credit Party of any of the terms and conditions thereof.

(e)    If any Account Receivable includes a charge for any tax payable to any Governmental Authority, the Agent is hereby authorized (but in no event obligated) in its discretion to pay the amount thereof to the proper taxing authority for the Credit Parties' account and to charge the Credit Parties therefor. The Credit Parties shall notify the Agent if any Account Receivable includes any taxes due to any such Governmental Authority and, in the absence of such notice, the Agent shall have the right to retain the full proceeds of such Account Receivable and shall not be liable for any taxes that may be due by reason of the sale and delivery creating such Account Receivable.

(f)    Notwithstanding any other terms set forth in the Loan Documents, the rights and remedies of the Agent and the Lender herein provided, and the obligations of the Credit Parties set forth herein, are cumulative of, may be exercised singly or concurrently with, and are not exclusive of, any other rights, remedies or obligations set forth in any other Loan Document or as provided by law.

Section 7.02    Working Capital Control Account.    If at any time the aggregate amount of the cash and Permitted Investments excluding the Pittsburgh Acquisition of the Credit Parties exceeds $200,000 (such excess amount referred to as the "*Working Capital Account Balance*"), the Credit Parties shall immediately (a) notify the Agent of such Working Capital Account Balance, (b) establish a working capital control account in the name of the Agent (the "*Working Capital Control Account*") with the financial institution selected by the Agent in its sole discretion (the "*Working Capital Bank*"), and (c) transfer the Working Capital Account Balance to the Working Capital Control Account.  The Working Capital Control Account shall be under the control of the Agent pursuant to a Control Agreement.  Each Credit Party agrees that the Working Capital Control Account shall (i) at all times be under the sole dominion and control of the Agent, and neither any Credit Party nor any other Loan Party shall have any right or power to withdraw or make any disposition of any funds or other property in the Working Capital Control Account or any part thereof except the right to have such amounts applied in accordance with the provisions hereof and in the other Loan Documents, (ii) be subject to a perfected, first priority security interest in favor of the Agent, and (iii) constitute additional Collateral for the Obligations.  All of the funds delivered to the Working Capital Control Account shall constitute part of the Collateral and shall not constitute payment of any of the Obligations until applied as provided in the Loan Documents.  Investment income and interest on the Working Capital Account Balance shall be credited to the Working Capital Control Account and shall become a part thereof for all purposes.  From time to time but not more than once during any given Fiscal Quarter, the Borrower may request that the Agent direct the Working Capital Bank to release amounts on deposit in the Working Capital Control Account to the Borrower, for the purpose of funding capital expenditures and the working capital needs of the Credit Parties except for Lifestyle, in each case in accordance with the capital expenditure and operating budgets of the Credit Parties as then in effect.  Each request for a disbursement from the Working Capital Control Account shall be in writing, shall be signed by an Authorized Officer of the Borrower, shall specify the proposed use of such disbursement and shall demonstrate that such disbursement is in accordance with the capital expenditure and operating budgets of the Credit Parties.  If requested by the Agent, the Borrower shall also provide a cumulative reconciliation, in a form reasonably acceptable to the Agent, of amounts previously disbursed from the Working Capital Control Account and spent by the Credit Parties compared to the capital expenditure and operating budgets for the same period.  The Credit Parties shall not be entitled to any disbursement from the Working Capital Control Account if a Default or Event of Default shall have occurred and be continuing or if the amount of such requested disbursement, or the proposed use of such disbursement, is not provided for in, or does not conform with, the capital expenditure and operating budgets.    Notwithstanding any other provision of this Agreement or any other Loan Document, upon the occurrence and during the continuance of any Event of Default, the Agent may withdraw or otherwise disburse funds from the Working Capital Control Account for application to any of the Obligations without notice to any Loan Party, and the Agent shall have the continuing and exclusive right to apply and reapply the Working Capital Account Balance to the Obligations in any manner it deems appropriate.  Any taxes payable on or income earned from the Working Capital Control Account shall be paid by the Credit Parties during any particular tax year as and to the extent required under the provisions of the Internal Revenue Code.

Section 7.03    Collateral Custodian.    Upon the occurrence and during the continuance of any Default or Event of Default, the Agent may at any time and from time to time

- 65 -

employ and maintain on the premises of any Credit Party a custodian selected by the Agent who shall have full authority to do all acts necessary to protect the Agent's and the Lender's interests. Each Credit Party hereby agrees to cooperate with any such custodian and to do whatever the Agent may reasonably request to preserve the Collateral. All costs and expenses incurred by the Agent by reason of the employment of the custodian shall be the responsibility of the Credit Parties and charged to the Loan Account.

Section 7.04    Deposit Accounts.

(a)    To the extent reasonably possible, the Agent will, in accordance with the written instructions of the Borrower, invest on behalf of the Credit Parties (at the sole cost and expense and risk of the Credit Parties) any amounts from time to time held in the Working Capital Control Account in such Permitted Investments as may be selected by the Borrower. Any loss on such investments shall be for the account of the Credit Parties. The Borrower will pay when due any and all income and other taxes in respect of any such investments.

(b)    All book entries, securities, promissory notes, certificates, bonds, shares, units and instruments evidencing, securing or relating to any Permitted Investment acquired pursuant to paragraph (a) hereof shall be held by or on behalf of the Agent pursuant hereto, shall be made or issued in the name of the Agent (or any of its nominees), and shall be deemed to be held in the Working Capital Control Account. The Agent may (in its sole and absolute discretion) exchange certificates or instruments constituting Permitted Investments or investments with respect to any Collateral for certificates or instruments of smaller or larger denominations.

(c)    In the event that the Borrower does not instruct the Agent with respect to the sale or reinvestment of any Permitted Investment at or prior to the maturity thereof or the Agent withholds its consent to instructions received from the Borrower, the Agent may, in its sole discretion, hold the proceeds uninvested in the Working Capital Control Account or reinvest the proceeds of such Permitted Investment realized at the maturity thereof in a Permitted Investment to the extent reasonably possible. All interest on or other income from any Permitted Investments in the Working Capital Control Account shall be held in such account and be subject to investment and reinvestment as permitted in this Section 7.04(c) [Deposit Accounts]. If any Credit Party shall receive, by virtue of its being or having been an owner of any Permitted Investment, any (i) certificate (including, without limitation, any certificate representing a dividend or distribution), promissory note or other instrument, (ii) option or right, whether as an addition to, in substitution for, or in exchange for, any Collateral, or otherwise, (iii) dividends or distributions payable in cash or in securities or other property or (iv) payment of principal, interest, redemption price, purchase price or other payment in respect of any Collateral, such Credit Party shall receive such certificate, promissory note, instrument, option, right, payment, dividend or distribution in trust for the benefit of the Agent, shall segregate it from such Credit Party's other property and shall deliver it forthwith to the Agent in the exact form received, with any necessary indorsement and/or appropriate powers duly executed in blank, to be held by the Agent as Collateral and as further collateral security for the Obligations.

(d)    Anything to the contrary in this Agreement notwithstanding, nothing herein shall (i) render the Agent or the Lender liable to any Loan Party or give rise to any defense or right of set-off in respect of the Obligations in the event that the Agent shall not invest

any amount in the Working Capital Control Account in accordance herewith or (ii) require the payment of interest in excess of the maximum rate permitted by applicable law.

## ARTICLE VIII

## EVENTS OF DEFAULT

Section 8.01    Events of Default.  If any of the following Events of Default shall occur and be continuing:

(a)    any Credit Party shall fail to pay any principal of or interest on the Term Loan, any Agent Advance or any fee, indemnity or other amount payable under this Agreement or any other Loan Document when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise);

(b)    any representation or warranty made or deemed made by or on behalf of any Loan Party or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any report, certificate, or other document delivered to the Agent or the Lender pursuant to any Loan Document shall have been incorrect in any material respect when made or deemed made;

(c)    (i) any Loan Party shall fail to perform or comply with any covenant or agreement contained in ARTICLE VI or ARTICLE VII, or (ii) any Loan Party shall fail to perform or comply with any covenant or agreement contained in any Security Agreement to which it is a party, any Pledge Agreement to which it is a party, or any Mortgage to which it is a party if such covenant or agreement referred to in this clause (ii) is material;

(d)    any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this Section 8.01 [Events of Default];

(e)    any Loan Party shall fail to pay any principal of or interest on any of its Indebtedness (excluding Indebtedness evidenced by this Agreement), or any interest or premium thereon, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable cure or grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable cure or grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(f)    any Loan Party (i) shall institute any proceeding or voluntary case seeking to adjudicate it as bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the

entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Person or for any substantial part of its property, (ii) shall be generally not paying its debts as such debts become due or shall admit in writing its inability to pay its debts generally, (iii) shall make a general assignment for the benefit of creditors, or (iv) shall take any action to authorize or effect any of the actions set forth above in this subsection (f);

(g)     any proceeding shall be instituted against any Loan Party seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Person or for any substantial part of its property, and either such proceeding shall remain undismissed or unstayed for a period of sixty (60) days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against any such Person or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property) shall occur;

(h)     any provision of any Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto (other than a Lender), or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Credit Party or any Governmental Authority (including, without limitation, any Specified Authority) having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(i)     any Security Agreement, any Pledge Agreement, any Guaranty, or any Mortgage or any other security document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Agent for the benefit of the Lender on any Collateral purported to be covered thereby;

(j)     any bank at which any deposit account, blocked account, or lockbox account of any Credit Party is maintained shall fail to comply with any of the material terms of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of any Loan Party shall fail to comply with any of the material terms of any investment property control agreement to which such Person is a party;

(k)     one or more judgments or orders for the payment of money exceeding $200,000 in the aggregate shall be rendered against any Loan Party and remain unsatisfied and either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment or order, or (ii) there shall be a period of ten (10) consecutive days after entry thereof during which a stay of enforcement of any such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; provided, however, that any such judgment or order shall not give rise to an Event of Default under this subsection (k) if and for so long as (A) the amount of such judgment or order is covered by a valid and binding policy of insurance between the

defendant and the insurer covering full payment thereof and (B) such insurer has been notified, and has not disputed the claim made for payment, of the amount of such judgment or order;

(l)    any Credit Party is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting all or any material part of its business for more than fifteen (15) consecutive days;

(m)    any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than fifteen (15) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of any Credit Party, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect;

(n)    any cessation of a substantial part of the business of any Credit Party for a period which materially and adversely affects the ability of such Person to continue its business on a profitable basis;

(o)    (i) any Credit Party shall lose, fail to keep in force, suffer the termination, suspension, non-renewal or revocation of, or terminate, forfeit or suffer an adverse modification of, any License at any time held by it, which could reasonably be expected to have a Material Adverse Effect; (ii) the FCC shall schedule or conduct a hearing on the renewal or revocation of any material License held by any Credit Party based upon the acts or omissions of such Credit Party or any Affiliate of such Person and the Agent shall reasonably and in good faith conclude that the result thereof could reasonably be expected to be the termination, suspension, revocation, forfeiture, non-renewal of or material adverse modification of such License, and which termination, suspension, revocation, forfeiture, non-renewal of or amendment could reasonably be expected to have a Material Adverse Effect; (iii) any action, suit or proceeding shall be commenced and pending against any Credit Party which is reasonably likely to result in the termination, suspension or revocation, forfeiture, non-renewal or material adverse modification of any Broadcast License held by it or used in connection with a Station; (iv) any construction permit issued by the FCC in connection with a Station shall expire, be cancelled, revoked or forfeited, or fail to be renewed or any request for extension of time with respect thereto is denied by the FCC; or (v) any application or rule making proposal for modification of a Station's facilities is dismissed or denied by the FCC, in whole or in part, and such dismissal or denial could reasonably be expected to have a Material Adverse Effect;

(p)    the indictment, or the threatened indictment, of any Loan Party under any criminal statute, or commencement of criminal or civil proceedings against any Credit Party, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of such Person which shall not be dismissed within fifteen (15) days thereof;

(q)    any Credit Party or any of its ERISA Affiliates shall have made a complete or partial withdrawal from a Multiemployer Plan, and, as a result of such complete or partial withdrawal, any Credit Party or any of its ERISA Affiliates incurs a withdrawal liability in an annual amount exceeding $100,000; or a Multiemployer Plan enters reorganization status

under Section 4241 of ERISA, and, as a result thereof any Credit Party's or any of its ERISA Affiliates' annual contribution requirements with respect to such Multiemployer Plan increases in an annual amount exceeding $200,000;

        (r)     any Termination Event with respect to any Employee Plan shall have occurred, and, thirty (30) days after notice thereof shall have been given to any Credit Party by the Agent, (i) such Termination Event (if correctable) shall not have been corrected, and (ii) the then current value of such Employee Plan's vested benefits exceeds the then current value of assets allocable to such benefits in such Employee Plan by more than $100,000 (or, in the case of a Termination Event involving liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, the liability is in excess of such amount);

        (s)     any Loan Party shall be liable for any Environmental Liabilities and Costs the payment of which could reasonably be expected to have a Material Adverse Effect;

        (t)     a Change of Control shall have occurred without the Agent's prior written consent;

        (u)     an event or development occurs which could reasonably be expected to have a Material Adverse Effect;

        (v)     any default under any obligation of any Loan Party;

        (w)     the on-the-air broadcast operations of any operating Station shall be interrupted at any time for more than (x) seventy-two (72) consecutive hours, or (y) in the event of force majeure, five (5) days without Agent approval;

        (x)     any Lease of property used or to be used by any Credit Party as a studio, tower or transmitter site (i) shall not be renewed at least ninety (90) days prior to its scheduled expiration or termination date, unless the Agent consents thereto after having received from such Credit Party evidence and assurances acceptable to the Agent that (A) such Credit Party, has obtained a replacement location which is not less favorable to such Credit Party and its business operations pursuant to a signed written Lease acceptable to the Agent, and (B) such Credit Party will be able to relocate to such replacement premises without materially adversely affecting its continued business operations or station signal, or (ii) shall be in default as a result of such Credit Party's failure to observe or abide by all terms, conditions and covenants contained therein (unless cured within the applicable grace period), or (iii) shall be the subject of a default notice or eviction notice initiated or sent by the landlord thereof to such Credit Party or the Agent which shall remain uncured for fifteen (15) days after a Credit Party obtains notice thereof;

        (y)     any transfer of any Capital Stock of any Credit Party or any right to receive such Capital Stock or any other interest in any Credit Party shall be transferred and either (i) such transfer shall fail to comply with any applicable provision of the Communications Act, or (ii) the Agent shall not have received prior to such transfer any opinion reasonably satisfactory to the Agent from counsel reasonably satisfactory to the Agent to the effect that such transfer does so comply; or

(z)    if there occurs any attachment of any property of any Credit Party in an amount exceeding $100,000, which shall not be discharged or bonded within thirty (30) days of the date of such attachment.

then, and in any such event, the Agent may, and shall at the request of the Lender, by notice to the Borrower, (i) declare all or any portion of the Term Loan then outstanding to be due and payable, whereupon all or such portion of the aggregate principal of the Term Loan, including all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Credit Party, (ii) exercise any and all of its other rights and remedies under applicable law, hereunder and under the other Loan Documents; provided, however, that upon the occurrence of any Event of Default described in subsection (f) or (g) of this Section 8.01 [Events of Default], without any notice to any Credit Party or any other Person or any act by the Agent or the Lender, all Commitments shall automatically terminate and the Term Loan then outstanding, together with all accrued and unpaid interest thereon, all fees and all other amounts due under this Agreement and the other Loan Documents shall become due and payable automatically and immediately, without presentment, demand, protest or notice of any kind, all of which are expressly waived by each Credit Party, and (iii) may seek the appointment of a receiver or keeper to take possession of all or any portion of the Collateral or to operate same and, to the maximum extent permitted by law, may seek the appointment of such a receiver without the requirement of prior notice or a hearing, subject to Section 8.02 [FCC Matters].  Subject to Section 8.02 [FCC Matters], the Credit Parties further agree to consent to the appointment of a receiver (selected by the Agent and approved by the Lender) by any court of competent jurisdiction.  Such receiver may be instructed to seek from the FCC consent to an involuntary assignment or transfer of control of the Broadcast Licenses issued to any Credit Party by the FCC with respect to any Station (the "*FCC Licenses*") for the purposes of seeking a bona fide purchaser or purchasers of any such Credit Party's right, title and interest in and to such Station.  The Credit Parties hereby agree to consent to such involuntary transfer of control upon the request of the receivers so appointed and, if the Credit Parties shall refuse to consent to the transfer, the approval of the Credit Parties may be required by the court.  The receiver shall have the power, subject to Section 8.02 [FCC Matters], to dispose of any or all of the Credit Parties' right, title and interest in and to any Station in any manner lawful in the jurisdiction in which such receiver's appointment is confirmed, including the power to conduct a public or private sale of any or all of the Credit Parties' right, title and interest in and to such Station; provided, however, that the successful bidder at any such public or private sale shall not acquire the FCC License with respect to such Station unless and until the FCC shall first have granted its consent to such acquisition.

Section 8.02    FCC Matters.  The Agent's rights hereunder (and the rights of any receiver appointed by reason of the exercise of remedies hereunder) with respect to the Stations and the FCC Licenses are expressly subject to the Communications Laws.  Prior to the exercise by the Agent (or any receiver appointed by reason of the exercise of remedies hereunder) of any power, right, privilege or remedy pursuant to this Agreement which requires any consent, approval or authorization of the FCC or any other Governmental Authority, the Credit Parties will execute and deliver, or will cause the execution and delivery of, all applications, certificates, instruments and other documents and papers that the Agent reasonably determines may be

required to obtain such consent, approval, or authorization. Without limiting the generality of the foregoing, the Credit Parties will promptly upon request by the Agent (or any such receiver so appointed) execute and deliver the appropriate portions of applications to the FCC for assignment of or the transfer of control of the Broadcast Licenses issued to any Credit Party with respect to any Station and use their best efforts, upon the request of the Agent (or any receiver so appointed) to assist in obtaining from the FCC or such other Governmental Authority the necessary consents and approvals, if any, for the assignment of or the transfer of control of such Broadcast Licenses to the Agent or its designee upon or following acceleration of the payment of the Term Loan in accordance with the provisions hereof. Notwithstanding anything to the contrary in this Agreement but without waiving or limiting any obligation of the Credit Parties hereunder, neither the Agent nor any receiver appointed by reason of the exercise of remedies hereunder shall control, supervise, direct, or manage, or attempt to control, supervise, direct or manage, the business of the Stations, in any case that would constitute or result in any assignment of the FCC Licenses or a transfer of control of any Credit Party or the FCC Licenses whether de jure or de facto, if such assignment or such transfer of control would require under the Communications Laws (including the written rules and regulations promulgated by the FCC) the prior approval of the FCC, without first obtaining such approval of the FCC.

## ARTICLE IX

## AGENT

Section 9.01    Appointment.    The Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Agreement including: (i) to receive on behalf of the Lender any payment of principal of or interest on the Term Loan outstanding hereunder and all other amounts accrued hereunder for the account of the Lender and paid to the Agent, and, subject to Section 2.02 [Making the Term Loan] of this Agreement, to distribute promptly to the Lender of all payments so received; (ii) to distribute to the Lender copies of all material notices and agreements received by the Agent and not required to be delivered to the Lender pursuant to the terms of this Agreement, provided that the Agent shall not have any liability to the Lender for the Agent's inadvertent failure to distribute any such notices or agreements to the Lender; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loan, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement or any other Loan Document; (v) to make the Term Loan and Agent Advances, for the Agent or on behalf of the applicable Lender as provided in this Agreement or any other Loan Document; (vi) to perform, exercise, and enforce any and all other rights and remedies of the Lender with respect to the Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Agreement or any other Loan Document; (vii) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other Loan Document; and (viii) subject to Section 9.03 [Rights, Exculpation Etc.] of this Agreement, to take such action as the Agent deems appropriate on its behalf to administer the Term Loan and the

Loan Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations) together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof. As to any matters not expressly provided for by this Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Term Loan), the Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Lender, and such instructions of the Lender shall be binding upon all Lender and all makers of the Term Loan; provided, however, that the Agent shall not be required to take any action which, in the reasonable opinion of the Agent, exposes the Agent to liability or which is contrary to this Agreement or any other Loan Document or applicable law.

Section 9.02    Nature of Duties.    The Agent shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other Loan Documents. The duties of the Agent shall be mechanical and administrative in nature. The Agent shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of the Lender. Nothing in this Agreement or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agent any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein. The Lender shall make its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Term Loan hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral, and the Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide the Lender with any credit or other information with respect thereto, whether coming into its possession before the Term Loan hereunder or at any time or times thereafter, provided that, upon the reasonable request of a Lender, the Agent shall provide to the Lender any documents or reports delivered to the Agent by the Loan Parties pursuant to the terms of this Agreement or any other Loan Document. If the Agent seeks the consent or approval of the Lender to the taking or refraining from taking any action hereunder, the Agent shall send notice thereof to the Lender. The Agent shall promptly notify the Lender any time that the Lender has instructed the Agent to act or refrain from acting pursuant hereto.

Section 9.03    Rights, Exculpation, Etc.    The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction. Without limiting the generality of the foregoing, the Agent (i) may treat the payee of the Term Loan as the owner thereof until the Agent receives written notice of the assignment or transfer thereof, pursuant to Section 10.07 [Assignments and Participations] hereof, signed by such payee and in form satisfactory to the Agent; (ii) may consult with legal counsel (including, without limitation, counsel to the Agent or counsel to the Loan Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) make no warranty or representation to the Lender and shall not be responsible to the Lender for any statements, certificates, warranties or representations made in

or in connection with this Agreement or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to the Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectibility of the Collateral, the existence, priority or perfection of the Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agent be responsible or liable to the Lender for any failure to monitor or maintain any portion of the Collateral. The Agent shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 3.03 [Apportionment of Payments], and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of the Lender to whom payment was due but not made, shall be to recover from other Lender any payment in excess of the amount which they are determined to be entitled. The Agent may at any time request instructions from the Lender with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents the Agent is permitted or required to take or to grant, and if such instructions are promptly requested, the Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until it shall have received such instructions from the Lender. Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Agent as a result of the Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Lender.

Section 9.04    Reliance. The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 9.05    Indemnification. To the extent that the Agent is not reimbursed and indemnified by any Loan Party, the Lender will reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Agreement or any of the other Loan Documents or any action taken or omitted by the Agent under this Agreement or any of the other Loan Documents, including, without limitation, advances and disbursements made pursuant to Section 9.08 [Collateral Matters]; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final judicial determination that such liability resulted from the Agent's gross negligence or willful misconduct. The obligations of the Lender under this Section 9.05 [Indemnification] shall survive the payment in full of the Term Loan and the termination of this Agreement.

Section 9.06     Agent Individually.   The Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with any Borrower as if it were not acting as the Agent pursuant hereto without any duty to account to the other Lender.

Section 9.07     Successor Agent.

(a)     The Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving at least thirty (30) Business Days' prior written notice to the Borrower and the Lender.  Such resignation shall take effect upon the acceptance by a successor Agent of appointment pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)     Upon any such notice of resignation, the Lender shall appoint a successor Agent.  Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the Agent, and the Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents.  After the Agent's resignation hereunder as the Agent, the provisions of this ARTICLE IX [Agent] shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent under this Agreement and the other Loan Documents.

(c)     If a successor Agent shall not have been so appointed within said thirty (30) Business Day period, the Agent shall then appoint a successor Agent who shall serve as the Agent until such time, if any, as the Lender appoints a successor Agent as provided above.

Section 9.08     Collateral Matters.

(a)     The Agent may from time to time make such disbursements and advances ("*Agent Advances*") which the Agent, in its sole discretion, deems necessary or desirable to preserve, protect, prepare for sale or lease or dispose of the Collateral or any portion thereof, to enhance the likelihood or maximize the amount of repayment by the Borrower of the Term Loan and other Obligations or to pay any other amount chargeable to the Borrower pursuant to the terms of this Agreement, including, without limitation, costs, fees and expenses as described in Section 10.04 [Expenses, Taxes, Attorney's Fees].  The Agent Advances shall bear interest at the maximum rate set forth in this Agreement and shall be repayable on demand and be secured by the Collateral.  The Agent Advances shall constitute Obligations hereunder which may be charged to the Loan Account in accordance with Section 3.02 [Payments, Computations and Statements].  The Agent shall notify the Lender and the Borrower in writing of each such Agent Advance, which notice shall include a description of the purpose of such Agent Advance.  Without limitation to its obligations pursuant to Section 9.05 [Indemnification], the Lender agrees that it shall make available to the Agent, upon the Agent's demand, in Dollars in immediately available funds, the amount equal to the Total Commitment for such Agent Advance.  If such funds are not made available to the Agent by the Lender, the Agent shall be entitled to recover such funds on demand from the Lender, together with interest thereon for each day from the date such payment was due until the date such amount is paid to the Agent, at the Federal Funds Rate for three (3) Business Days and thereafter at the Reference Rate.

(b)    The Lender hereby irrevocably authorizes the Agent, at its option and in its discretion, to release any Lien granted to or held by the Agent upon any Collateral upon termination of the Total Commitment and payment and satisfaction of the Term Loan and all other Obligations which have matured and which the Agent has been notified in writing are then due and payable; or constituting property being sold or disposed of in compliance with the terms of this Agreement and the other Loan Documents; or constituting property in which the Loan Parties owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Lender.

(c)    Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the Lender (as set forth in Section 9.08(b) [Collateral Matters]), the Lender agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under Section 9.08(b) [Collateral Matters]. Upon receipt by the Agent of confirmation from the Lender of its authority to release any particular item or types of Collateral, and upon prior written request by any Loan Party, the Agent shall (and is hereby irrevocably authorized by the Lender to) execute such documents as may be necessary to evidence the release of the Liens granted to the Agent for the benefit of the Lender upon such Collateral; provided, however, that (i) the Agent shall not be required to execute any such document on terms which, in the Agent's opinion, would expose the Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Loan Party in respect of) all interests in the Collateral retained by any Loan Party.

(d)    The Agent shall have no obligation whatsoever to the Lender to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Agreement or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this Section 9.08 [Collateral Matters] or in any other Loan Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in the Collateral as one of the Lender and that the Agent shall have no duty or liability whatsoever to any other Lender, except as otherwise provided herein.

Section 9.09    Agency for Perfection. The Lender hereby appoints the Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and the Agent and the Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Agent and the Lender as secured party. Should the Lender obtain possession or control of any such Collateral, the Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such

Collateral to the Agent or in accordance with the Agent's instructions. Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

## ARTICLE X

## MISCELLANEOUS

        Section 10.01    Notices, Etc. All notices and other communications provided for hereunder shall be in writing and shall be mailed, telecopied or delivered, if to any Credit Party, at the following address:

        Before November 30, 2006:

        BusinessTalkradio.net, Inc.
        1490 Dayton Avenue
        Greenwich, CT 06830
        Attention: Mr. Michael Metters

        On and after November 30, 2006:

        BusinessTalkradio.net, Inc.
        401 Shippan Avenue
        Stamford, CT 06902
        Attention: Mr. Michael Metters

        with a copy to:

        Seiden Wayne LLC
        Two Penn Plaza East, 10th Floor
        Newark, NJ 07105
        Attention: William P. Oberdorf, Esq.
        Telecopier: (973) 491-3555

        if to the Agent, to it at the following address:

        BC Media Funding Company II, LLC
        10 Rockefeller Plaza, Suite 910
        New York, New York 10020
        Attention: Jacob J. Barker
        Telecopier: (917) 492-2058

        with a copy to:

        Akin Gump Strauss Hauer & Feld, LLP
        1700 Pacific Avenue, Suite 4100
        Dallas, Texas 75201
        Attention: Carlos Villota
        Telecopier: (214) 969-4343

or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 10.01 [Notices, Etc.]. All such notices and other communications shall be effective, (i) if mailed, when received or three (3) days after deposited in the mails, whichever occurs first, (ii) if telecopied, when transmitted and confirmation received, or (iii) if delivered, upon delivery, except that notices to the Agent pursuant to Article II shall not be effective until received by the Agent.

Section 10.02    Amendments, Etc.  No amendment or waiver of any provision of this Agreement, and no consent to any departure by any Credit Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender or by the Agent with the consent of the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given, provided, however, that no amendment, waiver or consent shall (i) increase the Commitment of the Lender, reduce the principal of, or interest on, the Term Loan payable to the Lender, reduce the amount of any fee payable for the account of the Lender, or postpone or extend any date fixed for any payment of principal of, or interest or fees on, the Term Loan payable to the Lender, in each case without the written consent of the Lender affected thereby, (ii) increase the Total Commitment without the written consent of the Lender, (iii) change the percentage of the Lender's Commitment or of the aggregate unpaid principal amount of the Term Loan that is required for the Lender or any of them to take any action hereunder, (iv) release all or a substantial portion of the Collateral (except as otherwise provided in this Agreement and the other Loan Documents), subordinate any Lien granted in favor of the Agent for the benefit of the Lender, or release any Borrower or any Guarantor, or (v) amend, modify or waive Section 3.03 [Apportionment of Payments] or this Section 10.02 [Amendments, Etc.] of this Agreement, in each case, without the written consent of the Lender. Notwithstanding the foregoing, no amendment, waiver or consent shall, unless in writing and signed by the Agent, affect the rights or duties of the Agent (but not in its capacity as a Lender) under this Agreement or the other Loan Documents.

Section 10.03    No Waiver; Remedies, Etc.  No failure on the part of the Agent or the Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Agent and the Lender provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Agent and the Lender under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Agent and the Lender to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 10.04    Expenses; Taxes; Attorneys' Fees.  The Borrowers will pay on demand, all costs and expenses incurred by or on behalf of the Agent (and, in the case of clauses (b) through (m) below, the Lender), regardless of whether the transactions contemplated hereby are consummated, including, without limitation, fees, costs, client charges and expenses of counsel for the Agent (and, in the case of clauses (b) through (m) below, the Lender), accounting, due diligence, periodic field audits, valuations, investigations, searches and filings, monitoring of assets, appraisals of Collateral, title searches and reviewing environmental

assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to:    (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including, without limitation, the preparation of any additional Loan Documents pursuant to <u>Section 6.01(b)</u> [Additional Guarantees and Collateral Security] or the review of any of the agreements, instruments and documents referred to in <u>Section 6.01(f)</u> [Inspection Rights]), (b) any requested amendments, waivers or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (c) the preservation and protection of any of the Lender's rights under this Agreement or the other Loan Documents, (d) the defense of any claim or action asserted or brought against the Agent or the Lender by any Person (other than the Agent or the Lender) that arises from or relates to this Agreement, any other Loan Document, the Agent's or the Lender's claims against any Loan Party, or any and all matters in connection therewith, (e) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document, (f) the filing of any petition, complaint, answer, motion or other pleading by the Agent or the Lender, or the taking of any action in respect of the Collateral or other security, in connection with this Agreement or any other Loan Document, (g) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Loan Document, (h) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (i) any attempt to collect from any Loan Party, (j) all liabilities and costs arising from or in connection with the past, present or future operations of any Credit Party involving any damage to real or personal property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property, (k) any Environmental Liabilities and Costs incurred in connection with the investigation, removal, cleanup and/or remediation of any Hazardous Materials present or arising out of the operations of any facility of any Credit Party, (l) any Environmental Liabilities and Costs incurred in connection with any Environmental Lien; or (m) the receipt by the Agent or the Lender of any advice from professionals with respect to any of the foregoing.  Without limitation of the foregoing or any other provision of any Loan Document:  (x) the Borrowers agree to pay all stamp, document, transfer, recording or filing taxes or fees and similar impositions now or hereafter determined by the Agent or the Lender to be payable in connection with this Agreement or any other Loan Document, and the Borrowers agree to save the Agent and the Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such taxes, fees or impositions, and (y) if the Credit Parties fail to perform any covenant or agreement contained herein or in any other Loan Document, the Agent may itself perform or cause performance of such covenant or agreement, and the expenses of the Agent incurred in connection therewith shall be reimbursed on demand by the Borrowers.

Section 10.05    <u>Right of Set-off</u>.    Upon the occurrence and during the continuance of any Event of Default, the Agent or the Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Credit Party (any such notice being expressly waived by the Credit Parties) and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by the Agent or the Lender to or for the credit or the account of any Credit Party against any and all obligations of the Credit Parties either now or hereafter existing under any Loan Document, irrespective of whether or not the Agent or the

Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured. The Agent and the Lender agrees to notify such Credit Party promptly after any such set-off and application made by the Agent or the Lender provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Agent and the Lender under this Section 10.05 [Right of Set-Off] are in addition to the other rights and remedies (including other rights of set-off) which the Agent and the Lender may have under this Agreement or any other Loan Documents of law or otherwise.

Section 10.06  Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 10.07  Assignments and Participations. (a) This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Credit Party and the Agent and the Lender and their respective successors and assigns; provided, however, that none of the Credit Parties may assign or transfer any of its rights hereunder without the prior written consent of the Lender and any such assignment without the Lender's prior written consent shall be null and void. Lender may assign any other their rights or obligations hereunder.

Section 10.08  Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telecopier shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telecopier also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

Section 10.09  GOVERNING LAW. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK.

Section 10.10  CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH CREDIT PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH CREDIT PARTY HEREBY IRREVOCABLY APPOINTS THE SECRETARY OF STATE OF

THE STATE OF NEW YORK AS ITS AGENT FOR SERVICE OF PROCESS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING AND FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 10.01 [NOTICES, ETC.] AND TO THE SECRETARY OF STATE OF THE STATE OF NEW YORK, SUCH SERVICE TO BECOME EFFECTIVE TEN (10) DAYS AFTER SUCH MAILING. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENT AND THE LENDER TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH CREDIT PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY CREDIT PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH CREDIT PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

Section 10.11    WAIVER OF JURY TRIAL, ETC. EACH CREDIT PARTY, THE AGENT AND THE LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH CREDIT PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF THE AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH CREDIT PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENT AND THE LENDER ENTERING INTO THIS AGREEMENT.

Section 10.12    Consent by the Agent and Lender. Except as otherwise expressly set forth herein to the contrary, if the consent, approval, satisfaction, determination, judgment, acceptance or similar action (an "*Action*") of the Agent or the Lender shall be permitted or required pursuant to any provision hereof or any provision of any other agreement to which any Credit Party is a party and to which the Agent or the Lender has succeeded thereto,

such Action shall be required to be in writing and may be withheld or denied by the Agent or the Lender, in its sole discretion, with or without any reason, and without being subject to question or challenge on the grounds that such Action was not taken in good faith.

Section 10.13    No Party Deemed Drafter.  Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 10.14    Reinstatement; Certain Payments.  If any claim is ever made upon the Agent or the Lender for repayment or recovery of any amount or amounts received by the Agent or the Lender in payment or on account of any of the Obligations, the Agent or the Lender shall give prompt notice of such claim to each other Lender and the Borrower, and if the Agent or the Lender repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over the Agent, the Lender or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by the Agent or the Lender with any such claimant, then and in such event each Credit Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to the Agent or the Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Agent or the Lender.

Section 10.15    Indemnification.

(a)    General Indemnity.  In addition to each Credit Party's other Obligations under this Agreement, each Credit Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless the Agent and the Lender and all of their respective officers, directors, employees, attorneys, consultants and agents (collectively called the "*Indemnitees*") from and against any and all losses, damages, liabilities, obligations, penalties, fees, costs and expenses (including, without limitation, attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following:  (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document or of any other document executed in connection with the transactions contemplated by this Agreement, (ii) the Agent's or the Lender's furnishing of funds to the Borrowers under this Agreement or the other Loan Documents, including, without limitation, the management of the Term Loan, (iii) any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Loan Documents, or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "*Indemnified Matters*"); provided, however, that the Credit Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final judgment of a court of competent jurisdiction.

(b)    Environmental Indemnity.  Without limiting Section 10.15(a) [General Indemnity] hereof, each Credit Party agrees to, jointly and severally, defend, indemnify, and hold harmless the Indemnitees against any and all Environmental Liabilities and Costs and all other claims, demands, penalties, fines, liability (including strict liability), losses, damages, costs and expenses (including without limitation, legal fees and expenses, consultant fees and laboratory fees), arising out of (i) any Releases or threatened Releases (x) at any property presently or formerly owned or operated by any Credit Party or any predecessor in interest, or (y) of any Hazardous Materials generated and disposed of by any Credit Party or any predecessor in interest; (ii) any violations of Environmental Laws by any Credit Party or any property owned or operated by any Credit Party; (iii) any Environmental Action relating to any Credit Party or any predecessor in interest; (iv) any personal injury (including wrongful death) or property damage (real or personal) arising out of exposure to Hazardous Materials used, handled, generated, transported or disposed by any Credit Party or any predecessor in interest; and (v) any breach of any warranty or representation regarding environmental matters made by any of the Credit Parties in Section 5.01(r) [Environmental Matters] or the breach of any covenant made by any of the Credit Parties in Section 6.01(j) [Environmental].  Notwithstanding the foregoing, the Credit Parties shall not have any obligation to any Indemnitee under this subsection (b) regarding any potential environmental matter covered hereunder which is caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final judgment of a court of competent jurisdiction.

(c)    The indemnification for all of the foregoing losses, damages, fees, costs and expenses of the Indemnitees are chargeable against the Loan Account.  To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 10.15 [Indemnification] may be unenforceable because it is violative of any law or public policy, each Credit Party shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees.  The indemnities set forth in this Section 10.15 [Indemnification] shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 10.16    Records.  The unpaid principal of and interest on the Term Loan, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 2.06 [Fees] hereof, including, without limitation, the Closing Fee, the Loan Servicing Fee and the collateral monitoring and audit fee payable pursuant to Section 3.01 [Audit and Collateral Monitoring Fees], shall at all times be ascertained from the records of the Agent, which shall be conclusive and binding absent manifest error.

Section 10.17    Binding Effect.  This Agreement shall become effective when it shall have been executed by each Credit Party, the Agent and the Lender and when the conditions precedent set forth in ARTICLE IV [Conditions Precedent]have been satisfied or waived in writing by the Agent, and thereafter shall be binding upon and inure to the benefit of each Credit Party, the Agent and the Lender, and their respective successors and assigns, except that the Borrowers shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of the Lender, and any assignment by the Lender shall be governed by Section 10.07 [Assignments and Participations] hereof.

Section 10.18    Interest.  It is the intention of the parties hereto that the Agent and the Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other Loan Document would be usurious as to the Agent or the Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or the Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other Loan Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to the Agent or the Lender that is contracted for, taken, reserved, charged or received by the Agent or the Lender under this Agreement or any other Loan Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or the Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or the Lender, as applicable, to the Borrowers); and (ii) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to the Agent or the Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by the Agent or the Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by the Agent or the Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or the Lender to the Borrowers).  All sums paid or agreed to be paid to the Agent or the Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to the Agent or the Lender, be amortized, prorated, allocated and spread throughout the full term of the Term Loan until payment in full so that the rate or amount of interest on account of the Term Loan hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (x) the amount of interest payable to the Agent or the Lender on any date shall be computed at the Highest Lawful Rate applicable to the Agent or the Lender pursuant to this Section 10.18 [Interest] and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or the Lender would be less than the amount of interest payable to the Agent or the Lender computed at the Highest Lawful Rate applicable to the Agent or the Lender, then the amount of interest payable to the Agent or the Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to the Agent or the Lender until the total amount of interest payable to the Agent or the Lender shall equal the total amount of interest which would have been payable to the Agent or the Lender if the total amount of interest had been computed without giving effect to this Section 10.18 [Interest].

For purposes of this Section 10.18 [Interest], the term "applicable law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrowers, on the one hand, and the Agent and the Lender, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan

transaction and this Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America.

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 10.19    Confession of Judgment.    Each Credit Party, jointly and severally, authorizes any attorney to appear in any court of record of New York, or any other state in the United States, on default in any payment of any installment due pursuant to any Loan Document, to waive the issuing and service of process, to admit the maturity of the amounts hereunder by acceleration or otherwise, and to confess judgment against any Credit Party in favor of Lender for the amount remaining to be paid under this Agreement, together with costs of suit and attorney fees, and to release all errors and waive all right of appeal and stay of execution.  No judgment or judgments against less than all of the Credit Parties shall be a bar to a subsequent judgment or judgments against any one or more of the Credit Parties against whom judgment has not been obtained on this instrument.

Section 10.20    Confidentiality.    The Agent and the Lender agrees (on behalf of itself and each of its affiliates, directors, officers, employees and representatives) to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable commercial finance companies, any non-public information supplied to it by the Loan Parties pursuant to this Agreement or the other Loan Documents which is identified in writing by the Loan Parties as being confidential at the time the same is delivered to such Person (and which at the time is not, and does not thereafter become, publicly available or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), provided that nothing herein shall limit the disclosure of any such information (i) to the extent required by statute, rule, regulation or judicial process, (ii) to counsel for the Agent or the Lender, (iii) to examiners, auditors, and accountants, (iv) in connection with any litigation to which the Agent or the Lender is a party or (v) to any assignee or participant (or prospective assignee or participant) so long as such assignee or participant (or prospective assignee or participant) first agrees, in writing, to be bound by the confidentiality provisions similar in substance to this Section 10.19 [Confidentiality].  The Agent and the Lender agrees that, upon receipt of a request or identification of the requirement for disclosure pursuant to clause (iv) hereof, it will make reasonable efforts to keep the Loan Parties informed of such request or identification; provided that each Credit Party acknowledges that the Agent and the Lender may make disclosure as required or requested by any Governmental Authority or representative thereof and that the Agent and the Lender may be subject to review by other regulatory agencies and may be required to provide to, or otherwise make available for review by, the representatives of such parties or agencies any such non-public information.

Section 10.21    Integration.    This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

**SIGNATURE PAGE TO FINANCING AGREEMENT**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BORROWER:

BUSINESSTALKRADIO.NET, INC.

By: _Michael J. Metter_

Name: _Michael J. Metter_

Title: _President_

SUBSIDIARIES:

BTR WEST, INC.

By: _Michael J. Metter_

Name: _Michael L. Metter_

Title: _President_

THE LIFESTYLE TALKRADIO NETWORK, INC.

By: _Michael J. Metter_

Name: _Michael L. Metter_

Title: _President_

THE GREENWICH BROADCASTING CORPORATION

By: _Michael J. Metter_

Name: _Michael L. Metter_

Title: _President_

BTR COMMUNICATIONS BOSTON, INC.

By: _Michael J. Metter_

Name: _Michael L. Metter_

Title: _President_

BTR GREENWICH, INC.

By: _Michael J. Metter_

Name: _Michael L. Metter_

Title: _President_

830687-1  Signature Page to Financing Agreement

BTR WEST II, INC.

By: _____
Name: _____
Title: President

BTR COMMUNICATIONS BOSTON II, INC.

By: _____
Name: Michael _____
Title: President

AGENT:                    BC MEDIA FUNDING COMPANY II, LLC

                          By: _____
                               Jacob Barker, Manager


LENDER:                   MEDIA FUNDING COMPANY, LLC

                          By:_____
                          Name:_____
                          Title:_____

BTR WEST II, INC.

By:_____
Name:  Michael L. Metter
Title:    President

BTR COMMUNICATIONS BOSTON II, INC.

By:_____
Name:  Michael L. Metter
Title:    President

AGENT:

BC MEDIA FUNDING COMPANY II LLC

By:_____
Name:  Jacob Barker
Title:    Managing Member

LENDER:

MEDIA FUNDING COMPANY LLC

By:_____
Name:  Jacob Barker
Title:    President

# Exhibit B

<u>EXHIBIT B</u>

## SECURITY AGREEMENT

This **SECURITY AGREEMENT** (this "*Agreement*") is dated as of November __, 2006 and entered into by and among BusinessTalkradio.net, Inc., a Delaware corporation (the "*Borrower*"), The Greenwich Broadcasting Corporation, a Connecticut corporation ("*Greenwich*"), The Lifestyle TalkRadio Network Inc., a Delaware corporation ("*Lifestyle*"), BTR West, Inc., a Nevada corporation ("*BTR West*"), and BTR Communications Boston, Inc., a Massachusetts corporation ("*BTR Boston*"), BTR Greenwich, Inc., a Connecticut corporation ("*BTR Connecticut*"), BTR West II, Inc., a Nevada corporation ("*Nevada II*"), BTR Communications Boston II, Inc., a Massachusetts corporation ("*Boston II*", together with Greenwich, Lifestyle, BTR West, BTR Boston, BTR Connecticut and Nevada II, the "*Subsidiary Guarantors*"), in favor of BC Media Funding Company II, LLC, a Delaware limited liability company (the "*Secured Party*"), as agent for the Lender (as defined below).

## RECITALS

**WHEREAS**, pursuant to the Financing Agreement dated as of November __, 2006, as it may hereafter be amended, restated, supplemented or otherwise modified from time to time (the "*Financing Agreement*"), by and among the Borrower, the Subsidiary Guarantors, Media Funding Company, LLC, a Delaware limited liability company and the other financial institutions from time to time party thereto (the "*Lender*"), and BC Media Funding Company II, LLC, a Delaware limited liability company, as agent for the Lenders (in such capacity, the "*Agent*"), Lenders have made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a term loan to Borrower in the aggregate amount of $5,500,000 (the "*Term Loan*").

**WHEREAS**, Subsidiary Guarantors have each executed and delivered the Subsidiary Guaranty, in each case in favor of Secured Party for the benefit of Lenders, pursuant to which each Subsidiary Guarantor has guarantied the prompt payment and performance when due of all obligations of Borrower under the Financing Agreement.

**WHEREAS**, it is a condition precedent to the extension of credit by the Lenders under the Financing Agreement that each of the Borrower and the Subsidiary Guarantors (collectively, the "*Grantors*") shall have executed and delivered to the Agent a security agreement providing for the grant to the Agent for the benefit of the Agent and the Lenders of a security interest in all property of such Grantor;

**WHEREAS**, the parties understand and agree that certain of the Collateral (defined below) secured by this Agreement and certain of the rights and remedies afforded the Agent hereunder may be subject to the jurisdiction and consent of the Federal Communications Commission (the "*FCC*");

**WHEREAS**, the Grantors are mutually dependent on each other in the conduct of their respective businesses as an integrated operation, with the credit needed from time to time by each Grantor often being provided through financing obtained by the other Grantors and the

ability to obtain such financing being dependent on the successful operation of all of the Grantors as a whole;

WHEREAS, each Grantor has determined that the execution, delivery and performance of this Agreement directly benefits, and are in the best interest of, such Grantor;

NOW, THEREFORE, in consideration of the agreements set forth herein and in the Financing Agreement and in order to induce Lenders to make the Term Loan under the Financing Agreement, each Grantor hereby jointly and severally agrees with the Secured Party for the benefit of the Agent and the Lenders as follows:

SECTION 1.  Definitions.

(a)    Reference is hereby made to the Financing Agreement for a statement of the terms thereof. All terms used in this Agreement and the recitals hereto which are defined in the Financing Agreement or in Article 9 of the Uniform Commercial Code (the "*Code*") as in effect from time to time in the State of New York and which are not otherwise defined herein shall have the same meanings herein as set forth therein; provided that terms used herein which are defined in the Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Agent may otherwise determine.

(b)    The following terms shall have the respective meanings provided for in the Code: "*Accounts*", "*Cash Proceeds*", "*Chattel Paper*", "*Commercial Tort Claim*", "*Commodity Account*", "*Commodity Contracts*", "*Deposit Account*", "*Documents*", "*Equipment*", "*Fixtures*", "*General Intangibles*", "*Goods*", "*Instruments*", "*Inventory*", "*Investment Property*", "*Letter-of-Credit Rights*", "*Noncash Proceeds*", "*Payment Intangibles*", "*Proceeds*", "*Promissory Notes*", "*Record*", "*Security Account*", "*Software*", and "*Supporting Obligations*."

(c)    As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"*Copyrights*" means all domestic and foreign copyrights, whether registered or not, including, without limitation, all Copyright Rights throughout the universe (whether now or hereafter arising) in any and all media (whether now or hereafter developed), in and to all original works of authorship fixed in any tangible medium of expression, acquired or used by any Grantor including, without limitation, computer programs, computer data bases, other computer software layouts, trade dress, drawings, designs, writings, and formulas (including, without limitation, all copyrights described in Schedule VI hereto), all Copyright Registrations, and all reissues, divisions, continuations, continuations in part and extensions or renewals thereof.

"*Copyright Licenses*" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any right to use or sell any works covered by any copyright (including, without limitation, all Copyright Licenses set forth in Schedule IV hereto).

2

"*Copyright Registrations*" means all copyright registrations issued to any Grantor and applications for copyright registration that have been or may hereafter be issued or applied for thereon in the United States and any state thereof and in foreign countries (including, without limitation, the registrations set forth on <u>Schedule VI</u> annexed hereto, as the same may be amended pursuant hereto from time to time).

"*Copyright Rights*" means all common law and other rights in and to the copyrights in the United States and any state thereof and in foreign countries including all Copyright Licenses (but with respect to such Copyright Licenses, only to the extent permitted by such licensing arrangements), the right (but not the obligation) to renew and extend Copyright Registrations and any such rights and to register works protectable by copyright and the right (but not the obligation) to sue in the name of any Grantor or in the name of Secured Party or Lenders for past, present and future infringements of the Copyrights and any such rights.

"*FCC Licenses*" means all licenses, permits, and other authorizations issued by the FCC and used in the business and operation of the Stations set forth in <u>Schedule V</u> hereto, together with all renewals, extensions and modifications thereof and applications therefore.

"*Intellectual Property*" means, with respect to any Grantor all right, title and interest (including rights acquired pursuant to a license or otherwise but only to the extent permitted by agreements governing such license or other use) in and to all of the following:

(a)　　Copyrights, Copyright Registrations and Copyright Rights, including, without limitation, each of the Copyrights, rights, titles and interests in and to the Copyrights, all derivative works and other works protectable by copyright, which are presently, or in the future may be, owned, created (as a work for hire for the benefit of such Grantor), authored (as a work for hire for the benefit of such Grantor), or acquired by such Grantor, in whole or in part, and all Copyright Rights with respect thereto and all Copyright Registrations therefor, heretofore or hereafter granted or applied for, and all renewals and extensions thereof, throughout the world;

(b)　　Patents;

(c)　　Trademarks, Trademark Registrations, the Trademark Rights and goodwill of such Grantor's business symbolized by the Trademarks and associated therewith;

(d)　　all trade secrets, trade secret rights, know-how, customer lists, processes of production, ideas, confidential business information, techniques, processes, formulas, and all other proprietary information; and

(e)　　all proceeds thereof (such as, by way of example and not by limitation, license royalties and proceeds of infringement suits).

"*IP Licenses*" means the Copyright Licenses, the Trademark Licenses and the Patent Licenses.

"*Patent Licenses*" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any

3

right to manufacture, use or sell any invention covered by any Patent (including, without limitation, all Patent Licenses set forth in <u>Schedule VI</u> hereto).

"*Patents*" means all domestic and foreign letters patent, design patents, utility patents, industrial designs, inventions, trade secrets, ideas, concepts, methods, techniques, processes, proprietary information, technology, know-how, formulae, rights of publicity and other general intangibles of like nature, now existing or hereafter acquired, owned or held by any Grantor (including, without limitation, all domestic and foreign letters patent, design patents, utility patents, industrial designs, inventions, trade secrets, ideas, concepts, methods, techniques, processes, proprietary information, technology, know-how and formulae of any Grantor (including, without limitation, such Patents described in <u>Schedule VI</u> hereto), all applications, registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office, or in any similar office or agency of the United States or any other country or any political subdivision thereof), all rights (but not obligations) corresponding thereto to sue for past, present and future infringements and all reissues, divisions, continuations, continuations in part and extensions or renewals thereof.

"*Pledged Debt*" means the Indebtedness from time to time owed to a Grantor, including the Indebtedness set forth on <u>Schedule IX</u> annexed hereto and issued by the obligors named therein, the Instruments and certificates evidencing such Indebtedness and all interest, cash or other property received, receivable or otherwise distributed in respect of or exchanged therefor.

"*Pledged Equity*" means all **Equity Interests** now or hereafter owned by a Grantor, including all securities convertible into, and rights, warrants, options and other rights to purchase or otherwise acquire, any of the foregoing, including those owned on the date hereof and set forth on <u>Schedule VIII</u> annexed hereto, the certificates or other instruments representing any of the foregoing and any interest of such Grantor in the entries on the books of any securities intermediary pertaining thereto and all distributions, dividends and other property received, receivable or otherwise distributed in respect of or exchanged therefor.

"*Pledged Subsidiary Debt*" means Pledged Debt owed to a Grantor by any obligor that is, or becomes, a direct or indirect Subsidiary of such Grantor, of which such Grantor is a direct or indirect Subsidiary or that controls, is controlled by or under common control with such Grantor.

"*Pledged Subsidiary Equity*" means Pledged Equity in a Person that is, or becomes a direct Subsidiary of a Grantor.

"*Trademark Licenses*" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensor or licensee and providing for the grant of any right concerning any Trademark, together with any goodwill connected with and symbolized by any such trademark licenses, contracts or agreements and the right to prepare for sale or lease and sell or lease any and all Inventory now or hereafter owned by any Grantor and now or hereafter covered by such licenses (including, without limitation, all Trademark Licenses described in <u>Schedule VI</u> hereto).

4

"***Trademark Registrations***" means all registrations that have been or may hereafter be issued or applied for thereon in the United States and any state thereof and in foreign countries (including, without limitation, the registrations and applications set forth on <u>Schedule II</u> annexed hereto).

"***Trademarks***" means all domestic and foreign trademarks, service marks, collective marks, certification marks, trade names, business names, d/b/a's, Internet domain names, trade styles, designs, logos, fictitious business names, and/or other source and/or business identifiers and applications pertaining thereto, owned by any Grantor, or hereafter adopted and used, in its business and other source or business identifiers and all general intangibles of like nature, now or hereafter owned, adopted, acquired or used by any Grantor (including, without limitation, all domestic and foreign trademarks, service marks, collective marks, certification marks, trade names, business names, d/b/a's, Internet domain names, trade styles, designs, logos and other source or business identifiers described in <u>Schedule VI</u> hereto), all applications, Trademark Registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof), and all reissues, extensions or renewals thereof, together with all goodwill of the business symbolized by such marks and all customer lists, formulae and other Records of any Grantor relating to the distribution of products and services in connection with which any of such marks are used.

"***Trademark Rights***" means all common law and other rights (but in no event any of the obligations) in and to the Trademarks in the United States and any state thereof and in foreign countries, including all Trademark Licenses (but with respect to such Trademark Licenses, only to the extent permitted by such licensing arrangements), the right (but not the obligation) to renew and extend Trademark Registrations and any such rights and to register works protectable by copyright and the right (but not the obligation) to sue in the name of any Grantor or in the name of Secured Party or Lenders for past, present and future infringements of the Trademarks and any such rights.

SECTION 2.   <u>Grant of Security Interest</u>.   As collateral security for all of the Obligations (as defined in <u>Section 3</u> hereof), each Grantor hereby pledges and assigns to the Agent, and grants to the Agent for the benefit of the Agent and the Lenders, a continuing security interest in, all personal property of such Grantor, wherever located and whether now or hereafter existing and whether now owned or hereafter acquired, of every kind and description, tangible or intangible (the "***Collateral***"), including, without limitation, the following:

        (a)     all Accounts;

        (b)     all Chattel Paper (whether tangible or electronic);

        (c)     the Commercial Tort Claims including but not limited to those claims set forth on <u>Schedule VII</u> hereto;

        (d)     all Deposit Accounts (including without limitation the Working Capital Control Account), all cash, and all other property from time to time deposited therein and the

monies and property in the possession or under the control of the Agent or any Lender or any affiliate, representative, agent or correspondent of the Agent or any Lender;

      (e)    all Documents;

      (f)    all Equipment;

      (g)    all General Intangibles (including, without limitation, all Payment Intangibles), including, without limitation, Payment Intangibles, Software, the FCC Licenses to the extent, but only to the extent, that the Grantor is permitted by law to grant a security interest therein pursuant to the Communications Laws, including, to the maximum extent permitted by law, all rights incident or appurtenant to the FCC Licenses and the rights to receive all proceeds derived from or in connection with the sale, assignment or transfer of the FCC Licenses;

      (h)    all Goods including all Inventory, all Equipment and all Fixtures;

      (i)    all Instruments (including, without limitation, Promissory Notes);

      (j)    all Investment Property;

      (k)    all Copyrights, Patents and Trademarks, and all IP Licenses;

      (l)    all Letter-of-Credit Rights;

      (k)    all Supporting Obligations; all Records;

      (m)    all other tangible and intangible personal property of such Grantor (whether or not subject to the Code), including, without limitation, all bank and other accounts and all cash and all investments therein, all proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the property of such Grantor described in the preceding clauses of this <u>Section 2</u> (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by such Grantor in respect of any of the items listed above), and all books, correspondence, files and other Records, including, without limitation, all tapes, disks, cards, Software, data and computer programs in the possession or under the control of such Grantor or any other Person from time to time acting for such Grantor that at any time evidence or contain information relating to any of the property described in the preceding clauses of this <u>Section 2</u> or are otherwise necessary or helpful in the collection or realization thereof; and

      (n)    all Proceeds, including all Cash Proceeds and Noncash Proceeds, and products of any and all of the foregoing Collateral; in each case howsoever such Grantor's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise). Notwithstanding the foregoing, the Collateral shall include FCC Licenses only to the extent such assignment or pledge under this <u>Section 2</u> would not cause a breach or default under such FCC License or violate any Federal or state law.

SECTION 3.   Security for Obligations.

(a)   This Security Agreement secures, and the Collateral is collateral security for, the prompt payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, of all Secured Obligations of each Grantor. *"Secured Obligations"* means:

(i)   with respect to Borrower, all obligations and liabilities of every nature of Borrower now or hereafter existing under or arising out of or in connection with the Financing Agreement and the other Loan Documents; and

(ii)   with respect to each Guarantor and any additional Guarantor, all obligations and liabilities of every nature of such Grantor now or hereafter existing under or arising out of or in connection with the Subsidiary Guarantees;

(iii)   in each case together with all extensions or renewals thereof, whether for principal, interest, fees, expenses, indemnities or otherwise, whether voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owed with others, and whether or not from time to time decreased or extinguished and later increased, created or incurred, and all or any portion of such obligations or liabilities that are paid, to the extent all or any part of such payment is avoided or recovered directly or indirectly from Secured Party or any Lender, fraudulent transfer or otherwise, and all obligations of every nature of Grantors now or hereafter existing under this Security Agreement (including, without limitation, interest and other amounts that, but for the filing of a petition in bankruptcy with respect to the Borrower or any other Grantor, would accrue on such obligations, whether or not a claim is allowed against the Borrower or such Grantor for such amounts in the related bankruptcy proceeding).

SECTION 4.   Representations and Warranties.   Each Grantor jointly and severally represents and warrants as follows:

(a)   Schedule I attached hereto sets forth (i) the exact legal name of each Grantor, (ii) the organizational identification number of each Grantor or states that no such organizational identification number exists and (iii) the jurisdiction of organization of each such Grantor including all foreign jurisdictions where such Grantor is qualified to do business. No Grantor (or predecessor by merger or otherwise of such Grantor) has, within the five year period preceding the date hereof, had a different name from the name of such Grantor listed on the signature pages hereof, except the names set forth on Schedule I annexed hereto.

(b)   All Equipment, Fixtures, Goods and Inventory now existing are, and all Fixtures, Equipment, Fixtures, Goods and Inventory hereafter existing will be, located and/or based at the addresses specified therefor in Schedule II hereto (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof). Each Grantor's chief place of business and chief executive office, the place where such Grantor keeps its Records concerning Accounts and all originals of all Chattel Paper are located at the addresses specified therefor in Schedule II hereto. None of the Accounts are evidenced by Promissory Notes or other Instruments. Set forth in Schedule III hereto is a complete and accurate list, as of the date of this

7

Agreement, of each Deposit Account, Securities Account and Commodities Account of each Grantor, together with the name and address of each institution at which each such Account is maintained, the account number for each such Account and a description of the purpose of each such Account. Set forth in Schedule I hereto is (i) a complete and correct list of each trade name used by each Grantor and (ii) the name of, and each trade name used by, each Person from which such Grantor has acquired any substantial part of the Collateral.

(c)     Each Grantor has delivered to the Agent complete and correct copies of each IP License described in Schedule IV hereto, including all schedules and exhibits thereto, which represents all of the IP Licenses existing on the date of this Agreement. Each such IP License sets forth the entire agreement and understanding of the parties thereto relating to the subject matter thereof, and there are no other agreements, arrangements or understandings, written or oral, relating to the matters covered thereby or the rights of any Grantor or any of its **Affiliates** in respect thereof. Each IP License now existing is, and each other IP License will be, the legal, valid and binding obligation of the parties thereto, enforceable against such parties in accordance with its terms. No default thereunder by any such party thereto has occurred, nor does any defense, offset, deduction or counterclaim exist thereunder in favor of any such party.

(d)     Each Grantor has delivered to the Agent complete and correct copies of each of the FCC Licenses described in Schedule V, which represent all of the FCC Licenses of such Grantor existing on the date of this Agreement, each of which is in effect in accordance with its terms. The FCC Licenses listed in Schedule V with respect to any Station include all authorizations, licenses, applications and permits issued by or filed with the FCC that are required or necessary for the operation of such Station, and the conduct of the business of each Grantor with respect to such Station, as now conducted and as proposed to be conducted.

(e)     The Grantors own and control, or otherwise possess adequate rights to use, all Trademarks, Patents and Copyrights, which are the only trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity necessary to conduct their business in substantially the same manner as conducted as of the date hereof. Schedule VI hereto sets forth a true and complete list of all Intellectual Property and IP Licenses owned or used by each Grantor as of the date hereof. All such Intellectual Property is subsisting and in full force and effect, has not been adjudged invalid or unenforceable, is valid and enforceable and has not been abandoned in whole or in part. Except as set forth in Schedule VI, no such Intellectual Property is the subject of any licensing or franchising agreement. No Grantor is now infringing or in conflict with any such rights of others in any material respect, and to the best knowledge of each Grantor, no other Person is now infringing or in conflict in any material respect with any such properties, assets and rights owned or used by any Grantor. No Grantor has received any notice that it is violating or has violated the trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity or other intellectual property rights of any third party.

(f)     No Grantor holds any Commercial Tort Claims or is aware of any such pending claims, except for such claims described in Schedule VII.

(g)    The partnership interests or membership interests of each Grantor in each of its Subsidiaries that is a partnership or a limited liability company are not (i) dealt in or traded on securities exchanges or in securities markets, (ii) securities for purposes of Article 8 of any relevant Uniform Commercial Code, (iii) investment company securities within the meaning of Section 8-103 of any relevant Uniform Commercial Code and (iv) evidenced by a certificate. Such partnership interests or membership interests constitute General Intangibles.

(h)    All certificates or Instruments (excluding checks) evidencing, comprising or representing the Collateral have been delivered to Secured Party duly endorsed or accompanied by duly executed instruments of transfer or assignment in blank.

(i)    All of the Pledged Subsidiary Equity set forth on Schedule VIII annexed hereto has been duly authorized and validly issued and is fully paid and non-assessable; all of the Pledged Subsidiary Debt set forth on Schedule IX annexed hereto has been duly authorized and is the legally valid and binding obligation of the issuers thereof and is not in default; except as set forth in the Financing Agreement, there are no outstanding warrants, options or other rights to purchase, or other agreements outstanding with respect to, or property that is now or hereafter convertible into, or that requires the issuance or sale of, any Pledged Subsidiary Equity; Schedule VIII annexed hereto sets forth all of the Equity Interests and the Pledged Equity owned by each Grantor, and the percentage ownership in each issuer thereof; and Schedule IX annexed hereto sets forth all of the Pledged Debt owned by such Grantor.

(j)    As of the date hereof, all of such Grantor's Chattel Paper and Letters of Credit are described on Schedule X. No Person has possession or control of any of its Chattel Paper, Letters of Credit or Letter of Credit rights.

(k)    No negotiable Documents are outstanding with respect to any of the Inventory.

(l)    Each Grantor (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the state, province or jurisdiction of its organization as set forth on Schedule I hereto, (ii) has all requisite power and authority to conduct its business as now conducted and as presently contemplated and to execute, deliver and perform this Agreement and each other Loan Document to be executed and delivered by it pursuant to the Financing Agreement or other Loan Documents and to consummate the transactions contemplated hereby and thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business make such qualification necessary.

(m)    The execution, delivery and performance by each Grantor of this Agreement and each other Loan Document to which such Grantor is or will be a party (i) have been duly authorized by all necessary action, (ii) do not and will not contravene its charter or by-laws, its limited liability company or operating agreement or its certificate of partnership or partnership agreement or any other charter document, as applicable, or any applicable Requirement of Law (including, without limitation, any Communications Law) or any

9

contractual restriction binding on or otherwise affecting such Grantor or any of its properties, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Loan Document) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license (including, without limitation, any Broadcast License), authorization or approval applicable to it or its operations or any of its properties.

(n)    This Agreement is, and each other Loan Document to which any Grantor is or will be a party, when executed and delivered, will be, a legal, valid and binding obligation of such Grantor, enforceable against such Grantor in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws.

(o)    There is no pending or, to the best knowledge of any Grantor, threatened action, suit, proceeding or claim affecting any Grantor or its properties before any court or other Governmental Authority, including, without limitation, any Specified Authority or any arbitrator, or any order, judgment or award by any court or other Governmental Authority, including, without limitation, any Specified Authority or arbitrator, that may adversely affect the grant by any Grantor, or the perfection, of the security interest purported to be created hereby in the Collateral, or the exercise by the Agent of any of its rights or remedies hereunder.

(p)    All federal, state and local tax returns and other reports required by applicable law to be filed by any Grantor have been filed, or extensions have been obtained, and all taxes, assessments and other governmental charges imposed upon any Grantor or any property of such Grantor (including, without limitation, all federal income and social security taxes on employees' wages) and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP.

(q)    The Grantors are and will be at all times the sole and exclusive owners of, or otherwise have and will have adequate rights in, the Collateral free and clear of any Lien except for (i) the Lien created by this Agreement and (ii) Permitted Liens. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording or filing office except (A) such as may have been filed in favor of the Agent relating to this Agreement and (B) such as may have been filed to perfect or protect any Permitted Lien.

(r)    As of the date hereof, and after giving effect to this Agreement and the Loan Documents, and the completion of the transactions contemplated by any Grantor at the time of the execution of this Agreement, each Grantor is and will be Solvent. Each Grantor is not entering into this Agreement or any other Loan Document to which such Grantor is a party or its property is subject with the intent of hindering, delaying or defrauding any creditor.

(s)    The exercise by the Agent of any of its rights and remedies hereunder will not contravene any law or any contractual restriction binding on or otherwise affecting any

10

Grantor or any of its properties and will not result in, or require the creation of, any Lien upon or with respect to any of its properties.

(t)    Subject to <u>Section 11</u>, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other regulatory body, or any other Person, is required for (i) the grant by any Grantor, or the perfection, of the security interest purported to be created hereby in the Collateral or (ii) the exercise by the Agent of any of its rights and remedies hereunder, except (A) for the filing under the Uniform Commercial Code as in effect in the applicable jurisdiction of the financing statements as described in <u>Schedule I</u> hereto, all of which financing statements, filings and other recordings, as applicable, have been duly filed and are in full force and effect, (B) with respect to the perfection of the security interest created hereby in the United States Intellectual Property, for the recording of the appropriate Assignment for Security, substantially in the form of **Exhibit A** hereto in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, (C) with respect to the perfection of the security interest created hereby in motor vehicles (including, without limitation, all trucks, trailers, tractors, service vehicles, automobiles and other mobile equipment) for which the title to such motor vehicles is governed by a certificate of title or ownership (collectively, the *"Motor Vehicles"*), for the submission of an appropriate application requesting that the Lien of the Agent be noted on the certificate of title or ownership, completed and authenticated by the applicable Grantor, together with the certificate of title, with respect to each Motor Vehicle, to the appropriate state agency, (D) with respect to any action that may be necessary to obtain control of Collateral described in Sections 5(i) and 5(k) hereof, the taking of such actions, and (E) the taking possession of all Documents, Chattel Paper, Instruments and cash constituting Collateral.

(u)    This Agreement creates in favor of the Agent for the benefit of the Agent and the Lenders a legal, valid and enforceable security interest in the Collateral, as security for the Obligations. The Agent's having possession of all Instruments, Documents and Chattel Paper and cash constituting Collateral and obtaining control of all Collateral described in Sections 5(i) and 5(k) hereof from time to time, the recording of the appropriate Assignment for Security executed pursuant hereto in the United States Patent and Trademark Office and the United States Copyright Office, as applicable, the submission of an appropriate application requesting that the Lien of the Agent be noted on the certificate of title or ownership, completed and authenticated by the applicable Grantor, to the applicable state agency, and the filing of the financing statements and the other filings and recordings, as applicable, described in <u>Schedule I</u> hereto and, with respect to the Intellectual Property hereafter existing and not covered by an appropriate Assignment for Security, the recording in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, of appropriate instruments of assignment, result in the perfection of such security interests. Such security interests are, or in the case of Collateral in which any Grantor obtains rights after the date hereof, will be, perfected, first priority security interests, subject only to the Permitted Liens that, as a matter of law, would be prior to Liens in favor of the Agent, for the benefit of the Agent and the Lenders, and the recording of such instruments of assignment. Such recordings and filings and all other actions necessary or desirable to perfect and protect such security interest have been duly taken, except for (i) the Agent's having possession of Instruments, Documents and Chattel Paper and cash constituting Collateral after the date hereof, (ii) the Agent obtaining control of any Collateral described in

11

Sections 5(i) and 5(k) of this Agreement after the date hereof and (iii) the other filings and recordations described in Section 4(m) hereof.

(v)    All information heretofore, herein or hereafter supplied to Secured Party or to any Lender by or on behalf of any Grantor with respect to the Collateral is true and correct.

SECTION 5.    Covenants as to the Collateral.  So long as any of the Obligations shall remain outstanding and the Financing Agreement and the other Loan Documents shall not have expired or terminated, unless the Agent shall otherwise consent in writing:

(a)    Further Assurances.  Each Grantor will at its expense, at any time and from time to time, promptly execute and deliver all further instruments and documents and take all further action that may be necessary or desirable or that the Agent may request in order to (i) perfect and protect the security interest purported to be created hereby; (ii) enable the Agent to exercise and enforce its rights and remedies hereunder in respect of the Collateral; or (iii) otherwise effect the purposes of this Agreement, including, without limitation:  (A) marking conspicuously all Chattel Paper and each IP License and, at the request of the Agent, each of its Records pertaining to the Collateral with a legend, in form and substance satisfactory to the Agent, indicating that such Chattel Paper, IP License or Collateral is subject to the security interest created hereby, (B) if any Account shall be evidenced by Promissory Notes or other Instruments or Chattel Paper, delivering and pledging to the Agent hereunder such Promissory Notes, Instruments or Chattel Paper, duly endorsed and accompanied by executed instruments of transfer or assignment, all in form and substance satisfactory to the Agent, (C) executing and filing (to the extent, if any, that such Grantor's signature is required thereon) or authenticating the filing of, such financing or continuation statements, or amendments thereto, as may be necessary or desirable or that the Agent may request in order to perfect and preserve the security interest purported to be created hereby, (D) furnishing to the Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Agent may reasonably request, all in reasonable detail, (E) if any Collateral shall be in the possession of a third party, notifying such Person of the Agent's security interest created hereby and obtaining a written acknowledgment from such Person that such Person holds possession of the Collateral for the benefit of the Agent, which such written acknowledgement shall be in form and substance satisfactory to the Agent, (F) if at any time after the date hereof, any Grantor acquires or holds any Commercial Tort Claim, immediately notifying the Agent in a writing signed by such Grantor setting forth a brief description of such Commercial Tort Claim and granting to the Agent a security interest therein and in the proceeds thereof, which writing shall incorporate the provisions hereof and shall be in form and substance satisfactory to the Agent, (G) upon the acquisition after the date hereof by any Grantor of any Equipment subject to a certificate of title or ownership (other than a Motor Vehicle or Equipment that is subject to a purchase money security interest permitted by Section 6.02(a) of the Financing Agreement), immediately notifying the Agent of such acquisition, setting forth a description of the Equipment acquired and a good faith estimate of the current value of such Equipment, and immediately causing the Agent to be listed as the lienholder on such certificate of title or ownership and delivering evidence of the same to the Agent, and (H) taking all actions required by applicable law or by other law as applicable in any foreign jurisdiction.

12

(b)    <u>Location of Equipment and Inventory</u>.    Each Grantor will keep the Equipment and Inventory (other than used Equipment and Inventory sold in the ordinary course of business in accordance with Section 5(g) hereof or otherwise permitted to be sold under the Financing Agreement) at one or more of the locations specified therefor in <u>Section 4(b)</u> hereof or, upon not less than twenty (20) days' prior written notice to the Agent accompanied by a new <u>Schedule II</u> hereto indicating each new location of the Equipment and Inventory, at such other locations in the continental United States, as the Grantors may elect, provided that (i) all action has been taken to grant to the Agent a perfected, first priority security interest in such Equipment and Inventory (subject to Permitted Liens), and (ii) the Agent's rights in such Equipment and Inventory, including, without limitation, the existence, perfection and priority of the security interest created hereby in such Equipment and Inventory, are not adversely affected thereby.

(c)    <u>Condition of Equipment</u>.    Each Grantor will maintain or cause the Equipment to be maintained and preserved in good condition, repair and working order, ordinary wear and tear excepted (other than obsolete or worn-out Equipment and/or Equipment that is sold as permitted by the Financing Agreement), and will forthwith, or in the case of any loss or damage to any Equipment as promptly as practicable after the occurrence thereof, make or cause to be made all repairs, replacements and other improvements in connection therewith so that the value and operating efficiency thereof shall be at all times be maintained and preserved. Each Grantor will promptly furnish to the Agent a statement describing in reasonable detail any loss or damage in excess of $10,000 to any Equipment.

(d)    <u>Taxes, Etc</u>.    Each Grantor jointly and severally agrees to pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Equipment and Inventory, except to the extent the validity thereof is being contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves in accordance with GAAP have been set aside for the payment thereof.

(e)    <u>Insurance</u>.

(i)    Each Grantor will, at its own expense, maintain insurance (including, without limitation, comprehensive general liability, hazard, property and business interruption insurance) with respect to all of its properties, including, without limitation, its Equipment and Inventory and all real properties leased or owned by it in such amounts, against such risks, in such form and with responsible and reputable insurance companies or associations as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and in any event, in amount, adequacy and scope reasonably satisfactory to the Agent. Each policy for liability insurance shall provide for all losses to be paid to the Agent as its interests may appear, and each policy for property damage insurance shall provide for all losses to be adjusted with, and paid directly to, the Agent. In addition, each such policy shall (A) name each Grantor and the Agent (and such other Persons as the Agent may designate from time to time) as insured parties thereunder (without any representation or warranty by or obligation upon the Agent or such other Person) as their interests may appear, (B) contain an agreement by the insurer that any loss thereunder shall be payable to the Agent on its own account

13

notwithstanding any action, inaction or breach of representation or warranty by any Grantor, (C) provide that there shall be no recourse against the Agent for payment of premiums or other amounts with respect thereto and (D) provide that at least thirty (30) days' prior written notice of cancellation, lapse, expiration or other adverse change shall be given to the Agent by the insurer. Each Grantor will, if so requested by the Agent, deliver to the Agent original or duplicate policies of such insurance and, as often as the Agent may reasonably request, a report of a reputable insurance broker with respect to such insurance. Each Grantor will also, at the request of the Agent, execute and deliver instruments of assignment of such insurance policies and cause the respective insurers to acknowledge notice of such assignment.

(ii)    Reimbursement under any liability insurance maintained by any Grantor pursuant to this Section 5(e) may be paid directly to the Person who shall have incurred liability covered by such insurance. In the case of any loss involving damage to Equipment or Inventory, any proceeds of insurance maintained by a Grantor pursuant to this Section 5(e) shall be paid to the Agent, such Grantor will make or cause to be made the necessary repairs to or replacements of such Equipment or Inventory, and any proceeds of insurance maintained by such Grantor pursuant to this Section 5(e) shall, to the extent that such proceeds have been paid to the Agent, be paid by the Agent to such Grantor as reimbursement for the costs of such repairs or replacements.

(iii)    Upon the occurrence and during the continuance of a Default or Event of Default or upon any insurance payment in respect of any Equipment or Inventory, all insurance payments in respect of such Equipment or Inventory shall be paid to the Agent and applied as specified in Section 7(b) hereof.

(f)    Provisions Concerning the Accounts and the Licenses.

(i)    No Grantor shall, without the prior written consent of the Agent, change (A) such Grantor's name, identity or organizational structure, or (B) its jurisdiction of incorporation as set forth in Section 4(b) hereto. Each Grantor shall (x) immediately notify the Agent upon obtaining an organizational identification number, if on the date hereof such Grantor did not have such identification number, and (y) keep adequate records concerning the Accounts and Chattel Paper and permit representatives of the Agent pursuant to the terms of the Financing Agreement to inspect and make abstracts from such Records and Chattel Paper.

(ii)    Each Grantor will, except as otherwise provided in this subsection (f), continue to collect, at its own expense, all amounts due or to become due under the Accounts. In connection with such collections, each Grantor may (and, at the Agent's direction, will) take such action as such Grantor or the Agent may deem necessary or advisable to enforce collection or performance of the Accounts; provided, however, that the Agent shall have the right at any time, upon the occurrence and during the continuance of a Default or Event of Default, to notify the Account Debtors or obligors under any Accounts of the assignment of such Accounts to the Agent and to direct such Account Debtors or obligors to make payment of all amounts due or to become due to such Grantor thereunder directly to the Agent or its designated agent and, upon such notification and at the expense of such Grantor and to the extent permitted by law, to enforce collection of any such Accounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might

14

have done. Upon the occurrence and during the continuance of a Default or Event of Default and after receipt by any Grantor of a notice from the Agent that the Agent has notified, intends to notify, or has enforced or intends to enforce a Grantor's rights against the Account Debtors or obligors under any Accounts as referred to in the proviso to the immediately preceding sentence, (A) all amounts and proceeds (including Instruments) received by such Grantor in respect of the Accounts shall be received in trust for the benefit of the Agent hereunder, shall be segregated from other funds of such Grantor and shall be forthwith paid over to the Agent or its designated agent in the same form as so received (with any necessary endorsement) to be held as cash collateral and either (i) credited to the Loan Account so long as no Default or Event of Default shall have occurred and be continuing or (ii) if a Default or an Event of Default shall have occurred and be continuing, applied as specified in Section 7(b) hereof, and (B) such Grantor will not adjust, settle or compromise the amount or payment of any Account or release wholly or partly any Account Debtor or obligor thereof or allow any credit or discount thereon. In addition, upon the occurrence and during the continuance of a Default or an Event of Default, the Agent may (in its sole and absolute discretion) direct any or all of the banks and financial institutions with which any Grantor either maintains a Deposit Account or a lockbox or deposits the proceeds of any Accounts to send immediately to the Agent or its designated agent by wire transfer (to such account as the Agent shall specify, or in such other manner as the Agent shall direct) all or a portion of such securities, cash, investments and other items held by such institution. Any such securities, cash, investments and other items so received by the Agent or its designated agent shall (in the sole and absolute discretion of the Agent) be held as additional Collateral for the Obligations or distributed in accordance with Section 7(b) hereof.

(iii)    Upon the occurrence and during the continuance of any breach or default under any IP License referred to in Schedule IV hereto by any party thereto other than a Grantor, (A) the relevant Grantor will, promptly after obtaining knowledge thereof, give the Agent written notice of the nature and duration thereof, specifying what action, if any, it has taken and proposes to take with respect thereto, (B) no Grantor will, without the prior written consent of the Agent, declare or waive any such breach or default or affirmatively consent to the cure thereof or exercise any of its remedies in respect thereof, and (C) each Grantor will, upon written instructions from the Agent and at such Grantor's expense, take such action as the Agent may deem necessary or advisable in respect thereof.

(iv)    Each Grantor will, at its expense, promptly deliver to the Agent a copy of each notice or other communication received by it by which any other party to any IP License referred to in Schedule IV or FCC License referred to in Schedule V hereto purports to exercise any of its rights or affect any of its obligations or the Grantor's rights thereunder, together with a copy of any reply by such Grantor thereto.

(v)    Each Grantor will exercise promptly and diligently each and every right which it may have under each IP License (other than any right of termination) in accordance with reasonable and sound business practice and will duly perform and observe in all respects all of its obligations under each IP License and will take all action necessary to maintain the IP Licenses in full force and effect. No Grantor will, without the prior written consent of the Agent, cancel, terminate, amend or otherwise modify in any respect, or waive any provision of, any IP License referred to in Schedule IV hereto.

15

(g)     Transfers and Other Liens.

(i)     Except to the extent expressly permitted by Section 6.02(c) of the Financing Agreement, no Grantor will sell, assign (by operation of law or otherwise), lease, license, exchange or otherwise transfer or dispose of any of the Collateral.

(ii)     Except to the extent expressly permitted by Section 6.02(a) of the Financing Agreement, no Grantor will create, suffer to exist or grant any Lien upon or with respect to any Collateral.

(h)     Intellectual Property.

(i)     If applicable, each Grantor has duly executed and delivered the applicable Assignment for Security in the form attached hereto as Exhibit A. Each Grantor (either itself or through licensees) will, and will cause each licensee thereof to, take all action necessary to maintain all of the Intellectual Property in full force and effect, including, without limitation, using the proper statutory notices and markings and using the Trademarks on each applicable trademark class of goods in order to so maintain the Trademarks in full force, free from any claim of abandonment for non-use, and no Grantor will (nor permit any licensee thereof to) do any act or knowingly omit to do any act whereby any Intellectual Property may become invalidated; provided, however, that so long as no Default or Event of Default has occurred and is continuing, no Grantor shall have an obligation to use or to maintain any Intellectual Property (A) that relates solely to any product or work, that has been, or is in the process of being, discontinued, abandoned or terminated, (B) that is being replaced with Intellectual Property substantially similar to the Intellectual Property that may be abandoned or otherwise become invalid, so long as the failure to use or maintain such Intellectual Property does not materially adversely affect the validity of such replacement Intellectual Property and so long as such replacement Intellectual Property is subject to the Lien created by this Agreement, or (C) that is substantially the same as another Intellectual Property that is in full force, so long as the failure to use or maintain such Intellectual Property does not materially adversely affect the validity of such replacement Intellectual Property and so long as such other Intellectual Property is subject to the Lien and security interest created by this Agreement. Each Grantor will cause to be taken all necessary steps in any proceeding before the United States Patent and Trademark Office and the United States Copyright Office or any similar office or agency in any other country or political subdivision thereof to maintain each registration of the Intellectual Property (other than the Intellectual Property described in the proviso to the immediately preceding sentence), including, without limitation, filing of renewals, affidavits of use, affidavits of incontestability and opposition, interference and cancellation proceedings and payment of maintenance fees, filing fees, taxes or other governmental fees. If any Intellectual Property is infringed, misappropriated, diluted or otherwise violated in any material respect by a third party, the Grantors shall (x) upon obtaining knowledge of such infringement, misappropriation, dilution or other violation, promptly notify the Agent and (y) to the extent the Grantors shall deem appropriate under the circumstances, promptly sue for infringement, misappropriation, dilution or other violation, seek injunctive relief where appropriate and recover any and all damages for such infringement, misappropriation, dilution or other violation, or take such other actions as the Grantors shall deem appropriate under the circumstances to protect such Intellectual Property. Each Grantor shall furnish to the Agent, from time to time upon the Agent's request, statements and schedules further identifying and describing

16

the Intellectual Property and IP Licenses and such other reports in connection with the Intellectual Property and IP Licenses as the Agent may reasonably request, all in reasonable detail and promptly upon request of the Agent, following receipt by the Agent of any such statements, schedules or reports, the Grantors shall modify this Agreement by amending Schedule VI hereto to include any Intellectual Property and IP License, as the case may be, which becomes part of the Collateral under this Agreement and shall execute and authenticate such documents and do such acts as shall be necessary or, in the judgment of the Agent, desirable to subject such Intellectual Property and IP Licenses to the Lien and security interest created by this Agreement. Notwithstanding anything herein to the contrary, upon the occurrence and during the continuance of a Default or an Event of Default, no Grantor may abandon or otherwise permit any Intellectual Property to become invalid without the prior written consent of the Agent, and if any Intellectual Property is infringed, misappropriated, diluted or otherwise violated in any material respect by a third party, the Grantors will take such action as the Agent shall deem appropriate under the circumstances to protect such Intellectual Property.

(ii)    In no event shall any Grantor, either itself or through any agent, employee, licensee or designee, file an application for the registration of any Trademark or Copyright or the issuance of any Patent with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, or in any similar office or agency of the United States or any country or any political subdivision thereof unless it gives the Agent prior written notice thereof. Upon request of the Agent, each Grantor shall execute, authenticate and deliver any and all assignments, agreements, instruments, documents and papers as the Agent may reasonably request to evidence the Agent's security interest hereunder in such Intellectual Property and the General Intangibles of such Grantor relating thereto or represented thereby, and each Grantor hereby appoints the Agent its attorney-in-fact to execute and/or authenticate and file all such writings for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed, and such power (being coupled with an interest) shall be irrevocable until the termination of all Commitments, the repayment of all of the Obligations in full and the termination of each of the Loan Documents.

(i)    Deposit, Commodities and Securities Accounts. Prior to the date hereof, each Grantor shall cause each bank and other financial institution with an account referred to in Schedule III hereto to execute and deliver to the Agent a control agreement, in form and substance reasonably satisfactory to the Agent, duly executed by such Grantor and such bank or financial institution, or enter into other arrangements in form and substance satisfactory to the Agent, pursuant to which such institution shall irrevocably agree, among other things, that (i) it will comply at any time with the instructions originated by the Agent to such bank or financial institution directing the disposition of cash, Commodity Contracts, securities, Investment Property and other items from time to time credited to such account, without further consent of such Grantor, which instructions the Agent will not give to such bank or other financial institution in the absence of a continuing Default or Event of Default, (ii) all cash, Commodity Contracts, securities, Investment Property and other items of such Grantor deposited with such institution shall be subject to a perfected, first priority security interest in favor of the Agent, (iii) any right of set off, banker's Lien or other similar Lien, security interest or encumbrance shall be fully waived as against the Agent, and (iv) upon receipt of written notice from the Agent during the continuance of a Default or an Event of Default, such bank or financial institution shall immediately send to the Agent by wire transfer (to such account as the Agent shall specify,

17

or in such other manner as the Agent shall direct) all such cash, the value of any Commodity Contracts, securities, Investment Property and other items held by it. Without the prior written consent of the Agent, no Grantor shall make or maintain any Deposit Account, Commodity Account or Securities Account except for the accounts set forth in Schedule III hereto. The provisions of this paragraph 5(i) shall not apply to (i) Deposit Accounts for which the Agent is the depositary and (ii) Deposit Accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of a Grantor's salaried employees.

(j)    Motor Vehicles.

(i)    Upon the occurrence and during the continuance of a Default or an Event of Default, and at the written request of the Agent, each Grantor shall cause all Motor Vehicles, now owned or hereafter acquired by any Grantor, the ownership of which under applicable law (including without limitation, any Motor Vehicle Law), is evidenced by a certificate of title or ownership, to be properly titled in the name of such Grantor, with the Agent's Lien noted thereon, and, if requested by the Agent, deliver to the Agent (or its custodian) originals of all such certificates of title or ownership for such Motor Vehicles, with the Agent's Lien noted thereon.

(ii)    Upon the occurrence and during the continuance of a Default or an Event of Default and at the written request of the Agent, upon the acquisition after the date hereof by any Grantor of any Motor Vehicle or other Equipment subject to a certificate of title or ownership (other than a Motor Vehicle or Equipment to be acquired that is subject to a purchase money security interest permitted by Section 6.02(a) of the Financing Agreement), such Grantor shall immediately notify the Agent of such acquisition, set forth a description of the Motor Vehicle or other Equipment acquired and a good faith estimate of the current value of such Motor Vehicle or Equipment, and if so requested by the Agent, immediately deliver to the Agent (or its custodian) originals of the certificates of title or ownership for such Motor Vehicle or Equipment, together with the manufacturer's statement of origin, and an application duly executed by the appropriate Grantor to evidence the Agent's Lien thereon.

(iii)    Subject to clauses (j)(i) and (j)(ii) above, upon the occurrence and during the continuance of a Default or an Event of Default, and at the written request of the Agent, each Grantor hereby appoints the Agent as its attorney-in-fact, effective the date hereof and terminating upon the termination of this Agreement, for the purpose of (A) executing on behalf of such Grantor title or ownership applications for filing with appropriate state agencies to enable Motor Vehicles now owned or hereafter acquired by such Grantor to be retitled and the Agent listed as lienholder thereof, (B) filing such applications with such state agencies, and (C) executing such other documents and instruments on behalf of, and taking such other action in the name of, such Grantor as the Agent may deem necessary or advisable to accomplish the purposes hereof (including, without limitation, for the purpose of creating in favor of the Agent a perfected Lien on the Motor Vehicles and exercising the rights and remedies of the Agent hereunder).

(iv)    Any certificates of title or ownership delivered pursuant to the terms hereof shall be accompanied by odometer statements for each Motor Vehicle covered thereby.

(k)    <u>Control</u>.  Each Grantor hereby agrees to take any or all action that may be necessary and that the Agent may request in order for the Agent to obtain control in accordance with Sections 9-104, 9-105, 9-106 and 9-107 of the Code with respect to the following Collateral: (i) Deposit Accounts, (ii) Electronic Chattel Paper, (iii) Investment Property and (iv) Letter-of-Credit Rights.

(l)    <u>Inspection and Reporting</u>.    Subject to the terms of the Financing Agreement, each Grantor shall permit the Agent and the Lenders, or any agents or representatives thereof or such professionals or other Persons as the Agent and the Lenders may designate (i) to examine and inspect the books and records of the Grantor and take copies and extracts therefrom, (ii) to visit and inspect the Collateral, (iii) to verify materials, leases, notes, Accounts, Inventory and other assets of such Grantor from time to time, (iv) to conduct audits, physical counts, appraisals and/or valuations or examinations at the locations of such Grantor and (v) to discuss such Grantor's affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives, in each case as provided in the Financing Agreement.

(m)    <u>Partnership and Limited Liability Company Interest</u>.  No Grantor that is a partnership or a limited liability company shall, nor shall any Grantor with any Subsidiary that is a partnership or a limited liability company, permit such partnership interests or membership interests to (i) be dealt in or traded on securities exchanges or in securities markets, (ii) become a security for purposes of Article 8 of any relevant Uniform Commercial Code, (iii) become an investment company security within the meaning of Section 8-103 of any relevant Uniform Commercial Code or (iv) be evidenced by a certificate.    Each Grantor agrees that such partnership interests or membership interests shall constitute General Intangibles.

SECTION 6.    <u>Additional Provisions Concerning the Collateral</u>.

(a)    Each Grantor hereby (i) authorizes the Agent to file, one or more financing or continuation statements, and amendments thereto, relating to the Collateral (including, without limitation, any such financing statements that indicate the Collateral as "all assets" or words of similar import) and (ii) ratifies such authorization to the extent that the Agent has filed any such financing or continuation statements, or amendments thereto, prior to the date hereof.    A photocopy or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

(b)    Each Grantor hereby irrevocably appoints the Agent as its attorney-in-fact and proxy, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, from time to time in the Agent's discretion, to take any action and to execute any instrument which the Agent may deem necessary or advisable to accomplish the purposes of this Agreement (subject to the rights of a Grantor under Section 5 hereof and in compliance with the Communications Laws), including, without limitation, (i) to obtain and

adjust insurance required to be paid to the Agent pursuant to Section 5(e) hereof, (ii) to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any Collateral, (iii) to receive, endorse, and collect any drafts or other instruments, documents and chattel paper in connection with clause (i) or (ii) above, (iv) to file any claims or take any action or institute any proceedings which the Agent may deem necessary or desirable for the collection of any Collateral or otherwise to enforce the rights of the Agent and the Lenders with respect to any Collateral and (v) to execute assignments, licenses and other documents to enforce the rights of the Agent and the Lenders with respect to any Collateral.  This power is coupled with an interest and is irrevocable until all of the Obligations are paid in full after the termination of the Financing Agreement and the other Loan Documents.

(c)    For the purpose of enabling the Agent to exercise rights and remedies hereunder, at such time as the Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby grants to the Agent, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to any Grantor) to use, assign, license or sublicense any Intellectual Property now owned or hereafter acquired by any Grantor, wherever the same may be located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof. Notwithstanding anything contained herein to the contrary, but subject to the provisions of the Financing Agreement that limit the right of a Grantor to dispose of its property and Section 5(h) hereof, so long as no Default or Event of Default shall have occurred and be continuing, each Grantor may exploit, use, enjoy, protect, license, sublicense, assign, sell, dispose of or take other actions with respect to the Intellectual Property in the ordinary course of its business.  In furtherance of the foregoing, unless a Default or an Event of Default shall have occurred and be continuing, the Agent shall from time to time, upon the request of a Grantor, execute and deliver any instruments, certificates or other documents, in the form so requested, which such Grantor shall have certified are appropriate (in such Grantor's judgment) to allow it to take any action permitted above (including relinquishment of the license provided pursuant to this clause (c) as to any Intellectual Property).  Further, upon the payment in full of all of the Obligations after the cancellation or termination of the Financing Agreement and the other Loan Documents, the Agent (subject to Section 12(e) hereof) shall release and reassign to the Grantors all of the Agent's right, title and interest in and to the Intellectual Property, and the IP Licenses, all without recourse, representation or warranty whatsoever and at the Grantors' sole expense.  The exercise of rights and remedies hereunder by the Agent shall not terminate the rights of the holders of any licenses or sublicenses theretofore granted by any Grantor in accordance with the second sentence of this clause (c).  Each Grantor hereby releases the Agent from any claims, causes of action and demands at any time arising out of or with respect to any actions taken or omitted to be taken by the Agent under the powers of attorney granted herein other than actions taken or omitted to be taken through the Agent's gross negligence or willful misconduct, as determined by a final determination of a court of competent jurisdiction.

(d)    If any Grantor fails to perform any agreement contained herein, the Agent may itself perform, or cause performance of, such agreement or obligation (in compliance with the Communications Laws), in the name of such Grantor or the Agent, and the expenses of the

Agent incurred in connection therewith shall be jointly and severally payable by the Grantors pursuant to Section 8 hereof and shall be secured by the Collateral.

(e)    The powers conferred on the Agent hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

(f)    Anything herein to the contrary notwithstanding (i) each Grantor shall remain liable under the IP Licenses and otherwise with respect to any of the Collateral to the extent set forth therein to perform all of its obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by the Agent of any of its rights hereunder shall not release any Grantor from any of its obligations under the IP Licenses or otherwise in respect of the Collateral, and (iii) the Agent shall not have any obligation or liability by reason of this Agreement under the IP Licenses or with respect to any of the other Collateral, nor shall the Agent be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

SECTION 7.   Remedies Upon Default.   If any Default or Event of Default shall have occurred and be continuing:

(a)    Subject to Section 11, the Agent may exercise in respect of the Collateral, in addition to any other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party upon default under the Code (whether or not the Code applies to the affected Collateral), and also may (i) take absolute control of the Collateral, including, without limitation, transfer into the Agent's name or into the name of its nominee or nominees (to the extent the Agent has not theretofore done so) and thereafter receive, for the benefit of the Lenders, all payments made thereon, give all consents, waivers and ratifications in respect thereof and otherwise act with respect thereto as though it were the outright owner thereof, (ii) require each Grantor to, and each Grantor hereby agrees that it will at its expense and upon request of the Agent forthwith, assemble all or part of the Collateral as directed by the Agent and make it available to the Agent at a place or places to be designated by the Agent that is reasonably convenient to both parties, and the Agent may enter into and occupy any premises owned or leased by any Grantor where the Collateral or any part thereof is located or assembled for a reasonable period in order to effectuate the Agent's rights and remedies hereunder or under law, without obligation to any Grantor in respect of such occupation, and (iii) without notice except as specified below and without any obligation to prepare or process the Collateral for sale, (A) sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Agent's offices or elsewhere, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Agent may deem commercially reasonable and/or (B) lease, license or dispose of the Collateral or any part thereof upon such terms as the Agent may deem commercially reasonable. Each Grantor agrees that, to the extent notice of sale or any other disposition of the Collateral shall be required by law, at least ten (10) days' notice to a Grantor of the time and place of any public sale or the time after which any private sale or other disposition of the Collateral is to be made shall constitute reasonable notification. The Agent

shall not be obligated to make any sale or other disposition of Collateral regardless of notice of sale having been given. The Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor hereby waives any claims against the Agent and the Lenders arising by reason of the fact that the price at which the Collateral may have been sold at a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if the Agent accepts the first offer received and does not offer the Collateral to more than one offeree, and waives all rights that such Grantor may have to require that all or any part of the Collateral be marshalled upon any sale (public or private) thereof. Each Grantor hereby acknowledges that (i) any such sale of the Collateral by the Agent shall be made without warranty, (ii) the Agent may specifically disclaim any warranties of title, possession, quiet enjoyment or the like, and (iii) such actions set forth in clauses (i) and (ii) above shall not adversely effect the commercial reasonableness of any such sale of the Collateral. In addition to the foregoing, (i) upon written notice to any Grantor from the Agent, each Grantor shall cease any use of the Intellectual Property or any trademark, patent or copyright similar thereto for any purpose described in such notice; (ii) the Agent may, at any time and from time to time, upon ten (10) days' prior notice to any Grantor, license, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any of the Intellectual Property, throughout the universe for such term or terms, on such conditions, and in such manner, as the Agent shall in its sole discretion determine; and (iii) the Agent may, at any time, pursuant to the authority granted in Section 6 hereof (such authority being effective upon the occurrence and during the continuance of a Default or an Event of Default execute and deliver on behalf of a Grantor, one or more instruments of assignment of the Intellectual Property (or any application or registration thereof), in form suitable for filing, recording or registration in any country.

(b)    Any cash held by the Agent as Collateral and all Cash Proceeds received by the Agent in respect of any sale of or collection from, or other realization upon, all or any part of the Collateral may, in the discretion of the Agent, be held by the Agent as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Agent pursuant to Section 8 hereof) in whole or in part by the Agent against, all or any part of the Obligations in such order as the Agent shall elect, consistent with the provisions of the Financing Agreement. Any surplus of such cash or Cash Proceeds held by the Agent and remaining after payment in full of all of the Obligations after termination of the Financing Agreement and the other Loan Documents shall be paid over to whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct.

(c)    In the event that the proceeds of any such sale, collection or realization are insufficient to pay all amounts to which the Agent and the Lenders are legally entitled, the Grantors shall be jointly and severally liable for the deficiency, together with interest thereon at the highest rate specified in any applicable Loan Document for interest on overdue principal thereof or such other rate as shall be fixed by applicable law, together with the costs of collection and the reasonable fees, costs, expenses and other client charges of any attorneys employed by the Agent to collect such deficiency.

(d)    Each Grantor hereby acknowledges that if the Agent complies with any applicable state or federal law requirements in connection with a disposition of the Collateral,

22

such compliance will not adversely affect the commercial reasonableness of any sale or other disposition of the Collateral.

(e)    The Agent shall not be required to marshal any present or future collateral security (including, but not limited to, this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of the Agent's rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising.  To the extent that any Grantor lawfully may, such Grantor hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Agent's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

SECTION 8.  Indemnity and Expenses.

(a)    Each Grantor jointly and severally agrees to defend, protect, indemnify and hold harmless the Agent and each Lender (and all of their respective officers, directors, employees, attorneys, consultants and agents) from and against any and all claims, damages, losses, liabilities, obligations, penalties, fees, costs and expenses (including, without limitation, legal fees, costs, expenses and disbursements of the Agent's and each Lender's counsel) to the extent that they arise out of or otherwise result from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting solely and directly from the Agent's gross negligence or willful misconduct, as determined by a final judgment of a court of competent jurisdiction.

(b)    Each Grantor jointly and severally agrees to pay to the Agent upon demand the amount of any and all costs and expenses, including the reasonable fees, costs, expenses and disbursements of counsel for the Agent and of any experts and agents (including, without limitation, any collateral trustee which may act as agent of the Agent), which the Agent may incur in connection with (i) the preparation, negotiation, execution, delivery, recordation, administration, amendment, waiver or other modification or termination of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, any Collateral, (iii) the exercise or enforcement of any of the rights of the Agent hereunder, or (iv) the failure by any Grantor to perform or observe any of the provisions hereof.

SECTION 9.  Notices, Etc.  All notices and other communications provided for hereunder shall be in writing and shall be mailed (by certified mail, postage prepaid and return receipt requested), telecopied or delivered, if to a Grantor, to it in care of the Administrative Borrower at its address specified in the Financing Agreement and if to the Agent, to it at its address specified in the Financing Agreement; or as to any such Person, at such other address as shall be designated by such Person in a written notice to such other Person complying as to delivery with the terms of this Section 9.  All such notices and other communications shall be effective (a) if mailed (by certified mail, postage prepaid and return receipt requested), when

received or three (3) days after deposited in the mails, whichever occurs first, (b) if telecopied, when transmitted and confirmation is received or (c) if delivered, upon delivery.

SECTION 10. Security Interest Absolute. Subject to Section 11, all rights of the Agent and the Lenders, all Liens and all obligations of each of the Grantors hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Financing Agreement, any other Loan Document or any other agreement or instrument relating thereto, (b) any change in the time, manner or place of payment of, or in any other term in respect of, all or any of the Obligations, or any other amendment or waiver of or consent to any departure from the Financing Agreement or any other Loan Document, (c) any exchange or release of, or non-perfection of any Lien on any Collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Obligations, or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any of the Grantors in respect of the Obligations. All authorizations and agencies contained herein with respect to any of the Collateral are irrevocable and powers coupled with an interest.

SECTION 11. FCC Matters. Notwithstanding anything to the contrary contained herein, any foreclosure on, sale, transfer or other disposition of any Collateral or any other action taken or proposed to be taken hereunder that would affect the operational, voting, or other control of the Grantors or affect the ownership of the FCC Licenses, shall not violate the Communications Laws and, if and to the extent required by the Communications Laws, shall be subject to the prior consent of the FCC and any other applicable governmental authority. Notwithstanding anything to the contrary contained herein, the Agent shall not take any action pursuant hereto that would constitute or result in any assignment of the FCC Licenses or transfer of control of any Grantor if such assignment or transfer of control would require under then existing law (including the Communications Laws), the prior approval of the FCC, without first obtaining such approval of the FCC and notifying the FCC of the consummation of such assignment or transfer of control (to the extent required to do so). Each Grantor agrees to take any action which the Agent may reasonably request in order to obtain and enjoy the full rights and benefits granted to the Agent by this Agreement, including, without limitation, after the occurrence and during the continuance of a Default or an Event of Default, (a) assisting and cooperating in obtaining any approval of the FCC that is then required under the Communications Laws or under any other law for any action or transaction contemplated by this Agreement, and (b) upon request, the execution, delivery and filing with the FCC of the assignor's or transferor's portion of any application or applications for consent to the assignment of FCC Licenses issued to such Grantor with respect to the Stations or transfer of control of the Grantor.

SECTION 12. Miscellaneous.

(a)     No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by each Grantor and the Agent, and no waiver of any provision of this Agreement, and no consent to any departure by any Grantor therefrom, shall be effective unless it is in writing and signed by the Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)     No failure on the part of the Agent or the Lenders to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Agent and the Lenders provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Agent and the Lenders under any Loan Document against any party thereto are not conditional or contingent on any attempt by such Person to exercise any of its rights under any other Loan Document against such party or against any other Person, including but not limited to, any Grantor.

(c)     Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(d)     This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until the later of (A) the payment in full of the Obligations and (B) the termination of the Financing Agreement and the other Loan Documents, and (ii) be binding on each Grantor and all other Persons who become bound as debtor to this Agreement in accordance with Section 9-203(d) of the Code and shall inure, together with all rights and remedies of the Agent and the Lenders hereunder, to the benefit of the Agent and the Lenders and their respective permitted successors, transferees and assigns. Without limiting the generality of clause (ii) of the immediately preceding sentence, without notice to the Grantors, the Agent and the Lenders may assign or otherwise transfer their rights and obligations under this Agreement and any other Loan Document, to any other Person and such other Person shall thereupon become vested with all of the benefits in respect thereof granted to the Agent and the Lenders herein or otherwise. Upon any such assignment or transfer, all references in this Agreement to the Agent or any such Lender shall mean the assignee of the Agent or such Lender. None of the rights or obligations of any Grantor hereunder may be assigned or otherwise transferred without the prior written consent of the Agent, and any such assignment or transfer shall be null and void.

(e) Upon the satisfaction in full of the Obligations and the termination of the Financing Agreement and the other Loan Documents, (i) this Agreement and the security interests created hereby shall terminate and all rights to the Collateral shall revert to the Grantors and (ii) the Agent will, upon the Grantors' request and at the Grantors' expense, without any representation, warranty or recourse whatsoever, (A) return to the Grantors such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof and (B) execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence such termination.

(f)     THIS AGREEMENT SHALL BE GOVERNED BY, CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, EXCEPT AS REQUIRED BY MANDATORY PROVISIONS OF LAW AND EXCEPT TO THE EXTENT THAT THE VALIDITY AND PERFECTION OR THE PERFECTION AND THE EFFECT OF PERFECTION OR NON-PERFECTION OF THE SECURITY INTEREST

CREATED HEREBY, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

(g)    ANY LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY DOCUMENT RELATED THERETO MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS THEREOF, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH GRANTOR HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.    EACH GRANTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION, SUIT OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT.

(h)    Each Grantor irrevocably consents to the service of process of any of the aforesaid courts in any such action, suit or proceeding by the mailing of copies thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Grantor at its address provided herein, such service to become effective ten (10) days after such mailing

(i)    Nothing contained herein shall affect the right of the Agent to serve process in any other manner permitted by law or commence legal proceedings or otherwise proceed against any Grantor or any property of any Grantor in any other jurisdiction.

(j)    Each Grantor irrevocably and unconditionally waives any right it may have to claim or recover in any legal action, suit or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

(k)    **EACH GRANTOR AND (BY ITS ACCEPTANCE OF THE BENEFITS OF THIS AGREEMENT) THE AGENT WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR OTHER ACTION OF THE PARTIES HERETO.**

(l)    Section headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(m)    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original,

26

but all of which taken together constitute one in the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile shall be equally effective as delivery of an original executed counterpart.

(n)     All of the obligations of the Grantors hereunder are joint and several. The Agent may, in its sole and absolute discretion, enforce the provisions hereof against any of the Grantors and shall not be required to proceed against all Grantors jointly or seek payment from the Grantors ratably. In addition, the Agent may, in its sole and absolute discretion, select the Collateral of any one or more of the Grantors for sale or application to the Obligations, without regard to the ownership of such Collateral, and shall not be required to make such selection ratably from the Collateral owned by all of the Grantors. The release or discharge of any Grantor by the Agent shall not release or discharge any other Grantor from the obligations of such Person hereunder.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, each Grantor has caused this Agreement to be executed and delivered by its officer thereunto duly authorized as of the date first above written.

GRANTORS:

BUSINESSTALKRADIO.NET, INC.

By: _____
Name: _____
Title: _____

THE GREENWICH BROADCASTING CORPORATION

By: _____
Name: _____
Title: _____

THE LIFESTYLE TALKRADIO NETWORK INC.

By: _____
Name: _____
Title: _____

BTR WEST, INC.

By: _____
Name: _____
Title: _____

BTR COMMUNICATIONS BOSTON, INC.

By: _____
Name: _____
Title: _____

BTR GREENWICH, INC.

By: _____
Name: _____
Title: _____

BTR WEST II, INC.

By: _____
Name: _____
Title: _____

BTR COMMUNICATIONS BOSTON II, INC.

By: _____
Name: _____
Title: _____

SCHEDULE I

LEGAL NAMES; ORGANIZATIONAL IDENTIFICATION NUMBERS; STATES OR
JURISDICTIONS OF ORGANIZATION

| Exact Legal Name | Org. ID | Assumed Names | Jurisdiction of Organization | Foreign Qualifications | Employer Identification Number |
|---|---|---|---|---|---|
| BusinessTalkradio. net, Inc. | 3647077 | | Delaware | Connecticut; Massachusetts; Nevada | |
| The Greenwich Broadcasting Corporation | 0020179 | WGCH, 1490 WGCH, Greenwich Radio | Connecticut | None. | 06-0795193 |
| The Lifestyle TalkRadio Network Inc. | 3884440 | LTR, LTRN, Lifestyle TalkRadio Network™ | Delaware | None. | 34-2024407 |
| BTR West, Inc. | E0691712 006-0 | None. | Nevada | None. | 11-3792714 |
| BTR Communications Boston, Inc. | 00093548 3 | None. | Massachusetts | None. | 11-3792717 |
| BTR West II, Inc. | E0793992 006-5 | KNUU, K-News, Newsradio 970 | Nevada | None. | |
| BTR Greenwich, Inc. | 0876528 | None. | Connecticut | None. | |
| BTR Communications Boston II, Inc. | 00093671 5 | WBET | Massachusetts | None. | |

SCHED. I

SCHEDULE II

LOCATIONS OF GRANTORS

Description of Location (State if Location (i) contains Equipment, Fixtures, Goods or Inventory, (ii) is chief place of business and chief executive office, or (iii) contains Records concerning Accounts and originals of Chattel Paper)

| **Name of Grantor** | **Locations of Equipment and Inventory, and all office locations** |
|---|---|
| BusinessTalkradio.net, Inc. | 1490 Dayton Avenue, Greenwich, CT 06830 (Records) |
| The Greenwich Broadcasting Corporation | 1490 Dayton Avenue, Greenwich, CT 06830 (Records) |
| | 177 West Putnam Avenue, Greenwich CT (Fixture) |
| | 71 Lewis Street, Greenwich CT (chief place of business) |
| | 401 Shippan Avenue, Stamford, CT 06902 (Records) |
| The Lifestyle TalkRadio Network Inc. | 2137 Deer Park Avenue, Deer Park, NY 11729 (chief place of business) |
| BTR West, Inc. | 1455 East Tropicana Avenue, Suite 550, Las Vegas, Nevada 89119 (chief place of business) |
| BTR Communications Boston, Inc. | 60 Main Street, Brockton, Massachusetts (chief place of business) |
| | Walnut Street, West Bridgewater, Massachusetts (Fixture) |
| BTR West II, Inc. | 1455 East Tropicana Avenue, Suite 550, Las Vegas, Nevada 89119 (chief place of business) |
| BTR Greenwich, Inc. | 1490 Dayton Avenue, Greenwich, CT 06830 (Records) |
| | 177 West Putnam Avenue, Greenwich CT (Fixture) |
| | 71 Lewis Street, Greenwich CT (chief place of business) |
| | 401 Shippan Avenue, Stamford, CT 06902 (Records) |
| BTR Communications Boston II, Inc. | 60 Main Street, Brockton, Massachusetts (chief place of business) |
| | Walnut Street, West Bridgewater, Massachusetts (Fixture) |

SCHEDULE III

DEPOSIT ACCOUNTS, SECURITIES ACCOUNTS AND COMMODITIES ACCOUNTS

| Name and Address of Institution Maintaining Account | Account Number | Type of Account |
|---|---|---|
| Patriot National Bank 100 Mason St. Greenwich, CT 06830 | 54-020581-2 | General operating |
| Patriot National Bank 100 Mason St. Greenwich, CT 06830 | 54-020387-4 | General operating |
| Patriot National Bank 100 Mason St. Greenwich, CT 06830 | 34-020140-9 | General operating |
| Patriot National Bank 100 Mason St. Greenwich, CT 06830 | 54-020407-0 | General operating |

SCHEDULE IV

IP LICENSES

None.

SCHEDULE V

FCC LICENSES

WGCH(AM), Facility No. 65674, Greenwich, CT, File No. BZ-19861107AK; Remote Pickup: KC27759

WGCH(AM), File No. BR-20051201CIS

WGCH(AM), License Renewal Authorization, File No. BR-19971128B2

KNUU(AM), Facility No. 33074, Paradise, NV, File No. BL-20060309AEM; STL: WEF67

WBET(AM), Facility No. 19631, Brockton, MA, File No. BZ-19981204AC; Remote Pickup: KPE571

WBET(AM), License Renewal Authorization, File No. BR-20051130ARZ

Sched. V

SCHEDULE VI

INTELLECTUAL PROPERTY

Intellectual Property relating to Greenwich, CT station

Call Letters: WGCH (AM)

Domain name:  wgch.com

Slogan: "The voice of Greenwich" (unregistered)

The Station licenses in radio broadcast programming pursuant to agreements with programming providers, as described in Schedule 5.01(x).

Intellectual Property relating to BusinessTalkRadio Network

Trademark application pending for BUSINESS TALK RADIO NETWORK + design; application no. 75868470, filed February 16, 2005

Copyright in original programming (unregistered).

The network grants to radio stations the right to broadcast the network's programming pursuant to affiliate agreements described in Schedule 5.01(x).

Intellectual Property relating to Lifestyle TalkRadio Network

Trademark application pending for LIFESTYLE TALK RADIO NETWORK + design; application no. 78568521 filed February 16, 2005

Copyright in original programming (unregistered).

The network grants to radio stations the right to broadcast the network's programming pursuant to affiliate agreements described in Schedule 5.01(x).

Intellectual Property relating to Brockton, MA station

call letters: WBET(AM)

Domain name: wbet.com

Slogan: "Full Service Radio for Metro South"

Logo:  see attached Schedule 5.01(w)A

Two-second audio "jingle" of "WBET"

Intellectual Property relating to Paradise (Las Vegas), NV Station

call letters: KNUU

Tradenames (unregistered): K-NEWS
                           Newsradio 970

Domain name: Knews 970.com

SCHEDULE VII

COMMERCIAL TORT CLAIMS

None.

SCHEDULE VIII

PLEDGED EQUITY

| Equity Issuer | Class of Equity | Equity Certificate Nos. | Par Value | Amount of Equity Interests | Percentage of Outstanding Equity Pledged |
|---|---|---|---|---|---|
| The Greenwich Broadcasting Corporation | Common Stock | 154 | Without | 80,000 | 100% |
| The Lifestyle TalkRadio Network Inc. | Common Stock | 2 | Without | 100 | 100% |
| BTR West, Inc. | Common Stock | 1 | $0.001 | 10 | 100% |
| BTR Communications Boston, Inc. | Common Stock | 1 | $0.001 | 100 | 100% |
| BTR Greenwich, Inc. | Common Stock | 1 | $0.001 | 1 | 100% |
| BTR West II, Inc. | Common Stock | 1 | $0.001 | 10 | 100% |
| BTR Communications Boston II, Inc. | Common Stock | 1 | $0.001 | 100 | 100% |

Sched. VIII

SCHEDULE IX

PLEDGED DEBT

| **Debt Issuer** | **Description of Debt** | **Amount of Indebtedness** |
| --- | --- | --- |

None.

SCHEDULE X

CHATTEL PAPER AND LETTERS OF CREDIT

Chattel Paper:

| **Grantor** | **Payee** | **Amount and Date** | **Collateral** |
|---|---|---|---|
| None. | | | |

Letters of Credit:

| **Grantor** | **Beneficiary** | **Issuer** | **Amount and Expiration** |
|---|---|---|---|
| None. | | | |

Sched. X

EXHIBIT I TO
SECURITY AGREEMENT

**[FORM OF] GRANT OF TRADEMARK SECURITY INTEREST**

          **WHEREAS, [NAME OF GRANTOR]**, a _____ corporation (the "*Grantor*"), owns and uses in its business, and will in the future adopt and so use, various intangible assets, including the Trademark Collateral (as defined below); and

          **WHEREAS,** BusinessTalkradio.Net, Inc., a Delaware corporation (the "*Company*"), has entered into a Financing Agreement dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, being the "*Financing Agreement*") with the financial institutions named therein (collectively, together with their respective successors and assigns party to the Financing Agreement from time to time, the "*Lenders*"), and **BC Media Funding Company II, LLC**, a Delaware limited liability company, as Agent for Lenders (in such capacity, the "*Secured Party*") pursuant to which Lenders have made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a certain term facility to Company; and

          [Insert if Grantor is a Subsidiary:] [**WHEREAS,** Grantor has executed and delivered that certain Subsidiary Guaranty dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "*Guaranty*") in favor of Secured Party for the benefit of Lenders, pursuant to which Grantor has guarantied the prompt payment and performance when due of all obligations of Company under the Financing Agreement and the other Loan Documents; and]

          **WHEREAS,** pursuant to the terms of a Security Agreement dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "*Security Agreement*"), among Grantor, Secured Party and the other grantors named therein, Grantor has created in favor of Secured Party a security interest in, and Secured Party has become a secured creditor with respect to, the Trademark Collateral;

          **NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, subject to the terms and conditions of the Security Agreement, to evidence further the security interest granted by Grantor to Secured Party pursuant to the Security Agreement, Grantor hereby grants to Secured Party a security interest in all of Grantor's right, title and interest in and to the following, in each case whether now or hereafter existing or in which Grantor now has or hereafter acquires an interest and wherever the same may be located (the "*Trademark Collateral*"):

          (i)       all rights, title and interest (including rights acquired pursuant to a license or otherwise) in and to all trademarks, service marks, designs, logos, indicia, tradenames, trade dress, corporate names, company names, business names, fictitious business names, trade styles and/or other source and/or business identifiers and applications pertaining thereto, owned by such Grantor, or hereafter adopted and used, in its business (including, without limitation, the trademarks set forth on <u>Schedule A</u>

annexed hereto) (collectively, the "***Trademarks***"), all registrations that have been or may hereafter be issued or applied for thereon in the United States and any state thereof and in foreign countries (including, without limitation, the registrations and applications set forth on <u>Schedule A</u> annexed hereto), all common law and other rights (but in no event any of the obligations) in and to the Trademarks in the United States and any state thereof and in foreign countries, and all goodwill of such Grantor's business symbolized by the Trademarks and associated therewith; and

(ii)    all proceeds, products, rents and profits of or from any and all of the foregoing Trademark Collateral and, to the extent not otherwise included, all payments under insurance (whether or not Secured Party is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Trademark Collateral. For purposes of this Grant of Trademark Security Interest, the term "***proceeds***" includes whatever is receivable or received when Trademark Collateral or proceeds are sold, licensed, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

Grantor does hereby further acknowledge and affirm that the rights and remedies of Secured Party with respect to the security interest in the Trademark Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

[Signature Page Follows]

**IN WITNESS WHEREOF**, Grantor has caused this Grant of Trademark Security Interest to be duly executed and delivered by its officer thereunto duly authorized as of the ___ day of November, 2006.

**[NAME OF GRANTOR]**

By:_____

Name:_____

Title:_____

**SCHEDULE A**
**TO**
**GRANT OF TRADEMARK SECURITY INTEREST**

| Owner | Trademark Description | Registration/ Appl. Number | Registration/ Appl. Date |
|---|---|---|---|
| BusinessTalkradio.net, Inc. | BUSINESS TALK RADIO NETWORK + design | 78568470 | February 16, 2005 |
| BusinessTalkradio.net, Inc. | LIFESTYLE TALK RADIO NETWORK + design | 78568521 | February 16, 2005 |

EXHIBIT II TO
SECURITY AGREEMENT

### [FORM OF] GRANT OF PATENT SECURITY INTEREST

       **WHEREAS**, [NAME OF GRANTOR], a _____ corporation (the "*Grantor*"), owns and uses in its business, and will in the future adopt and so use, various intangible assets, including the Patent Collateral (as defined below); and

       **WHEREAS**, BusinessTalkradio.Net, Inc., a Delaware corporation (the "*Company*"), has entered into a Financing Agreement dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, being the "*Financing Agreement*") with the financial institutions named therein (collectively, together with their respective successors and assigns party to the Financing Agreement from time to time, the "*Lenders*"), and **BC Media Funding Company II, LLC**, a Delaware limited liability company, as Agent for Lenders (in such capacity, the "*Secured Party*") pursuant to which Lenders have made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a certain term facility to Company; and

       [Insert if Grantor is a Subsidiary:] [**WHEREAS**, Grantor has executed and delivered that certain Subsidiary Guaranty dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "*Guaranty*") in favor of Secured Party for the benefit of Lenders, pursuant to which Grantor has guarantied the prompt payment and performance when due of all obligations of Company under the Financing Agreement and the other Loan Documents; and]

       **WHEREAS**, pursuant to the terms of a Security Agreement dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "*Security Agreement*"), among Grantor, Secured Party and the other grantors named therein, Grantor has created in favor of Secured Party a security interest in, and Secured Party has become a secured creditor with respect to, the Patent Collateral;

       **NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, subject to the terms and conditions of the Security Agreement, to evidence further the security interest granted by Grantor to Secured Party pursuant to the Security Agreement, Grantor hereby grants to Secured Party a security interest in all of Grantor's right, title and interest in and to the following, in each case whether now or hereafter existing or in which Grantor now has or hereafter acquires an interest and wherever the same may be located (the "*Patent Collateral*"):

       (i)    all rights, title and interest (including rights acquired pursuant to a license or otherwise) in and to all patents and patent applications and rights and interests in patents and patent applications under any domestic or foreign law that are presently, or in the future may be, owned or held by such Grantor and all patents and patent applications and rights, title and interests in patents and patent applications under any domestic or foreign law that are presently, or in the future may be, owned by such Grantor in whole or in part (including, without limitation, the patents and patent applications set forth on

Schedule A annexed hereto), all rights (but not obligations) corresponding thereto to sue for past, present and future infringements and all re-issues, divisions, continuations, renewals, extensions and continuations-in-part thereof; and

(ii)   all proceeds, products, rents and profits of or from any and all of the foregoing Patent Collateral and, to the extent not otherwise included, all payments under insurance (whether or not Secured Party is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Patent Collateral.   For purposes of this Grant of Patent Security Interest, the term **"proceeds"** includes whatever is receivable or received when Patent Collateral or proceeds are sold, licensed, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

Grantor does hereby further acknowledge and affirm that the rights and remedies of Secured Party with respect to the security interest in the Patent Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

[Signature Page Follows]

**IN WITNESS WHEREOF,** Grantor has caused this Grant of Patent Security Interest to be duly executed and delivered by its officer thereunto duly authorized as of the ___ day of November, 2006.

**[NAME OF GRANTOR]**

By:_____

Name:_____

Title:_____

**SCHEDULE A**
**TO**
**GRANT OF PATENT SECURITY INTEREST**

**Patents Issued:**

| Patent No. | Issue Date | Invention | Inventor(s) |
|---|---|---|---|
| None. | | | |

**Patents Pending:**

| Applicant's Name | Date Filed | Application Number | Invention | Inventor(s) |
|---|---|---|---|---|
| None. | | | | |

EXHIBIT III TO
SECURITY AGREEMENT

### [FORM OF] GRANT OF COPYRIGHT SECURITY INTEREST

**WHEREAS**, **[NAME OF GRANTOR]**, a _____ corporation ("*Grantor*"), owns and uses in its business, and will in the future adopt and so use, various intangible assets, including the Copyright Collateral (as defined below); and

**WHEREAS**, BusinessTalkradio.Net, Inc., a Delaware corporation (the "*Company*"), has entered into a Financing Agreement dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, being the "*Financing Agreement*") with the financial institutions named therein (collectively, together with their respective successors and assigns party to the Financing Agreement from time to time, the "*Lenders*"), and **BC Media Funding Company II, LLC**, a Delaware limited liability company, as Agent for Lenders (in such capacity, the "*Secured Party*") pursuant to which Lenders have made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a certain term facility to Company; and

[Insert if Grantor is a Subsidiary:] [**WHEREAS**, Grantor has executed and delivered that certain Subsidiary Guaranty dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "*Guaranty*") in favor of Secured Party for the benefit of Lenders, pursuant to which Grantor has guarantied the prompt payment and performance when due of all obligations of Company under the Financing Agreement and the other Loan Documents; and]

**WHEREAS**, pursuant to the terms of a Security Agreement dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "*Security Agreement*"), among Grantor, Secured Party and the other grantors named therein, Grantor has created in favor of Secured Party a security interest in, and Secured Party has become a secured creditor with respect to, the Copyright Collateral;

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, subject to the terms and conditions of the Security Agreement, to evidence further the security interest granted by Grantor to Secured Party pursuant to the Security Agreement, Grantor hereby grants to Secured Party a security interest in all of Grantor's right, title and interest in and to the following, in each case whether now or hereafter existing or in which Grantor now has or hereafter acquires an interest and wherever the same may be located (the "*Copyright Collateral*"):

(i)    all rights, title and interest (including rights acquired pursuant to a license or otherwise) under copyright in various published and unpublished works of authorship including, without limitation, computer programs, computer data bases, other computer software layouts, trade dress, drawings, designs, writings, and formulas (including, without limitation, the works set forth on Schedule A annexed hereto, as the same may be amended pursuant hereto from time to time) (collectively, the "*Copyrights*"), all copyright registrations issued to Grantor and applications for copyright registration that

have been or may hereafter be issued or applied for thereon in the United States and any state thereof and in foreign countries (including, without limitation, the registrations set forth on <u>Schedule A</u> annexed hereto, as the same may be amended pursuant hereto from time to time) (collectively, the "***Copyright Registrations***"), all common law and other rights in and to the Copyrights in the United States and any state thereof and in foreign countries including all copyright licenses (but with respect to such copyright licenses, only to the extent permitted by such licensing arrangements) (the "***Copyright Rights***"), including, without limitation, each of the Copyrights, rights, titles and interests in and to the Copyrights, all derivative works and other works protectable by copyright, which are presently, or in the future may be, owned, created (as a work for hire for the benefit of Grantor), authored (as a work for hire for the benefit of Grantor), or acquired by Grantor, in whole or in part, and all Copyright Rights with respect thereto and all Copyright Registrations therefor, heretofore or hereafter granted or applied for, and all renewals and extensions thereof, throughout the world, including all proceeds thereof (such as, by way of example and not by limitation, license royalties and proceeds of infringement suits), the right (but not the obligation) to renew and extend such Copyright Registrations and Copyright Rights and to register works protectable by copyright and the right (but not the obligation) to sue in the name of such Grantor or in the name of Secured Party or Lenders for past, present and future infringements of the Copyrights and Copyright Rights; and

(ii)     all proceeds, products, rents and profits of or from any and all of the foregoing Copyright Collateral and, to the extent not otherwise included, all payments under insurance (whether or not Secured Party is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Copyright Collateral. For purposes of this Grant of Copyright Security Interest, the term "***proceeds***" includes whatever is receivable or received when Copyright Collateral or proceeds are sold, licensed, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

Grantor does hereby further acknowledge and affirm that the rights and remedies of Secured Party with respect to the security interest in the Copyright Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

**IN WITNESS WHEREOF**, Grantor has caused this Grant of Copyright Security Interest to be duly executed and delivered by its officer thereunto duly authorized as of the ___ day of November, 2006.

**[NAME OF GRANTOR]**

By:_____ _____
Name:_____
Title:_____

**SCHEDULE A**
**TO**
**GRANT OF COPYRIGHT SECURITY INTEREST**


<u>**U.S. Copyright Registrations:**</u>

|  | <u>Title</u> | <u>Registration No.</u> | <u>Date of Issue</u> | <u>Registered Owner</u> |
|---|---|---|---|---|
| None. | | | | |


<u>**Foreign Copyright Registrations:**</u>

|  | <u>Country</u> | <u>Title</u> | <u>Registration No.</u> | <u>Date of Issue</u> |
|---|---|---|---|---|
| None. | | | | |


<u>**Pending U.S. Copyright Registration Applications:**</u>

|  | <u>Title</u> | <u>Appl. No.</u> | <u>Date of Application</u> | <u>Copyright Claimant</u> |
|---|---|---|---|---|
| None. | | | | |


<u>**Pending Foreign Copyright Registration Applications:**</u>

|  | <u>Country</u> | <u>Title</u> | <u>Appl. No.</u> | <u>Date of Application</u> |
|---|---|---|---|---|
| None. | | | | |

# Exhibit C

<div align="center">

**GUARANTY**
(Individual)

</div>

     **THIS PERSONAL GUARANTY** (this "*Guaranty*"), is made as of November 13, 2006, by Frank Lazauskas, a New Jersey resident ("*Guarantor*"), in favor of BC Media Funding Company II, LLC, a Delaware limited liability company (the "*Secured Party*"), as agent for the benefit of Media Funding Company, LLC, a Delaware limited liability company (the "*Lender*").

<div align="center">

**RECITALS**

</div>

     **WHEREAS**, pursuant to the Financing Agreement dated as of November 13, 2006, as it may hereafter be amended, restated, supplemented or otherwise modified from time to time (the "*Financing Agreement*"), by and among BusinessTalkradio.net, Inc., a Delaware corporation (the "*Borrower*"), the Subsidiary Guarantors, the Secured Party and the Lender, the Lender has made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a term loan to Borrower in the aggregate amount of $5,500,000 (the "*Term Loan*");

     **WHEREAS**, it is a condition precedent to the making of the Term Loan by the Lender pursuant to the Financing Agreement that the Guarantor shall have executed and delivered to the Secured Party a Guaranty guaranteeing the obligations of the Borrower with respect to the Term Loan; and

     **WHEREAS**, the Guarantor has determined that the execution, delivery and performance of this Guaranty will directly benefit, and are within the best interests of, the Guarantor;

     **NOW, THEREFORE**, in consideration of the premises and the agreements herein and in order to induce the Secured Party to make and maintain the Term Loan pursuant to the Financing Agreement, the Guarantor hereby agrees with the Secured Party as follows:

     **Definitions**.  Capitalized terms used hereunder but not defined herein shall have the meanings given them in the Financing Agreement.  As used herein the following terms shall have the following meanings:

     "*Guaranteed Obligations*" means collectively all of the indebtedness, obligations, and undertakings which are described in subsections (a), (b) and (c) of Section 1.

     "*Obligation Documents*" means this Guaranty, the Financing Agreement, the Security Agreement, the Pledge and Security Agreement, the other Guarantees and all other documents and instruments under, by reason of which, or pursuant to which any or all of the Guaranteed Obligations are evidenced, governed, secured, or otherwise dealt with, and all other documents, instruments, agreements, certificates, legal opinions and other writings heretofore or hereafter delivered in connection herewith or therewith, in each case as the same may be amended from time to time.

"*Obligors*" means Borrower, Guarantor, the other Loan Parties (as defined in the Financing Agreement) and any other endorsers, guarantors or obligors, primary or secondary, of any or all of the Guaranteed Obligations.

"*Secured Obligations*" shall have the meanings given such term in the Security Agreement.

"*Security*" means any rights, properties, or interests of the Lender, under the Obligation Documents or otherwise, which provide recourse or other benefits to the Lender in connection with the Guaranteed Obligations or the non-payment or non-performance thereof, including collateral (whether real or personal, tangible or intangible) in which the Lender has rights under or pursuant to any Obligation Documents, guaranties of the payment or performance of any Obligation, bonds, surety agreements, keep-well agreements, letters of credit, rights of subrogation, rights of offset, and rights pursuant to which other claims are subordinated to the Guaranteed Obligations.

"*Security Agreement*" means that certain Security Agreement, dated as of the date hereof, between Borrower and Agent for the benefit of Lender, as the same may be amended or modified from time to time.

Section 1. **Guaranty**.

(a) Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete, and full payment when due, and no matter how the same shall become due, of all sums payable under:

(i) the Financing Agreement, including all principal, all interest thereon and all other sums payable thereunder including attorney's fees or otherwise; and

(ii) all other Obligation Documents, whether for principal, interest, fees, including attorneys' fees, or otherwise.

Without limiting the generality of the foregoing, Guarantor's liability hereunder shall extend to and include all post-petition interest, expenses, and other duties and liabilities of Borrower described above in this subsection (a), or below in the following subsection (b), which would be owed by Borrower or any other Loan Party but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, or similar proceeding involving Borrower or such Loan Party.

(b) Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete and full performance, when due, and no matter how the same shall become due, of all Secured Obligations and undertakings of Borrower and each other Loan Party to the Lender under, by reason of, or pursuant to any of the Obligation Documents, or any other instrument or document.

(c) If Borrower shall for any reason fail to pay any of the Guaranteed Obligations, as and when such Guaranteed Obligation shall become due and payable, whether at its stated maturity, as a result of the exercise of any power to accelerate, or otherwise, Guarantor will,

upon demand by the Lender, pay such Guaranteed Obligation in full to the Agent for the benefit of the Lender. If Borrower or any other Loan Party shall for any reason fail to perform promptly any of the Guaranteed Obligations, Guarantor will, upon demand by Agent, cause such Guaranteed Obligation to be performed or, if specified by Agent, provide sufficient funds, in such amount and manner as Agent shall in good faith determine, for the prompt, full and faithful performance of such Guaranteed Obligation.

(d)     If either of Borrower, Guarantor or any other Loan Party fails to pay or perform any Guaranteed Obligation as described in the immediately preceding subsections (a), (b), or (c) Guarantor will incur the additional obligation to pay to Agent for the benefit of the Lender, and Guarantor will forthwith upon demand by the Lender or Agent pay to Agent, the amount of any and all expenses, including fees and disbursements of Agent's counsel and of any experts or agents retained by Agent, which Agent may incur as a result of such failure.

(e)     As between Guarantor and the Lender, this Guaranty shall be considered a primary and liquidated liability of Guarantor.

Section 2.     **Unconditional Guaranty**.

(a)     No action which the Lender or Agent may take or omit to take in connection with any of the Obligation Documents, any of the Guaranteed Obligations (or any other indebtedness owing by Borrower or any other Loan Party to Agent on behalf of the Lender), or any Security, and no course of dealing of the Lender or Agent with any Obligor or any other Person, shall release or diminish Guarantor's obligations, liabilities, agreements or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against the Lender, regardless of whether any such action or inaction may increase any risks to or liabilities of the Lender or any Obligor or increase any risk to or diminish any safeguard of any Security. Without limiting the foregoing, Guarantor hereby expressly agrees that the Agent or the Lender may, from time to time, without notice to or the consent of Guarantor, do any or all of the following:

(i)     Amend, change or modify, in whole or in part, any one or more of the Obligation Documents and give or refuse to give any waivers or other indulgences with respect thereto;

(ii)     Neglect, delay, fail, or refuse to take or prosecute any action for the collection or enforcement of any of the Guaranteed Obligations, to foreclose or take or prosecute any action in connection with any Security or Obligation Document, to bring suit against any Obligor or any other Person, or to take any other action concerning the Guaranteed Obligations or the Obligation Documents;

(iii)     Accelerate, change, rearrange, extend, or renew the time, rate, terms, or manner for payment or performance of any one or more of the Guaranteed Obligations (whether for principal, interest, fees, expenses, indemnifications, affirmative or negative covenants, or otherwise);

(iv)     Compromise or settle any unpaid or unperformed Guaranteed Obligation or any other obligation or amount due or owing, or claimed to be due or owing, under any one or more of the Obligation Documents;

(v)     Take, exchange, amend, eliminate, surrender, release, or subordinate any or all Security for any or all of the Guaranteed Obligations, accept additional or substituted Security therefor, and perfect or fail to perfect Lender's rights in any or all Security;

(vi)    Discharge, release, substitute or add Obligors; or

(vii)   Apply all monies received from Obligors or others or from any Security for any of the Guaranteed Obligations, as Lender may determine to be in its best interest, without in any way being required to marshal Security or assets or to apply all or any part of such monies upon any particular Guaranteed Obligations.

(b)     No action or inaction of any Obligor or any other Person or any dispute and/or litigation among the Guarantors, and no change of law or circumstances, shall release or diminish Guarantor's obligations, liabilities, agreements, or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against Agent or the Lender.  Without limiting the foregoing, the obligations, liabilities, agreements, and duties of Guarantor under this Guaranty shall not be released, diminished, impaired, reduced, or affected by the occurrence of any or all of the following from time to time, even if occurring without notice to or without the consent of Guarantor:

(i)     Any voluntary or involuntary liquidation, dissolution, sale of all or substantially all assets, marshalling of assets or liabilities, receivership, conservatorship, assignment for the benefit of creditors, insolvency, bankruptcy, reorganization, arrangement, or composition of any Obligor or any other proceedings involving any Obligor or any of the assets of any Obligor under laws for the protection of debtors, or any discharge, impairment, modification, release, or limitation of the liability of, or stay of actions or lien enforcement proceedings against, any Obligor, any properties of any Obligor, or the estate in bankruptcy of any Obligor in the course of or resulting from any such proceedings.

(ii)    The failure by the Agent or the Lender to file or enforce a claim in any proceeding described in the immediately preceding subsection (i) or to take any other action in any proceeding to which any Obligor is a party.

(iii)   The release by operation of law of any Obligor from any of the Guaranteed Obligations or any other obligations to the Agent or the Lender.

(iv)    The invalidity, deficiency, illegality, or unenforceability of any of the Guaranteed Obligations or the Obligation Documents, in whole or in part, any bar by any statute of limitations or other law of recovery on any of the Guaranteed Obligations, or any defense or excuse for failure to perform on account of force majeure, act of God, casualty, impossibility, impracticability, or other defense or excuse whatsoever.

(v)     The failure of any Obligor or any other person or entity to sign any guaranty or other instrument or agreement within the contemplation of any Obligor, Agent or the Lender.

(vi)    The fact that Guarantor may have incurred directly part of the Guaranteed Obligations or is otherwise primarily liable therefor.

(vii)    Without limiting any of the foregoing, any fact or event (whether or not similar to any of the foregoing) which in the absence of this provision would or might constitute or afford a legal or equitable discharge or release of or defense to a guarantor or surety other than the actual payment and performance by Guarantor under this Guaranty.

(c)    Lender may invoke the benefits of this Guaranty before pursuing any remedies against any Obligor or any other Person and before proceeding against any Security now or hereafter existing for the payment or performance of any of the Guaranteed Obligations. Lender may maintain an action against Guarantor on this Guaranty without joining any other Obligor therein and without bringing a separate action against any other Obligor.

(d)    If any payment to the Agent or the Lender by any Obligor is held to constitute a preference or a voidable transfer under applicable state, Federal, national or international laws, or if for any other reason the Agent or the Lender is required to refund such payment to the payor thereof or to pay the amount thereof to any other Person, such payment to the Agent or the Lender shall not constitute a release of Guarantor from any liability hereunder, and Guarantor agrees to pay such amount to the Agent or the Lender on demand and agrees and acknowledges that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment or payments. Any transfer by subrogation which is made as contemplated in Section 6 prior to any such payment or payments shall (regardless of the terms of such transfer) be automatically voided upon the making of any such payment or payments, and all rights so transferred shall thereupon revert to and be vested in Lender.

(e)    This is a continuing guaranty and shall apply to and cover all Guaranteed Obligations and renewals and extensions thereof and substitutions therefor from time to time.

Section 3.    **Waiver.**    Guarantor hereby waives, with respect to the Guaranteed Obligations, this Guaranty, and the other Obligation Documents:

(a)    notice of the incurrence of any Guaranteed Obligation by Borrower, and notice of any kind concerning the assets, liabilities, financial condition, creditworthiness, businesses, prospects, or other affairs of Borrower (it being understood and agreed that: (i) Guarantor shall take full responsibility for informing himself of such matters, (ii) neither the Agent nor the Lender shall have responsibility of any kind to inform Guarantor of such matters, and (iii) Lender is hereby authorized to assume that Guarantor, by virtue of its relationships with Borrower which is independent of this Guaranty, has full and complete knowledge of such matters whenever the Lender extends credit to Borrower or take any other action which may change or increase Guarantor's liabilities or losses hereunder).

(b)    notice that the Agent or the Lender, any Obligor, or any other Person has taken or omitted to take any action under any Obligation Document or any other agreement or instrument relating thereto or relating to any Guaranteed Obligation.

(c)     default, demand, presentment for payment, and notice of default, demand, dishonor, nonpayment, or nonperformance.

(d)     notice of intention to accelerate, notice of acceleration, protest, notice of protest, notice of any exercise of remedies (as described in the following Section 5 or otherwise), and all other notices of any kind whatsoever.

Section 4.     **Exercise of Remedies**.  The Agent and the Lender shall have the right to enforce, from time to time, in any order and at the Agent's or Lender's sole discretion, any rights, powers and remedies which the Agent and the Lender may have under the Obligation Documents or otherwise, including judicial foreclosure, the exercise of rights of power of sale, the taking of a deed or assignment in lieu of foreclosure, the appointment of a receiver to collect rents, issues and profits, the exercise of remedies against personal property, or the enforcement of any assignment of leases, rentals, oil or gas production, or other properties or rights, whether real or personal, tangible or intangible; and Guarantor shall be liable to the Agent and the Lender hereunder for any deficiency resulting from the exercise by the Lender of any such right or remedy even though any rights which Guarantor may have against Borrower or others may be destroyed or diminished by exercise of any such right or remedy.  No failure on the part of the Agent and the Lender to exercise, and no delay in exercising, any right hereunder or under any other Obligation Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right preclude any other or further exercise thereof or the exercise of any other right. The rights, powers and remedies of the Agent and the Lender provided herein and in the other Obligation Documents are cumulative and are in addition to, and not exclusive of, any other rights, powers or remedies provided by law or in equity.  The rights of the Agent and the Lender hereunder are not conditional or contingent on any attempt by the Lender to exercise any of its rights under any other Obligation Document against any Obligor or any other Person.

Section 5.     **Limited Subrogation**.  Until all of the Guaranteed Obligations have been indefeasibly paid and performed in full Guarantor shall have no right to exercise any right of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which Guarantor may now or hereafter have against or to any Obligor or any Security in connection with this Guaranty, and Guarantor hereby waives any rights to enforce any remedy which Guarantor may have against Borrower and any right to participate in any Security until such time.  If any amount shall be paid to Guarantor on account of any such subrogation or other rights, any such other remedy, or any Security at any time when all of the Guaranteed Obligations and all other expenses guaranteed pursuant hereto shall not have been paid in full, such amount shall be held in trust for the benefit of the Agent and the Lender, shall be segregated from the other funds of Guarantor and shall forthwith be paid over to the Agent and the Lender to be held by the Agent or the Lender as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portion of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect.

Section 6.     **Successors and Assigns**.  Guarantor's rights or obligations hereunder may not be assigned or delegated, but this Guaranty and such obligations shall pass to and be fully binding upon the estate and heirs of Guarantor, as well as Guarantor.  This Guaranty shall apply to and inure to the benefit of Agent, Lender and their successors or assigns.  Without limiting the generality of the immediately preceding sentence, the Lender may assign any Guaranteed Obligation held by such Lender or any portion thereof, and the Lender may assign such Lender's

rights or any portion thereof under any Obligation Document, to any other Person, and such other Person shall thereupon become entitled to all of the benefits in respect thereof granted to such Lender hereunder unless otherwise expressly provided by such Lender in connection with such assignment or transfer.

Section 7.    **Subordination and Offset**.    Guarantor hereby subordinates and makes inferior to the Guaranteed Obligations any and all indebtedness now or at any time hereafter owed by Borrower or any of the other Loan Parties.  If Guarantor receives any such payment without the prior written consent of Lender, the amount so paid shall be held in trust for the benefit of Lender, shall be segregated from the other funds of Guarantor, and shall forthwith be paid over to Agent to be held by Agent as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portions of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect. Guarantor hereby grants to Agent and Lender a right of offset to secure the payment of the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder, which right of offset shall be upon any and all monies, securities and other property (and the proceeds therefrom) of Guarantor now or hereafter held or received by or in transit to Agent or Lender from or for the account of Guarantor, whether for safekeeping, custody, pledge, transmission, collection or otherwise.  Upon the occurrence of any Default, the Agent and the Lender are hereby authorized at any time and from time to time, without notice to Guarantor, to offset, appropriate and apply any and all items hereinabove referred to against the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder irrespective of whether or not Agent or Lender shall have made any demand under this Guaranty and although such obligations and liabilities may be contingent or unmatured.  The rights of Agent and Lender under this Section are in addition to, and shall not be limited by, any other rights and remedies (including other rights of offset) which Agent or Lender may have.

Section 8.    **Representations and Warranties**.    Guarantor hereby represents and warrants to Lender as follows:

(a)    The recitals at the beginning of this Guaranty are true and correct in all respects.

(b)    Guarantor has the requisite power, competence and authority to execute, deliver and perform this Guaranty, each other writing executed or delivered in connection with this Guaranty and each amendment or supplement to any of the foregoing to which Guarantor is a party, and to perform and consummate the transactions contemplated hereby and thereby.

(c)    The execution, delivery and performance by Guarantor of this Guaranty do not and will not contravene any law or governmental regulation or any contractual restriction binding on or affecting Guarantor or any of Guarantor's properties, and do not and will not result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of Guarantor's properties.

(d)    This Guaranty is, and each other agreement or instrument of Guarantor contemplated hereby will be, a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its respective terms, except as limited by bankruptcy, insolvency or similar laws of general application relating to the enforcement of creditors' rights.

(e)     There is no action, suit or proceeding pending or, to the knowledge of Guarantor, threatened against or otherwise affecting Guarantor before any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality which may materially and adversely affect Guarantor's financial condition or its ability to perform its obligations hereunder.

(f)     Guarantor is not "insolvent" on the date hereof (that is, the sum of Guarantor's absolute and contingent liabilities, including the Guaranteed Obligations, does not exceed the fair market value of Guarantor's assets). Guarantor has not incurred (whether hereby or otherwise), nor does Guarantor intend to incur or believe that Guarantor will incur, debts which will be beyond Guarantor's ability to pay as such debts mature.

Section 9.    **No Oral Change**. No amendment of any provision of this Guaranty shall be effective unless it is in writing and signed by Guarantor and Agent on behalf of the Lender, and no waiver of any provision of this Guaranty, and no consent to any departure by Guarantor therefrom, shall be effective unless it is in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 10.    **Prohibition on Asset Transfers**. Until the Obligations are indefeasibly paid in full, Guarantor agrees that he shall not transfer any material assets to any Person.

Section 11.    **Invalidity of Particular Provisions**. If any term or provision of this Guaranty shall be determined to be illegal or unenforceable all other terms and provisions hereof shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable law.

Section 12.    **Headings and References**. The headings used herein are for purposes of convenience only and shall not be used in construing the provisions hereof. The words "this Guaranty," "this instrument," "herein," "hereof," "hereby" and words of similar import refer to this Guaranty as a whole and not to any particular subdivision unless expressly so limited. The phrases "this section" and "this subsection" and similar phrases refer only to the subdivisions hereof in which such phrases occur. The word "or" is not exclusive, and the word "including" (in its various forms) means "including without limitation". Pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

Section 13.    **Term**. This Guaranty shall be irrevocable until all of the Guaranteed Obligations have been completely and finally paid and performed. Lender has no obligation to make any loans or other advances to Borrower, all obligations and undertakings of Borrower under, by reason of, or pursuant to the Obligation Documents have been completely performed, and this Guaranty is thereafter subject to reinstatement as provided in Section 3(d). All extensions of credit and financial accommodations heretofore or hereafter made by Lender to Borrower shall be conclusively presumed to have been made in acceptance hereof and in reliance hereon.

Section 14. **Notices**. Any notice or communication required or permitted hereunder shall be given as provided in the Security Agreement, except that all notices to Guarantor shall be addressed as follows:

Frank Lazauskas
[1490 Dayton Avenue]
[Greenwich, CT 06830]

Section 15. **Limitation on Interest**. Lender and Guarantor intend to contract in strict compliance with applicable usury law from time to time in effect, and the provisions of the Financing Agreement limiting the interest for which Guarantor is obligated are expressly incorporated herein by reference.

Section 16. **Counterparts; Fax**. This Guaranty may be executed in any number of counterparts, each of which when so executed shall be deemed to constitute one and the same Guaranty. This Guaranty may be validly executed and delivered by facsimile or other electronic transmission.

SECTION 17. **Governing Law**. **THIS GUARANTY SHALL BE DEEMED A CONTRACT AND INSTRUMENT MADE UNDER THE LAWS OF THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE LAWS OF THE UNITED STATES OF AMERICA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. THE GUARANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS SITTING IN THE STATE OF NEW YORK AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT OR THE GUARANTEED OBLIGATIONS BY ANY MEANS ALLOWED UNDER NEW YORK OR FEDERAL LAW.**

SECTION 18. **Final Agreement**. **THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES HERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES HERETO.**

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be executed as of the date first above written.

GUARANTOR:

SSN: _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_

Personal - Guarentee

**ACCEPTED AND AGREED:**

AGENT                                        BC MEDIA FUNDING COMPANY II, LLC

                                             By: _____
                                             Name: Jacob Barker
                                             Title: Managing Member


LENDER:                                      MEDIA FUNDING COMPANY, LLC

                                             By: _____
                                             Name: Jacob Barker
                                             Title: President


**Individual Guarantee Signature Page**

# Exhibit D

# GUARANTY
(Individual)

**THIS PERSONAL GUARANTY** (this "*Guaranty*"), is made as of November 13, 2006, by Michael L. Metter, a Connecticut resident ("*Guarantor*"), in favor of BC Media Funding Company II, LLC, a Delaware limited liability company (the "*Secured Party*"), as agent for the benefit of Media Funding Company, LLC, a Delaware limited liability company (the "*Lender*").

## RECITALS

**WHEREAS**, pursuant to the Financing Agreement dated as of November 13, 2006, as it may hereafter be amended, restated, supplemented or otherwise modified from time to time (the "*Financing Agreement*"), by and among BusinessTalkradio.net, Inc., a Delaware corporation (the "*Borrower*"), the Subsidiary Guarantors, the Secured Party and the Lender, the Lender has made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a term loan to Borrower in the aggregate amount of $5,500,000 (the "*Term Loan*");

**WHEREAS**, it is a condition precedent to the making of the Term Loan by the Lender pursuant to the Financing Agreement that the Guarantor shall have executed and delivered to the Secured Party a Guaranty guaranteeing the obligations of the Borrower with respect to the Term Loan; and

**WHEREAS**, the Guarantor has determined that the execution, delivery and performance of this Guaranty will directly benefit, and are within the best interests of, the Guarantor;

**NOW, THEREFORE**, in consideration of the premises and the agreements herein and in order to induce the Secured Party to make and maintain the Term Loan pursuant to the Financing Agreement, the Guarantor hereby agrees with the Secured Party as follows:

**Definitions**.  Capitalized terms used hereunder but not defined herein shall have the meanings given them in the Financing Agreement.  As used herein the following terms shall have the following meanings:

"*Guaranteed Obligations*" means collectively all of the indebtedness, obligations, and undertakings which are described in subsections (a), (b) and (c) of <u>Section 1</u>.

"*Obligation Documents*" means this Guaranty, the Financing Agreement, the Security Agreement, the Pledge and Security Agreement, the other Guarantees and all other documents and instruments under, by reason of which, or pursuant to which any or all of the Guaranteed Obligations are evidenced, governed, secured, or otherwise dealt with, and all other documents, instruments, agreements, certificates, legal opinions and other writings heretofore or hereafter delivered in connection herewith or therewith, in each case as the same may be amended from time to time.

"*Obligors*" means Borrower, Guarantor, the other Loan Parties (as defined in the Financing Agreement) and any other endorsers, guarantors or obligors, primary or secondary, of any or all of the Guaranteed Obligations.

"*Secured Obligations*" shall have the meanings given such term in the Security Agreement.

"*Security*" means any rights, properties, or interests of the Lender, under the Obligation Documents or otherwise, which provide recourse or other benefits to the Lender in connection with the Guaranteed Obligations or the non-payment or non-performance thereof, including collateral (whether real or personal, tangible or intangible) in which the Lender has rights under or pursuant to any Obligation Documents, guaranties of the payment or performance of any Obligation, bonds, surety agreements, keep-well agreements, letters of credit, rights of subrogation, rights of offset, and rights pursuant to which other claims are subordinated to the Guaranteed Obligations.

"*Security Agreement*" means that certain Security Agreement, dated as of the date hereof, between Borrower and Agent for the benefit of Lender, as the same may be amended or modified from time to time.

Section 1.    **Guaranty**.

(a)    Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete, and full payment when due, and no matter how the same shall become due, of all sums payable under:

(i)    the Financing Agreement, including all principal, all interest thereon and all other sums payable thereunder including attorney's fees or otherwise; and

(ii)    all other Obligation Documents, whether for principal, interest, fees, including attorneys' fees, or otherwise.

Without limiting the generality of the foregoing, Guarantor's liability hereunder shall extend to and include all post-petition interest, expenses, and other duties and liabilities of Borrower described above in this subsection (a), or below in the following subsection (b), which would be owed by Borrower or any other Loan Party but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, or similar proceeding involving Borrower or such Loan Party.

(b)    Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete and full performance, when due, and no matter how the same shall become due, of all Secured Obligations and undertakings of Borrower and each other Loan Party to the Lender under, by reason of, or pursuant to any of the Obligation Documents, or any other instrument or document.

(c)    If Borrower shall for any reason fail to pay any of the Guaranteed Obligations, as and when such Guaranteed Obligation shall become due and payable, whether at its stated maturity, as a result of the exercise of any power to accelerate, or otherwise, Guarantor will,

upon demand by the Lender, pay such Guaranteed Obligation in full to the Agent for the benefit of the Lender. If Borrower or any other Loan Party shall for any reason fail to perform promptly any of the Guaranteed Obligations, Guarantor will, upon demand by Agent, cause such Guaranteed Obligation to be performed or, if specified by Agent, provide sufficient funds, in such amount and manner as Agent shall in good faith determine, for the prompt, full and faithful performance of such Guaranteed Obligation.

(d)     If either of Borrower, Guarantor or any other Loan Party fails to pay or perform any Guaranteed Obligation as described in the immediately preceding subsections (a), (b), or (c) Guarantor will incur the additional obligation to pay to Agent for the benefit of the Lender, and Guarantor will forthwith upon demand by the Lender or Agent pay to Agent, the amount of any and all expenses, including fees and disbursements of Agent's counsel and of any experts or agents retained by Agent, which Agent may incur as a result of such failure.

(e)     As between Guarantor and the Lender, this Guaranty shall be considered a primary and liquidated liability of Guarantor.

Section 2.    **Unconditional Guaranty**.

(a)     No action which the Lender or Agent may take or omit to take in connection with any of the Obligation Documents, any of the Guaranteed Obligations (or any other indebtedness owing by Borrower or any other Loan Party to Agent on behalf of the Lender), or any Security, and no course of dealing of the Lender or Agent with any Obligor or any other Person, shall release or diminish Guarantor's obligations, liabilities, agreements or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against the Lender, regardless of whether any such action or inaction may increase any risks to or liabilities of the Lender or any Obligor or increase any risk to or diminish any safeguard of any Security.  Without limiting the foregoing, Guarantor hereby expressly agrees that the Agent or the Lender may, from time to time, without notice to or the consent of Guarantor, do any or all of the following:

(i)     Amend, change or modify, in whole or in part, any one or more of the Obligation Documents and give or refuse to give any waivers or other indulgences with respect thereto;

(ii)    Neglect, delay, fail, or refuse to take or prosecute any action for the collection or enforcement of any of the Guaranteed Obligations, to foreclose or take or prosecute any action in connection with any Security or Obligation Document, to bring suit against any Obligor or any other Person, or to take any other action concerning the Guaranteed Obligations or the Obligation Documents;

(iii)   Accelerate, change, rearrange, extend, or renew the time, rate, terms, or manner for payment or performance of any one or more of the Guaranteed Obligations (whether for principal, interest, fees, expenses, indemnifications, affirmative or negative covenants, or otherwise);

(iv)    Compromise or settle any unpaid or unperformed Guaranteed Obligation or any other obligation or amount due or owing, or claimed to be due or owing, under any one or more of the Obligation Documents;

3

(v)     Take, exchange, amend, eliminate, surrender, release, or subordinate any or all Security for any or all of the Guaranteed Obligations, accept additional or substituted Security therefor, and perfect or fail to perfect Lender's rights in any or all Security;

(vi)     Discharge, release, substitute or add Obligors; or

(vii)     Apply all monies received from Obligors or others or from any Security for any of the Guaranteed Obligations, as Lender may determine to be in its best interest, without in any way being required to marshal Security or assets or to apply all or any part of such monies upon any particular Guaranteed Obligations.

(b)     No action or inaction of any Obligor or any other Person or any dispute and/or litigation among the Guarantors, and no change of law or circumstances, shall release or diminish Guarantor's obligations, liabilities, agreements, or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against Agent or the Lender. Without limiting the foregoing, the obligations, liabilities, agreements, and duties of Guarantor under this Guaranty shall not be released, diminished, impaired, reduced, or affected by the occurrence of any or all of the following from time to time, even if occurring without notice to or without the consent of Guarantor:

(i)     Any voluntary or involuntary liquidation, dissolution, sale of all or substantially all assets, marshalling of assets or liabilities, receivership, conservatorship, assignment for the benefit of creditors, insolvency, bankruptcy, reorganization, arrangement, or composition of any Obligor or any other proceedings involving any Obligor or any of the assets of any Obligor under laws for the protection of debtors, or any discharge, impairment, modification, release, or limitation of the liability of, or stay of actions or lien enforcement proceedings against, any Obligor, any properties of any Obligor, or the estate in bankruptcy of any Obligor in the course of or resulting from any such proceedings.

(ii)     The failure by the Agent or the Lender to file or enforce a claim in any proceeding described in the immediately preceding subsection (i) or to take any other action in any proceeding to which any Obligor is a party.

(iii)     The release by operation of law of any Obligor from any of the Guaranteed Obligations or any other obligations to the Agent or the Lender.

(iv)     The invalidity, deficiency, illegality, or unenforceability of any of the Guaranteed Obligations or the Obligation Documents, in whole or in part, any bar by any statute of limitations or other law of recovery on any of the Guaranteed Obligations, or any defense or excuse for failure to perform on account of force majeure, act of God, casualty, impossibility, impracticability, or other defense or excuse whatsoever.

(v)     The failure of any Obligor or any other person or entity to sign any guaranty or other instrument or agreement within the contemplation of any Obligor, Agent or the Lender.

(vi)    The fact that Guarantor may have incurred directly part of the Guaranteed Obligations or is otherwise primarily liable therefor.

(vii)    Without limiting any of the foregoing, any fact or event (whether or not similar to any of the foregoing) which in the absence of this provision would or might constitute or afford a legal or equitable discharge or release of or defense to a guarantor or surety other than the actual payment and performance by Guarantor under this Guaranty.

(c)    Lender may invoke the benefits of this Guaranty before pursuing any remedies against any Obligor or any other Person and before proceeding against any Security now or hereafter existing for the payment or performance of any of the Guaranteed Obligations. Lender may maintain an action against Guarantor on this Guaranty without joining any other Obligor therein and without bringing a separate action against any other Obligor.

(d)    If any payment to the Agent or the Lender by any Obligor is held to constitute a preference or a voidable transfer under applicable state, Federal, national or international laws, or if for any other reason the Agent or the Lender is required to refund such payment to the payor thereof or to pay the amount thereof to any other Person, such payment to the Agent or the Lender shall not constitute a release of Guarantor from any liability hereunder, and Guarantor agrees to pay such amount to the Agent or the Lender on demand and agrees and acknowledges that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment or payments. Any transfer by subrogation which is made as contemplated in Section 6 prior to any such payment or payments shall (regardless of the terms of such transfer) be automatically voided upon the making of any such payment or payments, and all rights so transferred shall thereupon revert to and be vested in Lender.

(e)    This is a continuing guaranty and shall apply to and cover all Guaranteed Obligations and renewals and extensions thereof and substitutions therefor from time to time.

Section 3.    **Waiver**.    Guarantor hereby waives, with respect to the Guaranteed Obligations, this Guaranty, and the other Obligation Documents:

(a)    notice of the incurrence of any Guaranteed Obligation by Borrower, and notice of any kind concerning the assets, liabilities, financial condition, creditworthiness, businesses, prospects, or other affairs of Borrower (it being understood and agreed that: (i) Guarantor shall take full responsibility for informing himself of such matters, (ii) neither the Agent nor the Lender shall have responsibility of any kind to inform Guarantor of such matters, and (iii) Lender is hereby authorized to assume that Guarantor, by virtue of its relationships with Borrower which is independent of this Guaranty, has full and complete knowledge of such matters whenever the Lender extends credit to Borrower or take any other action which may change or increase Guarantor's liabilities or losses hereunder).

(b)    notice that the Agent or the Lender, any Obligor, or any other Person has taken or omitted to take any action under any Obligation Document or any other agreement or instrument relating thereto or relating to any Guaranteed Obligation.

(c)    default, demand, presentment for payment, and notice of default, demand, dishonor, nonpayment, or nonperformance.

(d)    notice of intention to accelerate, notice of acceleration, protest, notice of protest, notice of any exercise of remedies (as described in the following <u>Section 5</u> or otherwise), and all other notices of any kind whatsoever.

Section 4.    **Exercise of Remedies**.  The Agent and the Lender shall have the right to enforce, from time to time, in any order and at the Agent's or Lender's sole discretion, any rights, powers and remedies which the Agent and the Lender may have under the Obligation Documents or otherwise, including judicial foreclosure, the exercise of rights of power of sale, the taking of a deed or assignment in lieu of foreclosure, the appointment of a receiver to collect rents, issues and profits, the exercise of remedies against personal property, or the enforcement of any assignment of leases, rentals, oil or gas production, or other properties or rights, whether real or personal, tangible or intangible; and Guarantor shall be liable to the Agent and the Lender hereunder for any deficiency resulting from the exercise by the Lender of any such right or remedy even though any rights which Guarantor may have against Borrower or others may be destroyed or diminished by exercise of any such right or remedy.  No failure on the part of the Agent and the Lender to exercise, and no delay in exercising, any right hereunder or under any other Obligation Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right preclude any other or further exercise thereof or the exercise of any other right.  The rights, powers and remedies of the Agent and the Lender provided herein and in the other Obligation Documents are cumulative and are in addition to, and not exclusive of, any other rights, powers or remedies provided by law or in equity.  The rights of the Agent and the Lender hereunder are not conditional or contingent on any attempt by the Lender to exercise any of its rights under any other Obligation Document against any Obligor or any other Person.

Section 5.    **Limited Subrogation**.  Until all of the Guaranteed Obligations have been indefeasibly paid and performed in full Guarantor shall have no right to exercise any right of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which Guarantor may now or hereafter have against or to any Obligor or any Security in connection with this Guaranty, and Guarantor hereby waives any rights to enforce any remedy which Guarantor may have against Borrower and any right to participate in any Security until such time.  If any amount shall be paid to Guarantor on account of any such subrogation or other rights, any such other remedy, or any Security at any time when all of the Guaranteed Obligations and all other expenses guaranteed pursuant hereto shall not have been paid in full, such amount shall be held in trust for the benefit of the Agent and the Lender, shall be segregated from the other funds of Guarantor and shall forthwith be paid over to the Agent and the Lender to be held by the Agent or the Lender as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portion of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect.

Section 6.    **Successors and Assigns**.  Guarantor's rights or obligations hereunder may not be assigned or delegated, but this Guaranty and such obligations shall pass to and be fully binding upon the estate and heirs of Guarantor, as well as Guarantor.  This Guaranty shall apply to and inure to the benefit of Agent, Lender and their successors or assigns.  Without limiting the generality of the immediately preceding sentence, the Lender may assign any Guaranteed Obligation held by such Lender or any portion thereof, and the Lender may assign such Lender's

rights or any portion thereof under any Obligation Document, to any other Person, and such other Person shall thereupon become entitled to all of the benefits in respect thereof granted to such Lender hereunder unless otherwise expressly provided by such Lender in connection with such assignment or transfer.

Section 7. **Subordination and Offset**. Guarantor hereby subordinates and makes inferior to the Guaranteed Obligations any and all indebtedness now or at any time hereafter owed by Borrower or any of the other Loan Parties. If Guarantor receives any such payment without the prior written consent of Lender, the amount so paid shall be held in trust for the benefit of Lender, shall be segregated from the other funds of Guarantor, and shall forthwith be paid over to Agent to be held by Agent as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portions of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect. Guarantor hereby grants to Agent and Lender a right of offset to secure the payment of the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder, which right of offset shall be upon any and all monies, securities and other property (and the proceeds therefrom) of Guarantor now or hereafter held or received by or in transit to Agent or Lender from or for the account of Guarantor, whether for safekeeping, custody, pledge, transmission, collection or otherwise. Upon the occurrence of any Default, the Agent and the Lender are hereby authorized at any time and from time to time, without notice to Guarantor, to offset, appropriate and apply any and all items hereinabove referred to against the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder irrespective of whether or not Agent or Lender shall have made any demand under this Guaranty and although such obligations and liabilities may be contingent or unmatured. The rights of Agent and Lender under this Section are in addition to, and shall not be limited by, any other rights and remedies (including other rights of offset) which Agent or Lender may have.

Section 8. **Representations and Warranties**. Guarantor hereby represents and warrants to Lender as follows:

(a)    The recitals at the beginning of this Guaranty are true and correct in all respects.

(b)    Guarantor has the requisite power, competence and authority to execute, deliver and perform this Guaranty, each other writing executed or delivered in connection with this Guaranty and each amendment or supplement to any of the foregoing to which Guarantor is a party, and to perform and consummate the transactions contemplated hereby and thereby.

(c)    The execution, delivery and performance by Guarantor of this Guaranty do not and will not contravene any law or governmental regulation or any contractual restriction binding on or affecting Guarantor or any of Guarantor's properties, and do not and will not result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of Guarantor's properties.

(d)    This Guaranty is, and each other agreement or instrument of Guarantor contemplated hereby will be, a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its respective terms, except as limited by bankruptcy, insolvency or similar laws of general application relating to the enforcement of creditors' rights.

(e)  There is no action, suit or proceeding pending or, to the knowledge of Guarantor, threatened against or otherwise affecting Guarantor before any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality which may materially and adversely affect Guarantor's financial condition or its ability to perform its obligations hereunder.

(f)  Guarantor is not "insolvent" on the date hereof (that is, the sum of Guarantor's absolute and contingent liabilities, including the Guaranteed Obligations, does not exceed the fair market value of Guarantor's assets). Guarantor has not incurred (whether hereby or otherwise), nor does Guarantor intend to incur or believe that Guarantor will incur, debts which will be beyond Guarantor's ability to pay as such debts mature.

Section 9.  **No Oral Change**. No amendment of any provision of this Guaranty shall be effective unless it is in writing and signed by Guarantor and Agent on behalf of the Lender, and no waiver of any provision of this Guaranty, and no consent to any departure by Guarantor therefrom, shall be effective unless it is in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 10.  **Prohibition on Asset Transfers**. Until the Obligations are indefeasibly paid in full, Guarantor agrees that he shall not transfer any material assets to any Person.

Section 11.  **Invalidity of Particular Provisions**. If any term or provision of this Guaranty shall be determined to be illegal or unenforceable all other terms and provisions hereof shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable law.

Section 12.  **Headings and References**. The headings used herein are for purposes of convenience only and shall not be used in construing the provisions hereof. The words "this Guaranty," "this instrument," "herein," "hereof," "hereby" and words of similar import refer to this Guaranty as a whole and not to any particular subdivision unless expressly so limited. The phrases "this section" and "this subsection" and similar phrases refer only to the subdivisions hereof in which such phrases occur. The word "or" is not exclusive, and the word "including" (in its various forms) means "including without limitation". Pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

Section 13.  **Term**. This Guaranty shall be irrevocable until all of the Guaranteed Obligations have been completely and finally paid and performed. Lender has no obligation to make any loans or other advances to Borrower, all obligations and undertakings of Borrower under, by reason of, or pursuant to the Obligation Documents have been completely performed, and this Guaranty is thereafter subject to reinstatement as provided in Section 3(d). All extensions of credit and financial accommodations heretofore or hereafter made by Lender to Borrower shall be conclusively presumed to have been made in acceptance hereof and in reliance hereon.

Section 14. **Notices**. Any notice or communication required or permitted hereunder shall be given as provided in the Security Agreement, except that all notices to Guarantor shall be addressed as follows:

Michael L. Metter
One tinker Lane
Greenwich, CT 06830

Section 15. **Limitation on Interest**. Lender and Guarantor intend to contract in strict compliance with applicable usury law from time to time in effect, and the provisions of the Financing Agreement limiting the interest for which Guarantor is obligated are expressly incorporated herein by reference.

Section 16. **Counterparts; Fax**. This Guaranty may be executed in any number of counterparts, each of which when so executed shall be deemed to constitute one and the same Guaranty. This Guaranty may be validly executed and delivered by facsimile or other electronic transmission.

SECTION 17. **Governing Law**. **THIS GUARANTY SHALL BE DEEMED A CONTRACT AND INSTRUMENT MADE UNDER THE LAWS OF THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE LAWS OF THE UNITED STATES OF AMERICA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. THE GUARANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS SITTING IN THE STATE OF NEW YORK AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT OR THE GUARANTEED OBLIGATIONS BY ANY MEANS ALLOWED UNDER NEW YORK OR FEDERAL LAW.**

SECTION 18. **Final Agreement**. **THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES HERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES HERETO.**

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be executed as of the date first above written.

GUARANTOR:

SSN: 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

*Individual Guarantee Signature Page*

**ACCEPTED AND AGREED:**

AGENT

BC MEDIA FUNDING COMPANY II, LLC

By: _____
Name: Jacob Barker
Title: Managing Member

LENDER:

MEDIA FUNDING COMPANY, LLC

By: _____
Name: Jacob Barker
Title: President

**Individual Guarantee Signature Page**

# Exhibit E

## GUARANTY
(Individual)

**THIS PERSONAL GUARANTY** (this *"Guaranty"*), is made as of November 13, 2006, by Leonard F. Moscati, a Connecticut resident (*"Guarantor"*), in favor of BC Media Funding Company II, LLC, a Delaware limited liability company (the *"Secured Party"*), as agent for the benefit of Media Funding Company, LLC, a Delaware limited liability company (the *"Lender"*).

## RECITALS

**WHEREAS**, pursuant to the Financing Agreement dated as of November 13, 2006, as it may hereafter be amended, restated, supplemented or otherwise modified from time to time (the *"Financing Agreement"*), by and among BusinessTalkradio.net, Inc., a Delaware corporation (the *"Borrower"*), the Subsidiary Guarantors, the Secured Party and the Lender, the Lender has made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a term loan to Borrower in the aggregate amount of $5,500,000 (the *"Term Loan"*);

**WHEREAS**, it is a condition precedent to the making of the Term Loan by the Lender pursuant to the Financing Agreement that the Guarantor shall have executed and delivered to the Secured Party a Guaranty guaranteeing the obligations of the Borrower with respect to the Term Loan; and

**WHEREAS**, the Guarantor has determined that the execution, delivery and performance of this Guaranty will directly benefit, and are within the best interests of, the Guarantor;

**NOW, THEREFORE**, in consideration of the premises and the agreements herein and in order to induce the Secured Party to make and maintain the Term Loan pursuant to the Financing Agreement, the Guarantor hereby agrees with the Secured Party as follows:

**Definitions**.  Capitalized terms used hereunder but not defined herein shall have the meanings given them in the Financing Agreement.  As used herein the following terms shall have the following meanings:

*"Guaranteed Obligations"* means collectively all of the indebtedness, obligations, and undertakings which are described in subsections (a), (b) and (c) of Section 1.

*"Obligation Documents"* means this Guaranty, the Financing Agreement, the Security Agreement, the Pledge and Security Agreement, the other Guarantees and all other documents and instruments under, by reason of which, or pursuant to which any or all of the Guaranteed Obligations are evidenced, governed, secured, or otherwise dealt with, and all other documents, instruments, agreements, certificates, legal opinions and other writings heretofore or hereafter delivered in connection herewith or therewith, in each case as the same may be amended from time to time.

"*Obligors*" means Borrower, Guarantor, the other Loan Parties (as defined in the Financing Agreement) and any other endorsers, guarantors or obligors, primary or secondary, of any or all of the Guaranteed Obligations.

"*Secured Obligations*" shall have the meanings given such term in the Security Agreement.

"*Security*" means any rights, properties, or interests of the Lender, under the Obligation Documents or otherwise, which provide recourse or other benefits to the Lender in connection with the Guaranteed Obligations or the non-payment or non-performance thereof, including collateral (whether real or personal, tangible or intangible) in which the Lender has rights under or pursuant to any Obligation Documents, guaranties of the payment or performance of any Obligation, bonds, surety agreements, keep-well agreements, letters of credit, rights of subrogation, rights of offset, and rights pursuant to which other claims are subordinated to the Guaranteed Obligations.

"*Security Agreement*" means that certain Security Agreement, dated as of the date hereof, between Borrower and Agent for the benefit of Lender, as the same may be amended or modified from time to time.

Section 1.    **Guaranty**.

(a)    Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete, and full payment when due, and no matter how the same shall become due, of all sums payable under:

(i)    the Financing Agreement, including all principal, all interest thereon and all other sums payable thereunder including attorney's fees or otherwise; and

(ii)    all other Obligation Documents, whether for principal, interest, fees, including attorneys' fees, or otherwise.

Without limiting the generality of the foregoing, Guarantor's liability hereunder shall extend to and include all post-petition interest, expenses, and other duties and liabilities of Borrower described above in this subsection (a), or below in the following subsection (b), which would be owed by Borrower or any other Loan Party but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, or similar proceeding involving Borrower or such Loan Party.

(b)    Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete and full performance, when due, and no matter how the same shall become due, of all Secured Obligations and undertakings of Borrower and each other Loan Party to the Lender under, by reason of, or pursuant to any of the Obligation Documents, or any other instrument or document.

(c)    If Borrower shall for any reason fail to pay any of the Guaranteed Obligations, as and when such Guaranteed Obligation shall become due and payable, whether at its stated maturity, as a result of the exercise of any power to accelerate, or otherwise, Guarantor will,

upon demand by the Lender, pay such Guaranteed Obligation in full to the Agent for the benefit of the Lender. If Borrower or any other Loan Party shall for any reason fail to perform promptly any of the Guaranteed Obligations, Guarantor will, upon demand by Agent, cause such Guaranteed Obligation to be performed or, if specified by Agent, provide sufficient funds, in such amount and manner as Agent shall in good faith determine, for the prompt, full and faithful performance of such Guaranteed Obligation.

(d)     If either of Borrower, Guarantor or any other Loan Party fails to pay or perform any Guaranteed Obligation as described in the immediately preceding subsections (a), (b), or (c) Guarantor will incur the additional obligation to pay to Agent for the benefit of the Lender, and Guarantor will forthwith upon demand by the Lender or Agent pay to Agent, the amount of any and all expenses, including fees and disbursements of Agent's counsel and of any experts or agents retained by Agent, which Agent may incur as a result of such failure.

(e)     As between Guarantor and the Lender, this Guaranty shall be considered a primary and liquidated liability of Guarantor.

Section 2.     **Unconditional Guaranty.**

(a)     No action which the Lender or Agent may take or omit to take in connection with any of the Obligation Documents, any of the Guaranteed Obligations (or any other indebtedness owing by Borrower or any other Loan Party to Agent on behalf of the Lender), or any Security, and no course of dealing of the Lender or Agent with any Obligor or any other Person, shall release or diminish Guarantor's obligations, liabilities, agreements or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against the Lender, regardless of whether any such action or inaction may increase any risks to or liabilities of the Lender or any Obligor or increase any risk to or diminish any safeguard of any Security. Without limiting the foregoing, Guarantor hereby expressly agrees that the Agent or the Lender may, from time to time, without notice to or the consent of Guarantor, do any or all of the following:

(i)     Amend, change or modify, in whole or in part, any one or more of the Obligation Documents and give or refuse to give any waivers or other indulgences with respect thereto;

(ii)     Neglect, delay, fail, or refuse to take or prosecute any action for the collection or enforcement of any of the Guaranteed Obligations, to foreclose or take or prosecute any action in connection with any Security or Obligation Document, to bring suit against any Obligor or any other Person, or to take any other action concerning the Guaranteed Obligations or the Obligation Documents;

(iii)     Accelerate, change, rearrange, extend, or renew the time, rate, terms, or manner for payment or performance of any one or more of the Guaranteed Obligations (whether for principal, interest, fees, expenses, indemnifications, affirmative or negative covenants, or otherwise);

(iv)     Compromise or settle any unpaid or unperformed Guaranteed Obligation or any other obligation or amount due or owing, or claimed to be due or owing, under any one or more of the Obligation Documents;

(v)     Take, exchange, amend, eliminate, surrender, release, or subordinate any or all Security for any or all of the Guaranteed Obligations, accept additional or substituted Security therefor, and perfect or fail to perfect Lender's rights in any or all Security;

(vi)    Discharge, release, substitute or add Obligors; or

(vii)   Apply all monies received from Obligors or others or from any Security for any of the Guaranteed Obligations, as Lender may determine to be in its best interest, without in any way being required to marshal Security or assets or to apply all or any part of such monies upon any particular Guaranteed Obligations.

(b)     No action or inaction of any Obligor or any other Person or any dispute and/or litigation among the Guarantors, and no change of law or circumstances, shall release or diminish Guarantor's obligations, liabilities, agreements, or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against Agent or the Lender. Without limiting the foregoing, the obligations, liabilities, agreements, and duties of Guarantor under this Guaranty shall not be released, diminished, impaired, reduced, or affected by the occurrence of any or all of the following from time to time, even if occurring without notice to or without the consent of Guarantor:

(i)     Any voluntary or involuntary liquidation, dissolution, sale of all or substantially all assets, marshalling of assets or liabilities, receivership, conservatorship, assignment for the benefit of creditors, insolvency, bankruptcy, reorganization, arrangement, or composition of any Obligor or any other proceedings involving any Obligor or any of the assets of any Obligor under laws for the protection of debtors, or any discharge, impairment, modification, release, or limitation of the liability of, or stay of actions or lien enforcement proceedings against, any Obligor, any properties of any Obligor, or the estate in bankruptcy of any Obligor in the course of or resulting from any such proceedings.

(ii)    The failure by the Agent or the Lender to file or enforce a claim in any proceeding described in the immediately preceding subsection (i) or to take any other action in any proceeding to which any Obligor is a party.

(iii)   The release by operation of law of any Obligor from any of the Guaranteed Obligations or any other obligations to the Agent or the Lender.

(iv)    The invalidity, deficiency, illegality, or unenforceability of any of the Guaranteed Obligations or the Obligation Documents, in whole or in part, any bar by any statute of limitations or other law of recovery on any of the Guaranteed Obligations, or any defense or excuse for failure to perform on account of force majeure, act of God, casualty, impossibility, impracticability, or other defense or excuse whatsoever.

(v)     The failure of any Obligor or any other person or entity to sign any guaranty or other instrument or agreement within the contemplation of any Obligor, Agent or the Lender.

(vi)    The fact that Guarantor may have incurred directly part of the Guaranteed Obligations or is otherwise primarily liable therefor.

(vii)    Without limiting any of the foregoing, any fact or event (whether or not similar to any of the foregoing) which in the absence of this provision would or might constitute or afford a legal or equitable discharge or release of or defense to a guarantor or surety other than the actual payment and performance by Guarantor under this Guaranty.

(c)    Lender may invoke the benefits of this Guaranty before pursuing any remedies against any Obligor or any other Person and before proceeding against any Security now or hereafter existing for the payment or performance of any of the Guaranteed Obligations. Lender may maintain an action against Guarantor on this Guaranty without joining any other Obligor therein and without bringing a separate action against any other Obligor.

(d)    If any payment to the Agent or the Lender by any Obligor is held to constitute a preference or a voidable transfer under applicable state, Federal, national or international laws, or if for any other reason the Agent or the Lender is required to refund such payment to the payor thereof or to pay the amount thereof to any other Person, such payment to the Agent or the Lender shall not constitute a release of Guarantor from any liability hereunder, and Guarantor agrees to pay such amount to the Agent or the Lender on demand and agrees and acknowledges that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment or payments. Any transfer by subrogation which is made as contemplated in Section 6 prior to any such payment or payments shall (regardless of the terms of such transfer) be automatically voided upon the making of any such payment or payments, and all rights so transferred shall thereupon revert to and be vested in Lender.

(e)    This is a continuing guaranty and shall apply to and cover all Guaranteed Obligations and renewals and extensions thereof and substitutions therefor from time to time.

Section 3.    **Waiver**.    Guarantor hereby waives, with respect to the Guaranteed Obligations, this Guaranty, and the other Obligation Documents:

(a)    notice of the incurrence of any Guaranteed Obligation by Borrower, and notice of any kind concerning the assets, liabilities, financial condition, creditworthiness, businesses, prospects, or other affairs of Borrower (it being understood and agreed that: (i) Guarantor shall take full responsibility for informing himself of such matters, (ii) neither the Agent nor the Lender shall have responsibility of any kind to inform Guarantor of such matters, and (iii) Lender is hereby authorized to assume that Guarantor, by virtue of its relationships with Borrower which is independent of this Guaranty, has full and complete knowledge of such matters whenever the Lender extends credit to Borrower or take any other action which may change or increase Guarantor's liabilities or losses hereunder).

(b)    notice that the Agent or the Lender, any Obligor, or any other Person has taken or omitted to take any action under any Obligation Document or any other agreement or instrument relating thereto or relating to any Guaranteed Obligation.

(c)     default, demand, presentment for payment, and notice of default, demand, dishonor, nonpayment, or nonperformance.

(d)     notice of intention to accelerate, notice of acceleration, protest, notice of protest, notice of any exercise of remedies (as described in the following Section 5 or otherwise), and all other notices of any kind whatsoever.

Section 4.    **Exercise of Remedies**.  The Agent and the Lender shall have the right to enforce, from time to time, in any order and at the Agent's or Lender's sole discretion, any rights, powers and remedies which the Agent and the Lender may have under the Obligation Documents or otherwise, including judicial foreclosure, the exercise of rights of power of sale, the taking of a deed or assignment in lieu of foreclosure, the appointment of a receiver to collect rents, issues and profits, the exercise of remedies against personal property, or the enforcement of any assignment of leases, rentals, oil or gas production, or other properties or rights, whether real or personal, tangible or intangible; and Guarantor shall be liable to the Agent and the Lender hereunder for any deficiency resulting from the exercise by the Lender of any such right or remedy even though any rights which Guarantor may have against Borrower or others may be destroyed or diminished by exercise of any such right or remedy.  No failure on the part of the Agent and the Lender to exercise, and no delay in exercising, any right hereunder or under any other Obligation Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right preclude any other or further exercise thereof or the exercise of any other right. The rights, powers and remedies of the Agent and the Lender provided herein and in the other Obligation Documents are cumulative and are in addition to, and not exclusive of, any other rights, powers or remedies provided by law or in equity.  The rights of the Agent and the Lender hereunder are not conditional or contingent on any attempt by the Lender to exercise any of its rights under any other Obligation Document against any Obligor or any other Person.

Section 5.    **Limited Subrogation**.  Until all of the Guaranteed Obligations have been indefeasibly paid and performed in full Guarantor shall have no right to exercise any right of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which Guarantor may now or hereafter have against or to any Obligor or any Security in connection with this Guaranty, and Guarantor hereby waives any rights to enforce any remedy which Guarantor may have against Borrower and any right to participate in any Security until such time.  If any amount shall be paid to Guarantor on account of any such subrogation or other rights, any such other remedy, or any Security at any time when all of the Guaranteed Obligations and all other expenses guaranteed pursuant hereto shall not have been paid in full, such amount shall be held in trust for the benefit of the Agent and the Lender, shall be segregated from the other funds of Guarantor and shall forthwith be paid over to the Agent and the Lender to be held by the Agent or the Lender as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portion of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect.

Section 6.    **Successors and Assigns**.  Guarantor's rights or obligations hereunder may not be assigned or delegated, but this Guaranty and such obligations shall pass to and be fully binding upon the estate and heirs of Guarantor, as well as Guarantor.  This Guaranty shall apply to and inure to the benefit of Agent, Lender and their successors or assigns.  Without limiting the generality of the immediately preceding sentence, the Lender may assign any Guaranteed Obligation held by such Lender or any portion thereof, and the Lender may assign such Lender's

rights or any portion thereof under any Obligation Document, to any other Person, and such other Person shall thereupon become entitled to all of the benefits in respect thereof granted to such Lender hereunder unless otherwise expressly provided by such Lender in connection with such assignment or transfer.

Section 7.    **Subordination and Offset**.    Guarantor hereby subordinates and makes inferior to the Guaranteed Obligations any and all indebtedness now or at any time hereafter owed by Borrower or any of the other Loan Parties.   If Guarantor receives any such payment without the prior written consent of Lender, the amount so paid shall be held in trust for the benefit of Lender, shall be segregated from the other funds of Guarantor, and shall forthwith be paid over to Agent to be held by Agent as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portions of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect. Guarantor hereby grants to Agent and Lender a right of offset to secure the payment of the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder, which right of offset shall be upon any and all monies, securities and other property (and the proceeds therefrom) of Guarantor now or hereafter held or received by or in transit to Agent or Lender from or for the account of Guarantor, whether for safekeeping, custody, pledge, transmission, collection or otherwise. Upon the occurrence of any Default, the Agent and the Lender are hereby authorized at any time and from time to time, without notice to Guarantor, to offset, appropriate and apply any and all items hereinabove referred to against the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder irrespective of whether or not Agent or Lender shall have made any demand under this Guaranty and although such obligations and liabilities may be contingent or unmatured. The rights of Agent and Lender under this Section are in addition to, and shall not be limited by, any other rights and remedies (including other rights of offset) which Agent or Lender may have.

Section 8.    **Representations and Warranties**.    Guarantor hereby represents and warrants to Lender as follows:

(a)    The recitals at the beginning of this Guaranty are true and correct in all respects.

(b)    Guarantor has the requisite power, competence and authority to execute, deliver and perform this Guaranty, each other writing executed or delivered in connection with this Guaranty and each amendment or supplement to any of the foregoing to which Guarantor is a party, and to perform and consummate the transactions contemplated hereby and thereby.

(c)    The execution, delivery and performance by Guarantor of this Guaranty do not and will not contravene any law or governmental regulation or any contractual restriction binding on or affecting Guarantor or any of Guarantor's properties, and do not and will not result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of Guarantor's properties.

(d)    This Guaranty is, and each other agreement or instrument of Guarantor contemplated hereby will be, a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its respective terms, except as limited by bankruptcy, insolvency or similar laws of general application relating to the enforcement of creditors' rights.

(e)     There is no action, suit or proceeding pending or, to the knowledge of Guarantor, threatened against or otherwise affecting Guarantor before any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality which may materially and adversely affect Guarantor's financial condition or its ability to perform its obligations hereunder.

(f)     Guarantor is not "insolvent" on the date hereof (that is, the sum of Guarantor's absolute and contingent liabilities, including the Guaranteed Obligations, does not exceed the fair market value of Guarantor's assets). Guarantor has not incurred (whether hereby or otherwise), nor does Guarantor intend to incur or believe that Guarantor will incur, debts which will be beyond Guarantor's ability to pay as such debts mature.

Section 9.     **No Oral Change**. No amendment of any provision of this Guaranty shall be effective unless it is in writing and signed by Guarantor and Agent on behalf of the Lender, and no waiver of any provision of this Guaranty, and no consent to any departure by Guarantor therefrom, shall be effective unless it is in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 10.     **Prohibition on Asset Transfers**. Until the Obligations are indefeasibly paid in full, Guarantor agrees that he shall not transfer any material assets to any Person.

Section 11.     **Invalidity of Particular Provisions**. If any term or provision of this Guaranty shall be determined to be illegal or unenforceable all other terms and provisions hereof shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable law.

Section 12.     **Headings and References**. The headings used herein are for purposes of convenience only and shall not be used in construing the provisions hereof. The words "this Guaranty," "this instrument," "herein," "hereof," "hereby" and words of similar import refer to this Guaranty as a whole and not to any particular subdivision unless expressly so limited. The phrases "this section" and "this subsection" and similar phrases refer only to the subdivisions hereof in which such phrases occur. The word "or" is not exclusive, and the word "including" (in its various forms) means "including without limitation". Pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

Section 13.     **Term**. This Guaranty shall be irrevocable until all of the Guaranteed Obligations have been completely and finally paid and performed. Lender has no obligation to make any loans or other advances to Borrower, all obligations and undertakings of Borrower under, by reason of, or pursuant to the Obligation Documents have been completely performed, and this Guaranty is thereafter subject to reinstatement as provided in Section 3(d). All extensions of credit and financial accommodations heretofore or hereafter made by Lender to Borrower shall be conclusively presumed to have been made in acceptance hereof and in reliance hereon.

Section 14. **Notices**. Any notice or communication required or permitted hereunder shall be given as provided in the Security Agreement, except that all notices to Guarantor shall be addressed as follows:

> Leonard F. Moscati
> 41 Richmond Hill Road
> Greenwich, CT 06831

Section 15. **Limitation on Interest**. Lender and Guarantor intend to contract in strict compliance with applicable usury law from time to time in effect, and the provisions of the Financing Agreement limiting the interest for which Guarantor is obligated are expressly incorporated herein by reference.

Section 16. **Counterparts; Fax**. This Guaranty may be executed in any number of counterparts, each of which when so executed shall be deemed to constitute one and the same Guaranty. This Guaranty may be validly executed and delivered by facsimile or other electronic transmission.

SECTION 17. **Governing Law**. **THIS GUARANTY SHALL BE DEEMED A CONTRACT AND INSTRUMENT MADE UNDER THE LAWS OF THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE LAWS OF THE UNITED STATES OF AMERICA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. THE GUARANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS SITTING IN THE STATE OF NEW YORK AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT OR THE GUARANTEED OBLIGATIONS BY ANY MEANS ALLOWED UNDER NEW YORK OR FEDERAL LAW.**

SECTION 18. **Final Agreement**. **THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES HERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES HERETO.**

<div align="center">

**[SIGNATURE PAGE FOLLOWS]**

</div>

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be executed as of the date first above written.

GUARANTOR:

SSN: _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_

**ACCEPTED AND AGREED:**

AGENT                                    BC MEDIA FUNDING COMPANY II, LLC

                                         By: _____
                                         Name: Jacob Barker
                                         Title: Managing Member


LENDER:                                  MEDIA FUNDING COMPANY, LLC

                                         By: _____
                                         Name: Jacob Barker
                                         Title: President


**Individual Guarantee Signature Page**

# Exhibit F

## GUARANTY
### (Individual)

**THIS PERSONAL GUARANTY** (this "*Guaranty*"), is made as of November 13, 2006, by B. Michael Pisani, a New Jersey resident ("*Guarantor*"), in favor of BC Media Funding Company II, LLC, a Delaware limited liability company (the "*Secured Party*"), as agent for the benefit of Media Funding Company, LLC, a Delaware limited liability company (the "*Lender*").

## RECITALS

**WHEREAS**, pursuant to the Financing Agreement dated as of November 13, 2006, as it may hereafter be amended, restated, supplemented or otherwise modified from time to time (the "*Financing Agreement*"), by and among BusinessTalkradio.net, Inc., a Delaware corporation (the "*Borrower*"), the Subsidiary Guarantors, the Secured Party and the Lender, the Lender has made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a term loan to Borrower in the aggregate amount of $5,500,000 (the "*Term Loan*");

**WHEREAS**, it is a condition precedent to the making of the Term Loan by the Lender pursuant to the Financing Agreement that the Guarantor shall have executed and delivered to the Secured Party a Guaranty guaranteeing the obligations of the Borrower with respect to the Term Loan; and

**WHEREAS**, the Guarantor has determined that the execution, delivery and performance of this Guaranty will directly benefit, and are within the best interests of, the Guarantor;

**NOW, THEREFORE**, in consideration of the premises and the agreements herein and in order to induce the Secured Party to make and maintain the Term Loan pursuant to the Financing Agreement, the Guarantor hereby agrees with the Secured Party as follows:

**Definitions**.  Capitalized terms used hereunder but not defined herein shall have the meanings given them in the Financing Agreement.  As used herein the following terms shall have the following meanings:

"*Guaranteed Obligations*" means collectively all of the indebtedness, obligations, and undertakings which are described in subsections (a), (b) and (c) of <u>Section 1</u>.

"*Obligation Documents*" means this Guaranty, the Financing Agreement, the Security Agreement, the Pledge and Security Agreement, the other Guarantees and all other documents and instruments under, by reason of which, or pursuant to which any or all of the Guaranteed Obligations are evidenced, governed, secured, or otherwise dealt with, and all other documents, instruments, agreements, certificates, legal opinions and other writings heretofore or hereafter delivered in connection herewith or therewith, in each case as the same may be amended from time to time.

"*Obligors*" means Borrower, Guarantor, the other Loan Parties (as defined in the Financing Agreement) and any other endorsers, guarantors or obligors, primary or secondary, of any or all of the Guaranteed Obligations.

"*Secured Obligations*" shall have the meanings given such term in the Security Agreement.

"*Security*" means any rights, properties, or interests of the Lender, under the Obligation Documents or otherwise, which provide recourse or other benefits to the Lender in connection with the Guaranteed Obligations or the non-payment or non-performance thereof, including collateral (whether real or personal, tangible or intangible) in which the Lender has rights under or pursuant to any Obligation Documents, guaranties of the payment or performance of any Obligation, bonds, surety agreements, keep-well agreements, letters of credit, rights of subrogation, rights of offset, and rights pursuant to which other claims are subordinated to the Guaranteed Obligations.

"*Security Agreement*" means that certain Security Agreement, dated as of the date hereof, between Borrower and Agent for the benefit of Lender, as the same may be amended or modified from time to time.

Section 1.     **Guaranty**.

(a)     Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete, and full payment when due, and no matter how the same shall become due, of all sums payable under:

(i)     the Financing Agreement, including all principal, all interest thereon and all other sums payable thereunder including attorney's fees or otherwise; and

(ii)     all other Obligation Documents, whether for principal, interest, fees, including attorneys' fees, or otherwise.

Without limiting the generality of the foregoing, Guarantor's liability hereunder shall extend to and include all post-petition interest, expenses, and other duties and liabilities of Borrower described above in this subsection (a), or below in the following subsection (b), which would be owed by Borrower or any other Loan Party but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, or similar proceeding involving Borrower or such Loan Party.

(b)     Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete and full performance, when due, and no matter how the same shall become due, of all Secured Obligations and undertakings of Borrower and each other Loan Party to the Lender under, by reason of, or pursuant to any of the Obligation Documents, or any other instrument or document.

(c)     If Borrower shall for any reason fail to pay any of the Guaranteed Obligations, as and when such Guaranteed Obligation shall become due and payable, whether at its stated maturity, as a result of the exercise of any power to accelerate, or otherwise, Guarantor will,

upon demand by the Lender, pay such Guaranteed Obligation in full to the Agent for the benefit of the Lender. If Borrower or any other Loan Party shall for any reason fail to perform promptly any of the Guaranteed Obligations, Guarantor will, upon demand by Agent, cause such Guaranteed Obligation to be performed or, if specified by Agent, provide sufficient funds, in such amount and manner as Agent shall in good faith determine, for the prompt, full and faithful performance of such Guaranteed Obligation.

(d)     If either of Borrower, Guarantor or any other Loan Party fails to pay or perform any Guaranteed Obligation as described in the immediately preceding subsections (a), (b), or (c) Guarantor will incur the additional obligation to pay to Agent for the benefit of the Lender, and Guarantor will forthwith upon demand by the Lender or Agent pay to Agent, the amount of any and all expenses, including fees and disbursements of Agent's counsel and of any experts or agents retained by Agent, which Agent may incur as a result of such failure.

(e)     As between Guarantor and the Lender, this Guaranty shall be considered a primary and liquidated liability of Guarantor.

Section 2.     **Unconditional Guaranty**.

(a)     No action which the Lender or Agent may take or omit to take in connection with any of the Obligation Documents, any of the Guaranteed Obligations (or any other indebtedness owing by Borrower or any other Loan Party to Agent on behalf of the Lender), or any Security, and no course of dealing of the Lender or Agent with any Obligor or any other Person, shall release or diminish Guarantor's obligations, liabilities, agreements or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against the Lender, regardless of whether any such action or inaction may increase any risks to or liabilities of the Lender or any Obligor or increase any risk to or diminish any safeguard of any Security.   Without limiting the foregoing, Guarantor hereby expressly agrees that the Agent or the Lender may, from time to time, without notice to or the consent of Guarantor, do any or all of the following:

(i)     Amend, change or modify, in whole or in part, any one or more of the Obligation Documents and give or refuse to give any waivers or other indulgences with respect thereto;

(ii)     Neglect, delay, fail, or refuse to take or prosecute any action for the collection or enforcement of any of the Guaranteed Obligations, to foreclose or take or prosecute any action in connection with any Security or Obligation Document, to bring suit against any Obligor or any other Person, or to take any other action concerning the Guaranteed Obligations or the Obligation Documents;

(iii)     Accelerate, change, rearrange, extend, or renew the time, rate, terms, or manner for payment or performance of any one or more of the Guaranteed Obligations (whether for principal, interest, fees, expenses, indemnifications, affirmative or negative covenants, or otherwise);

(iv)     Compromise or settle any unpaid or unperformed Guaranteed Obligation or any other obligation or amount due or owing, or claimed to be due or owing, under any one or more of the Obligation Documents;

(v)    Take, exchange, amend, eliminate, surrender, release, or subordinate any or all Security for any or all of the Guaranteed Obligations, accept additional or substituted Security therefor, and perfect or fail to perfect Lender's rights in any or all Security;

(vi)    Discharge, release, substitute or add Obligors; or

(vii)    Apply all monies received from Obligors or others or from any Security for any of the Guaranteed Obligations, as Lender may determine to be in its best interest, without in any way being required to marshal Security or assets or to apply all or any part of such monies upon any particular Guaranteed Obligations.

(b)    No action or inaction of any Obligor or any other Person or any dispute and/or litigation among the Guarantors, and no change of law or circumstances, shall release or diminish Guarantor's obligations, liabilities, agreements, or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against Agent or the Lender. Without limiting the foregoing, the obligations, liabilities, agreements, and duties of Guarantor under this Guaranty shall not be released, diminished, impaired, reduced, or affected by the occurrence of any or all of the following from time to time, even if occurring without notice to or without the consent of Guarantor:

(i)    Any voluntary or involuntary liquidation, dissolution, sale of all or substantially all assets, marshalling of assets or liabilities, receivership, conservatorship, assignment for the benefit of creditors, insolvency, bankruptcy, reorganization, arrangement, or composition of any Obligor or any other proceedings involving any Obligor or any of the assets of any Obligor under laws for the protection of debtors, or any discharge, impairment, modification, release, or limitation of the liability of, or stay of actions or lien enforcement proceedings against, any Obligor, any properties of any Obligor, or the estate in bankruptcy of any Obligor in the course of or resulting from any such proceedings.

(ii)    The failure by the Agent or the Lender to file or enforce a claim in any proceeding described in the immediately preceding subsection (i) or to take any other action in any proceeding to which any Obligor is a party.

(iii)    The release by operation of law of any Obligor from any of the Guaranteed Obligations or any other obligations to the Agent or the Lender.

(iv)    The invalidity, deficiency, illegality, or unenforceability of any of the Guaranteed Obligations or the Obligation Documents, in whole or in part, any bar by any statute of limitations or other law of recovery on any of the Guaranteed Obligations, or any defense or excuse for failure to perform on account of force majeure, act of God, casualty, impossibility, impracticability, or other defense or excuse whatsoever.

(v)    The failure of any Obligor or any other person or entity to sign any guaranty or other instrument or agreement within the contemplation of any Obligor, Agent or the Lender.

(vi)     The fact that Guarantor may have incurred directly part of the Guaranteed Obligations or is otherwise primarily liable therefor.

(vii)     Without limiting any of the foregoing, any fact or event (whether or not similar to any of the foregoing) which in the absence of this provision would or might constitute or afford a legal or equitable discharge or release of or defense to a guarantor or surety other than the actual payment and performance by Guarantor under this Guaranty.

(c)     Lender may invoke the benefits of this Guaranty before pursuing any remedies against any Obligor or any other Person and before proceeding against any Security now or hereafter existing for the payment or performance of any of the Guaranteed Obligations. Lender may maintain an action against Guarantor on this Guaranty without joining any other Obligor therein and without bringing a separate action against any other Obligor.

(d)     If any payment to the Agent or the Lender by any Obligor is held to constitute a preference or a voidable transfer under applicable state, Federal, national or international laws, or if for any other reason the Agent or the Lender is required to refund such payment to the payor thereof or to pay the amount thereof to any other Person, such payment to the Agent or the Lender shall not constitute a release of Guarantor from any liability hereunder, and Guarantor agrees to pay such amount to the Agent or the Lender on demand and agrees and acknowledges that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment or payments. Any transfer by subrogation which is made as contemplated in Section 6 prior to any such payment or payments shall (regardless of the terms of such transfer) be automatically voided upon the making of any such payment or payments, and all rights so transferred shall thereupon revert to and be vested in Lender.

(e)     This is a continuing guaranty and shall apply to and cover all Guaranteed Obligations and renewals and extensions thereof and substitutions therefor from time to time.

Section 3.     **Waiver**.   Guarantor hereby waives, with respect to the Guaranteed Obligations, this Guaranty, and the other Obligation Documents:

(a)     notice of the incurrence of any Guaranteed Obligation by Borrower, and notice of any kind concerning the assets, liabilities, financial condition, creditworthiness, businesses, prospects, or other affairs of Borrower (it being understood and agreed that: (i) Guarantor shall take full responsibility for informing himself of such matters, (ii) neither the Agent nor the Lender shall have responsibility of any kind to inform Guarantor of such matters, and (iii) Lender is hereby authorized to assume that Guarantor, by virtue of its relationships with Borrower which is independent of this Guaranty, has full and complete knowledge of such matters whenever the Lender extends credit to Borrower or take any other action which may change or increase Guarantor's liabilities or losses hereunder).

(b)     notice that the Agent or the Lender, any Obligor, or any other Person has taken or omitted to take any action under any Obligation Document or any other agreement or instrument relating thereto or relating to any Guaranteed Obligation.

(c)    default, demand, presentment for payment, and notice of default, demand, dishonor, nonpayment, or nonperformance.

(d)    notice of intention to accelerate, notice of acceleration, protest, notice of protest, notice of any exercise of remedies (as described in the following <u>Section 5</u> or otherwise), and all other notices of any kind whatsoever.

Section 4.    **Exercise of Remedies**.  The Agent and the Lender shall have the right to enforce, from time to time, in any order and at the Agent's or Lender's sole discretion, any rights, powers and remedies which the Agent and the Lender may have under the Obligation Documents or otherwise, including judicial foreclosure, the exercise of rights of power of sale, the taking of a deed or assignment in lieu of foreclosure, the appointment of a receiver to collect rents, issues and profits, the exercise of remedies against personal property, or the enforcement of any assignment of leases, rentals, oil or gas production, or other properties or rights, whether real or personal, tangible or intangible; and Guarantor shall be liable to the Agent and the Lender hereunder for any deficiency resulting from the exercise by the Lender of any such right or remedy even though any rights which Guarantor may have against Borrower or others may be destroyed or diminished by exercise of any such right or remedy.  No failure on the part of the Agent and the Lender to exercise, and no delay in exercising, any right hereunder or under any other Obligation Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right preclude any other or further exercise thereof or the exercise of any other right. The rights, powers and remedies of the Agent and the Lender provided herein and in the other Obligation Documents are cumulative and are in addition to, and not exclusive of, any other rights, powers or remedies provided by law or in equity.  The rights of the Agent and the Lender hereunder are not conditional or contingent on any attempt by the Lender to exercise any of its rights under any other Obligation Document against any Obligor or any other Person.

Section 5.    **Limited Subrogation**.  Until all of the Guaranteed Obligations have been indefeasibly paid and performed in full Guarantor shall have no right to exercise any right of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which Guarantor may now or hereafter have against or to any Obligor or any Security in connection with this Guaranty, and Guarantor hereby waives any rights to enforce any remedy which Guarantor may have against Borrower and any right to participate in any Security until such time.  If any amount shall be paid to Guarantor on account of any such subrogation or other rights, any such other remedy, or any Security at any time when all of the Guaranteed Obligations and all other expenses guaranteed pursuant hereto shall not have been paid in full, such amount shall be held in trust for the benefit of the Agent and the Lender, shall be segregated from the other funds of Guarantor and shall forthwith be paid over to the Agent and the Lender to be held by the Agent or the Lender as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portion of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect.

Section 6.    **Successors and Assigns**.  Guarantor's rights or obligations hereunder may not be assigned or delegated, but this Guaranty and such obligations shall pass to and be fully binding upon the estate and heirs of Guarantor, as well as Guarantor.  This Guaranty shall apply to and inure to the benefit of Agent, Lender and their successors or assigns.  Without limiting the generality of the immediately preceding sentence, the Lender may assign any Guaranteed Obligation held by such Lender or any portion thereof, and the Lender may assign such Lender's

rights or any portion thereof under any Obligation Document, to any other Person, and such other Person shall thereupon become entitled to all of the benefits in respect thereof granted to such Lender hereunder unless otherwise expressly provided by such Lender in connection with such assignment or transfer.

Section 7.    **Subordination and Offset**.    Guarantor hereby subordinates and makes inferior to the Guaranteed Obligations any and all indebtedness now or at any time hereafter owed by Borrower or any of the other Loan Parties. If Guarantor receives any such payment without the prior written consent of Lender, the amount so paid shall be held in trust for the benefit of Lender, shall be segregated from the other funds of Guarantor, and shall forthwith be paid over to Agent to be held by Agent as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portions of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect. Guarantor hereby grants to Agent and Lender a right of offset to secure the payment of the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder, which right of offset shall be upon any and all monies, securities and other property (and the proceeds therefrom) of Guarantor now or hereafter held or received by or in transit to Agent or Lender from or for the account of Guarantor, whether for safekeeping, custody, pledge, transmission, collection or otherwise. Upon the occurrence of any Default, the Agent and the Lender are hereby authorized at any time and from time to time, without notice to Guarantor, to offset, appropriate and apply any and all items hereinabove referred to against the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder irrespective of whether or not Agent or Lender shall have made any demand under this Guaranty and although such obligations and liabilities may be contingent or unmatured. The rights of Agent and Lender under this Section are in addition to, and shall not be limited by, any other rights and remedies (including other rights of offset) which Agent or Lender may have.

Section 8.    **Representations and Warranties**.    Guarantor hereby represents and warrants to Lender as follows:

(a)    The recitals at the beginning of this Guaranty are true and correct in all respects.

(b)    Guarantor has the requisite power, competence and authority to execute, deliver and perform this Guaranty, each other writing executed or delivered in connection with this Guaranty and each amendment or supplement to any of the foregoing to which Guarantor is a party, and to perform and consummate the transactions contemplated hereby and thereby.

(c)    The execution, delivery and performance by Guarantor of this Guaranty do not and will not contravene any law or governmental regulation or any contractual restriction binding on or affecting Guarantor or any of Guarantor's properties, and do not and will not result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of Guarantor's properties.

(d)    This Guaranty is, and each other agreement or instrument of Guarantor contemplated hereby will be, a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its respective terms, except as limited by bankruptcy, insolvency or similar laws of general application relating to the enforcement of creditors' rights.

(e)     There is no action, suit or proceeding pending or, to the knowledge of Guarantor, threatened against or otherwise affecting Guarantor before any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality which may materially and adversely affect Guarantor's financial condition or its ability to perform its obligations hereunder.

(f)     Guarantor is not "insolvent" on the date hereof (that is, the sum of Guarantor's absolute and contingent liabilities, including the Guaranteed Obligations, does not exceed the fair market value of Guarantor's assets). Guarantor has not incurred (whether hereby or otherwise), nor does Guarantor intend to incur or believe that Guarantor will incur, debts which will be beyond Guarantor's ability to pay as such debts mature.

Section 9.     **No Oral Change**. No amendment of any provision of this Guaranty shall be effective unless it is in writing and signed by Guarantor and Agent on behalf of the Lender, and no waiver of any provision of this Guaranty, and no consent to any departure by Guarantor therefrom, shall be effective unless it is in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 10.     **Prohibition on Asset Transfers**. Until the Obligations are indefeasibly paid in full, Guarantor agrees that he shall not transfer any material assets to any Person.

Section 11.     **Invalidity of Particular Provisions**. If any term or provision of this Guaranty shall be determined to be illegal or unenforceable all other terms and provisions hereof shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable law.

Section 12.     **Headings and References**. The headings used herein are for purposes of convenience only and shall not be used in construing the provisions hereof. The words "this Guaranty," "this instrument," "herein," "hereof," "hereby" and words of similar import refer to this Guaranty as a whole and not to any particular subdivision unless expressly so limited. The phrases "this section" and "this subsection" and similar phrases refer only to the subdivisions hereof in which such phrases occur. The word "or" is not exclusive, and the word "including" (in its various forms) means "including without limitation". Pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

Section 13.     **Term**. This Guaranty shall be irrevocable until all of the Guaranteed Obligations have been completely and finally paid and performed. Lender has no obligation to make any loans or other advances to Borrower, all obligations and undertakings of Borrower under, by reason of, or pursuant to the Obligation Documents have been completely performed, and this Guaranty is thereafter subject to reinstatement as provided in Section 3(d). All extensions of credit and financial accommodations heretofore or hereafter made by Lender to Borrower shall be conclusively presumed to have been made in acceptance hereof and in reliance hereon.

Section 14. **Notices**. Any notice or communication required or permitted hereunder shall be given as provided in the Security Agreement, except that all notices to Guarantor shall be addressed as follows:

Michael Pisani
44 Lake road
Short Hills, NJ 07078

Section 15. **Limitation on Interest**. Lender and Guarantor intend to contract in strict compliance with applicable usury law from time to time in effect, and the provisions of the Financing Agreement limiting the interest for which Guarantor is obligated are expressly incorporated herein by reference.

Section 16. **Counterparts; Fax**. This Guaranty may be executed in any number of counterparts, each of which when so executed shall be deemed to constitute one and the same Guaranty. This Guaranty may be validly executed and delivered by facsimile or other electronic transmission.

SECTION 17. **Governing Law**. **THIS GUARANTY SHALL BE DEEMED A CONTRACT AND INSTRUMENT MADE UNDER THE LAWS OF THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE LAWS OF THE UNITED STATES OF AMERICA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. THE GUARANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS SITTING IN THE STATE OF NEW YORK AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT OR THE GUARANTEED OBLIGATIONS BY ANY MEANS ALLOWED UNDER NEW YORK OR FEDERAL LAW.**

SECTION 18. **Final Agreement**. **THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES HERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES HERETO.**

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be executed as of the date first above written.

GUARANTOR:

B. Michael Pisa

SSN: 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

*Individual Guarantee Signature Page*

**ACCEPTED AND AGREED:**

AGENT                                    BC MEDIA FUNDING COMPANY II, LLC

                                         By: _____
                                         Name: Jacob Barker
                                         Title: Managing Member


LENDER:                                  MEDIA FUNDING COMPANY, LLC

                                         By: _____
                                         Name: Jacob Barker
                                         Title: President

# Exhibit G

## FORBEARANCE AGREEMENT

This Forbearance Agreement (this *"Agreement"*) is dated as of December 28, 2007 and is entered into by and among BusinessTalkradio.net, Inc., a Delaware corporation (the *"Borrower"*), and The Greenwich Broadcasting Corporation, a Connecticut corporation (*"Greenwich"*), The Lifestyle TalkRadio Network, Inc., a Delaware corporation (*"Lifestyle"*), BTR West, Inc., a Nevada corporation (*"BTR West"*), BTR Communications Boston, Inc., a Massachusetts corporation (*"BTR Boston"*), BTR Greenwich, Inc., a Connecticut corporation (*"BTR Connecticut"*), BTR West II, Inc., a Nevada corporation (*"Nevada II"*), BTR Communications Boston II, Inc., a Massachusetts corporation (*"Boston II"*), WURP East, Inc., a Pennsylvania corporation (*"Pittsburgh East"*), WURP, Inc., a Pennsylvania corporation (*"Pittsburgh"*), and together with Greenwich, Lifestyle, BTR West, BTR Boston, BTR Connecticut, Nevada II, and Pittsburgh East, the *"Subsidiary Guarantors"*), Media Funding Company, LLC, a Delaware limited liability company (the *"Lender"*), and BC Media Funding Company II, LLC, a Delaware limited liability company, as agent for the Lender (in such capacity, the *"Agent"*).

## RECITALS:

WHEREAS, Agent, Lender and Borrower are parties to that certain Financing Agreement dated as of November 13, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*);

WHEREAS, Events of Default have occurred under subsection 8.01(c) of the Credit Agreement in that the Borrower failed to achieve (i) a minimum fixed charge coverage ratio of at least 1.0 to 1.0 in accordance with the requirements of Section 6.03(b) of the Credit Agreement for the 12-month periods ending on January through September 2007; (ii) Consolidated EBITDA in accordance with the requirements of Section 6.03(c) of the Credit Agreement for the quarters ending March 31, 2007, June 30, 2007, and September 30, 2007; and (iii) Net Cash Revenue in accordance with the requirements of Section 6.03(d) of the Credit Agreement for the quarters ending March 31, 2007, June 30, 2007, and September 30, 2007 (such Events of Default, the *"Existing Defaults"*); and

WHEREAS, Agent and Lender are willing to forbear from enforcing their rights that arise because of the Existing Defaults for a limited period of time, provided that Borrower complies with the terms of this Agreement.

1

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I. DEFINITIONS

**Section 1.01** All capitalized terms used herein (including in the introductory paragraph and recitals set forth above) and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

**Section 1.02** The following terms used in this Agreement shall have the meanings set forth below:

"*Bridge Financing*" means that certain financing to be entered into by the Borrower and prospective investors in a principal amount of at least $600,000, to be utilized by the borrower to fund development of the Borrower's website, pay for certain accounting-related services and for certain other working capital purposes, which financing, in all respects, shall be subordinate to the Obligations under the Credit Agreement.

"*Forbearance Default*" means (a) the occurrence of any Default or Event of Default other than the Existing Defaults; (b) the failure of Borrowers to comply with any term, condition or covenant set forth in this Agreement, (c) any representation made by Borrowers under or in connection with this Agreement shall prove to be materially false or misleading as of the date when made or (d) the filing of any petition (voluntary or involuntary) under the insolvency or bankruptcy laws of the United States or any state thereof, or of any foreign jurisdiction, with respect to a Borrower, any of its affiliates, or any of its Subsidiaries.

"*Termination Date*" means the earlier to occur of (a) 5:00 p.m. New York time on March 31, 2008, or (b) the date upon which a Forbearance Default occurs.

## ARTICLE II.    CONFIRMATION BY BORROWERS OF OBLIGATIONS

Each Borrower acknowledges and agrees that as of the date hereof, the Borrowers have no right of offset, defense, or counterclaim with respect to the Obligations.

## ARTICLE III.    AGREEMENT TO FORBEAR; SUBORDINATION AGREEMENT; OTHER AGREEMENTS

**Section 3.01** Provided that no Forbearance Default occurs, Agent and **Lender** hereby agree to refrain, through the Termination Date, from exercising any of their rights and remedies under the Credit Agreement or any of the other Loan Documents that may exist by virtue of the Existing Defaults. If Borrowers comply with

2

all terms, covenants and conditions set forth in this Agreement, the Agent and Lender agree that the Existing Defaults shall be deemed waived.

**Section 3.02**    Nothing in this Agreement shall be construed as a waiver of or acquiescence to the Existing Defaults which shall continue in existence, subject only to the agreement of Agent and Lender, as set forth herein, not to enforce their remedies for a limited period of time. Nor shall anything in this Agreement be construed as the Agent's or the Lender's consent to the Bridge Financing, which shall be subject, in all respects, to the approval of the Agent and the Lender in their sole and absolute discretion. Except as expressly provided herein, the execution and delivery of this Agreement shall not: (a) constitute an extension, modification, or waiver of any aspect of the Credit Agreement or the other Loan Documents; (b) extend the terms of the Credit Agreement or the due date of any of the Obligations; (c) give rise to any obligation on the part of Agent or any Lender to extend, modify or waive any term or condition of the Credit Agreement or any of the other Loan Documents; (d) give rise to any defenses or counterclaims to the right of Agent or Lender to compel payment of the Obligations or to otherwise enforce their rights and remedies under the Credit Agreement and the other Loan Documents; or (e) establish a custom or course of dealing between or among the Borrowers, the Agent and/or the Lender, or any of them. Except as expressly limited herein, Agent and Lender hereby expressly reserve all of their rights and remedies under the Credit Agreement and the other Loan Documents and under applicable law with respect to the Existing Defaults. From and after the Termination Date, Agent and Lender shall be entitled to enforce the Credit Agreement and other Loan Documents according to the original terms thereof.

**Section 3.03**    Provided that no Forbearance Default occurs, the parties hereto hereby agree that Borrower shall not be required to make the principal amortization payment of $75,000 required on December 31, 2007, and the principal amortization payment of $3,000 required on February 28, 2008.

**Section 3.04**    The parties hereto hereby agree that, effective as of and retroactive to December 1, 2007, the Payment-in-Kind Interest Rate shall be increased by 300 basis points so that the Payment-in-Kind Interest Rate is 4.50% per annum.

**ARTICLE IV.    REPRESENTATIONS AND WARRANTIES**

In consideration of the limited agreement of Agent and Lender to forbear from the exercise of their rights and remedies as set forth above, each Loan Party jointly and severally hereby represents and warrants to Agent and Lender as of the date hereof as follows:

**Section 4.01**    Borrowers has made full disclosure to Agent and Lender of all Existing Defaults and Events of Default and all other disclosures as is required under subsection 6.01(a)(ix) of the Credit Agreement.

3

**Section 4.02**    The execution, delivery and performance of this Agreement by each Loan Party are within such Person's corporate power and have been duly authorized by all necessary corporate action.

**Section 4.03**    This Agreement constitutes a valid and legally binding Agreement enforceable against each Loan Party in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights generally and to general equitable principals.

**Section 4.04**    All Loan Documents, including without limitation the Credit Agreement, constitute valid and legally binding obligations of each Loan Party thereto, enforceable against such Loan Party in accordance with the terms thereof subject to the effects of bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights generally and to general equitable principals.

## ARTICLE V.        COVENANTS

In order to induce Agent and Lender to forbear from the exercise of their rights and remedies as set forth above, each Loan Party hereby covenants and agrees with Agent and Lender as follows:

**Section 5.01**    Borrower shall consummate the Bridge Financing and receive immediate access to the cash proceeds therefrom no later than January 31, 2008.

**Section 5.02**    Borrower shall, and shall cause its Subsidiaries to, continue to perform and observe all terms and conditions contained in the Credit Agreement and other Loan Documents.

**Section 5.03**    Borrower shall reimburse Agent and Lender for all costs and expenses incurred in connection with the enforcement of this Agreement (including, without limitation, reasonable attorneys' fees and legal expenses, which may consist of fees and legal expenses of outside counsel retained by Agent or any Lender or the allocated costs of in-house counsel of Agent or any Lender).

**Section 5.04**    Borrower shall fully and publicly disclose the existence of this agreement and a summary of its terms and conditions in compliance with all applicable securities laws.

## ARTICLE VI.        GENERAL RELEASE

In consideration of, among other things, the forbearance provided for herein, and any other financial accommodations which Agent and/or Lender elects to extend to Borrower, each Loan Party forever waives, releases and discharges any and all claims (including, without limitation, cross-claims, counterclaims, rights of setoff and

<div align="center">4</div>

recoupment), causes of action, demands, suits, costs, expenses and damages that it now has or hereafter may have, of whatsoever nature and kind, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity that arise under or relate to any of the Loan Documents or this Agreement or any Person's rights or obligations thereunder (collectively, *"Claims"*), against Agent or Lender, any of such Person's Subsidiaries and affiliates, and its and their respective successors, assigns, officers, directors, employees, agents, attorneys and other representatives (collectively, the *"Lender Releasees"*), based in whole or in part on facts, whether or not known, existing on or prior to the date of this Agreement. The provisions of this section shall survive the termination of the Credit Agreement and payment in full of the Obligations.

## ARTICLE VII.    MISCELLANEOUS

**Section 7.01        Headings.** Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 7.02        Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES.

**Section 7.03        Counterparts.** This Agreement may be executed in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

**Section 7.04        Continued Effectiveness.** Except as expressly set forth in this Agreement, the terms of the Credit Agreement and each of the other Loan Documents remain unchanged, and all such Loan Documents shall remain in full force and effect and are hereby confirmed and ratified.

**Section 7.05        No Novation.** This Agreement shall not be deemed or construed to be a satisfaction, reinstatement, novation or release of the Credit Agreement or of any of the other Loan Documents or, except as expressly provided herein, a waiver by Agent or any Lender of any of its rights and remedies under the Credit Agreement or any of the other Loan Documents, or any of them, or at law or in equity.

**Section 7.06        Reaffirmation.** Each Loan Party signatory hereto hereby reaffirms each and every covenant, condition, obligation and provision set forth in the Loan Documents, as modified hereby.

**Section 7.07        Construction.** Each Loan Party signatory hereto acknowledges that it has been represented by its own legal counsel in connection its execution of this Agreement and the Loan Documents, that it has exercised independent

5

judgment with respect to this Agreement and the Loan Documents, and that it has not relied on Agent or any Lender or on Agent's or any Lender's counsel for any advice with respect to this Agreement or the Loan Documents. If any provision of this Agreement is found to be unenforceable, such provision shall be limited or deleted to the minimum extent necessary so that the remaining terms remain in full force and effect.

**Section 7.08    Integration; Waivers.**    This Agreement, the Loan Documents and the other written agreements, instruments and documents entered into in connection therewith (collectively, the *"Borrower/Lender Documents"*) set forth in full the terms of agreement between the parties with respect to the subject matter thereof and are intended as the full, complete and exclusive contract governing the relationship between the parties with respect thereto, superseding all other discussions, promises, representations, warranties, agreements and understandings between the parties with respect thereto. Any waiver of any condition in, or breach of, any of the foregoing in a particular instance shall not operate as a waiver of other or subsequent conditions or breaches of the same or a different kind. Agent's and each Lender's exercise or failure to exercise any rights under any of the foregoing in a particular instance shall not operate as a waiver of its right to exercise the same or different rights in other instances. Except as expressly provided to the contrary in this Agreement, all the terms, conditions and provisions of the Borrower/Lender Documents shall continue in full force and effect.

**Section 7.09    Consent to Jurisdiction.**    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH CREDIT PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.    EACH CREDIT PARTY HEREBY IRREVOCABLY APPOINTS THE SECRETARY OF STATE OF THE STATE OF NEW YORK AS ITS AGENT FOR SERVICE OF PROCESS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING AND FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 10.01 [NOTICES, ETC.] AND TO THE SECRETARY OF STATE OF THE STATE OF NEW YORK, SUCH SERVICE TO BECOME EFFECTIVE TEN (10) DAYS AFTER SUCH MAILING. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENT AND THE LENDER TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH CREDIT PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN

ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY CREDIT PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH CREDIT PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

**Section 7.10      Waiver of Jury Trial.**  EACH CREDIT PARTY, THE AGENT AND THE LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH CREDIT PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF THE AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH CREDIT PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENT AND THE LENDER ENTERING INTO THIS AGREEMENT.

**Section 7.11      Reaffirmation.**  Each Loan Party has executed and delivered one or more of the Loan Documents as debtor, grantor, pledgor, guarantor, assignor, or in other similar capacities in which such Person has granted liens or security interests in their respective properties or otherwise acted as an accommodation party or guarantor, as the case may be. Each Loan Party hereby ratifies and reaffirms all of its respective payment and performance obligations, contingent or otherwise, under the Loan Documents to which it is a party and, to the extent any such Person has granted liens on or security interests in any of their respective properties pursuant to any of the Loan Documents as security for or otherwise guaranteed the Obligations under or with respect to the Agreement or any other Loan Documents, hereby ratifies and reaffirms such payment and performance obligations, guarantee and grant of security interests and liens and confirms and agrees that such security interests and liens hereafter secure all of the Obligations. Each Loan Party agrees that each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed, and agrees that this Agreement shall not (a) operate as a waiver of any right, power or remedy of Agent or Lender under the Loan Documents or (b) constitute a waiver of any provision of any of the Loan Documents or serve to effect a novation of the Obligations.

7

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above, by their respective duly authorized officers.

BORROWER:

BUSINESSTALKRADIO.NET, INC.

By: _____
Name: Michael L. Metter
Title: President

SUBSIDIARIES:

BTR WEST, INC.

By: _____
Name: Michael L. Metter
Title: President

THE LIFESTYLE TALKRADIO NETWORK, INC.

By: _____
Name: Michael L. Metter
Title: President

THE GREENWICH BROADCASTING
CORPORATION

By: _____
Name: Michael L. Metter
Title: President

BTR COMMUNICATIONS BOSTON, INC.

By: _____
Name: Michael L. Metter
Title: President

BTR GREENWICH INC.

By: _____
Name: Michael L. Metter
Title: President

BTR WEST II, INC.

By: _Michael_

Name: _Michael L. Metter_

Title: _President_

BTR COMMUNICATIONS BOSTON II, INC.

By: _Michael_

Name: _Michael L. Metter_

Title: _President_

WURP, INC.

By: _Michael_

Name: _Michael L. Metter_

Title: _President_

WURP EAST, INC.

By: _Michael_

Name: _Michael L. Metter_

Title: _President_

AGENT:

BC MEDIA FUNDING COMPANY II, LLC

By: _____

    Jacob Barker, Manager

LENDER:

MEDIA FUNDING COMPANY, LLC

By: _____

Name: _____

Title: _____

SIGNATURE PAGE TO FORBEARANCE AGREEMENT

BTR WEST II, INC.

By:_____
Name:_____
Title:_____

BTR COMMUNICATIONS BOSTON II, INC.

By:_____
Name:_____
Title:_____

WURP, INC.

By:_____
Name:_____
Title:_____

WURP EAST, INC.

By:_____
Name:_____
Title:_____

AGENT:

BC MEDIA FUNDING COMPANY II, LLC

By: _____
Jacob Barker, Manager

LENDER:

MEDIA FUNDING COMPANY, LLC

By: _____
Name: _Jacob J. Barker_
Title: _Manager_

SIGNATURE PAGE TO FORBEARANCE AGREEMENT

# Exhibit H



**Barker Capital SD, LLC**
401 E. 8th Street
Suite 220B
Sioux Falls, SD 57103

**Phone:** 605.338.9609
**Fax:** 605.338.5266

# Fax

| To: | Michael Metter / William P. Oberdorf, Esq. | From: | Timothy P. Olson |
|---|---|---|---|
| Fax: | (203) 323-7302 / (973) 491-3555 | Pages: | 3 (including cover) |
| Phone: | | Date: | 2/6/2008 |
| Re: | | CC: | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle



BARKER CAPITAL, LLC
401 E. 8th Street
Suite 220B
Sioux Falls, SD 57103

February 6, 2008

VIA FACSIMILE

BusinessTalkradio.net, Inc.
401 Shippan Avenue
Stamford, CT 06902
Attention: Mr. Michael L. Metter

> Re:  *Financing Agreement (the "Financing Agreement") dated as of November 13, 2006, by and among BusinessTalkradio.net, Inc. ("Borrower"), Media Funding Company, LLC ("Lender") and BC Media Funding Company II, LLC ("Agent") and the Forbearance Agreement (the "Forbearance Agreement") dated as of December 28, 2007, by and among Borrower, Lender, Agent and the other parties thereto*

Dear Mr. Metter:

As of January 31, 2008, the Borrower failed to consummate the Bridge Financing at the level required by the Forbearance Agreement. Such failure constitutes a Forbearance Default under the Forbearance Agreement. In light of such Forbearance Default:

- (i)    The Termination Date under the Forbearance Agreement occurred on January 31, 2008;
- (ii)   The Lenders will not waive the Existing Defaults;
- (iii)  The Borrower shall be required to make the principal amortization payment of $75,000 which was scheduled for December 31, 2007, and the principal amortization payment of $3,000 which is scheduled for February 28, 2008; and
- (iv)   Effective as of February 1, 2008, the Borrower shall be required to pay interest on all Obligations at the Default Rate in accordance with Section 2.04(b) of the Financing Agreement.

The Lender has not waived any of its rights or any of the Borrower's Obligations under the Financing Agreement or the Forbearance Agreement, and the Lender expressly reserves any such rights. This letter shall not be deemed to be a waiver of any provision of or any Event of Default under the Financing Agreement or the Forbearance Agreement. Capitalized terms used herein and not otherwise defined shall have their

BusinessTalkradio.net, Inc.
February 6, 2008
Page 2

respective meanings set forth in the Financing Agreement or the Forbearance
Agreement.

Very truly yours,

BC MEDIA FUNDING COMPANY II, LLC

By: _____

Timothy P. Olson, Authorized Representative

cc:    (via facsimile)
       William P. Oberdorf, Esq.
       Seiden Wayne LLC
       Two Penn Plaza East, 10th Floor
       Newark, NJ 07105

Message Confirmation Report

FEB-06-2008 04:25 PM WED

Fax Number  :  6053385266
Name        :  BARKER CAPITAL SD

Name/Number   :  12033237302
Page          :  3
Start Time    :  FEB-06-2008 04:24PM WED
Elapsed Time  :  00'42"
Mode          :  STD ECM
Results       :     [O.K]



Barker Capital SD, LLC
401 E. 8ᵗʰ Street
Suite 220B
Sioux Falls, SD 57103

Phone: 605.338.9609
Fax: 605.338.5266

# Fax

| To: | Michael Metter / William P. Oberdorf, Esq. | From: | Timothy P. Olson |
|---|---|---|---|
| Fax: | (203) 323-7302 / (973) 491-3555 | Pages: | 3 (including cover) |
| Phone: | | Date: | 2/6/2008 |
| Re: | | CC: | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Message Confirmation Report

FEB-06-2008 04:26 PM WED

Fax Number   :   6053385266
Name         :   BARKER CAPITAL SD

Name/Number    :   19734913555
Page           :   3
Start Time     :   FEB-06-2008 04:25PM WED
Elapsed Time   :   00′22″
Mode           :   STD ECM
Results        :   [O. K]



Barker Capital SD, LLC
401 E. 8th Street
Suite 220B
Sioux Falls, SD 57103

Phone: 605.338.9609
Fax: 605.338.5266

# Fax

| To: | Michael Metter / William F. Oberdorf, Esq. | From: | Timothy P. Olson |
|-----|--------------------------------------------|-------|------------------|
| Fax: | (203) 323-7302 / (973) 491-3555 | Pages: | 3 (including cover) |
| Phone: | | Date: | 2/6/2008 |
| Re: | | CC: | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

# Exhibit I

BARKER CAPITAL, LLC
401 E. 8th Street
Suite 220B
Sioux Falls, SD 57103

April 24, 2008

VIA FIRST CLASS MAIL

Frank Lazauskas
1490 Dayton Avenue
Greenwich, CT 06830

Michael L. Metter
One Tinker Lane
Greenwich, CT 06830

Leonard F. Moscati
41 Richmond Hill Road
Greenwich, CT 06831

B. Michael Pisani
44 Lake road
Short Hills, NJ 07078

> *Re:*    *Financing Agreement (the "Financing Agreement") dated as of November 13, 2006, by and among BusinessTalkradio.net, Inc. ("Borrower"), Media Funding Company, LLC ("Lender") and BC Media Funding Company II, LLC ("Agent")*

Gentlemen:

We are writing to inform you, as personal guarantors of the Obligations of the Borrower under the Financing Agreement, that the Borrower repeatedly has failed to satisfy its covenants under the Financing Agreement. Among others, these covenant failures relate to the Borrower's operating performance, financial commitments and reporting obligations.

The Lender and Agent currently are in the process of evaluating all available alternatives to enforce their rights under the Financing Agreement, including, without limitation, immediately accelerating all Obligations under the Financing Agreement and proceeding against the Collateral and, to the extent necessary, enforcing the personal guarantees, subsidiary guarantees, cooperation guaranty and spousal consents. The Borrower's payment in full of all Obligations outstanding under the Financing Agreement will bring such process to a close.

Frank Lazauskas
Michael L. Metter
Leonard F. Moscati
B. Michael Pisani
April 24, 2008
Page 2

     The Lender and Agent have not waived any of their rights or any of the Borrower's Obligations under the Financing Agreement, and expressly reserve any such rights. This letter shall not be deemed to be a waiver of any provision of or any Event of Default under the Financing Agreement. Capitalized terms used herein and not otherwise defined shall have their respective meanings set forth in the Financing Agreement.

               Very truly yours,

               BC MEDIA FUNDING COMPANY II, LLC

By: _____
               Timothy P. Olson, Authorized Representative

# Exhibit J





# FAX COVER SHEET

Please
Deliver To: _Dale Norton_          Fax Number: _605-338-5266_

From: _Tom Ness_          Fax Number: (203) 323-7302

Date: _5/6/28_          Time: _11:59 am_

Number of pages (including this page): _5_

Comments:

_March Signature_

P O Box 4826 * Greenwich, CT 06831 * (203) 323-7300 * Fax: (203) 323-7302
www.businesstalkradio.net
www.lifestyletalkradio.com

### Certificate Required by Section 6.01(a)(iv) of the Financing Agreement, Dated as of November 13, 2006, by and among BusinessTalkradio.net, Inc., as Borrower, Media Funding Company, LLC, as Lender, and BC Media Funding Company II, LLC, as Agent[1]

#### Officer Certification – Quarter Ending March 31, 2008

_____, 2008

I, Michael L. Metter, certify that the attached financial statements of BusinessTalkradio.net, Inc., present fairly, in all respects, the financial position, results of operations, retained earnings and cash flows of BusinessTalkradio.net, Inc., for the quarter ending March 31, 2008, in accordance with GAAP applied in a manner consistent with that of the most recent financial statements furnished to the Agent and Lender, subject to normal year-end adjustments. I have reviewed the provisions of the Financing Agreement and the other Loan Documents and have made or caused to be made under my supervision a review of such financial statements with a view to determining whether the Borrower was in material compliance with all of the provisions of the Financing Agreement and the other Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and I have no knowledge of the existence of an Event of Default or Default, except that:

- Consolidated Net Revenue for the Borrower is $788,165 for the quarter ending March 31, 2008. The required net revenue under the Financing Agreement is $788,165;
- Consolidated EBITDA for the Borrower is ($46,208) for the quarter ending March 31, 2008. The required EBITDA under the Financing Agreement is $132,639;
- The Fixed Charge Coverage Ratio for the twelve-month period ending March 31, 2008 was (0.01). The required fixed charge coverage ratio under the Financing Agreement is a minimum of 1.0;
- A written subordination or waiver and a written access agreement have not been timely delivered with respect to KNUU-(AM), the Las Vegas station, in accordance with the requirements of Sections 6.01(m)(i) and (ii), respectively, of the Financing Agreement;
- The Borrower has issued an aggregate of 7,678,335 shares of its Common Stock to the Persons set forth in Exhibit A attached hereto; and

---

[1] Such agreement is hereinafter referred to as the "Financing Agreement". Capitalized terms used but not otherwise defined in this certificate shall have the meanings given such terms in such Financing Agreement.

I also certify that during the above mentioned period, no proceeds of the Term Loan have been used by or for the benefit of Lifestyle. See the attached schedule showing the calculations of the financial covenants as specified in Section 6.03 of the loan agreement.

Signed

05/06/2008  11:01    2033237302                BUSINESSTALKRADIO.NET                PAGE  04

**Certificate Required by Section 6.01(a)(iv) of the Financing Agreement,
Dated as of November 13, 2006, by and among BusinessTalkradio.net,
Inc., as Borrower, Media Funding Company, LLC, as Lender, and
BC Media Funding Company II, LLC, as Agent[1]**

**Officer Certification – Month Ending March 31, 2008**

_____, 2008

I, Michael L. Metter, certify that the attached financial statements of
BusinessTalkradio.net, Inc. (the "Borrower"), present fairly, in all material respects, the
financial position, results of operations, retained earnings and cash flows of the Borrower
for the month ended March 31, 2008, in accordance with GAAP applied in a manner
consistent with that of the most recent financial statements furnished to the Agent and
Lender, subject to normal year-end adjustments. I have reviewed the provisions of the
Financing Agreement and the other Loan Documents and have made or caused to be
made under my supervision a review of such financial statements with a view to
determining whether the Borrower was in material compliance with all of the provisions
of the Financing Agreement and the other Loan Documents at the times such compliance
is required hereby and thereby, and that such review has not disclosed, and I have no
knowledge of the existence of an Event of Default or Default, except that:

- The Fixed Charge Coverage Ratio for the Borrower for the twelve-month period
  ending March 31, 2008 was (0.01). The required fixed charge coverage ratio
  under the Financing Agreement is a minimum of 1.0;
- A written subordination or waiver and a written access agreement have not been
  timely delivered with respect to KNUU-(AM), the Las Vegas station, in
  accordance with the requirements of Sections 6.01(m)(i) and (ii), respectively, of
  the Financing Agreement;
- The Borrower has issued an aggregate of 7,678,335 shares of its Common Stock
  to the Persons set forth in Exhibit A attached hereto.

---

[1] Such agreement is hereinafter referred to as the "Financing Agreement". Capitalized terms used but not
otherwise defined in this certificate shall have the meanings given such terms in such Financing
Agreement.

93CZ91-2

I also certify that during the above mentioned period, no proceeds of the Term Loan have been used by or for the benefit of Lifestyle.  See the attached schedule showing the calculations of the financial covenants as specified in Section 6.03 of the loan agreement.

Signed

# Exhibit K





# FAX COVER SHEET

Please
Deliver To: _Dale Norton_          Fax Number: _605-338-5266_

From: _Tom Ness_                   Fax Number: (203) 323-7302

Date: _5/14/08_                    Time: _4:45pm_

Number of pages (including this page): _8_

Comments:

_April Cort, Liston_

P.O. Box 4826 * Greenwich, CT 06831 * (203) 323-7300 * Fax: (203) 323-7302
www.businesstalkradio.net
www.lifestyletalkradio.com

05/14/2008  15:43    2033237302                 BUSINESSTALKRADIONET                    PAGE  02

**Certificate Required by Section 6.01(a)(iv) of the Financing Agreement,
Dated as of November 13, 2006, by and among BusinessTalkradio.net,
Inc., as Borrower, Media Funding Company, LLC, as Lender, and
BC Media Funding Company II, LLC, as Agent[1]**

### Officer Certification – Month Ending April 30, 2008

### May 14, 2008

I, Michael L. Metter, certify that the attached financial statements of BusinessTalkradio.net, Inc. (the "Borrower"), present fairly, in all material respects, the financial position, results of operations, retained earnings and cash flows of the Borrower for the month ended April 30, 2008, in accordance with GAAP applied in a manner consistent with that of the most recent financial statements furnished to the Agent and Lender, subject to normal year-end adjustments. I have reviewed the provisions of the Financing Agreement and the other Loan Documents and have made or caused to be made under my supervision a review of such financial statements with a view to determining whether the Borrower was in material compliance with all of the provisions of the Financing Agreement and the other Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and I have no knowledge of the existence of an Event of Default or Default, except that:

- The Fixed Charge Coverage Ratio for the Borrower for the twelve-month period ending April 30, 2008 was (0.03). The required fixed charge coverage ratio under the Financing Agreement is a minimum of 1.0;
- A written subordination or waiver and a written access agreement have not been timely delivered with respect to KNUU-(AM), the Las Vegas station, in accordance with the requirements of Sections 6.01(m)(i) and (ii), respectively, of the Financing Agreement;
- The Borrower has issued an aggregate of 8,145,002 shares of its Common Stock to the Persons set forth in Exhibit A attached hereto.

---

[1] Such agreement is hereinafter referred to as the "Financing Agreement". Capitalized terms used but not otherwise defined in this certificate shall have the meanings given such terms in such Financing Agreement.

930291-2

05/14/2008  15:43     2033237302              BUSINESSTALKRADIONET              PAGE  03

I also certify that during the above-mentioned period, no proceeds of the Term Loan have been used by or for the benefit of Lifestyle.  See the attached schedule showing the calculations of the financial covenants as specified in Section 6.03 of the Financing Agreement.

Signed

Exhibit A
to Officer's Certificate

Recipients of Shares of Common Stock
Between November 14, 2006 and April 30, 2008

EQUITY OFFERING 11/14/06-04/30/08

price per share                              $0.30

| NAME | SHARES | PRICE |
|------|--------|-------|
| Robert Lanava | 10.000 | $ 3,000 |
| Michael L. Metter | 166,667 | 50,000 |
| B. Michael Pisani | 166,667 | 50,000 |
| Philip Casesa | 86,667 | 26,000 |
| Stuart Werner | 100,000 | 30,000 |
| Leonard Moscati | 333,333 | 100,000 |
| Doug Prescott | 83,333 | 25,000 |
| FJL Enterprises, Inc. | 166,667 | 50,000 |
| USA Fund, LLP | 166,667 | 50,000 |
| Kellogg Capital Group, LLC | 166,667 | 50,000 |
| Doug Prescott | 83,333 | 25,000 |
| Dr. Jerome Brodlie | 166,667 | 50,000 |
| Larry Blau | 166,667 | 50,000 |
| Paul Papi | 83,333 | 25,000 |
| Kingsley Wood | 166,667 | 50,000 |
| Nicholas Sitnycky | 100,000 | 30,000 |
| Myron Weiner | 40,000 | 12,000 |
| William Ritger | 100,000 | 30,000 |
| Michael Metter | 140,000 | 42,000 |
| TNJ Enterprises, Inc. | 116,667 | 35,000 |
| B. Michael Pisani | 133,333 | 40,000 |
| Leonard Moscati | 166,667 | 50,000 |
| David Berley | 1,000,000 | 300,000 |
| Marc Berley | 16,667 | 5,000 |
| TNJ Enterprises, Inc. | 83,333 | 25,000 |
| B. Michael Pisani | 100,000 | 30,000 |
| TNJ Enterprises, Inc. | 100,000 | 30,000 |
| Leonard Moscati | 100,000 | 30,000 |
| TNJ Enterprises, Inc. | 100,000 | 30,000 |
| B. Michael Pisani | 100,000 | 30,000 |
| TNJ Enterprises, Inc. | 100,000 | 30,000 |

Total – continued on next page            4.610.002

930291-2

Exhibit A
to Officer's Certificate

| | | |
|---|---|---|
| Total from prior page | 4,610,002 | |
| Employee grants for 2006, excl. Servino | 67,500 | n/a |
| DW Stephan, trustee (1st installment for Programming to LTRN) | 100,000 | n/a |
| Charles Lanktree (for consulting services) | 50,000 | n/a |
| DW Stephan, trustee (2nd installment for Programming to LTRN) | 100,000 | n/a |
| Employee, Director, and Consulting Grants for 2007 | 417,500 | |
| USA Fund, LLP | 333,333 | 100,000 |
| Leonard Moscati | 166,667 | 50,000 |
| B. Michael Pisani | 333,333 | 100,000 |
| TNJ Enterprises, Inc. | 166,667 | 50,000 |
| Michael L. Metter | 333,333 | 100,000 |
| Network One | 666,667 | 200,000 |
| IDT | 333,333 | 100,000 |
| Charles Lanktree | 466,667 | 140,000 |
| | | |
| Shares issued between 11/14/06-04/30/08 | 8,145,002 | |

930291-2

05/14/2008  15:43    2033237302          BUSINESSTALKRADIONET          PAGE  06

Exhibit B
to Officer's Certificate

### LMAs

Borrower entered into a Time Brokerage Agreement dated as of December 19, 2006 with Jarad Broadcasting Company of Westhampton, Inc. in connection with the agreement between such parties for the proposed acquisition of substantially all the assets of WBON-FM (now WBZB-FM). This agreement ended without acquisition on August 31, 2007.

Borrower entered into a Time Brokerage Agreement dated as of December 19, 2006 with Jarad Broadcasting Company of Hampton Bays, Inc. in connection with the agreement between such parties for the proposed acquisition of substantially all the assets of WLIR-FM. This agreement ended without acquisition on August 31, 2007.

Borrower entered into a Local Marketing Agreement date as of March 15, 2007 with Urban Radio of Pennsylvania, LLC in connection with the agreement between such parties for the proposed acquisition of substantially all the assets of WURP-AM. ("Acquisition"). The Local Marketing Agreement automatically terminated, effective August 29, 2007, when the Acquisition was consummated.

930291-2                                    2

### Certificate Required by Section 6.01(a)(v) of the Financing Agreement, Dated as of November 13, 2006, by and among BusinessTalkradio.net, Inc., as Borrower, Media Funding Company, LLC, as Lender, and BC Media Funding Company II, LLC, as Agent[1]

#### Certification of B. Michael Pisani – April 30, 2008

#### May 14, 2008

I, B. Michael Pisani, have reviewed the provisions of the Financing Agreement and the other Loan Documents and have made a review of the financial conditions of the Individual Guarantors during the period covered by the month ending April 30, 2008 with a view to determining whether the Individual Guarantors were in compliance with all of the provisions of the Financing Agreement and the Loan Documents. Such review (i) has not disclosed, and I have no knowledge of, the existence of an Event of Default or Default with respect to any of the Individual Guarantors, and (ii) The Individual Guarantors, B. Michael Pisani, Michael L Metter, Leonard F. Moscati and Frank Lazauskas, have maintained collectively at least $6,000,000 in Liquid Assets and Marketable Securities. In addition, I have no knowledge of the existence of an Event of Default or Default with respect to any of the Credit Parties under the Financing Agreement or the other Loan Documents other than those Events of Default or Defaults which are specified in the Officer's Certificate for the Month ended April 30, 2008 being concurrently delivered pursuant to the Financing Agreement, a copy of which Officer's Certificate is attached hereto.

Signed _B. Michael Pisani_

---

[1] Such agreement is hereinafter referred to as the "Financing Agreement". Capitalized terms used but not otherwise defined in this certificate shall have the meanings given such terms in such Financing Agreement.

937291-2

**Business Talk Radio**
**Financial Covenant Calculations**
April 30, 2008

**A.   Cash on Hand**

| | | |
|---|---|---|
| Total Checking/Savings | $ | 389,915 |
| Total Cash on Hand | $ | 389,915 |
| Covenant requirement | $ | 200,000 |

Note: In compliance

**B.   Minimum Fixed Charge Coverage Ratio**
for twelve-month period ended 04/30/08

| | | | | | |
|---|---|---|---|---|---|
| Consolidated Net Income excluding (a) any extraordinary or non-recurring gains or losses or gains or losses from dispositions, (b) interest income, (c) income not directly derived from the operations of the Stations or the ownership and easing of broadcast towers, and (d) non-cash income, including trade or barter | $ | (1,556,987) | Consolidated Net Loss - 12 months ended 04/30/08 | | (1,789,468) |
| | | | Less Interest Income | | (7,637) |
| | | | Add Barter Loss | | 30,236 |
| | | | Add back Loss on Disposal of Fixed Assets/LMA | | 209,903 |
| | | | | | (1,556,987) |

| | |
|---|---|
| Consolidated Net Interest Expense | 814,632 |
| Provision for taxes based on income | - |
| Total depreciation expense | 539,120 |
| Total amortization expense | 159,862 |
| Consolidated EBITDA | (43,369) |

| | |
|---|---|
| Consolidated Net Interest Expense | 814,632 |
| Scheduled principal payments on Consolidated Total Debt | 381,000 |
| Consolidated Rental Expense | 265,499 |
| Consolidated Fixed Charges | 1,461,331 |
| Fixed Charge Coverage Ratio | (0.03) |
| Covenant requirement | 1.0 |

Note: Not in compliance

**C.   Consolidated EBITDA**

Not applicable for the month ended 04/30/08.  Required quarterly.

**D.   Net Revenue**

Not applicable for the month ended 04/30/08.  Required quarterly.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------x

BC MEDIA FUNDING COMPANY II and MEDIA    :
FUNDING COMPANY,                                            :      Index No. 08-601724

                                      :

                      Plaintiffs,         :

                                      :

             -against-               :

                                      :

FRANK LAZAUSKAS, MICHAEL L. METTER,    :
LEONARD F. MUSCASTI and B. MICHAEL PISANI,   :
                    Defendants.      :

                                      :

-------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
## FOR SUMMARY JUDGMENT

WINSTON & STRAWN LLP
Anthony DiSarro
Kara L. Gorycki
200 Park Avenue
New York, New York 10166-4193
(212) 294-6700

Attorneys for Plaintiffs
BC Media Funding Company II
and Media Funding Company

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................ii

PRELIMINARY STATEMENT .........................................................................1

FACTUAL BACKGROUND...............................................................................2
    The Parties ...................................................................................................2
    The Agreements...........................................................................................2
    The Forum Selection Clauses .....................................................................3
    BTR's Defaults............................................................................................4

POINT I ..............................................................................................................8
    PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT
    PURSUANT TO CPLR 3213 IS AN APPROPRIATE MEANS OF ENFORCING THE
    DEFENDANTS' GUARANTEES ................................................................8

POINT II.............................................................................................................10
    SUMMARY JUDGMENT SHOULD BE GRANTED IN PLAINTIFFS' FAVOR
    BECAUSE PLAINTIFFS HAVE SHOWN A PRIMA FACIE ENTITLEMENT TO
    PAYMENT ..................................................................................................10

    A.   Defendants Have Failed To Fulfill Their Payment Obligations Under
         The Guarantees ...............................................................................10

    B.   The Guarantees Are Unconditional And Mandate Defendants' Prompt Payment
         Of The Amount Due And Owing Under The Financing Agreement ............11

CONCLUSION...................................................................................................13

i

# TABLE OF AUTHORITIES

Page(s)

CASES

Banco Popular North America v. Victory Taxi Management, Inc.,
    1 N.Y.3d 381, 774 N.Y.S.2d 480 (2004).................................................................................8

Bank of America, N.A. v. Solow,
    No. 601892/07, 2008 WL 1821877 (Sup. Ct. New York County Apr. 17, 2008).................8, 9

Bank of China v. Chung Tai Enterprise (U.S.A.), Inc.,
    202 A.D.2d 306, 609 N.Y.S.2d 216 (1st Dep't 1994)..............................................................8

Bank Leumi Trust Co. of New York v. Rattett & Liebman,
    182 A.D.2d 541, 582 N.Y.S.2d 707 .....................................................................................11

Boland v. Indah Kiat Finance(IV) Mauritius Ltd.,
    291 A.D.2d 342, 739 N.Y.S.2d 122 (1st Dep't 2002)...........................................................10

Dell'Anno v. Molinari,
    No. 111324/06, 2008 WL 961156 (Sup. Ct. New York County April 8, 2008) .................8, 11

European American Bank v. Cohen,
    183 A.D.2d 453, 585 N.Y.S.2d 1017 (1st Dep't 1992)............................................................9

First Interstate Credit Alliance v. Sokol,
    179 A.D.2d 583, 579 N.Y.S.2d 653 (1st Dep't 1992).........................................................8, 10

Harrison Court Associates. v. 220 Westchester Ave. Associates,
    203 A.D.2d 244, 609 N.Y.S.2d 653 (2d Dep't 1994)............................................................11

Schwartz v. Turner Holdings, Inc.,
    139 A.D.2d 458, 527 N.Y.S.2d 229 (1st Dep't 1988)..............................................................9

Weissman v. Sinorm Deli, Inc.,
    88 N.Y.2d 437, 646 N.Y.S.2d 308 (1996).............................................................................10

STATUTES

CPLR 3213 (McKinney 2008) ...............................................................................................passim

ii

## PRELIMINARY STATEMENT

BC Media Funding Company II ("BCMF") and Media Funding Company ("MFC"), (collectively, the "Plaintiffs") make this motion for summary judgment in lieu of a complaint in order to collect indebtedness of over $5 million that is personally guaranteed by Defendants Frank Lazauskas, Michael L. Metter, Leonard F. Moscati and B. Michael Pisani (collectively, the "Defendants"). Defendants are part owners of BusinessTalkradio.net, Inc. ("BTR"), a company to which Plaintiffs agreed to extend term loans under a Financing Agreement entered into in November 2006. Defendants executed unconditional guarantees obligating them to pay Plaintiffs for all amounts due and owing under the Financing Agreement in the event of BTR's default. BTR has repeatedly defaulted, thereby triggering the guarantees.

Plaintiffs' motion for summary judgment in lieu of complaint is an appropriate and effective means of collecting the money owed to them under the Defendants' guarantees. Indeed, New York courts have repeatedly held that a personal guarantee falls within the definition of an "instrument for the payment of money only" under CPLR 3213 — even where, as here, it is necessary to consult documents outside the language of the guarantee to determine the guarantor's obligations.

Not only is this motion procedurally appropriate, but Plaintiffs have established a prima facie case of entitlement to payment – the guarantees signed by Defendants are unconditional and require payment regardless of how or when such payment became due, and all indebtedness incurred under the term loans extended to BTR is presently due and owing as a result of BTR's defaults.

## FACTUAL BACKGROUND

### The Parties

BCMF is a Delaware limited liability company with its principal place of business located at 10 Rockefeller Plaza, New York, New York. MFC is a Delaware limited liability company engaged in the business of providing financing to entities engaged in the media business.

Defendants Michael L. Metter and Leonard F. Moscati are residents of Connecticut. (Affidavit of Timothy P. Olson, dated June 5, 2008 ("Olson Aff.") Ex. D, E, p. 1). Defendants Frank Lazauskas and B. Michael Pisani are residents of New Jersey. (Id. Ex. C, F, p.1 ). Defendant Michael L. Metter is the President and CEO of BTR, a Delaware corporation engaged in the media business. Specifically, BTR owns and operates two radio networks and at least three FCC licensed AM radio stations in three major markets. (Id. ¶ 3).

### The Agreements

BCMF acted as agent for MFC with respect to a Financing Agreement, dated November 13, 2006 (the "Financing Agreement"), between MFC, as lender, and BTR, as borrower. (Id. ¶ 2). Pursuant to the Financing Agreement, MFC agreed to extend term loans to BTR in the aggregate principal amount of $5.5 million. (Id. ¶ 4 Ex. A). BTR borrowed significant sums under the Financing Agreement. Indeed, as of June 2, 2008, BTR owes Plaintiffs an amount that is no less than $5,418,763.15 as a result of such borrowing. (Id. ¶ 7). The loans to BTR were secured by a lien on all of BTR's assets, embodied in a Security Agreement dated November 13, 2006. (Id. ¶ 4 Ex. B). In further protection of MFC in the event of BTR's non-payment, Defendants were required to execute personal guarantees (the "Guarantees"). (Id. ¶ 5).

2

**The Forum Selection Clauses**

The Financing Agreement, Security Agreement and Guarantees each contain a forum selection clause that requires the parties to consent to jurisdiction in this Court. For instance, the Guarantees state that "[t]he Guarantor hereby irrevocably submits himself to the exclusive jurisdiction of the state and federal courts sitting in the state of New York and agrees and consents that service of process may be made upon him … by any means allowed under New York or federal law." (Id. Exs. C-F, Section 17). Furthermore, the Guarantees are expressly governed by New York law. (Id.).

**The Guarantees**

The Guarantees are expressly irrevocable, absolute and unconditional. They state in relevant part:

> Section 1.     Guaranty
>
> (a). Guarantor hereby <u>irrevocably, absolutely, and unconditionally</u> guarantees to the Agent for the benefit of the Lenders, jointly and severally, the prompt, complete, and full payment when due, <u>and no matter how the same shall become due,</u> of all sums payable under:
>
> (i)     the Financing Agreement, including all principal, all interest thereon and all other sums payable thereunder including attorney's fees or otherwise; ….

(Id. Exs. C-F). Furthermore, the Guarantees expressly provide that the obligations of the guarantor are triggered whenever the borrower – BTR – fails to pay amounts due under the Financing Agreement:

> (c)     If Borrower shall for any reason fail to pay any of the Guaranteed Obligations, as and when such Guaranteed Obligation shall become due and payable, whether at its stated maturity, as a result of the exercise of any power to accelerate, or otherwise, Guarantor will, upon demand by any Lender, pay such Guaranteed Obligation in full to the Agent for the benefit of the Lenders. If Borrower, or any other Loan Party shall for any reason

3

> fail to perform promptly any of the Guaranteed Obligations,
> Guarantor will, upon demand by Agent, cause such Guaranteed
> Obligation to be performed or, if specified by Agent, provide
> sufficient funds, in such amount and manner as Agent shall in good
> faith determine, for the prompt, full and faithful performance of
> such Guaranteed Obligation.

(Id. Exs. C-F, Section 1(c)) (emphasis added).

The Guarantees are not only unconditional, they require prompt payment in the event of BTR's default. (Id. ¶ 6). Moreover, so long as BTR is in default, the Guarantees require no action or notice on Plaintiffs' part to trigger Defendants' obligations. (Id.) Section 2 of the Guarantees states "[n]o action which the Lenders or Agent may take or omit to take in connection with any of the Obligation Documents [or] any of the Guaranteed Obligations ... shall release or diminish Guarantor's obligations, liabilities, agreements or duties hereunder ...." (Olson Aff. Exs. C-F, Section 2).

**BTR's Defaults**

BTR has committed several acts or omissions of "Default," as that term is defined in the Financing Agreement. (Id. ¶¶ 8-10). BCMF has notified BTR and Defendants about these repeated Defaults via several letters directed to the attention of Michael L. Metter, whom the Financing Agreement designates as the individual to receive notices on BTR's behalf. (Id. Ex. A, Art. X). As of December 28, 2007, as a result of certain events of default that occurred under the Financing Agreement, BTR, BCMF and MFC, entered into a Forbearance Agreement. Pursuant to the Forbearance Agreement, BTR agreed and acknowledged that "Events of Default" existed under the Financing Agreement (the "Existing Events of Default") and BCMF and MFC agreed to forbear from exercising their rights under the Financing Agreement for a limited period of time (the "Forbearance Period") as a result of those Existing Events of Default. (Id. ¶ 8 Ex. G).

4

On April 24, 2008, after the Forbearance Period had expired, BCMF sent the Defendants a written letter declaring that BTR repeatedly had failed to satisfy its covenants under the Financing Agreement. (Id. ¶ 9 Ex. H). Specifically, BTR had breached several of its covenants set forth in the Financing Agreement by, among other failures, failing to achieve certain operating performance metrics, to meet certain financial commitments under the Financing Agreement, and to provide reports of certain events required by the Financing Agreement. (Id.) Each violation of the contractual covenants constituted an independent "Event of Default" under the Financing Agreement. (Id. ¶ 9). The letter indicated to the Defendants that, unless BTR took immediate steps to pay in full all "Obligations" outstanding under the Financing Agreement, BCMF and MCF would take such steps they deemed necessary to enforce their rights under the Financing Agreement. (Id. Ex. H).

On May 6, 2008, BTR provided BCMF certain officer certificates required under the Financing Agreement and executed by Defendant Michael L. Metter for the quarter ending March 31, 2008 and the month ending March 31, 2008 (together, the "March Officer Certificates"). (Id. ¶ 10 Ex. I). Thereafter, on May 14, 2008, BTR provided BCMF a certain officer certificate required under the Financing Agreement and executed by Defendant Michael L. Metter for the month ending April 30, 2008 (the "April Officer Certificate"). (Id. ¶ 10 Ex. J). As certified as correct by Defendant Michael L. Metter, the March Officer Certificates and the April Officer Certificate explicitly detail various Events of Defaults that exist under the Financing Agreement as a result of BTR's action or inaction. (Id.)

Despite BTR's prior agreement and acknowledgement in the Forbearance Agreement that Events of Default existed under the Financing Agreement, and Defendant Michael L. Metter's certification as to the existence of various Events of Defaults under the

Financing Agreement, BTR has refused to pay interest with respect to its obligations under the Financing Agreement at the Default Rate, as it is required to do under the Financing Agreement. This failure constitutes an independent and separate Event of Default under the Financing Agreement. (Id. ¶ 11 Ex. A, Art. VIII).

In addition, in a May 16, 2008 letter from BTR's attorneys, just two days following the certification from BTR's President and CEO detailing the Events of Default that existed under the Financing Agreement, BTR attempted to deny the existence of any Events of Default. (Id. ¶ 12 Ex. K). On May 20, 2008, BCMF responded to the May 16, 2008, letter, pointing out that by BTR's own admissions in the March Officer Certificates and the April Officer Certificate, Events of Default plainly existed under the Financing Agreement. (Id. ¶ 13 Ex. L). BTR's attorneys never responded to BCMF's May 20, 2008 letter. (Id. ¶ 12).

In light of BTR's numerous events of default and failure to pay, among other things, the default interest required under the Financing Agreement, BCMF commenced efforts to exercise Plaintiffs' rights to foreclose upon collateral under the Security Agreement and to enforce the Individual Guarantees. (Id. ¶ 13).

The April 24, 2008 and May 20, 2008 letters from BMCF to Defendants provided notice to Defendants that their guarantees were triggered by BTR's multiple defaults. To date, Defendants have failed to make payment in accordance with their obligations under the Guarantees. (Id. ¶ 14). There is no defense to liability of the Defendants under the Guarantees. The Individual Guarantees are "irrevocable, absolute and unconditional." BTR has defaulted under the Financing Agreement, and thus each Defendant is obligated to pay the total amount due from BTR under the Financing Agreement. (Id. ¶15).

6

Plaintiffs are entitled to the entry of summary judgment against each Defendant, jointly and severally, in the amount of no less than $5,418,763.15, which amount continues to accrue interest and other expenses, such as attorneys' fees, under the terms of the Financing Agreement.

## POINT I

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT PURSUANT TO CPLR 3213 IS AN APPROPRIATE MEANS OF ENFORCING THE DEFENDANTS' GUARANTEES

Plaintiffs' motion for summary judgment in lieu of a complaint is an appropriate and effective means of enforcing the Guarantees. CPLR 3213 allows a party to make a motion for summary judgment in lieu of a complaint "[w]hen an action is based upon an instrument for the payment of money only or upon any judgment." CPLR 3213 "'provide[s] a speedy and effective means' for resolving 'presumptively meritorious' claims." Banco Popular N. America v. Victory Taxi Mgmt., Inc., 1 N.Y.3d 381, 383, 774 N.Y.S.2d 480, 482 (2004) (quoting Interman Indus. Prods. v. R.S.M. Electron Power, 37 N.Y.2d 151, 154, 371 N.Y.S.2d 675, 679 (1975)).

The circumstances, here, clearly warrant the use of CPLR 3213. New York courts have held that a guarantee falls within the scope of this provision, constituting "an instrument for the repayment of money only." See First Interstate Credit Alliance v. Sokol, 179 A.D.2d 583, 583, 579 N.Y.S.2d 653, 653 (1st Dep't 1992) ("The guarantee is clearly an instrument for the payment of money only upon which a motion pursuant to CPLR 3213 may be brought"). This includes unconditional guarantees, "which represent the 'prototypical example' of an instrument for the payment of money only.'" Dell'Anno v. Molinari, No. 111324/06, 2008 WL 961156, at *3 (Sup. Ct. New York County April 8, 2008) (Freid, J.); see Bank of China v. Chung Tai Enterprise (U.S.A.), Inc., 202 A.D.2d 306, 306, 609 N.Y.S.2d 216, 217 (1st Dep't 1994) (holding guarantors liable under CPLR 3213 for failure to make payments pursuant to unconditional guarantee); Bank of America, N.A. v. Solow, No. 601892/07, 2008 WL 1821877, at *4 (Sup. Ct. New York County Apr. 17, 2008) (Freid, J.) (same). For instance, in Solow, the defendant

8

argued that a guarantee was defective as a predicate for a CPLR 3213 motion because, inter alia, the obligation in the guarantee could not be understood without resort to several other complex documents. The court rejected these arguments, finding the plaintiff's CPLR 3213 motion to be proper, and granted summary judgment in favor of the plaintiff.

The guarantee at issue in Solow incorporated several complex mortgage and loan documents, from which the amount owed, the interest rate and the nature of the primary obligation could be established. Solow, 2008 WL 1821877, at *4. The Solow Court held that a party may move under CPLR 3213 upon a guarantee which incorporates external documents setting forth the guarantor's repayment obligations because "[a] guaranty may be the proper subject of a motion for summary judgment in lieu of complaint whether or not it recites a sum certain, and the need to consult the underlying documents to establish the amount of liability does not affect the availability of CPLR 3213." Solow, 2008 WL 1821877, at *4; see also European Am. Bank v. Cohen, 183 A.D.2d 453, 585 N.Y.S.2d 1017 (1st Dep't 1992) (holding that consultation of bank records to determine amount due under note permissible on CPLR 3213 motion); Schwartz v. Turner Holdings, Inc., 139 A.D.2d 458, 527 N.Y.S.2d 229 (1st Dep't 1988) (holding that need to consult related document to determine interest payment due under promissory note did not preclude motion under CPLR 3213). Under Solow, and well settled New York case law, it is clear that the Guarantees are properly subject to CPLR 3213 review.

Because the Guarantees are "instruments for the payment of money only" contemplated by CPLR 3213, Plaintiffs' motion for summary judgment in lieu of a complaint is a valid means of enforcing those guarantees.

9

## POINT II

## SUMMARY JUDGMENT SHOULD BE GRANTED IN PLAINTIFFS' FAVOR BECAUSE PLAINTIFFS HAVE SHOWN A PRIMA FACIE ENTITLEMENT TO PAYMENT

Plaintiffs are entitled to summary judgment because the terms of the Guarantees are unconditional and BTR has failed to pay the $5 million plus that is due and owing under the Financing Agreement. When an action is brought under CPLR 3213 to enforce an "instrument for the payment of money only," a prima facie case of a plaintiff's right to payment will be made out "by the instrument and a failure to make the payments called for by its terms." Weissman v. Sinorm Deli, Inc., 88 N.Y.2d 437, 444, 646 N.Y.S.2d 308, 311 (1996); see Boland v. Indah Kiat Finance(IV) Mauritius Ltd., 291 A.D.2d 342, 343, 739 N.Y.S.2d 122, 122 (1st Dep't 2002); First Interstate Credit Alliance v. Sokol, 179 A.D.2d 583, 583, 579 N.Y.S.2d 653, 653 (1st Dep't 1992). Plaintiffs have established that a CPLR 3213 motion is appropriate here, and the record shows that summary judgment is warranted as Defendants both signed unconditional guarantees which obligated them to repay loans totaling over $5 million in the event of BTR's default. (See Olson Aff. ¶¶ 6-7, 15-16, Exs. C-F).

### A.   Defendants Have Failed To Fulfill Their Payment Obligations Under The Guarantees

Summary judgment should be granted in Plaintiffs' favor because Defendants are legally obligated to provide prompt payment of the $5 million plus owed by BTR to Plaintiffs, as required by the Guarantees. Under the terms of these guarantees, upon BTR's default, Defendants must pay all of BTR's outstanding obligations.[1]  (Olson Aff. Exs. C-F, Section 1(c)).

---

[1]      The Guarantees also provide that, so long as BTR is in default, no notice or action is required to obligate Defendants to pay amounts owed by BTR under the Financing Agreement. Section 2 of the Guarantees states "[n]o action which the Lenders or Agent may take or omit to take in connection with any of the Obligation Documents, any of the Guaranteed Obligations ... shall release or diminish Guarantor's obligations, liabilities, agreements or duties hereunder ...." (Olson Aff. Exs. C-F, Seetion 2).

In this instance, BTR has defaulted on several occasions, and Defendants have been notified of these defaults:

- On April 24, 2008, BCMF sent the Defendants a written letter declaring that BTR repeatedly had failed to satisfy its covenants under the Financing Agreement. (Id. ¶ 9 Ex. H). Specifically, BTR had breached several of its covenants set forth in the Financing Agreement by, among other failures, failing to achieve certain operating performance metrics, to meet certain financial commitments under the Financing Agreement, and to provide reports of certain events required by the Financing Agreement. (Id.) BTR failed to cure these defaults.

- On May 20, 2008, BCMF sent a written letter to Defendants, pointing out that by BTR's own admissions in the March Officer Certificates and the April Officer Certificate, Events of Default plainly existed under the Financing Agreement. (Id. ¶ 12 Ex. L). BTR's attorneys never responded to BCMF's letter of May 20, 2008. (Id. ¶ 12).

As of June 2, 2008, BTR owed Plaintiffs $5,418,763.15 which had accrued under the Financing Agreement. Pursuant to the Guarantees, Defendants are thus obliged to pay the amount presently due and owing to Plaintiffs.

### B. The Guarantees Are Unconditional And Mandate Defendants' Prompt Payment Of The Amount Due And Owing Under The Financing Agreement

The Guarantees are unconditional, and Defendants cannot deny liability thereunder, a point which, in itself, warrants summary judgment in favor of Plaintiffs. Indeed, "[s]ubmission of an unconditional guaranty along with an affidavit of nonpayment is sufficient for [summary] judgment." Dell'Anno, 2008 WL 961156 at *3 (granting summary judgment on CPLR 3213 motion); see also Harrison Court Assocs. v. 220 Westchester Ave. Assocs., 203 A.D.2d 244, 244, 609 N.Y.S.2d 653, 653 (2d Dep't 1994) (finding that plaintiff's submission of note and guarantee in question sufficiently established entitlement to summary judgment under CPLR 3213); Bank Leumi Trust Co. of New York v. Rattett & Liebman, 182 A.D.2d 541, 541, 582 N.Y.S.2d 707 708 (1st Dep't 1992) (granting summary judgment where plaintiff submitted

note, unconditional guarantee and evidence of nonpayment).  By their own language, the Guarantees signed by the Defendants "irrevocably, absolutely, and unconditionally" obligate Defendants to pay off BTR's loans in the event of BTR's default. (Olson Aff. Exs. C-F, Section 1). Payment is required no matter how or when it becomes due.   (Id.).  BTR defaulted multiple times under the Financing Agreement and Defendants were on notice of these defaults.  (Id. ¶¶ 8-10).

Under the terms of the Guarantees, Defendants are now therefore liable for the $5 million plus due under the Financing Agreement, (Id. ¶ 6-7, 15), and summary judgment should be granted in Plaintiffs' favor.

12

## CONCLUSION

For the foregoing reasons, Plaintiffs motion for summary judgment in lieu of a complaint should be granted, and the Court should enter judgment directing that defendants Frank Lazauskas, Michael L. Metter, Leonard F. Moscati and B. Michael Pisani are jointly and severally liable to Plaintiffs in the amount of not less than $5,418,763.15, plus interest and attorney's fees.

Dated: New York, New York
June 9, 2008

WINSTON & STRAWN LLP

By: _____
Anthony DiSarro
Kara L. Gorycki
200 Park Avenue
New York, New York 10166
(212)294-6700
adisarro@winston.com
kgorycki@winston.com

*Attorneys for Plaintiffs*
*BC Media Funding Company II and*
*Media Funding Company*

Job #  R-A032-6/10-867          **AFFIDAVIT OF SERVICE**          Winston & Strawn

COURT: Supreme Court     COUNTY: New York

-----------------------------------
                                                    Index #:08-601724
**BC Media Funding Company II and Media**
**Funding Company**

                         Plaintiff

             against

**Frank Lazauskas, Michael L. Metter,**
**Leonard F. Moscati & B. Michael Pisani**

                    Defendant
-----------------------------------

STATE OF NEW YORK, COUNTY OF NEW YORK SS:
**Art Mondshein** being duly sworn, desposes and says:
I am over 18 years of age, not a party to this action and reside in
the State of New York:

That on **June 11, 2008 at 11:30 am**
at **c/o Business Talk Radio Network; 401 Shippan Avenue, , Stamford, Connecticut,**
I SERVED a true copy of the **RJI, Summons & Notice of Motion for Summary**
**Judgement in Lieu of Complaint, Exhibits, Statement in Support of Assignment of Case**
**to the Commercial Division & Memorandum of Law in Support of Summary Judgement**
upon **B. Michael Pisani**
therein named by delivering to, and leaving a true copy of said
**RJI, Summons & Notice of Motion for Summary Judgement in Lieu of Complaint, Exhibits,**
**Statement in Support of Assignment of Case to the Commercial Division & Memorandum**
**of Law in Support of Summary Judgement**
with a person of suitable age and discretion to wit:
**Cindy Torre, co-worker**
Deponent describes person served as aforesaid to the best of deponents ability
at the time and circumstances of service as follows:

|         |          |
|---------|----------|
| SEX:    | Female   |
| COLOR:  | White    |
| HAIR:   | Brown    |
| AGE:    | 45       |
| HEIGHT: | 5'5 "    |
| WEIGHT: | 130      |
|         | glasses  |

**NEW YORK**
**COUNTY CLERK'S OFFICE**

**JUN 16 2008**

**NOT COMPARED**
**WITH COPY FILE**

On **June 12, 2008**
I deposited in the United States mails a true copy or copies of the
**the above cited papers** in a properly enclosed and sealed post paid
wrapper addressed to the said defendant(s) at the afformentioned address.
Copy mailed first class mail marked "Personal and Confidential" not indicating on the
outside thereof, by return address or otherwise that said notice is from an attorney or
concerns an action against the person to be served.
Sworn to before me this
 **June 12, 2008**

                                      _____
                                      Art Mondshein 794479

Lana Faith Pollack
Commissioner of Deeds
No. (1/6537
Certificate Filed in New York County
Commission Expires July 1, 2008

THE LETTER OF THE LAW PROCESS SERVICE CO. INC, 577 GRAND STREET, SUITE F907, N.Y. 10002

Job #  R-A032-6/10-866                                    Winston & Strawn

**AFFIDAVIT OF SERVICE**

COURT: Supreme Court     COUNTY: New York
------------------------------------                  Index #:08-601724
**BC Media Funding Company II and**
**Media Funding Company**

                              Plaintiff

               against

**Frank Lazauskas, Michael L. Metter,**
**Leonard F. Moscati & B. Michael Pisani**

                              Defendant
------------------------------------

STATE OF NEW YORK, COUNTY OF NEW YORK SS:
**Art Mondshein** being duly sworn, deposes and says:
I am over 18 years of age, not a party to this action and reside in
the State of New York:
That on **June 11, 2008 at 11:30 am**
**c/o Business Talk Radio Network; 401 Shippan Avenue, , Stamford, Connecticut,**
I SERVED a true copy of the **RJI, Summons & Notice of Motion for Summary**
**Judgement in Lieu of Complaint, Exhibits, Statement of Support of Assignment of Case**
**to the Commercial Division & Memorandum of Law in Support of Summary Judgement**
upon **Frank Lazauskas**
therein named by delivering to, and leaving a true copy of said
**RJI, Summons & Notice of Motion for Summary Judgement in Lieu of Complaint, Exhibits,**
**Statement of Support of Assignment of Case to the Commercial Division, &**
**Memorandum of Law in Support of Summary Judgement**
with a person of suitable age and discretion to wit:
**Cindy Torre, co-worker**
Deponent describes person served as aforesaid to the best of deponents ability
at the time and circumstances of service as follows:

              SEX:       Female
              COLOR:     White
              HAIR:      Brown
              AGE:       45
              HEIGHT:    5'5 "
              WEIGHT:    130
                         glasses

NEW YORK
COUNTY CLERK'S OFFICE

JUN 16 2008

NOT COMPARED
WITH COPY FILE

On **June 12, 2008**
I deposited in the United States mails a true copy or copies of the above mentioned
**papers** in a properly enclosed and sealed post paid
wrapper addressed to the said defendant(s) at the afformentioned address.
Copy mailed first class mail marked "Personal and Confidential" not indicating on the
outside thereof, by return address or otherwise that said notice is from an attorney or
concerns an action against the person to be served.

Sworn to before me this
  **June 12, 2008**
                                    _____
                                    Art Mondshein 794479
Lana Faith Pollack
Commissioner of Deeds
No. 1-5557/0
Certificate Filed in New York County
Commission Expires July 1, 2008

THE LETTER OF THE LAW PROCESS SERVICE CO. INC, 577 GRAND STREET, SUITE F907, N.Y. 10002

Job #  R-A032-6/10-868                                    Winston & Strawn

**AFFIDAVIT OF SERVICE**

COURT: Supreme Court      COUNTY: New York
---------------------------------                    Index #:08-601724

**BC Media Funding Company II and**
**Media Funding Company**

                         Plaintiff

             against

**Frank Lazauskas, Michael L. Metter,**
**Leonard F. Moscati & B. Michael Pisani**
                         Defendant
---------------------------------

STATE OF NEW YORK,COUNTY OF NEW YORK SS:
**Art Mondshein** being duly sworn, desposes and says:
I am over 18 years of age, not a party to this action and reside in
the State of New York:

That on **June 11, 2008 at 11:30 am**
at **c/o Business Talk Radio Network; 401 Shippan Avenue, , Stamford, Connecticut,**
I SERVED a true copy of the **RJI, Summons & Notice of Motion for Summary**
**Judgement in Lieu of Complaint, Exhibits, Statement in Support of Assignment of Case**
**to the Commercial Division & Memorandum of Law in Support of Summary Judgement**
upon **Michael L. Metter**
therein named by delivering to, and leaving a true copy of said
**RJI, Summons & Notice of Motion for Summary Judgement in Lieu of Complaint, Exhibits,**
**Statement in Support of Assignment of Case to the Commercial Division & Memorandum**
**of Law in Support of Summary Judgement**
with a person of suitable age and discretion to wit:
**Cindy Torre, co-worker**
Deponent describes person served as aforesaid to the best of deponents ability
at the time and circumstances of service as follows:

|  |  |
|---|---|
| SEX: | Female |
| COLOR: | White |
| HAIR: | Brown |
| AGE: | 45 |
| HEIGHT: | 5'5 " |
| WEIGHT: | 130 |
|  | glasses |

NEW YORK
COUNTY CLERK'S OFFICE

JUN 16 2008

NOT COMPARED
WITH COPY FILE

On **June 12, 2008**
I deposited in the United States mails a true copy or copies of the
**the above cited papers** in a properly enclosed and sealed post paid
wrapper addressed to the said defendant(s) at the afformentioned address.
Copy mailed first class mail marked "Personal and Confidential" not indicating on the
outside thereof, by return address or otherwise that said notice is from an attorney or
concerns an action against the person to be served.
Sworn to before me this
 **June 12, 2008**

                                              _____
                                              Art Mondshein 794479

Lana Faith Pollack
Commissioner of Deeds
No. 4-5517
Certificate Filed in New York County
Commission Expires July 1, 2008

THE LETTER OF THE LAW PROCESS SERVICE CO. INC, 577 GRAND STREET, SUITE F907, N.Y. 10002

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------- x

BC MEDIA FUNDING COMPANY II and MEDIA    :    Index No. 601724/08
FUNDING COMPANY,
                 Plaintiffs,    :


        -against-    :    **AFFIRMATION OF SERVICE**


FRANK LAZAUSKAS, MICHAEL L. METTER,    :
LEONARD F. MOSCATI and B. MICHAEL PISANI,
                 :

          Defendants.
                 :

---------------------------------------------------------------- x


       I, Lane H. Lerner, a staff attorney at Winston & Strawn LLP, counsel for

Plaintiffs in the above-captioned action, and admitted to practice in the courts of the State of

New York, and with an office located at 200 Park Avenue, New York, New York, 10166, hereby

state the following:

       On June 16, 2008 one (1) true copy of the accompanying **Summons and Notice**

**of Motion for Summary Judgment in Lieu of Complaint, Exhibits thereto, Request for**

**Judicial Intervention, Statement in Support of Assignment of Case to the Commercial**

**Division, and Memorandum of Law in Support of Summary Judgment** was served upon

Defendant Leonard F. Moscati by depositing one (1) true copy of each, enclosed in a wrapper

addressed as shown below, into the custody of FedEx for overnight delivery, prior to the latest

time designated by FedEx for overnight delivery, to the following counsel which accepted

service of process of the aforementioned documents on behalf of the defendants in the

action (annexed hereto is an email confirmation of acceptance of service):

<div align="center">
Scott D. Rosen, Esq.<br>
COHN BIRNBAUM & SHEA, P.C.<br>
100 Pearl Street<br>
Hartford, CT 06103
</div>

I hereby affirm the foregoing statement to be true under the penalties of perjury.

Dated: July 2, 2008

<div align="center">
Lane H. Lerner
</div>

NY:1175508.1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------------x
BC MEDIA FUNDING COMPANY II and MEDIA
FUNDING COMPANY,

          Plaintiffs,

     -against-

FRANK LAZAUSKAS, MICHAEL L. METTER,
LEONARD F. MOSCATI and B. MICHAEL PISANI,

          Defendants.

---------------------------------------------------------------------x

$I_{NDEX}$ N$_2$.: 08-601724

**AFFIDAVIT OF**
**TIMOTHY P. OLSON**

STATE OF SOUTH DAKOTA )
          ) ss.:
COUNTY OF MINNEHAHA  )

    TIMOTHY P. OLSON, being duly sworn, deposes and says:

    1.  I am Managing Director and General Counsel of Barker Capital, LLC

("Barker Capital"), a New York limited liability company with its principal place of business

located at 10 Rockefeller Plaza, New York, New York. Barker Capital and BC Media Funding

Company II ("BCMF"), a Delaware limited liability company with its principal place of business

located at 10 Rockefeller Plaza, New York, New York, are under common control. I have been

authorized by BCMF to submit this affidavit. I make this affidavit, which is based on personal

knowledge, in support of the motion for summary judgment by plaintiffs, BCMF and Media

Funding Company ("MFC" and, together with BCMF, "Plaintiffs").

    2.  BCMF is the agent for MFC with respect to a Financing Agreement, dated

as of November 13, 2006 (the "Financing Agreement"), between MFC, as lender, and

BusinessTalkradio.net, Inc. ("BTR"), as borrower. (Attached hereto as Exhibit A is a true and correct copy of the Financing Agreement).

      3.     MCF is a Delaware limited liability company engaged in the business of providing financing to entities engaged in the media business. BTR is a Delaware corporation engaged in the media business; specifically it owns and operates two radio networks and at least three FCC licensed AM radio stations in three major markets. Defendant Michael L. Metter is President and CEO of BTR.

      4.     Pursuant to the Financing Agreement, MFC agreed to extend term loans to BTR in the aggregate principal amount of $5.5 million. The term loans were secured by a lien on all of BTR's assets in favor of BCMF, as MFC's agent, which is set forth in a Security Agreement, dated November 13, 2006. (Attached hereto as Exhibit B is a true and correct copy of the Security Agreement).

      5.     In further protection to MFC in the event of BTR's non-payment, each of the Defendants was required to and did execute an "irrevocable, absolute and unconditional" personal guarantee of all amounts owed by BTR under the Financing Agreement. (Attached hereto as Exhibits C, D, E and F respectively, are true and correct copies of the guarantees, dated as of November 13, 2006, by Frank Lazauskas, Michael L. Metter, Leonard F. Moscati and B. Michael Pisani (together, the "Individual Guarantees")).

      6.     Each of the Individual Guarantees provides that the Guarantor shall pay all sums payable by BTR under the Financing Agreement "when due, no matter how the same shall become due." (Section 1(a) and (c)). The Individual Guarantees are unconditional. So long as BTR is in default under the Financing Agreement, no action or notice is required to obligate the Guarantors to pay amounts owed by BTR under the Financing Agreement. (Section 2).

<div align="center">2</div>

7.    BTR borrowed significant sums under the Financing Agreement. Indeed, as of June 2, 2008, BTR owes Plaintiffs an amount that is no less than $5,418,763.15 as a result of such borrowing.

8.    As of December 28, 2007, as a result of certain events of default that occurred under the Financing Agreement, BTR, BCMF and MFC, entered into a Forbearance Agreement (Attached hereto as Exhibit G is a true and correct copy of the Forbearance Agreement). Pursuant to the Forbearance Agreement, BTR agreed and acknowledged that "Events of Default" existed under the Financing Agreement (the "Existing Events of Default") and BCMF and MFC agreed to forbear from exercising their rights under the Financing Agreement for a limited period of time as a result of those Existing Events of Default; provided that BTR complied with the terms of the Forbearance Agreement. (Forbearance Agreement, Recitals and Section 3.01).    By the terms of the Forbearance Agreement, such limited forbearance period expired no later than March 31, 2008, and earlier upon occurrence of a default under the Forbearance Agreement. (Forbearance Agreement, Sections 3.01 and 1.02).

9.    On April 24, 2008, BCMF sent the Defendants a written letter declaring that BTR repeatedly had failed to satisfy its covenants under the Financing Agreement. Specifically, BTR had breached several of its covenants set forth in the Financing Agreement by, among other failures, failing to achieve certain operating performance metrics, to meet certain financial commitments under the Financing Agreement, and to provide reports of certain events required by the Financing Agreement. Each violation of the contractual covenants constituted an independent "Event of Default" under the Financing Agreement.    The letter indicated to the Defendants that, unless BTR took immediate steps to pay in full all "Obligations" outstanding under the Financing Agreement, BCMF and MCF would take such steps they deemed necessary

3

to enforce their rights under the Financing Agreement. (Attached hereto as Exhibit H is a true and correct copy of such correspondence from BCMF to BTR).

       10.    On May 6, 2008, BTR provided BCMF certain officer certificates required under the Financing Agreement and executed by Defendant Michael L. Metter for the quarter ending March 31, 2008 and the month ending March 31, 2008 (together, the "March Officer Certificates"). (Attached hereto as Exhibit I is a true and correct copy of the March Officer Certificates). Thereafter, on May 14, 2008, BTR provided BCMF a certain officer certificate required under the Financing Agreement and executed by Defendant Michael L. Metter for the month ending April 30, 2008 (the "April Officer Certificate"). (Attached hereto as Exhibit J is a true and correct copy of the April Officer Certificate). As certified as correct by Defendant Michael L. Metter, the March Officer Certificates and the April Officer Certificate explicitly detail various Events of Defaults that exist under the Financing Agreement as a result of BTR's action or inaction. (See, e.g., Exhibit J (indicating that the "Fixed Charge Coverage Ratio for the twelve-month period ending April 30, 2008 did not meet the minimum required under the Financing Agreement)).

       11.    Despite BTR's prior agreement and acknowledgement in the Forbearance Agreement that Events of Default existed under the Financing Agreement and Defendant Michael L. Metter's certification as to the existence of various Events of Defaults under the Financing Agreement, BTR has refused to pay interest with respect to its obligations under the Financing Agreement at the Default Rate as it is required to do under the Financing Agreement, which resulted in an independent and separate Event of Default under the Financing Agreement.

       12.    In addition, in a May 16, 2008, written letter from BTR's attorneys, just two days following the certification from BTR's President and CEO detailing the events of

4

default and after BTR had agreed and acknowledged in the Forbearance Agreement that Events of Default existed under the Financing Agreement, BTR denied the existence of any events of default under the Financing Agreement. (Attached hereto as Exhibit K is a true and correct copy of such correspondence from BTR's attorney). On May 20, 2008, BCMF responded to the May 16, 2008, letter to point out that by BTR's own admissions in the March Officer Certificates and the April Officer Certificate, events of default plainly existed under the Financing Agreement and to reserve expressly BCMF's and MFC's rights under the Financing Agreement. (Attached hereto as Exhibit L is a true and correct copy of such correspondence to BTR's attorney). BTR's attorneys never responded to BCMF's letter of May 20, 2008.

13.    In light of BTR's numerous events of default and failure to pay, among other things, the default interest required under the Financing Agreement, BCMF commenced efforts to exercise Plaintiffs' rights to foreclose upon collateral under the Security Agreement and to enforce the Individual Guarantees.

14.    To date, Defendants have failed to make payment in accordance with their obligations under the Individual Guarantees.

15.    There is no defense to liability of the Defendants under the Individual Guarantees. The Individual Guarantees are "irrevocable, absolute and unconditional." BTR has defaulted under the Financing Agreement, and thus each Defendant is obligated to pay the total amount due from BTR under the Financing Agreement.

16.     Plaintiffs are entitled to the entry of summary judgment against each Defendant, jointly and severally, in the amount of no less than $5,418,763.15, which amount continues to accrue interest and other expenses, such as attorneys' fees, under the terms of the Financing Agreement.

TIMOTHY P. OLSON

Sworn to before me this 5th
day of June, 2008

Notary Public

# Exhibit A

FINANCING AGREEMENT

Dated as of November ___, 2006

by and among

BUSINESSTALKRADIO.NET, INC.
as Borrower,

MEDIA FUNDING COMPANY, LLC,
as Lender,
and

BC MEDIA FUNDING COMPANY II, LLC,
as Agent

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS; CERTAIN TERMS                                          1
    Section 1.01    Definitions................................................................... 1
    Section 1.02    Terms Generally........................................................ 22
    Section 1.03    Accounting and Other Terms.................................. 22
    Section 1.04    Time References......................................................... 22

ARTICLE II THE TERM LOAN                                                     23
    Section 2.01    Commitment. ............................................................ 23
    Section 2.02    Making the Term Loan. ........................................... 23
    Section 2.03    Repayment of Term Loan; Evidence of Debt. ......... 24
    Section 2.04    Interest....................................................................... 25
    Section 2.05    Reduction of Commitment; Prepayment of Term Loan. ............ 25
    Section 2.06    Fees. ........................................................................... 27
    Section 2.07    [Intentionally Omitted] ...............................**Error! Bookmark not defined.**
    Section 2.08    Taxes .......................................................................... 27

ARTICLE III FEES, PAYMENTS AND OTHER COMPENSATION                           28
    Section 3.01    Audit and Collateral Monitoring Fees .................... 28
    Section 3.02    Payments; Computations and Statements. ............... 29
    Section 3.03    Apportionment of Payments ................................... 29
    Section 3.04    Increased Costs and Reduced Return....................... 30
    Section 3.05    Joint and Several Liability of the Credit Parties. .... 31

ARTICLE IV CONDITIONS TO TERM LOAN                                          32
    Section 4.01    Conditions Precedent ............................................... 32
    Section 4.02    Conditions to Each Extension of Credit................... 33

ARTICLE V REPRESENTATIONS AND WARRANTIES                                    33
    Section 5.01    Representations and Warranties................................ 33

ARTICLE VI COVENANTS OF THE CREDIT PARTIES                                  33
    Section 6.01    Affirmative Covenants.............................................. 33
    Section 6.02    Negative Covenants .................................................. 33
    Section 6.03    Financial Covenants.................................................. 33
    Section 6.04    Individual Financial Covenants ............................... 33

ARTICLE VII MANAGEMENT, COLLECTION AND STATUS OF ACCOUNTS
RECEIVABLE AND OTHER COLLATERAL                                             33
    Section 7.01    Management of Collateral......................................... 33
    Section 7.02    Working Capital Control Account ........................... 33

Section 7.03    Collateral Custodian.................................................................. 33
Section 7.04    Deposit Accounts. ....................................................................... 33

ARTICLE VIII EVENTS OF DEFAULT                                                      33
Section 8.01    Events of Default ......................................................................... 33
Section 8.02    FCC Matters................................................................................. 33

ARTICLE IX AGENT                                                                   33
Section 9.01    Appointment ................................................................................ 33
Section 9.02    Nature of Duties.......................................................................... 33
Section 9.03    Rights, Exculpation, Etc ........................................................... 33
Section 9.04    Reliance........................................................................................ 33
Section 9.05    Indemnification ........................................................................... 33
Section 9.06    Agent Individually ...................................................................... 33
Section 9.07    Successor Agent.......................................................................... 33
Section 9.08    Collateral Matters...................................................................... 33
Section 9.09    Agency for Perfection ................................................................. 33

ARTICLE X MISCELLANEOUS                                                            33
Section 10.01   Notices, Etc.................................................................................. 33
Section 10.02   Amendments, Etc......................................................................... 33
Section 10.03   No Waiver; Remedies, Etc......................................................... 33
Section 10.04   Expenses; Taxes; Attorneys' Fees ........................................... 33
Section 10.05   Right of Set-off ........................................................................... 33
Section 10.06   Severability .................................................................................. 33
Section 10.07   Assignments and Participations ............................................... 33
Section 10.08   Counterparts................................................................................ 33
Section 10.09   GOVERNING LAW..................................................................... 33
Section 10.10   CONSENT TO JURISDICTION; SERVICE OF PROCESS AND
                VENUE ......................................................................................... 33
Section 10.11   WAIVER OF JURY TRIAL, ETC .............................................. 33
Section 10.12   Consent by the Agent and Lender............................................. 33
Section 10.13   No Party Deemed Drafter .......................................................... 33
Section 10.14   Reinstatement; Certain Payments ........................................... 33
Section 10.15   Indemnification............................................................................ 33
Section 10.16   Records ......................................................................................... 33
Section 10.17   Binding Effect.............................................................................. 33
Section 10.18   Interest.......................................................................................... 33
Section 10.19   Confession of Judgment............................................................. 33
Section 10.20   Confidentiality ............................................................................ 33
Section 10.21   Integration ................................................................................... 33

Schedules

| 2.05(a) | Payment Schedule |
|---|---|
| 5.01(c) | Governmental Approvals |
| 5.01(e) | Capitalization |
| 5.01(f) | Litigation |
| 5.01(n) | Broadcast Licenses |
| 5.01(n)(iv) | Actions, Proceedings or Investigation |
| 5.01(o) | Real Property |
| 5.01(r) | Environmental Matters |
| 5.01(s) | Insurance |
| 5.01(t) | Use of Proceeds |
| 5.01(v) | Bank Accounts |
| 5.01(w) | Intellectual Property |
| 5.01(x) | Material Contracts |
| 5.01(cc) | Company Information |
| 5.01(ee) | Change in Collateral; Collateral Records |

Exhibits

| A-2 | Cooperation Guaranty |
|---|---|
| A-3 | Individual Guaranty |
| A-4 | Subsidiary Guaranty |
| B | Security Agreement |
| C | Pledge Agreement |
| D | Intercompany Subordination Agreement |
| E | Control Agreement |
| F | Affiliate Subordination Agreement |
| G | Post-Closing Agreement |

**Schedule 1.01(A)**

**Schedule 2.5(a)**

**Payment Schedule**

**(Attached)**

## FINANCING AGREEMENT

THIS FINANCING AGREEMENT, dated as of November 13, 2006, by and among BusinessTalkradio.net, Inc., a Delaware corporation, (the "*Borrower*") and The Greenwich Broadcasting Corporation, a Connecticut corporation ("*Greenwich*"), The Lifestyle TalkRadio Network, Inc., a Delaware corporation ("*Lifestyle*"), BTR West, Inc., a Nevada corporation ("*BTR West*"), BTR Communications Boston, Inc., a Massachusetts corporation ("*BTR Boston*"), BTR Greenwich, Inc., a Connecticut corporation ("*BTR Connecticut*"), BTR West II, Inc., a Nevada corporation ("*Nevada II*"), BTR Communications Boston II, Inc., a Massachusetts corporation ("*Boston II*", together with Greenwich, Lifestyle, BTR West, BTR Boston, BTR Connecticut and Nevada II, the "*Subsidiary Guarantors*"), Media Funding Company, LLC, a Delaware limited liability company (the "*Lender*"), and BC Media Funding Company II, LLC, a Delaware limited liability company, as agent for the Lender (in such capacity, the "*Agent*").

## RECITALS

**WHEREAS**, the Borrower has requested that the Lender extend credit to the Borrower consisting of term loans in an aggregate amount of $5,500,000. The proceeds of the term loans shall be used to refinance existing indebtedness of the Borrower, for the Acquisitions (as defined below), for general working capital purposes of the Borrower and to pay fees and expenses related to this Agreement. The Lender is willing to extend such credit to the Borrower subject to the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS; CERTAIN TERMS

Section 1.01 <u>Definitions</u>. As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"*Account Debtor*" means each debtor, customer or obligor in any way obligated on or in connection with any Account Receivable.

"*Account Receivable*" means, with respect to any Person, any and all rights of such Person to payment for goods sold and/or services rendered, including accounts, general intangibles and any and all such rights evidenced by chattel paper, instruments or documents, whether due or to become due and whether or not earned by performance, and whether now or hereafter acquired or arising in the future, and any proceeds arising therefrom or relating thereto.

"*Acquisitions*" shall have the meaning specified therefor in <u>Section 2.01(c)</u> [Commitments].

"*Action*" has the meaning specified therefor in <u>Section 10.12</u> [Consent by the Agent and Lender].

"*Affiliate*" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (i) vote 1% or more of the Capital Stock having ordinary voting power for the election of directors of such Person or (ii) direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  Notwithstanding anything herein to the contrary, all Individual Guarantors shall be considered an "*Affiliate*" of the Loan Parties and in no event shall the Agent or Lender be considered an "*Affiliate*" of any Loan Party.

"*Affiliate Subordination Agreement*" means a subordination agreement executed and delivered by Credit Parties and each Guarantor in favor of Agent for the benefit of the Lender, substantially in the form of <u>Exhibit F</u>, as the same may be amended, modified and supplemented from time to time.

"*After Acquired Property*" has the meaning specified therefor in <u>Section 6.01(o)</u> [After Acquired Real Property].

"*Agent*" has the meaning specified therefor in the preamble hereto.

"*Agent Advances*" has the meaning specified therefor in <u>Section 9.08(a)</u> [Collateral Matters].

"*Agent's Account*" means an account at a bank designated by the Agent from time to time as the account into which the Loan Parties shall make all payments to the Agent for the benefit of the Agent and the Lender under this Agreement and the other Loan Documents.

"*Agreement*" means this Financing Agreement, as amended, supplemented or otherwise modified from time to time, including any exhibits and schedules hereto.

"*Applicable Rate*" means, at any time, the lesser of (a) the sum of the Current Rate plus the Payment-in-kind Interest Rate and (b) the Highest Lawful Rate.

"*Authorized Officer*" means, with respect to any Person, the chief executive officer, chief financial officer, president or executive vice president of such Person.

"*Bankruptcy Code*" means the United States Bankruptcy Code (11 U.S.C. § 101, et seq.), as amended, and any successor statute.

"*Becker Loan*" shall mean that certain Promissory Note, dated June 18, 2003, by and between the Borrower and John Becker in the principal amount of $500,000.

"*Board*" means the Board of Governors of the Federal Reserve System of the United States.

"*Board of Directors*" means, with respect to any Person, the board of directors (or comparable managers) of such Person or any committee thereof duly authorized to act on behalf of the board (or such managers).

"*Borrower*" has the meaning specified in the preamble hereto.

"*Broadcast License Subsidiary*" shall mean BTR Connecticut, BTR West, BTR Boston and any other Subsidiary of Borrower that holds a Broadcast License other than Lifestyle.

"*Broadcast Licenses*" means, with respect to any radio station, all licenses, authorizations, permits and approvals issued by the FCC necessary for the lawful operation of such radio station, including any amendments, modifications, consents or additional authorizations issued from time to time.

"*BTR West*" has the meaning specified in the preamble hereto.

"*BTR Boston*" has the meaning specified in the preamble hereto.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required to close.

"*Capital Expenditures*" means for any period, with respect to any Person, the aggregate of all expenditures by such Person and its Subsidiaries for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a consolidated balance sheet of such Person and its Subsidiaries provided that, for purposes of calculating compliance with Section 6.02(g) [Capital Expenditures], provided that the following expenditures shall be excluded, without duplication: (i) expenditures made to restore or replace Property to the condition of such Property immediately prior to any damage, loss, or destruction or condemnation of such Property, to the extent such expenditure is made with, or subsequently reimbursed out of the proceeds received from any Recovery Event, (ii) expenditures made by the Borrower or any of its Subsidiaries constituting an Investment permitted by Section 6.02(e)(ii) [Loans, Advances, Investments, Etc.], (iii) expenditures made by the Borrower of any of its Subsidiaries as a tenant in leasehold improvements, to the extent reimbursed by the landlord and (iv) expenditures made with the proceeds of any Dispositions permitted by clauses (ii)(A) and (ii)(B) of Section 6.02(c) [Fundamental Changes; Dispositions].

"*Capital Stock*" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"*Capitalized Lease*" means, with respect to any Person, any lease of real or personal property by such Person as lessee which is (i) required under GAAP to be capitalized on the balance sheet of such Person or (ii) a transaction of a type commonly known as a "*synthetic lease*" (i.e. a lease transaction that is treated as an operating lease for accounting purposes but

with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for Federal income tax purposes).

"***Capitalized Lease Obligations***" means, with respect to any Person, obligations of such Person under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"***Cash Equivalents***" means: (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of one year or less from the date of acquisition issued by any commercial bank organized under the laws of the United States of America or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-1 by Standard and Poor's or P-1 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within nine months from the date of acquisition; and (d) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by Standard and Poor's or A by Moody's.

"***Change of Control***" means each occurrence of any of the following:

(a)     the Individual Guarantors shall cease to beneficially own and of record own and control, directly or indirectly, free and clear of all Liens (other than Liens in favor of Agent), at least fifty percent (50%) of the issued and outstanding Capital Stock of the Borrower;

(b)     Borrower shall cease to directly beneficially and of record own and control, free and clear of all Liens (other than Liens in favor of Agent), one hundred percent (100%) of the issued and outstanding Capital Stock of the Subsidiary Guarantors;

(c)     (i) the Borrower or any of its Subsidiaries consolidates with or merges into another entity or conveys, transfers or leases all or substantially all of its property and assets to another Person, or (ii) any entity consolidates with or merges into the Borrower or any Subsidiary in a transaction pursuant to which the outstanding voting Capital Stock of the Borrower or such Subsidiary is reclassified or changed into or exchanged for cash, securities or other property; or

(d)     at any time, Michael Metter (or a comparable replacement satisfactory to the Agent) shall cease to be involved in the day to day operations and management of the business of the Credit Parties.

"***Closing Fee***" has the meaning specified therefor in Section 2.06(a) [Closing Fees].

- 4 -

"*Collateral*" means all of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by any Person upon which a Lien is granted or purported to be granted by such Person as security for all or any part of the Obligations.

"*Collateral Lease Assignment*" means an agreement made by a Credit Party in favor of the Agent for the benefit of the Lender, collaterally assigning to Agent one or more Leases, securing the Obligations and delivered to the Agent, in form and substance reasonably satisfactory to the Agent, as amended, supplemented or otherwise modified from time to time, including any exhibits and schedules thereto.

"*Communications Act*" means the Communications Act of 1934, as amended.

"*Communications Laws*" means all applicable provisions of (a) the Communications Act, and (b) the rules, regulations, published policies and published decisions promulgated and in effect from time to time (i) under the Communications Act, and (ii) by the FCC.

"*Consolidated EBITDA*" means with respect to any period, the Consolidated Net Income of the Borrower and its Subsidiaries on a consolidated basis (other than Lifestyle) for such period plus, to the extent deducted in determining such Consolidated Net Income for such period, without duplication, Consolidated Net Interest Expense, income tax expense, and depreciation and amortization, in each case determined on a basis consistent with (and accordance with the procedures set forth in) the Independent Accountant Report, and otherwise in accordance with GAAP.

"*Consolidated Net Income*" means, with respect to any Person for any period, the consolidated net income (loss) of such Person and its Subsidiaries for such period, determined on a consolidated basis, but excluding from the determination of Consolidated Net Income (without duplication) (a) any extraordinary or non recurring gains or losses or gains or losses from Dispositions, (b) interest income, (c) income not directly derived from the operation of the Stations or the ownership and leasing of broadcast towers and (d) non-cash income, including, without limitation, from trade or barter, determined on a basis consistent with (and accordance with the procedures set forth in) the Independent Accountant Report, and otherwise in accordance with GAAP.

"*Consolidated Net Interest Expense*" means, with respect to any Person for any period, consolidated gross interest expense of such Person and its Subsidiaries for such period determined on a consolidated basis and in accordance with GAAP (including, without limitation, interest expense paid to Affiliates of such Person), less consolidated interest income for such period determined on a consolidated basis and in accordance with GAAP and including non-cash expenses.

"*Consolidated Rental Expense*" means, for any period, the aggregate amount of all rents paid or payable in cash during such period under all real property leases to which Borrower or any of its Subsidiaries is a party as lessor as determined without duplication on a consolidated basis for Borrower and its Subsidiaries in conformity with GAAP.

"*Consolidated Total Debt*" means, at of any date of determination, the aggregate stated balance sheet amount of all Indebtedness of Borrower and its Subsidiaries, determined on a consolidated basis in accordance with GAAP.

"*Contingent Obligation*" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "*Contingent Obligation*" shall not include any product warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"*Control Agreement*" means a control agreement, in the form of Exhibit E attached hereto, executed and delivered by the Borrower, the Agent, and the applicable securities intermediary with respect to a securities account or a bank with respect to a deposit account, as amended, supplemented or otherwise modified from time to time, including any exhibits and schedules thereto.

"*Cooperation Guaranty*" means the cooperation guaranty made by the Credit Parties and their Affiliates in favor of the Agent for the benefit of the Lender, substantially in the form of Exhibit A-2, as amended, supplemented or otherwise modified from time to time, including any exhibits and schedules thereto.

"*Credit Parties*" means the Borrower and all of its Subsidiaries.

"*Current Interest*" means all interest that has accrued at the Current Rate.

"*Current Interest Amount*" means, as at any date of determination, the aggregate amount of accrued but unpaid interest that has accrued at the Current Rate.

"*Current Rate*" means, at any day, a rate per annum equal to the lesser of (a) the greater of (i) the sum of the Prime Rate in effect on such day plus 5.1% and (ii) seven (7.0%) percent, and (b) the Highest Lawful Rate.

"*Current Value*" shall have the meaning assigned to it in Section 6.01(o) [After Acquired Real Property]

"*Default*" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Default Rate*" means the lesser of (a) the sum of the Applicable Rate plus four (4.0%) percent per annum and (b) the Highest Lawful Rate.

"*Disposition*" means any transaction, or series of related transactions, pursuant to which any Person sells, assigns, transfers or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person.

"*Dollar*," "*Dollars*" and the symbol "*$*" each means lawful money of the United States of America.

"*Effective Date*" means the date of this Agreement.

"*Employee Plan*" means an employee benefit plan (other than a Multiemployer Plan) covered by Title IV of ERISA and maintained (or that was maintained at any time during the six (6) calendar years preceding the date of any borrowing hereunder) for employees of any Credit Party or any of its ERISA Affiliates.

"*Environmental Actions*" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter or other communication from any Person or Governmental Authority involving violations of Environmental Laws or Releases of Hazardous Materials (a) from any assets, properties or businesses owned or operated by any Credit Party or any predecessor in interest; (b) from adjoining properties or businesses; or (c) onto any facilities which received Hazardous Materials generated by any Credit Party or any predecessor in interest.

"*Environmental Laws*" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), as such laws may be amended or otherwise modified from time to time, and any other present or future federal, state, local or foreign statute, ordinance, rule, regulation, order, judgment, decree, permit, license or other binding determination of any Governmental Authority imposing liability or establishing standards of conduct for protection of the environment or other government restrictions relating to the protection of the environment or the Release, deposit or migration of any Hazardous Materials into the environment.

"*Environmental Liabilities and Costs*" means all liabilities, monetary obligations, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any Governmental Authority or any third party, and which relate to any environmental condition or a Release of Hazardous Materials from or onto (i) any property presently or formerly owned by any Credit Party or (ii) any facility which received Hazardous Materials generated by any Credit Party.

"*Environmental Lien*" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time.  References to sections of ERISA shall be construed also to refer to any successor sections.

"*ERISA Affiliate*" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "*controlled group*" within the meaning of Sections 414(b), (c), (m) and (o) of the Internal Revenue Code.

"*Event of Default*" means any of the events set forth in Section 8.01 [Events of Default] (after the giving of any notice or the passage of any applicable grace period, if any, expressly specified in Section 8.01 [Events of Default]).

"*Excess Cash Flow*" means, with respect to any Person for any period, (a) Consolidated Net Income of such Person for such period, plus (b) all non-cash items of such Person deducted in determining Consolidated Net Income for such period, less (c) the sum of (i) all non-cash items of such Person added to the calculation of Consolidated Net Income for such period, (ii) all scheduled and mandatory cash principal payments on the Term Loan made during such period, and all scheduled cash principal payments on other Indebtedness of such Person during such period to the extent such other Indebtedness is permitted to be incurred, and such payments are permitted to be made, under this Agreement, (iii) the cash portion of Capital Expenditures made by such Person during such period to the extent permitted to be made under this Agreement, and (iv) the excess, if any, of the 30-day moving average of Working Investment at the end of such period (such moving average to be calculated for the 30 days prior to the last day of such period) over the 30-day moving average of Working Investment at the beginning of such period (such moving average to be calculated for the 30 days prior to the last day of such period) (or minus the excess, if any, of 30-day moving average of Working Investment at the beginning of such period over such 30-day moving average of Working Investment at the end of such period).

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Extraordinary Receipts*" means any cash received by any Credit Party not in the ordinary course of business (and not consisting of proceeds described in Sections 2.05(c)(ii) or

2.05(c)(iii) [Mandatory Pre-payments] hereof), including, without limitation, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance (except to the extent applied to repair or replace property as reasonably required by Section 6.01(g) [Maintenance of Properties, Etc.]), (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (e) condemnation awards (and payments in lieu thereof) (except to the extent applied to repair or replace property as reasonably required by Section 6.01(g) [Maintenance of Properties, Etc.]), (f) indemnity payments and (g) any purchase price adjustment received in connection with any purchase agreement other than a refund of a portion of the purchase price actually paid in cash in connection with the New York Acquisitions or the Greenwich Acquisition by Borrower to the sellers thereof.

"*FAA*" means the Federal Aviation Administration or any successor to the functions and powers thereof.

"*FCC*" means the Federal Communications Commission or any successor to the functions and powers thereof.

"*FCC License*" has the meaning set forth in Section 8.01 [Events of Default].

"*Final Maturity Date*" means the date at the end of the applicable month, three (3) years after the Effective Date or such earlier date on which the Term Loan shall become due and payable in accordance with the terms of this Agreement or any of the other Loan Documents.

"*Financial Statements*" means (a) the combined and consolidated balance sheet of the Credit Parties for the Fiscal Year ended December 31, 2005, and the related consolidated statement of operations, shareholders' equity and cash flows for the Fiscal Year then ended, (b) the combined and consolidated balance sheet of the Credit Parties for the Fiscal Quarter ended [June 30, 2006], and the related consolidated statement of operations, shareholders' equity and cash flows for the Fiscal Quarter then ended and (c) the combined and consolidated balance sheet of the Credit Parties for each month since the last Fiscal Quarter, and the related consolidated statement of operations, shareholder's equity and cash flows for such months then ended.

"*Fiscal Quarters*" means the three-month periods ending each March 31, June 30, September 30 and December 31.

"*Fiscal Year*" means the fiscal year of the Credit Parties ending on December 31 of each year.

"*Fixed Charge Coverage Ratio*" shall mean, for any period, the ratio of (x) Consolidated EBITDA for such period to (y) Fixed Charges, for such period, calculated on a rolling 12-month basis beginning as of October 31, 2006 and each month thereafter.

"*Fixed Charges*" shall mean for any period of determination the sum (without duplication) of (i) Consolidated Net Interest Expense, (ii) scheduled principal payments in respect to Consolidated Total Debt, and (iii) Consolidated Rental Expense, all of the following as

determined on a consolidated basis for the Borrower and its Subsidiaries in conformity with GAAP.

"*GAAP*" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis, provided that for the purpose of Section 6.03 [Financial Covenants] hereof and the definitions used therein, "*GAAP*" shall mean generally accepted accounting principles in effect on the date hereof and consistent with those used in the preparation of the Financial Statements, provided, further, that if there occurs after the date of this Agreement any change in GAAP that affects in any respect the calculation of any covenant contained in Section 6.03 [Financial Covenants] hereof, the Agent and the Borrower shall negotiate in good faith amendments to the provisions of this Agreement that relate to the calculation of such covenant with the intent of having the respective positions of the Lender and the Borrower after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the covenants in Section 6.03 [Financial Covenants] hereof shall be calculated as if no such change in GAAP has occurred.

"*Governing Documents*" means, with respect to any Person, the certificate of incorporation and by-laws, the certificate of formation and partnership (or other formation document) and the bylaws, limited liability company agreement, operating agreement, partnership agreement (or other operating agreements) or other organizational documents of such Person.

"*Governmental Authority*" means any nation or government, any Federal, state, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Greenwich*" has the meaning assigned thereto in the preamble hereto.

"*Greenwich Acquisition*" means the acquisition of WGCH (AM) station and its related assets.

"*Ground Lease*" means a Lease of real property on which a tower owned by the Credit Parties sits that is used or held for use in the operation of the Stations.

"*Guarantor*" means the Individual Guarantors, the Subsidiary Guarantors, the Guarantors under the Cooperation Guaranty and each other Person that guarantees, pursuant to Section 6.01(b) [Additional Guarantees and Collateral Security] or otherwise, all or any part of the Obligations.

"*Guaranty*" means (a) the Cooperation Guaranty, (b) the Subsidiary Guarantees and (c) the Individual Guarantees.

"*Hazardous Material*" means (a) any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special

waste, or solid waste under Environmental Laws or that is likely to cause immediately, or at some future time, harm to or have an adverse effect on, the environment or risk to human health or safety, including, without limitation, any pollutant, contaminant, waste, hazardous waste, toxic substance or dangerous good which is defined or identified in any Environmental Law and which is present in the environment in such quantity or state that it contravenes any Environmental Law; (b) petroleum and its refined products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous waste characteristic, including, without limitation, corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials; and (e) any raw materials, building components (including, without limitation, asbestos-containing materials) and manufactured products containing hazardous substances listed or classified as such under Environmental Laws.

"*Highest Lawful Rate*" means, with respect to the Agent or the Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to the Agent or the Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"*Indebtedness*" means, with respect to any Person, all liabilities and obligations, contingent or otherwise, that in accordance with GAAP are required to be classified as liabilities upon the balance sheet of such Person (except items of capital stock, capital or paid-in surplus or of retained earnings), and in any event including, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than sixty (60) days after the date such payable was created); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) all Contingent Obligations; (h) liabilities incurred under Title IV of ERISA with respect to any plan (other than a Multiemployer Plan) covered by Title IV of ERISA and maintained for employees of such Person or any of its ERISA Affiliates; (i) withdrawal liability incurred under ERISA by such Person or any of its ERISA Affiliates with respect to any Multiemployer Plan; and (j) all obligations referred to in clauses (a) through (i) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer unless the Agent determines that such Person does not have any liability or obligation, contingent or otherwise, in respect of such Indebtedness.

"**_Indemnified Matters_**" has the meaning specified therefor in Section 10.15(a) [General Indemnity].

"**_Indemnitees_**" has the meaning specified therefor in Section 10.15(a) [General Indemnity].

"**_Independent Accountant_**" means the independent accountant retained to audit the Credit Parties' Financial Statements in connection with and prior to the Term Loan. Such independent accountant must have professional liability coverage of no less than $14 million dollars and otherwise be satisfactory to Lender. If the Agent requests the Independent Accountant to review any calculation by the Credit Parties of Consolidated Net Income or Consolidated EBIDTA at any time, then any adjustments made by the Independent Accountant shall be binding upon the Credit Parties.

"**_Independent Accountant Report_**" means the final report of the Independent Accountant, which adjusts 2005 Consolidated Net Income of the Credit Parties, a copy of which has been delivered to the Credit Parties prior to the Term Loan.

"**_Individual Guarantee_**" means each guaranty, made by each of the Individual Guarantors in favor of the Agent for the benefit of the Lender, substantially in the form of Exhibit A-3, as each may be amended, supplemented or otherwise modified from time to time, including any exhibits and schedules thereto.

"**_Individual Guarantors_**" means, collectively, (a) B. Michael Pisani, a resident of the State of New Jersey; (b) Michael L. Metter, a resident of the State of Connecticut; (c) Frank Lazauskas, a resident of the State of New Jersey; and (d) Leonard F. Moscati, a resident of the State of Connecticut.

"**_Insolvency Proceeding_**" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**_Intercompany Subordination Agreement_**" means a subordination agreement executed and delivered by Credit Parties and each Guarantor in favor of Agent for the benefit of the Lender, substantially in the form of Exhibit G; as the same may be amended, supplemented or modified from time to time.

"**_Internal Revenue Code_**" means the Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the regulations thereunder.

"**_Inventory_**" means, with respect to any Person, all goods and merchandise of such Person, including, without limitation, all raw materials, work-in-process, packaging, supplies, materials and finished goods of every nature used or usable in connection with the shipping, storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired, and all such other property the sale or other disposition of which would give rise to an Account Receivable or cash.

- 12 -

"*Investment*" means any advance, loan, extension of credit or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets substantially constituting an ongoing business from, or make any other investment in, any other Person.

"*Lease*" means any lease of real property to which any Loan Party or any of their Subsidiaries is a party as lessor or lessee.

"*Leased Real Property*" means all real property leased by the Credit Parties and used or held for use in the operation of the Stations, including without limitation land leased by the Credit Parties on which the Stations' studio, towers and transmitters are located, all buildings and other improvements owned by the Credit Parties thereon, all fixtures owned by the Credit Parties located at or used in connection with such facilities, all whether now or hereafter existing.

"*Lender*" has the meaning specified therefor in the preamble hereto.

"*Licenses*" means all of the Broadcast Licenses and all other permits, authorizations and licenses of any Governmental Authority granted or assigned, or to be granted or assigned, to any Credit Party in connection with the ownership or operation of the Stations.

"*Lien*" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any Capitalized Lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"*Lifestyle*" has the meaning assigned to it in the preamble hereto.

"*Liquid Assets*" means cash and Cash Equivalents.

"*LMA*" means a local marketing agreement, time brokerage agreement or any similar agreement between a broadcaster and a radio station licensee pursuant to which the broadcaster provides programming to, and/or retains the advertising revenues of, a substantial portion of the airtime of such station in exchange for fees paid to the licensee.

"*Loan Account*" means an account maintained hereunder by the Agent on its books of account at the Payment Office and, with respect to the Borrower, in which the Borrower will be charged with the Term Loan made to, and all other Obligations incurred by, the Borrower.

"*Loan Document*" means this Agreement, any Guaranty, any Security Agreement, any Pledge Agreement, any Mortgage, any Collateral Lease Assignment, the Affiliate Subordination Agreements, the Control Agreements and any other agreement, instrument, and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing the Term Loan or any other Obligation.

"*Loan Party*" means any Credit Party and any Guarantor.

- 13 -

"*Loan Servicing Fee*" has the meaning specified therefor in Section 2.06(b) [Loan Servicing Fee].

"*Marketable Security*" means (i) securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's or BBB (or equivalent) by Standard & Poor's, or an equivalent rating by a nationally recognized statistical rating organization, but excluding any debt securities or loans or advances between and among the Company and its Subsidiaries (ii) any stock or bonds regularly traded on the New York Stock Exchange, the American Stock Exchange or the NASDAQ Stock Market but specifically excludes (x) any security traded on the over-the-counter markets, and (y) any derivative securities and (iii) investment funds investing at least 95% of their assets in securities of the types described in clauses (i)-(ii) above.

"*Material Adverse Effect*" means a material adverse effect on any of (a) the operations, business, assets, properties, prospects or condition (financial or otherwise) of any Credit Party or the Credit Parties taken as a whole, (b) the ability of any Loan Party to perform any of its obligations under any Loan Document to which it is a party, (c) the legality, validity or enforceability of this Agreement or any other Loan Document, (d) the rights and remedies of the Agent or the Lender under any Loan Document, or (e) the validity, perfection or priority of a Lien in favor of the Agent for the benefit of the Lender on any of the Collateral.

"*Material Contract*" means, with respect to any Person, (a) each contract or agreement to which such Person is a party involving aggregate consideration payable to or by such Person of $25,000 or more (other than purchase orders in the ordinary course of the business of such Person and other than contracts that by their terms may be terminated by such Person in the ordinary course of its business upon less than sixty (60) days' notice without penalty or premium) and (b) all other contracts or agreements material to the business, operations, condition (financial or otherwise), performance, prospects or properties of such Person.

"*Moody's*" means Moody's Investors Service, Inc. and any successor thereto.

"*Mortgage*" means a mortgage (including, without limitation, a leasehold mortgage), deed of trust or deed to secure debt, in form and substance satisfactory to the Agent, made by a Credit Party in favor of the Agent for the benefit of the Lender, securing the Obligations and delivered to the Agent pursuant to Section 4.01(d) [Delivery of Documents], Section 6.01(b) [Additional Guarantees and Collateral Security], Section 5.01(o) [Properties] or otherwise.

"*Multiemployer Plan*" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Credit Party or any of its ERISA Affiliates has contributed to, or has been obligated to contribute, at any time during the preceding six (6) years.

"*Net Cash Proceeds*" means, (a) with respect to any Disposition by any Person, the amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Lien permitted by Section 6.02(a) [Liens, Etc.] on any asset (other

than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such Disposition (other than Indebtedness under this Agreement), (ii) reasonable expenses related thereto incurred by such Person in connection therewith, (iii) transfer taxes paid to any taxing authorities by such Person in connection therewith, and (iv) net income taxes to be paid in connection with such Disposition (after taking into account any tax credits or deductions and any tax sharing arrangements) and (b) with respect to the issuance or incurrence of any Indebtedness by any Person, or the sale or issuance by any Person of any shares of its Capital Stock, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person in connection therewith, after deducting therefrom only (i) reasonable expenses related thereto incurred by such Person in connection therewith, (ii) transfer taxes paid by such Person in connection therewith and (iii) net income taxes to be paid in connection therewith (after taking into account any tax credits or deductions and any tax sharing arrangements); in each case of clause (a) and (b) to the extent, but only to the extent, that the amounts so deducted are (x) actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person and (y) properly attributable to such transaction or to the asset that is the subject thereof.

"*Net Cash Revenue*" means, for any period, gross cash operating revenues of the Credit Parties for such period.

"*New York Acquisitions*" means the acquisitions of _____, _____, _____ or _____ stations and their related assets.

"*Notice of Borrowing*" has the meaning specified therefor in Section 2.02(b) [Making the Term Loan].

"*Obligations*" means all present and future indebtedness, obligations, and liabilities of each Loan Party to the Agent and/or the Lender, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 8.01 [Events of Default] including all such indebtedness, obligations and liabilities under the Loan Documents. Without limiting the generality of the foregoing, the Obligations of each Loan Party under the Loan Documents include (a) the obligation to pay principal, interest (including any interest that, but for the provisions of the Bankruptcy Code, would have accrued), charges, expenses, fees, attorneys' fees and disbursements (including any charges, expenses, fees, attorneys' fees and disbursements that, but for the provisions of the Bankruptcy Code, would have accrued), indemnities and other amounts payable by such Person under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that the Agent or the Lender (in their sole discretion) may elect to pay or advance on behalf of such Person in accordance with the terms of the Loan Documents.

"*Operating Lease Obligations*" means all obligations for the payment of rent for any real or personal property under leases or agreements to lease, other than Capitalized Lease Obligations.

"***Owned Real Property***" means all real property now or hereafter owned by the Credit Parties and used or held for use in the operation of the Stations, including without limitation land owned by the Credit Parties on which the Stations' studio, towers and transmitters are located, all buildings and other improvements thereon, all fixtures located at or used in connection with such facilities, all whether now or hereafter existing.

"***Payment-in-Kind Interest***" means, as at any date of determination, the amount of accrued but unpaid interest at the Payment-in-Kind Interest Rate as of such date.

"***Payment-in-Kind Interest Rate***" means 1.50%, per annum.

"***Payment Office***" means the Agent's office located at 10 Rockefeller Plaza, Suite 910, New York, New York 10020, or at such other office or offices of the Agent as may be designated in writing from time to time by the Agent to the Borrower.

"***PBGC***" means the Pension Benefit Guaranty Corporation or any successor thereto.

"***Permitted Indebtedness***" means:

(a)    any Indebtedness owing to the Agent and the Lender under this Agreement and the other Loan Documents;

(b)    Indebtedness evidenced by Capitalized Lease Obligations entered into in order to finance Capital Expenditures made by the Credit Parties in accordance with the provisions of <u>Section 6.02(g)</u> [Capital Expenditures], which Indebtedness does not exceed $75,000 at any time outstanding;

(c)    temporary loans and advances made by one Credit Party to another Credit Party other than Lifestyle, in the ordinary course of business that are subordinated to the Obligations on terms acceptable to Agent and not exceeding in the aggregate for all Credit Parties at any one time outstanding $100,000; and

(d)    trade payables incurred in the ordinary course of business of the Stations that are unsecured and properly classified as current liabilities upon the balance sheet of a Credit Party in accordance with GAAP and that are in amounts consistent with past practice and, in any event, not materially greater than the amounts set forth on the 2005 year-end balance sheet included in the Financial Statements.

(e)    guarantee obligations of Michael Metter pursuant to that Lease Agreement dated September 1, 2006 by and between Osrock Partnership and Borrower as in effect on the Effective Date; and

(f)    guarantee obligations of Michael Metter pursuant to that certain Lease Agreement, dated July 1, 2006, by and between Harrison Management Company and Greenwich Broadcasting Corporation as in effect on the Effective Date.

"*Permitted Investments*" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case, maturing within six months from the date of acquisition thereof; (b) commercial paper, maturing not more than 270 days after the date of issue rated P-1 by Moody's or A-1 by Standard & Poor's; (c) certificates of deposit maturing not more than 270 days after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000; (d) repurchase agreements having maturities of not more than ninety (90) days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (c) above and which are secured by readily marketable direct obligations of the United States Government or any agency thereof, (e) money market accounts maintained with mutual funds having assets in excess of $2,500,000,000; (f) the Pittsburg Acquisition; and (g) tax exempt securities rated A or better by Moody's or A+ or better by Standard & Poor's.

"*Permitted Liens*" means:

(a)     Liens securing the Obligations;

(b)     Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's and other similar Liens arising (provided they are subordinate to the Agent's Liens on Collateral, except as provided by law) in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than thirty (30) days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(c)     deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) and statutory obligations or (iii) obligations on surety or appeal bonds, but only to the extent such deposits or pledges are incurred or otherwise arise in the ordinary course of business and secure obligations not past due;

(d)     easements, zoning restrictions and similar encumbrances on real property and minor irregularities in the title thereto that do not (i) secure obligations for the payment of money or (ii) materially impair the value of such property or its use by any Credit Party in the normal conduct of such Person's business; and

(e)     Liens covering Collateral having an aggregate fair market value not to exceed $25,000 at any time.

"*Person*" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"*Pittsburgh Acquisition*" means the acquisition of WURP (AM) station and its related assets.

"*Plan*" means any Employee Plan or Multiemployer Plan.

"*Pledge Agreement*" means each pledge and security agreement made by the holders of (i) a majority of the Capital Stock of the Borrower and (ii) all of the Capital Stock of each of the Borrower's Subsidiaries, in favor of the Agent for the benefit of the Lender, substantially in the form of Exhibit C, as amended, supplemented or otherwise modified from time to time, including any exhibits and schedules thereto.

"*Post-Closing Agreement*" means the post-closing agreement made by each Credit Parties and the Borrower for the benefit of the Agent, as agent for the Lender, in form of Exhibit G, including any exhibits and schedules thereto, as the same may be amended, modified or supplemented from time to time.

"*Prime Rate*" means for any day a per annum rate of interest equal to the "prime rate," as published in the "Money Rates" column of *The Wall Street Journal*, Central Edition, from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer of the Lender.

"*Property*" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including Capital Stock.

"*Recovery Event*" means any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of the Borrower or any of its Subsidiaries.

"*Regulation T*", "*Regulation U*" and "*Regulation X*" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"*Release*" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

"*Remedial Action*" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the indoor or outdoor environment; (b) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (c) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (d) perform any other actions authorized by 42 U.S.C. § 9601.

"**Reportable Event**" means an event described in Section 4043 of ERISA (other than an event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section).

"**Requirement of Law**" means, as to any Person, the Governing Documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**SEC**" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"**Security Agreement**" means any Security Agreement made by a Credit Party in favor of the Agent for the benefit of the Lender, substantially in the form of Exhibit B, securing the Obligations and delivered to the Agent, as amended, supplemented or otherwise modified from time to time, including any exhibits and schedules thereto.

"**Solvent**" means with respect to any Person, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value (as such term is defined in clause (a)) of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business and (d) such Person will be able to pay its debts as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured; provided that, for purposes of this definition, in computing the amount of any contingent, unliquidated, unmatured or disputed claim at any time, it is intended that such claims will be computed at the amount which, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual, liquidated or matured claim.

"**Specified Authority**" means the FCC, the FAA and all other Governmental Authorities having jurisdiction over the Credit Parties, any Station and/or any License.

"**Standard & Poor's**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"**Stations**" means collectively the following radio stations (and any other radio stations acquired by any Credit Party at any time):

WGCH (AM), Greenwich, Connecticut
KNUU(AM), Las Vegas, Nevada
WBET(AM), Brockton, Massachusetts

"**Subsidiary**" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of (i) the outstanding Capital Stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such Person, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such Person.

"**Subsidiary Guarantors**" shall have the meaning assigned thereto in the preamble hereto.

"**Subsidiary Guaranty**" means the unconditional guaranty, made by the Subsidiary Guarantors in favor of the Agent for the benefit of the Lender, substantially in the form of Exhibit A-4, as amended, supplemented or otherwise modified from time to time, including any exhibits and schedules thereto.

"**Tax Distributions**" means in any period, collectively, any and all payments, distributions, loans or advances made by a Credit Party to the holders of its Capital Stock, based on reasonable estimates of the amount of federal, state and local income taxes that such holders (or the owners of any Capital Stock that is a pass-through entity for tax purposes) would be required to pay with respect to the Fiscal Year in question due solely to such holder's status as a holder of Capital Stock of such Credit Party; provided, however, that (a) such Credit Party shall promptly provide to the Agent documentation supporting the determination of the amounts to be reported by such holders in respect of such taxes and any portion thereof proposed to be paid under Section 6.02(h) [Restricted Payments] to the reasonable satisfaction of the Agent, and (b) such payments shall be made only when and to the extent that any such holder is obligated to make estimated (based upon the highest combined federal, state and local income tax rates applicable to such holder) and final cash tax payments under applicable law.

"**Term**" shall mean the expiration of a period of three (3) years after the Effective Date.

"**Term Loan**" shall have the meaning specified therefore in Section 2.02(a) [Commitments].

"*Termination Event*" means (a) a Reportable Event with respect to any Employee Plan, (b) any event that causes any Loan Party or any of its ERISA Affiliates to incur liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, (b) the filing of a notice of intent to terminate an Employee Plan or the treatment of an Employee Plan amendment as a termination under Section 4041 of ERISA, (c) the institution of proceedings by the PBGC to terminate an Employee Plan, or (d) any other event or condition which would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Employee Plan.

"*Title Insurance Policy*" means a mortgagee's loan policy, in form and substance satisfactory to the Agent, together with all endorsements made from time to time thereto, issued by or on behalf of a title insurance company satisfactory to the Agent, insuring the Lien created by a Mortgage in an amount and on terms satisfactory to the Agent, delivered to the Agent.

"*Total Commitment*" means an aggregate amount of $5,500,000.

"*Tranche I*" means the portion of the Total Commitment designated as Tranche I on Schedule 1.01(A) hereto.

"*Tranche II*" means the portion of the Total Commitment designated as Tranche II on Schedule 1.01(A) hereto.

"*Tranche II Date*" means December ___, 2006 **[30 days from Effective Date]**.

"*Tower Site Lease*" means an agreement for the lease of a tower or of space on a tower or for real property where a tower is located, in any case, where such tower is for the primary radio signal of a Station (as the location of such tower is specified in the applicable Broadcast License with respect to such Station).

"*Uniform Commercial Code*" has the meaning specified therefor in Section 1.03 [Accounting and Other Terms].

"*WARN*" has the meaning specified therefor in Section 5.01(z) [Employee and Labor Matters].

"*Working Capital Account Balance*" has the meaning specified therefor in Section 7.02 [Working Capital Control Account].

"*Working Capital Bank*" has the meaning specified therefor in Section 7.02 [Working Capital Control Account].

"*Working Capital Control Account*" has the meaning specified therefor in Section 7.02 [Working Capital Control Account].

"*Working Investment*" means, at any date of determination thereof, (a) the sum, for any Person, of (i) the unpaid face amount of all Accounts Receivable of such Person as at such date of determination, plus (ii) the aggregate amount of prepaid expenses and other current

- 21 -

assets of such Person as at such date of determination, minus (b) the sum, for such Person, of (i) the unpaid amount of all accounts payable of such Person as at such date of determination, plus (ii) the aggregate amount of all accrued expenses of such Person as at such date of determination (but, excluding from accounts payable and accrued expenses, the current portion of long-term debt and all accrued interest and taxes).

"*Yield Maintenance Premium*" has the meaning specified therefor in <u>Section 2.06(c)</u> [Yield Maintenance Premium].

Section 1.02    <u>Terms Generally</u>.    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "*include*", "*includes*" and "*including*" shall be deemed to be followed by the phrase "*without limitation*". The word "*will*" shall be construed to have the same meaning and effect as the word "*shall*". Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such . amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "*herein*", "*hereof*" and "*hereunder*", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible. References in this Agreement to "*determination*" by the Agent include good faith estimates by the Agent (in the case of quantitative determinations) and good faith beliefs by the Agent (in the case of qualitative determinations).

Section 1.03    <u>Accounting and Other Terms</u>.    Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP applied on a basis consistent with those used in preparing the Financial Statements. All terms used in this Agreement which are defined in Article 8 or Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "*Uniform Commercial Code*") and which are not otherwise defined herein shall have the same meanings herein as set forth therein, provided that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Agent may otherwise determine.

Section 1.04    <u>Time References</u>.    Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day. For purposes of the computation of a period of time from a specified date to a later specified date, the word "*from*" means "*from and including*" and the words "*to*" and "*until*" each means "*to but excluding*"; provided, however, that with respect to a computation of fees or interest payable to the Agent or the Lender, such period shall in any event

consist of at least one full day.

## ARTICLE II

## THE TERM LOAN

Section 2.01   Commitment.

(a)     Subject to the terms and conditions herein set forth and relying upon the representations and warranties herein set forth, the Lender agrees to lend to the Borrower (i) on the Effective Date, the Tranche I portion of the Term Loan, and (ii) subject to the terms and upon satisfaction of the conditions set forth in Section 2.01(d) below, Tranche II portion of the Term Loan (together the "*Term Loan*").

(b)     The aggregate principal amount of the Term Loan shall not exceed the Total Commitment.  Any principal amount of the Term Loan which is repaid or prepaid may not be reborrowed.

(c)     The proceeds of the Term Loan may be used by the Credit Parties only (i) to refinance existing indebtedness of the Borrower, (ii) for the acquisition of KNUU-(AM) and WBET-(AM) radio stations (collectively, the "*Acquisitions*"), (iii) for general working capital purposes of the Borrower and its Subsidiaries except Lifestyle and (iv) to pay fees and expenses related to this Agreement and to the Acquisitions.

(d)     The Credit Parties may request the Tranche II portion of the Term Loan by delivery of a Notice of Borrowing no later than three (3) business days prior to the date of the proposed credit advance of the Tranche II portion of the Term Loan, which shall not be later than the Tranche II Date.  The Lender's obligation to make the Tranche II portion of the Term Loan is subject to (i) satisfaction by the Credit Parties of the conditions set forth in Section 4.01 [Conditions Precedent] as of the date of the advance of the Tranche II portion of the Term Loan (whether or not satisfied as of the date of the Tranche I portion of the Term Loan) and Section 4.02 [Conditions Precedent to Each Extension of Credit].

Section 2.02   Making the Term Loan.

(a)     Making the Tranche I Portion of the Term Loan.  Except as otherwise provided in this Section 2.02 [Making the Term Loan], on the Effective Date, the Tranche I portion of the Term Loan under this Agreement shall be made by the Lender by wire transfer in immediately available funds.   Notwithstanding any other provision of this Agreement, the Lender shall not have an obligation to make any Term Loan, if an Event of Default or Default exists.

(b)     Making the Tranche II Portion of the Term Loan. (i) The Borrower shall give the Agent prior telephonic notice (immediately confirmed in writing, in substantially the form of Exhibit D hereto (a "*Notice of Borrowing*")), not later than 12:00 noon (New York City time) on the date which is three Business Days prior to the date of the proposed funding of the Term Loan or portion thereof (or such longer period as provided by Section 2.01(d)).  The Notice of Borrowing shall be irrevocable and shall specify and certify (1) the principal amount of the

proposed Term Loan or portion thereof, (2) the intended use of the proceeds, (3) the proposed borrowing date, which for Tranche II may not be later than the Tranche II Date, and (4) satisfaction of all conditions precedent thereto.  The Agent and the Lender may act without liability upon the basis of written, telecopied or telephonic notice believed by the Agent in good faith to be from the Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Borrower to the Agent).  Each Credit Party hereby waives the right to dispute the Agent's record of the terms of any such telephonic Notice of Borrowing.  The Agent and the Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request the Term Loan or portion thereof on behalf of the Credit Parties until the Agent receives written notice to the contrary.  The Agent and the Lender shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing.

(c)     The Notice of Borrowing pursuant to this Section 2.02 shall be irrevocable and the Credit Parties shall be bound to make the borrowing in accordance therewith.

Section 2.03     Repayment of Term Loan; Evidence of Debt.

(a)     The Credit Parties shall pay the Agent for the account of the Lender principal payments equal to the amounts listed on Schedule 2.5(a) on the corresponding dates on the Term Loan, due and payable on the last day of each calendar month, commencing on June 30, 2007, with the final installment due on the Final Maturity Date in an amount equal to the entire principal balance of the Term Loan then unpaid, together with all such other amounts as may be necessary to pay in full, in cash, all Obligations to the Lender in the manner set forth in Section 3.02(a) [Payments, Computations and Statements].

(b)     The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Credit Parties to the Lender, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

(c)     The Agent shall maintain accounts in which it shall record (i) the amount of the Term Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Credit Parties to the Lender hereunder and (iii) the amount of any sum received by the Agent hereunder for the account of the Lender.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of the Lender or the Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Credit Parties to repay the Term Loan in accordance with the terms of this Agreement.

(e)     The Lender may request that the Term Loan (or portion thereof) made by it be evidenced by a promissory note.  In such event, the Credit Parties shall execute and deliver to the Lender a promissory note payable to the order of the Lender (or, if requested by the Lender, to the Agent) in a form furnished by the Agent and reasonably acceptable to the Borrower.  Thereafter, the Term Loan (or portion thereof) evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 10.07 [Assignments and Participations]) be represented by one or more promissory notes in such form

payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.04    Interest.

(a)    The Term Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Term Loan until such principal amount is paid in full by Borrower to Lender, at the Applicable Rate.

(b)    Default Interest.  To the extent permitted by law, upon the occurrence and during the continuance of an Event of Default, the principal of, and all accrued and unpaid interest on, the Term Loan and any other unpaid Obligations shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Default Rate.

(c)    Interest Payment.  Current Interest on the Term Loan shall be payable in cash monthly, in arrears, on the last day of each month, commencing on the last day of the month in which the Term Loan is made and at maturity (whether upon demand, by acceleration or otherwise).  Payment-in-Kind Interest shall accrue monthly, and shall be capitalized and added to the outstanding principal amount, in arrears, on the first day of each month, commencing on the first day of the month following the month in which the Term Loan is made until the Final Maturity Date.  Interest at the Default Rate shall be payable on demand.  Each Credit Party hereby authorizes the Agent to, and the Agent may, from time to time, charge the Loan Account pursuant to Section 3.02 [Payments, Computations and Statements] with the amount of any interest payment due hereunder.

(d)    General.  All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed.

Section 2.05    Reduction of Commitment; Prepayment of Term Loan.

(a)    Termination of Commitments.  The Tranche I portion of the Total Commitment shall terminate at 5:00 p.m. (New York city time) on the Effective Date. The Tranche II portion of the Total Commitment shall terminate at 5:00 p.m. (New York City time) on the Tranche II Date.

(b)    Optional Prepayment.  The Credit Parties may, upon at least five (5) Business Days' prior written notice to the Agent, prepay, together with any applicable Yield Maintenance Premium, the principal of the Term Loan, in whole or in part.  Each prepayment made pursuant to this clause (b) shall be accompanied by the payment of accrued interest in cash (including, without limitation, the Payment-in-Kind Interest Amount) to the date of such payment on the amount prepaid, together with any applicable Yield Maintenance Premium.

(c)    Mandatory Prepayment.

(i)    Within ten (10) days of delivery to the Agent and the Lender of Fiscal Quarter financial statements pursuant to Section 6.01(a)(ii) [Reporting Requirements], commencing with the delivery to the Agent and the Lender of the financial statements for the

Fiscal Quarter ended June 30, 2007 or, if such financial statements are not delivered to the Agent and the Lender on the date such statements are required to be delivered pursuant to Section 6.01(a)(ii) [Reporting Requirements], ten (10) days after the date such statements are required to be delivered to the Agent and the Lender pursuant to Section 6.01(a)(ii) [Reporting Requirements], the Credit Parties shall prepay the outstanding principal amount of the Term Loan in an amount equal to 100% of the Excess Cash Flow of the Credit Parties (other than Lifestyle) for such Fiscal Quarter; provided, that for the Fiscal Quarter in which the Pittsburgh Acquisition is permitted under Section 6.02(v) and consummated, such prepayment shall be reduced by the amount of Excess Cash Flow for such Fiscal Quarter that is used to fund the Pittsburgh Acquisition.

(ii)    Immediately upon any Disposition by any Credit Party, other than pursuant to either clause (A) or clause (B) of Section 6.02(c)(ii) [Fundamental Changes, Dispositions], the Credit Parties shall prepay the outstanding principal amount of the Term Loan in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Disposition to the extent that the aggregate amount of Net Cash Proceeds received by the Credit Parties (and not paid to Agent as a prepayment of the Term Loan) shall exceed for all such Dispositions per annum $100,000.  Nothing contained in this subsection (ii) shall permit any Credit Party to make a Disposition of any property other than in accordance with Section 6.02(c)(ii) [Fundamental Changes, Dispositions].

(iii)    Upon the issuance or incurrence by any Credit Party of any Indebtedness (other than Permitted Indebtedness), or the sale or issuance by any Credit Party of any shares of its Capital Stock (except for the first $3,000,000 of Net Cash Proceeds of such sale or issuance by any Credit Party of shares of its Capital Stock), the Credit Parties shall prepay the outstanding amount of the Term Loan in an amount equal to 50% of the Net Cash Proceeds received by such Person in connection therewith.  The provisions of this subsection shall not be deemed to be implied consent to any such issuance, incurrence or sale otherwise prohibited by the terms and conditions of this Agreement.

(iv)    Upon the receipt by any Credit Party of any Extraordinary Receipts, the Credit Parties shall prepay the outstanding principal of the Term Loan in an amount equal to 100% of such Extraordinary Receipts, net of any reasonable expenses incurred, directly or indirectly, in collecting such Extraordinary Receipts.  In the event that the aggregate amount of the cash and Permitted Investments of the Credit Parties at the end of any calendar year exceeds $500,000 (including the Working Capital Account Balance and any other amounts in the Working Capital Control Account, if any), the Credit Parties shall immediately prepay the outstanding principal of the Term Loan in the amount equal to such excess.

(d)    Interest and Fees.  Any prepayment made pursuant to this Section 2.05 [Termination of Commitment; Prepayment of Term Loan] shall be accompanied by accrued interest on the principal amount being prepaid to the date of prepayment (including, without limitation, the Payment-in-Kind Interest Amount) and the Yield Maintenance Premium.

(e)    Cumulative Prepayments.  Except as otherwise expressly provided in this Section 2.05 [Termination of Commitment; Prepayment of Term Loan], payments with respect to any subsection of this Section 2.05 [Termination of Commitment; Prepayment of Term Loan]

are in addition to payments made or required to be made under any other subsection of this Section 2.05 [Termination of Commitment; Prepayment of Term Loan].

Section 2.06    Fees.

(a)    Closing Fee. On or prior to the Effective Date, the Credit Parties shall pay to the Agent for the account of the Lender, a non-refundable closing fee (the "*Closing Fee*") equal to 2.50% of the Total Commitment, which shall be deemed fully earned when paid.

(b)    Loan Servicing Fee. From and after the Effective Date and until the later of (i) the Final Maturity Date and (ii) the date on which all Obligations are paid in full, the Credit Parties shall pay to the Agent for the account of the Agent, a non-refundable loan servicing fee (the "*Loan Servicing Fee*") equal to $2,300 each month, which shall be deemed fully earned when paid and which shall be payable on the Effective Date (payable ratably based on the number of days remaining in the calendar month in which the Effective Date occurs) and monthly in advance thereafter on the first day of each calendar month.

(c)    Yield Maintenance Premium. If for any reason at any time prior to the first anniversary of the Effective Date any of the Credit Parties prepay the Term Loan in whole or from time to time any of the Credit Parties prepay the Term Loan in part other than those payments made in accordance with Sections 2.05(c)(i), and 2.05(c)(iv) [Mandatory Prepayments], the Credit Parties shall pay to the Agent for the account of the Lender, an amount (the "*Yield Maintenance Premium*") equal to the aggregate amount of interest (calculated based on the Current Rate then in effect) that would have otherwise accrued on the amount of the principal prepaid, during the period from the date of prepayment until the date twelve (12) months after the Effective Date.

Section 2.07    Taxes. (a) All payments made by any Loan Party hereunder or under any other Loan Document shall be made without set-off, counterclaim, deduction or other defense. All such payments shall be made free and clear of and without deduction for any present or future income, franchise, sales, use, excise, stamp or other taxes, levies, imposts, deductions, charges, fees, withholdings, restrictions or conditions of any nature now or hereafter imposed, levied, collected, withheld or assessed by any jurisdiction (whether pursuant to Federal, state, local or foreign law) or by any political subdivision or taxing authority thereof or therein, and all interest, penalties or additional amounts, excluding taxes on the net income of the Lender or the Agent imposed by the United States or the jurisdiction in which the Lender or the Agent is organized or any political subdivision thereof or taxing authority thereof or any jurisdiction in which such Person's principal office is located or any political subdivision thereof or taxing authority thereof (such nonexcluded taxes, levies, imposts, deductions, charges, fees, withholdings, restrictions, conditions, interest, penalties and additional amounts being hereinafter collectively referred to as "Taxes"). If any Loan Party shall be required to deduct or to withhold any Taxes from or in respect of any amount payable hereunder or under any other Loan Document,

(i)    the amount so payable shall be increased so that after making all required deductions and withholdings (including Taxes on amounts payable pursuant to this

sentence) the Lender or the Agent, as the case may be, receive an amount equal to the sum they would have received had no such deduction or withholding been made,

(ii)    such Loan Party shall make such deduction or withholding,

(iii)    such Loan Party shall pay the full amount deducted or withheld to the relevant taxation authority in accordance with applicable law, and

(iv)    as promptly as possible thereafter, such Loan Party shall send the Lender and the Agent an official receipt (or, if an official receipt is not available, such other documentation as shall be reasonably satisfactory to the Lender or the Agent, as the case may be) evidencing payment of the amount or amounts so deducted or withheld. In addition, each Loan Party agrees to pay any present or future taxes, charges or similar levies which arise from any payment made hereunder or from the execution, delivery, performance, recordation or filing of, or otherwise with respect to, this Agreement or any other Loan Document other than the foregoing excluded taxes (hereinafter referred to as *"Other Taxes"*).

(b)    The Loan Parties hereby jointly and severally indemnify and agree to hold the Lender and the Agent harmless from and against Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.08 [Taxes]) paid by the Lender or the Agent and any liability (including penalties, interest and expenses for nonpayment, late payment or otherwise) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. Such indemnification shall be paid within ten (10) days from the date on which any the Lender or the Agent makes written demand therefor, which demand shall identify in reasonable detail the nature and amount of such Taxes or Other Taxes.

(c)    If any Loan Party fails to perform any of its obligations under this Section 2.08 [Taxes], the Loan Parties shall indemnify the Lender and the Agent for any taxes, interest or penalties that may become payable as a result of any such failure. The obligations of the Loan Parties under this Section 2.08 [Taxes] shall survive the termination of this Agreement and the payment of the Term Loan and all other amounts payable hereunder.

## ARTICLE III

### FEES, PAYMENTS AND OTHER COMPENSATION

Section 3.01    Audit and Collateral Monitoring Fees.    The Credit Parties acknowledge that pursuant to Section 6.01(f) [Inspection Rights], representatives of the Agent may visit any or all of the Credit Parties' properties and/or conduct audits, inspections, valuations and/or field examinations of any or all of the Credit Parties at any time and from time to time (so long as no Event of Default has occurred and is continuing, upon reasonable prior notice and during normal business hours and in a manner so as to not unduly disrupt the business of the Credit Parties). The Credit Parties agree to pay (i) the examiner's out-of-pocket costs and expenses incurred in connection with all such visits, audits, inspections, valuations and field examinations and (ii) the reasonable cost of all visits, audits, inspections, valuations and field examinations conducted by a third party on behalf of the Agent.

Section 3.02    <u>Payments; Computations and Statements.</u>

(a)    The Credit Parties will make each payment under this Agreement not later than 2:00 p.m. (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Agent's Account. All payments received by the Agent after 2:00 p.m. (New York City time) on any Business Day will be credited to the Loan Account on the next succeeding Business Day. All payments shall be made by the Credit Parties without set-off, counterclaim, deduction or other defense to the Agent and the Lender. Except as provided in <u>Section 2.02</u> [Making the Term Loan], after receipt, the Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal to the Lender and like funds relating to the payment of any other amount payable to the Lender to the Lender, in each case to be applied in accordance with the terms of this Agreement, provided that the Agent will cause to be distributed all interest and fees received from or for the account of the Borrower not less than once each month and in any event promptly after receipt thereof. The Lender and the Credit Parties hereby authorize the Agent to, and the Agent may, from time to time, charge the Loan Account of the Borrower with any amount due and payable by the Credit Parties under any Loan Document. Each of the Lender and the Credit Parties agrees that the Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing. The Lender and the Credit Parties confirm that any charges which the Agent may so make to the Loan Account of the Borrower as herein provided shall constitute part of the Obligations, shall be secured by the Loan Documents and shall be made as an accommodation to the Borrower and solely at the Agent's discretion. Whenever any payment to be made under any such Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be. All computations of fees shall be made by the Agent on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such fees are payable. Each determination by the Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

(b)    The Agent may (but is not obligated to), and shall promptly upon the Borrower's request but in any event not more frequently than once monthly, provide the Borrower from time to time a summary statement (in the form from time to time used by the Agent) of the amounts and dates of all payments on account of the Term Loan, the application of such payments, the amount of interest accrued on the Term Loan, the amount and nature of any charges to the Loan Account, and the amount of all unpaid fees, expenses and other Obligations. All entries on any such statement shall be presumed to be correct and, thirty (30) days after the same is sent, shall be final and conclusive absent manifest error.

Section 3.03    <u>Apportionment of Payments.</u> Subject to Section 2.02 [Making of Term Loan] hereof:

(a)    all payments of principal and interest in respect of the outstanding Term Loan, all payments of fees (other than the fees set forth in <u>Section 2.06</u> [Fees] hereof to the extent set forth in a written agreement among the Agent and the Lender, and the audit and collateral monitoring fee provided for in <u>Section 3.01</u> [Audit and Collateral Monitoring Fee]) and all other payments in respect of any other Obligations shall be allocated by the Agent to the

- 29 -

Lender as is entitled thereto, or otherwise as provided herein or, in respect of payments not made on account of the Term Loan, as designated by the Person making payment when the payment is made.

(b)     After the occurrence and during the continuance of an Event of Default, the Agent may, and upon the direction of the Lender shall, apply all payments in respect of any Obligations and all proceeds of the Collateral, subject to the provisions of this Agreement, (i) first, to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due to the Agent until paid in full, (ii) second, to pay the Obligations in respect of any fees and indemnities then due to the Lender until paid in full, (iii) third, to pay the Payment-in-Kind Interest Amount due in respect of the Term Loan until paid in full, (iv) fourth, to pay the Current Interest Amount due in respect of the Term Loan until paid in full, (v) fifth, to pay principal of the Term Loan until paid in full, and (vi) sixth, to the payment of all other Obligations then due and payable.

(c)     In each instance, so long as no Event of Default has occurred and is continuing, Section 3.03(b) [Apportionment of Payments] shall not be deemed to apply to any payment by the Credit Parties specified by the Borrower to the Agent to be for the payment of Obligations then due and payable under any provision of this Agreement or the prepayment of all or part of the principal of the Term Loan in accordance with the terms and conditions of Section 2.05 [Reduction of Commitment; Prepayment of Term Loan].

(d)     For purposes of Section 3.03(b) [Apportionment of Payments], *"paid in full"* with respect to interest shall include interest accrued after the commencement of any Insolvency Proceeding irrespective of whether a claim for such interest is allowable in such Insolvency Proceeding.

Section 3.04    Increased Costs and Reduced Return.

(a)     If the Lender or the Agent shall have determined that the adoption or implementation of, or any change in, in each case after the Effective Date, any law, rule, treaty or regulation, or any policy, guideline or directive of, or any change in, the interpretation or administration thereof by, any court, central bank or other administrative or Governmental Authority, or compliance by the Lender or the Agent or any Person controlling any the Lender or the Agent with any directive of, or guideline from, any Governmental Authority or the introduction of, or change in, any accounting principles applicable to the Lender or the Agent or any Person controlling any the Lender or the Agent (in each case, whether or not having the force of law), shall (i) subject the Lender or the Agent, or any Person controlling any the Lender or the Agent to any tax, duty or other charge with respect to this Agreement or the Term Loan made by the Lender or the Agent or change the basis of taxation of payments to the Lender or the Agent or any Person controlling any the Lender or the Agent of any amounts payable hereunder (except for taxes on the overall net income of the Lender or the Agent or any Person controlling any the Lender or  the Agent), or (ii) impose on the Lender or the Agent or any Person controlling any the Lender or the Agent any other condition regarding this Agreement or the Term Loan, and the result of any event referred to in clauses (i) or (ii) above shall be to increase the cost to the Lender or the Agent of making the Term Loan, or agreeing to make the Term Loan, or to reduce any amount received or receivable by the Lender or the Agent hereunder,

then, upon demand by any the Lender or the Agent, the Credit Parties shall pay to the Lender or the Agent such additional amounts as will compensate the Lender or the Agent for such increased costs or reductions in amount.

   (b)  If Lender or the Agent shall have determined that the implementation of, or any change in, any applicable accounting principles (in each case, whether or not having the force of law), has or would have the effect of reducing the rate of return on the Lender's or the Agent's or any such other controlling Person's capital to a level below that which the Lender or the Agent or such controlling Person could have achieved but for such circumstances as a consequence of the Term Loan made or maintained or any agreement to make the Term Loan or the Lender's or the Agent's or such other controlling Person's other obligations hereunder, then, upon demand by the Lender or the Agent, the Credit Parties shall pay to the Lender or the Agent from time to time such additional amounts as will compensate the Lender or the Agent for such reduction in the rate of return on the Lender's or the Agent's or such other controlling Person's capital.

   (c)  All amounts payable under this Section 3.04 [Increased Costs and Reduced Return] shall bear interest from the date that is ten (10) days after the date of demand by the Lender or the Agent until payment in full to the Lender or the Agent at the Current Rate. A certificate of the Lender or the Agent claiming compensation under this Section 3.04 [Increased Costs and Reduced Return], specifying the event herein above described and the nature of such event shall be submitted by the Lender or the Agent to the Borrower, setting forth the additional amount due and an explanation of the calculation thereof, and the Lender's or the Agent's reasons for invoking the provisions of this Section 3.04 [Increased Costs and Reduced Return], and shall be final and conclusive absent manifest error.

   Section 3.05  Joint and Several Liability of the Credit Parties.

   (a)  Notwithstanding anything in this Agreement or any other Loan Document to the contrary, each of the Credit Parties hereby accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Agent and the Lender under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each of the Credit Parties and in consideration of the undertakings of the other Credit Parties to accept joint and several liability for the Obligations. Each of the Credit Parties, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Credit Parties, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 3.06 [Joint and Several Liability of the Credit Parties]), it being the intention of the parties hereto that all of the Obligations shall be the joint and several obligations of each of the Credit Parties without preferences or distinction among them. If and to the extent that any of the Credit Parties shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event, the other Credit Parties will make such payment with respect to, or perform, such Obligation. Subject to the terms and conditions hereof, the Obligations of each of the Credit Parties under the provisions of this Section 3.06 [Joint and Several Liability of the Credit Parties] constitute the absolute and unconditional, full recourse Obligations of each of the Credit Parties, enforceable

against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.

(b)     The provisions of this Section 3.06 [Joint and Several Liability of the Credit Parties] are made for the benefit of the Agent, the Lender and their successors and assigns, and may be enforced by them from time to time against any or all of the Credit Parties as often as occasion therefor may arise and without requirement on the part of the Agent, the Lender or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Credit Parties or to exhaust any remedies available to it or them against any of the other Credit Parties or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 3.06 [Joint and Several Liability of the Credit Parties] shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.

(c)     Each of the Credit Parties hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Credit Parties with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agent or the Lender with respect to any of the Obligations or any Collateral, until such time as all of the Obligations have been paid in full in cash.  Any claim which any Credit Party may have against any other Credit Party with respect to any payments to the Agent or the Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

## ARTICLE IV

### CONDITIONS TO TERM LOAN

Section 4.01   Conditions Precedent.  The initial extension of credit requested to be made by Lender hereunder is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Effective Date, of the following conditions precedent:

(a)     Payment of Fees, Etc.  The Credit Parties shall have paid on or before the date of each such portion of the Term Loan all fees, costs, expenses and taxes then payable in connection with the Acquisitions pursuant to Section 2.06 [Fees], Section 10.04 [Expenses; Taxes; Attorneys' Fees], Schedule 5.10(t) and payment of certain broker fees in connection with the Acquisitions including (1) William Fleming and (2) Media Capital Solutions, LLC.

(b)     Representations and Warranties; No Event of Default.  The following statements shall be true and correct: (i) the representations and warranties contained in Article V [Representations and Warranties] and in each other Loan Document, certificate or other writing delivered to the Agent or the Lender pursuant hereto or thereto on or prior to the date of the Term Loan are true and correct on and as of such date as though made on and as of such date and (ii) no Default or Event of Default shall have occurred and be continuing on such date or would result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

(c)    Legality. The making of the Term Loan shall not contravene any law, rule or regulation applicable to the Agent or the Lender.

(d)    Delivery of Documents. The Agent shall have received on or before the date of the Term Loan the following, each duly executed by appropriate parties, dated a date, and otherwise in form and substance, satisfactory to the Agent:

(i)    if requested by Agent, one or more promissory notes duly executed by all of the Credit Parties evidencing the Term Loan (or a portion thereof);

(ii)    the Security Agreement;

(iii)    the Pledge Agreements, together with the original certificates (if any) representing (i) all of the Capital Stock owned by the Loan Parties of the Credit Parties, and (ii) all of the Capital Stock owned by the Credit Parties and all intercompany promissory notes of the Credit Parties, accompanied by undated stock powers executed in blank and other proper instruments of transfer;

(iv)    the Subsidiary Guarantees, the Cooperation Guaranty and the Individual Guarantees;

(v)    Mortgages, with respect each parcel of Owned Real Property and each Ground Lease, and Collateral Lease Assignments with respect to each Lease set forth on Schedule 5.01(o);

(vi)    evidence of the recording of the Mortgages in such office or offices as may be necessary or, in the opinion of the Agent, desirable to perfect the Lien purported to be created thereby or to otherwise protect the rights of the Agent and the Lender thereunder;

(vii)    a Title Insurance Policy with respect to each parcel of Owned Real Property and each Ground Lease;

(viii)    a survey of each parcel of Owned Real Property and each Ground Lease, certified to the Agent and to the issuer of the Title Insurance Policy;

(ix)    a copy of each environmental assessment in the possession of a Credit Party that is applicable to any Owned Real Property or any Ground Lease;

(x)    the Affiliate Subordination Agreement;

(xi)    the Intercompany Subordination Agreement;

(xii)    the Post-Closing Agreement;

(xiii)    confirmation of filing of all UCC financing statements as may be necessary or, in the opinion of the Agent, desirable to perfect the security interests purported to

be created by each Security Agreement, each Pledge Agreement, and each Mortgage, if applicable;

(xiv)    certified copies of request for copies of information on Form UCC-11 or lien searches, listing all effective financing statements which name as debtor any Loan Party and which are filed in the offices referred to in paragraph (xi) above, together with copies of such financing statements, none of which, except as otherwise agreed in writing by the Agent, shall cover any of the Collateral, and the results of searches for any tax Lien and judgment Lien filed against such Person or its property, which results, except as otherwise agreed to in writing by the Agent, shall not show any such Liens;

(xv)    a copy of the resolutions of each Loan Party (other than any individual that is a Loan Party), certified by an Authorized Officer thereof, authorizing (A) the borrowings hereunder and the transactions contemplated by the Loan Documents to which such Loan Party is or will be a party, and (B) the execution, delivery and performance by such Loan Party of each Loan Document to which such Loan Party is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith;

(xvi)    a certificate of an Authorized Officer of each Loan Party (other than any individual that is a Loan Party), certifying the names and true signatures of the representatives of such Loan Party authorized to sign each Loan Document to which such Loan Party is or will be a party and the other documents to be executed and delivered by such Loan Party in connection herewith and therewith, together with evidence of the incumbency of such authorized officers;

(xvii)    a certificate of the appropriate official(s) of the state of organization of each Loan Party (other than for an individual that is a Loan Party), certifying as to the subsistence in good standing of, and the payment of taxes by, such Loan Party in such states;

(xviii)    a true and complete copy of the charter, certificate of formation, certificate of limited partnership or other publicly filed organizational document of each Loan Party (other than any individual that is a Loan Party), certified by an appropriate official of the state of organization of such Loan Party which shall set forth the same complete name of such Loan Party as is set forth herein and the organizational number of such Loan Party, if an organized number is issued in such jurisdiction;

(xix)    a copy of the charter and by-laws, limited liability company agreement, operating agreement, agreement of limited partnership or other organizational document of each Loan Party (other than any individual that is a Loan Party), as applicable, together with all amendments thereto, certified by an Authorized Officer of such Loan Party;

(xx)    opinions of Seiden Wayne, LLC, corporate counsel to the Parties and The Law Offices of Dan Alpert, Special FCC counsel to the Credit Parties;

(xxi)    a certificate of an Authorized Officer of the Borrower, certifying as to the matters set forth in subsection (b) of this ARTICLE IV [Conditions Precedent];

(xxii)  a copy of the Financial Statements and the financial projections described in Section 5.01(g)(ii) [Financial Condition] hereof, certified as being true and correct copies thereof by an Authorized Officer of the Borrower;

(xxiii) a certificate of the financial officer of the Borrower, setting forth in reasonable detail the calculations required to establish compliance, on a pro forma basis after giving effect to the Term Loan, with each of the financial covenants for Fiscal Quarter ending September 30, 2006 contained in Section 6.03 [Financial Covenants];

(xxiv) a certificate of each Loan Party, certifying as to the solvency of such Loan Party;

(xxv)  evidence of the insurance coverage required by Section 6.01 [Affirmative Covenants] and the terms of each Security Agreement and each Mortgage, if applicable, and such other insurance coverage with respect to the business and operations of the Credit Parties as the Agent may reasonably request, in each case, where requested by the Agent, with such endorsements as to the named insureds or loss payees thereunder as the Agent may request and providing that such policy may be terminated or canceled (by the insurer or the insured thereunder) only upon thirty (30) days' prior written notice to the Agent and each such named insured or loss payee, together with evidence of the payment of all premiums due in respect thereof for such period as the Agent may request;

(xxvi) a landlord estoppel, waiver and nondisturbance agreement, executed by each landlord with respect to each of the Leases set forth on Schedule 5.01(o);

(xxvii) copies of each LMA, each Tower Site Lease, each lease for a transmitter, and the other Material Contracts to which a Credit Party is a party, certified as true and correct copies thereof by an Authorized Officer of the Borrower, together with a certificate of an Authorized Officer of the Borrower stating that such agreements remain in full force and effect and that none of the Credit Parties has breached or defaulted in any of its obligations under such agreements;

(xxviii)a termination and release agreement with respect to the Becker Loan and all related documents including the note executed therewith, duly executed by such parties, as applicable, together with UCC termination statements for all UCC financing statements filed with respect to the Becker Loan and covering any portion of the Collateral;

(xxix) a statement of sources and uses prepared by the Credit Parties and satisfactory to the Agent;

(xxx)   a copy of the budget with respect to the operation of the Stations and any capital improvements;

(xxxi) a copy of an engineering analysis and capital expenditure budget for all modifications or new facilities for which any Credit Party holds an FCC construction permit;

(xxxii) copies of all Licenses, consents and other authorizations, approvals or evidence of other actions (including, without limitation, any Broadcast License) required by any Governmental Authority (including, without limitation, the FCC and the FAA) in connection with the execution and delivery by any Loan Party of this Agreement or any other Loan Document or with the consummation of the transactions contemplated hereby or thereby (except such consents of the FCC as are referred to in Section 8.02 [FCC Matters]), and a status report as to all pending applications for such Licenses, consents, authorizations and other approvals;

(xxxiii) copies of all construction permits (A) issued by the FCC in connection with any Station, or (B) otherwise required to complete those modifications to facilities necessary for the commencement of the on-air operations of any Station; and

(xxxiv) such other agreements, instruments, approvals, opinions and other documents, as the Agent may reasonably request.

(e)    Material Adverse Effect.    The Agent shall have determined, in its sole judgment, that no event or development shall have occurred since the date of the most recent Financial Statements which could reasonably be expected to have a Material Adverse Effect.

(f)    Approvals.    All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of each portion of the Term Loan shall have been obtained and shall be in full force and effect.

(g)    Proceedings; Receipt of Documents.    All proceedings in connection with the making of each portion of the Term Loan and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be reasonably satisfactory to the Agent and its counsel, and the Agent and such counsel shall have received all such information and such counterpart originals or certified or other copies of such documents as the Agent or such counsel may reasonably request.

(h)    Due Diligence.    The Agent shall have completed its business, legal and collateral due diligence with respect to each Loan Party and the results thereof shall be acceptable to the Agent, in its sole and absolute discretion.

Section 4.02    Conditions to Each Extension of Credit.    Each extension of credit requested to be made by the Lender hereunder on any date (including the initial extension of credit) is subject to the satisfaction of the following conditions precedent:

(a)    Representations and Warranties.    Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date, except such representations and warranties expressly stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date.

(b)  No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Section 5.01  Representations and Warranties.  Each Credit Party hereby represents and warrants to the Agent and the Lender as follows:

(a)  Organization, Good Standing, Etc.  Each Loan Party (other than a Loan Party that is an individual) (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its organization, (ii) has all requisite power and authority to conduct its business as now conducted and as presently contemplated and, in the case of the Credit Parties, to make the borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

(b)  Authorization, Etc.  The execution, delivery and performance by each Loan Party (with respect to (i), (ii) and (iii) below, other than a Loan Party that is an individual) of each Loan Document to which it is or will be a party, (i) have been duly authorized by all necessary action, (ii) do not and will not contravene its charter or by-laws, its limited liability company or operating agreement or its certificate of partnership or partnership agreement, as applicable, or any applicable law or any contractual restriction binding on or otherwise affecting it or any of its properties, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Loan Document) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license (including, without limitation, any Broadcast License), authorization or approval applicable to its operations or any of its properties.

(c)  Governmental Approvals.  No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with the due execution, delivery and performance by any Loan Party of any Loan Document to which it is or will be a party including, without limitation, any Specified Authority or any other Person in connection with or as a condition to the execution, delivery or performance of any of the Loan Documents except (i) for the filing and/or recording of fixture filings and Mortgages, if applicable, (ii) from time to time, the Credit Parties may be required to obtain certain authorizations of or to make certain filings with the FCC and the FAA that are required in the ordinary course of business, (iii) copies of certain documents, including, without limitation, certain Loan Documents, may be required to be filed with the FCC within thirty (30) days of the closing, provided that the failure to file such copies will not affect the due execution, delivery and performance by any Loan Party of any Loan Document to which such Loan Party is a party or the legality, validity or enforceability thereof, (iv) prior approval of the FCC must be obtained for the consummation of any assignments or transfers of control of FCC authorizations and

- 37 -

ownership reports are required to be filed with the FCC after such consummation, and (v) prior to the exercise of certain rights or remedies under the Loan Documents by the Agent, FCC consents and notifications with respect to such exercise may be required to be timely obtained or made. All consents, approvals and authorizations described in Schedule 5.01(c) have been duly granted and are in full force and effect on the date hereof and all filings described in Schedule 5.01(c) have been properly and timely made.

(d)     Enforceability of Loan Documents. This Agreement is, and each other Loan Document to which any Loan Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws.

(e)     Capitalization; Subsidiaries. All of the issued and outstanding Capital Stock of each Subsidiary is owned by Borrower. All of the issued and outstanding Capital Stock of the Borrower is owned by the Persons listed on Schedule 5.01(e) attached hereto. All of the issued and outstanding shares of Capital Stock of each Subsidiary and of Borrower have been validly issued and are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights. Except as listed on Schedule 5.01(e), there are no outstanding debt or equity securities of any Borrower or any of Subsidiaries and no outstanding obligations of any Borrower or any Subsidiaries convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from such Borrower or any Subsidiary, or other obligations of such Borrower or any Subsidiary to issue, directly or indirectly, any shares of Capital Stock of such Borrower or any Subsidiary.

(f)     Litigation; Commercial Tort Claims. Except as set forth on Schedule 5.01(f) hereto, there is no pending or, to the best knowledge of any Loan Party, threatened action, suit or proceeding affecting any Credit Party before any court or other Governmental Authority, including, without limitation, any Specified Authority, or any arbitrator that (A) if adversely determined, could reasonably be expected to have a Material Adverse Effect or (B) relates to this Agreement or any other Loan Document to which a Credit Party is a party or any transaction contemplated hereby or thereby. As of the Effective Date, except as set forth on Schedule 5.01(f), none of the Credit Parties holds any commercial tort claims in respect of which a claim has been filed in a court of law or a written notice by an attorney has been given to a potential defendant.

(g)     Financial Condition.

(i)     The Financial Statements, copies of which have been delivered to the Agent and the Lender, fairly present the consolidated financial condition of the Credit Parties on a consolidated basis as at the respective dates thereof and the consolidated results of operations of the Credit Parties for the fiscal periods ended on such respective dates, all in accordance with GAAP (except for the absence of footnotes and normal year-end adjustments), and since the date of the most recent Financial Statements no event or development has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

(ii)    The Credit Parties have heretofore furnished to the Agent and the Lender (A) projected monthly income statements ending on December 31, 2006, and (B) projected annual income statements and statements of cash flows of the Credit Parties for the Fiscal Years ending in 2006 through 2008, which projected financial statements shall be updated from time to time pursuant to Section 6.01(a)(vii) [Reporting Requirements]. Such projections, as so updated, shall be believed by the Credit Parties at the time furnished to be reasonable, shall have been prepared on a reasonable basis and in good faith by the Credit Parties, and shall have been based on reasonable assumptions at the time made and upon the best information then available to the Credit Parties, and the Credit Parties shall not be aware of any facts or information that would lead them to believe that such projections, as so updated, are incorrect or misleading in any material respect.

(h)    Compliance with Law, Etc.    No Loan Party is in violation of its organizational documents, any law (including, without limitation, the Communications Laws), rule, regulation, judgment or order of any Governmental Authority (including, without limitation, any Specified Authority) applicable to it or any of its property or assets, or any material term of any agreement or instrument (including, without limitation, any Material Contract) binding on or otherwise affecting it or any of its properties.

(i)    ERISA.    (i) Each Employee Plan is in compliance with ERISA and the Internal Revenue Code, (ii) no Termination Event has occurred nor is reasonably expected to occur with respect to any Employee Plan, (iii) the most recent annual report (Form 5500 Series) with respect to each Employee Plan, including any required Schedule B (Actuarial Information) thereto, copies of which have been filed with the Internal Revenue Service and delivered to the Agent, is complete and correct and fairly presents the funding status of such Employee Plan, and since the date of such report there has been no material adverse change in such funding status, (iv) copies of each agreement entered into with the PBGC, the U.S. Department of Labor or the Internal Revenue Service with respect to any Employee Plan have been delivered to the Agent, (v) no Employee Plan had an accumulated or waived funding deficiency or permitted decrease which would create a deficiency in its funding standard account or has applied for an extension of any amortization period within the meaning of Section 412 of the Internal Revenue Code at any time during the previous sixty (60) months, and (vi) no Lien imposed under the Internal Revenue Code or ERISA exists or is likely to arise on account of any Employee Plan within the meaning of Section 412 of the Internal Revenue Code.   No Credit Party or any of its ERISA Affiliates has incurred any withdrawal liability under ERISA with respect to any Multiemployer Plan, or is aware of any facts indicating that it or any of its ERISA Affiliates may in the future incur any such withdrawal liability.   No Credit Party or any of its ERISA Affiliates nor any fiduciary of any Employee Plan has (i) engaged in a nonexempt prohibited transaction described in Sections 406 of ERISA or 4975 of the Internal Revenue Code, (ii) failed to pay any required installment or other payment required under Section 412 of the Internal Revenue Code on or before the due date for such required installment or payment, (iii) engaged in a transaction within the meaning of Section 4069 of ERISA or (iv) incurred any liability to the PBGC which remains outstanding other than the payment of premiums, and there are no premium payments which have become due which are unpaid.   There are no pending or, to the best knowledge of any Credit Party, threatened claims, actions, proceedings or lawsuits (other than claims for benefits in the normal course) asserted or instituted against (i) any Employee Plan or its assets, (ii) any fiduciary with respect to any Employee Plan, or (iii) any Credit Party or any of its ERISA

Affiliates with respect to any Employee Plan. Except as required by Section 4980B of the Internal Revenue Code, no Credit Party or any of its ERISA Affiliates maintains an employee welfare benefit plan (as defined in Section 3(1) of ERISA) which provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Credit Party or any of its ERISA Affiliates or coverage after a participant's termination of employment.

(j)    Taxes, Etc.    All Federal, state and local tax returns and other reports required by applicable law to be filed by any Credit Party have been filed, or extensions have been obtained, and all taxes, assessments and other governmental charges imposed upon any Credit Party or any property of any Credit Party and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP.

(k)    Regulations T, U and X.    No Credit Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of the Term Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(l)    Nature of Business.    Borrower, Greenwich Lifestyle, Nevada II and Boston II are not engaged in any business other than owning and operating radio broadcast properties, the Stations, radio broadcast programming services in connection therewith and any other activities directly or indirectly related thereto and no Broadcast License Subsidiary shall engage in any business other than holding its respective Broadcast License.

(m)    Adverse Agreements, Etc.    No Loan Party is a party to any agreement or instrument, or subject to any charter, limited liability company agreement, partnership agreement or other corporate, partnership or limited liability company restriction or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority, which has, or in the future could reasonably be expected to have, a Material Adverse Effect.

(n)    Broadcast Licenses; Permits, Etc.

(i)    Except as listed on Schedule 5.01(n), the Credit Parties, the Stations and the operations of the Credit Parties are in compliance with the Communications Laws, the applicable Broadcast Licenses (including, without limitation, payment of all annual FCC regulatory fees assessed with respect to such Broadcast Licenses), and all other Requirements of Law of the FCC and the FAA, including, without limitation, requirements for the filing of reports, except as those violations that would not in the aggregate have Material Adverse Effect other than any FCC fine over $1,000. In particular, except as set forth on Schedule 5.01(n) hereto, each Station is operating (A) from a tower structure, (B) at the center of radiation height, and (C) full-time and within at least 95% of the power, all as specified in the applicable Broadcast Licenses with respect to such Station that authorize the primary transmissions of such Station.

(ii)    All of the tower structures used or proposed to be used in the operation of the Stations (including, without limitation, tower structures used or proposed to be used in the operation of any FM booster facility) are obstruction-marked and lighted in accordance with the Communications Laws and all other Requirements of Law. Appropriate notifications to the FAA have been filed for each such tower structure, if and to the extent required by the Communications Laws or any other Requirement of Law. The FAA has granted *"No Hazard"* determinations with respect to each such tower structure, if and to the extent required by the Communications Laws or any other Requirement of Law. Appropriate Antenna Structure Registrations have been issued by the FCC with respect to each such tower structure, if and to the extent required by the Communications Laws or any other Requirement of Law. To the best knowledge of any Credit Party, neither the current nor proposed operation of any Station (including, without limitation, the operation of any FM booster facility) does or will expose workers or the general public to levels of radio frequency radiation in excess of the levels prescribed by the Communications Laws.

(iii)    Schedule 5.01(n) sets forth for each Station an accurate and complete list of all Broadcast Licenses issued by the FCC with respect to the Stations. The Broadcast Licenses listed in Schedule 5.01(n) with respect to any Station include all material authorizations, licenses, applications and permits issued by or filed with the FCC that are required or necessary for the operation of such Station, and the conduct of the business of each applicable Credit Party with respect to such Station, as now conducted and as presently proposed to be conducted. Except as listed in Schedule 5.01(n), the Broadcast Licenses with respect to each Station are issued in the name of the respective Credit Party that operates such Station (as set forth in Schedule 5.01(n)) under authority of such Broadcast Licenses and are validly issued and in full force and effect, unimpaired by any act of or omission by such Credit Party, its employees or agents, and have not been revoked, cancelled or forfeited and have not expired. The Broadcast Licenses listed on Schedule 5.01(n) are not subject to any condition not stated on the face of such Broadcast License, except such conditions as are applicable to radio stations of such type generally under the Communications Laws. Each Credit Party has fulfilled and performed in all material respects all of its obligations to date with respect to the Broadcast Licenses for the Stations. The Credit Parties have timely filed with the FCC applications for renewal of the Broadcast Licenses of all of the Stations. The renewal application is still pending for the Station in Connecticut. Such renewal applications disclose all information that may affect FCC action thereon. No Credit Party is aware of any information leading it to believe that any of the Broadcast Licenses (including without limitation those with pending renewal applications) will not be renewed in the ordinary course.

(iv)    (A) Except as set forth on Schedule 5.01(n)(iv), there is no action, proceeding, investigation, complaint, petition, objection or request for hearing reconsideration or administrative or judicial review pending or, to any Credit Party's knowledge threatened, with respect to any Station, any Broadcast License with respect to any Station or any Credit Party, which seeks or will seek to deny or adversely modify any application or rule making proposal pending before the FCC and pertaining to any Station, any Broadcast License with respect to any Station or any Credit Party, or with respect to any amendment or modification of any such Broadcast License or a Station and its operations, or the revocation of or conditional renewal or non-renewal of any such Broadcast License, and (B) there is no action, proceeding, investigation, complaint, petition, objection or request for hearing, reconsideration or administrative or judicial

review pending, or to any Credit Party's knowledge, threatened against any Person under common ownership with a Credit Party and regulated by the FCC which, in either case, if adversely determined, could reasonably be expected to have a Material Adverse Effect. Each Person who holds an *"attributable interest"* (within the meaning of the Communications Laws) with respect to any Credit Party is qualified to be an FCC licensee under the Communications Laws. To the best knowledge of the Credit Parties, none of the Stations (I) is causing or receiving objectionable interference or (II) is presently the subject of any presentation before the FCC or elsewhere that alleges that any of such stations is causing objectionable interference or that contains a proposal that could reasonably be expected to have the effect of causing objectionable interference to any of such stations or of requiring that any such Station cease operations or modify its facilities in any material respect.

(v)    No fine, forfeiture, notice of apparent liability or other penalty (A) assessed by the FCC with respect to the operations of any Station or the Broadcast Licenses of any Station, and (B) the payment or performance of which, or the compliance with which, could reasonably be expected to have a Material Adverse Effect, is payable or subject to performance or compliance with by any Credit Party; and no proceeding is pending or (to the best knowledge of any Credit Party) threatened with respect to the assessment of any such fine, forfeiture, notice of apparent liability or other penalty.

(o)    Properties. BTR West holds all of the Broadcast Licenses held for use in the operation of the Stations and Nevada II owns all of the other assets and properties used or held for use in the operation of the Stations located in Nevada. BTR Boston holds all of the Broadcast Licenses held for use in the operation of the Stations and BTR Boston II owns all of the other assets and properties used or held for use in the operation of the Stations in Massachusetts. BTR Connecticut holds all of the Broadcast Licenses and Greenwich owns all of the other assets and properties used or held for use in the operation of the Stations located in Connecticut. Lifestyle holds all of the Broadcast Licenses and owns all of the other assets and properties used or held for use in the operation of the Stations located in New York. Borrower owns all of the Capital Stock of the Subsidiary Guarantors and other assets used in the operation of the Stations.

(i)    Each Credit Party has good and marketable title to, valid leasehold interests in, or valid licenses to use, all property and assets material to its business, free and clear of all Liens, except Permitted Liens. All such properties and assets are in good working order and condition, ordinary wear and tear excepted.

(ii)    Schedule 5.01(o) sets forth a complete and accurate list, as of the Effective Date, of the location, by state and street address or coordinates, of all real property (including, without limitation, Tower Lease Sites, studio and transmitter sites) owned or leased by each Credit Party. As of the Effective Date, each Credit Party has valid leasehold interests in the Leases described on Schedule 5.01(o) to which it is a party. Schedule 5.01(o) sets forth with respect to each such Lease, the commencement date, termination date, renewal options (if any) and annual base rents. Each such Lease is valid and enforceable in accordance with its terms in all respects and is in full force and effect. No consent or approval of any landlord or other third party in connection with any such Lease is necessary for any Credit Party to enter into and execute the Loan Documents to which it is a party, except as set forth on Schedule 5.01(o). To

- 42 -

the best knowledge of any Credit Party, (A) no other party to any such Lease is in default of its obligations thereunder, and (B) no Credit Party (or, to the knowledge of any Credit party, any other party to any such Lease) has at any time delivered or received any notice of default which remains uncured under any such Lease and, as of the Effective Date, no event has occurred which, with the giving of notice or the passage of time or both, would constitute a material default under any such Lease.

(p)    Full Disclosure.    Each Credit Party has disclosed to the Agent all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the other reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Agent in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which it was made, not misleading; provided that, with respect to projected financial information, each Credit Party represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.  There is no contingent liability or fact that may have a Material Adverse Effect which has not been set forth in a footnote included in the Financial Statements or a Schedule hereto.

(q)    Operating Lease Obligations.    On the Effective Date, none of the Credit Parties has any Operating Lease Obligations other than the real property Leases set forth on Schedule 5.01(o).

(r)    Environmental Matters.  (i) Except as set forth on Schedule 5.01(r), the operations of each Credit Party are in compliance with all Environmental Laws; (ii) there has been no Release at any of the properties owned or operated by any Credit Party or a predecessor in interest, or at any disposal or treatment facility which received Hazardous Materials generated by any Credit Party or any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (iii) no Environmental Action has been asserted against any Credit Party or any predecessor in interest nor does any Credit Party have knowledge or notice of any threatened or pending Environmental Action against any Credit Party or any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (iv) no Environmental Actions have been asserted against any facilities that may have received Hazardous Materials generated by any Credit Party or, any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (v) no property now or formerly owned or operated by a Credit Party has been used as a treatment or disposal site for any Hazardous Material; (vi) no Credit Party has failed to report to the proper Governmental Authority any Release which is required to be so reported by any Environmental Laws which could reasonably be expected to have a Material Adverse Effect; (vii) each Credit Party holds all licenses, permits and approvals required under any Environmental Laws in connection with the operation of the business carried on by it, except for such licenses, permits and approvals as to which a Credit Party's failure to maintain or comply with could not reasonably be expected to have a Material Adverse Effect; and (viii) no Credit Party has received any notification pursuant to any Environmental Laws that (A) any work, repairs, construction or Capital Expenditures are required to be made in respect as a condition of continued compliance with any Environmental

Laws, or any license, permit or approval issued pursuant thereto or (B) any license, permit or approval referred to above is about to be reviewed, made, subject to limitations or conditions, revoked, withdrawn or terminated, in each case, except as could not reasonably be expected to have a Material Adverse Effect.

(s)     Insurance.  Each Credit Party keeps its property adequately insured and maintains (i) insurance to such extent and against such risks, including fire, as is customary with companies in the same or similar businesses, (ii) workmen's compensation insurance in the amount required by applicable law, (iii) public liability insurance, which shall include product liability insurance, in the amount customary with companies in the same or similar business against claims for personal injury or death on properties owned, occupied or controlled by it, and (iv) such other insurance as may be required by law or as may be reasonably required by the Agent (including, without limitation, against broadcasters' liability, insurance against claims of libel, slander, disparagement, defamation, interference with rights of privacy, and copyright and other proprietary right infringement, larceny, embezzlement or other criminal misappropriation). Schedule 5.01(s) sets forth a list of all insurance maintained by each Credit Party on the Effective Date.

(t)     Use of Proceeds.  The proceeds of the Term Loan will be used only as set forth in Section 2.01 [Commitments].  Except as set forth on Schedule 5.10(t), there is no broker fee due as a result of any action by any Loan Party in connection with the transactions contemplated by this Agreement and the other Loan Documents.

(u)     Solvency.  After giving effect to the transactions contemplated by this Agreement and before and after giving effect to the Term Loan, each of the Loan Parties is, and the Credit Parties are, individually and on a consolidated basis, Solvent.

(v)     Location of Bank Accounts.  Schedule 5.01(v) sets forth a complete and accurate list as of the Effective Date of all deposit, checking and other bank accounts, all securities and other accounts maintained with any broker dealer and all other similar accounts maintained by each Credit Party, together with a description thereof (i.e., the bank or broker dealer at which such deposit or other account is maintained and the account number and the purpose thereof).

(w)     Intellectual Property.  Each Credit Party owns or licenses or otherwise has the right to use all material licenses, permits, patents, patent applications, trademarks, trademark applications, service marks, tradenames, copyrights, copyright applications, franchises, authorizations, non-governmental licenses and permits and other intellectual property rights that are necessary for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Set forth on Schedule 5.01(w) is a complete and accurate list as of the Effective Date of all such material licenses, permits, patents, patent applications, trademarks, trademark applications, service marks, tradenames, copyrights, copyright applications, franchises, authorizations, non-governmental licenses and permits and other intellectual property rights of each Credit Party.  No slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Credit Party

infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Credit Party, threatened, except for such infringements and conflicts which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  To the best knowledge of each Credit Party, no patent, invention, device, application, principle or any statute, law, rule, regulations, standard or code is pending, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(x)    <u>Material Contracts</u>.  Set forth on <u>Schedule 5.01(x)</u> is a complete and accurate list as of the Effective Date of all Material Contracts of each Credit Party, showing the parties and subject matter thereof and amendments and modifications thereto.  Each such Material Contract (i) is in full force and effect and is binding upon and enforceable against each Credit Party that is a party thereto and, to the best knowledge of such Credit Party, all other parties thereto in accordance with its terms and (ii) has not been otherwise amended or modified and (iii) is not in default due to the action of any Credit Party or, to the best knowledge of any Credit Party, any other party thereto.

(y)    <u>Investment Company Acts</u>.  None of the Credit Parties is an "*investment company*" or an "*affiliated person*" or "*promoter*" of, or "*principal underwriter*" of or for, an "*investment company*", as such terms are defined in the Investment Company Act of 1940, as amended.

(z)    <u>Employee and Labor Matters</u>.  There is (i) no unfair labor practice complaint pending or, to the best knowledge of any Credit Party, threatened against any Credit Party before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Credit Party which arises out of or under any collective bargaining agreement, (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened against any Credit Party or (iii) to the best knowledge of any Credit Party, no union representation question existing with respect to the employees of any Credit Party and no union organizing activity taking place with respect to any of the employees of any Credit Party.  No Credit Party or any of its ERISA Affiliates has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("*WARN*") or similar state law, which remains unpaid or unsatisfied.  The hours worked and payments made to employees of any Credit Party have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements.  All material payments due from any Credit Party on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Credit Party.

(aa)    <u>Customers and Suppliers</u>.  There exists no actual or threatened termination, cancellation or limitation of, or modification to or material change in, the business relationship between (i) any Credit Party, on the one hand, and any customer or any group thereof, on the other hand, whose agreements with any Credit Party are individually or in the aggregate material to the business or operations of such Credit Party, or (ii) any Credit Party, on the one hand, and any material supplier thereof, on the other hand; and there exists no present state of facts or circumstances that could reasonably be expected to give rise to or result in any such termination, cancellation, limitation, modification or material change.

(bb)    No Bankruptcy Filing.    No Credit Party is contemplating either an Insolvency Proceeding or the liquidation of all or a major portion of such Credit Party's assets or property, and no Credit Party has any knowledge of any Person contemplating an Insolvency Proceeding against it.

(cc)    Company Information.    Schedule 5.01(cc) sets forth a complete and accurate list as of the date hereof of (i) each place of business of each Credit Party, (ii) each location at which any Collateral is located, (iii) the chief executive office of each Credit Party, (iv) the federal employer identification number of each Credit Party, (v) each previous name used by a Credit Party within the last five years and (vi) each tradename used by each Credit Party, if any.

(dd)    Locations of Collateral.    There is no location at which any Credit Party has any Collateral (except for Inventory in transit) other than (i) those locations listed on Schedule 5.01(cc) and (ii) any other locations within the United States, so long as any Credit Party notifies Agent and Lender in writing ten (10) days prior to the movement of any collateral to said location except for those certain locations of radio station towers.

(ee)    Security Interests.    Each Security Agreement creates in favor of the Agent, for the benefit of the Lender, a legal, valid and enforceable security interest in the Collateral secured thereby.    Upon the filing of the UCC financing statements described in Section 4.01(d)(xi) [Delivery of Documents], such security interests in and Liens on the Collateral granted thereby shall be perfected, first priority security interests, and no further recordings or filings are or will be required in connection with the creation, perfection or enforcement of such security interests and Liens, other than (i) the filing of continuation statements in accordance with applicable law, (ii) the recording of the Collateral Assignments for Security pursuant to each Security Agreement in the United States Patent and Trademark Office and the United States Copyright Office, as applicable, with respect to after-acquired U.S. patent and trademark applications and registrations and U.S. copyrights and (iii) the recordation of appropriate evidence of the security interest in the appropriate foreign registry with respect to all foreign intellectual property.

(ff)    Schedules.    All of the information which is required to be scheduled to this Agreement is set forth on the Schedules attached hereto, is correct and accurate in all material respects as of the date hereof and does not omit to state any information material thereto.

(gg)    Representations and Warranties in Documents; No Default.    All representations and warranties set forth in this Agreement and the other Loan Documents are true and correct in all material respects at the time as of which such representations were made and on the Effective Date.    No Event of Default has occurred and is continuing and no condition exists which constitutes a Default or an Event of Default.

- 46 -

## ARTICLE VI

## COVENANTS OF THE CREDIT PARTIES

Section 6.01    <u>Affirmative Covenants</u>.  So long as any principal of or interest on the Term Loan or any other Obligation (whether or not due) shall remain unpaid or the Lender shall have any Commitment hereunder, each Credit Party will, and each Individual Guarantor will, pursuant to Sections 6.01(a)(xiii), 6.01(a)(xiv), 6.01(a)(xviii), 6.01(c) and 6.01(k), unless the Lender shall otherwise consent in writing:

(a)    <u>Reporting Requirements</u>.  Furnish to the Agent and the Lender:

(i)    as soon as available and in any event within forty-five (45) days after the end of each fiscal quarter of the Credit Parties commencing with the first fiscal quarter of each Credit Party ending after the Effective Date, consolidated balance sheets, consolidated statements of operations and retained earnings and consolidated statements of cash flows of the Credit Parties as at the end of such quarter, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the figures for the corresponding date or period of the immediately preceding Fiscal Year, all in reasonable detail and certified by an Authorized Officer of the Borrower as fairly presenting, in all respects, the financial position of the Credit Parties as of the end of such quarter and the results of operations and cash flows of the Credit Parties for such quarter, in accordance with GAAP applied in a manner consistent with that of the most recent financial statements of the Credit Parties furnished to the Agent and the Lender, subject to normal year-end adjustments;

(ii)    as soon as available and in any event within ninety (90) days after the end of each Fiscal Year of the Credit Parties and in the case of Fiscal Year 2005, on or before forty-five (45) days after the Effective Date, audited consolidated balance sheets, audited consolidated statements of operations and retained earnings and audited consolidated statements of cash flows of the Credit Parties as at the end of such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the immediately preceding Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, and accompanied by a report and an opinion, prepared in accordance with generally accepted auditing standards, of independent certified public accountants of recognized standing selected by the Borrower and reasonably satisfactory to the Agent (which opinion shall be without (A) a "going concern" or like qualification or exception, (B) any qualification or exception as to the scope of such audit, or (C) any qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item, the effect of which would be to cause any noncompliance with the provisions of <u>Section 6.03</u> [Financial Covenants]), together with a written statement of such accountants (1) to the effect that, in making the examination necessary for their certification of such financial statements, they have not obtained any knowledge of the existence of an Event of Default or a Default and (2) if such accountants shall have obtained any knowledge of the existence of an Event of Default or such Default, describing the nature thereof;

(iii)    as soon as available and in any event within fifteen (15) days after the end of each fiscal month of the Credit Parties commencing with the first fiscal month of the Credit Parties ending after the Effective Date, internally prepared consolidated balance sheets, consolidated statements of operations and retained earnings and consolidated statements of cash flows as at the end of such fiscal month, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such fiscal month, all in reasonable detail and certified by an Authorized Officer of the Borrower as fairly presenting, in all material respects, the financial position of the Credit Parties as at the end of such fiscal month and the results of operations, retained earnings and cash flows of the Credit Parties for such fiscal month, in accordance with GAAP applied in a manner consistent with that of the most recent financial statements furnished to the Agent and the Lender, subject to normal year-end adjustments;

(iv)    simultaneously with the delivery of the financial statements of the Credit Parties required by clauses (i), (ii) and (iii) of this Section 6.01(a) [Reporting Requirements], a certificate of an Authorized Officer of the Borrower (A) stating that such Authorized Officer has reviewed the provisions of this Agreement and the other Loan Documents and has made or caused to be made under his or her supervision a review of the condition and operations of the Credit Parties during the period covered by such financial statements with a view to determining whether the Credit Parties were in material compliance with all of the provisions of this Agreement and such Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and such Authorized Officer has no knowledge of, the existence of an Event of Default or Default or, if an Event of Default or Default exists, describing the nature and period of existence thereof and the action which the Credit Parties propose to take or have taken with respect thereto; (B) stating specifically whether the Credit Parties have complied with the provisions of Section 6.02(u) during such period; (C) attaching a schedule showing the calculations specified in Section 6.03 [Financial Covenants]; and (D) certifying that during such period that no proceeds of the Term Loan have been used by or for the benefit of Lifestyle.

(v)    simultaneously with the delivery of the financial statements of the Credit Parties required by clauses (i) and (ii) of this Section 6.01(a) [Reporting Requirements] and after the occurrence of any Default or Event of Default, simultaneously with the delivery of the financial statements of the Credit Parties required by clause (iii) of this Section 6.01(a) [Reporting Requirements], a certificate of an Mr. B. Michael Pisani stating that he has reviewed the provisions of this Agreement and the other Loan Documents and has made a review of the financial conditions of the Individual Guarantors during the relevant period with a view to determining whether the Individual Guarantors were in compliance with all of the provisions of this Agreement and such Loan Documents including but not limited to Section 6.04 [Individual Financial Covenants] hereof, and that such review (i) has not disclosed, and he has no knowledge of, the existence of an Event of Default or Default and (ii) has disclosed that the Individual Guarantors have maintained collectively during such period at least $6,000,000 in Liquid Assets and Marketable Securities;

(vi)    promptly upon the Agent's request, reports in form and detail satisfactory to the Agent and certified by an Authorized Officer of the Borrower as being accurate and complete (A) listing all Accounts Receivable of the Credit Parties as of such day,

which shall include the amount and age of each such Account Receivable, showing separately those which are more than 30, 60, 90 and 120 days old and a description of all Liens, set-offs, defenses and counterclaims with respect thereto, together with a reconciliation of such schedule with the schedule delivered to the Agent pursuant to this clause (v)(A) for the immediately preceding fiscal month, the name and mailing address of each Account Debtor with respect to each such Account Receivable and such other information as the Agent may reasonably request, and (B) listing all accounts payable of the Credit Parties as of each such day which shall include the amount and age of each such account payable, the name and mailing address of each account creditor and such other information as the Agent may reasonably request, all in detail and in form satisfactory to the Agent;

(vii)    as soon as available and in any event not later than thirty (30) days prior to the end of each Fiscal Year, financial projections, supplementing and superseding the financial projections referred to in Section 5.01(g)(ii)(A) [Financial Condition], prepared on a monthly basis and the consolidated final annual budget and any other forecasts or projections of the Credit Parties, in form and substance reasonably satisfactory to the Agent, for the immediately succeeding Fiscal Year for the Credit Parties;

(viii)    (A) promptly after submission to any Governmental Authority, (I) all documents and information furnished to such Governmental Authority in connection with any investigation of any Credit Party other than routine inquiries by such Governmental Authority, and (II) copies of any periodic or special reports filed by any Credit Party with any Specified Authority, other than routine reports filed in the ordinary course of business, and (B) as soon as available and in any event within five (5) days of the execution, receipt or delivery thereof, copies of material notices and other material communications received from or sent to any Specified Authority which specifically relate to a Credit Party, any Station or any License;

(ix)    as soon as possible and in any event within three (3) Business Days after the occurrence of an Event of Default or Default or in any event within five (5) Business Days of the occurrence of any event or development that could reasonably be expected to have a Material Adverse Effect, the written statement of an Authorized Officer of the Borrower setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Credit Party proposes to take with respect thereto;

(x)    (A) as soon as possible and in any event within ten (10) days after any Credit Party or any ERISA Affiliate thereof knows or has reason to know that (1) any Reportable Event with respect to any Employee Plan has occurred, (2) any other Termination Event with respect to any Employee Plan has occurred, or (3) an accumulated funding deficiency has been incurred or an application has been made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including installment payments) or an extension of any amortization period under Section 412 of the Internal Revenue Code with respect to an Employee Plan, a statement of an Authorized Officer of the Borrower setting forth the details of such occurrence and the action, if any, which such Credit Party or such ERISA Affiliate proposes to take with respect thereto, (B) promptly and in any event within three (3) days after receipt thereof by any Credit Party or any ERISA Affiliate thereof from the PBGC, copies of each notice received by any Credit Party or any ERISA Affiliate thereof of the PBGC's

intention to terminate any Plan or to have a trustee appointed to administer any Plan, (C) promptly and in any event within 10 (ten) days after the filing thereof with the Internal Revenue Service if requested by the Agent, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Employee Plan and Multiemployer Plan, (D) promptly and in any event within 10 (ten) days after any Credit Party or any ERISA Affiliate thereof knows or has reason to know that a required installment within the meaning of Section 412 of the Internal Revenue Code has not been made when due with respect to an Employee Plan, (E) promptly and in any event within three (3) Business Days after receipt thereof by any Credit Party or any ERISA Affiliate thereof from a sponsor of a Multiemployer Plan or from the PBGC, a copy of each notice received by any Credit Party or any ERISA Affiliate thereof concerning the imposition or amount of withdrawal liability under Section 4202 of ERISA or indicating that such Multiemployer Plan may enter reorganization status under Section 4241 of ERISA, and (F) promptly and in any event within ten (10) days after any Credit Party or any ERISA Affiliate thereof sends notice of a plant closing or mass layoff (as defined in WARN) to employees, copies of each such notice sent by such Credit Party or such ERISA Affiliate thereof;

(xi)    promptly upon their becoming available, and in any event within ten (10) days following the publication thereof, all Arbitron and other ratings reports applicable to any Credit Party with respect to the radio broadcast markets in which any Station is located;

(xii)    promptly after the commencement thereof but in any event not later than ten (10) days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Credit Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(xiii)    as soon as possible and in any event within ten (10) days after execution, receipt or delivery thereof, copies of any material notices that any Credit Party executes or receives in connection with any Material Contract;

(xiv)    as soon as possible and in any event within ten (10) days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with the sale or other Disposition of the Capital Stock of, or all or substantially all of the assets of, any Credit Party;

(xv)    promptly after the sending or filing thereof, copies of all statements, reports and other information any Loan Party sends to any holders of, or files with any Governmental Authority in respect of, any Indebtedness or Capital Stock of any Credit Party;

(xvi)    promptly upon receipt thereof, copies of all financial reports (including, without limitation, management letters), if any, submitted to any Credit Party by its auditors in connection with any annual or interim audit of the books thereof, and copies of all correspondence between its auditors and any Credit Party;

(xvii)    promptly, and in any event within five (5) days after the end of each month, an update of any reports delivered pursuant to Section 4.01(d) [Delivery of

Documents], including reports as to the status of any FCC construction permits and applications and any related work, in form and substance reasonably satisfactory to the Agent;

(xviii)  promptly, and in any event within five (5) days after the internal distribution thereof, copies of all internal financial and other reports prepared by or delivered to any Credit Party or any executive officer of a Credit Party;

(xix)  promptly at the end of the Fiscal Quarter ending on April 30, 2007 and at the end of Fiscal Year 2007 and each Fiscal Year thereafter during the term hereof each Individual Guarantor shall provide quarterly financial statements or annual financial statements, as applicable, in form and substance acceptable to Lender, including but not limited to, (a) total net worth of each Individual Guarantor, and (b) total amount of Liquid Assets and Marketable Securities held by such Individual Guarantor, but at least delivered within forty-five (45) days of the end of each Fiscal Quarter listed above and at the end of each Fiscal Year during the term hereof, and at the end of each Fiscal Year, copies of federal income tax returns within forty-five (45) days of their having been filed during the term hereof of each Individual Guarantor;

(xx)  promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Credit Party as the Agent may from time to time may reasonably request; and

(xxi)  on the closing date of each Acquisition, a certificate of the financial officer of the Borrower, setting forth in reasonable detail the calculations required to establish compliance, both (A) immediately prior to giving effect to such the Acquisition and (B) on a pro forma basis immediately after giving effect to such Acquisition, with each of the financial covenants contained in Section 6.03 [Financial Covenants];.

(b)  Additional Guarantees and Collateral Security.  Cause:

(i)  each Subsidiary of any Credit Party not in existence on the Effective Date to execute and deliver to the Agent promptly and in any event within three (3) Business Days after the formation, acquisition by any Credit Party or change in status thereof (A) a Subsidiary Guaranty guaranteeing the Obligations, (B) a Security Agreement, (C) if such Subsidiary has any Subsidiaries, a Pledge Agreement together with (x) certificates evidencing all of the Capital Stock of any Person owned by such Subsidiary, (y) undated stock powers executed in blank with signature guaranteed, and (z) such opinion of counsel and such approving certificate of such Subsidiary as the Agent may request in respect of complying with any legend on any such certificate or any other matter relating to such shares, (D) one or more Mortgages creating on the real property of such Subsidiary a perfected, first priority Lien on such real property, a Title Insurance Policy covering such real property, a current ALTA survey thereof and a surveyor's certificate, each in form and substance satisfactory to the Agent, together with such other agreements, instruments and documents as the Agent may require whether comparable to the documents required under Section 6.01(o) [After Acquired Real Property] or otherwise, and (E) such other agreements, instruments, approvals, legal opinions or other documents reasonably requested by the Agent in order to create, perfect, establish the first priority of or otherwise protect any Lien purported to be covered by any such Security Agreement, Pledge Agreement[, Mortgage] or otherwise to effect the intent that such Subsidiary shall become bound by all of the

terms, covenants and agreements contained in the Loan Documents and that all property and assets of such Subsidiary shall (to the maximum extent permitted by applicable law) become Collateral for the Obligations; and

(ii)    each owner of the Capital Stock of any such Subsidiary to execute and deliver promptly and in any event within three (3) days after the formation or acquisition by any Credit Party of such Subsidiary a Pledge Agreement, together with (A) certificates evidencing all of the Capital Stock of such Subsidiary, (B) undated stock powers or other appropriate instruments of assignment executed in blank with signature guaranteed, (C) such opinion of counsel and such approving certificate of such Subsidiary as the Agent may reasonably request in respect of complying with any legend on any such certificate or any other matter relating to such shares and (D) such other agreements, instruments, approvals, legal opinions or other documents reasonably requested by the Agent.]

(c)    Compliance with Laws, Etc.   Each Credit Party and each Individual Guarantor will comply in all material respects with all applicable laws, rules, regulations and orders (including, without limitation, all Communications Laws and Environmental Laws), such compliance to include, without limitation, (i) paying before the same become delinquent all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any of its properties, and (ii) paying all lawful claims which if unpaid might become a Lien or charge upon any of its properties, except, in any case, to the extent of an extension of payment date or to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP.

(d)    Preservation of Existence, Etc.   Maintain and preserve its existence, rights and privileges, and become or remain duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

(e)    Keeping of Records and Books of Account.   Keep reasonably adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP.

(f)    Inspection Rights.   Permit the agents and representatives of the Agent at any time and from time to time (so long as no Event of Default has occurred and is continuing, during normal business hours and in a manner so as not to unduly disrupt the business of the Credit Parties), at the expense of the Borrower, to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other assets, to conduct audits, physical counts, valuations, appraisals, Phase I Environmental Site Assessments (and, if requested by the Agent based upon the results of any such Phase I Environmental Site Assessment, a Phase II Environmental Site Assessment) or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives. In furtherance of the foregoing, each Credit Party hereby authorizes its independent accountants to discuss the affairs, finances and

accounts of such Person (independently or together with representatives of such Person) with the agents and representatives of the Agent in accordance with this Section 6.01(f) [Inspection Rights].

      (g)   Maintenance of Properties, Etc. Maintain and preserve all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, if such loss or forfeiture could reasonably be expected to result in a Material Adverse Effect.

      (h)   Maintenance of Insurance. Maintain insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance, broadcasters' liability, insurance against claims of libel, slander, disparagement, defamation, interference with rights of privacy, and copyright and other proprietary right infringement, larceny, embezzlement or other criminal misappropriation) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and in any event in amount, adequacy and scope reasonably satisfactory to the Agent. All policies covering the Collateral are to be made payable to the Agent for the benefit of the Lender, as its interests may appear, in case of loss, under a standard non contributory "lender" or "secured party" clause and are to contain such other provisions as the Agent may require to fully protect the Lender's interest in the Collateral and to any payments to be made under such policies. All certificates of insurance are to be delivered to the Agent and the policies are to be premium prepaid, with the loss payable and additional insured endorsement in favor of the Agent and such other Persons as the Agent may designate from time to time, and shall provide for not less than thirty (30) days' prior written notice to the Agent of the exercise of any right of cancellation. If any Credit Party fails to maintain such insurance, the Agent may arrange for such insurance, but at the Borrowers' expense and without any responsibility on the Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Upon the occurrence and during the continuance of an Event of Default, the Agent shall have the sole right, in the name of the Lender, any Credit Party, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

      (i)   Obtaining of Permits, Etc. Obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses (including, without limitation, all Broadcast Licenses), authorizations, approvals, entitlements and accreditations which are necessary or useful in the proper conduct of its business as presently conducted or as proposed to be conducted (including, without limitation, maintaining each outstanding FCC construction permit in connection with any Station in full force and effect and not permitting any such permit to lapse, expire, or be cancelled or forfeited).

(j)    Environmental. (i) Keep any property either owned or operated by it free of any Environmental Liens; (ii) comply in all material respects with applicable Environmental Laws and provide to the Agent any documentation of such compliance which the Agent may reasonably request; (iii) provide the Agent written notice within five (5) days of any Release of a Hazardous Material in excess of any reportable quantity from or onto property at any time owned or operated by it and take any Remedial Actions required to abate said Release; and (iv) provide the Agent with written notice within ten (10) days of the receipt of any of the following: (A) notice that an Environmental Lien has been filed against any property of any Credit Party; (B) commencement of any Environmental Action or unequivocal notice that an Environmental Action will be filed against any Credit Party; and (C) notice of a violation, citation or other administrative order which could reasonably be expected to have a Material Adverse Effect.

(k)    Further Assurances. Each Credit Party and each Individual Guarantor will take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as the Agent may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents to which any Loan Party is a party, (ii) to subject to valid and perfected first priority Liens any of the Collateral or any other property of any Credit Party, (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents to which any Loan Party is a party and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto the Agent and, the Lender the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document to which any Loan Party is a party. In furtherance of the foregoing, to the maximum extent permitted by applicable law, each Credit Party (i) authorizes the Agent to execute any such agreements, instruments or other documents in such Credit Party's name and to file such agreements, instruments or other documents in any appropriate filing office (to the extent not executed or filed by a Credit Party), (ii) authorizes the Agent to file any financing statement required hereunder or under any other Loan Document, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of such Credit Party, and (iii) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of such Credit Party prior to the date hereof.

(l)    Change in Collateral; Collateral Records. (i) Give the Agent not less than thirty (30) days' prior written notice of any change in the location of any Collateral, other than to locations set forth on Schedule 5.01(ee) and with respect to which the Agent has filed financing statements and otherwise perfect its Liens thereon, (ii) advise the Agent promptly, in sufficient detail, of any material adverse change relating to the type, quantity or quality of the Collateral or the Lien granted thereon and (iii) execute and deliver to the Agent for the benefit of the Lender from time to time, solely for the Agent's convenience in maintaining a record of Collateral, such written statements and schedules as the Agent may reasonably require, designating, identifying or describing the Collateral.

(m)    Landlord Waivers; Collateral Access Agreements.

(i)    At any time any Collateral with a book value in excess of $10,000 (when aggregated with all other Collateral at the same location) is located on any real property of

a Credit Party (whether such real property is now existing or acquired after the Effective Date) which is not owned by a Credit Party, use reasonable best efforts to obtain written subordinations or waivers, in form and substance reasonably satisfactory to the Agent, of all present and future Liens to which the owner or lessor of such premises may be entitled to assert against the Collateral; and

(ii)    Use reasonable best efforts to obtain written access agreements, in form and substance reasonably satisfactory to the Agent, providing access to Collateral located on any premises not owned by a Credit Party in order to remove such Collateral from such premises during an Event of Default.

(n)    Subordination. Cause all Indebtedness and other obligations now or hereafter owed by it to any of its Affiliates, to be subordinated in right of payment and security to the Indebtedness and other Obligations owing to the Agent and the Lender in accordance with a subordination agreement in form and substance reasonably satisfactory to the Agent.

(o)    After Acquired Real Property. Upon the acquisition by it after the date hereof of any interest (whether fee or leasehold) in any real property (wherever located) (each such interest being an "*After Acquired Property*") (x) with a Current Value (as defined below) in excess of $50,000 in the case of a fee interest, or (y) requiring the payment of annual rent exceeding in the aggregate $18,000 in the case of leasehold interest, immediately so notify the Agent, setting forth with specificity a description of the interest acquired, the location of the real property, any structures or improvements thereon and either an appraisal or such Credit Party's good-faith estimate of the current value of such real property (for purposes of this Section, the "*Current Value*"). The Agent shall notify such Credit Party whether it intends to require a Mortgage and the other documents referred to below or in the case of leasehold, a leasehold Mortgage or landlord's waiver (pursuant to Section 6.02(m)) [Landlord Waivers; Collateral Access Agreements] hereof). Upon receipt of such notice requesting a Mortgage, the Person which has acquired such After Acquired Property shall promptly, and in any event not more than fourteen (14) days after the acquisition of such property, furnish to the Agent the following, each in form and substance satisfactory to the Agent: (i) a Mortgage and (if required by the Agent) an Environmental Indemnity Agreement with respect to such real property and related assets located at the After Acquired Property, each duly executed by such Person and in recordable form; (ii) evidence of the recording of the Mortgage referred to in clause (i) above in such office or offices as may be necessary or, in the opinion of the Agent, desirable to create and perfect a valid and enforceable first priority lien on the property purported to be covered thereby or to otherwise protect the rights of the Agent and the Lender thereunder; (iii) a Title Insurance Policy, (iv) a survey of such real property, certified to the Agent and to the issuer of the Title Insurance Policy by a licensed professional surveyor reasonably satisfactory to the Agent; (v) Phase I Environmental Site Assessments with respect to such real property, certified to the Agent by a company reasonably satisfactory to the Agent; (vi) in the case of a leasehold interest, a certified copy of the lease between the landlord and such Person with respect to such real property in which such Person has a leasehold interest, and the certificate of occupancy with respect thereto; (vii) in the case of a leasehold interest, an attornment and nondisturbance agreement between the landlord (and any fee mortgagee) with respect to such real property and the Agent; and (viii) such other documents or instruments (including guarantees and opinions of counsel) as the Agent may reasonably require. The Borrower shall pay all fees and expenses, including reasonable

attorneys' fees and expenses, and all title insurance charges and premiums, in connection with each Credit Party's obligations under this Section 6.01(m) [After Acquired Real Property].

(p)    Fiscal Year.    Cause the Fiscal Year of the Credit Parties to end on December 31 of each calendar year unless the Agent consents to a change in such Fiscal Year (and appropriate related changes to this Agreement).

(q)    Renewal of Licenses.    Diligently prosecute the Credit Parties' pending applications for renewal of Broadcast Licenses, and renew the Licenses in a timely manner and in accordance with all applicable provisions thereof.

Section 6.02    Negative Covenants.    So long as any principal of or interest on the Term Loan or any other Obligation (whether or not due) shall remain unpaid or the Lender shall have any Commitment hereunder, each Credit Party shall not and, each Individual Guarantor shall not, pursuant to Sections 6.02(w) and (x), unless the Lender shall otherwise consent in writing:

(a)    Liens, Etc.    Create, incur, assume or suffer to exist any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired; file or suffer to exist under the Uniform Commercial Code or any similar law or statute of any jurisdiction, a financing statement (or the equivalent thereof) that names it as debtor; sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement (or the equivalent thereof); sell any of its property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets; or assign or otherwise transfer any account or other right to receive income; other than, as to all of the above in the case of a Credit Party other than a Broadcast License Subsidiary, Permitted Liens.

(b)    Indebtedness.    Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to any Indebtedness, other than, in case of a Credit Party other than a Broadcast License Subsidiary, Permitted Indebtedness.

(c)    Fundamental Changes; Dispositions.    Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with, any Person, or convey, sell, lease or sublease, transfer or otherwise dispose of, whether in one transaction or a series of related transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing), or purchase or otherwise acquire, whether in one transaction or a series of related transactions, all or substantially all of the assets of any Person (or any division thereof) (or agree to do any of the foregoing); provided, however, that

(i)    any wholly-owned Subsidiary of any Borrower may be merged into Borrower or another wholly-owned Subsidiary of such Borrower (except for Lifestyle), so long as (A) no other provision of this Agreement would be violated thereby, (B) such Credit Party gives the Agent at least thirty (30) days' prior written notice of such merger or consolidation, (C) no Default or Event of Default shall have occurred and be continuing either before or after giving effect to such transaction, (D) the Lender's rights in any Collateral, including, without limitation, the existence, perfection and priority of any Lien thereon, are not adversely affected by such merger or consolidation and (E) the surviving Subsidiary, if any, is

- 56 -

joined as a Loan Party hereunder and is a party to a Subsidiary Guaranty and a Security Agreement and the Capital Stock of which Subsidiary is the subject of a Pledge Agreement, in each case, which is in full force and effect on the date of and immediately after giving effect to such merger or consolidation; and

(ii)    any Credit Party may, for cash proceeds only, (A) sell Inventory in the ordinary course of business, (B) dispose of obsolete or worn-out equipment in the ordinary course of business (so long as such equipment is replaced with equivalent equipment), and (C) sell or otherwise dispose of other property or assets (other than a Broadcast License) for cash in an aggregate amount not less than the fair market value of such property or assets, provided that, in the case of (ii)(B) and (ii)(C), the Net Cash Proceeds of such Dispositions do not exceed $100,000 in the aggregate in any twelve-month period and are paid to the Agent for the benefit of the Lender to the extent required pursuant to the terms of Section 2.05(c) [Mandatory Payments].

(d)    <u>Change in Nature of Business</u>.  Make any material change in the nature of its business as described in <u>Section 5.01(l)</u> [Nature of Business].

(e)    <u>Loans, Advances, Investments, Etc.</u>  Make or commit or agree to make any loan, advance guarantee of obligations, other extension of credit or capital contributions to, or hold or invest in or commit or agree to hold or invest in, or purchase or otherwise acquire or commit or agree to purchase or otherwise acquire any shares of the Capital Stock, bonds, notes, debentures or other securities of, or make or commit or agree to make any other Investment in, any other Person, or purchase or own any futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, except for:  (i) temporary loans and advances made by one Credit Party to another Credit Party other than Lifestyle in the ordinary course of business and not exceeding in the aggregate for all Credit Parties at any one time outstanding $100,000, <u>provided</u> <u>that</u> no Credit Party at any time may (1) claim any impairment of said loans, (2) write-off any amount thereunder or (3) charge off any amount thereunder; (ii) Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers; and (iii) Permitted Investments.    Notwithstanding the previous sentence, at no time may any Credit Party make any loans or advances to or for the benefit of Lifestyle.

(f)    <u>Lease Obligations</u>.  Create, incur or suffer to exist any obligations as lessee (i) for the payment of rent for any real or personal property in connection with any sale and leaseback transaction or (ii) for the payment of rent for any real or personal property under leases or agreements to lease other than (A) Capitalized Lease Obligations which would not cause the aggregate amount of all obligations under Capitalized Leases entered into after the Effective Date owing by all Credit Parties in any Fiscal Year to exceed the amounts set forth in subsection (g) of this <u>Section 6.02</u> [Negative Covenants], and (B) Operating Lease Obligations which would not cause the aggregate amount of all Operating Lease Obligations owing by all Credit Parties in any Fiscal Year to exceed $125,000.

(g)    <u>Capital Expenditures</u>.  Make or commit or agree to make any Capital Expenditure (by purchase or Capitalized Lease) that would cause the aggregate amount of all

Capital Expenditures made by the Credit Parties to exceed $200,000 per calendar year (on a cumulative, aggregate basis) other than the Acquisitions and the Pittsburgh Acquisition.

       (h)     <u>Restricted Payments</u>. (i) Declare or pay any dividend or other distribution, direct or indirect, on account of any Capital Stock of any Credit Party, now or hereafter outstanding, (ii) make any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Capital Stock or Indebtedness (other than the payment of Permitted Indebtedness in the ordinary course of business and otherwise in compliance with this Agreement), now or hereafter outstanding, (iii) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Capital Stock of Borrower, now or hereafter outstanding, (iv) return any Capital Stock to any shareholders or other equity holders of any Credit Party, or make any other distribution of property, assets, shares of Capital Stock, warrants, rights, options, obligations or securities thereto as such, or (v) pay any management fees or any other fees or expenses (including the reimbursement thereof by any Credit Party) pursuant to any management, consulting or other services agreement to any of the shareholders or other equityholders of any Credit Party or other Affiliates, or to any other Subsidiaries or Affiliates of Borrower; <u>provided</u>, <u>however</u>, that (A) Borrower may make Tax Distributions to the holders of its Capital Stock, in each case if, and only if, on and as of the date of such making of any Tax Distribution and after giving effect thereto, no Default or Event of Default has occurred and is continuing or will result therefrom, and the Borrower making such Tax Distribution is Solvent (and the Borrower agrees not to make any such Tax Distribution if the Agent has not given written notice to the Borrower that any such condition has not been satisfied), (B) a Credit Party may make distributions to the Borrower or another Credit Party (other than Lifestyle) and (C) Lifestyle may make distributions to any Credit Party.

       (i)     <u>Federal Reserve Regulations</u>.  Permit the Term Loan or the proceeds of the Term Loan under this Agreement to be used for any purpose that would cause the Term Loan to be a margin loan under the provisions of Regulation T, U or X of the Board.

       (j)     <u>Transactions with Affiliates</u>.  Enter into, renew, extend or be a party to any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except (i) in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof, (ii) transactions with another Credit Party other than Lifestyle, and (iii) transactions permitted by Section 6.02(e) [Loans, Advances, Investments, Etc.].

       (k)     <u>Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries</u>.  Create or otherwise cause, incur, assume, suffer or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of any Credit Party (i) to pay dividends or to make any other distribution on any shares of Capital Stock of such Subsidiary owned by any Loan Party or any of its Subsidiaries, (ii) to pay or prepay or to subordinate any Indebtedness owed to any Loan Party or any of its Subsidiaries, (iii) to make loans or advances to any Loan Party or any of its Subsidiaries or (iv) to transfer any

of its property or assets to any Loan Party or any of its Subsidiaries, or permit any of its Subsidiaries to do any of the foregoing; provided, however, that nothing in any of clauses (i) through (iv) of this Section 6.02(k) [Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries] shall prohibit or restrict compliance with:

        (A)    this Agreement and the other Loan Documents;

        (B)    any applicable law, rule or regulation (including, without limitation, applicable currency control laws and applicable state corporate statutes restricting the payment of dividends in certain circumstances);

        (C)    in the case of clause (iv) any agreement setting forth customary restrictions on the subletting, assignment or transfer of any property or asset that is a lease, license, conveyance or contract of similar property or assets; or

        (D)    in the case of clause (iv) any agreement, instrument or other document evidencing a Permitted Lien from restricting on customary terms the transfer of any property or assets subject thereto.

        (l)    <u>Limitation on Issuance of Capital Stock</u>.  Issue or sell or enter into any agreement or arrangement for the issuance and sale of any shares of its Capital Stock, any securities convertible into or exchangeable for its Capital Stock or any warrants except pursuant to the Borrower's equity incentive plan.

        (m)    <u>Modifications of Indebtedness, Organizational Documents and Certain Other Agreements; Etc.</u>  (i) Amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of its Indebtedness or of any instrument or agreement (including, without limitation, any LMA, purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness if such amendment, modification or change would shorten the final maturity or average life to maturity of, or require any payment to be made earlier than the date originally scheduled on, such Indebtedness, would increase the interest rate applicable to such Indebtedness, would change the subordination provision, if any, of such Indebtedness, or would otherwise be adverse to the Lender or the issuer of such Indebtedness in any respect, (ii) except as permitted by Section 6.02(c) [Fundamental Changes, Dispositions], amend, modify or otherwise change its name, jurisdiction of organization, organizational identification number or FEIN, (iii) amend, modify or otherwise change its certificate of incorporation or bylaws (or other similar organizational documents), including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it, with respect to any of its Capital Stock (including any shareholders' agreement), or enter into any new agreement with respect to any of its Capital Stock, except any such amendments, modifications or changes or any such new agreements or arrangements pursuant to this clause (iii) that either individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect or (iv) amend, modify or otherwise change any License except for any amendments or modifications (A) required by applicable law, (B) required in connection with the renewal of any License or (C) which would not materially change the rights, duties and obligations of any Credit Party under such License.

(n)    <u>Investment Company Act of 1940</u>.  Engage in any business, enter into any transaction, use any securities or take any other action that would cause it to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" or a company "controlled" by an "investment company" not entitled to an exemption within the meaning of such Act.

(o)    <u>Compromise of Accounts Receivable</u>.  Compromise or adjust any Account Receivable (or extend the time of payment thereof) or grant any discounts, allowances or credits other than, provided no Default or Event of Default has occurred and is continuing, in the ordinary course of its business; <u>provided</u>, <u>however</u>, in no event shall any such discount, allowance or credit exceed $100,000 in any Fiscal Year and no such extension of the time for payment extend beyond 180 days from the original due date thereof.

(p)    <u>Properties</u>.  Permit any property to become a fixture with respect to real property or to become an accession with respect to other personal property with respect to which real or personal property the Agent does not have a valid and perfected first priority Lien.

(q)    <u>ERISA</u>.  (i) Engage, or permit any ERISA Affiliate to engage, in any transaction described in Section 4069 of ERISA; (ii) engage, or permit any ERISA Affiliate to engage, in any prohibited transaction described in Section 406 of ERISA or 4975 of the Internal Revenue Code for which a statutory or class exemption is not available or a private exemption has not previously been obtained from the U.S. Department of Labor; (iii) adopt or permit any ERISA Affiliate to adopt any employee welfare benefit plan within the meaning of Section 3(1) of ERISA which provides benefits to employees after termination of employment other than as required by Section 601 of ERISA or applicable law; (iv) fail to make any contribution or payment to any Multiemployer Plan which it or any ERISA Affiliate may be required to make under any agreement relating to such Multiemployer Plan, or any law pertaining thereto; or (v) fail, or permit any ERISA Affiliate to fail, to pay any required installment or any other payment required under Section 412 of the Internal Revenue Code on or before the due date for such installment or other payment.

(r)    <u>Environmental</u>.  Permit the use, handling, generation, storage, treatment, Release or disposal of Hazardous Materials at any property owned or leased by it, except in compliance with Environmental Laws and so long as such use, handling, generation, storage, treatment, Release or disposal of Hazardous Materials does not result in a Material Adverse Effect.

(s)    <u>Certain Agreements</u>.  Agree to any material amendment or other material change to or material waiver of any of its rights under any Material Contract.

(t)    <u>LMA's, Etc</u>.  Enter into any LMA or other similar arrangement, other than the LMAs set forth on Schedule 5.01(n) and in effect on the date hereof.

(u)    <u>Lifestyle</u>.  Advance or transfer any funds to Lifestyle or to any Person for the benefit of Lifestyle.

(v)    <u>Purchase of Assets</u>.  Purchase or otherwise acquire assets other than, if no Default or Event of Default exists, (i) assets purchased in the ordinary course of business, (ii) the Acquisitions, (iii) Capital Expenditures permitted under Section 6.02(g) [Capital Expenditures],

and (iv) if the Borrower delivers an officer's certificate to Lender certifying that (A) no Default or Event of Default exists, (B) calculations demonstrating sufficient Excess Cash Flow for the relevant Fiscal Quarter to pay for all costs and related expenses of the Pittsburgh Acquisition, including the entire purchase price thereof, and (C) that all such costs and expenses will be funded out of the Excess Cash Flow for such Fiscal Quarter, of any applicable Pittsburgh Acquisition.

(w)    Asset Transfer.  In regards to any Individual Guarantor transfer any assets to any other Person if the result is to render such Individual Guarantor not Solvent after giving effect to the transfer and such Individual Guarantor's full, actual and contingent liability under his Guaranty.

(x)    Majority Control by Individual Guarantors.  In regards to any Individual Guarantor, allow the aggregate amount of the Equity Interest (both voting and economic) owned and pledged under the Loan Documents by the Individual Guarantors at any time be less than 51% of the issued and outstanding Equity Interests (both voting and economic) of the Borrower.

(y)    No Impairment and Charge-Offs.  No Credit Party may write-off, charge-off, discount, or impair in any other way any Indebtedness owed to such Credit Party by any other Loan Party without the Agent's prior written consent.

Section 6.03    Financial Covenants.  So long as any principal of or interest on the Term Loan or any other Obligation (whether or not due) shall remain unpaid or the Lender shall have any Commitment hereunder, the Credit Parties shall not, and unless the Lender shall otherwise consent in writing:

(a)    Cash on Hand.  Permit the aggregate amount of Liquid Assets held by the Credit Parties free and clear of any Liens (other than any Lien in favor of the Agent) to be less than $200,000 at any time.  Without limiting the generality of the foregoing and without limiting any other restriction in this Agreement, the Credit Parties shall not make any payment of corporate overhead expense if, upon such payment, they are not in compliance with the foregoing covenant.

(b)    Minimum Fixed Charge Coverage Ratio.  Permit the Fixed Charge Coverage Ratio, calculated for any twelve-month period ending during any period to be less than 1.0 to 1.0.

(c)    Consolidated EBITDA.  Permit Consolidated EBITDA at the end of each Fiscal Quarter set forth below of the Credit Parties to be less than the applicable amount set forth below for all Stations for such Fiscal Quarter:

| Fiscal Quarter Ending | Amount |
|---|---|
| September 30, 2006 | $157,000 |
| December 31, 2006 | $142,375 |
| March 31, 2007 | $109,394 |
| June 30, 2007 | $300,030 |
| September 30, 2007 | $323,775 |
| December 31, 2007 | $540,592 |
| March 31, 2008 | $132,639 |

| | |
|---|---|
| June 30, 2008 | $330,147 |
| September 30, 2008 | $355,592 |
| December 31, 200 | $581,082 |
| March 31, 2009 | $156,994 |
| June 30, 2009 | $311,543 |
| September 30, 2009 | $388,869 |
| October 31, 2009 | $188,686 |

(d)    Net Revenue.  Permit Net Cash Revenue of the Credit Parties at the end of each Fiscal Quarter set forth below of the Credit Parties to be less than the applicable amount set forth below for all Stations for such Fiscal Quarter:

| **Fiscal Quarter Ending** | **Amount** |
|---|---|
| September 30, 2006 | $1,108,000 |
| December 31, 2006 | $657,000 |
| March 31, 2007 | $919,588 |
| June 30, 2007 | $1,157,057 |
| September 30, 2007 | $1,186,637 |
| December 31, 2007 | $1,456,720 |
| March 31, 2008 | $956,373 |
| June 30, 2008 | $1,202,406 |
| September 30, 2008 | $1,234,102 |
| December 31, 2008 | $1,514,990 |
| March 31, 2009 | $994,628 |
| June 30, 2009 | $1,187,142 |
| September 30, 2009 | $1,283,467 |
| October 31, 2009 | $501,395 |

Section 6.04   Individual Financial Covenants.  So long as any principal of or interest on the Term Loan or any other Obligation (whether or not due) shall remain unpaid or the Lender shall have any Commitment hereunder, the Individual Guarantors shall, unless the Lender shall otherwise consents in writing, maintain at all times aggregate Liquid Assets and Marketable Securities of $6,000,000 collectively, to be tested and certified to at the end of each Fiscal Quarter during the term hereof and, after the occurrence of any Default or Event of Default, to be tested and certified to at the end of each month during the term hereof.

## ARTICLE VII
## MANAGEMENT, COLLECTION AND STATUS OF
## ACCOUNTS RECEIVABLE AND OTHER COLLATERAL

Section 7.01   Management of Collateral.

(a)    Immediately upon the request of the Agent, after a Default has occurred, the Credit Parties shall (i) establish, and, during the term of this Agreement, maintain one or more lockboxes in the name of the Agent (collectively, the "*Lockboxes*") with the financial

institutions selected by the Agent in its sole discretion (each being referred to as a "*Lockbox Bank*"), and (ii) establish, and during the term of this Agreement, maintain an account (a "*Collection Account*" and, collectively, the "*Collection Accounts*") with each Lockbox Bank. All such Lockboxes and Collection Accounts shall be under the control of the Agent pursuant to a Control Agreement. Upon such request by the Agent, the Credit Parties shall irrevocably instruct their Account Debtors, with respect to Accounts Receivable of the Credit Parties, to remit all payments to be made by checks or other drafts to the Lockboxes and to remit all payments to be made by wire transfer or by Automated Clearing House, Inc. payment as directed by the Agent and shall instruct each Lockbox Bank to deposit all amounts received in its Lockbox to the Collection Account at such Lockbox Bank on the day received or, if such day is not a Business Day, on the next succeeding Business Day. After such request by the Agent and until the Agent has advised the Credit Parties to the contrary after the occurrence and during the continuance of an Event of Default, the Credit Parties may and will enforce, collect and receive all amounts owing on the Accounts Receivable of the Credit Parties for the Agent's benefit and on the Agent's behalf, but at the Credit Parties' expense; such privilege shall terminate, at the election of the Agent, upon the occurrence and during the continuance of an Event of Default. All checks, drafts, notes, money orders, acceptances, cash and other evidences of Indebtedness received directly by the Credit Parties from any of their Account Debtors, as proceeds from Accounts Receivable of the Credit Parties, or as proceeds of any other Collateral, shall be held by the Credit Parties in trust for the Agents and the Lender and upon receipt be deposited by the Credit Parties in original form and no later than the next Business Day after receipt thereof into a Collection Account. The Credit Parties shall not commingle such collections with the Credit Parties' own funds or the funds of any of their Affiliates or with the proceeds of any assets not included in the Collateral. If any Event of Default shall occur and be continuing, upon notice from the Agent all funds received in the Collection Account shall be sent by wire transfer or Automated Clearing House, Inc. payment to the Agent's Account for application at the end of each Business Day to reduce the then principal balance of the Term Loan, conditional upon final payment to the Agent. No checks, drafts or other instruments received by the Agent shall constitute final payment to the Agent unless and until such checks, drafts or instruments have actually been collected.

(b)     After the occurrence and during the continuance of an Event of Default, the Agent may send a notice of assignment and/or notice of the Lender's security interest to any and all Account Debtors or third parties holding or otherwise concerned with any of the Collateral, and thereafter the Agent shall have the sole right to collect the Accounts Receivable and/or take possession of the Collateral and the books and records relating thereto. The Credit Parties shall not, without prior written consent of the Agent, grant any extension of time of payment of any Account Receivable, compromise or settle any Account Receivable for less than the full amount thereof, release, in whole or in part, any Person or property liable for the payment thereof, or allow any credit or discount whatsoever thereon, except, in the absence of a continuing Event of Default, as permitted by Section 6.02(o) [Compromise of Accounts Receivable].

(c)     Each Credit Party hereby appoints the Agent or its designee on behalf of the Agent as the Credit Parties' attorney-in-fact with power exercisable during the continuance of an Event of Default to endorse any Credit Party's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Accounts Receivable, to sign

any Credit Party's name on any invoice or bill of lading relating to any of the Accounts Receivable, drafts against Account Debtors with respect to Accounts Receivable, assignments and verifications of Accounts Receivable and notices to Account Debtors with respect to Accounts Receivable, to send verification of Accounts Receivable, and to notify the Postal Service authorities to change the address for delivery of mail addressed to any Credit Party to such address as the Agent may designate and to do all other acts and things necessary to carry out this Agreement. All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission (other than acts of omission or commission constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction), or for any error of judgment or mistake of fact or law; this power being coupled with an interest is irrevocable until the Term Loan and other Obligations under the Loan Documents are paid in full and all of the Loan Documents are terminated. It is understood and agreed that any such attorney or designee shall not exercise control over the programming or operations of any of the Stations to the extent such control would violate the Communications Laws.

(d)    Nothing herein contained shall be construed to constitute the Agent as agent of any Credit Party for any purpose whatsoever, and the Agent shall not be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof (other than from acts of omission or commission constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction). The Agent shall not, under any circumstance or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Accounts Receivable or any instrument received in payment thereof or for any damage resulting therefrom (other than acts of omission or commission constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction). The Agent, by anything herein or in any assignment or otherwise, does not assume any of the obligations under any contract or agreement assigned to the Agent and shall not be responsible in any way for the performance by any Credit Party of any of the terms and conditions thereof.

(e)    If any Account Receivable includes a charge for any tax payable to any Governmental Authority, the Agent is hereby authorized (but in no event obligated) in its discretion to pay the amount thereof to the proper taxing authority for the Credit Parties' account and to charge the Credit Parties therefor. The Credit Parties shall notify the Agent if any Account Receivable includes any taxes due to any such Governmental Authority and, in the absence of such notice, the Agent shall have the right to retain the full proceeds of such Account Receivable and shall not be liable for any taxes that may be due by reason of the sale and delivery creating such Account Receivable.

(f)    Notwithstanding any other terms set forth in the Loan Documents, the rights and remedies of the Agent and the Lender herein provided, and the obligations of the Credit Parties set forth herein, are cumulative of, may be exercised singly or concurrently with, and are not exclusive of, any other rights, remedies or obligations set forth in any other Loan Document or as provided by law.

Section 7.02   Working Capital Control Account.  If at any time the aggregate amount of the cash and Permitted Investments excluding the Pittsburgh Acquisition of the Credit Parties exceeds $200,000 (such excess amount referred to as the *"Working Capital Account Balance"*), the Credit Parties shall immediately (a) notify the Agent of such Working Capital Account Balance, (b) establish a working capital control account in the name of the Agent (the "*Working Capital Control Account*") with the financial institution selected by the Agent in its sole discretion (the *"Working Capital Bank"*), and (c) transfer the Working Capital Account Balance to the Working Capital Control Account.  The Working Capital Control Account shall be under the control of the Agent pursuant to a Control Agreement.  Each Credit Party agrees that the Working Capital Control Account shall (i) at all times be under the sole dominion and control of the Agent, and neither any Credit Party nor any other Loan Party shall have any right or power to withdraw or make any disposition of any funds or other property in the Working Capital Control Account or any part thereof except the right to have such amounts applied in accordance with the provisions hereof and in the other Loan Documents, (ii) be subject to a perfected, first priority security interest in favor of the Agent, and (iii) constitute additional Collateral for the Obligations.  All of the funds delivered to the Working Capital Control Account shall constitute part of the Collateral and shall not constitute payment of any of the Obligations until applied as provided in the Loan Documents.  Investment income and interest on the Working Capital Account Balance shall be credited to the Working Capital Control Account and shall become a part thereof for all purposes.  From time to time but not more than once during any given Fiscal Quarter, the Borrower may request that the Agent direct the Working Capital Bank to release amounts on deposit in the Working Capital Control Account to the Borrower, for the purpose of funding capital expenditures and the working capital needs of the Credit Parties except for Lifestyle, in each case in accordance with the capital expenditure and operating budgets of the Credit Parties as then in effect.  Each request for a disbursement from the Working Capital Control Account shall be in writing, shall be signed by an Authorized Officer of the Borrower, shall specify the proposed use of such disbursement and shall demonstrate that such disbursement is in accordance with the capital expenditure and operating budgets of the Credit Parties.  If requested by the Agent, the Borrower shall also provide a cumulative reconciliation, in a form reasonably acceptable to the Agent, of amounts previously disbursed from the Working Capital Control Account and spent by the Credit Parties compared to the capital expenditure and operating budgets for the same period.  The Credit Parties shall not be entitled to any disbursement from the Working Capital Control Account if a Default or Event of Default shall have occurred and be continuing or if the amount of such requested disbursement, or the proposed use of such disbursement, is not provided for in, or does not conform with, the capital expenditure and operating budgets.  Notwithstanding any other provision of this Agreement or any other Loan Document, upon the occurrence and during the continuance of any Event of Default, the Agent may withdraw or otherwise disburse funds from the Working Capital Control Account for application to any of the Obligations without notice to any Loan Party, and the Agent shall have the continuing and exclusive right to apply and reapply the Working Capital Account Balance to the Obligations in any manner it deems appropriate.  Any taxes payable on or income earned from the Working Capital Control Account shall be paid by the Credit Parties during any particular tax year as and to the extent required under the provisions of the Internal Revenue Code.

Section 7.03   Collateral Custodian.   Upon the occurrence and during the continuance of any Default or Event of Default, the Agent may at any time and from time to time

employ and maintain on the premises of any Credit Party a custodian selected by the Agent who shall have full authority to do all acts necessary to protect the Agent's and the Lender's interests. Each Credit Party hereby agrees to cooperate with any such custodian and to do whatever the Agent may reasonably request to preserve the Collateral. All costs and expenses incurred by the Agent by reason of the employment of the custodian shall be the responsibility of the Credit Parties and charged to the Loan Account.

Section 7.04    Deposit Accounts.

(a)    To the extent reasonably possible, the Agent will, in accordance with the written instructions of the Borrower, invest on behalf of the Credit Parties (at the sole cost and expense and risk of the Credit Parties) any amounts from time to time held in the Working Capital Control Account in such Permitted Investments as may be selected by the Borrower. Any loss on such investments shall be for the account of the Credit Parties. The Borrower will pay when due any and all income and other taxes in respect of any such investments.

(b)    All book entries, securities, promissory notes, certificates, bonds, shares, units and instruments evidencing, securing or relating to any Permitted Investment acquired pursuant to paragraph (a) hereof shall be held by or on behalf of the Agent pursuant hereto, shall be made or issued in the name of the Agent (or any of its nominees), and shall be deemed to be held in the Working Capital Control Account. The Agent may (in its sole and absolute discretion) exchange certificates or instruments constituting Permitted Investments or investments with respect to any Collateral for certificates or instruments of smaller or larger denominations.

(c)    In the event that the Borrower does not instruct the Agent with respect to the sale or reinvestment of any Permitted Investment at or prior to the maturity thereof or the Agent withholds its consent to instructions received from the Borrower, the Agent may, in its sole discretion, hold the proceeds uninvested in the Working Capital Control Account or reinvest the proceeds of such Permitted Investment realized at the maturity thereof in a Permitted Investment to the extent reasonably possible. All interest on or other income from any Permitted Investments in the Working Capital Control Account shall be held in such account and be subject to investment and reinvestment as permitted in this Section 7.04(c) [Deposit Accounts]. If any Credit Party shall receive, by virtue of its being or having been an owner of any Permitted Investment, any (i) certificate (including, without limitation, any certificate representing a dividend or distribution), promissory note or other instrument, (ii) option or right, whether as an addition to, in substitution for, or in exchange for, any Collateral, or otherwise, (iii) dividends or distributions payable in cash or in securities or other property or (iv) payment of principal, interest, redemption price, purchase price or other payment in respect of any Collateral, such Credit Party shall receive such certificate, promissory note, instrument, option, right, payment, dividend or distribution in trust for the benefit of the Agent, shall segregate it from such Credit Party's other property and shall deliver it forthwith to the Agent in the exact form received, with any necessary indorsement and/or appropriate powers duly executed in blank, to be held by the Agent as Collateral and as further collateral security for the Obligations.

(d)    Anything to the contrary in this Agreement notwithstanding, nothing herein shall (i) render the Agent or the Lender liable to any Loan Party or give rise to any defense or right of set-off in respect of the Obligations in the event that the Agent shall not invest

any amount in the Working Capital Control Account in accordance herewith or (ii) require the payment of interest in excess of the maximum rate permitted by applicable law.

## ARTICLE VIII

## EVENTS OF DEFAULT

Section 8.01 Events of Default. If any of the following Events of Default shall occur and be continuing:

(a) any Credit Party shall fail to pay any principal of or interest on the Term Loan, any Agent Advance or any fee, indemnity or other amount payable under this Agreement or any other Loan Document when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise);

(b) any representation or warranty made or deemed made by or on behalf of any Loan Party or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any report, certificate, or other document delivered to the Agent or the Lender pursuant to any Loan Document shall have been incorrect in any material respect when made or deemed made;

(c) (i) any Loan Party shall fail to perform or comply with any covenant or agreement contained in ARTICLE VI or ARTICLE VII, or (ii) any Loan Party shall fail to perform or comply with any covenant or agreement contained in any Security Agreement to which it is a party, any Pledge Agreement to which it is a party, or any Mortgage to which it is a party if such covenant or agreement referred to in this clause (ii) is material;

(d) any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this Section 8.01 [Events of Default];

(e) any Loan Party shall fail to pay any principal of or interest on any of its Indebtedness (excluding Indebtedness evidenced by this Agreement), or any interest or premium thereon, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable cure or grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable cure or grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(f) any Loan Party (i) shall institute any proceeding or voluntary case seeking to adjudicate it as bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the

entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Person or for any substantial part of its property, (ii) shall be generally not paying its debts as such debts become due or shall admit in writing its inability to pay its debts generally, (iii) shall make a general assignment for the benefit of creditors, or (iv) shall take any action to authorize or effect any of the actions set forth above in this subsection (f);

(g)     any proceeding shall be instituted against any Loan Party seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Person or for any substantial part of its property, and either such proceeding shall remain undismissed or unstayed for a period of sixty (60) days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against any such Person or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property) shall occur;

(h)     any provision of any Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto (other than a Lender), or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Credit Party or any Governmental Authority (including, without limitation, any Specified Authority) having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(i)     any Security Agreement, any Pledge Agreement, any Guaranty, or any Mortgage or any other security document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Agent for the benefit of the Lender on any Collateral purported to be covered thereby;

(j)     any bank at which any deposit account, blocked account, or lockbox account of any Credit Party is maintained shall fail to comply with any of the material terms of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of any Loan Party shall fail to comply with any of the material terms of any investment property control agreement to which such Person is a party;

(k)     one or more judgments or orders for the payment of money exceeding $200,000 in the aggregate shall be rendered against any Loan Party and remain unsatisfied and either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment or order, or (ii) there shall be a period of ten (10) consecutive days after entry thereof during which a stay of enforcement of any such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; provided, however, that any such judgment or order shall not give rise to an Event of Default under this subsection (k) if and for so long as (A) the amount of such judgment or order is covered by a valid and binding policy of insurance between the

defendant and the insurer covering full payment thereof and (B) such insurer has been notified, and has not disputed the claim made for payment, of the amount of such judgment or order;

(l)     any Credit Party is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting all or any material part of its business for more than fifteen (15) consecutive days;

(m)     any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than fifteen (15) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of any Credit Party, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect;

(n)     any cessation of a substantial part of the business of any Credit Party for a period which materially and adversely affects the ability of such Person to continue its business on a profitable basis;

(o)     (i) any Credit Party shall lose, fail to keep in force, suffer the termination, suspension, non-renewal or revocation of, or terminate, forfeit or suffer an adverse modification of, any License at any time held by it, which could reasonably be expected to have a Material Adverse Effect; (ii) the FCC shall schedule or conduct a hearing on the renewal or revocation of any material License held by any Credit Party based upon the acts or omissions of such Credit Party or any Affiliate of such Person and the Agent shall reasonably and in good faith conclude that the result thereof could reasonably be expected to be the termination, suspension, revocation, forfeiture, non-renewal of or material adverse modification of such License, and which termination, suspension, revocation, forfeiture, non-renewal of or amendment could reasonably be expected to have a Material Adverse Effect; (iii) any action, suit or proceeding shall be commenced and pending against any Credit Party which is reasonably likely to result in the termination, suspension or revocation, forfeiture, non-renewal or material adverse modification of any Broadcast License held by it or used in connection with a Station; (iv) any construction permit issued by the FCC in connection with a Station shall expire, be cancelled, revoked or forfeited, or fail to be renewed or any request for extension of time with respect thereto is denied by the FCC; or (v) any application or rule making proposal for modification of a Station's facilities is dismissed or denied by the FCC, in whole or in part, and such dismissal or denial could reasonably be expected to have a Material Adverse Effect;

(p)     the indictment, or the threatened indictment, of any Loan Party under any criminal statute, or commencement of criminal or civil proceedings against any Credit Party, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of such Person which shall not be dismissed within fifteen (15) days thereof;

(q)     any Credit Party or any of its ERISA Affiliates shall have made a complete or partial withdrawal from a Multiemployer Plan, and, as a result of such complete or partial withdrawal, any Credit Party or any of its ERISA Affiliates incurs a withdrawal liability in an annual amount exceeding $100,000; or a Multiemployer Plan enters reorganization status

under Section 4241 of ERISA, and, as a result thereof any Credit Party's or any of its ERISA Affiliates' annual contribution requirements with respect to such Multiemployer Plan increases in an annual amount exceeding $200,000;

(r)     any Termination Event with respect to any Employee Plan shall have occurred, and, thirty (30) days after notice thereof shall have been given to any Credit Party by the Agent, (i) such Termination Event (if correctable) shall not have been corrected, and (ii) the then current value of such Employee Plan's vested benefits exceeds the then current value of assets allocable to such benefits in such Employee Plan by more than $100,000 (or, in the case of a Termination Event involving liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, the liability is in excess of such amount);

(s)     any Loan Party shall be liable for any Environmental Liabilities and Costs the payment of which could reasonably be expected to have a Material Adverse Effect;

(t)     a Change of Control shall have occurred without the Agent's prior written consent;

(u)     an event or development occurs which could reasonably be expected to have a Material Adverse Effect;

(v)     any default under any obligation of any Loan Party;

(w)     the on-the-air broadcast operations of any operating Station shall be interrupted at any time for more than (x) seventy-two (72) consecutive hours, or (y) in the event of force majeure, five (5) days without Agent approval;

(x)     any Lease of property used or to be used by any Credit Party as a studio, tower or transmitter site (i) shall not be renewed at least ninety (90) days prior to its scheduled expiration or termination date, unless the Agent consents thereto after having received from such Credit Party evidence and assurances acceptable to the Agent that (A) such Credit Party, has obtained a replacement location which is not less favorable to such Credit Party and its business operations pursuant to a signed written Lease acceptable to the Agent, and (B) such Credit Party will be able to relocate to such replacement premises without materially adversely affecting its continued business operations or station signal, or (ii) shall be in default as a result of such Credit Party's failure to observe or abide by all terms, conditions and covenants contained therein (unless cured within the applicable grace period), or (iii) shall be the subject of a default notice or eviction notice initiated or sent by the landlord thereof to such Credit Party or the Agent which shall remain uncured for fifteen (15) days after a Credit Party obtains notice thereof;

(y)     any transfer of any Capital Stock of any Credit Party or any right to receive such Capital Stock or any other interest in any Credit Party shall be transferred and either (i) such transfer shall fail to comply with any applicable provision of the Communications Act, or (ii) the Agent shall not have received prior to such transfer any opinion reasonably satisfactory to the Agent from counsel reasonably satisfactory to the Agent to the effect that such transfer does so comply; or

(z)     if there occurs any attachment of any property of any Credit Party in an amount exceeding $100,000, which shall not be discharged or bonded within thirty (30) days of the date of such attachment.

then, and in any such event, the Agent may, and shall at the request of the Lender, by notice to the Borrower, (i) declare all or any portion of the Term Loan then outstanding to be due and payable, whereupon all or such portion of the aggregate principal of the Term Loan, including all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Credit Party, (ii) exercise any and all of its other rights and remedies under applicable law, hereunder and under the other Loan Documents; provided, however, that upon the occurrence of any Event of Default described in subsection (f) or (g) of this Section 8.01 [Events of Default], without any notice to any Credit Party or any other Person or any act by the Agent or the Lender, all Commitments shall automatically terminate and the Term Loan then outstanding, together with all accrued and unpaid interest thereon, all fees and all other amounts due under this Agreement and the other Loan Documents shall become due and payable automatically and immediately, without presentment, demand, protest or notice of any kind, all of which are expressly waived by each Credit Party, and (iii) may seek the appointment of a receiver or keeper to take possession of all or any portion of the Collateral or to operate same and, to the maximum extent permitted by law, may seek the appointment of such a receiver without the requirement of prior notice or a hearing, subject to Section 8.02 [FCC Matters]. Subject to Section 8.02 [FCC Matters], the Credit Parties further agree to consent to the appointment of a receiver (selected by the Agent and approved by the Lender) by any court of competent jurisdiction. Such receiver may be instructed to seek from the FCC consent to an involuntary assignment or transfer of control of the Broadcast Licenses issued to any Credit Party by the FCC with respect to any Station (the "*FCC Licenses*") for the purposes of seeking a bona fide purchaser or purchasers of any such Credit Party's right, title and interest in and to such Station. The Credit Parties hereby agree to consent to such involuntary transfer of control upon the request of the receivers so appointed and, if the Credit Parties shall refuse to consent to the transfer, the approval of the Credit Parties may be required by the court. The receiver shall have the power, subject to Section 8.02 [FCC Matters], to dispose of any or all of the Credit Parties' right, title and interest in and to any Station in any manner lawful in the jurisdiction in which such receiver's appointment is confirmed, including the power to conduct a public or private sale of any or all of the Credit Parties' right, title and interest in and to such Station; provided, however, that the successful bidder at any such public or private sale shall not acquire the FCC License with respect to such Station unless and until the FCC shall first have granted its consent to such acquisition.

Section 8.02    FCC Matters. The Agent's rights hereunder (and the rights of any receiver appointed by reason of the exercise of remedies hereunder) with respect to the Stations and the FCC Licenses are expressly subject to the Communications Laws. Prior to the exercise by the Agent (or any receiver appointed by reason of the exercise of remedies hereunder) of any power, right, privilege or remedy pursuant to this Agreement which requires any consent, approval or authorization of the FCC or any other Governmental Authority, the Credit Parties will execute and deliver, or will cause the execution and delivery of, all applications, certificates, instruments and other documents and papers that the Agent reasonably determines may be

required to obtain such consent, approval, or authorization. Without limiting the generality of the foregoing, the Credit Parties will promptly upon request by the Agent (or any such receiver so appointed) execute and deliver the appropriate portions of applications to the FCC for assignment of or the transfer of control of the Broadcast Licenses issued to any Credit Party with respect to any Station and use their best efforts, upon the request of the Agent (or any receiver so appointed) to assist in obtaining from the FCC or such other Governmental Authority the necessary consents and approvals, if any, for the assignment of or the transfer of control of such Broadcast Licenses to the Agent or its designee upon or following acceleration of the payment of the Term Loan in accordance with the provisions hereof. Notwithstanding anything to the contrary in this Agreement but without waiving or limiting any obligation of the Credit Parties hereunder, neither the Agent nor any receiver appointed by reason of the exercise of remedies hereunder shall control, supervise, direct, or manage, or attempt to control, supervise, direct or manage, the business of the Stations, in any case that would constitute or result in any assignment of the FCC Licenses or a transfer of control of any Credit Party or the FCC Licenses whether de jure or de facto, if such assignment or such transfer of control would require under the Communications Laws (including the written rules and regulations promulgated by the FCC) the prior approval of the FCC, without first obtaining such approval of the FCC.

## ARTICLE IX

## AGENT

Section 9.01    Appointment.  The Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Agreement including: (i) to receive on behalf of the Lender any payment of principal of or interest on the Term Loan outstanding hereunder and all other amounts accrued hereunder for the account of the Lender and paid to the Agent, and, subject to Section 2.02 [Making the Term Loan] of this Agreement, to distribute promptly to the Lender of all payments so received; (ii) to distribute to the Lender copies of all material notices and agreements received by the Agent and not required to be delivered to the Lender pursuant to the terms of this Agreement, provided that the Agent shall not have any liability to the Lender for the Agent's inadvertent failure to distribute any such notices or agreements to the Lender; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loan, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement or any other Loan Document; (v) to make the Term Loan and Agent Advances, for the Agent or on behalf of the applicable Lender as provided in this Agreement or any other Loan Document; (vi) to perform, exercise, and enforce any and all other rights and remedies of the Lender with respect to the Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Agreement or any other Loan Document; (vii) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other Loan Document; and (viii) subject to Section 9.03 [Rights, Exculpation Etc.] of this Agreement, to take such action as the Agent deems appropriate on its behalf to administer the Term Loan and the

Loan Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations) together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof. As to any matters not expressly provided for by this Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Term Loan), the Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Lender, and such instructions of the Lender shall be binding upon all Lender and all makers of the Term Loan; provided, however, that the Agent shall not be required to take any action which, in the reasonable opinion of the Agent, exposes the Agent to liability or which is contrary to this Agreement or any other Loan Document or applicable law.

Section 9.02    Nature of Duties.    The Agent shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other Loan Documents. The duties of the Agent shall be mechanical and administrative in nature. The Agent shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of the Lender. Nothing in this Agreement or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agent any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein. The Lender shall make its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Term Loan hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral, and the Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide the Lender with any credit or other information with respect thereto, whether coming into its possession before the Term Loan hereunder or at any time or times thereafter, provided that, upon the reasonable request of a Lender, the Agent shall provide to the Lender any documents or reports delivered to the Agent by the Loan Parties pursuant to the terms of this Agreement or any other Loan Document. If the Agent seeks the consent or approval of the Lender to the taking or refraining from taking any action hereunder, the Agent shall send notice thereof to the Lender. The Agent shall promptly notify the Lender any time that the Lender has instructed the Agent to act or refrain from acting pursuant hereto.

Section 9.03    Rights, Exculpation, Etc.    The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction. Without limiting the generality of the foregoing, the Agent (i) may treat the payee of the Term Loan as the owner thereof until the Agent receives written notice of the assignment or transfer thereof, pursuant to Section 10.07 [Assignments and Participations] hereof, signed by such payee and in form satisfactory to the Agent; (ii) may consult with legal counsel (including, without limitation, counsel to the Agent or counsel to the Loan Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) make no warranty or representation to the Lender and shall not be responsible to the Lender for any statements, certificates, warranties or representations made in

or in connection with this Agreement or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to the Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectibility of the Collateral, the existence, priority or perfection of the Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agent be responsible or liable to the Lender for any failure to monitor or maintain any portion of the Collateral. The Agent shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 3.03 [Apportionment of Payments], and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of the Lender to whom payment was due but not made, shall be to recover from other Lender any payment in excess of the amount which they are determined to be entitled. The Agent may at any time request instructions from the Lender with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents the Agent is permitted or required to take or to grant, and if such instructions are promptly requested, the Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until it shall have received such instructions from the Lender. Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Agent as a result of the Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Lender.

Section 9.04    Reliance. The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 9.05    Indemnification. To the extent that the Agent is not reimbursed and indemnified by any Loan Party, the Lender will reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Agreement or any of the other Loan Documents or any action taken or omitted by the Agent under this Agreement or any of the other Loan Documents, including, without limitation, advances and disbursements made pursuant to Section 9.08 [Collateral Matters]; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final judicial determination that such liability resulted from the Agent's gross negligence or willful misconduct. The obligations of the Lender under this Section 9.05 [Indemnification] shall survive the payment in full of the Term Loan and the termination of this Agreement.

Section 9.06    Agent Individually.    The Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with any Borrower as if it were not acting as the Agent pursuant hereto without any duty to account to the other Lender.

Section 9.07    Successor Agent.

(a)    The Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving at least thirty (30) Business Days' prior written notice to the Borrower and the Lender. Such resignation shall take effect upon the acceptance by a successor Agent of appointment pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation, the Lender shall appoint a successor Agent. Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the Agent, and the Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents. After the Agent's resignation hereunder as the Agent, the provisions of this ARTICLE IX [Agent] shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent under this Agreement and the other Loan Documents.

(c)    If a successor Agent shall not have been so appointed within said thirty (30) Business Day period, the Agent shall then appoint a successor Agent who shall serve as the Agent until such time, if any, as the Lender appoints a successor Agent as provided above.

Section 9.08    Collateral Matters.

(a)    The Agent may from time to time make such disbursements and advances ("*Agent Advances*") which the Agent, in its sole discretion, deems necessary or desirable to preserve, protect, prepare for sale or lease or dispose of the Collateral or any portion thereof, to enhance the likelihood or maximize the amount of repayment by the Borrower of the Term Loan and other Obligations or to pay any other amount chargeable to the Borrower pursuant to the terms of this Agreement, including, without limitation, costs, fees and expenses as described in Section 10.04 [Expenses, Taxes, Attorney's Fees]. The Agent Advances shall bear interest at the maximum rate set forth in this Agreement and shall be repayable on demand and be secured by the Collateral. The Agent Advances shall constitute Obligations hereunder which may be charged to the Loan Account in accordance with Section 3.02 [Payments, Computations and Statements]. The Agent shall notify the Lender and the Borrower in writing of each such Agent Advance, which notice shall include a description of the purpose of such Agent Advance. Without limitation to its obligations pursuant to Section 9.05 [Indemnification], the Lender agrees that it shall make available to the Agent, upon the Agent's demand, in Dollars in immediately available funds, the amount equal to the Total Commitment for such Agent Advance. If such funds are not made available to the Agent by the Lender, the Agent shall be entitled to recover such funds on demand from the Lender, together with interest thereon for each day from the date such payment was due until the date such amount is paid to the Agent, at the Federal Funds Rate for three (3) Business Days and thereafter at the Reference Rate.

(b)     The Lender hereby irrevocably authorizes the Agent, at its option and in its discretion, to release any Lien granted to or held by the Agent upon any Collateral upon termination of the Total Commitment and payment and satisfaction of the Term Loan and all other Obligations which have matured and which the Agent has been notified in writing are then due and payable; or constituting property being sold or disposed of in compliance with the terms of this Agreement and the other Loan Documents; or constituting property in which the Loan Parties owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Lender.

(c)     Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the Lender (as set forth in Section 9.08(b) [Collateral Matters]), the Lender agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under Section 9.08(b) [Collateral Matters]. Upon receipt by the Agent of confirmation from the Lender of its authority to release any particular item or types of Collateral, and upon prior written request by any Loan Party, the Agent shall (and is hereby irrevocably authorized by the Lender to) execute such documents as may be necessary to evidence the release of the Liens granted to the Agent for the benefit of the Lender upon such Collateral; provided, however, that (i) the Agent shall not be required to execute any such document on terms which, in the Agent's opinion, would expose the Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Loan Party in respect of) all interests in the Collateral retained by any Loan Party.

(d)     The Agent shall have no obligation whatsoever to the Lender to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Agreement or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this Section 9.08 [Collateral Matters] or in any other Loan Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in the Collateral as one of the Lender and that the Agent shall have no duty or liability whatsoever to any other Lender, except as otherwise provided herein.

Section 9.09     Agency for Perfection. The Lender hereby appoints the Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and the Agent and the Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Agent and the Lender as secured party. Should the Lender obtain possession or control of any such Collateral, the Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such

Collateral to the Agent or in accordance with the Agent's instructions. Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

## ARTICLE X

## MISCELLANEOUS

Section 10.01    Notices, Etc.  All notices and other communications provided for hereunder shall be in writing and shall be mailed, telecopied or delivered, if to any Credit Party, at the following address:

Before November 30, 2006:

BusinessTalkradio.net, Inc.
1490 Dayton Avenue
Greenwich, CT 06830
Attention: Mr. Michael Metters

On and after November 30, 2006:

BusinessTalkradio.net, Inc.
401 Shippan Avenue
Stamford, CT 06902
Attention: Mr. Michael Metters

with a copy to:

Seiden Wayne LLC
Two Penn Plaza East, 10th Floor
Newark, NJ 07105
Attention: William P. Oberdorf, Esq.
Telecopier: (973) 491-3555

if to the Agent, to it at the following address:

BC Media Funding Company II, LLC
10 Rockefeller Plaza, Suite 910
New York, New York 10020
Attention:  Jacob J. Barker
Telecopier:  (917) 492-2058

with a copy to:

Akin Gump Strauss Hauer & Feld, LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas  75201
Attention: Carlos Villota
Telecopier: (214) 969-4343

or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 10.01 [Notices, Etc.]. All such notices and other communications shall be effective, (i) if mailed, when received or three (3) days after deposited in the mails, whichever occurs first, (ii) if telecopied, when transmitted and confirmation received, or (iii) if delivered, upon delivery, except that notices to the Agent pursuant to Article II shall not be effective until received by the Agent.

Section 10.02    Amendments, Etc. No amendment or waiver of any provision of this Agreement, and no consent to any departure by any Credit Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender or by the Agent with the consent of the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given, provided, however, that no amendment, waiver or consent shall (i) increase the Commitment of the Lender, reduce the principal of, or interest on, the Term Loan payable to the Lender, reduce the amount of any fee payable for the account of the Lender, or postpone or extend any date fixed for any payment of principal of, or interest or fees on, the Term Loan payable to the Lender, in each case without the written consent of the Lender affected thereby, (ii) increase the Total Commitment without the written consent of the Lender, (iii) change the percentage of the Lender's Commitment or of the aggregate unpaid principal amount of the Term Loan that is required for the Lender or any of them to take any action hereunder, (iv) release all or a substantial portion of the Collateral (except as otherwise provided in this Agreement and the other Loan Documents), subordinate any Lien granted in favor of the Agent for the benefit of the Lender, or release any Borrower or any Guarantor, or (v) amend, modify or waive Section 3.03 [Apportionment of Payments] or this Section 10.02 [Amendments, Etc.] of this Agreement, in each case, without the written consent of the Lender. Notwithstanding the foregoing, no amendment, waiver or consent shall, unless in writing and signed by the Agent, affect the rights or duties of the Agent (but not in its capacity as a Lender) under this Agreement or the other Loan Documents.

Section 10.03    No Waiver; Remedies, Etc. No failure on the part of the Agent or the Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Agent and the Lender provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Agent and the Lender under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Agent and the Lender to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 10.04    Expenses; Taxes; Attorneys' Fees. The Borrowers will pay on demand, all costs and expenses incurred by or on behalf of the Agent (and, in the case of clauses (b) through (m) below, the Lender), regardless of whether the transactions contemplated hereby are consummated, including, without limitation, fees, costs, client charges and expenses of counsel for the Agent (and, in the case of clauses (b) through (m) below, the Lender), accounting, due diligence, periodic field audits, valuations, investigations, searches and filings, monitoring of assets, appraisals of Collateral, title searches and reviewing environmental

assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to: (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including, without limitation, the preparation of any additional Loan Documents pursuant to Section 6.01(b) [Additional Guarantees and Collateral Security] or the review of any of the agreements, instruments and documents referred to in Section 6.01(f) [Inspection Rights]), (b) any requested amendments, waivers or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (c) the preservation and protection of any of the Lender's rights under this Agreement or the other Loan Documents, (d) the defense of any claim or action asserted or brought against the Agent or the Lender by any Person (other than the Agent or the Lender) that arises from or relates to this Agreement, any other Loan Document, the Agent's or the Lender's claims against any Loan Party, or any and all matters in connection therewith, (e) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document, (f) the filing of any petition, complaint, answer, motion or other pleading by the Agent or the Lender, or the taking of any action in respect of the Collateral or other security, in connection with this Agreement or any other Loan Document, (g) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Loan Document, (h) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (i) any attempt to collect from any Loan Party, (j) all liabilities and costs arising from or in connection with the past, present or future operations of any Credit Party involving any damage to real or personal property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property, (k) any Environmental Liabilities and Costs incurred in connection with the investigation, removal, cleanup and/or remediation of any Hazardous Materials present or arising out of the operations of any facility of any Credit Party, (l) any Environmental Liabilities and Costs incurred in connection with any Environmental Lien; or (m) the receipt by the Agent or the Lender of any advice from professionals with respect to any of the foregoing. Without limitation of the foregoing or any other provision of any Loan Document: (x) the Borrowers agree to pay all stamp, document, transfer, recording or filing taxes or fees and similar impositions now or hereafter determined by the Agent or the Lender to be payable in connection with this Agreement or any other Loan Document, and the Borrowers agree to save the Agent and the Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such taxes, fees or impositions, and (y) if the Credit Parties fail to perform any covenant or agreement contained herein or in any other Loan Document, the Agent may itself perform or cause performance of such covenant or agreement, and the expenses of the Agent incurred in connection therewith shall be reimbursed on demand by the Borrowers.

Section 10.05    Right of Set-off.    Upon the occurrence and during the continuance of any Event of Default, the Agent or the Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Credit Party (any such notice being expressly waived by the Credit Parties) and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by the Agent or the Lender to or for the credit or the account of any Credit Party against any and all obligations of the Credit Parties either now or hereafter existing under any Loan Document, irrespective of whether or not the Agent or the

Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured. The Agent and the Lender agrees to notify such Credit Party promptly after any such set-off and application made by the Agent or the Lender provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Agent and the Lender under this Section 10.05 [Right of Set-Off] are in addition to the other rights and remedies (including other rights of set-off) which the Agent and the Lender may have under this Agreement or any other Loan Documents of law or otherwise.

Section 10.06    Severability.    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 10.07    Assignments and Participations. (a) This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Credit Party and the Agent and the Lender and their respective successors and assigns; provided, however, that none of the Credit Parties may assign or transfer any of its rights hereunder without the prior written consent of the Lender and any such assignment without the Lender's prior written consent shall be null and void.    Lender may assign any other their rights or obligations hereunder.

Section 10.08    Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telecopier shall be equally as effective as delivery of an original executed counterpart of this Agreement.    Any party delivering an executed counterpart of this Agreement by telecopier also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

Section 10.09    GOVERNING LAW. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK.

Section 10.10    CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE.    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH CREDIT PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH CREDIT PARTY HEREBY IRREVOCABLY APPOINTS THE SECRETARY OF STATE OF

THE STATE OF NEW YORK AS ITS AGENT FOR SERVICE OF PROCESS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING AND FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 10.01 [NOTICES, ETC.] AND TO THE SECRETARY OF STATE OF THE STATE OF NEW YORK, SUCH SERVICE TO BECOME EFFECTIVE TEN (10) DAYS AFTER SUCH MAILING. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENT AND THE LENDER TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH CREDIT PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY CREDIT PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH CREDIT PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

Section 10.11    WAIVER OF JURY TRIAL, ETC. EACH CREDIT PARTY, THE AGENT AND THE LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH CREDIT PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF THE AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH CREDIT PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENT AND THE LENDER ENTERING INTO THIS AGREEMENT.

Section 10.12    Consent by the Agent and Lender. Except as otherwise expressly set forth herein to the contrary, if the consent, approval, satisfaction, determination, judgment, acceptance or similar action (an "**Action**") of the Agent or the Lender shall be permitted or required pursuant to any provision hereof or any provision of any other agreement to which any Credit Party is a party and to which the Agent or the Lender has succeeded thereto,

such Action shall be required to be in writing and may be withheld or denied by the Agent or the Lender, in its sole discretion, with or without any reason, and without being subject to question or challenge on the grounds that such Action was not taken in good faith.

Section 10.13    No Party Deemed Drafter.  Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 10.14    Reinstatement; Certain Payments.  If any claim is ever made upon the Agent or the Lender for repayment or recovery of any amount or amounts received by the Agent or the Lender in payment or on account of any of the Obligations, the Agent or the Lender shall give prompt notice of such claim to each other Lender and the Borrower, and if the Agent or the Lender repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over the Agent, the Lender or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by the Agent or the Lender with any such claimant, then and in such event each Credit Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to the Agent or the Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Agent or the Lender.

Section 10.15    Indemnification.

(a)    General Indemnity.  In addition to each Credit Party's other Obligations under this Agreement, each Credit Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless the Agent and the Lender and all of their respective officers, directors, employees, attorneys, consultants and agents (collectively called the "*Indemnitees*") from and against any and all losses, damages, liabilities, obligations, penalties, fees, costs and expenses (including, without limitation, attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following:  (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document or of any other document executed in connection with the transactions contemplated by this Agreement, (ii) the Agent's or the Lender's furnishing of funds to the Borrowers under this Agreement or the other Loan Documents, including, without limitation, the management of the Term Loan, (iii) any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Loan Documents, or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "*Indemnified Matters*"); provided, however, that the Credit Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final judgment of a court of competent jurisdiction.

(b)    Environmental Indemnity.  Without limiting Section 10.15(a) [General Indemnity] hereof, each Credit Party agrees to, jointly and severally, defend, indemnify, and hold harmless the Indemnitees against any and all Environmental Liabilities and Costs and all other claims, demands, penalties, fines, liability (including strict liability), losses, damages, costs and expenses (including without limitation, legal fees and expenses, consultant fees and laboratory fees), arising out of (i) any Releases or threatened Releases (x) at any property presently or formerly owned or operated by any Credit Party or any predecessor in interest, or (y) of any Hazardous Materials generated and disposed of by any Credit Party or any predecessor in interest; (ii) any violations of Environmental Laws by any Credit Party or any property owned or operated by any Credit Party; (iii) any Environmental Action relating to any Credit Party or any predecessor in interest; (iv) any personal injury (including wrongful death) or property damage (real or personal) arising out of exposure to Hazardous Materials used, handled, generated, transported or disposed by any Credit Party or any predecessor in interest; and (v) any breach of any warranty or representation regarding environmental matters made by any of the Credit Parties in Section 5.01(r) [Environmental Matters] or the breach of any covenant made by any of the Credit Parties in Section 6.01(j) [Environmental].  Notwithstanding the foregoing, the Credit Parties shall not have any obligation to any Indemnitee under this subsection (b) regarding any potential environmental matter covered hereunder which is caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final judgment of a court of competent jurisdiction.

(c)    The indemnification for all of the foregoing losses, damages, fees, costs and expenses of the Indemnitees are chargeable against the Loan Account.  To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 10.15 [Indemnification] may be unenforceable because it is violative of any law or public policy, each Credit Party shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees.  The indemnities set forth in this Section 10.15 [Indemnification] shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 10.16    Records.  The unpaid principal of and interest on the Term Loan, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 2.06 [Fees] hereof, including, without limitation, the Closing Fee, the Loan Servicing Fee and the collateral monitoring and audit fee payable pursuant to Section 3.01 [Audit and Collateral Monitoring Fees], shall at all times be ascertained from the records of the Agent, which shall be conclusive and binding absent manifest error.

Section 10.17    Binding Effect.  This Agreement shall become effective when it shall have been executed by each Credit Party, the Agent and the Lender and when the conditions precedent set forth in ARTICLE IV [Conditions Precedent]have been satisfied or waived in writing by the Agent, and thereafter shall be binding upon and inure to the benefit of each Credit Party, the Agent and the Lender, and their respective successors and assigns, except that the Borrowers shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of the Lender, and any assignment by the Lender shall be governed by Section 10.07 [Assignments and Participations] hereof.

Section 10.18   Interest.   It is the intention of the parties hereto that the Agent and the Lender shall conform strictly to usury laws applicable to it.   Accordingly, if the transactions contemplated hereby or by any other Loan Document would be usurious as to the Agent or the Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or the Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other Loan Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to the Agent or the Lender that is contracted for, taken, reserved, charged or received by the Agent or the Lender under this Agreement or any other Loan Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or the Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or the Lender, as applicable, to the Borrowers); and (ii) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to the Agent or the Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by the Agent or the Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by the Agent or the Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or the Lender to the Borrowers).  All sums paid or agreed to be paid to the Agent or the Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to the Agent or the Lender, be amortized, prorated, allocated and spread throughout the full term of the Term Loan until payment in full so that the rate or amount of interest on account of the Term Loan hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (x) the amount of interest payable to the Agent or the Lender on any date shall be computed at the Highest Lawful Rate applicable to the Agent or the Lender pursuant to this Section 10.18 [Interest] and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or the Lender would be less than the amount of interest payable to the Agent or the Lender computed at the Highest Lawful Rate applicable to the Agent or the Lender, then the amount of interest payable to the Agent or the Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to the Agent or the Lender until the total amount of interest payable to the Agent or the Lender shall equal the total amount of interest which would have been payable to the Agent or the Lender if the total amount of interest had been computed without giving effect to this Section 10.18 [Interest].

For purposes of this Section 10.18 [Interest], the term "applicable law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrowers, on the one hand, and the Agent and the Lender, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan

transaction and this Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America.

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 10.19    Confession of Judgment.    Each Credit Party, jointly and severally, authorizes any attorney to appear in any court of record of New York, or any other state in the United States, on default in any payment of any installment due pursuant to any Loan Document, to waive the issuing and service of process, to admit the maturity of the amounts hereunder by acceleration or otherwise, and to confess judgment against any Credit Party in favor of Lender for the amount remaining to be paid under this Agreement, together with costs of suit and attorney fees, and to release all errors and waive all right of appeal and stay of execution. No judgment or judgments against less than all of the Credit Parties shall be a bar to a subsequent judgment or judgments against any one or more of the Credit Parties against whom judgment has not been obtained on this instrument.

Section 10.20    Confidentiality.  The Agent and the Lender agrees (on behalf of itself and each of its affiliates, directors, officers, employees and representatives) to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable commercial finance companies, any non-public information supplied to it by the Loan Parties pursuant to this Agreement or the other Loan Documents which is identified in writing by the Loan Parties as being confidential at the time the same is delivered to such Person (and which at the time is not, and does not thereafter become, publicly available or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), provided that nothing herein shall limit the disclosure of any such information (i) to the extent required by statute, rule, regulation or judicial process, (ii) to counsel for the Agent or the Lender, (iii) to examiners, auditors, and accountants, (iv) in connection with any litigation to which the Agent or the Lender is a party or (v) to any assignee or participant (or prospective assignee or participant) so long as such assignee or participant (or prospective assignee or participant) first agrees, in writing, to be bound by the confidentiality provisions similar in substance to this Section 10.19 [Confidentiality].  The Agent and the Lender agrees that, upon receipt of a request or identification of the requirement for disclosure pursuant to clause (iv) hereof, it will make reasonable efforts to keep the Loan Parties informed of such request or identification; provided that each Credit Party acknowledges that the Agent and the Lender may make disclosure as required or requested by any Governmental Authority or representative thereof and that the Agent and the Lender may be subject to review by other regulatory agencies and may be required to provide to, or otherwise make available for review by, the representatives of such parties or agencies any such non-public information.

Section 10.21    Integration.    This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

**SIGNATURE PAGE TO FINANCING AGREEMENT**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BORROWER:

BUSINESSTALKRADIO.NET, INC.

By: _____
Name: Michael L. Metter
Title: President

SUBSIDIARIES:

BTR WEST, INC.

By: _____
Name: Michael L. Metter
Title: President

THE LIFESTYLE TALKRADIO NETWORK, INC.

By: _____
Name: Michael L. Metter
Title: President

THE GREENWICH BROADCASTING
CORPORATION

By: _____
Name: Michael L. Metter
Title: President

BTR COMMUNICATIONS BOSTON, INC.

By: _____
Name: Michael L. Metter
Title: President

BTR GREENWICH, INC.

By: _____
Name: Michael L. Metter
Title: President

BTR WEST II, INC.

By: _____
Name: _____
Title: _____

BTR COMMUNICATIONS BOSTON II, INC.

By: _____
Name: Michael L. Wetter
Title: _____

AGENT:                          BC MEDIA FUNDING COMPANY II, LLC

                                By: _____
                                    Jacob Barker, Manager


LENDER:                         MEDIA FUNDING COMPANY, LLC

                                By: _____
                                Name: _____
                                Title: _____

830687-1  Signature Page to Financing Agreement

**BTR WEST II, INC.**

By:_____
Name:  Michael L. Metter
Title:   President

**BTR COMMUNICATIONS BOSTON II, INC.**

By:_____
Name:  Michael L. Metter
Title:   President

**AGENT:**                        **BC MEDIA FUNDING COMPANY II LLC**

By:_____
Name:  Jacob Barker
Title:    Managing Member

**LENDER:**                       **MEDIA FUNDING COMPANY LLC**

By:_____
Name:  Jacob Barker
Title:   President

# Exhibit B

EXHIBIT B

## SECURITY AGREEMENT

This **SECURITY AGREEMENT** (this "*Agreement*") is dated as of November __, 2006 and entered into by and among BusinessTalkradio.net, Inc., a Delaware corporation (the "*Borrower*"), The Greenwich Broadcasting Corporation, a Connecticut corporation ("*Greenwich*"), The Lifestyle TalkRadio Network Inc., a Delaware corporation ("*Lifestyle*"), BTR West, Inc., a Nevada corporation ("*BTR West*"), and BTR Communications Boston, Inc., a Massachusetts corporation ("*BTR Boston*"), BTR Greenwich, Inc., a Connecticut corporation ("*BTR Connecticut*"), BTR West II, Inc., a Nevada corporation ("*Nevada II*"), BTR Communications Boston II, Inc., a Massachusetts corporation ("*Boston II*", together with Greenwich, Lifestyle, BTR West, BTR Boston, BTR Connecticut and Nevada II, the "*Subsidiary Guarantors*"), in favor of BC Media Funding Company II, LLC, a Delaware limited liability company (the "*Secured Party*"), as agent for the Lender (as defined below).

## RECITALS

**WHEREAS**, pursuant to the Financing Agreement dated as of November __, 2006, as it may hereafter be amended, restated, supplemented or otherwise modified from time to time (the "*Financing Agreement*"), by and among the Borrower, the Subsidiary Guarantors, Media Funding Company, LLC, a Delaware limited liability company and the other financial institutions from time to time party thereto (the "*Lender*"), and BC Media Funding Company II, LLC, a Delaware limited liability company, as agent for the Lenders (in such capacity, the "*Agent*"), Lenders have made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a term loan to Borrower in the aggregate amount of $5,500,000 (the "*Term Loan*").

**WHEREAS**, Subsidiary Guarantors have each executed and delivered the Subsidiary Guaranty, in each case in favor of Secured Party for the benefit of Lenders, pursuant to which each Subsidiary Guarantor has guarantied the prompt payment and performance when due of all obligations of Borrower under the Financing Agreement.

**WHEREAS**, it is a condition precedent to the extension of credit by the Lenders under the Financing Agreement that each of the Borrower and the Subsidiary Guarantors (collectively, the "*Grantors*") shall have executed and delivered to the Agent a security agreement providing for the grant to the Agent for the benefit of the Agent and the Lenders of a security interest in all property of such Grantor;

**WHEREAS**, the parties understand and agree that certain of the Collateral (defined below) secured by this Agreement and certain of the rights and remedies afforded the Agent hereunder may be subject to the jurisdiction and consent of the Federal Communications Commission (the "*FCC*");

**WHEREAS**, the Grantors are mutually dependent on each other in the conduct of their respective businesses as an integrated operation, with the credit needed from time to time by each Grantor often being provided through financing obtained by the other Grantors and the

ability to obtain such financing being dependent on the successful operation of all of the Grantors as a whole;

**WHEREAS**, each Grantor has determined that the execution, delivery and performance of this Agreement directly benefits, and are in the best interest of, such Grantor;

**NOW, THEREFORE**, in consideration of the agreements set forth herein and in the Financing Agreement and in order to induce Lenders to make the Term Loan under the Financing Agreement, each Grantor hereby jointly and severally agrees with the Secured Party for the benefit of the Agent and the Lenders as follows:

SECTION 1.  Definitions.

(a)    Reference is hereby made to the Financing Agreement for a statement of the terms thereof.  All terms used in this Agreement and the recitals hereto which are defined in the Financing Agreement or in Article 9 of the Uniform Commercial Code (the "*Code*") as in effect from time to time in the State of New York and which are not otherwise defined herein shall have the same meanings herein as set forth therein; provided that terms used herein which are defined in the Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Agent may otherwise determine.

(b)    The following terms shall have the respective meanings provided for in the Code:  "*Accounts*", "*Cash Proceeds*", "*Chattel Paper*", "*Commercial Tort Claim*", "*Commodity Account*", "*Commodity Contracts*", "*Deposit Account*", "*Documents*", "*Equipment*", "*Fixtures*", "*General Intangibles*", "*Goods*", "*Instruments*", "*Inventory*", "*Investment Property*", "*Letter-of-Credit Rights*", "*Noncash Proceeds*", "*Payment Intangibles*", "*Proceeds*", "*Promissory Notes*", "*Record*", "*Security Account*", "*Software*", and "*Supporting Obligations*."

(c)    As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"*Copyrights*" means all domestic and foreign copyrights, whether registered or not, including, without limitation, all Copyright Rights throughout the universe (whether now or hereafter arising) in any and all media (whether now or hereafter developed), in and to all original works of authorship fixed in any tangible medium of expression, acquired or used by any Grantor including, without limitation, computer programs, computer data bases, other computer software layouts, trade dress, drawings, designs, writings, and formulas (including, without limitation, all copyrights described in Schedule VI hereto), all Copyright Registrations, and all reissues, divisions, continuations, continuations in part and extensions or renewals thereof.

"*Copyright Licenses*" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any right to use or sell any works covered by any copyright (including, without limitation, all Copyright Licenses set forth in Schedule IV hereto).

2

"*Copyright Registrations*" means all copyright registrations issued to any Grantor and applications for copyright registration that have been or may hereafter be issued or applied for thereon in the United States and any state thereof and in foreign countries (including, without limitation, the registrations set forth on Schedule VI annexed hereto, as the same may be amended pursuant hereto from time to time).

"*Copyright Rights*" means all common law and other rights in and to the copyrights in the United States and any state thereof and in foreign countries including all Copyright Licenses (but with respect to such Copyright Licenses, only to the extent permitted by such licensing arrangements), the right (but not the obligation) to renew and extend Copyright Registrations and any such rights and to register works protectable by copyright and the right (but not the obligation) to sue in the name of any Grantor or in the name of Secured Party or Lenders for past, present and future infringements of the Copyrights and any such rights.

"*FCC Licenses*" means all licenses, permits, and other authorizations issued by the FCC and used in the business and operation of the Stations set forth in Schedule V hereto, together with all renewals, extensions and modifications thereof and applications therefore.

"*Intellectual Property*" means, with respect to any Grantor all right, title and interest (including rights acquired pursuant to a license or otherwise but only to the extent permitted by agreements governing such license or other use) in and to all of the following:

(a)    Copyrights, Copyright Registrations and Copyright Rights, including, without limitation, each of the Copyrights, rights, titles and interests in and to the Copyrights, all derivative works and other works protectable by copyright, which are presently, or in the future may be, owned, created (as a work for hire for the benefit of such Grantor), authored (as a work for hire for the benefit of such Grantor), or acquired by such Grantor, in whole or in part, and all Copyright Rights with respect thereto and all Copyright Registrations therefor, heretofore or hereafter granted or applied for, and all renewals and extensions thereof, throughout the world;

(b)    Patents;

(c)    Trademarks, Trademark Registrations, the Trademark Rights and goodwill of such Grantor's business symbolized by the Trademarks and associated therewith;

(d)    all trade secrets, trade secret rights, know-how, customer lists, processes of production, ideas, confidential business information, techniques, processes, formulas, and all other proprietary information; and

(e)    all proceeds thereof (such as, by way of example and not by limitation, license royalties and proceeds of infringement suits).

"*IP Licenses*" means the Copyright Licenses, the Trademark Licenses and the Patent Licenses.

"*Patent Licenses*" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any

right to manufacture, use or sell any invention covered by any Patent (including, without limitation, all Patent Licenses set forth in <u>Schedule VI</u> hereto).

"***Patents***" means all domestic and foreign letters patent, design patents, utility patents, industrial designs, inventions, trade secrets, ideas, concepts, methods, techniques, processes, proprietary information, technology, know-how, formulae, rights of publicity and other general intangibles of like nature, now existing or hereafter acquired, owned or held by any Grantor (including, without limitation, all domestic and foreign letters patent, design patents, utility patents, industrial designs, inventions, trade secrets, ideas, concepts, methods, techniques, processes, proprietary information, technology, know-how and formulae of any Grantor (including, without limitation, such Patents described in <u>Schedule VI</u> hereto), all applications, registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office, or in any similar office or agency of the United States or any other country or any political subdivision thereof), all rights (but not obligations) corresponding thereto to sue for past, present and future infringements and all reissues, divisions, continuations, continuations in part and extensions or renewals thereof.

"***Pledged Debt***" means the Indebtedness from time to time owed to a Grantor, including the Indebtedness set forth on <u>Schedule IX</u> annexed hereto and issued by the obligors named therein, the Instruments and certificates evidencing such Indebtedness and all interest, cash or other property received, receivable or otherwise distributed in respect of or exchanged therefor.

"***Pledged Equity***" means all **Equity Interests** now or hereafter owned by a Grantor, including all securities convertible into, and rights, warrants, options and other rights to purchase or otherwise acquire, any of the foregoing, including those owned on the date hereof and set forth on <u>Schedule VIII</u> annexed hereto, the certificates or other instruments representing any of the foregoing and any interest of such Grantor in the entries on the books of any securities intermediary pertaining thereto and all distributions, dividends and other property received, receivable or otherwise distributed in respect of or exchanged therefor.

"***Pledged Subsidiary Debt***" means Pledged Debt owed to a Grantor by any obligor that is, or becomes, a direct or indirect Subsidiary of such Grantor, of which such Grantor is a direct or indirect Subsidiary or that controls, is controlled by or under common control with such Grantor.

"***Pledged Subsidiary Equity***" means Pledged Equity in a Person that is, or becomes a direct Subsidiary of a Grantor.

"***Trademark Licenses***" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensor or licensee and providing for the grant of any right concerning any Trademark, together with any goodwill connected with and symbolized by any such trademark licenses, contracts or agreements and the right to prepare for sale or lease and sell or lease any and all Inventory now or hereafter owned by any Grantor and now or hereafter covered by such licenses (including, without limitation, all Trademark Licenses described in <u>Schedule VI</u> hereto).

4

"*Trademark Registrations*" means all registrations that have been or may hereafter be issued or applied for thereon in the United States and any state thereof and in foreign countries (including, without limitation, the registrations and applications set forth on Schedule II annexed hereto).

"*Trademarks*" means all domestic and foreign trademarks, service marks, collective marks, certification marks, trade names, business names, d/b/a's, Internet domain names, trade styles, designs, logos, fictitious business names, and/or other source and/or business identifiers and applications pertaining thereto, owned by any Grantor, or hereafter adopted and used, in its business and other source or business identifiers and all general intangibles of like nature, now or hereafter owned, adopted, acquired or used by any Grantor (including, without limitation, all domestic and foreign trademarks, service marks, collective marks, certification marks, trade names, business names, d/b/a's, Internet domain names, trade styles, designs, logos and other source or business identifiers described in Schedule VI hereto), all applications, Trademark Registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof), and all reissues, extensions or renewals thereof, together with all goodwill of the business symbolized by such marks and all customer lists, formulae and other Records of any Grantor relating to the distribution of products and services in connection with which any of such marks are used.

"*Trademark Rights*" means all common law and other rights (but in no event any of the obligations) in and to the Trademarks in the United States and any state thereof and in foreign countries, including all Trademark Licenses (but with respect to such Trademark Licenses, only to the extent permitted by such licensing arrangements), the right (but not the obligation) to renew and extend Trademark Registrations and any such rights and to register works protectable by copyright and the right (but not the obligation) to sue in the name of any Grantor or in the name of Secured Party or Lenders for past, present and future infringements of the Trademarks and any such rights.

SECTION 2.  Grant of Security Interest.  As collateral security for all of the Obligations (as defined in Section 3 hereof), each Grantor hereby pledges and assigns to the Agent, and grants to the Agent for the benefit of the Agent and the Lenders, a continuing security interest in, all personal property of such Grantor, wherever located and whether now or hereafter existing and whether now owned or hereafter acquired, of every kind and description, tangible or intangible (the "*Collateral*"), including, without limitation, the following:

      (a)    all Accounts;

      (b)    all Chattel Paper (whether tangible or electronic);

      (c)    the Commercial Tort Claims including but not limited to those claims set forth on Schedule VII hereto;

      (d)    all Deposit Accounts (including without limitation the Working Capital Control Account), all cash, and all other property from time to time deposited therein and the

monies and property in the possession or under the control of the Agent or any Lender or any affiliate, representative, agent or correspondent of the Agent or any Lender;

      (e)    all Documents;

      (f)    all Equipment;

      (g)    all General Intangibles (including, without limitation, all Payment Intangibles), including, without limitation, Payment Intangibles, Software, the FCC Licenses to the extent, but only to the extent, that the Grantor is permitted by law to grant a security interest therein pursuant to the Communications Laws, including, to the maximum extent permitted by law, all rights incident or appurtenant to the FCC Licenses and the rights to receive all proceeds derived from or in connection with the sale, assignment or transfer of the FCC Licenses;

      (h)    all Goods including all Inventory, all Equipment and all Fixtures;

      (i)    all Instruments (including, without limitation, Promissory Notes);

      (j)    all Investment Property;

      (k)    all Copyrights, Patents and Trademarks, and all IP Licenses;

      (l)    all Letter-of-Credit Rights;

      (k)    all Supporting Obligations; all Records;

      (m)    all other tangible and intangible personal property of such Grantor (whether or not subject to the Code), including, without limitation, all bank and other accounts and all cash and all investments therein, all proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the property of such Grantor described in the preceding clauses of this Section 2 (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by such Grantor in respect of any of the items listed above), and all books, correspondence, files and other Records, including, without limitation, all tapes, disks, cards, Software, data and computer programs in the possession or under the control of such Grantor or any other Person from time to time acting for such Grantor that at any time evidence or contain information relating to any of the property described in the preceding clauses of this Section 2 or are otherwise necessary or helpful in the collection or realization thereof; and

      (n)    all Proceeds, including all Cash Proceeds and Noncash Proceeds, and products of any and all of the foregoing Collateral; in each case howsoever such Grantor's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise). Notwithstanding the foregoing, the Collateral shall include FCC Licenses only to the extent such assignment or pledge under this Section 2 would not cause a breach or default under such FCC License or violate any Federal or state law.

SECTION 3.  Security for Obligations.

(a)    This Security Agreement secures, and the Collateral is collateral security for, the prompt payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, of all Secured Obligations of each Grantor. *"Secured Obligations"* means:

(i)    with respect to Borrower, all obligations and liabilities of every nature of Borrower now or hereafter existing under or arising out of or in connection with the Financing Agreement and the other Loan Documents; and

(ii)    with respect to each Guarantor and any additional Guarantor, all obligations and liabilities of every nature of such Grantor now or hereafter existing under or arising out of or in connection with the Subsidiary Guarantees;

(iii)    in each case together with all extensions or renewals thereof, whether for principal, interest, fees, expenses, indemnities or otherwise, whether voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owed with others, and whether or not from time to time decreased or extinguished and later increased, created or incurred, and all or any portion of such obligations or liabilities that are paid, to the extent all or any part of such payment is avoided or recovered directly or indirectly from Secured Party or any Lender, fraudulent transfer or otherwise, and all obligations of every nature of Grantors now or hereafter existing under this Security Agreement (including, without limitation, interest and other amounts that, but for the filing of a petition in bankruptcy with respect to the Borrower or any other Grantor, would accrue on such obligations, whether or not a claim is allowed against the Borrower or such Grantor for such amounts in the related bankruptcy proceeding).

SECTION 4.  Representations and Warranties.    Each Grantor jointly and severally represents and warrants as follows:

(a)    Schedule I attached hereto sets forth (i) the exact legal name of each Grantor, (ii) the organizational identification number of each Grantor or states that no such organizational identification number exists and (iii) the jurisdiction of organization of each such Grantor including all foreign jurisdictions where such Grantor is qualified to do business.  No Grantor (or predecessor by merger or otherwise of such Grantor) has, within the five year period preceding the date hereof, had a different name from the name of such Grantor listed on the signature pages hereof, except the names set forth on Schedule I annexed hereto.

(b)    All Equipment, Fixtures, Goods and Inventory now existing are, and all Equipment, Fixtures, Goods and Inventory hereafter existing will be, located and/or based at the addresses specified therefor in Schedule II hereto (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof).  Each Grantor's chief place of business and chief executive office, the place where such Grantor keeps its Records concerning Accounts and all originals of all Chattel Paper are located at the addresses specified therefor in Schedule II hereto.  None of the Accounts are evidenced by Promissory Notes or other Instruments.  Set forth in Schedule III hereto is a complete and accurate list, as of the date of this

Agreement, of each Deposit Account, Securities Account and Commodities Account of each Grantor, together with the name and address of each institution at which each such Account is maintained, the account number for each such Account and a description of the purpose of each such Account. Set forth in Schedule I hereto is (i) a complete and correct list of each trade name used by each Grantor and (ii) the name of, and each trade name used by, each Person from which such Grantor has acquired any substantial part of the Collateral.

(c)     Each Grantor has delivered to the Agent complete and correct copies of each IP License described in Schedule IV hereto, including all schedules and exhibits thereto, which represents all of the IP Licenses existing on the date of this Agreement. Each such IP License sets forth the entire agreement and understanding of the parties thereto relating to the subject matter thereof, and there are no other agreements, arrangements or understandings, written or oral, relating to the matters covered thereby or the rights of any Grantor or any of its **Affiliates** in respect thereof. Each IP License now existing is, and each other IP License will be, the legal, valid and binding obligation of the parties thereto, enforceable against such parties in accordance with its terms. No default thereunder by any such party thereto has occurred, nor does any defense, offset, deduction or counterclaim exist thereunder in favor of any such party.

(d)     Each Grantor has delivered to the Agent complete and correct copies of each of the FCC Licenses described in Schedule V, which represent all of the FCC Licenses of such Grantor existing on the date of this Agreement, each of which is in effect in accordance with its terms. The FCC Licenses listed in Schedule V with respect to any Station include all authorizations, licenses, applications and permits issued by or filed with the FCC that are required or necessary for the operation of such Station, and the conduct of the business of each Grantor with respect to such Station, as now conducted and as proposed to be conducted.

(e)     The Grantors own and control, or otherwise possess adequate rights to use, all Trademarks, Patents and Copyrights, which are the only trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity necessary to conduct their business in substantially the same manner as conducted as of the date hereof. Schedule VI hereto sets forth a true and complete list of all Intellectual Property and IP Licenses owned or used by each Grantor as of the date hereof. All such Intellectual Property is subsisting and in full force and effect, has not been adjudged invalid or unenforceable, is valid and enforceable and has not been abandoned in whole or in part. Except as set forth in Schedule VI, no such Intellectual Property is the subject of any licensing or franchising agreement. No Grantor is now infringing or in conflict with any such rights of others in any material respect, and to the best knowledge of each Grantor, no other Person is now infringing or in conflict in any material respect with any such properties, assets and rights owned or used by any Grantor. No Grantor has received any notice that it is violating or has violated the trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity or other intellectual property rights of any third party.

(f)     No Grantor holds any Commercial Tort Claims or is aware of any such pending claims, except for such claims described in Schedule VII.

(g)    The partnership interests or membership interests of each Grantor in each of its Subsidiaries that is a partnership or a limited liability company are not (i) dealt in or traded on securities exchanges or in securities markets, (ii) securities for purposes of Article 8 of any relevant Uniform Commercial Code, (iii) investment company securities within the meaning of Section 8-103 of any relevant Uniform Commercial Code and (iv) evidenced by a certificate.  Such partnership interests or membership interests constitute General Intangibles.

(h)    All certificates or Instruments (excluding checks) evidencing, comprising or representing the Collateral have been delivered to Secured Party duly endorsed or accompanied by duly executed instruments of transfer or assignment in blank.

(i)    All of the Pledged Subsidiary Equity set forth on Schedule VIII annexed hereto has been duly authorized and validly issued and is fully paid and non-assessable; all of the Pledged Subsidiary Debt set forth on Schedule IX annexed hereto has been duly authorized and is the legally valid and binding obligation of the issuers thereof and is not in default; except as set forth in the Financing Agreement, there are no outstanding warrants, options or other rights to purchase, or other agreements outstanding with respect to, or property that is now or hereafter convertible into, or that requires the issuance or sale of, any Pledged Subsidiary Equity; Schedule VIII annexed hereto sets forth all of the Equity Interests and the Pledged Equity owned by each Grantor, and the percentage ownership in each issuer thereof; and Schedule IX annexed hereto sets forth all of the Pledged Debt owned by such Grantor.

(j)    As of the date hereof, all of such Grantor's Chattel Paper and Letters of Credit are described on Schedule X.  No Person has possession or control of any of its Chattel Paper, Letters of Credit or Letter of Credit rights.

(k)    No negotiable Documents are outstanding with respect to any of the Inventory.

(l)    Each Grantor (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the state, province or jurisdiction of its organization as set forth on Schedule I hereto, (ii) has all requisite power and authority to conduct its business as now conducted and as presently contemplated and to execute, deliver and perform this Agreement and each other Loan Document to be executed and delivered by it pursuant to the Financing Agreement or other Loan Documents and to consummate the transactions contemplated hereby and thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business make such qualification necessary.

(m)    The execution, delivery and performance by each Grantor of this Agreement and each other Loan Document to which such Grantor is or will be a party (i) have been duly authorized by all necessary action, (ii) do not and will not contravene its charter or by-laws, its limited liability company or operating agreement or its certificate of partnership or partnership agreement or any other charter document, as applicable, or any applicable Requirement of Law (including, without limitation, any Communications Law) or any

9

contractual restriction binding on or otherwise affecting such Grantor or any of its properties, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Loan Document) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license (including, without limitation, any Broadcast License), authorization or approval applicable to it or its operations or any of its properties.

(n)    This Agreement is, and each other Loan Document to which any Grantor is or will be a party, when executed and delivered, will be, a legal, valid and binding obligation of such Grantor, enforceable against such Grantor in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws.

(o)    There is no pending or, to the best knowledge of any Grantor, threatened action, suit, proceeding or claim affecting any Grantor or its properties before any court or other Governmental Authority, including, without limitation, any Specified Authority or any arbitrator, or any order, judgment or award by any court or other Governmental Authority, including, without limitation, any Specified Authority or arbitrator, that may adversely affect the grant by any Grantor, or the perfection, of the security interest purported to be created hereby in the Collateral, or the exercise by the Agent of any of its rights or remedies hereunder.

(p)    All federal, state and local tax returns and other reports required by applicable law to be filed by any Grantor have been filed, or extensions have been obtained, and all taxes, assessments and other governmental charges imposed upon any Grantor or any property of such Grantor (including, without limitation, all federal income and social security taxes on employees' wages) and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP.

(q)    The Grantors are and will be at all times the sole and exclusive owners of, or otherwise have and will have adequate rights in, the Collateral free and clear of any Lien except for (i) the Lien created by this Agreement and (ii) Permitted Liens.  No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording or filing office except (A) such as may have been filed in favor of the Agent relating to this Agreement and (B) such as may have been filed to perfect or protect any Permitted Lien.

. (r)    As of the date hereof, and after giving effect to this Agreement and the Loan Documents, and the completion of the transactions contemplated by any Grantor at the time of the execution of this Agreement, each Grantor is and will be Solvent.  Each Grantor is not entering into this Agreement or any other Loan Document to which such Grantor is a party or its property is subject with the intent of hindering, delaying or defrauding any creditor.

(s)    The exercise by the Agent of any of its rights and remedies hereunder will not contravene any law or any contractual restriction binding on or otherwise affecting any

10

Grantor or any of its properties and will not result in, or require the creation of, any Lien upon or with respect to any of its properties.

(t)     Subject to <u>Section 11</u>, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other regulatory body, or any other Person, is required for (i) the grant by any Grantor, or the perfection, of the security interest purported to be created hereby in the Collateral or (ii) the exercise by the Agent of any of its rights and remedies hereunder, except (A) for the filing under the Uniform Commercial Code as in effect in the applicable jurisdiction of the financing statements as described in <u>Schedule I</u> hereto, all of which financing statements, filings and other recordings, as applicable, have been duly filed and are in full force and effect, (B) with respect to the perfection of the security interest created hereby in the United States Intellectual Property, for the recording of the appropriate Assignment for Security, substantially in the form of **Exhibit A** hereto in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, (C) with respect to the perfection of the security interest created hereby in motor vehicles (including, without limitation, all trucks, trailers, tractors, service vehicles, automobiles and other mobile equipment) for which the title to such motor vehicles is governed by a certificate of title or ownership (collectively, the "*Motor Vehicles*"), for the submission of an appropriate application requesting that the Lien of the Agent be noted on the certificate of title or ownership, completed and authenticated by the applicable Grantor, together with the certificate of title, with respect to each Motor Vehicle, to the appropriate state agency, (D) with respect to any action that may be necessary to obtain control of Collateral described in Sections 5(i) and 5(k) hereof, the taking of such actions, and (E) the taking possession of all Documents, Chattel Paper, Instruments and cash constituting Collateral.

(u)     This Agreement creates in favor of the Agent for the benefit of the Agent and the Lenders a legal, valid and enforceable security interest in the Collateral, as security for the Obligations. The Agent's having possession of all Instruments, Documents and Chattel Paper and cash constituting Collateral and obtaining control of all Collateral described in Sections 5(i) and 5(k) hereof from time to time, the recording of the appropriate Assignment for Security executed pursuant hereto in the United States Patent and Trademark Office and the United States Copyright Office, as applicable, the submission of an appropriate application requesting that the Lien of the Agent be noted on the certificate of title or ownership, completed and authenticated by the applicable Grantor, to the applicable state agency, and the filing of the financing statements and the other filings and recordings, as applicable, described in <u>Schedule I</u> hereto and, with respect to the Intellectual Property hereafter existing and not covered by an appropriate Assignment for Security, the recording in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, of appropriate instruments of assignment, result in the perfection of such security interests. Such security interests are, or in the case of Collateral in which any Grantor obtains rights after the date hereof, will be, perfected, first priority security interests, subject only to the Permitted Liens that, as a matter of law, would be prior to Liens in favor of the Agent, for the benefit of the Agent and the Lenders, and the recording of such instruments of assignment. Such recordings and filings and all other actions necessary or desirable to perfect and protect such security interest have been duly taken, except for (i) the Agent's having possession of Instruments, Documents and Chattel Paper and cash constituting Collateral after the date hereof, (ii) the Agent obtaining control of any Collateral described in

11

Sections 5(i) and 5(k) of this Agreement after the date hereof and (iii) the other filings and recordations described in Section 4(m) hereof.

(v)    All information heretofore, herein or hereafter supplied to Secured Party or to any Lender by or on behalf of any Grantor with respect to the Collateral is true and correct.

SECTION 5.    Covenants as to the Collateral.  So long as any of the Obligations shall remain outstanding and the Financing Agreement and the other Loan Documents shall not have expired or terminated, unless the Agent shall otherwise consent in writing:

(a)    Further Assurances.  Each Grantor will at its expense, at any time and from time to time, promptly execute and deliver all further instruments and documents and take all further action that may be necessary or desirable or that the Agent may request in order to (i) perfect and protect the security interest purported to be created hereby; (ii) enable the Agent to exercise and enforce its rights and remedies hereunder in respect of the Collateral; or (iii) otherwise effect the purposes of this Agreement, including, without limitation: (A) marking conspicuously all Chattel Paper and each IP License and, at the request of the Agent, each of its Records pertaining to the Collateral with a legend, in form and substance satisfactory to the Agent, indicating that such Chattel Paper, IP License or Collateral is subject to the security interest created hereby, (B) if any Account shall be evidenced by Promissory Notes or other Instruments or Chattel Paper, delivering and pledging to the Agent hereunder such Promissory Notes, Instruments or Chattel Paper, duly endorsed and accompanied by executed instruments of transfer or assignment, all in form and substance satisfactory to the Agent, (C) executing and filing (to the extent, if any, that such Grantor's signature is required thereon) or authenticating the filing of, such financing or continuation statements, or amendments thereto, as may be necessary or desirable or that the Agent may request in order to perfect and preserve the security interest purported to be created hereby, (D) furnishing to the Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Agent may reasonably request, all in reasonable detail, (E) if any Collateral shall be in the possession of a third party, notifying such Person of the Agent's security interest created hereby and obtaining a written acknowledgment from such Person that such Person holds possession of the Collateral for the benefit of the Agent, which such written acknowledgement shall be in form and substance satisfactory to the Agent, (F) if at any time after the date hereof, any Grantor acquires or holds any Commercial Tort Claim, immediately notifying the Agent in a writing signed by such Grantor setting forth a brief description of such Commercial Tort Claim and granting to the Agent a security interest therein and in the proceeds thereof, which writing shall incorporate the provisions hereof and shall be in form and substance satisfactory to the Agent, (G) upon the acquisition after the date hereof by any Grantor of any Equipment subject to a certificate of title or ownership (other than a Motor Vehicle or Equipment that is subject to a purchase money security interest permitted by Section 6.02(a) of the Financing Agreement), immediately notifying the Agent of such acquisition, setting forth a description of the Equipment acquired and a good faith estimate of the current value of such Equipment, and immediately causing the Agent to be listed as the lienholder on such certificate of title or ownership and delivering evidence of the same to the Agent, and (H) taking all actions required by applicable law or by other law as applicable in any foreign jurisdiction.

12

(b) <u>Location of Equipment and Inventory</u>. Each Grantor will keep the Equipment and Inventory (other than used Equipment and Inventory sold in the ordinary course of business in accordance with Section 5(g) hereof or otherwise permitted to be sold under the Financing Agreement) at one or more of the locations specified therefor in <u>Section 4(b)</u> hereof or, upon not less than twenty (20) days' prior written notice to the Agent accompanied by a new <u>Schedule II</u> hereto indicating each new location of the Equipment and Inventory, at such other locations in the continental United States, as the Grantors may elect, provided that (i) all action has been taken to grant to the Agent a perfected, first priority security interest in such Equipment and Inventory (subject to Permitted Liens), and (ii) the Agent's rights in such Equipment and Inventory, including, without limitation, the existence, perfection and priority of the security interest created hereby in such Equipment and Inventory, are not adversely affected thereby.

(c) <u>Condition of Equipment</u>. Each Grantor will maintain or cause the Equipment to be maintained and preserved in good condition, repair and working order, ordinary wear and tear excepted (other than obsolete or worn-out Equipment and/or Equipment that is sold as permitted by the Financing Agreement), and will forthwith, or in the case of any loss or damage to any Equipment as promptly as practicable after the occurrence thereof, make or cause to be made all repairs, replacements and other improvements in connection therewith so that the value and operating efficiency thereof shall be at all times be maintained and preserved. Each Grantor will promptly furnish to the Agent a statement describing in reasonable detail any loss or damage in excess of $10,000 to any Equipment.

(d) <u>Taxes, Etc.</u> Each Grantor jointly and severally agrees to pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Equipment and Inventory, except to the extent the validity thereof is being contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves in accordance with GAAP have been set aside for the payment thereof.

(e) <u>Insurance</u>.

(i) Each Grantor will, at its own expense, maintain insurance (including, without limitation, comprehensive general liability, hazard, property and business interruption insurance) with respect to all of its properties, including, without limitation, its Equipment and Inventory and all real properties leased or owned by it in such amounts, against such risks, in such form and with responsible and reputable insurance companies or associations as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and in any event, in amount, adequacy and scope reasonably satisfactory to the Agent. Each policy for liability insurance shall provide for all losses to be paid to the Agent as its interests may appear, and each policy for property damage insurance shall provide for all losses to be adjusted with, and paid directly to, the Agent. In addition, each such policy shall (A) name each Grantor and the Agent (and such other Persons as the Agent may designate from time to time) as insured parties thereunder (without any representation or warranty by or obligation upon the Agent or such other Person) as their interests may appear, (B) contain an agreement by the insurer that any loss thereunder shall be payable to the Agent on its own account

13

notwithstanding any action, inaction or breach of representation or warranty by any Grantor, (C) provide that there shall be no recourse against the Agent for payment of premiums or other amounts with respect thereto and (D) provide that at least thirty (30) days' prior written notice of cancellation, lapse, expiration or other adverse change shall be given to the Agent by the insurer. Each Grantor will, if so requested by the Agent, deliver to the Agent original or duplicate policies of such insurance and, as often as the Agent may reasonably request, a report of a reputable insurance broker with respect to such insurance. Each Grantor will also, at the request of the Agent, execute and deliver instruments of assignment of such insurance policies and cause the respective insurers to acknowledge notice of such assignment.

(ii)    Reimbursement under any liability insurance maintained by any Grantor pursuant to this Section 5(e) may be paid directly to the Person who shall have incurred liability covered by such insurance.  In the case of any loss involving damage to Equipment or Inventory, any proceeds of insurance maintained by a Grantor pursuant to this Section 5(e) shall be paid to the Agent, such Grantor will make or cause to be made the necessary repairs to or replacements of such Equipment or Inventory, and any proceeds of insurance maintained by such Grantor pursuant to this Section 5(e) shall, to the extent that such proceeds have been paid to the Agent, be paid by the Agent to such Grantor as reimbursement for the costs of such repairs or replacements.

(iii)    Upon the occurrence and during the continuance of a Default or Event of Default or upon any insurance payment in respect of any Equipment or Inventory, all insurance payments in respect of such Equipment or Inventory shall be paid to the Agent and applied as specified in Section 7(b) hereof.

(f)    Provisions Concerning the Accounts and the Licenses.

(i)    No Grantor shall, without the prior written consent of the Agent, change (A) such Grantor's name, identity or organizational structure, or (B) its jurisdiction of incorporation as set forth in Section 4(b) hereto.  Each Grantor shall (x) immediately notify the Agent upon obtaining an organizational identification number, if on the date hereof such Grantor did not have such identification number, and (y) keep adequate records concerning the Accounts and Chattel Paper and permit representatives of the Agent pursuant to the terms of the Financing Agreement to inspect and make abstracts from such Records and Chattel Paper.

(ii)    Each Grantor will, except as otherwise provided in this subsection (f), continue to collect, at its own expense, all amounts due or to become due under the Accounts.  In connection with such collections, each Grantor may (and, at the Agent's direction, will) take such action as such Grantor or the Agent may deem necessary or advisable to enforce collection or performance of the Accounts; provided, however, that the Agent shall have the right at any time, upon the occurrence and during the continuance of a Default or Event of Default, to notify the Account Debtors or obligors under any Accounts of the assignment of such Accounts to the Agent and to direct such Account Debtors or obligors to make payment of all amounts due or to become due to such Grantor thereunder directly to the Agent or its designated agent and, upon such notification and at the expense of such Grantor and to the extent permitted by law, to enforce collection of any such Accounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might

14

have done. Upon the occurrence and during the continuance of a Default or Event of Default and after receipt by any Grantor of a notice from the Agent that the Agent has notified, intends to notify, or has enforced or intends to enforce a Grantor's rights against the Account Debtors or obligors under any Accounts as referred to in the proviso to the immediately preceding sentence, (A) all amounts and proceeds (including Instruments) received by such Grantor in respect of the Accounts shall be received in trust for the benefit of the Agent hereunder, shall be segregated from other funds of such Grantor and shall be forthwith paid over to the Agent or its designated agent in the same form as so received (with any necessary endorsement) to be held as cash collateral and either (i) credited to the Loan Account so long as no Default or Event of Default shall have occurred and be continuing or (ii) if a Default or an Event of Default shall have occurred and be continuing, applied as specified in Section 7(b) hereof, and (B) such Grantor will not adjust, settle or compromise the amount or payment of any Account or release wholly or partly any Account Debtor or obligor thereof or allow any credit or discount thereon. In addition, upon the occurrence and during the continuance of a Default or an Event of Default, the Agent may (in its sole and absolute discretion) direct any or all of the banks and financial institutions with which any Grantor either maintains a Deposit Account or a lockbox or deposits the proceeds of any Accounts to send immediately to the Agent or its designated agent by wire transfer (to such account as the Agent shall specify, or in such other manner as the Agent shall direct) all or a portion of such securities, cash, investments and other items held by such institution. Any such securities, cash, investments and other items so received by the Agent or its designated agent shall (in the sole and absolute discretion of the Agent) be held as additional Collateral for the Obligations or distributed in accordance with Section 7(b) hereof.

(iii)    Upon the occurrence and during the continuance of any breach or default under any IP License referred to in Schedule IV hereto by any party thereto other than a Grantor, (A) the relevant Grantor will, promptly after obtaining knowledge thereof, give the Agent written notice of the nature and duration thereof, specifying what action, if any, it has taken and proposes to take with respect thereto, (B) no Grantor will, without the prior written consent of the Agent, declare or waive any such breach or default or affirmatively consent to the cure thereof or exercise any of its remedies in respect thereof, and (C) each Grantor will, upon written instructions from the Agent and at such Grantor's expense, take such action as the Agent may deem necessary or advisable in respect thereof.

(iv)    Each Grantor will, at its expense, promptly deliver to the Agent a copy of each notice or other communication received by it by which any other party to any IP License referred to in Schedule IV or FCC License referred to in Schedule V hereto purports to exercise any of its rights or affect any of its obligations or the Grantor's rights thereunder, together with a copy of any reply by such Grantor thereto.

(v)    Each Grantor will exercise promptly and diligently each and every right which it may have under each IP License (other than any right of termination) in accordance with reasonable and sound business practice and will duly perform and observe in all respects all of its obligations under each IP License and will take all action necessary to maintain the IP Licenses in full force and effect. No Grantor will, without the prior written consent of the Agent, cancel, terminate, amend or otherwise modify in any respect, or waive any provision of, any IP License referred to in Schedule IV hereto.

15

(g)   <u>Transfers and Other Liens</u>.

(i)   Except to the extent expressly permitted by <u>Section 6.02(c)</u> of the Financing Agreement, no Grantor will sell, assign (by operation of law or otherwise), lease, license, exchange or otherwise transfer or dispose of any of the Collateral.

(ii)   Except to the extent expressly permitted by Section 6.02(a) of the Financing Agreement, no Grantor will create, suffer to exist or grant any Lien upon or with respect to any Collateral.

(h)   <u>Intellectual Property</u>.

(i)   If applicable, each Grantor has duly executed and delivered the applicable Assignment for Security in the form attached hereto as Exhibit A. Each Grantor (either itself or through licensees) will, and will cause each licensee thereof to, take all action necessary to maintain all of the Intellectual Property in full force and effect, including, without limitation, using the proper statutory notices and markings and using the Trademarks on each applicable trademark class of goods in order to so maintain the Trademarks in full force, free from any claim of abandonment for non-use, and no Grantor will (nor permit any licensee thereof to) do any act or knowingly omit to do any act whereby any Intellectual Property may become invalidated; <u>provided, however</u>, that so long as no Default or Event of Default has occurred and is continuing, no Grantor shall have an obligation to use or to maintain any Intellectual Property (A) that relates solely to any product or work, that has been, or is in the process of being, discontinued, abandoned or terminated, (B) that is being replaced with Intellectual Property substantially similar to the Intellectual Property that may be abandoned or otherwise become invalid, so long as the failure to use or maintain such Intellectual Property does not materially adversely affect the validity of such replacement Intellectual Property and so long as such replacement Intellectual Property is subject to the Lien created by this Agreement, or (C) that is substantially the same as another Intellectual Property that is in full force, so long as the failure to use or maintain such Intellectual Property does not materially adversely affect the validity of such replacement Intellectual Property and so long as such other Intellectual Property is subject to the Lien and security interest created by this Agreement. Each Grantor will cause to be taken all necessary steps in any proceeding before the United States Patent and Trademark Office and the United States Copyright Office or any similar office or agency in any other country or political subdivision thereof to maintain each registration of the Intellectual Property (other than the Intellectual Property described in the proviso to the immediately preceding sentence), including, without limitation, filing of renewals, affidavits of use, affidavits of incontestability and opposition, interference and cancellation proceedings and payment of maintenance fees, filing fees, taxes or other governmental fees. If any Intellectual Property is infringed, misappropriated, diluted or otherwise violated in any material respect by a third party, the Grantors shall (x) upon obtaining knowledge of such infringement, misappropriation, dilution or other violation, promptly notify the Agent and (y) to the extent the Grantors shall deem appropriate under the circumstances, promptly sue for infringement, misappropriation, dilution or other violation, seek injunctive relief where appropriate and recover any and all damages for such infringement, misappropriation, dilution or other violation, or take such other actions as the Grantors shall deem appropriate under the circumstances to protect such Intellectual Property. Each Grantor shall furnish to the Agent, from time to time upon the Agent's request, statements and schedules further identifying and describing

16

the Intellectual Property and IP Licenses and such other reports in connection with the Intellectual Property and IP Licenses as the Agent may reasonably request, all in reasonable detail and promptly upon request of the Agent, following receipt by the Agent of any such statements, schedules or reports, the Grantors shall modify this Agreement by amending Schedule VI hereto to include any Intellectual Property and IP License, as the case may be, which becomes part of the Collateral under this Agreement and shall execute and authenticate such documents and do such acts as shall be necessary or, in the judgment of the Agent, desirable to subject such Intellectual Property and IP Licenses to the Lien and security interest created by this Agreement. Notwithstanding anything herein to the contrary, upon the occurrence and during the continuance of a Default or an Event of Default, no Grantor may abandon or otherwise permit any Intellectual Property to become invalid without the prior written consent of the Agent, and if any Intellectual Property is infringed, misappropriated, diluted or otherwise violated in any material respect by a third party, the Grantors will take such action as the Agent shall deem appropriate under the circumstances to protect such Intellectual Property.

(ii)     In no event shall any Grantor, either itself or through any agent, employee, licensee or designee, file an application for the registration of any Trademark or Copyright or the issuance of any Patent with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, or in any similar office or agency of the United States or any country or any political subdivision thereof unless it gives the Agent prior written notice thereof. Upon request of the Agent, each Grantor shall execute, authenticate and deliver any and all assignments, agreements, instruments, documents and papers as the Agent may reasonably request to evidence the Agent's security interest hereunder in such Intellectual Property and the General Intangibles of such Grantor relating thereto or represented thereby, and each Grantor hereby appoints the Agent its attorney-in-fact to execute and/or authenticate and file all such writings for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed, and such power (being coupled with an interest) shall be irrevocable until the termination of all Commitments, the repayment of all of the Obligations in full and the termination of each of the Loan Documents.

(i)     Deposit, Commodities and Securities Accounts.     Prior to the date hereof, each Grantor shall cause each bank and other financial institution with an account referred to in Schedule III hereto to execute and deliver to the Agent a control agreement, in form and substance reasonably satisfactory to the Agent, duly executed by such Grantor and such bank or financial institution, or enter into other arrangements in form and substance satisfactory to the Agent, pursuant to which such institution shall irrevocably agree, among other things, that (i) it will comply at any time with the instructions originated by the Agent to such bank or financial institution directing the disposition of cash, Commodity Contracts, securities, Investment Property and other items from time to time credited to such account, without further consent of such Grantor, which instructions the Agent will not give to such bank or other financial institution in the absence of a continuing Default or Event of Default, (ii) all cash, Commodity Contracts, securities, Investment Property and other items of such Grantor deposited with such institution shall be subject to a perfected, first priority security interest in favor of the Agent, (iii) any right of set off, banker's Lien or other similar Lien, security interest or encumbrance shall be fully waived as against the Agent, and (iv) upon receipt of written notice from the Agent during the continuance of a Default or an Event of Default, such bank or financial institution shall immediately send to the Agent by wire transfer (to such account as the Agent shall specify,

17

or in such other manner as the Agent shall direct) all such cash, the value of any Commodity Contracts, securities, Investment Property and other items held by it. Without the prior written consent of the Agent, no Grantor shall make or maintain any Deposit Account, Commodity Account or Securities Account except for the accounts set forth in Schedule III hereto. The provisions of this paragraph 5(i) shall not apply to (i) Deposit Accounts for which the Agent is the depositary and (ii) Deposit Accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of a Grantor's salaried employees.

      (j)   <u>Motor Vehicles</u>.

      (i)   Upon the occurrence and during the continuance of a Default or an Event of Default, and at the written request of the Agent, each Grantor shall cause all Motor Vehicles, now owned or hereafter acquired by any Grantor, the ownership of which under applicable law (including without limitation, any Motor Vehicle Law), is evidenced by a certificate of title or ownership, to be properly titled in the name of such Grantor, with the Agent's Lien noted thereon, and, if requested by the Agent, deliver to the Agent (or its custodian) originals of all such certificates of title or ownership for such Motor Vehicles, with the Agent's Lien noted thereon.

      (ii)   Upon the occurrence and during the continuance of a Default or an Event of Default and at the written request of the Agent, upon the acquisition after the date hereof by any Grantor of any Motor Vehicle or other Equipment subject to a certificate of title or ownership (other than a Motor Vehicle or Equipment to be acquired that is subject to a purchase money security interest permitted by Section 6.02(a) of the Financing Agreement), such Grantor shall immediately notify the Agent of such acquisition, set forth a description of the Motor Vehicle or other Equipment acquired and a good faith estimate of the current value of such Motor Vehicle or Equipment, and if so requested by the Agent, immediately deliver to the Agent (or its custodian) originals of the certificates of title or ownership for such Motor Vehicle or Equipment, together with the manufacturer's statement of origin, and an application duly executed by the appropriate Grantor to evidence the Agent's Lien thereon.

      (iii)   Subject to clauses (j)(i) and (j)(ii) above, upon the occurrence and during the continuance of a Default or an Event of Default, and at the written request of the Agent, each Grantor hereby appoints the Agent as its attorney-in-fact, effective the date hereof and terminating upon the termination of this Agreement, for the purpose of (A) executing on behalf of such Grantor title or ownership applications for filing with appropriate state agencies to enable Motor Vehicles now owned or hereafter acquired by such Grantor to be retitled and the Agent listed as lienholder thereof, (B) filing such applications with such state agencies, and (C) executing such other documents and instruments on behalf of, and taking such other action in the name of, such Grantor as the Agent may deem necessary or advisable to accomplish the purposes hereof (including, without limitation, for the purpose of creating in favor of the Agent a perfected Lien on the Motor Vehicles and exercising the rights and remedies of the Agent hereunder).

(iv)    Any certificates of title or ownership delivered pursuant to the terms hereof shall be accompanied by odometer statements for each Motor Vehicle covered thereby.

(k)    Control. Each Grantor hereby agrees to take any or all action that may be necessary and that the Agent may request in order for the Agent to obtain control in accordance with Sections 9-104, 9-105, 9-106 and 9-107 of the Code with respect to the following Collateral: (i) Deposit Accounts, (ii) Electronic Chattel Paper, (iii) Investment Property and (iv) Letter-of-Credit Rights.

(l)    Inspection and Reporting.    Subject to the terms of the Financing Agreement, each Grantor shall permit the Agent and the Lenders, or any agents or representatives thereof or such professionals or other Persons as the Agent and the Lenders may designate (i) to examine and inspect the books and records of the Grantor and take copies and extracts therefrom, (ii) to visit and inspect the Collateral, (iii) to verify materials, leases, notes, Accounts, Inventory and other assets of such Grantor from time to time, (iv) to conduct audits, physical counts, appraisals and/or valuations or examinations at the locations of such Grantor and (v) to discuss such Grantor's affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives, in each case as provided in the Financing Agreement.

(m)    Partnership and Limited Liability Company Interest. No Grantor that is a partnership or a limited liability company shall, nor shall any Grantor with any Subsidiary that is a partnership or a limited liability company, permit such partnership interests or membership interests to (i) be dealt in or traded on securities exchanges or in securities markets, (ii) become a security for purposes of Article 8 of any relevant Uniform Commercial Code, (iii) become an investment company security within the meaning of Section 8-103 of any relevant Uniform Commercial Code or (iv) be evidenced by a certificate.    Each Grantor agrees that such partnership interests or membership interests shall constitute General Intangibles.

SECTION 6.    Additional Provisions Concerning the Collateral.

(a)    Each Grantor hereby (i) authorizes the Agent to file, one or more financing or continuation statements, and amendments thereto, relating to the Collateral (including, without limitation, any such financing statements that indicate the Collateral as "all assets" or words of similar import) and (ii) ratifies such authorization to the extent that the Agent has filed any such financing or continuation statements, or amendments thereto, prior to the date hereof.    A photocopy or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

(b)    Each Grantor hereby irrevocably appoints the Agent as its attorney-in-fact and proxy, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, from time to time in the Agent's discretion, to take any action and to execute any instrument which the Agent may deem necessary or advisable to accomplish the purposes of this Agreement (subject to the rights of a Grantor under Section 5 hereof and in compliance with the Communications Laws), including, without limitation, (i) to obtain and

19

adjust insurance required to be paid to the Agent pursuant to Section 5(e) hereof, (ii) to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any Collateral, (iii) to receive, endorse, and collect any drafts or other instruments, documents and chattel paper in connection with clause (i) or (ii) above, (iv) to file any claims or take any action or institute any proceedings which the Agent may deem necessary or desirable for the collection of any Collateral or otherwise to enforce the rights of the Agent and the Lenders with respect to any Collateral and (v) to execute assignments, licenses and other documents to enforce the rights of the Agent and the Lenders with respect to any Collateral. This power is coupled with an interest and is irrevocable until all of the Obligations are paid in full after the termination of the Financing Agreement and the other Loan Documents.

(c)     For the purpose of enabling the Agent to exercise rights and remedies hereunder, at such time as the Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby grants to the Agent, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to any Grantor) to use, assign, license or sublicense any Intellectual Property now owned or hereafter acquired by any Grantor, wherever the same may be located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof. Notwithstanding anything contained herein to the contrary, but subject to the provisions of the Financing Agreement that limit the right of a Grantor to dispose of its property and Section 5(h) hereof, so long as no Default or Event of Default shall have occurred and be continuing, each Grantor may exploit, use, enjoy, protect, license, sublicense, assign, sell, dispose of or take other actions with respect to the Intellectual Property in the ordinary course of its business. In furtherance of the foregoing, unless a Default or an Event of Default shall have occurred and be continuing, the Agent shall from time to time, upon the request of a Grantor, execute and deliver any instruments, certificates or other documents, in the form so requested, which such Grantor shall have certified are appropriate (in such Grantor's judgment) to allow it to take any action permitted above (including relinquishment of the license provided pursuant to this clause (c) as to any Intellectual Property). Further, upon the payment in full of all of the Obligations after the cancellation or termination of the Financing Agreement and the other Loan Documents, the Agent (subject to Section 12(e) hereof) shall release and reassign to the Grantors all of the Agent's right, title and interest in and to the Intellectual Property, and the IP Licenses, all without recourse, representation or warranty whatsoever and at the Grantors' sole expense. The exercise of rights and remedies hereunder by the Agent shall not terminate the rights of the holders of any licenses or sublicenses theretofore granted by any Grantor in accordance with the second sentence of this clause (c). Each Grantor hereby releases the Agent from any claims, causes of action and demands at any time arising out of or with respect to any actions taken or omitted to be taken by the Agent under the powers of attorney granted herein other than actions taken or omitted to be taken through the Agent's gross negligence or willful misconduct, as determined by a final determination of a court of competent jurisdiction.

(d)     If any Grantor fails to perform any agreement contained herein, the Agent may itself perform, or cause performance of, such agreement or obligation (in compliance with the Communications Laws), in the name of such Grantor or the Agent, and the expenses of the

Agent incurred in connection therewith shall be jointly and severally payable by the Grantors pursuant to Section 8 hereof and shall be secured by the Collateral.

(e)    The powers conferred on the Agent hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

(f)    Anything herein to the contrary notwithstanding (i) each Grantor shall remain liable under the IP Licenses and otherwise with respect to any of the Collateral to the extent set forth therein to perform all of its obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by the Agent of any of its rights hereunder shall not release any Grantor from any of its obligations under the IP Licenses or otherwise in respect of the Collateral, and (iii) the Agent shall not have any obligation or liability by reason of this Agreement under the IP Licenses or with respect to any of the other Collateral, nor shall the Agent be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

SECTION 7.    Remedies Upon Default.    If any Default or Event of Default shall have occurred and be continuing:

(a)    Subject to Section 11, the Agent may exercise in respect of the Collateral, in addition to any other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party upon default under the Code (whether or not the Code applies to the affected Collateral), and also may (i) take absolute control of the Collateral, including, without limitation, transfer into the Agent's name or into the name of its nominee or nominees (to the extent the Agent has not theretofore done so) and thereafter receive, for the benefit of the Lenders, all payments made thereon, give all consents, waivers and ratifications in respect thereof and otherwise act with respect thereto as though it were the outright owner thereof, (ii) require each Grantor to, and each Grantor hereby agrees that it will at its expense and upon request of the Agent forthwith, assemble all or part of the Collateral as directed by the Agent and make it available to the Agent at a place or places to be designated by the Agent that is reasonably convenient to both parties, and the Agent may enter into and occupy any premises owned or leased by any Grantor where the Collateral or any part thereof is located or assembled for a reasonable period in order to effectuate the Agent's rights and remedies hereunder or under law, without obligation to any Grantor in respect of such occupation, and (iii) without notice except as specified below and without any obligation to prepare or process the Collateral for sale, (A) sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Agent's offices or elsewhere, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Agent may deem commercially reasonable and/or (B) lease, license or dispose of the Collateral or any part thereof upon such terms as the Agent may deem commercially reasonable. Each Grantor agrees that, to the extent notice of sale or any other disposition of the Collateral shall be required by law, at least ten (10) days' notice to a Grantor of the time and place of any public sale or the time after which any private sale or other disposition of the Collateral is to be made shall constitute reasonable notification. The Agent

21

shall not be obligated to make any sale or other disposition of Collateral regardless of notice of sale having been given. The Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor hereby waives any claims against the Agent and the Lenders arising by reason of the fact that the price at which the Collateral may have been sold at a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if the Agent accepts the first offer received and does not offer the Collateral to more than one offeree, and waives all rights that such Grantor may have to require that all or any part of the Collateral be marshalled upon any sale (public or private) thereof. Each Grantor hereby acknowledges that (i) any such sale of the Collateral by the Agent shall be made without warranty, (ii) the Agent may specifically disclaim any warranties of title, possession, quiet enjoyment or the like, and (iii) such actions set forth in clauses (i) and (ii) above shall not adversely effect the commercial reasonableness of any such sale of the Collateral. In addition to the foregoing, (i) upon written notice to any Grantor from the Agent, each Grantor shall cease any use of the Intellectual Property or any trademark, patent or copyright similar thereto for any purpose described in such notice; (ii) the Agent may, at any time and from time to time, upon ten (10) days' prior notice to any Grantor, license, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any of the Intellectual Property, throughout the universe for such term or terms, on such conditions, and in such manner, as the Agent shall in its sole discretion determine; and (iii) the Agent may, at any time, pursuant to the authority granted in Section 6 hereof (such authority being effective upon the occurrence and during the continuance of a Default or an Event of Default execute and deliver on behalf of a Grantor, one or more instruments of assignment of the Intellectual Property (or any application or registration thereof), in form suitable for filing, recording or registration in any country.

(b)     Any cash held by the Agent as Collateral and all Cash Proceeds received by the Agent in respect of any sale of or collection from, or other realization upon, all or any part of the Collateral may, in the discretion of the Agent, be held by the Agent as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Agent pursuant to Section 8 hereof) in whole or in part by the Agent against, all or any part of the Obligations in such order as the Agent shall elect, consistent with the provisions of the Financing Agreement. Any surplus of such cash or Cash Proceeds held by the Agent and remaining after payment in full of all of the Obligations after termination of the Financing Agreement and the other Loan Documents shall be paid over to whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct.

(c)     In the event that the proceeds of any such sale, collection or realization are insufficient to pay all amounts to which the Agent and the Lenders are legally entitled, the Grantors shall be jointly and severally liable for the deficiency, together with interest thereon at the highest rate specified in any applicable Loan Document for interest on overdue principal thereof or such other rate as shall be fixed by applicable law, together with the costs of collection and the reasonable fees, costs, expenses and other client charges of any attorneys employed by the Agent to collect such deficiency.

(d)     Each Grantor hereby acknowledges that if the Agent complies with any applicable state or federal law requirements in connection with a disposition of the Collateral,

22

such compliance will not adversely affect the commercial reasonableness of any sale or other disposition of the Collateral.

(e)     The Agent shall not be required to marshal any present or future collateral security (including, but not limited to, this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of the Agent's rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising.  To the extent that any Grantor lawfully may, such Grantor hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Agent's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

SECTION 8.   Indemnity and Expenses.

(a)     Each Grantor jointly and severally agrees to defend, protect, indemnify and hold harmless the Agent and each Lender (and all of their respective officers, directors, employees, attorneys, consultants and agents) from and against any and all claims, damages, losses, liabilities, obligations, penalties, fees, costs and expenses (including, without limitation, legal fees, costs, expenses and disbursements of the Agent's and each Lender's counsel) to the extent that they arise out of or otherwise result from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting solely and directly from the Agent's gross negligence or willful misconduct, as determined by a final judgment of a court of competent jurisdiction.

(b)     Each Grantor jointly and severally agrees to pay to the Agent upon demand the amount of any and all costs and expenses, including the reasonable fees, costs, expenses and disbursements of counsel for the Agent and of any experts and agents (including, without limitation, any collateral trustee which may act as agent of the Agent), which the Agent may incur in connection with (i) the preparation, negotiation, execution, delivery, recordation, administration, amendment, waiver or other modification or termination of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, any Collateral, (iii) the exercise or enforcement of any of the rights of the Agent hereunder, or (iv) the failure by any Grantor to perform or observe any of the provisions hereof.

SECTION 9.   Notices, Etc.  All notices and other communications provided for hereunder shall be in writing and shall be mailed (by certified mail, postage prepaid and return receipt requested), telecopied or delivered, if to a Grantor, to it in care of the Administrative Borrower at its address specified in the Financing Agreement and if to the Agent, to it at its address specified in the Financing Agreement; or as to any such Person, at such other address as shall be designated by such Person in a written notice to such other Person complying as to delivery with the terms of this Section 9.  All such notices and other communications shall be effective (a) if mailed (by certified mail, postage prepaid and return receipt requested), when

received or three (3) days after deposited in the mails, whichever occurs first, (b) if telecopied, when transmitted and confirmation is received or (c) if delivered, upon delivery.

SECTION 10. Security Interest Absolute. Subject to Section 11, all rights of the Agent and the Lenders, all Liens and all obligations of each of the Grantors hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Financing Agreement, any other Loan Document or any other agreement or instrument relating thereto, (b) any change in the time, manner or place of payment of, or in any other term in respect of, all or any of the Obligations, or any other amendment or waiver of or consent to any departure from the Financing Agreement or any other Loan Document, (c) any exchange or release of, or non-perfection of any Lien on any Collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Obligations, or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any of the Grantors in respect of the Obligations. All authorizations and agencies contained herein with respect to any of the Collateral are irrevocable and powers coupled with an interest.

SECTION 11. FCC Matters. Notwithstanding anything to the contrary contained herein, any foreclosure on, sale, transfer or other disposition of any Collateral or any other action taken or proposed to be taken hereunder that would affect the operational, voting, or other control of the Grantors or affect the ownership of the FCC Licenses, shall not violate the Communications Laws and, if and to the extent required by the Communications Laws, shall be subject to the prior consent of the FCC and any other applicable governmental authority. Notwithstanding anything to the contrary contained herein, the Agent shall not take any action pursuant hereto that would constitute or result in any assignment of the FCC Licenses or transfer of control of any Grantor if such assignment or transfer of control would require under then existing law (including the Communications Laws), the prior approval of the FCC, without first obtaining such approval of the FCC and notifying the FCC of the consummation of such assignment or transfer of control (to the extent required to do so). Each Grantor agrees to take any action which the Agent may reasonably request in order to obtain and enjoy the full rights and benefits granted to the Agent by this Agreement, including, without limitation, after the occurrence and during the continuance of a Default or an Event of Default, (a) assisting and cooperating in obtaining any approval of the FCC that is then required under the Communications Laws or under any other law for any action or transaction contemplated by this Agreement, and (b) upon request, the execution, delivery and filing with the FCC of the assignor's or transferor's portion of any application or applications for consent to the assignment of FCC Licenses issued to such Grantor with respect to the Stations or transfer of control of the Grantor.

SECTION 12. Miscellaneous.

(a)    No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by each Grantor and the Agent, and no waiver of any provision of this Agreement, and no consent to any departure by any Grantor therefrom, shall be effective unless it is in writing and signed by the Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)    No failure on the part of the Agent or the Lenders to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Agent and the Lenders provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Agent and the Lenders under any Loan Document against any party thereto are not conditional or contingent on any attempt by such Person to exercise any of its rights under any other Loan Document against such party or against any other Person, including but not limited to, any Grantor.

(c)    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(d)    This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until the later of (A) the payment in full of the Obligations and (B) the termination of the Financing Agreement and the other Loan Documents, and (ii) be binding on each Grantor and all other Persons who become bound as debtor to this Agreement in accordance with Section 9-203(d) of the Code and shall inure, together with all rights and remedies of the Agent and the Lenders hereunder, to the benefit of the Agent and the Lenders and their respective permitted successors, transferees and assigns. Without limiting the generality of clause (ii) of the immediately preceding sentence, without notice to the Grantors, the Agent and the Lenders may assign or otherwise transfer their rights and obligations under this Agreement and any other Loan Document, to any other Person and such other Person shall thereupon become vested with all of the benefits in respect thereof granted to the Agent and the Lenders herein or otherwise. Upon any such assignment or transfer, all references in this Agreement to the Agent or any such Lender shall mean the assignee of the Agent or such Lender. None of the rights or obligations of any Grantor hereunder may be assigned or otherwise transferred without the prior written consent of the Agent, and any such assignment or transfer shall be null and void.

(e)    Upon the satisfaction in full of the Obligations and the termination of the Financing Agreement and the other Loan Documents, (i) this Agreement and the security interests created hereby shall terminate and all rights to the Collateral shall revert to the Grantors and (ii) the Agent will, upon the Grantors' request and at the Grantors' expense, without any representation, warranty or recourse whatsoever, (A) return to the Grantors such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof and (B) execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence such termination.

(f)    THIS AGREEMENT SHALL BE GOVERNED BY, CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, EXCEPT AS REQUIRED BY MANDATORY PROVISIONS OF LAW AND EXCEPT TO THE EXTENT THAT THE VALIDITY AND PERFECTION OR THE PERFECTION AND THE EFFECT OF PERFECTION OR NON-PERFECTION OF THE SECURITY INTEREST

25

CREATED HEREBY, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

(g)    ANY LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY DOCUMENT RELATED THERETO MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS THEREOF, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH GRANTOR HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.    EACH GRANTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION, SUIT OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT.

(h)    Each Grantor irrevocably consents to the service of process of any of the aforesaid courts in any such action, suit or proceeding by the mailing of copies thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Grantor at its address provided herein, such service to become effective ten (10) days after such mailing

(i)    Nothing contained herein shall affect the right of the Agent to serve process in any other manner permitted by law or commence legal proceedings or otherwise proceed against any Grantor or any property of any Grantor in any other jurisdiction.

(j)    Each Grantor irrevocably and unconditionally waives any right it may have to claim or recover in any legal action, suit or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

(k)    **EACH GRANTOR AND (BY ITS ACCEPTANCE OF THE BENEFITS OF THIS AGREEMENT) THE AGENT WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR OTHER ACTION OF THE PARTIES HERETO.**

(l)    Section headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(m)    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original,

but all of which taken together constitute one in the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile shall be equally effective as delivery of an original executed counterpart.

(n)    All of the obligations of the Grantors hereunder are joint and several. The Agent may, in its sole and absolute discretion, enforce the provisions hereof against any of the Grantors and shall not be required to proceed against all Grantors jointly or seek payment from the Grantors ratably. In addition, the Agent may, in its sole and absolute discretion, select the Collateral of any one or more of the Grantors for sale or application to the Obligations, without regard to the ownership of such Collateral, and shall not be required to make such selection ratably from the Collateral owned by all of the Grantors. The release or discharge of any Grantor by the Agent shall not release or discharge any other Grantor from the obligations of such Person hereunder.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, each Grantor has caused this Agreement to be executed and delivered by its officer thereunto duly authorized as of the date first above written.

GRANTORS:

BUSINESSTALKRADIO.NET, INC.

By: _____
Name: _____
Title: _____

THE GREENWICH BROADCASTING
CORPORATION

By: _____
Name: _____
Title: _____

THE LIFESTYLE TALKRADIO NETWORK INC.

By: _____
Name: _____
Title: _____

BTR WEST, INC.

By: _____
Name: _____
Title: _____

BTR COMMUNICATIONS BOSTON, INC.

By: _____
Name: _____
Title: _____

Signature Page to Security Agreement

BTR GREENWICH, INC.

By: _____
Name: _____
Title: _____

BTR WEST II, INC.

By: _____
Name: _____
Title: _____

BTR COMMUNICATIONS BOSTON II, INC.

By: _____
Name: _____
Title: _____

SCHEDULE I

LEGAL NAMES; ORGANIZATIONAL IDENTIFICATION NUMBERS; STATES OR
JURISDICTIONS OF ORGANIZATION

| Exact Legal Name | Org. ID | Assumed Names | Jurisdiction of Organization | Foreign Qualifications | Employer Identification Number |
|---|---|---|---|---|---|
| BusinessTalkradio. net, Inc. | 3647077 | | Delaware | Connecticut; Massachusetts; Nevada | |
| The Greenwich Broadcasting Corporation | 0020179 | WGCH, 1490 WGCH, Greenwich Radio | Connecticut | None. | 06-0795193 |
| The Lifestyle TalkRadio Network Inc. | 3884440 | LTR, LTRN, Lifestyle TalkRadio Network™ | Delaware | None. | 34-2024407 |
| BTR West, Inc. | E0691712 006-0 | None. | Nevada | None. | 11-3792714 |
| BTR Communications Boston, Inc. | 00093548 3 | None. | Massachusetts | None. | 11-3792717 |
| BTR West II, Inc. | E0793992 006-5 | KNUU, K-News, Newsradio 970 | Nevada | None. | |
| BTR Greenwich, Inc. | 0876528 | None. | Connecticut | None. | |
| BTR Communications Boston II, Inc. | 00093671 5 | WBET | Massachusetts | None. | |

SCHED. I

## SCHEDULE II

## LOCATIONS OF GRANTORS

Description of Location (State if Location (i) contains Equipment, Fixtures, Goods or Inventory, (ii) is chief place of business and chief executive office, or (iii) contains Records concerning Accounts and originals of Chattel Paper)

| **Name of Grantor** | **Locations of Equipment and Inventory, and all office locations** |
|---|---|
| BusinessTalkradio.net, Inc. | 1490 Dayton Avenue, Greenwich, CT 06830 (Records) |
| The Greenwich Broadcasting Corporation | 1490 Dayton Avenue, Greenwich, CT 06830 (Records) |
| | 177 West Putnam Avenue, Greenwich CT (Fixture) |
| | 71 Lewis Street, Greenwich CT (chief place of business) |
| | 401 Shippan Avenue, Stamford, CT 06902 (Records) |
| The Lifestyle TalkRadio Network Inc. | 2137 Deer Park Avenue, Deer Park, NY 11729 (chief place of business) |
| BTR West, Inc. | 1455 East Tropicana Avenue, Suite 550, Las Vegas, Nevada 89119 (chief place of business) |
| BTR Communications Boston, Inc. | 60 Main Street, Brockton, Massachusetts (chief place of business) |
| | Walnut Street, West Bridgewater, Massachusetts (Fixture) |
| BTR West II, Inc. | 1455 East Tropicana Avenue, Suite 550, Las Vegas, Nevada 89119 (chief place of business) |
| BTR Greenwich, Inc. | 1490 Dayton Avenue, Greenwich, CT 06830 (Records) |
| | 177 West Putnam Avenue, Greenwich CT (Fixture) |
| | 71 Lewis Street, Greenwich CT (chief place of business) |
| | 401 Shippan Avenue, Stamford, CT 06902 (Records) |
| BTR Communications Boston II, Inc. | 60 Main Street, Brockton, Massachusetts (chief place of business) |
| | Walnut Street, West Bridgewater, Massachusetts (Fixture) |

Sched. II

SCHEDULE III

DEPOSIT ACCOUNTS, SECURITIES ACCOUNTS AND COMMODITIES ACCOUNTS

| Name and Address of Institution Maintaining Account | Account Number | Type of Account |
| --- | --- | --- |
| Patriot National Bank 100 Mason St. Greenwich, CT 06830 | 54-020581-2 | General operating |
| Patriot National Bank 100 Mason St. Greenwich, CT 06830 | 54-020387-4 | General operating |
| Patriot National Bank 100 Mason St. Greenwich, CT 06830 | 34-020140-9 | General operating |
| Patriot National Bank 100 Mason St. Greenwich, CT 06830 | 54-020407-0 | General operating |

Sched. III

SCHEDULE IV

IP LICENSES

None.

SCHEDULE V

FCC LICENSES

WGCH(AM), Facility No. 65674, Greenwich, CT, File No. BZ-19861107AK; Remote Pickup: KC27759

WGCH(AM), File No. BR-20051201CIS

WGCH(AM), License Renewal Authorization, File No. BR-19971128B2

KNUU(AM), Facility No. 33074, Paradise, NV, File No. BL-20060309AEM; STL: WEF67

WBET(AM), Facility No. 19631, Brockton, MA, File No. BZ-19981204AC; Remote Pickup: KPE571

WBET(AM), License Renewal Authorization, File No. BR-20051130ARZ

Sched. V

SCHEDULE VI

INTELLECTUAL PROPERTY

Intellectual Property relating to Greenwich, CT station

Call Letters: WGCH (AM)

Domain name: wgch.com

Slogan: "The voice of Greenwich" (unregistered)

The Station licenses in radio broadcast programming pursuant to agreements with programming providers, as described in Schedule 5.01(x).

Intellectual Property relating to BusinessTalkRadio Network

Trademark application pending for BUSINESS TALK RADIO NETWORK + design; application no. 75868470, filed February 16, 2005

Copyright in original programming (unregistered).

The network grants to radio stations the right to broadcast the network's programming pursuant to affiliate agreements described in Schedule 5.01(x).

Intellectual Property relating to Lifestyle TalkRadio Network

Trademark application pending for LIFESTYLE TALK RADIO NETWORK + design; application no. 78568521 filed February 16, 2005

Copyright in original programming (unregistered).

The network grants to radio stations the right to broadcast the network's programming pursuant to affiliate agreements described in Schedule 5.01(x).

Intellectual Property relating to Brockton, MA station

call letters: WBET(AM)

Domain name: wbet.com

Slogan: "Full Service Radio for Metro South"

Logo: see attached Schedule 5.01(w)A

Two-second audio "jingle" of "WBET"

Intellectual Property relating to Paradise (Las Vegas), NV Station

call letters: KNUU

Tradenames (unregistered): K-NEWS
                          Newsradio 970

Domain name: Knews 970.com

SCHEDULE VII

COMMERCIAL TORT CLAIMS

None.

SCHEDULE VIII

PLEDGED EQUITY

| Equity Issuer | Class of Equity | Equity Certificate Nos. | Par Value | Amount of Equity Interests | Percentage of Outstanding Equity Pledged |
|---|---|---|---|---|---|
| The Greenwich Broadcasting Corporation | Common Stock | 154 | Without | 80,000 | 100% |
| The Lifestyle TalkRadio Network Inc. | Common Stock | 2 | Without | 100 | 100% |
| BTR West, Inc. | Common Stock | 1 | $0.001 | 10 | 100% |
| BTR Communications Boston, Inc. | Common Stock | 1 | $0.001 | 100 | 100% |
| BTR Greenwich, Inc. | Common Stock | 1 | $0.001 | 1 | 100% |
| BTR West II, Inc. | Common Stock | 1 | $0.001 | 10 | 100% |
| BTR Communications Boston II, Inc. | Common Stock | 1 | $0.001 | 100 | 100% |

Sched. VIII

SCHEDULE IX

PLEDGED DEBT

| **Debt Issuer** | **Description of Debt** | **Amount of Indebtedness** |
| --- | --- | --- |

None.

SCHEDULE X

CHATTEL PAPER AND LETTERS OF CREDIT

Chattel Paper:

| **Grantor** | **Payee** | **Amount and Date** | **Collateral** |
|---|---|---|---|
| None. | | | |

Letters of Credit:

| **Grantor** | **Beneficiary** | **Issuer** | **Amount and Expiration** |
|---|---|---|---|
| None. | | | |

Sched. X

EXHIBIT I TO
SECURITY AGREEMENT

**[FORM OF] GRANT OF TRADEMARK SECURITY INTEREST**

        **WHEREAS, [NAME OF GRANTOR]**, a _____ corporation (the "*Grantor*"), owns and uses in its business, and will in the future adopt and so use, various intangible assets, including the Trademark Collateral (as defined below); and

        **WHEREAS**, BusinessTalkradio.Net, Inc., a Delaware corporation (the "*Company*"), has entered into a Financing Agreement dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, being the "*Financing Agreement*") with the financial institutions named therein (collectively, together with their respective successors and assigns party to the Financing Agreement from time to time, the "*Lenders*"), and **BC Media Funding Company II, LLC**, a Delaware limited liability company, as Agent for Lenders (in such capacity, the "*Secured Party*") pursuant to which Lenders have made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a certain term facility to Company; and

        [Insert if Grantor is a Subsidiary:] [**WHEREAS**, Grantor has executed and delivered that certain Subsidiary Guaranty dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "*Guaranty*") in favor of Secured Party for the benefit of Lenders, pursuant to which Grantor has guarantied the prompt payment and performance when due of all obligations of Company under the Financing Agreement and the other Loan Documents; and]

        **WHEREAS**, pursuant to the terms of a Security Agreement dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "*Security Agreement*"), among Grantor, Secured Party and the other grantors named therein, Grantor has created in favor of Secured Party a security interest in, and Secured Party has become a secured creditor with respect to, the Trademark Collateral;

        **NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, subject to the terms and conditions of the Security Agreement, to evidence further the security interest granted by Grantor to Secured Party pursuant to the Security Agreement, Grantor hereby grants to Secured Party a security interest in all of Grantor's right, title and interest in and to the following, in each case whether now or hereafter existing or in which Grantor now has or hereafter acquires an interest and wherever the same may be located (the "*Trademark Collateral*"):

            (i)     all rights, title and interest (including rights acquired pursuant to a license or otherwise) in and to all trademarks, service marks, designs, logos, indicia, tradenames, trade dress, corporate names, company names, business names, fictitious business names, trade styles and/or other source and/or business identifiers and applications pertaining thereto, owned by such Grantor, or hereafter adopted and used, in its business (including, without limitation, the trademarks set forth on Schedule A

annexed hereto) (collectively, the "*Trademarks*"), all registrations that have been or may hereafter be issued or applied for thereon in the United States and any state thereof and in foreign countries (including, without limitation, the registrations and applications set forth on Schedule A annexed hereto), all common law and other rights (but in no event any of the obligations) in and to the Trademarks in the United States and any state thereof and in foreign countries, and all goodwill of such Grantor's business symbolized by the Trademarks and associated therewith; and

(ii)    all proceeds, products, rents and profits of or from any and all of the foregoing Trademark Collateral and, to the extent not otherwise included, all payments under insurance (whether or not Secured Party is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Trademark Collateral. For purposes of this Grant of Trademark Security Interest, the term "*proceeds*" includes whatever is receivable or received when Trademark Collateral or proceeds are sold, licensed, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

Grantor does hereby further acknowledge and affirm that the rights and remedies of Secured Party with respect to the security interest in the Trademark Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

[Signature Page Follows]

Grant of Trademark Security Interest
to Security Agreement

**IN WITNESS WHEREOF,** Grantor has caused this Grant of Trademark Security Interest to be duly executed and delivered by its officer thereunto duly authorized as of the ___ day of November, 2006.

**[NAME OF GRANTOR]**

By:_____

Name:_____

Title:_____

**SCHEDULE A**
**TO**
**GRANT OF TRADEMARK SECURITY INTEREST**

| Owner | Trademark Description | Registration/ Appl. Number | Registration/ Appl. Date |
|---|---|---|---|
| BusinessTalkradio.net, Inc. | BUSINESS TALK RADIO NETWORK + design | 78568470 | February 16, 2005 |
| BusinessTalkradio.net, Inc. | LIFESTYLE TALK RADIO NETWORK + design | 78568521 | February 16, 2005 |

EXHIBIT II TO
SECURITY AGREEMENT

## [FORM OF] GRANT OF PATENT SECURITY INTEREST

WHEREAS, [NAME OF GRANTOR], a _____ corporation (the "*Grantor*"), owns and uses in its business, and will in the future adopt and so use, various intangible assets, including the Patent Collateral (as defined below); and

WHEREAS, BusinessTalkradio.Net, Inc., a Delaware corporation (the "*Company*"), has entered into a Financing Agreement dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, being the "*Financing Agreement*") with the financial institutions named therein (collectively, together with their respective successors and assigns party to the Financing Agreement from time to time, the "*Lenders*"), and **BC Media Funding Company II, LLC**, a Delaware limited liability company, as Agent for Lenders (in such capacity, the "*Secured Party*") pursuant to which Lenders have made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a certain term facility to Company; and

[Insert if Grantor is a Subsidiary:] [WHEREAS, Grantor has executed and delivered that certain Subsidiary Guaranty dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "*Guaranty*") in favor of Secured Party for the benefit of Lenders, pursuant to which Grantor has guarantied the prompt payment and performance when due of all obligations of Company under the Financing Agreement and the other Loan Documents; and]

WHEREAS, pursuant to the terms of a Security Agreement dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "*Security Agreement*"), among Grantor, Secured Party and the other grantors named therein, Grantor has created in favor of Secured Party a security interest in, and Secured Party has become a secured creditor with respect to, the Patent Collateral;

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, subject to the terms and conditions of the Security Agreement, to evidence further the security interest granted by Grantor to Secured Party pursuant to the Security Agreement, Grantor hereby grants to Secured Party a security interest in all of Grantor's right, title and interest in and to the following, in each case whether now or hereafter existing or in which Grantor now has or hereafter acquires an interest and wherever the same may be located (the "*Patent Collateral*"):

(i)    all rights, title and interest (including rights acquired pursuant to a license or otherwise) in and to all patents and patent applications and rights and interests in patents and patent applications under any domestic or foreign law that are presently, or in the future may be, owned or held by such Grantor and all patents and patent applications and rights, title and interests in patents and patent applications under any domestic or foreign law that are presently, or in the future may be, owned by such Grantor in whole or in part (including, without limitation, the patents and patent applications set forth on

Schedule A annexed hereto), all rights (but not obligations) corresponding thereto to sue for past, present and future infringements and all re-issues, divisions, continuations, renewals, extensions and continuations-in-part thereof; and

(ii)    all proceeds, products, rents and profits of or from any and all of the foregoing Patent Collateral and, to the extent not otherwise included, all payments under insurance (whether or not Secured Party is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Patent Collateral. For purposes of this Grant of Patent Security Interest, the term **"proceeds"** includes whatever is receivable or received when Patent Collateral or proceeds are sold, licensed, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

Grantor does hereby further acknowledge and affirm that the rights and remedies of Secured Party with respect to the security interest in the Patent Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

[Signature Page Follows]

**IN WITNESS WHEREOF,** Grantor has caused this Grant of Patent Security Interest to be duly executed and delivered by its officer thereunto duly authorized as of the ___ day of November, 2006.

**[NAME OF GRANTOR]**

By:_____

Name:_____

Title:_____

**SCHEDULE A**
**TO**
**GRANT OF PATENT SECURITY INTEREST**

**Patents Issued:**

| Patent No. | Issue Date | Invention | Inventor(s) |
|---|---|---|---|

None.

**Patents Pending:**

| Applicant's Name | Date Filed | Application Number | Invention | Inventor(s) |
|---|---|---|---|---|

None.

EXHIBIT III TO
SECURITY AGREEMENT

## [FORM OF] GRANT OF COPYRIGHT SECURITY INTEREST

WHEREAS, [NAME OF GRANTOR], a _____ corporation ("*Grantor*"), owns and uses in its business, and will in the future adopt and so use, various intangible assets, including the Copyright Collateral (as defined below); and

WHEREAS, BusinessTalkradio.Net, Inc., a Delaware corporation (the "*Company*"), has entered into a Financing Agreement dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, being the "*Financing Agreement*") with the financial institutions named therein (collectively, together with their respective successors and assigns party to the Financing Agreement from time to time, the "*Lenders*"), and **BC Media Funding Company II, LLC**, a Delaware limited liability company, as Agent for Lenders (in such capacity, the "*Secured Party*") pursuant to which Lenders have made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a certain term facility to Company; and

[Insert if Grantor is a Subsidiary:] [WHEREAS, Grantor has executed and delivered that certain Subsidiary Guaranty dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "*Guaranty*") in favor of Secured Party for the benefit of Lenders, pursuant to which Grantor has guarantied the prompt payment and performance when due of all obligations of Company under the Financing Agreement and the other Loan Documents; and]

WHEREAS, pursuant to the terms of a Security Agreement dated as of November __, 2006 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "*Security Agreement*"), among Grantor, Secured Party and the other grantors named therein, Grantor has created in favor of Secured Party a security interest in, and Secured Party has become a secured creditor with respect to, the Copyright Collateral;

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, subject to the terms and conditions of the Security Agreement, to evidence further the security interest granted by Grantor to Secured Party pursuant to the Security Agreement, Grantor hereby grants to Secured Party a security interest in all of Grantor's right, title and interest in and to the following, in each case whether now or hereafter existing or in which Grantor now has or hereafter acquires an interest and wherever the same may be located (the "*Copyright Collateral*"):

      (i)     all rights, title and interest (including rights acquired pursuant to a license or otherwise) under copyright in various published and unpublished works of authorship including, without limitation, computer programs, computer data bases, other computer software layouts, trade dress, drawings, designs, writings, and formulas (including, without limitation, the works set forth on Schedule A annexed hereto, as the same may be amended pursuant hereto from time to time) (collectively, the "*Copyrights*"), all copyright registrations issued to Grantor and applications for copyright registration that

Grant of Copyright Security Interest
to Security Agreement

have been or may hereafter be issued or applied for thereon in the United States and any state thereof and in foreign countries (including, without limitation, the registrations set forth on <u>Schedule A</u> annexed hereto, as the same may be amended pursuant hereto from time to time) (collectively, the *"Copyright Registrations"*), all common law and other rights in and to the Copyrights in the United States and any state thereof and in foreign countries including all copyright licenses (but with respect to such copyright licenses, only to the extent permitted by such licensing arrangements) (the *"Copyright Rights"*), including, without limitation, each of the Copyrights, rights, titles and interests in and to the Copyrights, all derivative works and other works protectable by copyright, which are presently, or in the future may be, owned, created (as a work for hire for the benefit of Grantor), authored (as a work for hire for the benefit of Grantor), or acquired by Grantor, in whole or in part, and all Copyright Rights with respect thereto and all Copyright Registrations therefor, heretofore or hereafter granted or applied for, and all renewals and extensions thereof, throughout the world, including all proceeds thereof (such as, by way of example and not by limitation, license royalties and proceeds of infringement suits), the right (but not the obligation) to renew and extend such Copyright Registrations and Copyright Rights and to register works protectable by copyright and the right (but not the obligation) to sue in the name of such Grantor or in the name of Secured Party or Lenders for past, present and future infringements of the Copyrights and Copyright Rights; and

        (ii)     all proceeds, products, rents and profits of or from any and all of the foregoing Copyright Collateral and, to the extent not otherwise included, all payments under insurance (whether or not Secured Party is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Copyright Collateral. For purposes of this Grant of Copyright Security Interest, the term *"proceeds"* includes whatever is receivable or received when Copyright Collateral or proceeds are sold, licensed, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

        Grantor does hereby further acknowledge and affirm that the rights and remedies of Secured Party with respect to the security interest in the Copyright Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

**IN WITNESS WHEREOF**, Grantor has caused this Grant of Copyright Security Interest to be duly executed and delivered by its officer thereunto duly authorized as of the ___ day of November, 2006.

**[NAME OF GRANTOR]**

By:_____

Name:_____  _____

Title:_____

**SCHEDULE A**
**TO**
**GRANT OF COPYRIGHT SECURITY INTEREST**

<u>**U.S. Copyright Registrations:**</u>

| <u>Title</u> | <u>Registration No.</u> | <u>Date of Issue</u> | <u>Registered Owner</u> |
|---|---|---|---|

None.

<u>**Foreign Copyright Registrations:**</u>

| <u>Country</u> | <u>Title</u> | <u>Registration No.</u> | <u>Date of Issue</u> |
|---|---|---|---|

None.

<u>**Pending U.S. Copyright Registration Applications:**</u>

| <u>Title</u> | <u>Appl. No.</u> | <u>Date of Application</u> | <u>Copyright Claimant</u> |
|---|---|---|---|

None.

<u>**Pending Foreign Copyright Registration Applications:**</u>

| <u>Country</u> | <u>Title</u> | <u>Appl. No.</u> | <u>Date of Application</u> |
|---|---|---|---|

None.

# Exhibit C

# GUARANTY
(Individual)

**THIS PERSONAL GUARANTY** (this "*Guaranty*"), is made as of November 13, 2006, by Frank Lazauskas, a New Jersey resident ("*Guarantor*"), in favor of BC Media Funding Company II, LLC, a Delaware limited liability company (the "*Secured Party*"), as agent for the benefit of Media Funding Company, LLC, a Delaware limited liability company (the "*Lender*").

## RECITALS

**WHEREAS**, pursuant to the Financing Agreement dated as of November 13, 2006, as it may hereafter be amended, restated, supplemented or otherwise modified from time to time (the "*Financing Agreement*"), by and among BusinessTalkradio.net, Inc., a Delaware corporation (the "*Borrower*"), the Subsidiary Guarantors, the Secured Party and the Lender, the Lender has made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a term loan to Borrower in the aggregate amount of $5,500,000 (the "*Term Loan*");

**WHEREAS**, it is a condition precedent to the making of the Term Loan by the Lender pursuant to the Financing Agreement that the Guarantor shall have executed and delivered to the Secured Party a Guaranty guaranteeing the obligations of the Borrower with respect to the Term Loan; and

**WHEREAS**, the Guarantor has determined that the execution, delivery and performance of this Guaranty will directly benefit, and are within the best interests of, the Guarantor;

**NOW, THEREFORE**, in consideration of the premises and the agreements herein and in order to induce the Secured Party to make and maintain the Term Loan pursuant to the Financing Agreement, the Guarantor hereby agrees with the Secured Party as follows:

**Definitions**.  Capitalized terms used hereunder but not defined herein shall have the meanings given them in the Financing Agreement.  As used herein the following terms shall have the following meanings:

"*Guaranteed Obligations*" means collectively all of the indebtedness, obligations, and undertakings which are described in subsections (a), (b) and (c) of Section 1.

"*Obligation Documents*" means this Guaranty, the Financing Agreement, the Security Agreement, the Pledge and Security Agreement, the other Guarantees and all other documents and instruments under, by reason of which, or pursuant to which any or all of the Guaranteed Obligations are evidenced, governed, secured, or otherwise dealt with, and all other documents, instruments, agreements, certificates, legal opinions and other writings heretofore or hereafter delivered in connection herewith or therewith, in each case as the same may be amended from time to time.

"*Obligors*" means Borrower, Guarantor, the other Loan Parties (as defined in the Financing Agreement) and any other endorsers, guarantors or obligors, primary or secondary, of any or all of the Guaranteed Obligations.

"*Secured Obligations*" shall have the meanings given such term in the Security Agreement.

"*Security*" means any rights, properties, or interests of the Lender, under the Obligation Documents or otherwise, which provide recourse or other benefits to the Lender in connection with the Guaranteed Obligations or the non-payment or non-performance thereof, including collateral (whether real or personal, tangible or intangible) in which the Lender has rights under or pursuant to any Obligation Documents, guaranties of the payment or performance of any Obligation, bonds, surety agreements, keep-well agreements, letters of credit, rights of subrogation, rights of offset, and rights pursuant to which other claims are subordinated to the Guaranteed Obligations.

"*Security Agreement*" means that certain Security Agreement, dated as of the date hereof, between Borrower and Agent for the benefit of Lender, as the same may be amended or modified from time to time.

Section 1.    **Guaranty**.

(a)    Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete, and full payment when due, and no matter how the same shall become due, of all sums payable under:

(i)    the Financing Agreement, including all principal, all interest thereon and all other sums payable thereunder including attorney's fees or otherwise; and

(ii)    all other Obligation Documents, whether for principal, interest, fees, including attorneys' fees, or otherwise.

Without limiting the generality of the foregoing, Guarantor's liability hereunder shall extend to and include all post-petition interest, expenses, and other duties and liabilities of Borrower described above in this subsection (a), or below in the following subsection (b), which would be owed by Borrower or any other Loan Party but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, or similar proceeding involving Borrower or such Loan Party.

(b)    Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete and full performance, when due, and no matter how the same shall become due, of all Secured Obligations and undertakings of Borrower and each other Loan Party to the Lender under, by reason of, or pursuant to any of the Obligation Documents, or any other instrument or document.

(c)    If Borrower shall for any reason fail to pay any of the Guaranteed Obligations, as and when such Guaranteed Obligation shall become due and payable, whether at its stated maturity, as a result of the exercise of any power to accelerate, or otherwise, Guarantor will,

upon demand by the Lender, pay such Guaranteed Obligation in full to the Agent for the benefit of the Lender. If Borrower or any other Loan Party shall for any reason fail to perform promptly any of the Guaranteed Obligations, Guarantor will, upon demand by Agent, cause such Guaranteed Obligation to be performed or, if specified by Agent, provide sufficient funds, in such amount and manner as Agent shall in good faith determine, for the prompt, full and faithful performance of such Guaranteed Obligation.

(d)     If either of Borrower, Guarantor or any other Loan Party fails to pay or perform any Guaranteed Obligation as described in the immediately preceding subsections (a), (b), or (c) Guarantor will incur the additional obligation to pay to Agent for the benefit of the Lender, and Guarantor will forthwith upon demand by the Lender or Agent pay to Agent, the amount of any and all expenses, including fees and disbursements of Agent's counsel and of any experts or agents retained by Agent, which Agent may incur as a result of such failure.

(e)     As between Guarantor and the Lender, this Guaranty shall be considered a primary and liquidated liability of Guarantor.

Section 2.    **Unconditional Guaranty**.

(a)     No action which the Lender or Agent may take or omit to take in connection with any of the Obligation Documents, any of the Guaranteed Obligations (or any other indebtedness owing by Borrower or any other Loan Party to Agent on behalf of the Lender), or any Security, and no course of dealing of the Lender or Agent with any Obligor or any other Person, shall release or diminish Guarantor's obligations, liabilities, agreements or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against the Lender, regardless of whether any such action or inaction may increase any risks to or liabilities of the Lender or any Obligor or increase any risk to or diminish any safeguard of any Security. Without limiting the foregoing, Guarantor hereby expressly agrees that the Agent or the Lender may, from time to time, without notice to or the consent of Guarantor, do any or all of the following:

(i)     Amend, change or modify, in whole or in part, any one or more of the Obligation Documents and give or refuse to give any waivers or other indulgences with respect thereto;

(ii)     Neglect, delay, fail, or refuse to take or prosecute any action for the collection or enforcement of any of the Guaranteed Obligations, to foreclose or take or prosecute any action in connection with any Security or Obligation Document, to bring suit against any Obligor or any other Person, or to take any other action concerning the Guaranteed Obligations or the Obligation Documents;

(iii)     Accelerate, change, rearrange, extend, or renew the time, rate, terms, or manner for payment or performance of any one or more of the Guaranteed Obligations (whether for principal, interest, fees, expenses, indemnifications, affirmative or negative covenants, or otherwise);

(iv)     Compromise or settle any unpaid or unperformed Guaranteed Obligation or any other obligation or amount due or owing, or claimed to be due or owing, under any one or more of the Obligation Documents;

(v)    Take, exchange, amend, eliminate, surrender, release, or subordinate any or all Security for any or all of the Guaranteed Obligations, accept additional or substituted Security therefor, and perfect or fail to perfect Lender's rights in any or all Security;

(vi)    Discharge, release, substitute or add Obligors; or

(vii)    Apply all monies received from Obligors or others or from any Security for any of the Guaranteed Obligations, as Lender may determine to be in its best interest, without in any way being required to marshal Security or assets or to apply all or any part of such monies upon any particular Guaranteed Obligations.

(b)    No action or inaction of any Obligor or any other Person or any dispute and/or litigation among the Guarantors, and no change of law or circumstances, shall release or diminish Guarantor's obligations, liabilities, agreements, or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against Agent or the Lender.  Without limiting the foregoing, the obligations, liabilities, agreements, and duties of Guarantor under this Guaranty shall not be released, diminished, impaired, reduced, or affected by the occurrence of any or all of the following from time to time, even if occurring without notice to or without the consent of Guarantor:

(i)    Any voluntary or involuntary liquidation, dissolution, sale of all or substantially all assets, marshalling of assets or liabilities, receivership, conservatorship, assignment for the benefit of creditors, insolvency, bankruptcy, reorganization, arrangement, or composition of any Obligor or any other proceedings involving any Obligor or any of the assets of any Obligor under laws for the protection of debtors, or any discharge, impairment, modification, release, or limitation of the liability of, or stay of actions or lien enforcement proceedings against, any Obligor, any properties of any Obligor, or the estate in bankruptcy of any Obligor in the course of or resulting from any such proceedings.

(ii)    The failure by the Agent or the Lender to file or enforce a claim in any proceeding described in the immediately preceding subsection (i) or to take any other action in any proceeding to which any Obligor is a party.

(iii)    The release by operation of law of any Obligor from any of the Guaranteed Obligations or any other obligations to the Agent or the Lender.

(iv)    The invalidity, deficiency, illegality, or unenforceability of any of the Guaranteed Obligations or the Obligation Documents, in whole or in part, any bar by any statute of limitations or other law of recovery on any of the Guaranteed Obligations, or any defense or excuse for failure to perform on account of force majeure, act of God, casualty, impossibility, impracticability, or other defense or excuse whatsoever.

(v)    The failure of any Obligor or any other person or entity to sign any guaranty or other instrument or agreement within the contemplation of any Obligor, Agent or the Lender.

(vi)    The fact that Guarantor may have incurred directly part of the Guaranteed Obligations or is otherwise primarily liable therefor.

(vii)    Without limiting any of the foregoing, any fact or event (whether or not similar to any of the foregoing) which in the absence of this provision would or might constitute or afford a legal or equitable discharge or release of or defense to a guarantor or surety other than the actual payment and performance by Guarantor under this Guaranty.

(c)    Lender may invoke the benefits of this Guaranty before pursuing any remedies against any Obligor or any other Person and before proceeding against any Security now or hereafter existing for the payment or performance of any of the Guaranteed Obligations. Lender may maintain an action against Guarantor on this Guaranty without joining any other Obligor therein and without bringing a separate action against any other Obligor.

(d)    If any payment to the Agent or the Lender by any Obligor is held to constitute a preference or a voidable transfer under applicable state, Federal, national or international laws, or if for any other reason the Agent or the Lender is required to refund such payment to the payor thereof or to pay the amount thereof to any other Person, such payment to the Agent or the Lender shall not constitute a release of Guarantor from any liability hereunder, and Guarantor agrees to pay such amount to the Agent or the Lender on demand and agrees and acknowledges that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment or payments. Any transfer by subrogation which is made as contemplated in Section 6 prior to any such payment or payments shall (regardless of the terms of such transfer) be automatically voided upon the making of any such payment or payments, and all rights so transferred shall thereupon revert to and be vested in Lender.

(e)    This is a continuing guaranty and shall apply to and cover all Guaranteed Obligations and renewals and extensions thereof and substitutions therefor from time to time.

Section 3.    **Waiver**.    Guarantor hereby waives, with respect to the Guaranteed Obligations, this Guaranty, and the other Obligation Documents:

(a)    notice of the incurrence of any Guaranteed Obligation by Borrower, and notice of any kind concerning the assets, liabilities, financial condition, creditworthiness, businesses, prospects, or other affairs of Borrower (it being understood and agreed that: (i) Guarantor shall take full responsibility for informing himself of such matters, (ii) neither the Agent nor the Lender shall have responsibility of any kind to inform Guarantor of such matters, and (iii) Lender is hereby authorized to assume that Guarantor, by virtue of its relationships with Borrower which is independent of this Guaranty, has full and complete knowledge of such matters whenever the Lender extends credit to Borrower or take any other action which may change or increase Guarantor's liabilities or losses hereunder).

(b)    notice that the Agent or the Lender, any Obligor, or any other Person has taken or omitted to take any action under any Obligation Document or any other agreement or instrument relating thereto or relating to any Guaranteed Obligation.

(c)     default, demand, presentment for payment, and notice of default, demand, dishonor, nonpayment, or nonperformance.

(d)     notice of intention to accelerate, notice of acceleration, protest, notice of protest, notice of any exercise of remedies (as described in the following <u>Section 5</u> or otherwise), and all other notices of any kind whatsoever.

Section 4.     **Exercise of Remedies**.  The Agent and the Lender shall have the right to enforce, from time to time, in any order and at the Agent's or Lender's sole discretion, any rights, powers and remedies which the Agent and the Lender may have under the Obligation Documents or otherwise, including judicial foreclosure, the exercise of rights of power of sale, the taking of a deed or assignment in lieu of foreclosure, the appointment of a receiver to collect rents, issues and profits, the exercise of remedies against personal property, or the enforcement of any assignment of leases, rentals, oil or gas production, or other properties or rights, whether real or personal, tangible or intangible; and Guarantor shall be liable to the Agent and the Lender hereunder for any deficiency resulting from the exercise by the Lender of any such right or remedy even though any rights which Guarantor may have against Borrower or others may be destroyed or diminished by exercise of any such right or remedy.  No failure on the part of the Agent and the Lender to exercise, and no delay in exercising, any right hereunder or under any other Obligation Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right preclude any other or further exercise thereof or the exercise of any other right.  The rights, powers and remedies of the Agent and the Lender provided herein and in the other Obligation Documents are cumulative and are in addition to, and not exclusive of, any other rights, powers or remedies provided by law or in equity.  The rights of the Agent and the Lender hereunder are not conditional or contingent on any attempt by the Lender to exercise any of its rights under any other Obligation Document against any Obligor or any other Person.

Section 5.     **Limited Subrogation**.  Until all of the Guaranteed Obligations have been indefeasibly paid and performed in full Guarantor shall have no right to exercise any right of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which Guarantor may now or hereafter have against or to any Obligor or any Security in connection with this Guaranty, and Guarantor hereby waives any rights to enforce any remedy which Guarantor may have against Borrower and any right to participate in any Security until such time.  If any amount shall be paid to Guarantor on account of any such subrogation or other rights, any such other remedy, or any Security at any time when all of the Guaranteed Obligations and all other expenses guaranteed pursuant hereto shall not have been paid in full, such amount shall be held in trust for the benefit of the Agent and the Lender, shall be segregated from the other funds of Guarantor and shall forthwith be paid over to the Agent and the Lender to be held by the Agent or the Lender as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portion of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect.

Section 6.     **Successors and Assigns**.  Guarantor's rights or obligations hereunder may not be assigned or delegated, but this Guaranty and such obligations shall pass to and be fully binding upon the estate and heirs of Guarantor, as well as Guarantor.  This Guaranty shall apply to and inure to the benefit of Agent, Lender and their successors or assigns.  Without limiting the generality of the immediately preceding sentence, the Lender may assign any Guaranteed Obligation held by such Lender or any portion thereof, and the Lender may assign such Lender's

rights or any portion thereof under any Obligation Document, to any other Person, and such other Person shall thereupon become entitled to all of the benefits in respect thereof granted to such Lender hereunder unless otherwise expressly provided by such Lender in connection with such assignment or transfer.

Section 7. **Subordination and Offset**. Guarantor hereby subordinates and makes inferior to the Guaranteed Obligations any and all indebtedness now or at any time hereafter owed by Borrower or any of the other Loan Parties. If Guarantor receives any such payment without the prior written consent of Lender, the amount so paid shall be held in trust for the benefit of Lender, shall be segregated from the other funds of Guarantor, and shall forthwith be paid over to Agent to be held by Agent as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portions of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect. Guarantor hereby grants to Agent and Lender a right of offset to secure the payment of the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder, which right of offset shall be upon any and all monies, securities and other property (and the proceeds therefrom) of Guarantor now or hereafter held or received by or in transit to Agent or Lender from or for the account of Guarantor, whether for safekeeping, custody, pledge, transmission, collection or otherwise. Upon the occurrence of any Default, the Agent and the Lender are hereby authorized at any time and from time to time, without notice to Guarantor, to offset, appropriate and apply any and all items hereinabove referred to against the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder irrespective of whether or not Agent or Lender shall have made any demand under this Guaranty and although such obligations and liabilities may be contingent or unmatured. The rights of Agent and Lender under this Section are in addition to, and shall not be limited by, any other rights and remedies (including other rights of offset) which Agent or Lender may have.

Section 8. **Representations and Warranties**. Guarantor hereby represents and warrants to Lender as follows:

(a)     The recitals at the beginning of this Guaranty are true and correct in all respects.

(b)     Guarantor has the requisite power, competence and authority to execute, deliver and perform this Guaranty, each other writing executed or delivered in connection with this Guaranty and each amendment or supplement to any of the foregoing to which Guarantor is a party, and to perform and consummate the transactions contemplated hereby and thereby.

(c)     The execution, delivery and performance by Guarantor of this Guaranty do not and will not contravene any law or governmental regulation or any contractual restriction binding on or affecting Guarantor or any of Guarantor's properties, and do not and will not result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of Guarantor's properties.

(d)     This Guaranty is, and each other agreement or instrument of Guarantor contemplated hereby will be, a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its respective terms, except as limited by bankruptcy, insolvency or similar laws of general application relating to the enforcement of creditors' rights.

(e)     There is no action, suit or proceeding pending or, to the knowledge of Guarantor, threatened against or otherwise affecting Guarantor before any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality which may materially and adversely affect Guarantor's financial condition or its ability to perform its obligations hereunder.

(f)     Guarantor is not "insolvent" on the date hereof (that is, the sum of Guarantor's absolute and contingent liabilities, including the Guaranteed Obligations, does not exceed the fair market value of Guarantor's assets). Guarantor has not incurred (whether hereby or otherwise), nor does Guarantor intend to incur or believe that Guarantor will incur, debts which will be beyond Guarantor's ability to pay as such debts mature.

Section 9.     **No Oral Change**. No amendment of any provision of this Guaranty shall be effective unless it is in writing and signed by Guarantor and Agent on behalf of the Lender, and no waiver of any provision of this Guaranty, and no consent to any departure by Guarantor therefrom, shall be effective unless it is in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 10.     **Prohibition on Asset Transfers**. Until the Obligations are indefeasibly paid in full, Guarantor agrees that he shall not transfer any material assets to any Person.

Section 11.     **Invalidity of Particular Provisions**. If any term or provision of this Guaranty shall be determined to be illegal or unenforceable all other terms and provisions hereof shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable law.

Section 12.     **Headings and References**. The headings used herein are for purposes of convenience only and shall not be used in construing the provisions hereof. The words "this Guaranty," "this instrument," "herein," "hereof," "hereby" and words of similar import refer to this Guaranty as a whole and not to any particular subdivision unless expressly so limited. The phrases "this section" and "this subsection" and similar phrases refer only to the subdivisions hereof in which such phrases occur. The word "or" is not exclusive, and the word "including" (in its various forms) means "including without limitation". Pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

Section 13.     **Term**. This Guaranty shall be irrevocable until all of the Guaranteed Obligations have been completely and finally paid and performed. Lender has no obligation to make any loans or other advances to Borrower, all obligations and undertakings of Borrower under, by reason of, or pursuant to the Obligation Documents have been completely performed, and this Guaranty is thereafter subject to reinstatement as provided in Section 3(d). All extensions of credit and financial accommodations heretofore or hereafter made by Lender to Borrower shall be conclusively presumed to have been made in acceptance hereof and in reliance hereon.

Section 14. **Notices**. Any notice or communication required or permitted hereunder shall be given as provided in the Security Agreement, except that all notices to Guarantor shall be addressed as follows:

Frank Lazauskas
[1490 Dayton Avenue]
[Greenwich, CT 06830]

Section 15. **Limitation on Interest**. Lender and Guarantor intend to contract in strict compliance with applicable usury law from time to time in effect, and the provisions of the Financing Agreement limiting the interest for which Guarantor is obligated are expressly incorporated herein by reference.

Section 16. **Counterparts; Fax**. This Guaranty may be executed in any number of counterparts, each of which when so executed shall be deemed to constitute one and the same Guaranty. This Guaranty may be validly executed and delivered by facsimile or other electronic transmission.

SECTION 17. **Governing Law**. **THIS GUARANTY SHALL BE DEEMED A CONTRACT AND INSTRUMENT MADE UNDER THE LAWS OF THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE LAWS OF THE UNITED STATES OF AMERICA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. THE GUARANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS SITTING IN THE STATE OF NEW YORK AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT OR THE GUARANTEED OBLIGATIONS BY ANY MEANS ALLOWED UNDER NEW YORK OR FEDERAL LAW.**

SECTION 18. **Final Agreement**. **THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES HERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES HERETO.**

<div align="center">

**[SIGNATURE PAGE FOLLOWS]**

</div>

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be executed as of the date first above written.

GUARANTOR:

SSN: _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_

Personal-Guarantee

**ACCEPTED AND AGREED:**

AGENT                                    BC MEDIA FUNDING COMPANY II, LLC

                                         By: _____
                                         Name: Jacob Barker
                                         Title: Managing Member


LENDER:                                  MEDIA FUNDING COMPANY, LLC

                                         By: _____
                                         Name: Jacob Barker
                                         Title: President

*Individual Guarantee Signature Page*

# Exhibit D

## GUARANTY
(Individual)

THIS PERSONAL GUARANTY (this "*Guaranty*"), is made as of November 13, 2006, by Michael L. Metter, a Connecticut resident ("*Guarantor*"), in favor of BC Media Funding Company II, LLC, a Delaware limited liability company (the "*Secured Party*"), as agent for the benefit of Media Funding Company, LLC, a Delaware limited liability company (the "*Lender*").

## RECITALS

WHEREAS, pursuant to the Financing Agreement dated as of November 13, 2006, as it may hereafter be amended, restated, supplemented or otherwise modified from time to time (the "*Financing Agreement*"), by and among BusinessTalkradio.net, Inc., a Delaware corporation (the "*Borrower*"), the Subsidiary Guarantors, the Secured Party and the Lender, the Lender has made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a term loan to Borrower in the aggregate amount of $5,500,000 (the "*Term Loan*");

WHEREAS, it is a condition precedent to the making of the Term Loan by the Lender pursuant to the Financing Agreement that the Guarantor shall have executed and delivered to the Secured Party a Guaranty guaranteeing the obligations of the Borrower with respect to the Term Loan; and

WHEREAS, the Guarantor has determined that the execution, delivery and performance of this Guaranty will directly benefit, and are within the best interests of, the Guarantor;

NOW, THEREFORE, in consideration of the premises and the agreements herein and in order to induce the Secured Party to make and maintain the Term Loan pursuant to the Financing Agreement, the Guarantor hereby agrees with the Secured Party as follows:

Definitions. Capitalized terms used hereunder but not defined herein shall have the meanings given them in the Financing Agreement. As used herein the following terms shall have the following meanings:

"*Guaranteed Obligations*" means collectively all of the indebtedness, obligations, and undertakings which are described in subsections (a), (b) and (c) of Section 1.

"*Obligation Documents*" means this Guaranty, the Financing Agreement, the Security Agreement, the Pledge and Security Agreement, the other Guarantees and all other documents and instruments under, by reason of which, or pursuant to which any or all of the Guaranteed Obligations are evidenced, governed, secured, or otherwise dealt with, and all other documents, instruments, agreements, certificates, legal opinions and other writings heretofore or hereafter delivered in connection herewith or therewith, in each case as the same may be amended from time to time.

"*Obligors*" means Borrower, Guarantor, the other Loan Parties (as defined in the Financing Agreement) and any other endorsers, guarantors or obligors, primary or secondary, of any or all of the Guaranteed Obligations.

"*Secured Obligations*" shall have the meanings given such term in the Security Agreement.

"*Security*" means any rights, properties, or interests of the Lender, under the Obligation Documents or otherwise, which provide recourse or other benefits to the Lender in connection with the Guaranteed Obligations or the non-payment or non-performance thereof, including collateral (whether real or personal, tangible or intangible) in which the Lender has rights under or pursuant to any Obligation Documents, guaranties of the payment or performance of any Obligation, bonds, surety agreements, keep-well agreements, letters of credit, rights of subrogation, rights of offset, and rights pursuant to which other claims are subordinated to the Guaranteed Obligations.

"*Security Agreement*" means that certain Security Agreement, dated as of the date hereof, between Borrower and Agent for the benefit of Lender, as the same may be amended or modified from time to time.

Section 1.    **Guaranty**.

(a)    Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete, and full payment when due, and no matter how the same shall become due, of all sums payable under:

(i)    the Financing Agreement, including all principal, all interest thereon and all other sums payable thereunder including attorney's fees or otherwise; and

(ii)    all other Obligation Documents, whether for principal, interest, fees, including attorneys' fees, or otherwise.

Without limiting the generality of the foregoing, Guarantor's liability hereunder shall extend to and include all post-petition interest, expenses, and other duties and liabilities of Borrower described above in this subsection (a), or below in the following subsection (b), which would be owed by Borrower or any other Loan Party but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, or similar proceeding involving Borrower or such Loan Party.

(b)    Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete and full performance, when due, and no matter how the same shall become due, of all Secured Obligations and undertakings of Borrower and each other Loan Party to the Lender under, by reason of, or pursuant to any of the Obligation Documents, or any other instrument or document.

(c)    If Borrower shall for any reason fail to pay any of the Guaranteed Obligations, as and when such Guaranteed Obligation shall become due and payable, whether at its stated maturity, as a result of the exercise of any power to accelerate, or otherwise, Guarantor will,

2

upon demand by the Lender, pay such Guaranteed Obligation in full to the Agent for the benefit of the Lender. If Borrower or any other Loan Party shall for any reason fail to perform promptly any of the Guaranteed Obligations, Guarantor will, upon demand by Agent, cause such Guaranteed Obligation to be performed or, if specified by Agent, provide sufficient funds, in such amount and manner as Agent shall in good faith determine, for the prompt, full and faithful performance of such Guaranteed Obligation.

(d)     If either of Borrower, Guarantor or any other Loan Party fails to pay or perform any Guaranteed Obligation as described in the immediately preceding subsections (a), (b), or (c) Guarantor will incur the additional obligation to pay to Agent for the benefit of the Lender, and Guarantor will forthwith upon demand by the Lender or Agent pay to Agent, the amount of any and all expenses, including fees and disbursements of Agent's counsel and of any experts or agents retained by Agent, which Agent may incur as a result of such failure.

(e)     As between Guarantor and the Lender, this Guaranty shall be considered a primary and liquidated liability of Guarantor.

Section 2.    **Unconditional Guaranty**.

(a)     No action which the Lender or Agent may take or omit to take in connection with any of the Obligation Documents, any of the Guaranteed Obligations (or any other indebtedness owing by Borrower or any other Loan Party to Agent on behalf of the Lender), or any Security, and no course of dealing of the Lender or Agent with any Obligor or any other Person, shall release or diminish Guarantor's obligations, liabilities, agreements or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against the Lender, regardless of whether any such action or inaction may increase any risks to or liabilities of the Lender or any Obligor or increase any risk to or diminish any safeguard of any Security. Without limiting the foregoing, Guarantor hereby expressly agrees that the Agent or the Lender may, from time to time, without notice to or the consent of Guarantor, do any or all of the following:

(i)     Amend, change or modify, in whole or in part, any one or more of the Obligation Documents and give or refuse to give any waivers or other indulgences with respect thereto;

(ii)     Neglect, delay, fail, or refuse to take or prosecute any action for the collection or enforcement of any of the Guaranteed Obligations, to foreclose or take or prosecute any action in connection with any Security or Obligation Document, to bring suit against any Obligor or any other Person, or to take any other action concerning the Guaranteed Obligations or the Obligation Documents;

(iii)     Accelerate, change, rearrange, extend, or renew the time, rate, terms, or manner for payment or performance of any one or more of the Guaranteed Obligations (whether for principal, interest, fees, expenses, indemnifications, affirmative or negative covenants, or otherwise);

(iv)     Compromise or settle any unpaid or unperformed Guaranteed Obligation or any other obligation or amount due or owing, or claimed to be due or owing, under any one or more of the Obligation Documents;

(v)    Take, exchange, amend, eliminate, surrender, release, or subordinate any or all Security for any or all of the Guaranteed Obligations, accept additional or substituted Security therefor, and perfect or fail to perfect Lender's rights in any or all Security;

(vi)    Discharge, release, substitute or add Obligors; or

(vii)    Apply all monies received from Obligors or others or from any Security for any of the Guaranteed Obligations, as Lender may determine to be in its best interest, without in any way being required to marshal Security or assets or to apply all or any part of such monies upon any particular Guaranteed Obligations.

(b)    No action or inaction of any Obligor or any other Person or any dispute and/or litigation among the Guarantors, and no change of law or circumstances, shall release or diminish Guarantor's obligations, liabilities, agreements, or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against Agent or the Lender.  Without limiting the foregoing, the obligations, liabilities, agreements, and duties of Guarantor under this Guaranty shall not be released, diminished, impaired, reduced, or affected by the occurrence of any or all of the following from time to time, even if occurring without notice to or without the consent of Guarantor:

(i)    Any voluntary or involuntary liquidation, dissolution, sale of all or substantially all assets, marshalling of assets or liabilities, receivership, conservatorship, assignment for the benefit of creditors, insolvency, bankruptcy, reorganization, arrangement, or composition of any Obligor or any other proceedings involving any Obligor or any of the assets of any Obligor under laws for the protection of debtors, or any discharge, impairment, modification, release, or limitation of the liability of, or stay of actions or lien enforcement proceedings against, any Obligor, any properties of any Obligor, or the estate in bankruptcy of any Obligor in the course of or resulting from any such proceedings.

(ii)    The failure by the Agent or the Lender to file or enforce a claim in any proceeding described in the immediately preceding subsection (i) or to take any other action in any proceeding to which any Obligor is a party.

(iii)    The release by operation of law of any Obligor from any of the Guaranteed Obligations or any other obligations to the Agent or the Lender.

(iv)    The invalidity, deficiency, illegality, or unenforceability of any of the Guaranteed Obligations or the Obligation Documents, in whole or in part, any bar by any statute of limitations or other law of recovery on any of the Guaranteed Obligations, or any defense or excuse for failure to perform on account of force majeure, act of God, casualty, impossibility, impracticability, or other defense or excuse whatsoever.

(v)    The failure of any Obligor or any other person or entity to sign any guaranty or other instrument or agreement within the contemplation of any Obligor, Agent or the Lender.

(vi)    The fact that Guarantor may have incurred directly part of the Guaranteed Obligations or is otherwise primarily liable therefor.

(vii)    Without limiting any of the foregoing, any fact or event (whether or not similar to any of the foregoing) which in the absence of this provision would or might constitute or afford a legal or equitable discharge or release of or defense to a guarantor or surety other than the actual payment and performance by Guarantor under this Guaranty.

(c)    Lender may invoke the benefits of this Guaranty before pursuing any remedies against any Obligor or any other Person and before proceeding against any Security now or hereafter existing for the payment or performance of any of the Guaranteed Obligations. Lender may maintain an action against Guarantor on this Guaranty without joining any other Obligor therein and without bringing a separate action against any other Obligor.

(d)    If any payment to the Agent or the Lender by any Obligor is held to constitute a preference or a voidable transfer under applicable state, Federal, national or international laws, or if for any other reason the Agent or the Lender is required to refund such payment to the payor thereof or to pay the amount thereof to any other Person, such payment to the Agent or the Lender shall not constitute a release of Guarantor from any liability hereunder, and Guarantor agrees to pay such amount to the Agent or the Lender on demand and agrees and acknowledges that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment or payments. Any transfer by subrogation which is made as contemplated in Section 6 prior to any such payment or payments shall (regardless of the terms of such transfer) be automatically voided upon the making of any such payment or payments, and all rights so transferred shall thereupon revert to and be vested in Lender.

(e)    This is a continuing guaranty and shall apply to and cover all Guaranteed Obligations and renewals and extensions thereof and substitutions therefor from time to time.

Section 3.    **Waiver**.    Guarantor hereby waives, with respect to the Guaranteed Obligations, this Guaranty, and the other Obligation Documents:

(a)    notice of the incurrence of any Guaranteed Obligation by Borrower, and notice of any kind concerning the assets, liabilities, financial condition, creditworthiness, businesses, prospects, or other affairs of Borrower (it being understood and agreed that: (i) Guarantor shall take full responsibility for informing himself of such matters, (ii) neither the Agent nor the Lender shall have responsibility of any kind to inform Guarantor of such matters, and (iii) Lender is hereby authorized to assume that Guarantor, by virtue of its relationships with Borrower which is independent of this Guaranty, has full and complete knowledge of such matters whenever the Lender extends credit to Borrower or take any other action which may change or increase Guarantor's liabilities or losses hereunder).

(b)    notice that the Agent or the Lender, any Obligor, or any other Person has taken or omitted to take any action under any Obligation Document or any other agreement or instrument relating thereto or relating to any Guaranteed Obligation.

(c)     default, demand, presentment for payment, and notice of default, demand, dishonor, nonpayment, or nonperformance.

(d)     notice of intention to accelerate, notice of acceleration, protest, notice of protest, notice of any exercise of remedies (as described in the following <u>Section 5</u> or otherwise), and all other notices of any kind whatsoever.

Section 4.     **Exercise of Remedies**.  The Agent and the Lender shall have the right to enforce, from time to time, in any order and at the Agent's or Lender's sole discretion, any rights, powers and remedies which the Agent and the Lender may have under the Obligation Documents or otherwise, including judicial foreclosure, the exercise of rights of power of sale, the taking of a deed or assignment in lieu of foreclosure, the appointment of a receiver to collect rents, issues and profits, the exercise of remedies against personal property, or the enforcement of any assignment of leases, rentals, oil or gas production, or other properties or rights, whether real or personal, tangible or intangible; and Guarantor shall be liable to the Agent and the Lender hereunder for any deficiency resulting from the exercise by the Lender of any such right or remedy even though any rights which Guarantor may have against Borrower or others may be destroyed or diminished by exercise of any such right or remedy.  No failure on the part of the Agent and the Lender to exercise, and no delay in exercising, any right hereunder or under any other Obligation Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right preclude any other or further exercise thereof or the exercise of any other right. The rights, powers and remedies of the Agent and the Lender provided herein and in the other Obligation Documents are cumulative and are in addition to, and not exclusive of, any other rights, powers or remedies provided by law or in equity.  The rights of the Agent and the Lender hereunder are not conditional or contingent on any attempt by the Lender to exercise any of its rights under any other Obligation Document against any Obligor or any other Person.

Section 5.     **Limited Subrogation**.  Until all of the Guaranteed Obligations have been indefeasibly paid and performed in full Guarantor shall have no right to exercise any right of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which Guarantor may now or hereafter have against or to any Obligor or any Security in connection with this Guaranty, and Guarantor hereby waives any rights to enforce any remedy which Guarantor may have against Borrower and any right to participate in any Security until such time.  If any amount shall be paid to Guarantor on account of any such subrogation or other rights, any such other remedy, or any Security at any time when all of the Guaranteed Obligations and all other expenses guaranteed pursuant hereto shall not have been paid in full, such amount shall be held in trust for the benefit of the Agent and the Lender, shall be segregated from the other funds of Guarantor and shall forthwith be paid over to the Agent and the Lender to be held by the Agent or the Lender as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portion of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect.

Section 6.     **Successors and Assigns**.  Guarantor's rights or obligations hereunder may not be assigned or delegated, but this Guaranty and such obligations shall pass to and be fully binding upon the estate and heirs of Guarantor, as well as Guarantor.  This Guaranty shall apply to and inure to the benefit of Agent, Lender and their successors or assigns.  Without limiting the generality of the immediately preceding sentence, the Lender may assign any Guaranteed Obligation held by such Lender or any portion thereof, and the Lender may assign such Lender's

rights or any portion thereof under any Obligation Document, to any other Person, and such other Person shall thereupon become entitled to all of the benefits in respect thereof granted to such Lender hereunder unless otherwise expressly provided by such Lender in connection with such assignment or transfer.

Section 7. **Subordination and Offset**. Guarantor hereby subordinates and makes inferior to the Guaranteed Obligations any and all indebtedness now or at any time hereafter owed by Borrower or any of the other Loan Parties. If Guarantor receives any such payment without the prior written consent of Lender, the amount so paid shall be held in trust for the benefit of Lender, shall be segregated from the other funds of Guarantor, and shall forthwith be paid over to Agent to be held by Agent as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portions of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect. Guarantor hereby grants to Agent and Lender a right of offset to secure the payment of the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder, which right of offset shall be upon any and all monies, securities and other property (and the proceeds therefrom) of Guarantor now or hereafter held or received by or in transit to Agent or Lender from or for the account of Guarantor, whether for safekeeping, custody, pledge, transmission, collection or otherwise. Upon the occurrence of any Default, the Agent and the Lender are hereby authorized at any time and from time to time, without notice to Guarantor, to offset, appropriate and apply any and all items hereinabove referred to against the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder irrespective of whether or not Agent or Lender shall have made any demand under this Guaranty and although such obligations and liabilities may be contingent or unmatured. The rights of Agent and Lender under this Section are in addition to, and shall not be limited by, any other rights and remedies (including other rights of offset) which Agent or Lender may have.

Section 8. **Representations and Warranties**. Guarantor hereby represents and warrants to Lender as follows:

(a) The recitals at the beginning of this Guaranty are true and correct in all respects.

(b) Guarantor has the requisite power, competence and authority to execute, deliver and perform this Guaranty, each other writing executed or delivered in connection with this Guaranty and each amendment or supplement to any of the foregoing to which Guarantor is a party, and to perform and consummate the transactions contemplated hereby and thereby.

(c) The execution, delivery and performance by Guarantor of this Guaranty do not and will not contravene any law or governmental regulation or any contractual restriction binding on or affecting Guarantor or any of Guarantor's properties, and do not and will not result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of Guarantor's properties.

(d) This Guaranty is, and each other agreement or instrument of Guarantor contemplated hereby will be, a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its respective terms, except as limited by bankruptcy, insolvency or similar laws of general application relating to the enforcement of creditors' rights.

(e)     There is no action, suit or proceeding pending or, to the knowledge of Guarantor, threatened against or otherwise affecting Guarantor before any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality which may materially and adversely affect Guarantor's financial condition or its ability to perform its obligations hereunder.

(f)     Guarantor is not "insolvent" on the date hereof (that is, the sum of Guarantor's absolute and contingent liabilities, including the Guaranteed Obligations, does not exceed the fair market value of Guarantor's assets). Guarantor has not incurred (whether hereby or otherwise), nor does Guarantor intend to incur or believe that Guarantor will incur, debts which will be beyond Guarantor's ability to pay as such debts mature.

Section 9.     **No Oral Change**. No amendment of any provision of this Guaranty shall be effective unless it is in writing and signed by Guarantor and Agent on behalf of the Lender, and no waiver of any provision of this Guaranty, and no consent to any departure by Guarantor therefrom, shall be effective unless it is in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 10.     **Prohibition on Asset Transfers**. Until the Obligations are indefeasibly paid in full, Guarantor agrees that he shall not transfer any material assets to any Person.

Section 11.     **Invalidity of Particular Provisions**. If any term or provision of this Guaranty shall be determined to be illegal or unenforceable all other terms and provisions hereof shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable law.

Section 12.     **Headings and References**. The headings used herein are for purposes of convenience only and shall not be used in construing the provisions hereof. The words "this Guaranty," "this instrument," "herein," "hereof," "hereby" and words of similar import refer to this Guaranty as a whole and not to any particular subdivision unless expressly so limited. The phrases "this section" and "this subsection" and similar phrases refer only to the subdivisions hereof in which such phrases occur. The word "or" is not exclusive, and the word "including" (in its various forms) means "including without limitation". Pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

Section 13.     **Term**. This Guaranty shall be irrevocable until all of the Guaranteed Obligations have been completely and finally paid and performed. Lender has no obligation to make any loans or other advances to Borrower, all obligations and undertakings of Borrower under, by reason of, or pursuant to the Obligation Documents have been completely performed, and this Guaranty is thereafter subject to reinstatement as provided in Section 3(d). All extensions of credit and financial accommodations heretofore or hereafter made by Lender to Borrower shall be conclusively presumed to have been made in acceptance hereof and in reliance hereon.

Section 14. **Notices**. Any notice or communication required or permitted hereunder shall be given as provided in the Security Agreement, except that all notices to Guarantor shall be addressed as follows:

> Michael L. Metter
> One tinker Lane
> Greenwich, CT 06830

Section 15. **Limitation on Interest**. Lender and Guarantor intend to contract in strict compliance with applicable usury law from time to time in effect, and the provisions of the Financing Agreement limiting the interest for which Guarantor is obligated are expressly incorporated herein by reference.

Section 16. **Counterparts; Fax**. This Guaranty may be executed in any number of counterparts, each of which when so executed shall be deemed to constitute one and the same Guaranty. This Guaranty may be validly executed and delivered by facsimile or other electronic transmission.

SECTION 17. **Governing Law**. **THIS GUARANTY SHALL BE DEEMED A CONTRACT AND INSTRUMENT MADE UNDER THE LAWS OF THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE LAWS OF THE UNITED STATES OF AMERICA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. THE GUARANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS SITTING IN THE STATE OF NEW YORK AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT OR THE GUARANTEED OBLIGATIONS BY ANY MEANS ALLOWED UNDER NEW YORK OR FEDERAL LAW.**

SECTION 18. **Final Agreement**. **THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES HERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES HERETO.**

<div align="center">

**[SIGNATURE PAGE FOLLOWS]**

</div>

<div align="center">9</div>

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be executed as of the date first above written.

GUARANTOR:

SSN: 079-40-080|

*Individual Guarantee Signature Page*

**ACCEPTED AND AGREED:**

AGENT                                    BC MEDIA FUNDING COMPANY II, LLC

                                         By: _____
                                         Name: Jacob Barker
                                         Title: Managing Member


LENDER:                                  MEDIA FUNDING COMPANY, LLC

                                         By: _____
                                         Name: Jacob Barker
                                         Title: President

**Individual Guarantee Signature Page**

# Exhibit E

# GUARANTY
## (Individual)

**THIS PERSONAL GUARANTY** (this "*Guaranty*"), is made as of November 13, 2006, by Leonard F. Moscati, a Connecticut resident ("*Guarantor*"), in favor of BC Media Funding Company II, LLC, a Delaware limited liability company (the "*Secured Party*"), as agent for the benefit of Media Funding Company, LLC, a Delaware limited liability company (the "*Lender*").

## RECITALS

**WHEREAS**, pursuant to the Financing Agreement dated as of November 13, 2006, as it may hereafter be amended, restated, supplemented or otherwise modified from time to time (the "*Financing Agreement*"), by and among BusinessTalkradio.net, Inc., a Delaware corporation (the "*Borrower*"), the Subsidiary Guarantors, the Secured Party and the Lender, the Lender has made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a term loan to Borrower in the aggregate amount of $5,500,000 (the "*Term Loan*");

**WHEREAS**, it is a condition precedent to the making of the Term Loan by the Lender pursuant to the Financing Agreement that the Guarantor shall have executed and delivered to the Secured Party a Guaranty guaranteeing the obligations of the Borrower with respect to the Term Loan; and

**WHEREAS**, the Guarantor has determined that the execution, delivery and performance of this Guaranty will directly benefit, and are within the best interests of, the Guarantor;

**NOW, THEREFORE**, in consideration of the premises and the agreements herein and in order to induce the Secured Party to make and maintain the Term Loan pursuant to the Financing Agreement, the Guarantor hereby agrees with the Secured Party as follows:

**Definitions**.  Capitalized terms used hereunder but not defined herein shall have the meanings given them in the Financing Agreement.  As used herein the following terms shall have the following meanings:

"*Guaranteed Obligations*" means collectively all of the indebtedness, obligations, and undertakings which are described in subsections (a), (b) and (c) of Section 1.

"*Obligation Documents*" means this Guaranty, the Financing Agreement, the Security Agreement, the Pledge and Security Agreement, the other Guarantees and all other documents and instruments under, by reason of which, or pursuant to which any or all of the Guaranteed Obligations are evidenced, governed, secured, or otherwise dealt with, and all other documents, instruments, agreements, certificates, legal opinions and other writings heretofore or hereafter delivered in connection herewith or therewith, in each case as the same may be amended from time to time.

"*Obligors*" means Borrower, Guarantor, the other Loan Parties (as defined in the Financing Agreement) and any other endorsers, guarantors or obligors, primary or secondary, of any or all of the Guaranteed Obligations.

"*Secured Obligations*" shall have the meanings given such term in the Security Agreement.

"*Security*" means any rights, properties, or interests of the Lender, under the Obligation Documents or otherwise, which provide recourse or other benefits to the Lender in connection with the Guaranteed Obligations or the non-payment or non-performance thereof, including collateral (whether real or personal, tangible or intangible) in which the Lender has rights under or pursuant to any Obligation Documents, guaranties of the payment or performance of any Obligation, bonds, surety agreements, keep-well agreements, letters of credit, rights of subrogation, rights of offset, and rights pursuant to which other claims are subordinated to the Guaranteed Obligations.

"*Security Agreement*" means that certain Security Agreement, dated as of the date hereof, between Borrower and Agent for the benefit of Lender, as the same may be amended or modified from time to time.

Section 1.    **Guaranty**.

(a)    Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete, and full payment when due, and no matter how the same shall become due, of all sums payable under:

(i)    the Financing Agreement, including all principal, all interest thereon and all other sums payable thereunder including attorney's fees or otherwise; and

(ii)    all other Obligation Documents, whether for principal, interest, fees, including attorneys' fees, or otherwise.

Without limiting the generality of the foregoing, Guarantor's liability hereunder shall extend to and include all post-petition interest, expenses, and other duties and liabilities of Borrower described above in this subsection (a), or below in the following subsection (b), which would be owed by Borrower or any other Loan Party but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, or similar proceeding involving Borrower or such Loan Party.

(b)    Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete and full performance, when due, and no matter how the same shall become due, of all Secured Obligations and undertakings of Borrower and each other Loan Party to the Lender under, by reason of, or pursuant to any of the Obligation Documents, or any other instrument or document.

(c)    If Borrower shall for any reason fail to pay any of the Guaranteed Obligations, as and when such Guaranteed Obligation shall become due and payable, whether at its stated maturity, as a result of the exercise of any power to accelerate, or otherwise, Guarantor will,

upon demand by the Lender, pay such Guaranteed Obligation in full to the Agent for the benefit of the Lender.  If Borrower or any other Loan Party shall for any reason fail to perform promptly any of the Guaranteed Obligations, Guarantor will, upon demand by Agent, cause such Guaranteed Obligation to be performed or, if specified by Agent, provide sufficient funds, in such amount and manner as Agent shall in good faith determine, for the prompt, full and faithful performance of such Guaranteed Obligation.

(d)     If either of Borrower, Guarantor or any other Loan Party fails to pay or perform any Guaranteed Obligation as described in the immediately preceding subsections (a), (b), or (c) Guarantor will incur the additional obligation to pay to Agent for the benefit of the Lender, and Guarantor will forthwith upon demand by the Lender or Agent pay to Agent, the amount of any and all expenses, including fees and disbursements of Agent's counsel and of any experts or agents retained by Agent, which Agent may incur as a result of such failure.

(e)     As between Guarantor and the Lender, this Guaranty shall be considered a primary and liquidated liability of Guarantor.

Section 2.     **Unconditional Guaranty**.

(a)     No action which the Lender or Agent may take or omit to take in connection with any of the Obligation Documents, any of the Guaranteed Obligations (or any other indebtedness owing by Borrower or any other Loan Party to Agent on behalf of the Lender), or any Security, and no course of dealing of the Lender or Agent with any Obligor or any other Person, shall release or diminish Guarantor's obligations, liabilities, agreements or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against the Lender, regardless of whether any such action or inaction may increase any risks to or liabilities of the Lender or any Obligor or increase any risk to or diminish any safeguard of any Security.  Without limiting the foregoing, Guarantor hereby expressly agrees that the Agent or the Lender may, from time to time, without notice to or the consent of Guarantor, do any or all of the following:

(i)     Amend, change or modify, in whole or in part, any one or more of the Obligation Documents and give or refuse to give any waivers or other indulgences with respect thereto;

(ii)     Neglect, delay, fail, or refuse to take or prosecute any action for the collection or enforcement of any of the Guaranteed Obligations, to foreclose or take or prosecute any action in connection with any Security or Obligation Document, to bring suit against any Obligor or any other Person, or to take any other action concerning the Guaranteed Obligations or the Obligation Documents;

(iii)     Accelerate, change, rearrange, extend, or renew the time, rate, terms, or manner for payment or performance of any one or more of the Guaranteed Obligations (whether for principal, interest, fees, expenses, indemnifications, affirmative or negative covenants, or otherwise);

(iv)     Compromise or settle any unpaid or unperformed Guaranteed Obligation or any other obligation or amount due or owing, or claimed to be due or owing, under any one or more of the Obligation Documents;

(v)     Take, exchange, amend, eliminate, surrender, release, or subordinate any or all Security for any or all of the Guaranteed Obligations, accept additional or substituted Security therefor, and perfect or fail to perfect Lender's rights in any or all Security;

(vi)    Discharge, release, substitute or add Obligors; or

(vii)   Apply all monies received from Obligors or others or from any Security for any of the Guaranteed Obligations, as Lender may determine to be in its best interest, without in any way being required to marshal Security or assets or to apply all or any part of such monies upon any particular Guaranteed Obligations.

(b)     No action or inaction of any Obligor or any other Person or any dispute and/or litigation among the Guarantors, and no change of law or circumstances, shall release or diminish Guarantor's obligations, liabilities, agreements, or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against Agent or the Lender. Without limiting the foregoing, the obligations, liabilities, agreements, and duties of Guarantor under this Guaranty shall not be released, diminished, impaired, reduced, or affected by the occurrence of any or all of the following from time to time, even if occurring without notice to or without the consent of Guarantor:

(i)     Any voluntary or involuntary liquidation, dissolution, sale of all or substantially all assets, marshalling of assets or liabilities, receivership, conservatorship, assignment for the benefit of creditors, insolvency, bankruptcy, reorganization, arrangement, or composition of any Obligor or any other proceedings involving any Obligor or any of the assets of any Obligor under laws for the protection of debtors, or any discharge, impairment, modification, release, or limitation of the liability of, or stay of actions or lien enforcement proceedings against, any Obligor, any properties of any Obligor, or the estate in bankruptcy of any Obligor in the course of or resulting from any such proceedings.

(ii)    The failure by the Agent or the Lender to file or enforce a claim in any proceeding described in the immediately preceding subsection (i) or to take any other action in any proceeding to which any Obligor is a party.

(iii)   The release by operation of law of any Obligor from any of the Guaranteed Obligations or any other obligations to the Agent or the Lender.

(iv)    The invalidity, deficiency, illegality, or unenforceability of any of the Guaranteed Obligations or the Obligation Documents, in whole or in part, any bar by any statute of limitations or other law of recovery on any of the Guaranteed Obligations, or any defense or excuse for failure to perform on account of force majeure, act of God, casualty, impossibility, impracticability, or other defense or excuse whatsoever.

(v)     The failure of any Obligor or any other person or entity to sign any guaranty or other instrument or agreement within the contemplation of any Obligor, Agent or the Lender.

4

(vi)    The fact that Guarantor may have incurred directly part of the Guaranteed Obligations or is otherwise primarily liable therefor.

(vii)    Without limiting any of the foregoing, any fact or event (whether or not similar to any of the foregoing) which in the absence of this provision would or might constitute or afford a legal or equitable discharge or release of or defense to a guarantor or surety other than the actual payment and performance by Guarantor under this Guaranty.

(c)    Lender may invoke the benefits of this Guaranty before pursuing any remedies against any Obligor or any other Person and before proceeding against any Security now or hereafter existing for the payment or performance of any of the Guaranteed Obligations. Lender may maintain an action against Guarantor on this Guaranty without joining any other Obligor therein and without bringing a separate action against any other Obligor.

(d)    If any payment to the Agent or the Lender by any Obligor is held to constitute a preference or a voidable transfer under applicable state, Federal, national or international laws, or if for any other reason the Agent or the Lender is required to refund such payment to the payor thereof or to pay the amount thereof to any other Person, such payment to the Agent or the Lender shall not constitute a release of Guarantor from any liability hereunder, and Guarantor agrees to pay such amount to the Agent or the Lender on demand and agrees and acknowledges that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment or payments. Any transfer by subrogation which is made as contemplated in Section 6 prior to any such payment or payments shall (regardless of the terms of such transfer) be automatically voided upon the making of any such payment or payments, and all rights so transferred shall thereupon revert to and be vested in Lender.

(e)    This is a continuing guaranty and shall apply to and cover all Guaranteed Obligations and renewals and extensions thereof and substitutions therefor from time to time.

Section 3.    **Waiver**.    Guarantor hereby waives, with respect to the Guaranteed Obligations, this Guaranty, and the other Obligation Documents:

(a)    notice of the incurrence of any Guaranteed Obligation by Borrower, and notice of any kind concerning the assets, liabilities, financial condition, creditworthiness, businesses, prospects, or other affairs of Borrower (it being understood and agreed that: (i) Guarantor shall take full responsibility for informing himself of such matters, (ii) neither the Agent nor the Lender shall have responsibility of any kind to inform Guarantor of such matters, and (iii) Lender is hereby authorized to assume that Guarantor, by virtue of its relationships with Borrower which is independent of this Guaranty, has full and complete knowledge of such matters whenever the Lender extends credit to Borrower or take any other action which may change or increase Guarantor's liabilities or losses hereunder).

(b)    notice that the Agent or the Lender, any Obligor, or any other Person has taken or omitted to take any action under any Obligation Document or any other agreement or instrument relating thereto or relating to any Guaranteed Obligation.

(c)    default, demand, presentment for payment, and notice of default, demand, dishonor, nonpayment, or nonperformance.

(d)    notice of intention to accelerate, notice of acceleration, protest, notice of protest, notice of any exercise of remedies (as described in the following <u>Section 5</u> or otherwise), and all other notices of any kind whatsoever.

Section 4.    **Exercise of Remedies**.  The Agent and the Lender shall have the right to enforce, from time to time, in any order and at the Agent's or Lender's sole discretion, any rights, powers and remedies which the Agent and the Lender may have under the Obligation Documents or otherwise, including judicial foreclosure, the exercise of rights of power of sale, the taking of a deed or assignment in lieu of foreclosure, the appointment of a receiver to collect rents, issues and profits, the exercise of remedies against personal property, or the enforcement of any assignment of leases, rentals, oil or gas production, or other properties or rights, whether real or personal, tangible or intangible; and Guarantor shall be liable to the Agent and the Lender hereunder for any deficiency resulting from the exercise by the Lender of any such right or remedy even though any rights which Guarantor may have against Borrower or others may be destroyed or diminished by exercise of any such right or remedy.  No failure on the part of the Agent and the Lender to exercise, and no delay in exercising, any right hereunder or under any other Obligation Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right preclude any other or further exercise thereof or the exercise of any other right. The rights, powers and remedies of the Agent and the Lender provided herein and in the other Obligation Documents are cumulative and are in addition to, and not exclusive of, any other rights, powers or remedies provided by law or in equity.  The rights of the Agent and the Lender hereunder are not conditional or contingent on any attempt by the Lender to exercise any of its rights under any other Obligation Document against any Obligor or any other Person.

Section 5.    **Limited Subrogation**.  Until all of the Guaranteed Obligations have been indefeasibly paid and performed in full Guarantor shall have no right to exercise any right of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which Guarantor may now or hereafter have against or to any Obligor or any Security in connection with this Guaranty, and Guarantor hereby waives any rights to enforce any remedy which Guarantor may have against Borrower and any right to participate in any Security until such time.  If any amount shall be paid to Guarantor on account of any such subrogation or other rights, any such other remedy, or any Security at any time when all of the Guaranteed Obligations and all other expenses guaranteed pursuant hereto shall not have been paid in full, such amount shall be held in trust for the benefit of the Agent and the Lender, shall be segregated from the other funds of Guarantor and shall forthwith be paid over to the Agent and the Lender to be held by the Agent or the Lender as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portion of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect.

Section 6.    **Successors and Assigns**.  Guarantor's rights or obligations hereunder may not be assigned or delegated, but this Guaranty and such obligations shall pass to and be fully binding upon the estate and heirs of Guarantor, as well as Guarantor.  This Guaranty shall apply to and inure to the benefit of Agent, Lender and their successors or assigns. Without limiting the generality of the immediately preceding sentence, the Lender may assign any Guaranteed Obligation held by such Lender or any portion thereof, and the Lender may assign such Lender's

rights or any portion thereof under any Obligation Document, to any other Person, and such other Person shall thereupon become entitled to all of the benefits in respect thereof granted to such Lender hereunder unless otherwise expressly provided by such Lender in connection with such assignment or transfer.

Section 7.    **Subordination and Offset**.  Guarantor hereby subordinates and makes inferior to the Guaranteed Obligations any and all indebtedness now or at any time hereafter owed by Borrower or any of the other Loan Parties.  If Guarantor receives any such payment without the prior written consent of Lender, the amount so paid shall be held in trust for the benefit of Lender, shall be segregated from the other funds of Guarantor, and shall forthwith be paid over to Agent to be held by Agent as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portions of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect. Guarantor hereby grants to Agent and Lender a right of offset to secure the payment of the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder, which right of offset shall be upon any and all monies, securities and other property (and the proceeds therefrom) of Guarantor now or hereafter held or received by or in transit to Agent or Lender from or for the account of Guarantor, whether for safekeeping, custody, pledge, transmission, collection or otherwise.  Upon the occurrence of any Default, the Agent and the Lender are hereby authorized at any time and from time to time, without notice to Guarantor, to offset, appropriate and apply any and all items hereinabove referred to against the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder irrespective of whether or not Agent or Lender shall have made any demand under this Guaranty and although such obligations and liabilities may be contingent or unmatured.  The rights of Agent and Lender under this Section are in addition to, and shall not be limited by, any other rights and remedies (including other rights of offset) which Agent or Lender may have.

Section 8.    **Representations and Warranties**.  Guarantor hereby represents and warrants to Lender as follows:

(a)    The recitals at the beginning of this Guaranty are true and correct in all respects.

(b)    Guarantor has the requisite power, competence and authority to execute, deliver and perform this Guaranty, each other writing executed or delivered in connection with this Guaranty and each amendment or supplement to any of the foregoing to which Guarantor is a party, and to perform and consummate the transactions contemplated hereby and thereby.

(c)    The execution, delivery and performance by Guarantor of this Guaranty do not and will not contravene any law or governmental regulation or any contractual restriction binding on or affecting Guarantor or any of Guarantor's properties, and do not and will not result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of Guarantor's properties.

(d)    This Guaranty is, and each other agreement or instrument of Guarantor contemplated hereby will be, a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its respective terms, except as limited by bankruptcy, insolvency or similar laws of general application relating to the enforcement of creditors' rights.

(e)     There is no action, suit or proceeding pending or, to the knowledge of Guarantor, threatened against or otherwise affecting Guarantor before any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality which may materially and adversely affect Guarantor's financial condition or its ability to perform its obligations hereunder.

(f)     Guarantor is not "insolvent" on the date hereof (that is, the sum of Guarantor's absolute and contingent liabilities, including the Guaranteed Obligations, does not exceed the fair market value of Guarantor's assets).  Guarantor has not incurred (whether hereby or otherwise), nor does Guarantor intend to incur or believe that Guarantor will incur, debts which will be beyond Guarantor's ability to pay as such debts mature.

Section 9.    **No Oral Change**.  No amendment of any provision of this Guaranty shall be effective unless it is in writing and signed by Guarantor and Agent on behalf of the Lender, and no waiver of any provision of this Guaranty, and no consent to any departure by Guarantor therefrom, shall be effective unless it is in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 10.    **Prohibition on Asset Transfers**.  Until the Obligations are indefeasibly paid in full, Guarantor agrees that he shall not transfer any material assets to any Person.

Section 11.    **Invalidity of Particular Provisions**.   If any term or provision of this Guaranty shall be determined to be illegal or unenforceable all other terms and provisions hereof shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable law.

Section 12.    **Headings and References**.  The headings used herein are for purposes of convenience only and shall not be used in construing the provisions hereof.  The words "this Guaranty," "this instrument," "herein," "hereof," "hereby" and words of similar import refer to this Guaranty as a whole and not to any particular subdivision unless expressly so limited.  The phrases "this section" and "this subsection" and similar phrases refer only to the subdivisions hereof in which such phrases occur.  The word "or" is not exclusive, and the word "including" (in its various forms) means "including without limitation".  Pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

Section 13.    **Term**.  This Guaranty shall be irrevocable until all of the Guaranteed Obligations have been completely and finally paid and performed.  Lender has no obligation to make any loans or other advances to Borrower, all obligations and undertakings of Borrower under, by reason of, or pursuant to the Obligation Documents have been completely performed, and this Guaranty is thereafter subject to reinstatement as provided in Section 3(d).  All extensions of credit and financial accommodations heretofore or hereafter made by Lender to Borrower shall be conclusively presumed to have been made in acceptance hereof and in reliance hereon.

Section 14. **Notices**. Any notice or communication required or permitted hereunder shall be given as provided in the Security Agreement, except that all notices to Guarantor shall be addressed as follows:

Leonard F. Moscati
41 Richmond Hill Road
Greenwich, CT 06831

Section 15. **Limitation on Interest**. Lender and Guarantor intend to contract in strict compliance with applicable usury law from time to time in effect, and the provisions of the Financing Agreement limiting the interest for which Guarantor is obligated are expressly incorporated herein by reference.

Section 16. **Counterparts; Fax**. This Guaranty may be executed in any number of counterparts, each of which when so executed shall be deemed to constitute one and the same Guaranty. This Guaranty may be validly executed and delivered by facsimile or other electronic transmission.

SECTION 17. **Governing Law**. THIS GUARANTY SHALL BE DEEMED A CONTRACT AND INSTRUMENT MADE UNDER THE LAWS OF THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE LAWS OF THE UNITED STATES OF AMERICA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. THE GUARANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS SITTING IN THE STATE OF NEW YORK AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT OR THE GUARANTEED OBLIGATIONS BY ANY MEANS ALLOWED UNDER NEW YORK OR FEDERAL LAW.

SECTION 18. **Final Agreement**. THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES HERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES HERETO.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be executed as of the date first above written.

GUARANTOR:

SSN: _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_

*Individual Guarantee Signature Page*

**ACCEPTED AND AGREED:**

AGENT

BC MEDIA FUNDING COMPANY II, LLC

By: _____
Name: Jacob Barker
Title: Managing Member

LENDER:

MEDIA FUNDING COMPANY, LLC

By: _____
Name: Jacob Barker
Title: President

**Individual Guarantee Signature Page**

# Exhibit F

## GUARANTY
(Individual)

**THIS PERSONAL GUARANTY** (this "*Guaranty*"), is made as of November 13, 2006, by B. Michael Pisani, a New Jersey resident ("*Guarantor*"), in favor of BC Media Funding Company II, LLC, a Delaware limited liability company (the "*Secured Party*"), as agent for the benefit of Media Funding Company, LLC, a Delaware limited liability company (the "*Lender*").

## RECITALS

**WHEREAS**, pursuant to the Financing Agreement dated as of November 13, 2006, as it may hereafter be amended, restated, supplemented or otherwise modified from time to time (the "*Financing Agreement*"), by and among BusinessTalkradio.net, Inc., a Delaware corporation (the "*Borrower*"), the Subsidiary Guarantors, the Secured Party and the Lender, the Lender has made certain commitments, subject to the terms and conditions set forth in the Financing Agreement, to extend a term loan to Borrower in the aggregate amount of $5,500,000 (the "*Term Loan*");

**WHEREAS**, it is a condition precedent to the making of the Term Loan by the Lender pursuant to the Financing Agreement that the Guarantor shall have executed and delivered to the Secured Party a Guaranty guaranteeing the obligations of the Borrower with respect to the Term Loan; and

**WHEREAS**, the Guarantor has determined that the execution, delivery and performance of this Guaranty will directly benefit, and are within the best interests of, the Guarantor;

**NOW, THEREFORE**, in consideration of the premises and the agreements herein and in order to induce the Secured Party to make and maintain the Term Loan pursuant to the Financing Agreement, the Guarantor hereby agrees with the Secured Party as follows:

**Definitions**. Capitalized terms used hereunder but not defined herein shall have the meanings given them in the Financing Agreement. As used herein the following terms shall have the following meanings:

"*Guaranteed Obligations*" means collectively all of the indebtedness, obligations, and undertakings which are described in subsections (a), (b) and (c) of Section 1.

"*Obligation Documents*" means this Guaranty, the Financing Agreement, the Security Agreement, the Pledge and Security Agreement, the other Guarantees and all other documents and instruments under, by reason of which, or pursuant to which any or all of the Guaranteed Obligations are evidenced, governed, secured, or otherwise dealt with, and all other documents, instruments, agreements, certificates, legal opinions and other writings heretofore or hereafter delivered in connection herewith or therewith, in each case as the same may be amended from time to time.

"*Obligors*" means Borrower, Guarantor, the other Loan Parties (as defined in the Financing Agreement) and any other endorsers, guarantors or obligors, primary or secondary, of any or all of the Guaranteed Obligations.

"*Secured Obligations*" shall have the meanings given such term in the Security Agreement.

"*Security*" means any rights, properties, or interests of the Lender, under the Obligation Documents or otherwise, which provide recourse or other benefits to the Lender in connection with the Guaranteed Obligations or the non-payment or non-performance thereof, including collateral (whether real or personal, tangible or intangible) in which the Lender has rights under or pursuant to any Obligation Documents, guaranties of the payment or performance of any Obligation, bonds, surety agreements, keep-well agreements, letters of credit, rights of subrogation, rights of offset, and rights pursuant to which other claims are subordinated to the Guaranteed Obligations.

"*Security Agreement*" means that certain Security Agreement, dated as of the date hereof, between Borrower and Agent for the benefit of Lender, as the same may be amended or modified from time to time.

Section 1.    **Guaranty**.

(a)    Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete, and full payment when due, and no matter how the same shall become due, of all sums payable under:

(i)    the Financing Agreement, including all principal, all interest thereon and all other sums payable thereunder including attorney's fees or otherwise; and

(ii)    all other Obligation Documents, whether for principal, interest, fees, including attorneys' fees, or otherwise.

Without limiting the generality of the foregoing, Guarantor's liability hereunder shall extend to and include all post-petition interest, expenses, and other duties and liabilities of Borrower described above in this subsection (a), or below in the following subsection (b), which would be owed by Borrower or any other Loan Party but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, or similar proceeding involving Borrower or such Loan Party.

(b)    Guarantor hereby irrevocably, absolutely, and unconditionally guarantees to the Agent for the benefit of the Lender, jointly and severally, the prompt, complete and full performance, when due, and no matter how the same shall become due, of all Secured Obligations and undertakings of Borrower and each other Loan Party to the Lender under, by reason of, or pursuant to any of the Obligation Documents, or any other instrument or document.

(c)    If Borrower shall for any reason fail to pay any of the Guaranteed Obligations, as and when such Guaranteed Obligation shall become due and payable, whether at its stated maturity, as a result of the exercise of any power to accelerate, or otherwise, Guarantor will,

upon demand by the Lender, pay such Guaranteed Obligation in full to the Agent for the benefit of the Lender. If Borrower or any other Loan Party shall for any reason fail to perform promptly any of the Guaranteed Obligations, Guarantor will, upon demand by Agent, cause such Guaranteed Obligation to be performed or, if specified by Agent, provide sufficient funds, in such amount and manner as Agent shall in good faith determine, for the prompt, full and faithful performance of such Guaranteed Obligation.

(d)　　If either of Borrower, Guarantor or any other Loan Party fails to pay or perform any Guaranteed Obligation as described in the immediately preceding subsections (a), (b), or (c) Guarantor will incur the additional obligation to pay to Agent for the benefit of the Lender, and Guarantor will forthwith upon demand by the Lender or Agent pay to Agent, the amount of any and all expenses, including fees and disbursements of Agent's counsel and of any experts or agents retained by Agent, which Agent may incur as a result of such failure.

(e)　　As between Guarantor and the Lender, this Guaranty shall be considered a primary and liquidated liability of Guarantor.

Section 2.　**Unconditional Guaranty**.

(a)　　No action which the Lender or Agent may take or omit to take in connection with any of the Obligation Documents, any of the Guaranteed Obligations (or any other indebtedness owing by Borrower or any other Loan Party to Agent on behalf of the Lender), or any Security, and no course of dealing of the Lender or Agent with any Obligor or any other Person, shall release or diminish Guarantor's obligations, liabilities, agreements or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against the Lender, regardless of whether any such action or inaction may increase any risks to or liabilities of the Lender or any Obligor or increase any risk to or diminish any safeguard of any Security. Without limiting the foregoing, Guarantor hereby expressly agrees that the Agent or the Lender may, from time to time, without notice to or the consent of Guarantor, do any or all of the following:

(i)　　Amend, change or modify, in whole or in part, any one or more of the Obligation Documents and give or refuse to give any waivers or other indulgences with respect thereto;

(ii)　　Neglect, delay, fail, or refuse to take or prosecute any action for the collection or enforcement of any of the Guaranteed Obligations, to foreclose or take or prosecute any action in connection with any Security or Obligation Document, to bring suit against any Obligor or any other Person, or to take any other action concerning the Guaranteed Obligations or the Obligation Documents;

(iii)　　Accelerate, change, rearrange, extend, or renew the time, rate, terms, or manner for payment or performance of any one or more of the Guaranteed Obligations (whether for principal, interest, fees, expenses, indemnifications, affirmative or negative covenants, or otherwise);

(iv)　　Compromise or settle any unpaid or unperformed Guaranteed Obligation or any other obligation or amount due or owing, or claimed to be due or owing, under any one or more of the Obligation Documents;

(v)     Take, exchange, amend, eliminate, surrender, release, or subordinate any or all Security for any or all of the Guaranteed Obligations, accept additional or substituted Security therefor, and perfect or fail to perfect Lender's rights in any or all Security;

(vi)     Discharge, release, substitute or add Obligors; or

(vii)     Apply all monies received from Obligors or others or from any Security for any of the Guaranteed Obligations, as Lender may determine to be in its best interest, without in any way being required to marshal Security or assets or to apply all or any part of such monies upon any particular Guaranteed Obligations.

(b)     No action or inaction of any Obligor or any other Person or any dispute and/or litigation among the Guarantors, and no change of law or circumstances, shall release or diminish Guarantor's obligations, liabilities, agreements, or duties hereunder, affect this Guaranty in any way, or afford Guarantor any recourse against Agent or the Lender. Without limiting the foregoing, the obligations, liabilities, agreements, and duties of Guarantor under this Guaranty shall not be released, diminished, impaired, reduced, or affected by the occurrence of any or all of the following from time to time, even if occurring without notice to or without the consent of Guarantor:

(i)     Any voluntary or involuntary liquidation, dissolution, sale of all or substantially all assets, marshalling of assets or liabilities, receivership, conservatorship, assignment for the benefit of creditors, insolvency, bankruptcy, reorganization, arrangement, or composition of any Obligor or any other proceedings involving any Obligor or any of the assets of any Obligor under laws for the protection of debtors, or any discharge, impairment, modification, release, or limitation of the liability of, or stay of actions or lien enforcement proceedings against, any Obligor, any properties of any Obligor, or the estate in bankruptcy of any Obligor in the course of or resulting from any such proceedings.

(ii)     The failure by the Agent or the Lender to file or enforce a claim in any proceeding described in the immediately preceding subsection (i) or to take any other action in any proceeding to which any Obligor is a party.

(iii)     The release by operation of law of any Obligor from any of the Guaranteed Obligations or any other obligations to the Agent or the Lender.

(iv)     The invalidity, deficiency, illegality, or unenforceability of any of the Guaranteed Obligations or the Obligation Documents, in whole or in part, any bar by any statute of limitations or other law of recovery on any of the Guaranteed Obligations, or any defense or excuse for failure to perform on account of force majeure, act of God, casualty, impossibility, impracticability, or other defense or excuse whatsoever.

(v)     The failure of any Obligor or any other person or entity to sign any guaranty or other instrument or agreement within the contemplation of any Obligor, Agent or the Lender.

(vi)    The fact that Guarantor may have incurred directly part of the Guaranteed Obligations or is otherwise primarily liable therefor.

(vii)    Without limiting any of the foregoing, any fact or event (whether or not similar to any of the foregoing) which in the absence of this provision would or might constitute or afford a legal or equitable discharge or release of or defense to a guarantor or surety other than the actual payment and performance by Guarantor under this Guaranty.

(c)    Lender may invoke the benefits of this Guaranty before pursuing any remedies against any Obligor or any other Person and before proceeding against any Security now or hereafter existing for the payment or performance of any of the Guaranteed Obligations. Lender may maintain an action against Guarantor on this Guaranty without joining any other Obligor therein and without bringing a separate action against any other Obligor.

(d)    If any payment to the Agent or the Lender by any Obligor is held to constitute a preference or a voidable transfer under applicable state, Federal, national or international laws, or if for any other reason the Agent or the Lender is required to refund such payment to the payor thereof or to pay the amount thereof to any other Person, such payment to the Agent or the Lender shall not constitute a release of Guarantor from any liability hereunder, and Guarantor agrees to pay such amount to the Agent or the Lender on demand and agrees and acknowledges that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment or payments. Any transfer by subrogation which is made as contemplated in Section 6 prior to any such payment or payments shall (regardless of the terms of such transfer) be automatically voided upon the making of any such payment or payments, and all rights so transferred shall thereupon revert to and be vested in Lender.

(e)    This is a continuing guaranty and shall apply to and cover all Guaranteed Obligations and renewals and extensions thereof and substitutions therefor from time to time.

Section 3.    **Waiver**.    Guarantor hereby waives, with respect to the Guaranteed Obligations, this Guaranty, and the other Obligation Documents:

(a)    notice of the incurrence of any Guaranteed Obligation by Borrower, and notice of any kind concerning the assets, liabilities, financial condition, creditworthiness, businesses, prospects, or other affairs of Borrower (it being understood and agreed that: (i) Guarantor shall take full responsibility for informing himself of such matters, (ii) neither the Agent nor the Lender shall have responsibility of any kind to inform Guarantor of such matters, and (iii) Lender is hereby authorized to assume that Guarantor, by virtue of its relationships with Borrower which is independent of this Guaranty, has full and complete knowledge of such matters whenever the Lender extends credit to Borrower or take any other action which may change or increase Guarantor's liabilities or losses hereunder).

(b)    notice that the Agent or the Lender, any Obligor, or any other Person has taken or omitted to take any action under any Obligation Document or any other agreement or instrument relating thereto or relating to any Guaranteed Obligation.

(c)     default, demand, presentment for payment, and notice of default, demand, dishonor, nonpayment, or nonperformance.

(d)     notice of intention to accelerate, notice of acceleration, protest, notice of protest, notice of any exercise of remedies (as described in the following Section 5 or otherwise), and all other notices of any kind whatsoever.

Section 4.     **Exercise of Remedies**.  The Agent and the Lender shall have the right to enforce, from time to time, in any order and at the Agent's or Lender's sole discretion, any rights, powers and remedies which the Agent and the Lender may have under the Obligation Documents or otherwise, including judicial foreclosure, the exercise of rights of power of sale, the taking of a deed or assignment in lieu of foreclosure, the appointment of a receiver to collect rents, issues and profits, the exercise of remedies against personal property, or the enforcement of any assignment of leases, rentals, oil or gas production, or other properties or rights, whether real or personal, tangible or intangible; and Guarantor shall be liable to the Agent and the Lender hereunder for any deficiency resulting from the exercise by the Lender of any such right or remedy even though any rights which Guarantor may have against Borrower or others may be destroyed or diminished by exercise of any such right or remedy.  No failure on the part of the Agent and the Lender to exercise, and no delay in exercising, any right hereunder or under any other Obligation Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right preclude any other or further exercise thereof or the exercise of any other right. The rights, powers and remedies of the Agent and the Lender provided herein and in the other Obligation Documents are cumulative and are in addition to, and not exclusive of, any other rights, powers or remedies provided by law or in equity.  The rights of the Agent and the Lender hereunder are not conditional or contingent on any attempt by the Lender to exercise any of its rights under any other Obligation Document against any Obligor or any other Person.

Section 5.     **Limited Subrogation**.  Until all of the Guaranteed Obligations have been indefeasibly paid and performed in full Guarantor shall have no right to exercise any right of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which Guarantor may now or hereafter have against or to any Obligor or any Security in connection with this Guaranty, and Guarantor hereby waives any rights to enforce any remedy which Guarantor may have against Borrower and any right to participate in any Security until such time.  If any amount shall be paid to Guarantor on account of any such subrogation or other rights, any such other remedy, or any Security at any time when all of the Guaranteed Obligations and all other expenses guaranteed pursuant hereto shall not have been paid in full, such amount shall be held in trust for the benefit of the Agent and the Lender, shall be segregated from the other funds of Guarantor and shall forthwith be paid over to the Agent and the Lender to be held by the Agent or the Lender as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portion of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect.

Section 6.     **Successors and Assigns**.  Guarantor's rights or obligations hereunder may not be assigned or delegated, but this Guaranty and such obligations shall pass to and be fully binding upon the estate and heirs of Guarantor, as well as Guarantor.  This Guaranty shall apply to and inure to the benefit of Agent, Lender and their successors or assigns. Without limiting the generality of the immediately preceding sentence, the Lender may assign any Guaranteed Obligation held by such Lender or any portion thereof, and the Lender may assign such Lender's

rights or any portion thereof under any Obligation Document, to any other Person, and such other Person shall thereupon become entitled to all of the benefits in respect thereof granted to such Lender hereunder unless otherwise expressly provided by such Lender in connection with such assignment or transfer.

Section 7.    **Subordination and Offset**.    Guarantor hereby subordinates and makes inferior to the Guaranteed Obligations any and all indebtedness now or at any time hereafter owed by Borrower or any of the other Loan Parties. If Guarantor receives any such payment without the prior written consent of Lender, the amount so paid shall be held in trust for the benefit of Lender, shall be segregated from the other funds of Guarantor, and shall forthwith be paid over to Agent to be held by Agent as collateral for, or then or at any time thereafter applied in whole or in part by Lender against, all or any portions of the Guaranteed Obligations, whether matured or unmatured, in such order as Lender shall elect. Guarantor hereby grants to Agent and Lender a right of offset to secure the payment of the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder, which right of offset shall be upon any and all monies, securities and other property (and the proceeds therefrom) of Guarantor now or hereafter held or received by or in transit to Agent or Lender from or for the account of Guarantor, whether for safekeeping, custody, pledge, transmission, collection or otherwise. Upon the occurrence of any Default, the Agent and the Lender are hereby authorized at any time and from time to time, without notice to Guarantor, to offset, appropriate and apply any and all items hereinabove referred to against the Guaranteed Obligations and Guarantor's obligations and liabilities hereunder irrespective of whether or not Agent or Lender shall have made any demand under this Guaranty and although such obligations and liabilities may be contingent or unmatured. The rights of Agent and Lender under this Section are in addition to, and shall not be limited by, any other rights and remedies (including other rights of offset) which Agent or Lender may have.

Section 8.    **Representations and Warranties**.    Guarantor hereby represents and warrants to Lender as follows:

(a)    The recitals at the beginning of this Guaranty are true and correct in all respects.

(b)    Guarantor has the requisite power, competence and authority to execute, deliver and perform this Guaranty, each other writing executed or delivered in connection with this Guaranty and each amendment or supplement to any of the foregoing to which Guarantor is a party, and to perform and consummate the transactions contemplated hereby and thereby.

(c)    The execution, delivery and performance by Guarantor of this Guaranty do not and will not contravene any law or governmental regulation or any contractual restriction binding on or affecting Guarantor or any of Guarantor's properties, and do not and will not result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of Guarantor's properties.

(d)    This Guaranty is, and each other agreement or instrument of Guarantor contemplated hereby will be, a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its respective terms, except as limited by bankruptcy, insolvency or similar laws of general application relating to the enforcement of creditors' rights.

(e)    There is no action, suit or proceeding pending or, to the knowledge of Guarantor, threatened against or otherwise affecting Guarantor before any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality which may materially and adversely affect Guarantor's financial condition or its ability to perform its obligations hereunder.

(f)    Guarantor is not "insolvent" on the date hereof (that is, the sum of Guarantor's absolute and contingent liabilities, including the Guaranteed Obligations, does not exceed the fair market value of Guarantor's assets). Guarantor has not incurred (whether hereby or otherwise), nor does Guarantor intend to incur or believe that Guarantor will incur, debts which will be beyond Guarantor's ability to pay as such debts mature.

Section 9.    **No Oral Change**. No amendment of any provision of this Guaranty shall be effective unless it is in writing and signed by Guarantor and Agent on behalf of the Lender, and no waiver of any provision of this Guaranty, and no consent to any departure by Guarantor therefrom, shall be effective unless it is in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 10.    **Prohibition on Asset Transfers**. Until the Obligations are indefeasibly paid in full, Guarantor agrees that he shall not transfer any material assets to any Person.

Section 11.    **Invalidity of Particular Provisions**. If any term or provision of this Guaranty shall be determined to be illegal or unenforceable all other terms and provisions hereof shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable law.

Section 12.    **Headings and References**. The headings used herein are for purposes of convenience only and shall not be used in construing the provisions hereof. The words "this Guaranty," "this instrument," "herein," "hereof," "hereby" and words of similar import refer to this Guaranty as a whole and not to any particular subdivision unless expressly so limited. The phrases "this section" and "this subsection" and similar phrases refer only to the subdivisions hereof in which such phrases occur. The word "or" is not exclusive, and the word "including" (in its various forms) means "including without limitation". Pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

Section 13.    **Term**. This Guaranty shall be irrevocable until all of the Guaranteed Obligations have been completely and finally paid and performed. Lender has no obligation to make any loans or other advances to Borrower, all obligations and undertakings of Borrower under, by reason of, or pursuant to the Obligation Documents have been completely performed, and this Guaranty is thereafter subject to reinstatement as provided in Section 3(d). All extensions of credit and financial accommodations heretofore or hereafter made by Lender to Borrower shall be conclusively presumed to have been made in acceptance hereof and in reliance hereon.

Section 14. **Notices**. Any notice or communication required or permitted hereunder shall be given as provided in the Security Agreement, except that all notices to Guarantor shall be addressed as follows:

Michael Pisani
44 Lake road
Short Hills, NJ 07078

Section 15. **Limitation on Interest**. Lender and Guarantor intend to contract in strict compliance with applicable usury law from time to time in effect, and the provisions of the Financing Agreement limiting the interest for which Guarantor is obligated are expressly incorporated herein by reference.

Section 16. **Counterparts; Fax**. This Guaranty may be executed in any number of counterparts, each of which when so executed shall be deemed to constitute one and the same Guaranty. This Guaranty may be validly executed and delivered by facsimile or other electronic transmission.

SECTION 17. **Governing Law**. THIS GUARANTY SHALL BE DEEMED A CONTRACT AND INSTRUMENT MADE UNDER THE LAWS OF THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE LAWS OF THE UNITED STATES OF AMERICA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. THE GUARANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS SITTING IN THE STATE OF NEW YORK AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT OR THE GUARANTEED OBLIGATIONS BY ANY MEANS ALLOWED UNDER NEW YORK OR FEDERAL LAW.

SECTION 18. **Final Agreement**. THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES HERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES HERETO.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be executed as of the date first above written.

GUARANTOR:

B. Michael Pisa.

SSN: 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

*Individual Guarantee Signature Page*

**ACCEPTED AND AGREED:**

AGENT

BC MEDIA FUNDING COMPANY II, LLC

By: _____
Name: Jacob Barker
Title: Managing Member

LENDER:

MEDIA FUNDING COMPANY, LLC

By: _____
Name: Jacob Barker
Title: President

**Individual Guarantee Signature Page**

# Exhibit G

# FORBEARANCE AGREEMENT

This Forbearance Agreement (this *"Agreement"*) is dated as of December 28, 2007 and is entered into by and among BusinessTalkradio.net, Inc., a Delaware corporation (the *"Borrower"*), and The Greenwich Broadcasting Corporation, a Connecticut corporation (*"Greenwich"*), The Lifestyle TalkRadio Network, Inc., a Delaware corporation (*"Lifestyle"*), BTR West, Inc., a Nevada corporation (*"BTR West"*), BTR Communications Boston, Inc., a Massachusetts corporation (*"BTR Boston"*), BTR Greenwich, Inc., a Connecticut corporation (*"BTR Connecticut"*), BTR West II, Inc., a Nevada corporation (*"Nevada II"*), BTR Communications Boston II, Inc., a Massachusetts corporation (*"Boston II"*), WURP East, Inc., a Pennsylvania corporation (*"Pittsburgh East"*), WURP, Inc., a Pennsylvania corporation (*"Pittsburgh"*, and together with Greenwich, Lifestyle, BTR West, BTR Boston, BTR Connecticut, Nevada II, and Pittsburgh East, the *"Subsidiary Guarantors"*), Media Funding Company, LLC, a Delaware limited liability company (the *"Lender"*), and BC Media Funding Company II, LLC, a Delaware limited liability company, as agent for the Lender (in such capacity, the *"Agent"*).

## RECITALS:

WHEREAS, Agent, Lender and Borrower are parties to that certain Financing Agreement dated as of November 13, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*);

WHEREAS, Events of Default have occurred under subsection 8.01(c) of the Credit Agreement in that the Borrower failed to achieve (i) a minimum fixed charge coverage ratio of at least 1.0 to 1.0 in accordance with the requirements of Section 6.03(b) of the Credit Agreement for the 12-month periods ending on January through September 2007; (ii) Consolidated EBITDA in accordance with the requirements of Section 6.03(c) of the Credit Agreement for the quarters ending March 31, 2007, June 30, 2007, and September 30, 2007; and (iii) Net Cash Revenue in accordance with the requirements of Section 6.03(d) of the Credit Agreement for the quarters ending March 31, 2007, June 30, 2007, and September 30, 2007 (such Events of Default, the *"Existing Defaults"*); and

WHEREAS, Agent and Lender are willing to forbear from enforcing their rights that arise because of the Existing Defaults for a limited period of time, provided that Borrower complies with the terms of this Agreement.

1

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I. DEFINITIONS

**Section 1.01**    All capitalized terms used herein (including in the introductory paragraph and recitals set forth above) and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

**Section 1.02**    The following terms used in this Agreement shall have the meanings set forth below:

"*Bridge Financing*" means that certain financing to be entered into by the Borrower and prospective investors in a principal amount of at least $600,000, to be utilized by the borrower to fund development of the Borrower's website, pay for certain accounting-related services and for certain other working capital purposes, which financing, in all respects, shall be subordinate to the Obligations under the Credit Agreement.

"*Forbearance Default*" means (a) the occurrence of any Default or Event of Default other than the Existing Defaults; (b) the failure of Borrowers to comply with any term, condition or covenant set forth in this Agreement, (c) any representation made by Borrowers under or in connection with this Agreement shall prove to be materially false or misleading as of the date when made or (d) the filing of any petition (voluntary or involuntary) under the insolvency or bankruptcy laws of the United States or any state thereof, or of any foreign jurisdiction, with respect to a Borrower, any of its affiliates, or any of its Subsidiaries.

"*Termination Date*" means the earlier to occur of (a) 5:00 p.m. New York time on March 31, 2008, or (b) the date upon which a Forbearance Default occurs.

## ARTICLE II.        CONFIRMATION BY BORROWERS OF OBLIGATIONS

Each Borrower acknowledges and agrees that as of the date hereof, the Borrowers have no right of offset, defense, or counterclaim with respect to the Obligations.

## ARTICLE III.        AGREEMENT TO FORBEAR; SUBORDINATION AGREEMENT; OTHER AGREEMENTS

**Section 3.01**    Provided that no Forbearance Default occurs, Agent and **Lender** hereby agree to refrain, through the Termination Date, from exercising any of their rights and remedies under the Credit Agreement or any of the other Loan Documents that may exist by virtue of the Existing Defaults. If Borrowers comply with

2

all terms, covenants and conditions set forth in this Agreement, the Agent and Lender agree that the Existing Defaults shall be deemed waived.

**Section 3.02**    Nothing in this Agreement shall be construed as a waiver of or acquiescence to the Existing Defaults which shall continue in existence, subject only to the agreement of Agent and Lender, as set forth herein, not to enforce their remedies for a limited period of time.  Nor shall anything in this Agreement be construed as the Agent's or the Lender's consent to the Bridge Financing, which shall be subject, in all respects, to the approval of the Agent and the Lender in their sole and absolute discretion.  Except as expressly provided herein, the execution and delivery of this Agreement shall not: (a) constitute an extension, modification, or waiver of any aspect of the Credit Agreement or the other Loan Documents; (b) extend the terms of the Credit Agreement or the due date of any of the Obligations; (c) give rise to any obligation on the part of Agent or any Lender to extend, modify or waive any term or condition of the Credit Agreement or any of the other Loan Documents; (d) give rise to any defenses or counterclaims to the right of Agent or Lender to compel payment of the Obligations or to otherwise enforce their rights and remedies under the Credit Agreement and the other Loan Documents; or (e) establish a custom or course of dealing between or among the Borrowers, the Agent and/or the Lender, or any of them.  Except as expressly limited herein, Agent and Lender hereby expressly reserve all of their rights and remedies under the Credit Agreement and the other Loan Documents and under applicable law with respect to the Existing Defaults.  From and after the Termination Date, Agent and Lender shall be entitled to enforce the Credit Agreement and other Loan Documents according to the original terms thereof.

**Section 3.03**    Provided that no Forbearance Default occurs, the parties hereto hereby agree that Borrower shall not be required to make the principal amortization payment of $75,000 required on December 31, 2007, and the principal amortization payment of $3,000 required on February 28, 2008.

**Section 3.04**    The parties hereto hereby agree that, effective as of and retroactive to December 1, 2007, the Payment-in-Kind Interest Rate shall be increased by 300 basis points so that the Payment-in-Kind Interest Rate is 4.50% per annum.

## ARTICLE IV.    REPRESENTATIONS AND WARRANTIES

In consideration of the limited agreement of Agent and Lender to forbear from the exercise of their rights and remedies as set forth above, each Loan Party jointly and severally hereby represents and warrants to Agent and Lender as of the date hereof as follows:

**Section 4.01**    Borrowers has made full disclosure to Agent and Lender of all Existing Defaults and Events of Default and all other disclosures as is required under subsection 6.01(a)(ix) of the Credit Agreement.

3

**Section 4.02**     The execution, delivery and performance of this Agreement by each Loan Party are within such Person's corporate power and have been duly authorized by all necessary corporate action.

**Section 4.03**     This Agreement constitutes a valid and legally binding Agreement enforceable against each Loan Party in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights generally and to general equitable principals.

**Section 4.04**     All Loan Documents, including without limitation the Credit Agreement, constitute valid and legally binding obligations of each Loan Party thereto, enforceable against such Loan Party in accordance with the terms thereof subject to the effects of bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights generally and to general equitable principals.

## ARTICLE V.     COVENANTS

In order to induce Agent and Lender to forbear from the exercise of their rights and remedies as set forth above, each Loan Party hereby covenants and agrees with Agent and Lender as follows:

**Section 5.01**     Borrower shall consummate the Bridge Financing and receive immediate access to the cash proceeds therefrom no later than January 31, 2008.

**Section 5.02**     Borrower shall, and shall cause its Subsidiaries to, continue to perform and observe all terms and conditions contained in the Credit Agreement and other Loan Documents.

**Section 5.03**     Borrower shall reimburse Agent and Lender for all costs and expenses incurred in connection with the enforcement of this Agreement (including, without limitation, reasonable attorneys' fees and legal expenses, which may consist of fees and legal expenses of outside counsel retained by Agent or any Lender or the allocated costs of in-house counsel of Agent or any Lender).

**Section 5.04**     Borrower shall fully and publicly disclose the existence of this agreement and a summary of its terms and conditions in compliance with all applicable securities laws.

## ARTICLE VI.     GENERAL RELEASE

In consideration of, among other things, the forbearance provided for herein, and any other financial accommodations which Agent and/or Lender elects to extend to Borrower, each Loan Party forever waives, releases and discharges any and all claims (including, without limitation, cross-claims, counterclaims, rights of setoff and

4

recoupment), causes of action, demands, suits, costs, expenses and damages that it now has or hereafter may have, of whatsoever nature and kind, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity that arise under or relate to any of the Loan Documents or this Agreement or any Person's rights or obligations thereunder (collectively, "*Claims*"), against Agent or Lender, any of such Person's Subsidiaries and affiliates, and its and their respective successors, assigns, officers, directors, employees, agents, attorneys and other representatives (collectively, the "*Lender Releasees*"), based in whole or in part on facts, whether or not known, existing on or prior to the date of this Agreement. The provisions of this section shall survive the termination of the Credit Agreement and payment in full of the Obligations.

## ARTICLE VII.    MISCELLANEOUS

**Section 7.01      Headings.** Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 7.02      Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES.

**Section 7.03      Counterparts.** This Agreement may be executed in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

**Section 7.04      Continued Effectiveness.** Except as expressly set forth in this Agreement, the terms of the Credit Agreement and each of the other Loan Documents remain unchanged, and all such Loan Documents shall remain in full force and effect and are hereby confirmed and ratified.

**Section 7.05      No Novation.** This Agreement shall not be deemed or construed to be a satisfaction, reinstatement, novation or release of the Credit Agreement or of any of the other Loan Documents or, except as expressly provided herein, a waiver by Agent or any Lender of any of its rights and remedies under the Credit Agreement or any of the other Loan Documents, or any of them, or at law or in equity.

**Section 7.06      Reaffirmation.** Each Loan Party signatory hereto hereby reaffirms each and every covenant, condition, obligation and provision set forth in the Loan Documents, as modified hereby.

**Section 7.07      Construction.** Each Loan Party signatory hereto acknowledges that it has been represented by its own legal counsel in connection its execution of this Agreement and the Loan Documents, that it has exercised independent

5

judgment with respect to this Agreement and the Loan Documents, and that it has not relied on Agent or any Lender or on Agent's or any Lender's counsel for any advice with respect to this Agreement or the Loan Documents. If any provision of this Agreement is found to be unenforceable, such provision shall be limited or deleted to the minimum extent necessary so that the remaining terms remain in full force and effect.

**Section 7.08    Integration; Waivers.**    This Agreement, the Loan Documents and the other written agreements, instruments and documents entered into in connection therewith (collectively, the "*Borrower/Lender Documents*") set forth in full the terms of agreement between the parties with respect to the subject matter thereof and are intended as the full, complete and exclusive contract governing the relationship between the parties with respect thereto, superseding all other discussions, promises, representations, warranties, agreements and understandings between the parties with respect thereto. Any waiver of any condition in, or breach of, any of the foregoing in a particular instance shall not operate as a waiver of other or subsequent conditions or breaches of the same or a different kind. Agent's and each Lender's exercise or failure to exercise any rights under any of the foregoing in a particular instance shall not operate as a waiver of its right to exercise the same or different rights in other instances. Except as expressly provided to the contrary in this Agreement, all the terms, conditions and provisions of the Borrower/Lender Documents shall continue in full force and effect.

**Section 7.09    Consent to Jurisdiction.**    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH CREDIT PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH CREDIT PARTY HEREBY IRREVOCABLY APPOINTS THE SECRETARY OF STATE OF THE STATE OF NEW YORK AS ITS AGENT FOR SERVICE OF PROCESS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING AND FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 10.01 [NOTICES, ETC.] AND TO THE SECRETARY OF STATE OF THE STATE OF NEW YORK, SUCH SERVICE TO BECOME EFFECTIVE TEN (10) DAYS AFTER SUCH MAILING. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENT AND THE LENDER TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH CREDIT PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN

ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY CREDIT PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, ·EACH CREDIT PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

**Section 7.10      Waiver of Jury Trial.** EACH CREDIT PARTY, THE AGENT AND THE LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH CREDIT PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF THE AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH CREDIT PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENT AND THE LENDER ENTERING INTO THIS AGREEMENT.

**Section 7.11      Reaffirmation.** Each Loan Party has executed and delivered one or more of the Loan Documents as debtor, grantor, pledgor, guarantor, assignor, or in other similar capacities in which such Person has granted liens or security interests in their respective properties or otherwise acted as an accommodation party or guarantor, as the case may be. Each Loan Party hereby ratifies and reaffirms all of its respective payment and performance obligations, contingent or otherwise, under the Loan Documents to which it is a party and, to the extent any such Person has granted liens on or security interests in any of their respective properties pursuant to any of the Loan Documents as security for or otherwise guaranteed the Obligations under or with respect to the Agreement or any other Loan Documents, hereby ratifies and reaffirms such payment and performance obligations, guarantee and grant of security interests and liens and confirms and agrees that such security interests and liens hereafter secure all of the Obligations. Each Loan Party agrees that each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed, and agrees that this Agreement shall not (a) operate as a waiver of any right, power or remedy of Agent or Lender under the Loan Documents or (b) constitute a waiver of any provision of any of the Loan Documents or serve to effect a novation of the Obligations.

7

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above, by their respective duly authorized officers.

BORROWER:

BUSINESSTALKRADIO.NET, INC.

By: _____
Name: _____
Title: _____

SUBSIDIARIES:

BTR WEST, INC.

By: _____
Name: _____
Title: _____

THE LIFESTYLE TALKRADIO NETWORK, INC.

By: _____
Name: _____
Title: _____

THE GREENWICH BROADCASTING CORPORATION

By: _____
Name: _____
Title: _____

BTR COMMUNICATIONS BOSTON, INC.

By: _____
Name: _____
Title: _____

BTR GREENWICH INC.

By: _____
Name: _____
Title: _____

BTR WEST II, INC.

By: _____

Name: Michael L. Metter

Title: President

BTR COMMUNICATIONS BOSTON II, INC.

By: _____

Name: Michael L. Metter

Title: President

WURP, INC.

By: _____

Name: Michael L. Metter

Title: President

WURP EAST, INC.

By: _____

Name: Michael L. Metter

Title: President

AGENT:                          BC MEDIA FUNDING COMPANY II, LLC

                                By: _____
                                    Jacob Barker, Manager


LENDER:                         MEDIA FUNDING COMPANY, LLC

                                By: _____
                                Name: _____
                                Title: _____

SIGNATURE PAGE TO FORBEARANCE AGREEMENT

BTR WEST II, INC.

By:_____
Name:_____
Title:_____

BTR COMMUNICATIONS BOSTON II, INC.

By:_____
Name:_____
Title:_____

WURP, INC.

By:_____
Name:_____
Title:_____

WURP EAST, INC.

By:_____
Name:_____
Title:_____

AGENT:                    BC MEDIA FUNDING COMPANY II, LLC

                          By: _____
                          Jacob Barker, Manager

LENDER:                   MEDIA FUNDING COMPANY, LLC

                          By: _____
                          Name: Jacob J. Barker
                          Title: Manager

SIGNATURE PAGE TO FORBEARANCE AGREEMENT

# Exhibit H

BARKER CAPITAL, LLC
401 E. 8th Street
Suite 220B
Sioux Falls, SD 57103

April 24, 2008

VIA FIRST CLASS MAIL

Frank Lazauskas
1490 Dayton Avenue
Greenwich, CT 06830

Michael L. Metter
One Tinker Lane
Greenwich, CT 06830

Leonard F. Moscati
41 Richmond Hill Road
Greenwich, CT 06831

B. Michael Pisani
44 Lake road
Short Hills, NJ 07078

> Re:  *Financing Agreement (the "Financing Agreement") dated as of November*
> *13, 2006, by and among BusinessTalkradio.net, Inc. ("Borrower"), Media*
> *Funding Company, LLC ("Lender") and BC Media Funding Company II,*
> *LLC ("Agent")*

Gentlemen:

We are writing to inform you, as personal guarantors of the Obligations of the Borrower under the Financing Agreement, that the Borrower repeatedly has failed to satisfy its covenants under the Financing Agreement. Among others, these covenant failures relate to the Borrower's operating performance, financial commitments and reporting obligations.

The Lender and Agent currently are in the process of evaluating all available alternatives to enforce their rights under the Financing Agreement, including, without limitation, immediately accelerating all Obligations under the Financing Agreement and proceeding against the Collateral and, to the extent necessary, enforcing the personal guarantees, subsidiary guarantees, cooperation guaranty and spousal consents. The Borrower's payment in full of all Obligations outstanding under the Financing Agreement will bring such process to a close.

Frank Lazauskas
Michael L. Metter
Leonard F. Moscati
B. Michael Pisani
April 24, 2008
Page 2

The Lender and Agent have not waived any of their rights or any of the Borrower's Obligations under the Financing Agreement, and expressly reserve any such rights. This letter shall not be deemed to be a waiver of any provision of or any Event of Default under the Financing Agreement. Capitalized terms used herein and not otherwise defined shall have their respective meanings set forth in the Financing Agreement.

Very truly yours,

BC MEDIA FUNDING COMPANY II, LLC

By: _____

Timothy P. Olson, Authorized Representative

# Exhibit I





# FAX COVER SHEET

Please
Deliver To: _Dale Norton_          Fax Number: _605-338-5266_

From: _Tom Ness_                    Fax Number: (203) 323-7302

Date: _5/6/08_                      Time: _11:59 am_

Number of pages (including this page): _5_

Comments:

_March Signatures_

P.O. Box 4826 * Greenwich, CT 06831 * (203) 323-7300 * Fax: (203) 323-7302
www.businesstalkradio.net
www.lifestyletalkradio.com

**Certificate Required by Section 6.01(a)(iv) of the Financing Agreement,
Dated as of November 13, 2006, by and among BusinessTalkradio.net,
Inc., as Borrower, Media Funding Company, LLC, as Lender, and
BC Media Funding Company II, LLC, as Agent[1]**

**Officer Certification – Quarter Ending March 31, 2008**

——————, 2008

     I, Michael L. Metter, certify that the attached financial statements of BusinessTalkradio.net, Inc., present fairly, in all respects, the financial position, results of operations, retained earnings and cash flows of BusinessTalkradio.net, Inc., for the quarter ending March 31, 2008, in accordance with GAAP applied in a manner consistent with that of the most recent financial statements furnished to the Agent and Lender, subject to normal year-end adjustments. I have reviewed the provisions of the Financing Agreement and the other Loan Documents and have made or caused to be made under my supervision a review of such financial statements with a view to determining whether the Borrower was in material compliance with all of the provisions of the Financing Agreement and the other Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and I have no knowledge of the existence of an Event of Default or Default, except that:

- Consolidated Net Revenue for the Borrower is $788,165 for the quarter ending March 31, 2008. The required net revenue under the Financing Agreement is $788,165;
- Consolidated EBITDA for the Borrower is ($46,208) for the quarter ending March 31, 2008. The required EBITDA under the Financing Agreement is $132,639;
- The Fixed Charge Coverage Ratio for the twelve-month period ending March 31, 2008 was (0.01). The required fixed charge coverage ratio under the Financing Agreement is a minimum of 1.0;
- A written subordination or waiver and a written access agreement have not been timely delivered with respect to KNUU-(AM), the Las Vegas station, in accordance with the requirements of Sections 6.01(m)(i) and (ii), respectively, of the Financing Agreement;
- The Borrower has issued an aggregate of 7,678,335 shares of its Common Stock to the Persons set forth in Exhibit A attached hereto; and

---

[1] Such agreement is hereinafter referred to as the "Financing Agreement". Capitalized terms used but not otherwise defined in this certificate shall have the meanings given such terms in such Financing Agreement.

05/06/2008 11:01    2033237302          BUSINESSTALKRADIONET          PAGE 03

I also certify that during the above mentioned period, no proceeds of the Term Loan have
been used by or for the benefit of Lifestyle. See the attached schedule showing the
calculations of the financial covenants as specified in Section 6.03 of the loan agreement.

Signed

929230-3

05/05/2008  11:01    2033237302                BUSINESSTALKRADICNET                    PAGE  04

**Certificate Required by Section 6.01(a)(iv) of the Financing Agreement,
Dated as of November 13, 2006, by and among BusinessTalkradio.net,
Inc., as Borrower, Media Funding Company, LLC, as Lender, and
BC Media Funding Company II, LLC, as Agent[1]**

**Officer Certification – Month Ending March 31, 2008**

**_____, 2008**

       I, Michael L. Metter, certify that the attached financial statements of BusinessTalkradio.net, Inc. (the "Borrower"), present fairly, in all material respects, the financial position, results of operations, retained earnings and cash flows of the Borrower for the month ended March 31, 2008, in accordance with GAAP applied in a manner consistent with that of the most recent financial statements furnished to the Agent and Lender, subject to normal year-end adjustments. I have reviewed the provisions of the Financing Agreement and the other Loan Documents and have made or caused to be made under my supervision a review of such financial statements with a view to determining whether the Borrower was in material compliance with all of the provisions of the Financing Agreement and the other Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and I have no knowledge of the existence of an Event of Default or Default, except that:

- The Fixed Charge Coverage Ratio for the Borrower for the twelve-month period ending March 31, 2008 was (0.01). The required fixed charge coverage ratio under the Financing Agreement is a minimum of 1.0;
- A written subordination or waiver and a written access agreement have not been timely delivered with respect to KNUU-(AM), the Las Vegas station, in accordance with the requirements of Sections 6.01(m)(i) and (ii), respectively, of the Financing Agreement;
- The Borrower has issued an aggregate of 7,678.335 shares of its Common Stock to the Persons set forth in Exhibit A attached hereto.

---

[1] Such agreement is hereinafter referred to as the "Financing Agreement". Capitalized terms used but not otherwise defined in this certificate shall have the meanings given such terms in such Financing Agreement.

930291-2

I also certify that during the above mentioned period, no proceeds of the Term Loan have been used by or for the benefit of Lifestyle.  See the attached schedule showing the calculations of the financial covenants as specified in Section 6.03 of the loan agreement.

Signed

929730-2

# Exhibit J

05/14/2008  15:43    2033237302                    BUSINESSTALKRADIONET                    PAGE  01





# FAX COVER SHEET

Please
Deliver To: _Dale Norton_        Fax Number: _605-338-5266_

From: _Tom Ness_                 Fax Number: (203) 323-7302

Date: _5/14/08_                  Time: _4:45pm_

Number of pages (including this page): _8_

Comments:

_April Certificate_

P.O Box 4826 * Greenwich, CT 06831 * (203) 323-7300 * Fax: (203) 323-7302
www.businesstalkradio.net
www.lifestyletalkradio.com

05/14/2008   15:43   2033237302                    BUSINESSTALKRADIONET                    PAGE   02

**Certificate Required by Section 6.01(a)(iv) of the Financing Agreement,
Dated as of November 13, 2006, by and among BusinessTalkradio.net,
Inc., as Borrower, Media Funding Company, LLC, as Lender, and
BC Media Funding Company II, LLC, as Agent[1]**

**Officer Certification – Month Ending April 30, 2008**

### May 14, 2008

I, Michael L. Metter, certify that the attached financial statements of BusinessTalkradio.net, Inc. (the "Borrower"), present fairly, in all material respects, the financial position, results of operations, retained earnings and cash flows of the Borrower for the month ended April 30, 2008, in accordance with GAAP applied in a manner consistent with that of the most recent financial statements furnished to the Agent and Lender, subject to normal year-end adjustments. I have reviewed the provisions of the Financing Agreement and the other Loan Documents and have made or caused to be made under my supervision a review of such financial statements with a view to determining whether the Borrower was in material compliance with all of the provisions of the Financing Agreement and the other Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and I have no knowledge of the existence of an Event of Default or Default, except that:

- The Fixed Charge Coverage Ratio for the Borrower for the twelve-month period ending April 30, 2008 was (0.03). The required fixed charge coverage ratio under the Financing Agreement is a minimum of 1.0;
- A written subordination or waiver and a written access agreement have not been timely delivered with respect to KNUU-(AM), the Las Vegas station, in accordance with the requirements of Sections 6.01(m)(i) and (ii), respectively, of the Financing Agreement;
- The Borrower has issued an aggregate of 8,145,002 shares of its Common Stock to the Persons set forth in Exhibit A attached hereto.

---

[1] Such agreement is hereinafter referred to as the "Financing Agreement". Capitalized terms used but not otherwise defined in this certificate shall have the meanings given such terms in such Financing Agreement.

930291-2

05/14/2008  15:43    2033237302                BUSINESSTALKRADICNET                PAGE  03

I also certify that during the above-mentioned period, no proceeds of the Term Loan have been used by or for the benefit of Lifestyle.  See the attached schedule showing the calculations of the financial covenants as specified in Section 6.03 of the Financing Agreement.

Signed

05/14/2008  15:43    2033237302                    BUSINESSTALKRADIONET                    PAGE  04

Exhibit A
to Officer's Certificate

Recipients of Shares of Common Stock
Between November 14, 2006 and April 30, 2008

EQUITY OFFERING 11/14/06-04/30/08
price per share                          $0.30

| NAME | SHARES | PRICE |
|------|--------|-------|
| Robert Lanava | 10,000 | $ 3,000 |
| Michael L. Metter | 166,667 | 50,000 |
| B. Michael Pisani | 166,667 | 50,000 |
| Philip Casesa | 86,667 | 26,000 |
| Stuart Werner | 100,000 | 30,000 |
| Leonard Moscati | 333,333 | 100,000 |
| Doug Prescott | 83,333 | 25,000 |
| FJL Enterprises, Inc. | 166,667 | 50,000 |
| USA Fund, LLP | 166,667 | 50,000 |
| Kellogg Capital Group, LLC | 166,667 | 50,000 |
| Doug Prescott | 83,333 | 25,000 |
| Dr. Jerome Brodlic | 166,667 | 50,000 |
| Larry Blau | 166,667 | 50,000 |
| Paul Papi | 83,333 | 25,000 |
| Kingsley Wood | 166,667 | 50,000 |
| Nicholas Sitnycky | 100,000 | 30,000 |
| Myron Weiner | 40,000 | 12,000 |
| William Ritger | 100,000 | 30,000 |
| Michael Metter | 140,000 | 42,000 |
| TNJ Enterprises, Inc. | 116,667 | 35,000 |
| B. Michael Pisani | 133,333 | 40,000 |
| Leonard Moscati | 166,667 | 50,000 |
| David Berley | 1,000,000 | 300,000 |
| Marc Berley | 16,667 | 5,000 |
| TNJ Enterprises, Inc. | 83,333 | 25,000 |
| B. Michael Pisani | 100,000 | 30,000 |
| TNJ Enterprises, Inc. | 100,000 | 30,000 |
| Leonard Moscati | 100,000 | 30,000 |
| TNJ Enterprises, Inc. | 100,000 | 30,000 |
| B. Michael Pisani | 100,000 | 30,000 |
| TNJ Enterprises, Inc. | 100,000 | 30,000 |

Total – continued on next page                  4,610.002

Exhibit A
to Officer's Certificate

| | | |
|---|---|---|
| Total from prior page | 4,610,002 | |
| Employee grants for 2006, excl. Servino | 67,500 | n/a |
| DW Stephan, trustee (1st installment for Programming to LTRN) | 100,000 | n/a |
| Charles Lanktree (for consulting services) | 50,000 | n/a |
| DW Stephan, trustee (2nd installment for Programming to LTRN) | 100,000 | n/a |
| Employee, Director, and Consulting Grants for 2007 | 417,500 | |
| USA Fund, LLP | 333,333 | 100,000 |
| Leonard Moscati | 166,667 | 50,000 |
| B. Michael Pisani | 333,333 | 100,000 |
| TNJ Enterprises, Inc. | 166,667 | 50,000 |
| Michael L. Metter | 333,333 | 100,000 |
| Network One | 666,667 | 200,000 |
| IDT | 333,333 | 100,000 |
| Charles Lanktree | 466,667 | 140,000 |
| Shares issued between 11/14/06-04/30/08 | 8,145,002 | |

05/14/2008  15:43    2033237302                    BUSINESSTALKRADIONET                    PAGE  06

Exhibit B
to Officer's Certificate

LMAs

Borrower entered into a Time Brokerage Agreement dated as of December 19, 2006 with Jarad Broadcasting Company of Westhampton, Inc. in connection with the agreement between such parties for the proposed acquisition of substantially all the assets of WBON-FM (now WBZB-FM). This agreement ended without acquisition on August 31, 2007.

Borrower entered into a Time Brokerage Agreement dated as of December 19, 2006 with Jarad Broadcasting Company of Hampton Bays, Inc. in connection with the agreement between such parties for the proposed acquisition of substantially all the assets of WLIR-FM. This agreement ended without acquisition on August 31, 2007.

Borrower entered into a Local Marketing Agreement date as of March 15, 2007 with Urban Radio of Pennsylvania, LLC in connection with the agreement between such parties for the proposed acquisition of substantially all the assets of WURP-AM. ("Acquisition"). The Local Marketing Agreement automatically terminated, effective August 29, 2007, when the Acquisition was consummated.

**Certificate Required by Section 6.01(a)(v) of the Financing Agreement, Dated as of November 13, 2006, by and among BusinessTalkradio.net, Inc., as Borrower, Media Funding Company, LLC, as Lender, and BC Media Funding Company II, LLC, as Agent[1]**

**Certification of B. Michael Pisani – April 30, 2008**

### May 14, 2008

I, B. Michael Pisani, have reviewed the provisions of the Financing Agreement and the other Loan Documents and have made a review of the financial conditions of the Individual Guarantors during the period covered by the month ending April 30, 2008 with a view to determining whether the Individual Guarantors were in compliance with all of the provisions of the Financing Agreement and the Loan Documents. Such review (i) has not disclosed, and I have no knowledge of, the existence of an Event of Default or Default with respect to any of the Individual Guarantors, and (ii) The Individual Guarantors, B. Michael Pisani, Michael L Metter, Leonard F. Moscati and Frank Lazauskas, have maintained collectively at least $6,000,000 in Liquid Assets and Marketable Securities. In addition, I have no knowledge of the existence of an Event of Default or Default with respect to any of the Credit Parties under the Financing Agreement or the other Loan Documents other than those Events of Default or Defaults which are specified in the Officer's Certificate for the Month ended April 30, 2008 being concurrently delivered pursuant to the Financing Agreement, a copy of which Officer's Certificate is attached hereto.

Signed _B. Michael Pisani_

---

[1] Such agreement is hereinafter referred to as the "Financing Agreement". Capitalized terms used but not otherwise defined in this certificate shall have the meanings given such terms in such Financing Agreement.

930291-2

Business Talk Radio
Financial Covenant Calculations
April 30, 2008

| | | | |
|---|---|---|---|
| A. | Cash on Hand | | |
| | Total Checking/Savings | $ | 369,915 |
| | Total Cash on Hand | $ | 369,915 |
| | Covenant requirement | $ | 200,000 |
| | Note  In compliance | | |

B.   Minimum Fixed Charge Coverage Ratio
for twelve-month period ended 04/30/08

| | | |
|---|---|---|
| Consolidated Net Income excluding (a) any extraordinary or non-recurring gains or losses or gains or losses from dispositions, (b) interest income, © income not directly derived from the operations of the Stations or the ownership and leasing of broadcast towers, and (d) non-cash income, including trade or barter | $ | (1,556,967) |
| Consolidated Net Interest Expense | | 814,032 |
| Provision for taxes based on income | | - |
| Total depreciation expense | | 539,120 |
| Total amortization expense | | 159,682 |
| Consolidated EBITDA | | (43,355) |
| Consolidated Net Interest Expense | | 814,032 |
| Scheduled principal payments on Consolidated Total Debt | | 381,000 |
| Consolidated Rents Expense | | 265,499 |
| Consolidated Fixed Charges | | 1,461,331 |
| Fixed Charge Coverage Ratio | | (0.03) |
| Covenant requirement | | 1.0 |
| Note  Not in compliance | | |

| | |
|---|---|
| Consolidated Net Loss- 12 months ended 04/30/08 | (1,789,469) |
| Less Interest Income | (7,837) |
| Add Barter Loss | 30,236 |
| Add back Loss on Disposal of Fixed Assets/LMA | 209,903 |
| | (1,556,967) |

C.   Consolidated EBITDA

Not applicable for the month ended 04/30/08.  Required quarterly.

D.   Net Revenue

Not applicable for the month ended 04/30/08.  Required quarterly.

# Exhibit K

# COHN | BIRNBAUM | SHEA
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

HARTFORD  •  WESTPORT  •  NEW YORK

100 PEARL STREET
HARTFORD, CONNECTICUT 06103-4500
TELEPHONE 860 • 493 • 2200
FACSIMILE 860 • 727 • 0361

Scott D. Rosen, Esq.
srosen@cb-shea.com

May 16, 2008

Barker Capital, LLC
401 East 8th Street – Suite 220B
Sioux Falls, SD  57103

> Re:    Financing Agreement (the "Financing Agreement") dated as of November 13,
> 2006, by and among BusinessTalkradio.net, Inc. ("Borrower"), Media Funding
> Company, LLC ("Lender") and BC Media Funding Company II, LLC ("Agent")

Gentlemen:

This firm represents BusinessTalkradio.net, Inc. and its subsidiaries ("Borrowers"), and
Michael L. Metter in connection with the above-referenced matter.

We have been asked to respond to the February 6, 2008 letter and the April 24, 2008
letter (together, the "Default Letters") to Borrower from Barker Capital, LLC on behalf of Agent
and Lender (collectively, "Barker") to Mr. Metter and others, which allege the existence of
certain financial covenant defaults under the Financing Agreement.

Borrowers and Mr. Metter deny the existence of any events of default under the
Financing Agreement.  Barker has waived any previous events of default (the existence of which
Borrowers deny) and is estopped from exercising any rights and remedies thereon.

Borrowers are current on all payments.  Barker has accepted all such payments
unconditionally.

Borrower had fully disclosed to Barker and Barker was fully aware of, Borrower's
financial condition at the time of the closing of the Financing Agreement.  In particular, Barker
was aware at and before the time of the closing of Borrowers' (i) fixed charge coverage ratio, (ii)
consolidated EBITDA and (iii) net cash revenue.  There has been no material adverse change in
these financial covenants or results since the closing.

COHN | BIRNBAUM | SHEA

Barker Capital, LLC
May 16, 2008
Page 2


Barker's assertion of financial covenant defaults appears to be made in bad faith and for improper purposes. As evidence of Barker's bad faith, we note the following: That certain BC Media Funding Company II, L.P. Confidential Private Placement Memorandum dated October 2007 discloses the transaction evidenced by the Financing Agreement as not being in default as of October of 2007.

Borrowers and Metter hereby demand the immediate withdrawal of the Default Letters.

Very truly yours,

Scott D. Rosen

SDR/clm
cc:     BusinessTalkradio.net, Inc.
        Mr. Michael Metter

# Exhibit L



BARKER CAPITAL, LLC
401 E. 8th Street
Suite 220B
Sioux Falls, SD 57103

May 20, 2008

<u>VIA FACSIMILE</u>

Scott D. Rosen, Esq.
Cohn Birnbaum Shea
100 Pearl Street
Hartford, Connecticut 06103-4500

> Re:  *Financing Agreement (the "<u>Financing Agreement</u>") dated as of November 13, 2006, by and among BusinessTalkradio.net, Inc. ("<u>Borrower</u>"), Media Funding Company, LLC ("<u>Lender</u>") and BC Media Funding Company II, LLC ("<u>Agent</u>")*

Dear Mr. Rosen:

I am writing in response to your correspondence dated May 16, 2008. Capitalized terms used herein and not otherwise defined shall have their respective meanings set forth in the Financing Agreement. The Lender and Agent have not waived any of their rights or any of the Borrower's Obligations under the Financing Agreement, and have consistently expressly reserved and continue to expressly reserve any such rights.

Numerous Events of Default exist under the Financing Agreement, some of which previously and specifically have been enumerated to the Borrower. For example, the financial statements and monthly officer's certificates that the Borrower has provided to the Agent and Lender reflect numerous breaches of the financial covenants set forth in Article VI of the Financing Agreement. Each such breach constitutes an Event of Default.

Moreover, the Agent and the Lender have not waived these Events of Default; neither the Agent nor the Lender has provided any such written waiver as required by Sections 10.02 and 10.03 of the Financing Agreement. To the extent your waiver allegation relies on the Forbearance Agreement dated as of December 28, 2007, by and among the Borrower, Agent and Lender, Section 3.01 of such Forbearance Agreement expressly provides that no such waiver has occurred because Events of Default under the Financing Agreement occurred during the term of the Forbearance Agreement. Not only did a Forbearance Default (as defined in the Forbearance Agreement) occur, but the Borrowers failed to comply with Section 5.02 of the Forbearance Agreement. Thus,

Scott D. Rosen, Esq.
May 20, 2008
Page 2

by the express terms of Section 3.01 of the Forbearance Agreement, the Existing
Defaults (as defined in the Forbearance Agreement) were not waived.

     As for the other allegations contained in your correspondence:

- The Borrower is not current on all payment obligations required by the
  Financing Agreement. Among other deficiencies, the Borrower has not
  paid the default interest required by the Financing Agreement and
  invoiced by the Agent.

- Your correspondence indicates that there has been no material adverse
  change in the financial covenants set forth in the Financing Agreement
  since the closing. In fact, those financial covenants are the very financial
  covenants with which the Borrower agreed to comply when it accepted the
  Financing Agreement and the financing provided thereby, as evidenced by
  the Borrower's execution of the Financing Agreement. The Financing
  Agreement does not provide that the Borrower's failure to comply with the
  financial covenants will not constitute an Event of Default unless the
  failure constitutes a material adverse change. Quite to the contrary,
  Section 8.1(c)(i) of the Financing Agreement clearly and unambiguously
  provides that any failure to comply with the financial covenants in Article
  VI of the Financing Agreement constitutes an Event of Default. The
  Borrower has not complied with such covenants on numerous occasions,
  and each such failure constitutes an Event of Default.

     The Agent and Lender will continue to take such actions they deem advisable to
protect their interests in a manner that is consistent with the Agent's and Lender's rights
under the Financing Agreement. The baseless assertions in your May 16, 2008, letter to
the effect that Events of Default have not occurred and that Agent and Lender have
waived such Events of Default will not impact the course of action to be pursued by
Agent and Lender.

     In addition to the foregoing, Agent and Lender shall be entitled to pursue (and do
hereby reserve), at any time and from time to time, without notice, demand or any other
action, any and all rights and remedies available under the Financing Agreement, as well
as those rights and remedies available at law, in equity, or otherwise, whether or not
with respect to the Existing Defaults, against the Borrower, each of the Subsidiary
Guarantors and each of B. Michael Pisani, Michael L. Metter, Frank Lazauskas, and
Leonard F. Moscati, in their capacity as guarantor of Borrower's obligations under the
Loan Documents.

     This letter shall not be construed as a consent, waiver, forbearance, amendment,
or other modification with respect to any term, condition, or any other provision of the
Financing Agreement or the other Loan Documents, and each of the Loan Documents
shall remain in full force and effect, and this letter shall not waive, affect, or diminish

Scott D. Rosen, Esq.
May 20, 2008
Page 3

any right of Agent or Lender to demand strict compliance and performance with the
Loan Documents.  Neither this letter nor any other communication between Agent (or
its counsel) and Borrower (or its counsel) shall be deemed to be a waiver, modification,
or release of any Default or Event of Default, whether such default arose or arises before,
on, or after the date hereof and whether or not known to Agent or Lender.

Very truly yours,

Timothy P. Olson, Authorized Representative



<br />

**Barker Capital SD, LLC**
330 N. Main Ave.
Suite 202
Sioux Falls, SD 57104

**Main Phone:** 605.338.9722
**Fax:** 605.338.5266

# Fax

| To: | Scott Rosen, Esq. | From: | Timothy P. Olson |
|-----|-------------------|-------|------------------|
| Fax: | 860-727-0361 | Pages: | 4 (including cover) |
| Phone: | | Date: | 5/20/2008 |
| Re: | | CC: | |

☐ Urgent     ☐ For Review     ☐ Please Comment     ☐ Please Reply     ☐ Please Recycle

Please see attached correspondence.

**Message Confirmation Report**                    MAY-20-2008 08:33 AM TUE

                                        Fax Number    :   6053385266
                                        Name          :   BARKER CAPITAL SD

Name/Number    :   18607270361
Page           :   4
Start Time     :   MAY-20-2008 08:33AM TUE
Elapsed Time   :   00'52"
Mode           :   STD ECM
Results        :       [O.K]

---

**BARKER CAPITAL**

Barker Capital SD, LLC
330 N. Main Ave
Suite 202
Sioux Falls, SD 57104

Main Phone: 605.338.0722
Fax: 605.338.5266

# Fax

| To: | Scott Rosen, Esq. | From: | Timothy P. Olson |
|-----|-------------------|-------|------------------|
| Fax: | 860-727-0361 . | Pages: | 4 (including cover) |
| Phone: | | Date: | 5/20/2008 |
| Re: | | CC: | |

☐ Urgent     ☐ For Review     ☐ Please Comment     ☐ Please Reply     ☐ Please Recycle

Please see attached correspondence

JS 44C/SDNY
REV. 1/2008

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| BC MEDIA FUNDING COMPANY, II, MEDIA FUNDING COPMANY | FRANK LAZAUSKAS, MICHAEL L. METTER, LEONARD MOSCATI AND E. MICHAEL PISANI |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Anthony DiSarro and Kara L. Gorycki<br>Winston & Strawn, LLP<br>200 Park Avenue, New York, NY 10166-4193<br>(212) 294-6700 | SCOTT D. ROSEN, ESQUIRE, COHN BIRNBAUM & SHEA P.C.<br>100 PEARL STREET, 12TH FLOOR, HARTFORD, CT 06103<br>(860) 493-2200 |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

18.U.S.C. Sections 1441(a) and 1332(a)(1)

Has this or a similar case been previously filed in SDNY at any time? No? [✓] Yes? [ ]   Judge Previously Assigned _____

If yes, was this case Vol.[ ] Invol. [ ] Dismissed. No[ ] Yes [ ] If yes, give date _____ & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)*                       NATURE OF SUIT

TORTS                                     ACTIONS UNDER STATUTES

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 610 AGRICULTURE | [ ] 422 APPEAL 28 USC 158 | [ ] 400 STATE REAPPORTIONMENT |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | [ ] 365 PERSONAL INJURY PRODUCT LIABILITY | [ ] 620 OTHER FOOD & DRUG | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 410 ANTITRUST |
| [ ] 130 MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | | [ ] 430 BANKS & BANKING |
| [ ] 140 NEGOTIABLE INSTRUMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | | [ ] 630 LIQUOR LAWS | PROPERTY RIGHTS | [ ] 450 COMMERCE |
| [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 340 MARINE | PERSONAL PROPERTY | [ ] 640 RR & TRUCK | [ ] 820 COPYRIGHTS | [ ] 460 DEPORTATION |
| [ ] 151 MEDICARE ACT | [ ] 345 MARINE PRODUCT LIABILITY | [ ] 370 OTHER FRAUD | [ ] 650 AIRLINE REGS | [ ] 830 PATENT | [ ] 470 RACKETEER INFLU-ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | [ ] 660 OCCUPATIONAL SAFETY/HEALTH | [ ] 840 TRADEMARK | [ ] 480 CONSUMER CREDIT |
| | [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | [ ] 690 OTHER | | [ ] 490 CABLE/SATELLITE TV |
| [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 360 OTHER PERSONAL INJURY | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | LABOR | SOCIAL SECURITY | [ ] 810 SELECTIVE SERVICE |
| [ ] 160 STOCKHOLDERS SUITS | | | [ ] 710 FAIR LABOR STANDARDS ACT | [ ] 861 HIA (1395ff) | [ ] 850 SECURITIES/COMMODITIES/EXCHANGE |
| [X] 190 OTHER CONTRACT | | | [ ] 720 LABOR/MGMT RELATIONS | [ ] 862 BLACK LUNG (923) | [ ] 875 CUSTOMER CHALLENGE 12 USC 3410 |
| [ ] 195 CONTRACT PRODUCT LIABILITY | ACTIONS UNDER STATUTES | | [ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 OTHER STATUTORY ACTIONS |
| [ ] 196 FRANCHISE | CIVIL RIGHTS | PRISONER PETITIONS | [ ] 740 RAILWAY LABOR ACT | [ ] 864 SSID TITLE XVI | [ ] 891 AGRICULTURAL ACTS |
| | [ ] 441 VOTING | [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255 | [ ] 790 OTHER LABOR LITIGATION | [ ] 865 RSI (405(g)) | [ ] 892 ECONOMIC STABILIZATION ACT |
| | [ ] 442 EMPLOYMENT | | [ ] 791 EMPL RET INC SECURITY ACT | | [ ] 893 ENVIRONMENTAL MATTERS |
| REAL PROPERTY | [ ] 443 HOUSING/ACCOMMODATIONS | [ ] 530 HABEAS CORPUS | | FEDERAL TAX SUITS | [ ] 894 ENERGY ALLOCATION ACT |
| [ ] 210 LAND CONDEMNATION | [ ] 444 WELFARE | [ ] 535 DEATH PENALTY | IMMIGRATION | [ ] 870 TAXES (U.S. Plaintiff or Defendant) | [ ] 895 FREEDOM OF INFORMATION ACT |
| [ ] 220 FORECLOSURE | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 540 MANDAMUS & OTHER | [ ] 462 NATURALIZATION APPLICATION | [ ] 871 IRS-THIRD PARTY 26 USC 7609 | [ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE |
| [ ] 230 RENT LEASE & EJECTMENT | | [ ] 550 CIVIL RIGHTS | [ ] 463 HABEAS CORPUS-ALIEN DETAINEE | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 240 TORTS TO LAND | [ ] 446 AMERICANS WITH DISABILITIES -OTHER | [ ] 555 PRISON CONDITION | [ ] 465 OTHER IMMIGRATION ACTIONS | | |
| [ ] 245 TORT PRODUCT LIABILITY | [ ] 440 OTHER CIVIL RIGHTS | | | | |
| [ ] 290 ALL OTHER REAL PROPERTY | | | | | |

*Check if demanded in complaint:*

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____ OTHER _____

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

JUDGE _____     DOCKET NUMBER _____

*Check YES only if demanded in complaint*
JURY DEMAND: [ ] YES [✓] NO

NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

*(PLACE AN x IN ONE BOX ONLY)*

### ORIGIN

☐ 1 Original Proceeding  ☑ 2a. Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from (Specify District)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judg. Judgment

☐ 2b. Removed from State Court AND at least one party is pro se.

*(PLACE AN x IN ONE BOX ONLY)*

### BASIS OF JURISDICTION

☐ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT   ☐ 3 FEDERAL QUESTION (U.S. NOT A PARTY)   ☑ 4 DIVERSITY

***IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1322, 1441)***

### CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [X] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [X] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

BC MEDIA FUNDING COMPANY II
10 ROCKEFELLER PLAZA
NEW YORK, NY

MEDIA FUNDING COMPANY
10 ROCKEFELLER PLAZA
NEW YORK, NY

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

MICHAEL L. METTER, ONE TINKER LANE, GREENWICH, CT 06830 (Fairfield County);
FRANK LAZAUSKAS, 1490 DAYTON AVENUE, GREENWICH, CT 06830 (Fairfield County);
LEONARD F. MISCOTTI, 41 RICHMOND HILL ROAD, GREENWICH, CT 06830 (Fairfield County); AND
D. MICHAEL PISANI, 44 LAKE ROAD, SHORT HILLS, NEW JERSEY 07078 (Essex County).

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   ☐ WHITE PLAINS   ☑ MANHATTAN
(DO NOT check either box if this a PRISONER PETITION.)

DATE 7/9/08    SIGNATURE OF ATTORNEY OF RECORD

RECEIPT #

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[X] YES (DATE ADMITTED Mo. 6   Yr. 2004 )
Attorney Bar Code # SR1545

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J. Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BC Media Funding Company II )
Media Funding Company )       Civil Action No.
                          )
    Plaintiffs )
                          )
                          )
v. )
                          )
Frank Lazauskas, Michael L. Metter )
Leonard Moscati and E. Michael Pisani )
                          )
    Defendants )

## NOTICE OF REMOVAL

TO THE HONORABLE JUDGES FOR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK:

The removing party, Michael L. Metter, by his undersigned attorney, respectfully shows this Court as follows:

1.    The moving party is a defendant in this action.

2.    The plaintiffs commenced this action against Michael L. Metter, Frank Lazauskas, Leonard F. Moscati and E. Michael Pisani, in the Supreme Court of the State of New York, County of New York, on June 9, 2008, which action was assigned Index No. 08-601724, and is pending in that Court. Plaintiff's attorneys in the state court action are:

        Winston & Strawn LLP
        Anthony R. DiSarro and Kara L. Gorycki
        200 Park Avenue
        New York, NY 10166-4193
        Telephone: (212)294-6700

3.    On June 10, 2008, Plaintiff attempted to serve removing party with a Summons, Notice of Motion for Summary Judgment in Lieu of Complaint, and various other supporting and related documents more fully described in paragraph 9below, by leaving a copy of such papers at

1

removing party's place of business in Greenwich, Connecticut on June 10, 2008. This notice is filed within 30 days after such attempted service. Removing Party does not admit that such service was sufficient.

4.    Defendant Moscati was served on June 14, 2008. The date of service on the Defendants Lazauskas and Pisani is unknown, but on information and belief, was not earlier than June 10, 2008.

5.    The controversy in this action is wholly between citizens of different states in that:

a.    Defendant Michael L. Metter, the removing party, at all relevant times has been and is an individual citizen and resident of the State of Connecticut who resides at One Tinker Lane, Greenwich, CT, 06830;

b.    The Defendant, Frank Lazauskas at all relevant times has been and is an individual citizen and resident of the State of Connecticut who resides at 1490 Dayton Avenue, Greenwich, CT, 06830;

c.    The Defendant, Leonard F. Moscotti, at all relevant times has been and is an individual citizen of the State of Connecticut who resides at 41 Richmond Hill Road, Greenwich, CT, 06830.

d.    Defendant D. Michael Pisani at all relevant times has been and is an individual citizen of the State of New Jersey who resides at 44 Lake Road, Short Hills, New Jersey, 07078.

e.    The Plaintiff, BC Media Funding Company II is a Delaware limited liability company with its principal place of business located at 10 Rockefeller Plaza, New York New York.

f.    The Plaintiff, Media Funding Company is a Delaware limited liability company with its principal place of business located at 10 Rockefeller Plaza, New York New York.

6.    The amount in controversy, exclusive of interest and costs, is in excess of $75,000, as more fully appears in Notice of Motion for Summary Judgment in Lieu of Complaint, a copy of which is filed with this Notice and made a part hereof.

7.    This Court has, therefore, original jurisdiction of the above-entitled action pursuant to 28 U.S.C. §1332. As none of the Defendants are citizens or residents of the State of New York, removal of the action to this Court is proper pursuant to 28 U.S.C. §1441(a).

8.    The Defendants Frank Lazauskas, Leonard F. Moscotti and Michal Pisani assent to removal of this action to the Untied States District Court for the Southern District of New York. All of the Defendants are represented by the undersigned counsel.

9.    Copies of all process, pleadings and other papers served on removing party in this action are filed with this notice and consist of the following:

a.    Request for Judicial Intervention;

b.    Summons;

c.    Notice of Motion for Summary Judgment in Lieu of Complaint;

d.    Affidavit of Timothy T. Olson, together with Exhibits A through K thereto;

e.    Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment; and

f.    Statement in Support of Assignment of Case to the Commercial Division.

WHEREFORE, Removing Party respectfully requests that this action be removed from the Supreme Court of the State of New York, County of New York, to this Court.

Dated:  July 9, 2008                             COHN BIRNBAUM & SHEA P.C.

By_____
　　　　Scott D. Rosen (SR 1545)
　　　　100 Pearl Street – 12th Floor
　　　　Hartford, CT  06103
　　　　Telephone:  (860)493-2200
　　　　Attorneys for Defendant Michael L. Metter

ASSENTED TO BY ALL CO-DEFENDANTS:

COHN BIRNBAUM & SHEA PC

By_____
　　　Scott D. Rosen (SR 1545)
　　　100 Pearl Street – 12th Floor
　　　Hartford, CT  06103
　　　Telephone:  (860)493-2200

　　　Attorney for Defendant Frank Lazakaskus,
　　　　　Leonard F. Moscatti and B. Michael Pisani

142945

4

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BC Media Funding Company II | ) |
| Media Funding Company | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| Frank Lazauskas, Michael L. Metter | ) |
| Leonard Moscati and E. Michael Pisani | ) |
| | ) |
| Defendants | ) |

## VERIFICATION OF SCOTT D. ROSEN OF
## SERVICE OF NOTICE OF REMOVAL

I, Scott D. Rosen, attorney for the Defendants, have served a copy of the Notice of

Removal on the below-listed counsel for the Plaintiffs by depositing the same with the United

States Postal Service, postage prepaid, on July 9, 2008:

> Winston & Strawn LLP
> Anthony R. DiSarro and Kara L. Gorycki
> 200 Park Avenue
> New York, NY  10166-4193

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July

9, 2008.

Scott D. Rosen

142973

1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BC Media Funding Company II | ) | |
| Media Funding Company | ) | |
| | ) | |
|     Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | SUPREME COURT OF THE |
| Frank Lazauskas, Michael L. Metter | ) | STATE OF NEW YORK |
| Leonard Moscati and E. Michael Pisani | ) | COUNTY OF NEW YORK |
| | ) | Index No. 08-601724 |
|     Defendants | ) | |

## NOTICE OF FILING OF NOTICE OF REMOVAL

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

WINSTON & STRAWN LLP
Anthony R. DiSarro and Kara L. Gorycki
200 Park Avenue
New York, NY 10166-4193
Telephone: (212)294-6700
Attorneys for Plaintiffs BC Media Funding Company II and
Media Funding Compay

    Pursuant to U.S.C. §1446d, Defendant Michael L. Metter hereby gives notice to the

Supreme Court of the State of New York, County of New York and to Winston & Strawn LLP,

attorneys for the Plaintiffs, that Defendant has filed a Notice of Removal removing the above-

captioned action to the United States District Court for the Southern District of New York. A

copy of the Notice of Removal is attached hereto.

Dated:  July 9, 2008

COHN BIRNBAUM & SHEA P.C.

By _____
          Scott D. Rosen
          100 Pearl Street – 12th Floor
          Hartford, CT  06103
          Telephone:  (860)493-2200
          Attorneys for Defendant Michael L. Metter

142971

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BC Media Funding Company II | ) |
| Media Funding Company | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| Frank Lazauskas, Michael L. Metter | ) |
| Leonard Moscati and E. Michael Pisani | ) |
| | ) |
| Defendants | ) |

### VERIFICATION OF SCOTT D. ROSEN OF
### SERVICE OF NOTICE OF FILING OF NOTICE OF REMOVAL

I, Scott D. Rosen, attorney for the Defendants, have served a copy of the Notice of Filing of Notice of Removal on the below-listed counsel for the Plaintiffs by depositing the same with the United States Postal Service, postage prepaid, on July 9, 2008:

> Winston & Strawn LLP
> Anthony R. DiSarro and Kara L. Gorycki
> 200 Park Avenue
> New York, NY  10166-4193

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 9, 2008.

Scott D. Rosen

142974

1